**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

### MOTION INFORMATION STATEMENT

**Docket Number(s):** 17-1405 (L), 17-1411 (Con) _____ Caption [use short title]

**Motion for:** Certificate of Appealability

Rajaratnam v. United States of America

Set forth below precise, complete statement of relief sought:

Mr. Rajaratnam requests a Certificate of
Appealability for the denial of his Motion to
Vacate Convictions and Sentence under
28 U.S.C. 2255.

| | |
|---|---|
| **MOVING PARTY:** Raj Rajaratnam | **OPPOSING PARTY:** United States of America |
| ☑ Plaintiff   ☐ Defendant | |
| ☑ Appellant/Petitioner   ☐ Appellee/Respondent | |
| **MOVING ATTORNEY:** Christine H. Chung, Esq. | **OPPOSING ATTORNEY:** Michael Ferrara, Esq. |

[name of attorney, with firm, address, phone number and e-mail]

| | |
|---|---|
| Quinn Emanuel Urquhart & Sullivan, LLP | United States Attorney's Office, Southern District of New York |
| 51 Madison Ave., 22nd Fl., New York, NY 10010 | 1 St. Andrew's Plaza, New York, NY 10007 |
| (212) 849-7000, christinechung@quinnemanuel.com | (212) 637-2526, michael.ferrara@usdoj.gov |

Court-Judge/Agency appealed from: United States District Court for the Southern District of New York (Hon. Loretta A. Preska)

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed   ☑ Opposed   ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes   ☑ No   ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below?   ☐ Yes   ☐ No
Has this relief been previously sought in this Court?   ☐ Yes   ☐ No
Requested return date and explanation of emergency: _____

Is oral argument on motion requested?   ☑ Yes   ☐ No   (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes   ☑ No   If yes, enter date: _____

**Signature of Moving Attorney:**
/s/ Christine H. Chung _____ **Date:** June 6, 2017      Service by: ☑ CM/ECF   ☐ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

# 17-1405(L),17-1411(Con)

In The

## United States Court of Appeals

For The Second Circuit

———— ►►◄◄ ————

Raj Rajaratnam,

*Plaintiff-Appellant,*

v.

United States,

*Defendant-Appellee.*

———————————

*On Appeal From The United States District Court*
*For The Southern District of New York,*
*Hon. Loretta A. Preska, District Judge*

## MOTION FOR A CERTIFICATE OF APPEALABILITY PURSUANT TO 28 U.S.C. § 2253(c)

Quinn Emanuel Urquhart
& Sullivan, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010
(212) 849-7000

Jones Day
250 Vesey Street
New York, NY 10281-1047
(212) 326-3939

*Attorneys for Plaintiff-Appellant*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................1

ISSUE PRESENTED ............................................................................3

LEGAL STANDARD ............................................................................4

CASE SUMMARY ..............................................................................4

    A.    The Indictment and Trial .......................................................4

    B.    The Sentencing and Forfeiture Judgment .............................7

    C.    The Section 2255 and *Coram Nobis* Proceedings................8

ARGUMENT:

THE CERTIFICATE OF APPEALABILITY SHOULD BE
GRANTED ....................................................................................11

    A.    Count Two: The Roomy Khan Conspiracy (Polycom, Hilton,
and Google Trades) ............................................................12

    B.    Counts Five, Eight, Nine and Ten: The Akamai Trade ....................16

    C.    The ICST Trade Underlying Count One .............................19

CONCLUSION ................................................................................21

# TABLE OF AUTHORITIES

**Page**

## Cases

*Barefoot v. Estelle,*
    463 U.S. 880 (1983)............................................................4

*Bousley v United States,*
    523 U.S. 614 (1998)..........................................................11

*Buck v. Davis,*
    137 S. Ct. 759 (2017)..........................................................4

*Dirks v. SEC,*
    463 U.S. 646 (1983)......................................................13, 15

*Finkelstein v. Spitzer,*
    455 F.3d 131 (2d Cir. 2006) ............................................10

*Miller-El v. Cockrell,*
    537 U.S. 322 (2003)............................................................4

*Salman v. United States,*
    137 S. Ct. 420 (2016)..............................................1, 17, 18

*United States v. Baptiste,*
    223 F.3d 188 (3d Cir. 2000) ............................................10

*United States v. Contorinis,*
    692 F.3d 136 (2d Cir. 2012) ..............................................9

*United States v. Loschiavo,*
    531 F.2d 659 (2d Cir. 1976) ............................................11

*United States v. Lozado,*
    107 F.3d 1011 (2d Cir. 1997) ............................................4

*United States v. Newman,*
    773 F.3d 438 (2d Cir. 2014), *abrogated on other grounds by*
    *Salman v. United States*, 137 S. Ct. 420 (2016), ..........................*passim*

*United States v. Rajaratnam,*
    2012 WL 362031 (S.D.N.Y. Jan 31, 2012) ......................................7

## Statutes

28 U.S.C. § 2255 ..............................................................2, 8

Fed. R. App. P. 22(b) ............................................................4

## **<u>Miscellaneous</u>**

U.S.S.G. § 2B1.4....................................................................................................7

## PRELIMINARY STATEMENT

The conviction of Raj Rajaratnam, in May 2011, on 14 counts of securities fraud and conspiracy to commit securities fraud, resulted in the highest sentence ever imposed for insider trading in the Southern District of New York—11 years' imprisonment. On multiple counts, however, Rajaratnam was convicted of conduct that does not constitute insider trading under *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), *abrogated on other grounds by Salman v. United States*, 137 S. Ct. 420 (2016). At the very least, Rajaratnam's actual innocence on those counts is a matter of "reasonable debate," and therefore an appropriate subject for appeal.

This Court in *Newman* held that when a defendant is remote from the corporate insider, a conviction for insider trading requires proof that the defendant knew that the insider disclosed confidential information in exchange for a personal benefit. 773 F.3d at 449. That holding remains good law. While the Supreme Court, in *Salman*, expanded the definition of "personal benefit" announced in *Newman*, it did not alter the requirement of a defendant's knowledge of that benefit. 137 S. Ct. at 425 n.1, 428. The government insisted throughout Rajaratnam's trial that it was under no such burden, however. As a result, for five of the 14 counts of conviction, and nearly half of the $63.8 million gain figure accepted at sentencing, there was no proof of guilt.

On the ground of this failure of proof, Rajaratnam sought vacatur of the affected convictions under 28 U.S.C. § 2255, and resentencing. He also petitioned for a writ of error *coram nobis*, arguing that the forfeiture order of $53.8 million should be amended. Rajaratnam has appealed the denial of his *coram nobis* petition, as of right, and that appeal will raise his *Newman*-based claim of "actual innocence." Rajaratnam moves this Court to request the certificate that will permit his appeal of the denial of his Section 2255 motion as well. Ex. A (Order denying motion).[1] The District Court denied Rajaratnam's motion for a certificate of appealability ("COA"). Ex. B.

This motion should be granted. The prosecution focused upon less than 20 of the more than 36,000 trades that Rajaratnam personally executed between 2005 and 2009. In the case of the five trades that were the subject of the Section 2255 motion, there was no evidence that Rajaratnam knew that an insider remote to him had received a personal benefit in exchange for providing confidential information.

In lieu of such evidence, the District Court, when it denied Rajaratnam's Section 2255 motion, deemed it reasonable for the jury to infer that Rajaratnam would have recognized that insiders remote to him had received personal benefits. The District Court reasoned that having himself conferred a personal benefit on the

---

[1] The two appeals have been consolidated. "Ex. __" herein refers to an exhibit attached to the Declaration of Christine H. Chung submitted in support of this motion. Trial exhibits cited herein are also annexed to that declaration.

intermediary, in the form of an exchange of inside information, Rajaratnam must have "understood that this sort of confidential information is not provided to individuals without exchange of some benefit." Ex. A at *5. But the government relied on the same assumption in *Newman*, where it argued that it could be assumed that Newman, who had paid his intermediary hundreds of thousands of dollars, would have known that the remote insider must have disclosed information "for some personal reason rather than for no reason at all." 773 F.3d at 454 (quoting Ex. C (Gov't Br. in *Newman*) at *65). This Court rejected that argument, and the premise that the only reason an insider discloses inside information is for a personal benefit, as opposed to reasons such as a desire to share information with analysts, carelessness, or a mistaken belief that the information is already public. *Id.* at 454-55.

This Court should hear the question of whether Rajaratnam is actually innocent of five of the Counts on which the jury returned guilty verdicts.

## ISSUE PRESENTED

Mr. Rajaratnam requests a COA on the question of whether in light of *United States v. Newman*, 773 F.3d at 438, he is "actually innocent" of Counts Two, Five, Eight, Nine, Ten, and the ICST trade underlying Count One.[2]

---

[2] Rajaratnam does not seek a COA as to other issues he raised below, namely whether: (1) prior counsel's failure to appeal the correctness of the jury

3

## LEGAL STANDARD

A motion for a COA must first be made in the district court, and if the district court denies the request, then in the appeals court.  Fed. R. App. P. 22(b); *United States v. Lozado*, 107 F.3d 1011, 1016-17 (2d Cir. 1997).

The Supreme Court has held that a defendant need not demonstrate that he is likely to prevail on the merits, but is entitled to a COA merely upon a showing of a question that "reasonable jurists could debate."  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quotation marks omitted); *accord Buck v. Davis*, 137 S. Ct. 759, 773 (2017) ("The COA inquiry . . . is not coextensive with a merits analysis."). The defendant should obtain the appeal if "the issues are debatable among jurists of reason; . . . a court could resolve the issues in a different manner; or . . . the questions are adequate to deserve encouragement to proceed further."  *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (quotation marks omitted).

## CASE SUMMARY

### A.    The Indictment and Trial

The government proceeded to trial on a superseding indictment returned on January 20, 2011.  Ex. D.  The first five Counts charged conspiracies to commit securities fraud, with each conspiracy defined by the identity of the individual who allegedly passed inside information to Rajaratnam.  In Counts Three and Four,

---

instruction constituted ineffective assistance, and (2) the testimony of cooperator Anil Kumar was perjurious and fatally tainted certain Counts of conviction.

Rajiv Goel and Anil Kumar, who were insiders at Intel and McKinsey & Co., respectively, were alleged to have directly tipped Rajaratnam, the founder of Galleon Group. In Counts One, Two and Five, to the extent relevant here, former Galleon employees Adam Smith and Roomy Khan, and Danielle Chiesi, an employee of hedge fund New Castle Partners, respectively, were alleged to have obtained the inside information they passed to Rajaratnam from others, such that Rajaratnam was remote from the corporate insider.[3]

At trial, conducted in March to May of 2011, the government called only three cooperating witnesses who claimed to have provided inside information to Rajaratnam: Adam Smith in support of Count One, and direct tippees Goel and Kumar in support of Counts Three and Four. To prove the conduct alleged in Counts Two and Five, the government called neither the intermediary, Roomy Khan or Danielle Chiesi, nor the insiders who purportedly tipped inside information to Khan and Chiesi. Instead the government relied on circumstantial evidence—inferences derived from phone records and records of trading—in proving Count Two (the Khan conspiracy). As to Count Five (the Chiesi conspiracy), the government relied additionally on wiretapped communications.

---

[3] Counts Six through Fourteen charged substantive securities fraud in connection with one or another of the 20 or so trades that were also the subject of the conspiracy Counts. A chart of the Counts, the trades, and the intermediaries, insiders, and value relevant to each trade, is annexed hereto as Exhibit E. This chart was also submitted to the District Court. The Counts and trades at issue in Rajaratnam's habeas and *coram nobis* petitions appear in bold text.

5

Rajaratnam's defense, in the case of five trades at issue in his post-conviction motions, was that in all but one case (the ICST trade) there was no evidence that he even knew the insider's identity, much less that the insider had received a benefit for making his or her disclosures. *E.g.*, Ex. F (Tr. 5476, 5479, 5483, 5486). In all instances, Rajaratnam had positions and strategies with respect to the shares that pre-dated the purported receipt of inside information. *E.g.*, Ex. F (Tr. 2489-92); GX 42; DX-3416; GX 58; GX 61; GX 64; GX 532-T; DX-1006; DX-1169; DX-4682M. Rajaratnam's holdings and trading actions were consistent with recommendations made by Galleon analysts. *E.g.*, Ex. F (Tr. 5339); DX-45, GX 58; DX-1829. As to each trade, there was information already in the market about the purportedly confidential earnings or acquisition information upon which Rajaratnam purportedly traded. *E.g.*, Ex. F (Tr. 4725-27, 4730-39, 5325, 5335-36).

The government disclaimed throughout the trial the obligation to prove that Rajaratnam knew that insiders had received a personal benefit in exchange for providing confidential information. The government's proposed jury charge rejected any requirement that Rajaratnam knew of any benefit obtained by the insider, and instead instructed that it was sufficient for the jury to find that the insider in fact received a benefit. Ex. G. In summations, the government claimed that it was not required to prove Rajaratnam's knowledge of a benefit received by a remote insider. Ex. F (Tr. 5546) ("[W]ith respect to the stocks subject to the

conspiracy counts, we don't need to prove Mr. Rajaratnam's knowledge of the benefit.").

The District Court agreed, at least in theory, to the defense's request to charge the jury that as to any material, non-public information on which Rajaratnam traded, the government must prove that Rajaratnam knew that "the information . . . had been disclosed by an insider who directly or indirectly obtained some personal benefit from the disclosure." Ex. H (Court's Charge Script). As delivered, however, the instruction was garbled and unclear. The Court instructed: "The government must show that Mr. Rajaratnam knew that the information was material, non-public information that *if* disclosed by an insider *would* directly or indirectly obtain some personal benefit from the disclosure." Ex. F (Tr. 5623) (emphases supplied).

The jury deliberated for 11 days before returning a guilty verdict on all counts.

### B.    The Sentencing and Forfeiture Judgment

At sentencing, on October 13, 2011, the trial court accepted the government's calculation that the "gain" from the criminal conduct, under U.S.S.G. § 2B1.4, was $63.8 million, a figure representing the sum of the trading profits realized and losses avoided by the Galleon Group on the trades underlying the Counts of conviction. Ex. I at 26; *see also United States v. Rajaratnam*, No. 09

Cr. 1184 (RJH), 2012 WL 362031, at *2 n.1 (S.D.N.Y. Jan 31, 2012). The District Court imposed a term of incarceration below the guidelines range of 235 to 293 months' imprisonment, but emphasized that the 11-year term was at the "high end" of the range of sentences ever given for "similar" misconduct, and that a harsh penalty was warranted based on the "breadth" and "scope" of the insider trading. Ex. I at 30-31. The District Court credited Rajaratnam's "personal circumstances," including his advanced diabetes and kidney problems. *Id.* at 31-32. A forfeiture judgment was entered in the amount of $53.8 million—a figure derived from the "gain" figure of $63.8 million. *Id.* at 26, 29.

On December 11, 2011, Rajaratnam surrendered at FMC Devens. On June 24, 2013, this Court affirmed his convictions on direct appeal. *United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013). On June 16, 2014, the Supreme Court denied Rajaratnam's petition for *certiorari*. *Rajaratnam v. United States*, 134 S. Ct. 2820 (2014). Rajaratnam has served over half of his sentence.

### C.    The Section 2255 and *Coram Nobis* Proceedings

On June 16, 2015, Rajaratnam filed two post-conviction motions. Dkt. Nos. 351, 354. Based on *Newman*, he argued in a motion for relief under 28 U.S.C. § 2255 that he was factually innocent of Counts Two, Five, Eight, Nine and Ten, and the ICST Trade underlying Count One. In seeking a *coram nobis* writ, Rajaratnam contended that the forfeiture judgment should be amended because it was

8

predicated in part on non-criminal conduct. The latter motion alternatively sought relief under *United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012), which held that an insider defendant cannot be ordered to forfeit profits that he never received or possessed. 692 F.3d at 145.

The government filed a single brief opposing both motions. Dkt. No. 360. It did not dispute that if it had failed to adduce proof of Rajaratnam's knowledge of a personal benefit obtained by the remote insiders, Rajaratnam was entitled to habeas relief, irrespective of procedural default on direct appeal. Further, the government did not claim to have presented proof that Rajaratnam was made aware, by any source, of any benefit received by the remote insiders. It argued instead that Rajaratnam had failed to establish his "actual innocence" because the trial proof demonstrated that he was a "sophisticated businessman" who had himself paid for inside information, and the jury was entitled to infer on that basis that he "understood from experience" that "Inside Information came at a price" of "pecuniary-like benefits" conferred upon the remote insiders. *Id.* at 2, 23, 25.

On March 3, 2017, the District Court issued a Memorandum Opinion and Order (the "Order") denying both motions. Ex. A. The District Court found that Rajaratnam's challenge to his conviction on Count Five was unfounded because Rajaratnam had claimed that he was actually innocent of only one of two trades underlying that Count. *Id.* at *5. It also found that Rajaratnam had failed to

demonstrate actual innocence on any Count or trade, even accepting that the proof did not demonstrate his knowledge of any "specific benefits" received by the insiders, or even the identity of the insiders. *Id.* at **5-6. The Court found that because Rajaratnam "either knew where the information was originating from or was providing a benefit to the intermediate tippees," the jury was entitled to conclude that he also must have known that the insider, remote to him, received a personal benefit in exchange for providing the confidential information. *Id.* at *5. The District Court distinguished *Newman* on the ground that there were three or four levels of "distance between the defendants and the insiders," whereas Rajaratnam was at most one level removed from the intermediary who provided the benefit to the insider. *Id.* The Order also denied the *coram nobis* application insofar as it relied on *Newman*, and found Rajaratnam's reliance on *Contorinis* to lack merit. *Id.* at *9.

The District Court's denial of Rajaratnam's petition for a *coram nobis* writ has been appealed as of right. *Finkelstein v. Spitzer*, 455 F.3d 131, 132 (2d Cir. 2006) (*per curiam*) (citing *United States v. Baptiste*, 223 F.3d 188, 189 n.1 (3d Cir. 2000)). On May 9, 2017, the District Court denied Rajaratnam's motion for a COA, stating there had been "overwhelming" and "extensive" evidence supporting an inference that Rajaratnam knew of each insider's receipt of a personal benefit. Ex. B at 2-3.

10

## ARGUMENT

## The Certificate of Appealability Should be Granted

To establish "actual innocence," a petitioner must demonstrate that "in light of all the evidence, . . . it is more likely than not that no reasonable juror would have convicted him." *Bousley v United States*, 523 U.S. 614, 623 (1998) (quotation marks omitted). Vacatur is required where factual innocence is demonstrated because if the government "has offered and the record discloses no proof whatever of various elements of the crime charged," there is "a fatal constitutional taint for lack of due process of law." *United States v. Loschiavo*, 531 F.2d 659, 666 (2d Cir. 1976).

The question of whether there was evidence sufficient to support a reasonable inference of Rajaratnam's guilt, as to the challenged Counts and trades, easily merits consideration. The District Court failed to identify direct evidence that Rajaratnam knew that the insiders had received a personal benefit because there was none. The District Court thus relied on inferences—*i.e.*, that corporate insiders do not disclose confidential information without receiving a personal benefit—rejected by the holding in *Newman* that remains binding after *Salmon.* Rajaratnam's appeal should be heard.

11

### A.    Count Two:  The Roomy Khan Conspiracy (Polycom, Hilton, and Google Trades)

The three trades underlying Count Two were deemed at sentencing to account for a gain of over $22 million.  Count Two alleged that Roomy Khan, a former Galleon employee, had passed to Rajaratnam information she obtained from three different insiders: (1) from Sunil Bhalla, an executive at Polycom, information that Polycom would announce strong earnings in January 2006; (2) from Deep Shah, a Moody's analyst, information that Hilton would announce being acquired in July 2007; and (3) from Shammara Hussain, an analyst at Market Street Partners, an investor relations consultant to Google, that Google would miss its quarterly earnings target for the second quarter of 2007.

The government called neither Ms. Khan, nor Bhalla, Shah, or Hussain, who were never charged with any crime.  Instead it called executives from Polycom, Moody's, and Market Street Partners to establish that Bhalla, Shah, and Hussain had access to confidential information.  It relied on records of phone calls between those three and Khan as circumstantial evidence that Khan had received confidential information from each insider.  *See, e.g.*, GX 48; GX 57; GX 58; GX 64.  The government maintained that the proximity and timing of phone calls and records of trading activity (and in the case of Polycom, text messages between Khan and Rajaratnam) showed that Rajaratnam had traded on the confidential

12

information Khan had obtained from others and furnished to him.  *See, e.g.*, GX 58; GX 60; GX 64; GX 65.

To prove that Shah, Hussain, and Bhalla had received personal benefits from Khan, at a minimum in the form of the satisfaction of making a gift to a friend, *Dirks v. SEC*, 463 U.S. 646, 664 (1983), the government presented evidence that Khan had a close relationship with Shah (GX 47), that Khan had sent a FedEx envelope to Hussain under a false name just after Google missing its earnings target (GX 1406), and that Bhalla had given Khan authority to trade in a Lehman Brothers account in Bhalla's name (GX 1539).  It presented no proof, however, Rajaratnam *knew* Khan's source of information for any of these three trades, much less that he knew of Khan's close relationship with Shah, the FedEx envelope she sent to Hussain, or the authority Khan had to trade in Bhalla's account.

The District Court based its decision with respect to Count Two partly on a mistake as to the factual record, and partly on an inference rejected in *Newman*. First, the Order mistakenly states Rajaratnam knew of an insider with Google information, citing page 24 of the government's brief for the proposition that "in July 2007, Khan told Petitioner that he [sic] had learned from an insider that Google was going to announce unexpectedly poor financials." Ex. A at *5.  None of the sources in the government's brief (or anywhere else in the record) reference the content of any of the telephone discussions between Khan and Rajaratnam,

13

however, and thus none demonstrate Rajaratnam's awareness of the existence of even an unnamed insider.[4] In fact, the most specific information conveyed to Rajaratnam about any of the trades in Count Two, according to the trial proof, was a text message from Khan to Rajaratnam to await "guidance" about Polycom and Rajaratnam's text weeks later thanking Khan for the Polycom "idea." GX 64. Thus the Polycom, Hilton, and Google trades were not ones in which Rajaratnam knew "where the information was originating from." Ex. A at *5.

Second, the District Court reasoned that because Rajaratnam provided a "personal benefit" to Khan, in the form of reciprocal inside information, he "understood that this sort of confidential information is not provided to individuals without exchange of some benefit." *Id.* Based on this reasoning, the District Court held that "the jury had sufficient evidence reasonably to infer that Petitioner knew that inside information [Khan obtained from corporate insiders] was being provided in exchange for a personal benefit." *Id*. This is the same inference this Court found unreasonable in *Newman.* There, the government had argued that because Newman paid his intermediate tipper, Sandeep Goyal, hundreds of thousands of dollars, he must have known that Goyal's contact, the Dell insider,

---

[4] The cited materials, Dkt. No. 360 at 24, are a chart of the times and dates of calls between Rajaratnam and Khan, and the content of one text message (GX 58); a chart of Khan's trades in Google shares (GX 59), and the testimony of the founder of Market Street Partners that employee Hussain had access to confidential information about Google (Ex. F (Tr. 3127, 3135-51)).

had also received a personal benefit. Ex. C at *19, *70. *Newman* vacated the convictions, rejecting the premise that inside information is necessarily disclosed for a personal benefit. 773 F.3d at 454 ("the Supreme Court affirmatively rejected the premise that a tipper who discloses confidential information necessarily does so to receive a personal benefit") (citing *Dirks*, 463 U.S. at 661-62).

Here, as in *Newman*, there was an array of possibilities as to both the source of any confidential information furnished to the defendant by the middleman and, more importantly, the source's motive. 773 F.3d at 454-55 (even inferences about the "*nature* of the source" cannot permit an inference as to "that source's improper *motive*") (emphases in original). The Supreme Court's decision in *Dirks*, relied upon in *Newman*, provides the example of an insider who disclosed confidential information to an intermediary in acting as a whistleblower, and not to personally benefit. 463 U.S. at 665-66. *Dirks* identifies other disclosures which involve no personal benefit being gained by the insider: intentional disclosures to analysts or disclosures based on the mistaken belief that information is already public. *Id.* at 658-59, 661-62. *Newman* discusses the phenomenon that "analysts at hedge funds routinely estimate [financial] metrics" based on information that companies "routinely leak[]" and "selectively disclose[]." 773 F.3d at 454-55 (quotation marks omitted). Evidence was likewise presented at Rajaratnam's trial of leakage

of the purportedly confidential information on which he traded, before he traded. Ex. F (Tr. 4717-19, 4866-90, 5335 and referenced exhibits).

The inference the District Court deemed to salvage the conviction on Count Two—that "this sort of confidential information is not provided to individuals without exchange of some benefit" (Ex. A at *5)—was not an inference the government ever asked the jury to draw, nor a fair inference under *Newman*.

### B.    Counts Five, Eight, Nine and Ten:  The Akamai Trade

The same trades based on confidential information about Akamai Technologies, Inc., and relayed to intermediary Danielle Chiesi by Kieran Taylor, a marketing director at Akamai, are at issue in Counts Five, Eight, Nine, and Ten. Rajaratnam executed Akamai trades from July 25 to 30, 2008.

The government did not call Chiesi as a witness, and it did not call or charge Taylor.  Phone records showed that Chiesi had spoken by telephone to Rajaratnam twice on the evening of July 24, 2008, and that in between those calls she had spoken to Taylor.  GX 39; GX 532-T.  The call that Chiesi had with Rajaratnam after she spoke with Taylor was intercepted.   According to the tape, Chiesi reported to Rajaratnam, "Akamai . . . [T]hey're gonna guide down.  I just got a call from my guy.  I played him like a finely tuned piano" when "he just called me now."  GX 532-T at 1.  Chiesi continued, "I was talking about the family and everything, and then he said, "People think it's going to go to 25."  *Id.*  Trading

16

records corroborated a statement by Rajaratnam in the intercepted conversation that he was already "short" on Akamai. GX 532-T at 2; GX 42. Over the next six days, he increased that position. GX 42. On July 30, 2008, after Akamai announced that their shares would perform below expectations, and Galleon had gained a little over $5 million from its trades, Rajaratnam called Chiesi and said, "just wanted to say, thank you." GX 44; GX 543-T at 1; GX 2562.

The intercepts that provided the only evidence of what was conveyed to Rajaratnam about Taylor failed to establish that Rajaratnam knew that Taylor had received a "personal benefit" within the meaning of *Salman*. The Supreme Court in *Salman* abrogated *Newman*'s definition of "personal benefit," holding that for an insider to gift trading information to a friend or relative suffices to demonstrate receipt of a "personal benefit," even in the absence of an additional "objective, consequential" benefit to the insider, because "[t]he tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." *Salman*, 137 S. Ct. at 427-28 (quotation marks omitted). But there was no proof that Rajaratnam knew Taylor's identity or his relationship with Chiesi before the July 24, 2008 call. During that call, Chiesi conveyed that she had duped her "guy," by "play[ing] him like a finely-tuned piano," until he blurted out his information. GX 532-T at 1. This was not a description of Taylor providing confidential

information as a gift, so as to receive a personal benefit akin to trading himself. Instead, the "guy's" disclosure was inadvertent or unwitting.

The District Court found that Rajaratnam failed to establish "actual innocence" because he "concede[d] in his motion that he knew Taylor had provided this information to Chiesi because of their close friendship." Ex. A at *5 (citing Dkt. No. 355 (Defense Motion) at 22 ("the clear implication was that [Taylor] had provided that information merely out of friendship")). Actually, because *Newman* was controlling at the time, Rajaratnam accepted *arguendo* the explanation the government offered in its closing—that Rajaratnam knew the information was provided because of "that friendship." Ex. F (Tr. 5306). Under *Newman*, which had not yet been modified by *Salman*, that contention was insufficient to support conviction. *Newman*, 773 F.3d at 452.[5] In responding, moreover, the government notably did not defend the adequacy of its summation argument; instead, it relied on intercepted calls post-dating the Akamai trades by months to establish that Chiesi provided pecuniary-like benefits to Taylor, including inside information, at that later date. Dkt. No. 360 at 7-8, 28-29. The government has never identified any proof, beyond Chiesi's statement that she had

---

[5] The Akamai trades were the sole instance in which the government in summation referenced having proven or undertaken to prove Rajaratnam's knowledge of the benefit received by a remote insider.

18

"played" her "guy" like a "finely tuned piano," as evidence of Rajaratnam's knowledge of a benefit received by Taylor. *Id.*

The proof did not reasonably support an inference of guilt.

### C.    The ICST Trade Underlying Count One

The ICST trade, one of multiple trades underlying Count One, resulted in the attribution of a "gain" of $2.8 million at Rajaratnam's sentencing.

Adam Smith, a former Galleon employee, testified that a few weeks before a conference in March 2005, he learned from Kamal Ahmed, a Morgan Stanley banker, that ICST was going to be acquired by Integrated Devices Technology. Ex. F (Tr. 2489-94). Smith testified that he conveyed this news, and later the date on which the acquisition would be announced, to Rajaratnam. *Id.* (Tr. 2489-92); GX 2454; GX 2455; GX 2456. Trading records showed that Rajaratnam increased Galleon's existing position in ICST after a February 10, 2005 call between Smith and Ahmed. Ex. F (Tr. 3448-50); GX 26; GX 27; GX 28; DX-3416.

The government attempted to elicit from Smith that he conferred a personal benefit upon Ahmed in exchange for Ahmed's disclosure. This effort fell flat when Smith admitted on cross-examination that although he had taken steps like "provid[ing] some introductions" for Ahmed and "thoughts" about the market, none of those steps had been taken or even contemplated in 2005. Ex. F (Tr. 2508); *see id.* (Tr. 2806) ("Q. I am asking you, when you discussed this [inside

19

information] with Kamal Ahmed in 2005, you did not have an agreement that two years later you would make an introduction for him that would benefit him, right? A. No. I had not offered him any benefit for that information that he gave me at that time.").[6] But in any event, the government made no effort to elicit testimony, from Smith or anyone else, that Rajaratnam was aware that Ahmed had received any benefit for disclosing ICST information.

In ruling that Rajaratnam had failed to demonstrate his actual innocence as to the ICST trade, the District Court identified no evidence of knowledge. Instead, the Order appears to adopt reasoning that because Rajaratnam was aware that Smith and Ahmed had exchanged material, non-public information, and Smith and Ahmed were in fact in a "close relationship" at the time of the ICST trade, there was sufficient proof that Rajaratnam was aware of a personal benefit received by Ahmed. Ex. A at *5. The District Court stated that "[b]ecause Petitioner had knowledge of the exchange of non-public information between Smith and Ahmed, Petitioner cannot establish actual innocence . . . ." *Id.*

This chain of logic fails to identify any evidence showing that Rajaratnam was *aware* of a "close relationship" between Smith and Ahmed in 2005, nor did the government ever claim at trial that there was such awareness. The inferential leap found reasonable by the District Court is again one disallowed by *Newman*.

---

[6] Ahmed was never charged with wrongdoing.

## CONCLUSION

The motion for a certificate of appealability should be granted.


DATED:  June 6, 2017                     Respectfully submitted,

                                         QUINN EMANUEL URQUHART
                                           & SULLIVAN, LLP

                                    By: /s/ Christine H. Chung

                                         Christine H. Chung
                                         Adam M. Abensohn
                                         51 Madison Avenue, 22nd Floor
                                         New York, New York  10010
                                         (212) 849-7000

                                         Samidh Guha
                                         JONES DAY
                                         250 Vesey Street
                                         New York, NY 10281-1047
                                         (212) 326-3939

                                         *Attorneys for Plaintiff-Appellant Raj
                                         Rajaratnam*

## CERTIFICATE OF COMPLIANCE WITH FRAP 27(d)

1.     This brief complies with the type-volume requirements of Local Rule 27.1(a)(3) and Fed. R. App. P. 27(d)(2), because it contains 4,860 words, excluding the parts of the brief exempted by Fed. R. App. P. 27(a)(2)(B).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionately spaced typeface using Microsoft Word 2013 in 14 pt Times New Roman font.


/s/ Christine H. Chung                              June 6, 2017
*Attorney for Plaintiff-Appellant*               Date

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

| | |
|---|---|
| RAJ RAJARATNAM,<br><br>*Plaintiff-Appellant*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>*Defendant-Appellee*. | Nos. 17-1405(L), 17-1411(Con)<br><br>DECLARATION OF CHRISTINE H. CHUNG IN SUPPORT OF THE MOTION OF RAJ RAJARATNAM FOR A CERTIFICATE OF APPEALABILITY |

CHRISTINE H. CHUNG, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am an attorney admitted to practice law in the State of New York and before this Court. I am a member of the law firm Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Plaintiff-Appellant Raj Rajaratnam on appeal.

2. I submit this declaration in support of Mr. Rajaratnam's motion pursuant to 28 U.S.C. § 2253(c) for a Certificate of Appealability (the "Motion").

3. Attached as Exhibit A to this declaration is a true and correct copy of the Westlaw-published version of the March 3, 2017 Memorandum Opinion and Order denying Plaintiff-Appellant Raj Rajaratnam's Motion Pursuant to 28 U.S.C. § 2255 to Vacate Convictions and Sentence (the "Section 2255 Motion"). The Westlaw citation is *Rajaratnam v. United States*, No. 15 Civ. 5325 (LAP), 2017

WL 887027, at *1 (S.D.N.Y. Mar. 3, 2017).

4.      Attached as Exhibit B to this declaration is a true and correct copy of the May 9, 2017 Order denying Plaintiff-Appellant Raj Rajaratnam's Motion for a Certificate of Appealability.

5.      Attached as Exhibit C to this declaration is a true and correct copy of the Westlaw-published version of the brief for the United States of America in the appeal *United States v. Horvath (Newman)*, Nos. 13-1837(L), 13-1917(Con) (2d Cir.), dated November 14, 2013.  The Westlaw citation is 2013 WL 6163307 (2d Cir. Nov. 14. 2013).

6.      Attached as Exhibit D to this declaration is a true and correct copy of the Second Superseding Indictment, filed on January 20, 2011.

7.      Attached as Exhibit E to this declaration is a chart of the Counts of conviction and associated trades, and the intermediaries, insiders, and value relevant to each trade.  This chart was annexed to the reply brief filed by Mr. Rajaratnam in the District Court in support of his Section 2255 Motion.  The reply brief was filed as No. 365 of the District Court docket, No. 09 Cr. 1184 (S.D.N.Y.).

8.      Attached as Exhibit F to this declaration is a true and correct copy of excerpts from the trial transcript.  The trial transcript was also filed as Nos. 273, 285-294 of the District Court docket.

9.      Attached as Exhibit G to this declaration is a true and correct copy of Request No. 21 of the Government's Requests to Charge, filed on February 2, 2011, as No. 187 of the District Court docket.

10.      Attached as Exhibit H to this declaration is a true and correct copy of Instruction 31-C of the Court's Charge Script, dated April 25, 2011.

11.      Attached as Exhibit I to this declaration is a true and correct copy of the transcript of Mr. Rajaratnam's sentencing on October 13, 2011.

12.      The Government Exhibits and Defense Exhibits listed below, in paragraphs 13 to 41, were admitted at Mr. Rajaratnam's trial and are cited in the Motion.   To avoid a need to cross-reference, these exhibits are annexed hereto using the GX and DX numbers assigned at trial.

13.      Attached hereto is a true and correct copy of Government Exhibit 26, a chart entitled "Certain Communications in February 2005," relating to the dates and times of phone calls between Adam Smith and Kamal Ahmed.

14.      Attached hereto is a true and correct copy of Government Exhibit 27, a chart entitled "Galleon Tech Daily Closing Position in Integrated Circuit System Stock (ICST), February 1, 2005 Through June 30, 2005."

15.      Attached hereto is a true and correct copy of Government Exhibit 28, a chart entitled "Galleon Tech Profit on Stock in Integrated Circuit Systems (ICST) Held at Time of its Acquisition by Integrated Device Technology."

3

16.     Attached hereto is a true and correct copy of Government Exhibit 39, a chart entitled "Certain Communications On July 24, 2008," relating to the dates and times of phone calls between Danielle Chiesi and Raj Rajaratnam and between Danielle Chiesi and Kieran Taylor.

17.     Attached hereto is a true and correct copy of Government Exhibit 42, a chart entitled "Galleon Tech Daily Closing Position in Akamai Stock (AKAM) from June 1, 2008 Through July 30, 2008."

18.     Attached hereto is a true and correct copy of Government Exhibit 44, a chart entitled "Galleon Tech Profit From Trades in Akamai Securities Beginning on July 25, 2008."

19.     Attached hereto is a true and correct copy of Government Exhibit 47, a chart entitled "Telephone Communications Between Roomy Khan and Deep Shah, January 2007 through July 2007."

20.     Attached hereto is a true and correct copy of Government Exhibit 48, a chart entitled "Certain Communications On July 2, 2007," relating to the dates and times of phone calls between Roomy Khan and Deep Shah and between Roomy Khan and Raj Rajaratnam.

21.     Attached hereto is a true and correct copy of Government Exhibit 57, a chart entitled "Telephone Communications Between Roomy Khan and Shammara Hussain, January 2007 Through July 2007."

4

22.    Attached hereto is a true and correct copy of Government Exhibit 58, a chart entitled "Certain Communications From July 5, 2007 Through July 19, 2007," relating to the dates and times of phone calls between Roomy Khan and Shammara Hussain and between Roomy Khan and Raj Rajaratnam.

23.    Attached hereto is a true and correct copy of Government Exhibit 59, a chart entitled "Roomy Khan Trading in Google Securities from July 13, 2007 Through July 20, 2007."

24.    Attached hereto is a true and correct copy of Government Exhibit 60, a chart entitled "Galleon Tech and Diversified Trading in Google Securities From July 13, 2007 Through July 20, 2007."

25.    Attached hereto is a true and correct copy of Government Exhibit 61, a chart entitled "Galleon Tech and Diversified Daily Closing Position in Google Stock (GOOG), May 1, 2007 Through July 27, 2007."

26.    Attached hereto is a true and correct copy of Government Exhibit 64, a chart entitled "Certain Communications in January 2006," relating to the dates and times of phone calls between Roomy Khan and Sunil Bhalla and between Roomy Khan and Raj Rajaratnam and text messages sent or received by Raj Rajaratnam.

27.    Attached hereto is a true and correct copy of Government Exhibit 65, a chart entitled "Galleon Tech Trading in Polycom Stock (PLCM) From January 10 to January 25, 2006."

28.    Attached hereto is a true and correct copy of Government Exhibit 532-T, a transcript of a wiretapped phone call between Mr. Rajaratnam and Danielle Chiesi, dated July 24, 2008.

29.    Attached hereto is a true and correct copy of Government Exhibit 543-T, a transcript of a wiretapped phone call between Mr. Rajaratnam and Danielle Chiesi, dated July 30, 2008.

30.    Attached hereto is a true and correct copy of Government Exhibit 1406, FedEx Invoice Number 2-211-55458, Account Number 2412-0107-4, dated August 17, 2007.

31.    Attached hereto is a true and correct copy of Government Exhibit 1539, the Lehman Brothers Security Account Limited Discretionary Authorization for Roomy Khan, signed by Sunil Bhalla.

32.    Attached hereto is a true and correct copy of Government Exhibit 2454, an email from Adam Smith to Mr. Rajaratnam with the subject line "The two eyes," dated March 9, 2005.

33.   Attached hereto is a true and correct copy of Government Exhibit 2455, an email from Adam Smith to Mr. Rajaratnam with the subject line "Eyes," dated March 17, 2005.

34.   Attached hereto is a true and correct copy of Government Exhibit 2456, an email from Adam Smith to Mr. Rajaratnam with the subject line "eyes," dated April 21, 2005.

35.   Attached hereto is a true and correct copy of Government Exhibit 2562, the final transcript of the Akamai Technologies Inc. Earnings Conference Call for the second quarter of 2008, dated July 30, 2008.

36.   Attached hereto is a true and correct copy of Defense Exhibit 45, an email from Eric Rothdeutsch of Galleon to the Tech and Trading Group of Galleon with the subject line "ICST Update," dated February 10, 2005.

37.   Attached hereto is a true and correct copy of Defense Exhibit 1006, a Form 13F filed by Galleon Management, L.P., with the U.S. Securities and Exchange Commission, dated March 31, 2007, and indicating Galleon holdings in Hilton.

38.   Attached hereto is a true and correct copy of Defense Exhibit 1169, a Form 13F filed by Galleon Management, L.P., with the U.S. Securities and Exchange Commission, dated June 30, 2007, and indicating Galleon holdings in Hilton.

39.  Attached hereto is a true and correct copy of Defense Exhibit 1829, an email from Jessica Kourakos to Portfolio@galleongrp.com with the subject line "Sell short 75,000 AKAM," dated May 6, 2008.

40.  Attached hereto is a true and correct copy of Defense Exhibit 3416, ICST Trading Data from the Galleon OMS Database.

41.  Attached hereto is a true and correct copy of Defense Exhibit 4682M, a chart entitled "Transaction in Polycom Stock by Raj Rajaratnam for Galleon on December 21, 2005."

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
         June 6, 2017


                              /s/  *Christine H. Chung*
                              Christine H. Chung

# Exhibit A

2017 WL 887027
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Raj RAJARATNAM, Petitioner,

v.

UNITED STATES of America, Respondent.

15 Civ. 5325 (LAP)
|
Related To: 09 Cr. 1184 (LAP)
|
Filed 03/03/2017

**Attorneys and Law Firms**

Christine H. Chung, Quinn Emanuel, New York, NY, for
Petitioner.

Michael Ferrara, Jennifer Lane Gachiri, United States
Attorney's Office, New York, NY, for Respondent.

Memorandum Opinion and Order

LORETTA A. PRESKA, Senior United States District
Judge

 **\*1**  Before the Court is a motion to correct, vacate,
and/or set aside the sentence pursuant to Title 28,
United States Code, Section 2255, (Mot. Vacate, June
16, 2015, dkt. no. 354), and a motion for a writ of error
coram nobis to vacate, reassess, and amend the order
of forfeiture, (Mot. Writ of Error, June 16, 2015, dkt.
no. 351), filed by Petitioner Raj Rajaratnam ("Petitioner"
or "Rajaratnam"). The Government filed an omnibus
memorandum in opposition to both of Petitioner's
motions. (Opp., Oct. 5, 2015, dkt. no. 360). Petitioner
replied, filing both a reply memorandum pursuant to 28
U.S.C. § 2255, (Reply Mot. Vacate, Nov. 6, 2015, dkt. no.
365), and a reply memorandum for a writ of error coram
nobis. (Reply Mot. Writ of Error, Nov. 6, 2015, dkt.
no. 364). Subsequent correspondence was filed to address
Salman v. United States, 137 S.Ct. 420 (2016), a recent
Supreme Court decision that is relevant to Petitioner's
arguments in his § 2255 petition. (See dkt. nos. 368-372).

For reasons that follow, Petitioner's motions are denied.

**I. BACKGROUND**

On March 8, 2011, the Petitioner's trial commenced
before Judge Richard Holwell. Petitioner was charged in a
Superseding Indictment in fourteen counts. (Superseding
Indictment, Jan. 20, 2011, dkt. no. 165). Counts One
to Five charged Petitioner with conspiracies to commit
securities fraud, with each conspiracy defined by the
individual who allegedly passed the information to
Petitioner. (Id. at ¶¶ 1-35). Counts Six through Fourteen
charged Petitioner with substantive securities fraud in
connection with some of the individual trades that were
also the subjects of the conspiracy counts. (Id. at ¶¶ 36-41).
The counts included: (1) leading a multi-year conspiracy
with former and current employees of Galleon, including
Adam Smith, to trade based on illegal tips from multiple
insiders at public companies, (Count One)(id. at ¶¶ 1-7);
(2) leading a multi-year conspiracy with Roomy Khan,
a former Galleon employee, and exchanging illegal tips
with Khan related to multiple stocks, including Polycom
Inc. ("Polycom"), Hilton Hotel Corp. ("Hilton"), and
Google Inc. ("Google"), (Count Two) (id. at ¶¶ 8-14); (3)
leading a multi-year conspiracy with Rajiv Goel, an Intel
Corp. ("Intel") executive, and trading based on illegal tips
from Goel about Intel and Clearwire Corp. ("Clearwire"),
(Counts Three, Six, Seven, & Fourteen) (id. at ¶¶ 15-21,
36-37, 40-41); (4) leading a multi-year conspiracy with
Anil Kumar, a senior partner at McKinsey & Company,
Inc. ("McKinsey"), and trading based on illegal tips from
Kumar about Advanced Micro Devices, Inc. ("AMD"),
ATI Technologies Inc. ("ATI"), and eBay Inc. ("eBay"),
(Counts Four & Thirteen)(id. at ¶¶ 22-28, 38-39); (5)
conspiring with Danielle Chiesi, a portfolio manager at
another hedge fund, and exchanging illegal tips with
Chiesi relating to AMD, Akamai Technologies, Inc.
("Akamai"), and other companies, (Counts Five, Eight,
Nine & Ten)(id. at ¶¶ 29-37); and trading based on
material, non-public information he obtained from a
source at PeopleSupport, (Counts Eleven and Twelve).
(Id. at ¶¶ 36-37).

 **\*2**  At trial, the Government offered physical and
testimonial evidence as to Petitioner's guilt, including: (1)
wiretap recordings of Petitioner's phone conversation with
Kumar, Goel, Smith, Chiesi, and others demonstrating
that Petitioner schemed repeatedly to obtain and to
trade based on inside information, (Opp. at 4); (2)
testimony from Kumar regarding his agreement to
provide Petitioner with multiple illegal tips, including

tips related to AMD's acquisition of ATI in 2006, and Petitioner's elaborate schemes to conceal the bribes he paid to Kumar for those tips, (id.); (3) testimony from Goel regarding his agreement to provide Petitioner with multiple illegal tips relating to Intel's April 2007 earnings and Intel's 2008 investment in Clearwire, (id.); (4) testimony from Smith regarding his agreement to share inside information with individuals at Galleon including Petitioner and Petitioner's directives to conceal their crimes, (id.); (5) testimony from various executives at public companies and other firms relating to the confidentiality of the information Petitioner obtained from many sources, (id.); and (6) summary charts reflecting Petitioner's phone calls with sources of inside information and the extensive trading by Petitioner and others based on that information. (Id.)

On May 11, 2011, the jury found Petitioner guilty on all fourteen counts. (Rajaratnam Trial Tr., May 11, 2011, at 5712-13). On October 13, 2011, Judge Holwell sentenced Petitioner to a term of 132 months imprisonment, to be followed by two years of supervised release. (Judgment, Oct. 25, 2011, dkt. no. 328). Judge Holwell also ordered Petitioner to pay a fine of $10 million, a $1,400 special assessment, and forfeiture in the amount of $53, 816, 434. (Id.)

On appeal, Petitioner advanced two arguments: first, Petitioner argued that the wiretaps capturing his illegal schemes should have been suppressed because the Government included material falsehoods or omissions in the relevant applications. (Appeal Br. at 33, 11-4416, dkt. no. 75). Second, Petitioner challenged Judge Holwell's instruction to the jury that it could convict Rajaratnam if the inside information was "a factor, however small," in his trading decisions. (Id. at 56). Petitioner concedes that appellate counsel "did not challenge the trial court's instruction on 'knowledge' and 'benefit' or the sufficiency of the evidence of 'knowledge' or 'benefit.'" (Mot. Vacate at 12). The Court of Appeals affirmed Rajaratnam's convictions by opinion dated June 24, 2013. United States v. Rajaratnam, 719 F.3d 139 (2d Cir. 2013).

## II. Discussion

### A. § 2255 Habeas Petition

#### i. Legal Standard

It is well settled that a § 2255 petition is not a substitute for a direct appeal. United States v. Frady, 456 U.S. 152, 165 (1982); United States v. Vilar, 645 F.3d 543, 548 (2d Cir. 2011). A federal prisoner cannot use a § 2255 petition to litigate questions that could have been raised on direct appeal but were not. Sapia v. United States, 433 F.3d 212, 217 (2d Cir. 2005). Society's interest in repose of criminal judgments animates these procedural rules and compels their vigorous enforcement. See, e.g., Harrington v. Richter, 562 U.S. 86, 103 (2011)(discussing repose in the context of petitions for habeas corpus from state prisoners). Thus, where a petitioner has procedurally defaulted a claim by failing to raise it at a trial, sentencing, or on direct appeal, the claim may be raised through § 2255 only if petitioner "can first demonstrate either cause and actual prejudice, or that he is actually innocent." Bousley v. United States, 523 U.S. 614, 622 (1998)(internal quotations and citations omitted).

The Supreme Court has instructed that "cause" should be construed narrowly. See Coleman v. Thompson, 501 U.S. 722, 752 (1991)(noting that "cause" arises only when it is "something external to the petitioner" which "cannot be fairly attributed to him"). Where a petitioner argues that the "cause" for the procedural default was a result of ineffective assistance of counsel, the petitioner must demonstrate that (1) counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984); United States v. Whitman, 115 F.Supp.3d 439, 445 (S.D.N.Y. 2015). Ineffective assistance of counsel claims include both the "cause" and "prejudice" prongs because the Strickland standard also requires a showing of prejudice.

**\*3** Habeas courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. In reviewing allegations of deficient performance by appellate counsel, reviewing courts are instructed not to "second-guess reasonable professional judgments and impose on ... counsel a duty to raise every colorable claim" on appeal. Jones v. Barnes, 463 U.S. 745, 754 (1983)(internal quotation omitted). When analyzing the objective reasonableness of counsel's performance, such performance "must be assessed in light of the information known at the time of the decisions, not in

Case 17-105, Document 29, 06/06/2017, 2052263, Page39 of 467

hindsight." Strickland, 466 U.S. at 680. Additionally, in attempting to demonstrate constitutional ineffectiveness by appellate counsel, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). Instead, a habeas petitioner must establish that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Id. "Strategic choices" made by appellate counsel "after thorough investigation of law and facts relevant to plausible options" are "virtually unchallengeable." Strickland, 466 U.S. at 690-91.

In the event a petitioner cannot demonstrate "cause" for his procedural default, he or she can obtain review for his or her claim by showing "that a fundamental miscarriage of justice would result from a failure to entertain the claim." McCleskey v. Zant, 499 U.S. 467, 494-95 (1991). The Supreme Court has repeatedly emphasized that a "fundamental miscarriage of justice" results only when petitioner can establish "actual innocence." See Herrera v. Collins, 506 U.S. 390, 404 (1993)(referring to rule requiring "proper showing of actual innocence" as the "fundamental miscarriage of justice exception" and explaining the purpose of the exception is "to see that federal constitutional errors do not result in the incarceration of innocent persons").

Furthermore, " 'actual innocence' means factual innocence, not mere legal insufficiency." Bousley, 523 U.S. at 623. Accordingly, this narrow test is satisfied only when petitioner can demonstrate that his acts "have been ruled not to constitute criminal conduct." Underwood v. United States, 166 F.3d 84, 88 (2d Cir. 1999).

### ii. Discussion

### a. Ineffective Assistance of Counsel

Here, Petitioner cannot demonstrate ineffective assistance of counsel because there were no "objective factor[s] external" to the defendant that would have prevented him from raising his claims on direct appeal. See Coleman, 501 U.S. at 752 (noting that " 'cause' under the cause and prejudice test must be something *external* to the petitioner")(emphasis in original). Further, Petitioner fails

to show that he has suffered prejudice as a result of counsel's alleged error.

Petitioner argues that the jury instructions omitted the requirement that "the government must prove a remote tippee's knowledge of the benefit received by the insider, and that the benefit be more than the mere satisfaction of friendship." (Mot. Vacate at 26). Petitioner notes that trial counsel recognized the importance of the Government's burden to prove both "knowledge" and "benefit" as they submitted draft jury charges containing these requirements. (Id.) However, Petitioner contends that it was "objectively unreasonable" for trial counsel to abandon this issue in the jury charge, thereby failing to describe accurately the Government's burden, as was appellate counsel's failure to raise this issue on appeal. See id. ("[C]ounsel anticipated Newman... however, counsel failed to object to the charge as read" and "failed to object on direct appeal.").

The Court is unpersuaded. Counsel need not advance every non-frivolous argument in order to perform at an objective standard of reasonableness. See Mayo, 13 F.3d at 533. The record demonstrates that Petitioner's appellate counsel did advance several reasonable arguments and exercised reasonable judgment when doing so. The Court finds that the decision to advance the arguments that (1) the wiretap evidence should be suppressed and that (2) the jury was mistakenly instructed that they could convict if the inside information was "a factor, however small", (Appeal Br. at 33, 56, 11-4416, dkt. no. 75), was not unreasonable. The Petitioner advances no argument that these claims were any less significant or weaker than the claim that the jury instructions contained an error regarding personal benefit or knowledge. See Mayo, 13 F.3d at 533 (requiring a showing that ignored issues are clearly stronger than those presented to overcome presumption of effective counsel). Moreover, Petitioner does not show how "his appellate counsel's choice not to appeal the Court's instruction on personal benefit fell below an objective standard of reasonableness." See Whitman, 115 F.Supp. at 445 (denying § 2255 motion raising Newman claims when there is no showing by Petitioner as to why it was "objectively unreasonable" for counsel to raise certain claims but not others on appeal). Accordingly, the Petitioner has failed to overcome the strong presumption of effective assistance by counsel.

**\*4** Further, even if Petitioner had sufficiently demonstrated that counsel's representation fell below an objective standard of reasonableness, Petitioner has not shown that he suffered prejudice because of counsel's failure to raise this issue. Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. However, had Petitioner's counsel appealed Judge Holwell's jury instructions for failing to provide different instructions regarding knowledge of benefit, and had the Court of Appeals decided that knowledge of benefit was required to convict, that decision would not have resulted in a reversal of the challenged counts. Substantial evidence was introduced at trial showing that the Petitioner knew that insiders were receiving a benefit in exchange for confidential information. (See Opp. at 7-10, 24-25, 28-29, 30-32; see also, infra at 14-17). The Court therefore finds that any error in the jury instructions was harmless because such an error would not have had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Neder v. United States, 527 U.S. 1, 18-20 (1999). Accordingly, Petitioner did not suffer prejudice as a result of counsel's alleged error.

Thus, Petitioner's claim on the basis of ineffective assistance of counsel is denied.

### b. Actual Innocence

Petitioner's argument on the basis of the actual innocence standard also fails. Petitioner challenges his convictions on Counts Two, Five, Eight, Nine, Ten, and the ICST trade underlying Count One—namely, the Counts in which he did not personally provide benefits to insiders —on the grounds that "there is no evidence [Petitioner] knew that he received information provided by corporate insiders in exchange for a benefit, as Newman defined it." (Mot. Vacate at 25).

As an initial matter, the Supreme Court recently revisited the issue of what constitutes the requisite benefit in insider trading in Salman v. United States, holding that a benefit does not need to be pecuniary in nature but rather that a sufficient benefit is conferred when "an insider makes a gift of confidential information to a trading relative or friend." 137 S.Ct. at 427. Here, because all the information

was transferred between trading relatives or friends, the mere transfer of information is sufficient to constitute a benefit. Accordingly, even if pecuniary benefits were not provided to the tippers, the record still demonstrates that a sufficient benefit was provided to each of the insiders in exchange for his or her provision of confidential information. Therefore, Petitioner must demonstrate that he did not have the requisite knowledge in order to prevail on his claim of actual innocence.

In Unites States v. Newman, the Court held that to satisfy the knowledge element in an insider trading case the tippee must know that the insider disclosed confidential information in exchange for personal benefit. 773 F.3d 438 (2d Cir. 2014). In Newman, the defendants Todd Newman and Anthony Chiasson were charged with securities fraud for executing trades in Dell and NVIDIA stock and ultimately receiving profits of $4 million and $68 million for their respective funds. Id. at 443. Both individuals did not receive information directly from the corporate insider but rather were several steps removed from the corporate insiders. Id. With respect to the Dell tipping chain, Rob Ray, a member of Dell's investor relations department and the corporate insider in this tipping chain, tipped Sandy Goyal, who in turn provided this information to Jesse Tortora, who in turn provided this information to Newman as well as to Spyridon Adondakis, who in turn provided this information to Chiasson. Id. As such, in the Dell chain, Newman was three levels removed from the insider, and Chiasson was four levels removed. Id. With respect to the NVIDIA tipping chain, the evidence established that the insider, Chris Choi, a member of NVIDIA's finance unit, tipped Hyung Lim, who in turn tipped Danny Kuo, who circulated this information to Tortora and Adondakis, who in turn gave this information to Newman and Chiasson. Id. As such, both individual were four levels removed from the insider in this tipping chain. Id. Because there was no evidence that either Newman or Chiasson was aware that he or she was trading on information obtained from insiders or that the insiders received a benefit in exchange for the disclosures, the Court of Appeals reversed their convictions. Id. at 453.

**\*5** Here, Petitioner was situated very differently from either Newman or Chiasson because he either directly provided the benefit or was one level removed from the individual who provided the benefit. Moreover, in the instances where Petitioner was one level removed

from the insider, he either knew where the information was originating from or was providing a benefit to the intermediate tippees. The Court therefore finds that unlike <u>Newman</u>, where knowledge could not be inferred given the distance between the defendants and the insiders, here a reasonable jury could infer that Petitioner did have knowledge that the insiders disclosed confidential information in exchange for a benefit.

Specifically, as to Count Two, Petitioner received information from Khan in 2006 and 2007. (Superseding Indictment at ¶¶ 8-12). Khan had received this inside information from Bhalla, a Polycom executive, Deep Shah, a Moody's analyst, and Hussain, a marketing firm analyst for Google. (Opp. at 24). In July 2007, Khan told Petitioner that he had learned from an insider that Google was going to announce unexpectedly poor financials. (<u>Id.</u>) Petitioner traded on this information and earned millions in profits when Google announced its second quarter profits. (<u>Id.</u>) That same day, a FedEx envelope was sent from Khan's work address, using Khan's FedEx account, to Hussain. (<u>Id.</u> at 24-25). Additionally, with respect to these chains, Petitioner provided Khan with a benefit in the form of material non-public information. (<u>Id.</u> at 25-26). This benefit provided by Petitioner to Khan, the intermediate tippee, provides further evidence that Petitioner understood that this sort of confidential information is not provided to individuals without exchange of some benefit. Therefore, although Petitioner may not have known of the specific benefits that Khan provided to the inside tipper, the jury had sufficient evidence reasonably to infer that Petitioner knew that inside information was being provided in exchange for a personal benefit. Accordingly, Petitioner cannot prove actual innocence, which requires a showing of factual innocence, not "mere legal insufficiency." <u>Bousley</u>, 523 U.S. at 623.

Count Five includes both the Chiesi conspiracy as well as Petitioner's direct receipt of information from Kumar related to AMD. (Superseding Indictment at ¶ 31). Petitioner directly provided a benefit to Kumar. (<u>See</u> Opp. at 4-5) (Petitioner "wired money to Kumar's offshore account.... In return, Kumar repeatedly provided [Petitioner] with confidential information."). Accordingly, Petitioner had knowledge of inside information being provided in exchange for a personal benefit with respect to this Count and cannot establish actual innocence.

With respect to Counts Five, Eight, Nine, and Ten, the Government presented evidence that Chiesi provided benefits to Kieran Taylor, who in exchange gave inside information to Chiesi. As explained above, providing information to a trading relative or friend is sufficient to constitute a personal benefit. <u>See Salman</u>, 137 S.Ct. at 427. Petitioner concedes in his motion that he knew Taylor had provided this information to Chiesi because of their close friendship. (Mot. Vacate at 22, "the clear implication was [Taylor] had provided that information merely out of friendship.") Accordingly, he cannot now claim that he did not have the requisite knowledge that confidential information was being provided by an insider in exchange for a personal benefit.

With respect to the ICST trade underlying Count One, Petitioner also fails to prove actual innocence. Petitioner received information from Smith, a Galleon employee, who was receiving information from Kamal Ahmed, a former colleague of Smith's at Morgan Stanley. (Opp. at 30). Ahmed told Smith that a company was in the process of acquiring ICST. (<u>Id.</u>) Smith then passed this information to Petitioner and informed Petitioner that it came from Ahmed. (<u>Id.</u> at 30-31). The use of coded language between Smith and Petitioner when discussing this deal makes it clear that they knew this information was nonpublic and should not have been disclosed to them. (<u>Id.</u> at 31). Conferral of a personal benefit in exchange for this inside information is evident because Smith provided Ahmed with thoughts about the marketplace and stocks, introduced Ahmed to individuals he requested, and recommended him to executives at technology companies. (<u>Id.</u> at 31-32). Moreover, the mere provision of inside information from Ahmed to Smith was sufficient to establish the requisite personal benefit given the nature of their close relationship. <u>See Salman</u>, 137 S.Ct. at 427. Because Petitioner had knowledge of the exchange of nonpublic information between Smith and Ahmed, Petitioner cannot establish actual innocence with respect to this trade either.

**\*6** Because there was an exchange of personal benefit on each of these trades, and because Petitioner had knowledge that inside information was being conferred in exchange for such benefit, the Court denies Petitioner's claim of actual innocence on all of the foregoing counts.

**B. Vacatur for Perjured Testimony**

### i. Legal Standard

"[A] petitioner is not entitled to a new trial based on a claim of perjury, unless he 'first demonstrate[s] that the witness in fact committed perjury.' " United States v. Reeves, Nos. 02 Civ. 9309 (LAP) & 96 Cr. 325 (LAP), 2005 WL 3288012, at *9 (S.D.N.Y. Dec 2, 2005)(quoting United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001)). The movant bears the burden to prove perjury by a preponderance of the evidence. United States v. Sessa, Nos. 92-CR-351(ARR) & 97-CV-2079(ARR), 2011 WL 256330, at *44 (E.D.N.Y. Jan. 25, 2011). "Simple inaccuracies or inconsistencies" arising from "confusion, mistake, or faulty memory ... do not rise to the level of perjury." Id. "[E]ven a direct conflict in testimony does not in itself constitute perjury." United States v. Gambino, 59 F.3d 353, 365 (2d Cir. 1995). Rather, a witness perjures himself by adducing "false testimony concerning a material matter with the willful intent to provide false testimony." Monteleone, 257 F.3d at 219.

" [A] new trial is not foreordained" whenever a petitioner satisfies his initial burden. Id. Instead, in evaluating whether perjurious testimony warrants a new trial, courts in this circuit apply two, discrete standards of review set forth in United States v. Wallach, 935 F.2d. 445 (2d Cir. 1991). "Where the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's judgment." Id. at 456. However, "[w]here the government was unaware of a witness'[s] perjury ... a new trial is warranted only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." Id. The test for determining the materiality of the testimony is "whether there was a significant chance that this added item, developed by skilled counsel ... could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." United States v. Seijo, 514 F.2d 1357, 1364 (2d Cir. 1975) (citations omitted).

In the alternative, a Court must hold a hearing pursuant to Section 2255 "unless the motion ... conclusively show[s] that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). The Court of Appeals has instructed that "to prevail on his motion for a hearing [Petitioner] must establish that he has a 'plausible' claim." Armienti v.

United States, 234 F.3d 820 (2d Cir. 2000). Further, "[a]n evidentiary hearing is necessary only when petitioner establishes a 'plausible claim' of perjury—one not plainly disproved by the totality of evidence and that, if true, would entitle him to collateral relief." Brandon v. United States, No. 09 Civ. 7720 (JGK), 2011 WL 4801362, at *3 (S.D.N.Y. Oct. 11, 2011)(quoting Florez v. United States, No. 07 Civ. 4965, 2009 WL 2228121, at *11 (E.D.N.Y. July 24, 2009)).

### ii. Discussion

Petitioner argues that Counts Four and Thirteen, which concern Petitioner's trading securities based on inside information related to AMD, ATI, and eBay, should be vacated because Kumar perjured himself at trial. (Mot. Vacate at 27). However, Petitioner has failed to meet his initial burden to show that Kumar's testimony rose to the level of perjury, see Reeves, 2005 WL 3288012, at *9, or that the allegedly false testimony concerned a "material matter." Monteleone, 257 F.3d at 219.

**\*7** Prior to testifying as a witness at Petitioner's trial, Kumar met with the Government to prepare for his testimony. (Opp. at 36). However, more than three years later, Kumar refused to be prepared by the Government in advance of testifying at Rengan Rajaratnam's trial regarding similar conduct. Id. It is not surprising to the Court that, years later, without having his recollection refreshed with documents and recordings immediately prior to trial, Kumar's memory faltered and his testimony differed in certain respects concerning events that occurred nearly a decade prior. However, a faulty memory resulting in inaccuracies or mistakes does not prove that Kumar provided false testimony with the intent to provide false testimony during Petitioner's trial. See Sessa, 2011 WL 256330, at *44 (noting that mere inaccuracies do not rise to the level of perjury); Monteleone, 257 F.3d at 219. Accordingly, Petitioner has failed to show that Kumar committed perjury.

The Court is further persuaded that Petitioner did not meet his initial burden of showing perjury because the allegedly contradictory testimony did not concern matters material to Petitioner's conviction on Counts Four and Thirteen. See Monteleone, 257 F.3d at 219. Petitioner points out several inconsistent statements made by Kumar between Petitioner's trial and his brother Rengan's trial.

(See Reply Mot. Vacate at 19). For example, Petitioner notes that Kumar testified that McKinsey did not allow consulting agreements during Petitioner's trial but testified that McKinsey did allow consulting agreements during Rengan's trial. (Compare Rajaratnam Trial Tr., Mar. 10, 2011, at 264-65 with Rengan Trial Tr., June 26, 2014, at 822, 927). Petitioner also notes that Kumar's testimony differed as to why Kumar started tipping Petitioner: at Petitioner's trial, Kumar testified that the reason was because Petitioner was pressing him for information, whereas at Rengan's trial Kumar testified that he did so because he wanted Petitioner to support AMD and was eager to have Galleon become a client of McKinsey. (Compare Rajaratnam Trial Tr. at 279, 288-89 with Rengan Trial Tr., at 844, 956-57). Additional examples of Kumar's allegedly inconsistent statements include his testimony regarding Rengan's involvement in the conspiracy and Rengan's attempts to lure another one of Kumar's colleagues into the conspiracy. (See Reply Mot. Vacate at 19). It is apparent to the Court, however, that none of these statements is relevant to the basis of Petitioner's conviction on Counts Four and Thirteen, which relate to Petitioner's trading in securities of AMD, ATI, and eBay based on inside information. Indeed, the Court also notes that Judge Buchwald made remarks during Rengan's trial that at least some of Kumar's statements were not inconsistent with his previous testimony. (See Rengan Trial Tr. at 889-92, 1039-44).

Even the most serious of the allegedly contradictory statements identified by Petitioner—namely, that Kumar switched his testimony regarding the public/private nature of the AMD/Mubadala merger—are not material because Counts Four and Thirteen do not relate to that deal exclusively. (See Superseding Indictment at ¶¶ 24 and 39). Because Petitioner has not demonstrated that the allegedly inconsistent statements were material, the Court finds that he has failed to meet his initial burden to show perjury for this reason as well.

In addition, the Court notes that at Petitioner's trial there was substantial testimony—not later contradicted—that provided adequate grounds for a jury to convict on Counts Four and Thirteen. Kumar testified at length stating that he provided Petitioner with confidential information related to the ATI/AMD merger that Petitioner ultimately traded on and profited from substantially. (See Rajaratnam Trial Tr. at 350, 354-56,

366-67, 387). This testimony alone would provide sufficient grounds for jurors to find Petitioner guilty on Counts Four and Thirteen. These Counts, in part, allege that "Kumar spoke to [Petitioner] by telephone about AMD's planned acquisition of ATI," (id. ¶ 29), and that "[Petitioner] caused Galleon ... to execute transactions in the securities of ATI on the basis of material, nonpublic information," (id. ¶ 39). At no time did Kumar testify inconsistently about the ATI acquisitions; in fact, he reaffirmed during Rengan's trial that he provided Petitioner with confidential information relating to AMD. (Rengan Trial Tr. at 934-35). Kumar's consistency regarding conduct that directly relates to the basis of Petitioner's convictions on Counts Four and Thirteen further persuades the Court that Kumar did not commit perjury at Petitioner's trial.

**\*8** Because Petitioner has failed to meet his initial burden that the witness in fact committed perjury, the Court need not address the discrete Wallach standards of review and finds that the Petitioner is not entitled to a new trial. However, the Court also notes that Petitioner has failed to demonstrate that the Government knew or should have known about Kumar's alleged perjury. See Wallach, 935 F.2d at 456. Accordingly, Petitioner would again be required to make a showing of materiality, which, as noted above, Petitioner has failed to do.

Petitioner also argues that his conviction on Counts Four and Thirteen should be reversed on the grounds that had the contradictory portions of Kumar's testimony been available for impeachment purposes at the trial, the jury most likely would have found that Kumar lacked credibility and declined to convict. (Mot. Vacate at 42-43). "Upon discovery of previous trial perjury by a government witness, the court should decide whether the jury probably would have altered its verdict if it had the opportunity to appraise the impact of the newly-discovered evidence not only upon the factual elements of the government's case but also upon the credibility of the government's witness." United States v. Stofsky, 527 F.2d 237, 246 (2d Cir. 1975). As explained above, the Court is unpersuaded that Kumar's inconsistent testimony constitutes perjury. Even assuming arguendo that Kumar did commit perjury at Petitioner's trial, it appears unlikely to the Court that the jury would have altered its verdict because Kumar's testimony at both trials implicated Petitioner in a criminal scheme and a conspiracy to trade securities on the basis of inside information in a

substantially consistent manner. Accordingly, although as an initial matter it is the Court's finding that Kumar did not commit perjury at Kumar's trial, the unlikeliness that the jury would have altered its verdict if Kumar's credibility had been impeached further persuades the Court to deny Petitioner's request for a new trial.

Petitioner also requests a hearing to determine whether Kumar perjured himself at trial. (Mot. Vacate at 44-45). To be entitled to a hearing, Petitioner must establish a plausible claim of perjury. See Brandon, 2011 WL 4801362, at *3. Years after his initial testimony, and after not having reviewed any documents relating to events that happened almost a decade prior, Kumar gave partially inconsistent testimony regarding conduct immaterial to the basis of Petitioner's conviction. (See supra at 20-22). Furthermore, Kumar repeatedly reaffirmed that he engaged in insider trading with Petitioner, that he provided Petitioner with confidential information and in return received a benefit from Petitioner, all of which is corroborated by other evidence presented by the Government, including wiretapped conversations, trading records, and account statements. (Opp. at 35). Accordingly, the Court finds that Petitioner's perjury claim is not plausible and that a hearing pursuant to Section 2255 is not warranted.

Petioner's request for vacatur of Counts Four and Thirteen is denied.

### C. Writ or Error Coram Nobis

#### i. Legal Standard

"The writ of error coram nobis is an extraordinary writ; and an extraordinary remedy [that] should not be granted in the ordinary case." United States v. Denedo, 556 U.S. 904, 917 (2009)(internal quotation marks and ellipsis omitted). This writ "can relieve an individual of the continuing noncustodial effects of a criminal conviction." Kaminski v. United States, 339 F.3d 84, 90 (2d Cir. 2003). However, "judgment finality is not to be lightly cast aside," and courts must be cautious so that this extreme remedy is only granted in extreme cases. United States v. Denedo, 556 U.S. at 916. "Coram nobis is not a substitute for appeal, and relief under the writ is strictly limited to those cases in which errors of the most fundamental character have rendered the proceeding itself irregular and

invalid." Foont v. United States, 93 F.3d 76, 78 (2d Cir. 1996) (internal quotations and ellipsis omitted).

**\*9** "The proceedings leading to the petitioner's conviction are presumed to be correct, and 'the burden rests on the accused to show otherwise.' " Foont, 93 F.3d at 78-79 (quoting United States v. Morgan, 436 U.S. 502, 512 (1954)). To obtain relief, a petitioner must demonstrate that (1) "there are circumstances compelling such action to achieve justice," (2) "sound reasons exist for failure to seek appropriate earlier relief," and (3) petitioner "continues to suffer legal consequences from his conviction that may be remedied by granting the writ." Id. at 79. (quotation marks and alteration omitted).

#### ii. Discussion

Citing Newman and United States v. Contorinis, 692 F.3d 136 (2d Cir. 2015), Petitioner contends that his $53.8 million agreed-upon forfeiture order should be reduced by nearly $50 million. (Mot. Writ of Error at 1). However, for reasons described above, Petitioner's reliance on Newman is unavailing because he cannot establish actual innocence. (See supra at 11-17). Because Petitioner has failed to show that one of the three criteria necessary to grant this writ—namely, "circumstances compelling such action to achieve justice," Foont, 93 F.3d at 79—the Court rejects Petitioner's claim to exclude from the forfeiture those gains that were allegedly not unlawful under Newman. (Mot. Writ of Error at 3).

Further, Petitioner argues that the forfeiture is invalid under Contorinis because it exceeds the scope of the forfeiture statute, 18 U.S.C. § 981(A)(1)(C), because the forfeiture order must be limited to defendant's own gains and Petitioner never "received or possessed" the fees. (Mot. Writ of Error at 10-11). However, when Petitioner negotiated and agreed to the forfeiture order, he failed to raise this issue on direct appeal even though the Contorinis decision was available to him at that time. The Court therefore cannot find that the forfeiture order was an "error[ ] of the most fundamental character," Foreman v. United States, 247 Fed. Appx. 246, 248 (2d Cir. 2007), or that "sound reasons exist for failure to seek appropriate earlier relief," Foont, 93 F.3d at 79. Additionally, unlike in Contorinis, where the defendant was merely a portfolio manager of the fund and consequently did not have control over the funds, 692 F.3d at 139, here Petitioner

was the founder and manager of Galleon and did in fact acquire and have control over the funds, (Mot. Writ of Error at 4). Thus, there is no basis to reduce the agreed-upon forfeiture order under <u>Contorinis</u>.

Petitioner's writ of error coram nobis is denied.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the Court resolves the various outstanding motions and requests in the following manner:

1. The motion to correct, vacate, and/or set aside his sentence pursuant to Title 28, United States Code, Section 2255 [dkt. no. 354] and the request for oral argument [dkt. no. 366] are denied.

2. The writ of error coram nobis to vacate, reassess, and amend his order of forfeiture [dkt. no. 351] and the request for oral argument [dkt. no. 367] are denied.

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 887027

---

     © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   9

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------X
RAJ RAJARATNAM,                 :
                                :    15 Civ. 5325 (LAP)
              Petitioner,        :
                                :    Related To:
     -against-                   :    09 Cr. 1184 (LAP)
                                :
UNITED STATES OF AMERICA,        :    ORDER
                                :
              Respondent.        :
                                :
------------------------------X

Loretta A. Preska, Senior United States District Judge:

On March 3, 2017, the Court denied Raj Rajartnam's
("Rajaratnam" or "Petitioner") motion pursuant to 28 U.S.C.
§ 2255 to correct, vacate, and/or set aside the sentence.  (Op.,
Mar. 3, 2017, dkt. no. 373).  On April 3, 2017, Petitioner filed
a motion requesting the Court to issue a Certificate of
Appealability ("COA") regarding the question of whether he is
actually innocent in light of United States v. Newman, 773 F.3d
438 (2d Cir. 2014), and Salman v. United States, 137 S. Ct. 420
(2016).  (Mot., Apr. 3, 2017, dkt. no. 374).  The Government
opposed this motion by letter dated April 21, 2017.  (Opp.,
April 21, 2017, dkt. no. 376).  The motion is denied for the
following reasons.

District courts should grant a COA only where a defendant
"has made a substantial showing of the denial of a
constitutional right."  28 U.S.C. § 2253(c)(2).  Where a

district court has denied a petitioner's constitutional claim on the merits, the court may issue a certificate only when the petitioner has "demonstrate[d] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Petitioner presents two arguments in support of his application. First, Petitioner notes that the Court distinguished his case from Newman by highlighting the fact that he was situated very differently from Newman and Chiasson. (Mot. at 3). Petitioner therefore argues that reasonable jurists could debate whether the reasoning in Newman was dependent on how far removed the defendant was from the insiders. (Id.) However, the Court's decision was not solely dependent on how far removed Petitioner was from the insiders. Rather, the Court made this distinction to support its finding that based on the overwhelming evidence adduced at trial a reasonable jury could infer that Petitioner had knowledge that insiders were providing confidential information in exchange for a personal benefit. Reasonable jurists would not find this conclusion debatable.

Second, Petitioner argues that the Court's decision relies on propositions that the Newman Court arguably rejected. (Mot. at 3). Specifically, Petitioner notes that "Newman itself

2

rejected the reasonableness of drawing an inference of the
defendant's knowledge of a benefit received by a remote insider
based upon payments made by the defendant to an intermediary
. . . or acts of concealment on the defendant's part."
(Id.)(internal citations omitted). Contrary to Petitioner's
assertion, the Newman Court did not address whether acts of
concealment or payment to intermediate tippees would form a
reasonable basis for a jury to find that the defendant had
knowledge of the exchange of inside information for a benefit.
Moreover, the Court's decision did not assume "that an insider
necessarily discloses inside information for a personal
benefit." (See Mot. at 3). Rather, the Court found that the
extensive evidence adduced at trial allowed the jury to conclude
that the defendant had actual knowledge that insiders were
providing information in exchange for a benefit, particularly in
light of Salman, which held that such benefits need not be
pecuniary in nature. (Op. at 12, 14-17). Accordingly, because
Petitioner's argument depends on inaccurate representations of
both Newman and the Court's Opinion, reasonable jurists would
not find the Court's assessment debatable.

### CONCLUSION

For the foregoing reasons, the Court denies Petitioner's
motion requesting the issuance of a Certificate of Appealablity
(dkt. no. 374) because Petitioner has failed to identify a claim

that jurists of reason would find debatable. See Slack, 529

U.S. at 478.

SO ORDERED.

Dated: New York, New York
May 9, 2017

Loretta A. Preska

_____

LORETTA A. PRESKA
Senior United States District Judge

4

# Exhibit C

UNITED STATES OF AMERICA, Appellee, v. Jon..., 2013 WL 6163307...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page52 of 467

2013 WL 6163307 (C.A.2) (Appellate Brief)
United States Court of Appeals, Second Circuit.

UNITED STATES OF AMERICA, Appellee,

v.

Jon HORVATH, Danny Kuo, Hyung G. Lim, Michael Steinberg, Defendants,

Todd Newman, Anthony Chiasson, Defendants-Appellants.

Nos. 13-1837(L), 13-1917(CON).
November 14, 2013.

On Appeal from the United States District Court for the Southern District of New York

**Brief for the United States of America**

Antonia M. Apps, Richard C. Tarlowe, Micah W.J. Smith, Brent S. Wible, Assistant United States Attorneys, Of Counsel.

Preet Bharara, United States Attorney for the Southern District of New York, Attorney for the United States of America.

**\*i TABLE OF CONTENTS**

Preliminary Statement ............................................................................................ 1
Statement of Facts .................................................................................................. 3
A. The Government's Case ...................................................................................... 3
1. The Inside Tips Regarding Dell and Newman's and Chiasson's Trades on Those Tips .................... 5
2. The Inside Tips Regarding NVIDIA and Newman's and Chiasson's Trades on Those Tips .............. 12
3. The Benefits Ray and Choi Received for Disclosing Inside Information ................................. 14
4. Newman and Chiasson Knew the Dell and NVIDIA Tips Came from Insiders in Breach of a Duty ...... 17
of Confidentiality
a. Newman's Knowledge of the Breaches ................................................................... 17
b. Chiasson's Knowledge of the Breaches ................................................................... 21
B. The Defense Case and the Verdict ........................................................................ 27
C. The Sentencings .............................................................................................. 32
Argument:
Point I--The Jury Instructions Were Correct ............................................................... 32
 **\*ii** A. Applicable Law ........................................................................................ 33
B. Discussion .................................................................................................... 35
1. The Instruction on the Defendants' Knowledge of the Insiders' Breaches Was Correct ............... 35
a. Relevant Facts .............................................................................................. 36
b. Discussion .................................................................................................... 39
i. Tippee Liability Does Not Require Knowledge of a Personal Benefit ................................... 39
ii. There Was No Due Process Violation .................................................................... 59
iii. Any Error Was Harmless .................................................................................. 59
2. The District Court Properly Instructed the Jury on Conscious Avoidance ............................. 66
a. Relevant Facts .............................................................................................. 66
b. Applicable Law .............................................................................................. 67
c. Discussion .................................................................................................... 69
3. The Instruction on Nonpublic Information Was Correct ................................................. 73
a. Relevant Facts .............................................................................................. 73
b. Discussion .................................................................................................... 75
 **\*iii** Point II--There Was Sufficient Evidence that the Dell and NVIDIA Insiders Breached a Duty for ... 79
a Personal Benefit
A. Applicable Law .............................................................................................. 80
B. Discussion .................................................................................................... 81

Case 17-1405, Document 29, 06/06/2017, 2052263, Page53 of 467

1. There Was Sufficient Evidence that the Insiders Intentionally Breached a Duty of Confidentiality ... 81
2. There Was Sufficient Evidence that the Insiders Received Personal Benefits ...................................... 85
Point III--There Was No Prejudicial Variance as to Count Two ......................................................... 90
A. Applicable Law ........................................................................................................................... 91
B. Relevant Facts ............................................................................................................................. 92
C. Discussion ................................................................................................................................... 95
Point IV--Chiasson's Sentence Was Reasonable ............................................................................... 102
A. Relevant Facts ............................................................................................................................. 102
B. Applicable Law ........................................................................................................................... 106
1. Appellate Review of Sentences .................................................................................................... 106
2. Consideration of Sentencing Disparities ..................................................................................... 108
**\*iv** C. Discussion ......................................................................................................................... 109
1. Chiasson's Sentence Was Procedurally Reasonable ..................................................................... 109
2. Chiasson's Sentence Was Substantively Reasonable .................................................................... 113
Point V--The Forfeiture Order Was Proper ....................................................................................... 118
A. Relevant Facts ............................................................................................................................. 118
B. Applicable Law ........................................................................................................................... 122
C. Discussion ................................................................................................................................... 124
1. The District Court's Factual Findings Were Not Clearly Erroneous ............................................ 124
2. The District Court Properly Determined Forfeiture by a Preponderance of the Evidence ................... 127
Conclusion ......................................................................................................................................... 133

## **\*v**  TABLE OF AUTHORITIES

*Cases*:

*Alleyne v. United States*, 133 S. Ct. 2151 (2013) .................... 128, 129, 130, 132
*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) ........ 123
*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ........................ 127
*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985) ............................................................................... 41
*Berkovich v. Hicks*, 922 F.2d 1018 (2d Cir. 1991) .................. 100
*Brady v. Maryland*, 373 U.S. 83 (1963) ................................. 78
*Carpenter v. United States*, 484 U.S. 19 (1987) ..................... 77
*Dirks v. SEC*, 463 U.S. 646 (1983) ........................................ passim
*Gall v. United States*, 552 U.S. 38 (2007) .............................. 107
*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011) ............................................................................... 71
*In re Investors Management Co.*, 44 S.E.C. 633 (1971) .......... 40, 47
**\*vi**  *Jackson v. Virginia*, 443 U.S. 307 (1979) ................. 80
*Libretti v. United States*, 516 U.S. 29 (1995) ........................ 128
*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) ............................................................... 128
*SEC v. Anton*, No. 06-2274, 2009 WL 1109324 (E.D. Pa. Apr. 23, 2009) ................................................................... 86
*SEC v. Materia*, 745 F.2d 197 (2d Cir. 1984) ........................ 54
*SEC v. Maxwell*, 341 F.Supp.2d 941 (S.D. Ohio 2004) ........... 86
*SEC v. Musella*, 678 F. Supp. 1060 (S.D.N.Y. 1988) .............. 55
*SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012) ............................. passim
*SEC v. Thrasher*, 152 F. Supp. 2d 291 (S.D.N.Y. 2001) ......... 55
*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998) ............................. passim
*Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012) . 128, 129
*Staples v. United States*, 511 U.S. 600 (1994) ....................... 50, 51
**\*vii**  *State Teachers Ret. Bd. v. Fluor Corp.*, 592 F. Supp. 592 (S.D.N.Y. 1984) ......................................................... 56, 59
*United States v. Aina-Marshall*, 336 F.3d 167 (2d Cir. 2003) . 69
*United States v. Alkins*, 925 F.2d 541 (2d Cir. 1991) .............. 34, 77
*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) ........... 80
*United States v. Baker*, 693 F.2d 183 (D.C. Cir. 1982) ........... 45
*United States v. Booker*, 543 U.S. 220 (2005) ........................ 106, 128

UNITED STATES OF AMERICA, Appellee, v. Uell..., 2013 WL 6163367...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page54 of 467

*United States v. Botti*, 711 F.3d 299 (2d Cir. 2013) ............... 34, 60

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) ............. 52

*United States v. Cavera*, 550 F.3d 180(2d Cir. 2008) ............. 106, 107

*United States v. Chavez*, 549 F.3d 119 (2d Cir. 2008) ............. 80

*United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012) ........ 73, 76, 123

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) .............. 76

*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005) ............. 106

**viii** *United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013) ....... 67, 68, 71

*United States v. Day*, 700 F.3d 713 (4th Cir. 2012) ................ 129

*United States v. Dixon*, 536 F.2d 1388 (2d Cir. 1976) ............. 51

*United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006) ............. 91, 98, 99

*United States v. Falcone*, 257 F.3d 226 (2d Cir. 2001) ........... 44, 54

*United States v. Falu*, 776 F.2d 46 (2d Cir. 1985) .................... 45

*United States v. Feola*, 420 U.S. 671 (1975) .......................... 44

*United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006) ......... 107, 108, 109, 118

*United States v. Figueroa*, 165 F.3d 111 (2d Cir. 1998) .......... 44, 46

*United States v. Florez*, 447 F.3d 145 (2006) ......................... 108, 109, 116

*United States v. Frias*, 521 F.3d 229 (2d Cir. 2008) ............... 108

*United States v. Fruchter*, 411 F.3d 377 (2d Cir. 2005) .......... *passim*

*United States v. Gabriel*, 125 F.3d 89 (2d Cir. 1997) ............. 69

**ix** *United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993) ..... 88

*United States v. Gaskin*, 364 F.3d 438 (2d Cir. 2004) ............ 80, 123

*United States v. Goffer*, 721 F.3d 113 (2d Cir. 2013) ............. *passim*

*United States v. Griffith*, 284 F.3d 338 (2d Cir. 2002) ............ 44

*United States v. Han*, 230 F.3d 560 (2d Cir. 2000) ................. 34

*United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008) ............ 80

*United States v. Heimann*, 705 F.2d 662 (2d Cir. 1983) .......... 91

*United States v. Hopkins*, 53 F.3d 533 (2d Cir. 1995) ............. 68

*United States v. Irving*, 554 F.3d 64 (2d Cir. 2009) ................ 109

*United States v. Jiau*, -- F.3d --, 2013 WL 5735348 (2d Cir. Oct. 23, 2013) ................................................................ *passim*

*United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010) ............. 51, 52, 58

*United States v. Kozeny*, 667 F.3d 122 (2d Cir. 2011) ............ 68, 71

**x** *United States v. LaPorta*, 46 F.3d 152 (2d Cir. 1994) ...... 44

*United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002) ........... 97

*United States v. Leahy*, 438 F.3d 328 (3d Cir. 2006) .............. 131

*United States v. Libera*, 989 F.2d 596 (2d Cir. 1993) .............. *passim*

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012) ........... 77, 78, 79

*United States v. McDermott*, 918 F.2d 319 (2d Cir. 1990) ...... 91

*United States v. Mingoia*, 424 F.2d 710 (2d Cir. 1970) ........... 45

*United States v. Mitchell*, 328 F.3d 77 (2d Cir. 2003) ............. 34

*United States v. Moran-Toala*, 726 F.3d 334 (2d Cir. 2013) ... 33

*United States v. Mucciante*, 21 F.3d 1228 (2d Cir. 1994) ........ 91

*United States v. Mylett*, 97 F.3d 663 (2d Cir. 1996) ................ 43, 54

*United States v. Nektalov*, 461 F.3d 309 (2d Cir. 2006) .......... 118

*United States v. O'Hagan*, 521 U.S. 642 (1997) ...................... 54

**xi** *United States v. Pabon-Cruz*, 255 F. Supp. 2d 200 (S.D.N.Y. 2003) ................................................................ 60, 64

*United States v. Peltz*, 433 F.2d 48 (2d Cir. 1970) .................. 52

*United States v. Phillips*, 704 F.3d 754 (9th Cir. 2012) ........... 129

*United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974) ............ 100

*United States v. Quinn*, 359 F.3d 666 (4th Cir. 2004) ............. 88

*United States v. Rajaratnam*, 802 F. Supp. 2d 491 (S.D.N.Y. 2011) ................................................................ 56

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) ............... 131

*United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996) ............... 123

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ............... 91, 108

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) ............... 107

UNITED STATES OF AMERICA, Appellee, v. John..., 2013 WL 6163307...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page55 of 467

*United States v. Roglieri*, 700 F.2d 883 (2d Cir. 1983) .......... 45

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008) .............. 123

*United States v. Salmonese*, 352 F.2d 608 (2d Cir. 2003) ........ 91

**\*xii** *United States v. Sanders*, 211 F.3d 711 (2d Cir. 2000) .. 45

*United States v. Santoro*, 647 F. Supp. 153 (E.D.N.Y. 1986) .. 56

*United States v. Strother*, 49 F.3d 869 (2d Cir. 1995) ............. 101

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003) .......... 68, 71

*United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004) ......... 52

*United States v. Treacy*, 639 F.3d 32 (2d Cir. 2011) .............. 123

*United States v. Weintraub*, 273 F.3d 139 (2d Cir. 2001) ....... 44, 45, 46, 51

*United States v. Werner*, 160 F.2d 438 (2d Cir. 1947) ............ 60, 64

*United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008) ............ 77

*United States v. Whitman*, No. 12 Cr. 125 (JSR), 2012 WL 5505080 (S.D.N.Y. Nov. 19, 2012) ........................................ 56, 57, 60

*United States v. Wilkerson*, 361 F.3d 717 (2d Cir. 2004) ........ 34

*United States v. Wills*, 476 F.3d 103 (2d Cir. 2007) ............... 108

**\*xiii** *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) ....................................................................................... 50

*Statutes, Rules & Other Authorities:*

8 U.S.C. § 1327 ......................................................................... 44

15 U.S.C. § 78ff(a) .................................................................... 51

18 U.S.C. § 111 ......................................................................... 44

18 U.S.C. § 641 ......................................................................... 45

18 U.S.C. § 981(a)(1)(C) ........................................................... 122, 130

18 U.S.C. § 1361 ....................................................................... 45

18 U.S.C. § 1708 ....................................................................... 45

18 U.S.C. § 2314 ....................................................................... 45

18 U.S.C. § 2423 ....................................................................... 44

18 U.S.C. § 3553(a) ................................................................... 116

18 U.S.C. § 3553(a)(6) .............................................................. 108

28 U.S.C. § 2461 ....................................................................... 122

28 U.S.C. § 2461(c) ................................................................... 131

42 U.S.C. § 7413(c)(1) ............................................................... 44

17 C.F.R. § 243.100 ................................................................... 48

17 C.F.R. § 243.100(a) ............................................................... 48

17 C.F.R. § 243.101(c) ............................................................... 48

Fed. R. Crim. P. 32.2(b)(1)(B) .................................................. 123

**\*xiv** Fed. R. Crim. P. 52(a) ................................................... 34

Fed. R. Evid. 611(a) .................................................................. 100

Fed. R. Evid. 613(b) .................................................................. 101

U.S.S.G. § 2B1.4 ....................................................................... 109, 112

Insider Trading and Securities Fraud Enforcement Act of 1988, H.R. Rep. No. 100-910 (1988) ........................................ 115

Insider Trading Sanctions Act of 1984, H.R. Rep. No. 98-355 (1983) ......................................................................................... 115

*Selective Disclosure and Insider Trading*, 64 Fed. Reg. 72590-01 (Dec. 28, 1999) .............................................................. 49

*Selective Disclosure and Insider Trading*, 65 Fed. Reg. 51716-01 (Aug. 24, 2000) .............................................................. 49

## *1 Preliminary Statement

Todd Newman and Anthony Chiasson appeal from judgments of conviction entered on May 9, 2013, and May 14, 2013, respectively, in the United States District Court for the Southern District of New York, following a six-week jury trial before the Honorable Richard J. Sullivan, United States District Judge.

UNITED STATES OF AMERICA, Appellee, v. Joh..., 2013 WL 6133367...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page56 of 467

Superseding Indictment S2 12 Cr. 121 (RJS) (the "Indictment") was filed on August 28, 2012, in twelve counts. Count One charged Newman, Chiasson, and a co-defendant with conspiracy to commit securities **\*2** fraud, in violation of Title 18, United States Code, Section 371. Each of Counts Two through Five charged Newman and each of Counts Six through Ten charged Chiasson with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b-5-2; and Title 18, United States Code, Section 2.[1]

---

[1]    The co-defendant in the conspiracy count, who pleaded guilty before trial, was charged with securities fraud in Counts Eleven and Twelve.

Trial commenced on November 7, 2012, and ended on December 17, 2012, when the jury returned its verdict, finding Newman and Chiasson guilty on each of the counts in which they were charged.

On May 2, 2013, the District Court sentenced Newman to an aggregate term of 54 months' imprisonment, to be followed by an aggregate one-year term of supervised release, imposed a $500 mandatory special assessment, and ordered Newman to forfeit $737,724 and to pay a $1 million fine. On May 13, 2013, the Court sentenced Chiasson to an aggregate term of 78 months' imprisonment, to be followed by an aggregate one-year term of supervised release, imposed a $600 mandatory special assessment, and ordered Chiasson to pay a $5 million fine, deferring the determination of the forfeiture amount. On June 28, 2013, following further briefing by the parties, the Court ordered Chiasson to forfeit $1,382,217.

**\*3**   At the conclusion of his sentencing proceeding, Newman moved for bail pending appeal. By order dated May 8, 2013, the District Court denied Newman's motion. Chiasson also moved for bail pending appeal at his sentencing proceeding, which motion the Court denied for the reasons set forth in its May 8, 2013 order. Both Newman and Chiasson thereafter filed motions in this Court for bailing pending appeal. On June 21, 2013, this Court granted those motions. Newman and Chiasson thus remain free on bail pending appeal.

## Statement of Facts

### A. The Government's Case

The evidence at trial established that Newman, a portfolio manager at a hedge fund called Diamondback Capital Management, LLC ("Diamondback"), and Chiasson, a co-founder of a hedge fund called Level Global Investors, L.P. ("Level Global"), participated in an insider trading scheme along with a cohort of corrupt analysts at various hedge funds and investment firms who exchanged material, nonpublic information obtained from employees of publicly traded technology companies. The analysts provided the inside information they obtained to their portfolio managers--including Newman and Chiasson--who, in turn, used that information to trade in securities. The trial focused largely on tips from insiders at Dell, Inc. ("Dell") and NVIDIA Corporation ("NVIDIA"), who breached duties they owed to their employers by disclosing their companies' confidential earnings numbers before that information was publicly released.   **\*4**   Based on this inside information, Newman and Chiasson executed trades in Dell and NVIDIA securities, earning approximately $4 million and $68 million, respectively, in illicit profits for their funds.[2]

---

[2]    Counts Two, Three, Four, and Six through Nine were based on trades in Dell securities shortly before Dell's May 2008 and August 2008 earnings announcements. Counts Five and Ten were based on trades in NVIDIA securities shortly before NVIDIA's May 2009 earnings announcement.

The Government's proof included: (1) the testimony of cooperating witnesses Sandeep ("Sandy") Goyal and Hyung Lim, who received tips from insiders at Dell and NVIDIA and shared the tips with corrupt analysts; (2) the testimony of cooperating witnesses Jesse Tortora and Spyridon ("Sam") Adondakis, who worked as analysts for Newman and Chiasson, respectively,

UNITED STATES OF AMERICA, Appellee, v. Geh..., 2015 WL 6163307...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page57 of 467

and passed illegal tips to them; (3) the testimony of Dell and NVIDIA representatives establishing that the information disclosed to the defendants was confidential and that insiders breached duties of confidentiality in divulging it; (4) e-mails and instant messages corroborating the analysts' testimony; (5) compliance manuals of the defendants' hedge funds, which banned trading on inside information; and (6) telephone and trading records showing trades executed shortly after the defendants received inside tips from their analysts.

**\*5  1. The Inside Tips Regarding Dell and Newman's and Chiasson's Trades on Those Tips**

Between 2007 and May 2009, Rob Ray worked in Dell's investor relations department, where he had access to Dell's financial information as the company consolidated its earnings numbers from its various business units each quarter. (Tr. 2759, 2769; GX 1657). [3] For eight quarters in a row, Ray disclosed Dell's consolidated earnings numbers to Sandy Goyal, an analyst at Neuberger Berman, before the information was released to the public. (Tr. 2769, 2782, 2804, 2808, 2813; GX 39, 1704A, 1707). Ray provided multiple updates each quarter, often during the consolidation process (*i.e.*, between the close of the quarter and the earnings announcement). (Tr. 2769, 2781-82, 2793, 2804, 2808, 2813, 2820; GX 39, 1704A, 1707). [4]

---

[3]    "Tr." refers to the trial transcript; "GX" refers to a Government Exhibit introduced at trial; "DX" refers to a Defense Exhibit introduced at trial; "Newman Br." and "Chiasson Br." refer to the defendants' respective briefs on appeal; "A." refers to the appendix filed with those briefs; and "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with Chiasson's sentencing.

[4]    This internal consolidation of financial results is often referred to as a "roll-up" of financial information.

**\*6**  Upon receiving this information from Ray, Goyal shared it with Tortora, an analyst who worked for Newman at Diamondback. (Tr. 136, 144). Tortora, in turn, provided the information to Newman and certain other analysts with whom he shared inside information, including Sam Adondakis of Level Global. Adondakis passed the tips along to Chiasson. (Tr. 159; GX 214). Both Newman and Chiasson traded on the inside information Ray provided about Dell's earnings in advance of Dell's earnings announcements in May, August, and November of 2008, and earned substantial profits in connection with two of those quarters. (GX 51, 56, 59, 64).

Ray was not Goyal's primary contact at Dell for legitimate communications; Shep Dunlap, another investor relations employee at Dell, had that role. (Tr. 1472-73, 1475, 1631; GX 736, 759). Goyal spoke to Dunlap during business hours. By contrast, Ray, who worked in a cubicle where his criminal conversations could be overheard, provided confidential, inside information to Goyal at night and on weekends. (GX 26, 27; Tr. 1631). After Ray left Dell's investor relations team in May 2009 and joined the company's corporate development department, where he had no legitimate reason to discuss Dell's performance with analysts, he continued to provide inside information to Goyal. (GX 27, 1657; Tr. 2867).

Ray provided precise information concerning key portions of Dell's earnings results, including Dell's revenues, margins, and operating expenses. (Tr. 150, 154). For example, in advance of Dell's May 28, 2008 earnings announcement, Ray disclosed that Dell **\*7**  would report $15.8 billion in revenue and a gross margin between 18.5 and 18.6 percent. (*See* GX 600A (notes of a corrupt analyst documenting Ray's tip)). Ray provided similarly precise information before Dell announced its financial results in August and November of 2008. (*See* GX 214 (August 5, 2008 email from Tortora to Newman reporting that "gm [gross margin] looking at 17.5%"), 257 (November 14, 2008 e-mail from Tortora to Newman relaying "rev[enues of] 15.150 [billion], om [operating margin of] 6.1%")).

The confidential financial information Ray disclosed to Goyal was also largely accurate. As Tortora explained, there were occasions when certain metrics were "slightly off," but "the most important thing" was that Ray's information "allowed [the coconspirators] to accurately predict or project whether earnings were going to be materially better or worse than market expectations, thus allowing for trading on the stock." (Tr. 156). For example, before Dell's May 2008 earnings announcement,

Case 17-1405, Document 29, 06/06/2017, 2052263, Page58 of 467

as Dell was consolidating its financial information, Ray disclosed that Dell would report gross margins between 18.5 and 18.6 percent. (*See* GX 600A). At the time Ray disclosed this information, it matched Dell's internal numbers. (*See* GX 1712, 1712A at 2 (May 12, 2008 internal Dell report showing Generally Accepted Accounting Principles ("GAAP") and non-GAAP gross margins of 18.5 percent and 18.6 percent, respectively)).

As another example, in advance of Dell's August 2008 quarterly announcement, Ray told Goyal that Dell would report a gross margin number lower than **\*8** 17.5 percent, well below market expectations; consistent with Ray's tip, Dell in fact reported GAAP and non-GAAP margins of 17.2 and 17.4 percent, respectively. (Tr. 249, 1769; GX 238A at 5, 586A). Although Ray's tip that Dell would report revenues of $16.2 billion was slightly below the actual number ($16.4 billion), this discrepancy was insignificant because the critical metric that quarter was the gross margin number. Because Dell reported gross margins substantially below the prevailing market expectation of 18.3 percent, the stock price fell by almost 14 percent--the largest decline in eight years. (GX 1842, 3003S). [5] Ray similarly provided accurate information the following quarter. (*See* GX 255 (indicating Ray **\*9** told Goyal revenues would be $15.15 billion for the quarter ending in October 2008), 1807 (Dell reported revenues of $15.162 billion)). [6]

[5] Newman mischaracterizes an instant message exchange between Tortora and Newman at the time of the announcement. He asserts that Tortora " 'freaked' " when he saw Dell reported $16.4 billion in revenue. (Newman Br. 13 (quoting A. 2019)). The full text of the instant message shows that Tortora "freaked when [he] saw [the] 16.4 [billion revenue number] . . . *and stock go up.*" (A. 2019 (emphasis added)). At the time of the announcement, Newman held a large short position in Dell. Following the announcement, Dell's price initially rose (apparently in response to the higher than expected revenue number) before falling precipitously based on the margin information. When the stock price rose initially, Tortora was concerned that the market would not react as expected to the margin number. (Tr. 883).

[6] Newman misinterprets a February 20, 2009 instant message in which Tortora told Adondakis that he had been "dead wrong" on Dell the prior quarter, suggesting Tortora meant Ray's information had been incorrect. (Newman Br. 14 n.9). Tortora, however, explained that the information was accurate, but that the stock market did not react as expected based on Dell's results; he further explained that his comment about being "dead wrong" referred to his prediction of how the market would react. (Tr. 921).

In tipping Goyal, Ray breached his duty of confidentiality to Dell. Ray was never authorized to disclose Dell's nonpublic financial information to outsiders. (Tr. 2807). Dell's policies strictly prohibited disclosure of Dell's confidential information, and Dell's unannounced consolidated earnings numbers counted among the company's most sensitive information. (Tr. 2766-68, 2780-81). Dell allowed only approximately 20 employees to access this information, including the Chief Executive Officer, the Chief Financial Officer, and certain members of the investor relations team who needed the information to prepare for the company's quarterly earnings announcements. (Tr. 2800-01, 2815-16). Members of the investor relations team--including Ray--received training on Dell's nondisclosure policies and how to answer questions from investors so as to avoid inadvertently disclosing **\*10** current quarter earnings data before its public release. (Tr. 2774-75, 2823-27, 2973). [7]

[7] Members of Dell's investor relations team were permitted to help analysts with models pertaining to Dell's historical financial information, but were prohibited from discussing current quarterly financial information. (Tr. 2926). Moreover, while Dell's investor relations group sought to target certain institutional investors as long-term investors in the company, Dell strictly prohibited the selective release of quarterly earnings information before its public announcement. (Tr. 2777-78, 2784, 2974).

In addition to this training on Dell's nondisclosure policy, Ray was explicitly warned not to disclose Dell's financial results before the company announced its earnings in May and August of 2008--the very announcements underlying the substantive counts charging trades in Dell securities. For example, on May 12, 2008, Ray and other members of Dell's investor relations team received an e-mail that contained Dell's financial results for the quarter, scheduled to be announced later that month. (GX 1712, 1712A; Tr. 2186). In the e-mail, Lynn Tyson, who was then the head of Dell's investor relations team, warned that she would "hunt . . . down" anyone who "breath[ed] a peep" of the results. (GX 1712). Notwithstanding this warning, on May 11

UNITED STATES OF AMERICA, Appellee, v. Ben..., 2013 WL 6163367...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page59 of 467

and May 15, Ray had lengthy telephone conversations with Goyal during which he disclosed Dell's confidential earnings **\*11** numbers. (GX 31, 32, 33, 600A, 1712A at 2). [8] Both Chiasson and Newman traded on Ray's information in advance of Dell's May 2008 earnings announcement, reaping over $1 million and $4 million in profits, respectively. (GX 51, 56). Chiasson did so on May 12 and May 16, shortly after Adondakis passed the information to him (GX 34, 52), and Newman did so on May 16, upon receiving the information from Tortora (GX 33, 50).

[8]    The financial information contained in Government Exhibit 1712A was also available on a shared network drive to which Ray had access. (Tr. 2817, 2843).

Ray received similar warnings not to discuss Dell's financial information in advance of the August 2008 quarterly earnings announcement. On August 8--a week after the quarter ended--Ray received an email advising investor relations personnel to be "especially vigilant about not sharing current information." (GX 1730). Yet at 10:30 p.m. on August 14, only hours after receiving the latest roll-up of Dell's financial information, Ray had a lengthy telephone conversation with Goyal in which he disclosed the information. (GX 26, 1732). Goyal spoke to Tortora the next morning, before the market opened; thereafter, starting at 10:24 a.m., Newman began to increase his short position in Dell stock. (GX 2501; Tr. 1201-09).

Then, on August 20, Ray and other investor relations personnel received an e-mail stating, "[w]e are keeping a tight lid on this"--meaning Dell's earnings numbers--"due to our performance in the quarter." **\*12** (GX 1733). Nonetheless, at 9:29 p.m. on August 24, Ray had another lengthy telephone conversation with Goyal and disclosed confidential information to him. (GX 26). The next day, Goyal spoke to Tortora, who subsequently told both Newman and Adondakis that Dell would miss market expectations on gross margins. (GX 26, 42, 230, 231). After receiving this information, both Newman and Chiasson increased their short positions in Dell securities. (GX 2501-DA, 2501-LA). Newman's and Chiasson's trading on the Dell tips in advance of the August 28, 2008 earnings announcement resulted in approximately $3 million and $54 million, respectively, in illegal profits for their hedge funds. (GX 59, 64).

### 2. The Inside Tips Regarding NVIDIA and Newman's and Chiasson's Trades on Those Tips

Like Dell, NVIDIA limited employee access to its internal accounting database. Chris Choi, however, worked in NVIDIA's finance department and was involved in preparing the company's quarterly financial statements; he therefore had access to the company's earnings numbers before they were publicly announced. (GX 1858A; Tr. 3095-96). NVIDIA's policies prohibited disclosure of its "financial results" to outsiders, and Choi signed a confidentiality agreement when he began working at NVIDIA. (GX 1953; Tr. 3101, 3103). Moreover, Choi was not a member of the company's investor relations department, and was not authorized to speak to investors. (Tr. 3098-101, 3103). Choi nonetheless repeatedly shared **\*13** NVIDIA's nonpublic financial information with Hyung Lim, a friend he knew from church.

Over the course of more than two years, Choi tipped Lim on numerous occasions, providing multiple updates in advance of each quarterly earnings announcement. (Tr. 3097-98, 3101-03; GX 1952, 1959). The information Choi provided was both precise and accurate. For example, on February 9 and February 10, 2009--before NVIDIA announced its earnings for the quarter ending in January of that year-- Choi told Lim that quarterly revenues would be $481 million, down 46.4 percent from the previous quarter, and that GAAP gross margins would be 29.4 percent. (*See* GX 806 (e-mail documenting the tip)). Consistent with Choi's tip, after the market closed on February 10, NVIDIA reported revenues of $481.1 million (a 46 percent decrease from the prior quarter) and a GAAP gross margin number of 29.4 percent. (GX 1976). [9] As another example, Choi told Lim that, for the quarter ending in April 2009, NVIDIA would report revenues of "around $668 million" and gross margins of 30 percent. (*See* GX 820 (e-mail reflecting Choi's tip)). Consistent with this tip, NVIDIA later reported revenues of $664.2 million and non-GAAP gross margins of 30.6 percent. (GX 1979A).

UNITED STATES OF AMERICA, Appellee, v. Uen..., 2015 WL 6163307...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page60 of 467

9 The information Choi provided as to the non-GAAP gross margin number was incorrect, although it appeared that the error was in calculating the non-GAAP gross margins based on (accurate) information Choi provided about an inventory charge. (Tr. 490, 997-98).

**\*14** NVIDIA did not sanction such disclosures. Not only did the company prohibit employees like Choi from divulging nonpublic financial information to outsiders, but, as a corrupt analyst wrote in an e-mail to Tortora in February 2009, the head of NVIDIA's investor relations group "had a firm policy about not calling back even in the last month of [the] quarter." (GX 803; Tr. 493-94).

After receiving this inside information from Choi, Lim passed it on to his friend Danny Kuo, who worked as an analyst at an investment company in California. (Tr. 3039). Kuo, in turn, shared the information with his boss and other corrupt analysts, including Tortora and Adondakis. (GX 804, 818). Both Newman and Chiasson traded on the information ahead of NVIDIA's May 7, 2009 earnings announcement, earning over $73,000 and $10 million, respectively. (GX 71, 73).

### 3. The Benefits Ray and Choi Received for Disclosing Inside Information

Ray and Choi each disclosed inside information for personal benefit. In exchange for providing material, nonpublic information about Dell to Goyal, Ray received career advice and assistance from Goyal. [10] After **\*15** attending business school with Ray, Goyal worked at Dell before becoming a Wall Street analyst. (Tr. 1390). Ray wanted to follow in Goyal's path. (Tr. 1396-1403; *see* GX 700 (Ray stating, "I wanted to call and chat with you sometime and get some feedback about your experience so far when you have a little time. As you know, I am extremely interested in the equity research area and it will be great to get some perspective from you."), 705 (Ray thanking Goyal for career advice, attaching his résumé, and stating, "Since you have successfully made the transition from Dell to investment management, I would love to hear your feedback on my resume only if/when you have some time")). In September 2007, Ray told Goyal that he was "still desperately looking to break into the buy/sell side." (GX 708). Goyal immediately responded that he had "put in a good word" for Ray with a buy-side person with whom Goyal was having lunch at the time. (GX 708). Over the next two years, Goyal continued to advise Ray on a range of topics, from discussing an examination that is required in order to become a financial analyst to editing Ray's résumé and sending it to a Wall Street recruiter. (Tr. 1396-1403; GX 703, 705, 710, 715, 719, 719B, 720, 733).

10 Goyal told Ray that he worked in the research department at Neuberger Berman, writing research reports that formed the basis of stock recommendations Goyal sent to the firm's portfolio managers. (Tr. 1424, 1643). While Goyal did not tell Ray that he was trading on the information or sharing it with anyone outside Neuberger, the timing of Goyal's inquiries, with repeated updates during Dell's consolidation process, made apparent that Goyal sought to profit from the information before it became public.

At critical points in 2008, Ray and Goyal exchanged earnings numbers for career advice in the **\*16** very same conversation. For example, on August 14, 2008, two weeks before Dell's earnings announcement, Ray received by e-mail the "final" internal consolidation of Dell's earnings numbers. (GX 1732). That evening, Goyal sent an e-mail to Ray containing an investment pitch for Ray to use in connection with job interviews. (GX 734; Tr. 1461). A few hours later, Ray and Goyal had a lengthy telephone conversation during which Ray tipped Goyal. (GX 39). The next day, Goyal contacted Tortora, who passed Dell's earnings information along to Newman and Adondakis. (Tr. 266-70, 1203-07). Both Newman and Chiasson subsequently traded on the information the day they received it.

Ray and Goyal were also friends. The men had known each other for years. (Tr. 1469-70). They knew each other's wives, talked about going on family vacations together, and spoke frequently on the telephone, late at night, often for lengthy periods of time. (Tr. 1469-70).

Choi provided NVIDIA's earnings numbers to his friend Lim in advance of each quarterly earnings announcement in 2009. (Tr. 3082-83). Lim described Choi as a "family friend"; they had attended the same church, had lunches together, and had

UNITED STATES OF AMERICA, Appellee, v. Todd..., 2015 WL 6163367...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page61 of 467

participated in "occasional other church activities" since 2002. (Tr. 3032-33). Lim told Choi that he traded NVIDIA stock, and at times solicited Choi's view on whether trading in the stock would be profitable. (Tr. 3044, 3083). Lim sought NVIDIA's earnings information from Choi following a request for inside information from Lim's friend Kuo, who Lim knew wanted to execute **\*17** trades based on the information. (Tr. 3033). Kuo gave Lim a total of $15,000 in cash and various valuable items in return for the information. (Tr. 3010, 3039, 3042).

**4. Newman and Chiasson Knew the Dell and NVIDIA Tips Came from Insiders in Breach of a Duty of Confidentiality**

**a. Newman's Knowledge of the Breaches**

Newman knew that the information Tortora gave him concerning Dell and NVIDIA came from company insiders who disclosed the information in breach of their duties to keep it confidential, and not for any legitimate corporate purpose. Tortora told Newman the Dell tips came from a Dell employee. (Tr. 160-61). Tortora gave Newman the Dell tips he received from Goyal "verbatim," including references to Dell's "rollup" of its financial numbers. (Tr. 160). As discussed, those tips were specific, provided shortly before quarterly announcements, and materially different from market expectations. For example, on August 5, 2008, just four days after the quarter had closed, Tortora informed Newman that the "Q finished on fri, numbers still coming in," but that Goyal had reported, "gm looking at 17.5% vs street at 18.3%, however could go higher as things get rolled up." (GX 214; *see also* GX 287 (Newman writing to Tortora, "hey when u th[in]k sandy [Goyal] checks in," and Tortora responding, "most likely next week as close [of the quarter] today, but let me ask him today"), 296 (Tortora forwarding e-mail to Newman in which Goyal **\*18** wrote to Tortora, "waiting for qtr to end or come closer so that numbers more firm")).

The timing and frequency of the Dell updates--coming multiple times between the close of the quarter and the earnings announcements--as well as the specificity of the information demonstrated that an insider disclosed the information in breach of duty and for an improper purpose. Only a company insider with access to earnings numbers as they were being consolidated for a quarterly announcement could provide such disclosures. Moreover, Newman was keenly interested in Goyal's tips, at times pestering Tortora to obtain updates from Goyal shortly before Dell's earnings announcement. (*See, e.g.*, GX 228 (e-mail dated August 25, 2008, from Newman to Tortora asking, "U think we get one more dell update before [the earnings report is released on] thurs?"), 287 (instant message dated May 1, 2009, in which Newman asked Tortora, "hey when u thk sandy checks in?")).

Moreover, Newman knew that Goyal communicated with this particular Dell contact at night and on the weekend, rather than during the work day. When Newman asked Tortora in late October 2008 to confirm whether Dell would be issuing a mid-quarter update, Tortora responded that he had "spoke[n] to [Goyal]," who was "putting in a call to [his] main contact," but that Goyal "usually wont hear back from him til evening as calls him outside of work." (GX 322; *see also* GX 197 (in an e-mail chain forwarded to Newman, Tortora asked Goyal for "anything new on dell," and Goyal responded that he was not able to reach his contact over the weekend), 242 **\*19** (Tortora telling Newman that Goyal "spoke to his guy [at Dell] over weekend")).

That Newman authorized $175,000 in secret payments to Goyal through a sham consulting arrangement with Goyal's wife further demonstrated that Newman knew he was improperly obtaining material, nonpublic information regarding Dell. (GX 750-54, 775A, 776, 780A, 781A, 2269, 2270; Tr. 1353). Indeed, Newman agreed to award Goyal a $100,000 bonus at the end of 2008, explaining to Tortora that Goyal "helped us most." (GX 790). Newman would have had no reason to pay Goyal such a large sum if Goyal's contact at Dell had been authorized to disclose that information to investors.

As for NVIDIA, Newman received multiple updates on the company's earnings numbers shortly before three quarterly announcements in 2009. In the quarter before Newman made the illicit trade charged in Count Five, Tortora forwarded Newman an e-mail from Kuo containing NVIDIA's earnings numbers, including its revenue and gross margin data. (GX 805). In the e-mail, Kuo was explicit about the fact that the information was from "an accounting manager at NVDA," and that Kuo had received it "through a friend." (GX 805). The e-mail provided precise numbers and described an inventory charge, which information could have come only from a NVIDIA insider with access to the company's confidential financial data. The revenue and GAAP gross margin numbers proved to be accurate, as Tortora reminded Newman before Newman decided to trade on

UNITED STATES OF AMERICA, Appellee, v. Todd..., 2015 WL 6163307...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page62 of 467

another tip the insider provided in advance of **\*20** NVIDIA's May 2009 earnings announcement. (*See* GX 809, 815; *see also* GX 806 (Tortora writing that Kuo's source had "nailed rev and gaap gm to the decimal")). The e-mails in which Kuo shared Choi's tips--all of which Tortora forwarded to Newman--also reflected the internal consolidation process that only an insider with access to the company's financial numbers could know. (*See, e.g.*, GX 819 ("April quarter GM tracking to 30% . . . He won't know about the amount of inventory reserve charge, if any, until the end of the quarter"), 820 (providing "NVDA checks over the weekend, after the close of quarter"), 838 ("NVDA checks--final read before the print")).

The pattern and timing of Newman's trades confirmed that Newman understood he had access to material, nonpublic information. Knowing that the information about Dell's earnings came from corporate insiders and was inconsistent with market expectations, Newman made large investments in Dell securities based on the inside information. Before Newman received the Dell tips in 2008, he rarely, if ever, held a position in Dell securities at the time of its quarterly earnings announcements. Throughout 2008, however, as Goyal provided accurate information in advance of Dell's quarterly announcements, Newman made increasingly large investments in Dell securities. (GX 50 (450,000 shares as of May 29, 2008), 58 (800,000 shares short as of August 28, 2008), 67 (1.6 million shares as of November 20, 2008), 2501). In advance of Dell's August 2008 earnings announcement, Newman took the largest short position he had ever taken in a single stock during his time at Diamondback. (Tr. 3551-55; GX 8529A).

 **\*21** Not only did Newman take large positions based on material, nonpublic information, but he also frequently traded within minutes of obtaining inside information on Dell and NVIDIA. For example, in advance of NVIDIA's May 2009 earnings announcement, Tortora forwarded to Newman Kuo's tip that gross margins would be 30 percent--significantly below the consensus expectation of 35 percent. (GX 818). Commenting that the gross margin number was "ugly," Newman asked whether Kuo was "good on gm." (GX 818). Tortora immediately confirmed that Kuo's source had "[n]ailed everything including gm last q." (GX 818). Two minutes later, Newman shorted NVIDIA's stock. (GX 2501). Newman similarly traded in Dell securities nearly immediately after receiving Dell tips in May and August of 2008. (GX 33, 50, 2501, 2501-DA).

### b. Chiasson's Knowledge of the Breaches

Like Newman, Chiasson knew that his analyst, Adondakis, was providing him with nonpublic information that corporate insiders had improperly disclosed. Around May 2008, Adondakis learned that Tortora had access to an insider at Dell. (Tr. 1705, 1710). Tortora shared with Adondakis the inside information he got from his Dell source, and Adondakis passed the tips along to Chiasson, telling him that they came from a company insider. (Tr. 1708 (Adondakis testifying that he explained to Chiasson that Goyal used to work at Dell, obtained information from "someone within Dell," and provided the information to Tortora)).

 **\*22** Chiasson acted immediately upon receiving inside tips on Dell from Adondakis, demonstrating that he knew the tips were reliable. Upon receiving positive inside information on Dell in early May 2008, Chiasson closed out a short position in the stock and started to build a long position. (Tr. 1712-15; GX 53, 402). After receiving an update from Tortora on May 12, Adondakis called Chiasson to share the information. (GX 31). That same day, Chiasson discussed the pricing of Dell call options with a Level Global trader, and purchased 3,500 such options. (GX 406, 2501). [11] The following day, as Chiasson accumulated Dell securities, the trader informed Adondakis by e-mail that Chiasson "said he was waiting on one check from you on DELL . . . before buying much more." (GX 411). Three days later, on May 16, Adondakis received another update from Tortora; within 20 minutes, Chiasson purchased 750,000 shares of Dell stock. (GX 34, 2501). Based on the inside Dell tips Chiasson received in May 2008, Level Global reaped over $4 million in illicit profits following Dell's May 29, 2008 quarterly earnings announcement. (GX 56).

---

[11]    A call option gives the holder the right to buy a certain number of shares at a specified price by a certain date. Consistent with the positive tip Adondakis received in advance of Dell's May 29, 2008 earnings announcement, Chiasson's purchase of such options allowed him to take advantage of an increase in Dell's stock price following the announcement.

Case 17-1405, Document 28, 06/06/2017, 2052263, Page63 of 467

**\*23**  In July and August of 2008, leading up to Dell's quarterly earnings announcement on August 28, Adondakis passed numerous tips on Dell to Chiasson. Recognizing the reliability of the information the Dell insider had provided the previous quarter, Chiasson initiated a short position immediately after learning in early July that Dell would likely miss market expectations on gross margins, and steadily built the position as the earnings announcement approached and he received additional updates from Adondakis confirming that gross margins would be below expectations. (Tr. 1736-42, 1749; GX 60, 319, 446, 584). On August 14, for example, Ray received by e-mail Dell's consolidated financial results for the quarter and shared the information with Goyal that evening; Goyal subsequently spoke to Tortora, who passed the information along to Adondakis on August 18. (GX 40, 1732). At the time, Adondakis was attending a conference in California with Chiasson and another Level Global employee. During the flight there, Adondakis had told Chiasson that he expected to receive through Goyal's contact the final "roll-up" of Dell's financial results before the company's quarterly announcement. (Tr. 1792). The very same day Adondakis received this tip, Chiasson instructed his trader to sell short additional Dell shares. (GX 469).

Then, a few days before the announcement, Chiasson sent an e-mail to Adondakis asking whether there had been "any chatter over the weekend" on Dell. (GX 505). On August 27, after receiving another update from Tortora, Adondakis convened a conference call with Chiasson and two other men, including David Ganek (Chiasson's co-founder of Level Global).  **\*24**  (Tr. 1804-05; GX 523). During this call, Adondakis shared the update Tortora had given him on gross margins and other financial data, and Ganek instructed a trader to increase the firm's short position in Dell. (Tr. 1804, 1807-08; GX 528, 2501).[12]  Based on the inside tips on Dell, Level Global ultimately amassed a huge short position in advance of Dell's August 28, 2008 earnings announcement, earning nearly $54 million in illegal profits when it liquidated the position after the earnings announcement. (GX 62, 64). This was the second largest short position the firm had ever taken. (DX 39).

[12]  Ganek was aware that Adondakis received nonpublic information from a Dell insider during the consolidation process. On August 8, 2008, Ganek asked a Level Global trader whether Adondakis had heard "from his dell contact." (GX 438). The trader responded, "initial check was neg earlier in the week, next one is later next week I believe (not sure of exact timing), then one more right before the q[uarter]." (GX 438).

A series of e-mail and instant message exchanges between Chiasson and a friend at another hedge fund, Jeremy Yuster, demonstrated that Chiasson understood that only a Dell insider without authorization to disclose earnings information would have divulged Dell's gross margin numbers in advance of a quarterly announcement. After receiving a Dell update from Adondakis in August 2008 a few days after the quarter had ended, Chiasson reported to Yuster  **\*25**  that he had "checks on gm [gross margin for Dell] this qtr [quarter]" indicating that gross margins would not be good, and that Chiasson was waiting for the "final read." (GX 448). In response to Yuster's question as to how Chiasson could have "checks on gm%," Chiasson wrote, "Not your concern. I just do." (GX 448). Subsequently, on August 18, after Chiasson received the "final" update from Adondakis, Chiasson confirmed the numbers with Yuster: "Gm 17.4--17.7." (GX 476). When Yuster questioned whether that was possible, Chiasson responded, "My view on gm more convicted than [yours]." (GX 477).[13]

[13]  The day after Dell's quarterly announcement, a Level Global employee wrote to Chiasson that "we had that [Dell trade] nailed on conviction." (GX 549). Chiasson responded that, as to Dell, they had "1 guy used for 2 qtrs [quarters]," that is, he explained that a single Dell insider had provided tips for two successive quarters. (GX 549). Chiasson told yet another Level Global employee that the trade had been based on Adondakis's tips. (*See* GX 542 (in response to congratulations on the trade, Chiasson wrote, "Hit sam. Had a good read")).

As for the NVIDIA tips, Adondakis told Chiasson that he got the information from a friend of Tortora's who, in turn, got it from a friend from church. (Tr. 1878).[14]  As with Dell, Adondakis obtained and  **\*26**  provided to Chiasson multiple updates on NVIDIA's earnings shortly before the company's quarterly announcement in May 2009. (GX 45-47). In an e-mail exchange between Chiasson and Ganek in late April, Chiasson stated that Adondakis expected he would "get a firmer read shortly" with

UNITED STATES OF AMERICA, Appellee, v. Tedi..., 2013 WL 6163367...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page64 of 467

respect to the preliminary gross margin number Adonakis had received immediately before the end of the quarter. (GX 907). Adondakis received an updated "check" approximately one week later, indicating that NVIDIA's gross margins would not meet market expectations. (GX 927). Such tips could have come only from an insider.

14    Adonakis referred to the source as a "NVIDIA contact," which, based on Adondakis's course of dealings with Chiasson, meant a company insider. (Tr. 1879). In this regard, Adondakis obtained inside information about other technology companies either from friends of his who had friends at the companies or through expert-networking firms. (*See, e.g.*, GX 1618 (Chiasson, in an instant message, asking if Adondakis had established any "GOOD [ ] CONTAX" at a particular company through an expert networking firm, and Adondakis responding that he had "no mole in the organization yet"); Tr. 1678-91 (discussing contacts at Intel in 2007)).

Chiasson's conduct upon receiving the inside tips on NVIDIA from Adondakis showed that he knew the information was reliable. When Chiasson received a negative NVIDIA tip from Adondakis on April 27, 2009--ten days before the company announced its earnings--Chiasson held a long position in NVIDIA stock. (GX 920, 2501-LB). Chiasson immediately closed out the long position; after receiving an update on May 4, Chiasson caused Level Global to take a **\*27** large short position in NVIDIA stock. (GX 2501). The short trade resulted in over $10 million in illicit gains when NVIDIA announced its earnings data on May 7. (GX 73).

Chiasson's efforts to conceal the true bases for the Dell and NVIDIA trades from Level Global's official reports further demonstrated that Chiasson knew he had received inside information that had been improperly disclosed. Level Global had an internal reporting system in which employees were supposed to record the basis for trades in order to provide transparency to investors. More than a month after Chiasson began shorting Dell stock based on the confidential information he obtained from the Dell insider, Chiasson directed Adondakis to create a bogus research report that did not include any information about the Dell contact as the basis for the trades. (Tr. 1785). He similarly instructed Adondakis to create a sham report for the NVIDIA trade in 2009 that omitted reference to the inside source. (GX 928 (email in which Chiasson told Adondakis to create a "Hi level trading template" for the NVIDIA trade)).

## B. The Defense Case and the Verdict

Both defendants offered numerous documents during the cross-examination of Government witnesses. Additionally, Newman presented expert testimony concerning the size of the charged Dell and NVIDIA trades in comparison to the remainder of his portfolio. The defendants also called the case agent and questioned him about various consensually recorded telephone calls made at the direction of law enforcement **\*28** officers, as well as prior statements by the cooperating witnesses. (Tr. 3447-585).

Through their cross-examination of Government witnesses, the defendants sought to establish that Dell's investor relations personnel "leaked" earnings data that was similar to the information Ray disclosed. The evidence, however, belied that claim. Tortora testified that Lynn Tyson--Dell's head of investor relations at the time--never gave him the kind of detailed information concerning revenue and gross margins that he received from Goyal. (Tr. 342). In stark contrast to the specific gross margin and revenue numbers Ray disclosed, other members of Dell's investor relations team were willing to provide only general sentiments about Dell's business, such as "sound[ing] fairly confident on [gross margin] and [operating margin]." (DX 952). [15] As Tortora explained, **\*29** investor relations personnel and company management tended to comment only on the long-term view; unlike the tips regarding nonpublic financial data that Ray provided, this information could not be exploited to execute profitable trades around quarterly announcements. (Tr. 582-84).

15    The defendants claim--incorrectly--that Defense Exhibit 952 (an e-mail from Tortora to Newman recounting the substance of a telephone call with a Dell representative) is an example of Dell commenting on "soon-to-be-released industry data that would show poor results for Dell." (Newman Br. 19; Chiasson Br. 15). In fact, what Tortora reported in this email was that Dell stated industry data would show "poor calendar q4 results due to *sep to oct* demand drop off." (DX 952 (emphasis added)). As Tortora explained, at the time of this call--on December 15, 2008--Dell had already publicly released its earnings information for September and October

UNITED STATES OF AMERICA, Appellee, v. John..., 2013 WL 6163507...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page65 of 467

on November 20, 2008. (Tr. 595-96). As a Dell representative testified at trial, Dell investor relations personnel were trained to know what information was public or nonpublic, so they would not reveal nonpublic information before a quarterly announcement. (Tr. 2765, 2774).

The defendants attempted to demonstrate that Dell leaked current quarter earnings information by pointing to an April 2009 investor lunch with Lynn Tyson that Goyal attended. (*See* DX 994 (e-mail summarizing the discussion)). Newman distorts the record, however, by claiming that Tyson "*told* [the group of analysts] that Dell's normalized gross margin would be 18% for the *current quarter*." (Newman Br. 19 (emphasis added)). In fact, Goyal reported in the e-mail that Tyson "*implied* that *normalized* GM [gross margin] is near 18% levels." (DX 994 (emphasis added)). Goyal explained at trial that the comment was a conclusion he reached based on Tyson's comments and body language, and that the word "normalized" referred not to the current quarter, but to a longer-term outlook. (Tr. 1509, 1632). [16]

[16]  Newman also asserts that Dell leaked financial information by providing unit sales data to industry research services. (Newman Br. 20). This claim has no basis. These research services signed confidentiality agreements with Dell and released their reports to the entire market. (Tr. 2888-89). Moreover, Dell's unit sale numbers were not nearly as helpful indicators of stock price movements around quarterly earnings announcements as the information Ray provided. (Tr. 321).

**\*30**  The defendants' claim that Dell leaked its financial results in advance of earnings announcements was most powerfully undermined at trial by the fact that Dell's August 2008 announcement of its negative gross margin numbers shocked the market, resulting in a single-day decline in Dell's stock price of nearly 14 percent. (GX 1842, 3003S). Throughout August 2008, analysts expected that Dell would report a gross margin number of 18.3 percent. (GX 3003S). As of early August, however, Dell's internal numbers--which Ray disclosed to Goyal-- showed that Dell would report gross margins substantially below expectations. (GX 214). If Dell in fact leaked its financial performance data, market expectations would have adjusted accordingly and, more importantly, the price of Dell's stock would not have dropped dramatically immediately following the announcement. [17]

[17]  In their appeal briefs, the defendants also rely on a handful of e-mails from the October 2008 quarter that contain blatant hearsay. (Newman Br. 18 (third bullet point, citing DX 798), 19 (first, second, and fourth bullet points, citing DX 866, 900, 957); Chiasson Br. 15-16). One such e-mail stated, "[a]pparently DELL IR saying offline that they will miss Oct est[timates] 'by a country mile.' " (A. 2387; DX 798). The author of this e-mail did not testify, and there was no non-hearsay evidence that anyone on Dell's investor relations team actually made this statement. Another e-mail attributed a disclosure about Dell's earnings to Lynn Tyson, but, again, there was no non-hearsay evidence that she made any such disclosure. (DX 866). The District Court sustained the Government's objection that these exhibits were not admissible for their truth. (Tr. 474-75). Indeed, even Newman's counsel acknowledged that he was "not going to say [Investor Relations] actually did it," that is, leaked the information. (Tr. 475). Instead, the Court admitted the e-mails merely to show that Newman was told certain information came from investor relations. (Tr. 474-75). The defendants thus should not be permitted to use these documents for their truth on appeal.

**\*31**  Contrary to the evidence adduced at trial, the defendants also sought to show that NVIDIA leaked to analysts information concerning its financial performance. They pointed to a report of a meeting Adondakis had with the head of NVIDIA's investor relations department on March 27, 2009, in which Adondakis commented that the department head "did not flinch" when asked about a sell-side analyst's predictions for NVIDIA's revenue. (A. 2419; Chiasson Br. 16). In that report, Adondakis recommended that Chiasson continue to build a long position in NVIDIA stock, believing (incorrectly) that gross margins would be "flattish." (A. 2421). When Adondakis received an inside tip from Kuo a month later indicating **\*32**  worse than expected gross margins, however, Adondakis immediately told Chiasson to reverse course and short the stock, which Chiasson did, ultimately netting more than $10 million on the trade. (GX 73, 816, 900).

On December 17, 2012, the jury returned its verdict, rejecting these defenses and finding Newman and Chiasson guilty on each of the counts in which they were charged.

UNITED STATES OF AMERICA, Appellee, v. Todd..., 2013 WL 6163367...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page66 of 467

### C. The Sentencings

On May 2, 2013, the District Court sentenced Newman principally to an aggregate term of 54 months' imprisonment. On May 13, 2013, the Court sentenced Chiasson principally to an aggregate term of 78 months' imprisonment.

### ARGUMENT

### POINT I

### The Jury Instructions Were Correct

Newman and Chiasson challenge three aspects of the jury instructions. Both defendants contend that the District Court should have instructed the jury that the Government was required to prove the defendants knew an insider disclosed information for a personal benefit. (Newman Br. 30-40; Chiasson Br. 21-52). Additionally, Newman argues that there was no factual predicate for a conscious avoidance instruction (Newman Br. 42-45), and that the Court **\*33** erred in defining "nonpublic" information (Newman Br. 45-46). Each of these claims is unavailing. [18]

[18] In a footnote, Newman states that "[t]he district court's refusal to give jury instructions as requested by the defense stands in marked contrast to its willingness to interject itself into witness examinations, which ultimately inured to the benefit of the government." (Newman Br. 42 n.23). This suggestion of bias is utterly lacking in basis, as demonstrated by the two examples upon which Newman relies. In an effort to blur the line between permissible immaterial statements and illegal tips, Newman's counsel asked Dell's corporate representative if the Chief Executive Officer could make "positive" comments before an earnings release; the Government objected to this vague question, and the Court properly sought to clarify it. (Tr. 2949). Subsequently, Newman's counsel incorrectly suggested to the jury, through his questioning of cooperating witness Hyung Lim, that the Government was required to prove that Lim knew Newman. In these circumstances, the Court's instruction clarifying the law of conspiracy was appropriate. (Tr. 3051-52). Newman's claim of unfairness is thus unfounded.

### A. Applicable Law

This Court reviews jury instructions *de novo. United States v. Moran-Toala*, 726 F.3d 334, 344 (2d Cir. 2013). A defendant challenging a jury instruction must establish both that he requested a charge that "accurately represented the law in every respect" and **\*34** that the charge delivered was erroneous and caused him prejudice. *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). In considering whether there has been error, the reviewing court should consider the charge as a whole to determine if the jury was accurately advised as to the applicable law. *See United States v. Mitchell*, 328 F.3d 77, 82 (2d Cir. 2003). Moreover, a district court has "discretion to determine what language to use in instructing the jury as long as it adequately states the law," *United States v. Alkins*, 925 F.2d 541, 550 (2d Cir. 1991), and a defendant "cannot dictate the precise language of the charge," *United States v. Han*, 230 F.3d 560, 565 (2d Cir. 2000). Thus, if "the substance of a defendant's request[ed instruction] is given by the court in its own language, the defendant has no cause to complain." *Id.* (internal quotations omitted).

An instructional error should be disregarded if the error is harmless. *See* Fed. R. Crim. P. 52(a) ("[a]ny error . . . which does not affect substantial rights shall be disregarded"); *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013). Such an error is harmless "if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Botti*, 711 F.3d at 308 (internal citations and quotation marks omitted).

### \*35 B. Discussion

### 1. The Instruction on the Defendants' Knowledge of the Insiders' Breaches Was Correct

UNITED STATES OF AMERICA, Appellee, v. Joh..., 2015 WL 6163307...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page67 of 467

Newman and Chiasson each argue that the District Court erred in instructing the jury that it need find only that the defendants knew insiders disclosed material, nonpublic information in violation of a duty of confidentiality. They contend that the Court should have instructed the jury that the Government was also required to prove that they knew the insiders did so for some personal benefit. (Newman Br. 30-42; Chiasson Br. 20-52). They are mistaken. Neither the Supreme Court nor this Court has ever required the Government to establish such knowledge on the part of a tippee. Moreover, because the securities fraud statute's *mens rea* provision does not expressly apply to the benefit requirement (which requirement does not appear in the statute itself), the Government was required to prove knowledge of enough facts to distinguish conduct that is likely culpable from conduct that is entirely innocent. Establishing that the defendants traded on material, nonpublic information they knew insiders had disclosed in violation of a duty of confidentiality satisfied this requirement.

In any event, any instructional error was harmless. Having found that the defendants knew insiders disclosed inside information in breach of a duty (and not for any legitimate corporate purpose), the jury further would have concluded that the defendants inferred from the circumstances that the insiders did so **\*36** in return for some benefit. The defendants' claim should therefore be rejected.

### a. Relevant Facts

During the charge conference, Newman's and Chiasson's counsel urged the District Court to instruct the jury that, in order to convict, it must find that the defendants knew an insider disclosed inside information for a personal benefit. (Tr. 3594-605). The Court disagreed, finding that, in *SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012), this Court had made clear that the Government need prove only that "the tip[p]ee knew or had reason to know that the tip[p]ee improperly obtained the information . . . through the tipper's breach." (Tr. 3604).

The District Court subsequently instructed the jury, in pertinent part, that in order to establish that the defendants were guilty of insider trading, the Government had to prove that (1) the tippers had a "fiduciary duty or other relationship of trust and confidence" with their employers such that they were "entrusted with material, nonpublic information with the reasonable expectation that they would keep it confidential and not use it for personal benefit" (Tr. 4029); (2) the tippers intentionally breached that duty by "disclosing material, nonpublic information for their own benefit" (Tr. 4030); (3) the tippers received a personal benefit from the tips (Tr. 4032-33); (4) the defendant tippees knew the inside information was disclosed by the insiders in breach of a duty of trust and confidence (Tr. 4033); and (5) the defendant tippees participated in the insider trading scheme **\*37** knowingly, willfully, and with specific intent to defraud (Tr. 4036). Specifically, the Court gave the following instructions on the tippers' intent and the personal benefit requirement:

> Now, if you find that Mr. Ray and Mr. Choi had a fiduciary or other relationship of trust and confidence with their employers, then you must next consider whether the government has proven beyond a reasonable doubt that they intentionally breached that duty of trust and confidence by disclosing material, nonpublic information for their own benefit.

(Tr. 4030). [19]

[19]    The District Court defined "benefit" to include intangible benefits such as "maintaining a business contact" or "making a gift of confidential information to a trading relative or friend." (Tr. 4032-33).

As to the defendant tippees, the District Court instructed the jury as follows:

> To meet its burden, the government must also prove beyond a reasonable doubt that the Defendant you are considering knew that the material nonpublic information had been disclosed by the insider in breach of a duty of trust and confidence. The mere receipt of material, nonpublic information by a Defendant, and even

UNITED STATES OF AMERICA, Appellee, v. Ben..., 2015 WL 6163367...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page68 of 467

trading on that information, is not sufficient; he must have known that **\*38** it was originally disclosed by the insider in violation of a duty of confidentiality.

(Tr. 4033). The Court further instructed the jury that the Government was required to prove that the defendants "participated in . . . the insider trading scheme . . . knowingly, willfully, and with intent to defraud," that is, that the defendants knew "of the fraudulent nature of the scheme and acted with the intent that it succeed." (Tr. 4036-37). In doing so, the Court cautioned that:

> It is not a willful deceptive device in contravention of the federal securities laws for a person to use his superior financial or expert analysis or his educated guesses or predictions or his past practice or experience to determine which securities to buy or sell. Nor is it a deceptive device in contravention of the federal securities laws for a person to buy or sell securities based on public information or on tips where he does not know that the information had been disclosed in violation of a duty of confidence, or where the information is obtained from permissible sources.

(Tr. 4036-37).

**\*39 b. Discussion**

**i. Tippee Liability Does Not Require Knowledge of a Personal Benefit**

The question on this appeal is not whether tippees are prohibited from trading on material, nonpublic information they receive from company insiders. Nothing in the District Court's instructions would have permitted a conviction on that theory. Rather, as the jury found, both defendants traded on material, nonpublic information the defendants knew insiders had disclosed in violation of a duty to keep the information confidential. The narrow question presented here is whether the Government had to prove the defendants knew the insiders had disclosed the information not only in breach of a duty, but also for a personal benefit. Neither the Supreme Court nor any Court of Appeals has ever required such proof.

The Supreme Court addressed tippee liability in insider trading cases--and established the requirement that an insider-tipper is guilty of insider trading only if he disclosed confidential information to an outsider for a personal benefit--in *Dirks v. SEC*, 463 U.S. 646 (1983). Dirks was a first-level tippee who received information from an insider suggesting that management was committing fraud. *Dirks v. SEC*, 463 U.S. at 649. The tipper had notified various regulatory agencies of the fraud, but they failed to act; accordingly, he urged Dirks to verify the fraud and disclose it publicly. *Id.* Dirks conducted an investigation, and unsuccessfully sought to persuade a newspaper **\*40** to publish the allegations. *Id.* Although Dirks did not trade in the company's stock, he discussed his findings with clients and investors, some of whom did so. *Id.*

In finding that Dirks was not liable for insider trading, the Supreme Court held that tippees assume an insider's duty to the company's shareholders to disclose or abstain from trading in the company's stock if the inside information "has been made available to them *improperly*." *Id.* at 660 (emphasis in original). In discussing the "improper" receipt of inside information, the Supreme Court did not adopt the position advocated by Newman and Chiasson, namely, that a tippee must know the tipper benefitted from the tip. Rather, notwithstanding its holding that a *tipper* must benefit from a disclosure in order to be liable for insider trading, *id.* at 662, the Supreme Court did not explicitly require that a *tippee* know about this benefit. Instead, the Court required only that the tippee know the tipper disclosed information in breach of a duty. *Id.* at 660. As the Court stated:

> [A] tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his or her fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach.

UNITED STATES OF AMERICA, Appellee, v. Joh..., 2013 WL 6163073...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page69 of 467

*Id.*; *see also id.* at 661 n.19 (citing concurring opinion in **\*41** *In re Investors Management Co.*, 44 S.E.C. 633, 650 (1971), that a tippee can be held liable only if he received information in breach of an insider's duty not to disclose it). [20]

[20]   *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985), upon which the defendants rely, is not to the contrary. (Newman Br. 33-34 n.16; Chiasson Br. 25-26). The issue in *Bateman* was whether the common-law *in pari delicto* defense bars a private damages action by tippees against tippers who induced the tippees to invest in securities by misrepresenting that they were disclosing material, nonpublic information. *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. at 301. The elements of tippee liability were not at issue in the case, and *Bateman* made no holding regarding tippee knowledge.

Following *Dirks*, this Court has never required the Government to prove that a tippee knew an insider who disclosed confidential information acted for a personal benefit, and the Government is aware of no decision from any other Court of Appeals imposing such a requirement. To the contrary, in *SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998), this Court stated that the Securities and Exchange Commission ("SEC"), in order to establish a tippee's liability, was required to prove that (1) an insider possessed material, nonpublic information; (2) the insider disclosed such information to a tippee; (3) the tippee traded stock while in possession of that information; (4) the tippee knew the insider violated a relationship of **\*42** trust in disclosing the information; and (5) the insider benefitted by the disclosure, *id.* at 47.

Similarly, in *SEC v. Obus*, 693 F.3d 276, this Court did not require the SEC to prove that the tippees knew the insider had disclosed inside information for a personal benefit. In *Obus*, this Court considered whether the SEC had presented sufficient evidence to avoid summary judgment for the defendants (a tipper, an immediate tippee, and a successive tippee). In finding that it had done so and in rejecting the defendants' argument regarding the level of knowledge required on the tippee's part as to the tipper's breach, the Court summarized the elements of tipping liability as follows:

> [W]e hold that tipper liability requires that (1) the tipper had a duty to keep material non-public information confidential; (2) the tipper breached that duty by intentionally or recklessly relaying the information to a tippee who could use the information in connection with securities trading; and (3) the tipper received a personal benefit from the tip. Tippee liability requires that (1) the tipper breached a duty by tipping confidential information; (2) the tippee knew or had reason to know that the tippee improperly obtained the information (*i.e.*, that the information was obtained through the tipper's breach); and (3) the tippee, while in knowing possession of the material non-public information, **\*43** used the information by trading or by tipping for his own benefit.

*Obus*, 693 F.3d at 289.

Most recently, in *United States v. Jiau*,--F.3d--, 2013 WL 5735348 (2d Cir. Oct. 23, 2013), this Court stated that, to hold a tippee criminally liable for insider trading, the Government must prove the following elements:

> (1) the insider-tippers . . . were entrusted the duty to protect confidential information, which (2) they breached by disclosing to their tippee[ ], who (3) knew of their duty and (4) still used the information to trade a security or further tip the information for her benefit, and finally (5) the insider-tippers benefited in some way from their disclosure.

*Id.* at \*3.

Indeed, *Jiau* is merely the most recent in a string of cases in which this Court has found that a tippee, in order to be criminally liable for insider trading, need know only that an insider-tipper disclosed information in breach of a duty of confidentiality. *See United States v. Libera*, 989 F.2d 596, 600 (2d Cir. 1993) (holding that requirements for tippee liability are "(i) a breach by the tipper of a duty owed to the owner of the nonpublic information; and (ii) the tippee's knowledge that the tipper had breached the

duty"); *United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996) (explaining that tippee defendants must "subjectively believe that the [inside] information was obtained **\*44** in breach of a fiduciary duty"); *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) (same). As for the benefit received by the tipper, however, this Court has held that the Government need prove only that there was such a benefit, but not that the tippee knew of it.

That the Government does not have to prove a tippee-defendant's knowledge as to each of the elements of tipper liability is not unusual. Many statutes have elements as to which the Government need not prove the defendant's knowledge. *See, e.g., United States v. Feola*, 420 U.S. 671, 684 (1975) (in prosecution for assaulting a federal officer, under 18 U.S.C. § 111, Government need not prove the defendant knew victim was a *federal* officer); *United States v. Griffith*, 284 F.3d 338, 350-51 (2d Cir. 2002) (holding that a prosecution under 18 U.S.C. § 2423 for transporting a minor in interstate commerce to engage in prostitution does not require proof of the defendant's knowledge of the victim's age); *United States v. Weintraub*, 273 F.3d 139, 147-51 (2d Cir. 2001) (holding that the scienter provision of criminal provision of the Clean Air Act, 42 U.S.C. § 7413(c)(1), required proof that the defendant knew asbestos was involved, but not the kind and quantity of asbestos that triggered the applicable regulation); *United States v. Figueroa*, 165 F.3d 111, 119 (2d Cir. 1998) (in prosecution under 8 U.S.C. § 1327 for assisting alien excludable for certain reasons to enter United States, Government must show defendant knew alien was excludable but not knowledge of particular grounds of excludability); *United States v. LaPorta*, 46 F.3d 152, 158-59 (2d Cir. 1994) (in prosecution for destruction of government **\*45** property under 18 U.S.C. § 1361 Government need not prove defendant knew owner of property); *United States v. Falu*, 776 F.2d 46, 49-50 (2d Cir. 1985) (holding that predecessor statute to 21 U.S.C. § 860 did not require proof that a defendant knew he was distributing a controlled substance within 1,000 feet of a school); *United States v. Roglieri*, 700 F.2d 883, 885 (2d Cir. 1983) (knowledge that stolen item came from the mail is not required under 18 U.S.C. § 1708); *United States v. Baker*, 693 F.2d 183, 185 86 (D.C. Cir. 1982) (18 U.S.C. § 641 does not require proof of knowledge that stolen property belonged to the government); *United States v. Mingoia*, 424 F.2d 710, 713 (2d Cir. 1970) (knowledge that stolen goods were transported in interstate commerce is not required by 18 U.S.C. § 2314).

Where the reach of a statute's *mens rea* requirement is ambiguous, [21] this Court has "demand[ed] knowledge of enough facts to distinguish conduct that is likely culpable from conduct that is entirely innocent," that is, "knowledge only of facts that in a reasonable person would create an expectation that his conduct was likely subject to strict regulation." *United States v. Weintraub*, 273 F.3d at 147; *United States v. Sanders*, 211 F.3d 711, 723 (2d Cir. 2000) ("[I]t has become clear that knowledge may suffice for criminal culpability if 'extensive enough to attribute **\*46** to the knower a 'guilty mind,' or knowledge that he or she is performing a wrongful act.' " (quoting *United States v. Figueroa*, 165 F.3d at 115-16)). "The touchstone is the defendant's 'settled expectations' about the regulated conduct." *Weintraub*, 273 F.3d at 148 (citation omitted).

---

[21] Here, because the securities fraud statute does not explicitly address insider trading, let alone mention benefit, the statute supplies little guidance as to the reach of its *mens rea* provision.

Trading securities based on information a defendant knows to be not only material and nonpublic, but also to have been disclosed by a company insider in violation of a duty to keep the information confidential is plainly wrongful conduct. No reasonable person would harbor a settled expectation that he is free to trade securities based on such information. Indeed, Level Global's compliance manual forbade employees from trading while in possession of any material, nonpublic information. (GX 1852 at LEVEL 000006667 (Level Global compliance manual stating that "[t]he Firm forbids any Employee to trade, either personally or on behalf of others, . . . while in possession of material non-public information" and that "Employees should assume that all information obtained in the course of their employment or association with the Firm is not public unless the information has been publicly disclosed by means of a press release, wire service, newspaper, proxy statement or prospectus or in a public filing made with a regulatory agency, or is otherwise available from public disclosure services")). And Diamondback's compliance manual defined material, nonpublic information to include information disclosed by a company insider in breach of a duty of confidentiality. (GX 2253 at F-3 (Diamondback compliance manual indicating that "material nonpublic information may include '*tips*' **\*47** you receive directly or indirectly from a third party where you know, or should know, that the third party is disclosing the information improperly, in breach of *his or her* duty of confidentiality to the owner or source of the information" and instructing employees to contact "Legal/Compliance" upon receiving such information (italics in original))).

UNITED STATES OF AMERICA, Appellee, v. Joh..., 2015 WL 6163567...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page71 of 467

In these circumstances, there is no credible claim of surprise that trading on information knowingly obtained from an insider who had an obligation to keep it confidential was a wrongful act. *See In re Investors Management Co.*, 44 S.E.C. 633, at *11 n.2 (Comm'r Smith, concurring) (likening tippees to those who "knowingly receive stolen goods"). [22]

[22]    These circumstances are entirely unlike those in *Dirks*, given that Dirks knew the insider was a whistleblower who sought to expose a fraud. *Dirks*, 463 U.S. at 649. The circumstances here are also unlike other situations the *Dirks* Court recognized would not lead to tippee liability, such as where it is unclear whether the information was either material to the stock's price or nonpublic. *Id.* at 662. The earnings information at issue here plainly was both material and nonpublic when the insiders disclosed it shortly before quarterly announcements.

In pressing a contrary conclusion, Newman and Chiasson emphasize that trading on material, nonpublic information from an insider is not, by itself, illegal. (*See, e.g.*, Newman Br. 30; Chiasson Br. 21, 27). Of course, the jury instructions here did not permit the jury to convict based on such proof alone. To **\*48** the contrary, the District Court instructed the jury that, in order to convict, it must find that an insider breached a duty of confidentiality by "disclosing material, nonpublic information for their own benefit," and that the defendants "knew that the material nonpublic information had been disclosed by the insider in breach of a duty of trust and confidence." (Tr. 4029-30, 4033).

In this regard, Chiasson argues that the SEC's adoption of "Regulation Fair Disclosure" ("Regulation FD") in 1999--which imposes on securities issuers an obligation to make prompt public disclosure of material, nonpublic information if the information is disclosed selectively by the issuer or someone acting on its behalf, *see* 17 C.F.R. § 243.100--somehow supports his claim that *Dirks* requires tippee knowledge of a benefit to the insider because people are not prohibited from trading on such selectively disclosed information. (Chiasson Br. 27-32). Regulation FD, adopted pursuant to Section 13(a) of the Exchange Act, addresses selective disclosures that were authorized by the issuer. It does not address unauthorized tips provided by insiders in violation of a duty of confidentiality to the company. *See* 17 C.F.R. § 243.100(a) (providing that where "an issuer, or any person acting on its behalf, discloses any material nonpublic information regarding that issuer or its securities" to certain specified people, "the issuer shall make public disclosure of that information"); *id.* § 243.101(c) (defining "[p]erson acting on behalf of an issuer" and stating that "[a]n officer, director, employee, or agent of an issuer who discloses material nonpublic information in breach of a duty of trust or **\*49** confidence to the issuer shall not be considered to be acting on behalf of the issuer"). [23] Here, the jury found that Newman and Chiasson knew insiders disclosed information in violation of a duty of confidentiality. Regulation FD is therefore inapposite. [24]

[23]    Indeed, the adopting release explicitly stated that Regulation FD "does not affect any existing grounds for liability under Rule 10b-5," such as "liability for 'tipping' and insider trading." *Selective Disclosure and Insider Trading*, 65 Fed. Reg. 51716-01, at *51726 (Aug. 24, 2000).

[24]    Chiasson further relies on documents released by the SEC in connection with Regulation FD's promulgation in 1999 to bolster his unsupported claim that the selective disclosure of earnings numbers in advance of a quarterly announcement is common. (Chiasson Br. 28). Of course, there was no proof at trial that such selective disclosures are common. In any event, the studies cited in the SEC's release were commentaries on market practices in the late 1990s. *See, e.g.*, *Selective Disclosure and Insider Trading*, 64 Fed. Reg. 72590-01, at *72592 n.11 (Dec. 28, 1999) (citing a 1998 study in which 26 percent of responding companies indicated they engaged in some type of selective disclosure). Chiasson appears to assume that practices a decade later--in 2008 and 2009--had not changed and that Regulation FD has had little impact in curbing selective disclosures. Chiasson, however, points to no evidence to support this assumption. To the contrary, the trial evidence showed that Dell and NVIDIA do not sanction such selective disclosures. (*See, e.g.*, Tr. 2771-80).

**\*50**  Newman and Chiasson further suggest that the benefit received (or anticipated) by the tipper is the fact that marks the difference between conduct that is wrongful and conduct that is innocent. (*See, e.g.*, Newman Br. 35 n.17; Chiasson Br. 29). They thus contend the Government must prove a tippee's knowledge of the tipper's benefit, lest a defendant with an innocent mental state be convicted. For the reasons already given, this is incorrect.

UNITED STATES OF AMERICA, Appellee, v. Todd..., 2013 WL 6163307...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page72 of 467

In this regard, the defendants' reliance on *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994), and *Staples v. United States*, 511 U.S. 600, 615 (1994), is unavailing. (Neman Br. 34; Chiasson Br. 33). In *X-Citement Video, Inc.*, the Supreme Court interpreted a child pornography statute to require proof that the defendant knew the performers in a pornographic film were underage so as to ensure that the statute did not "sweep within [its] ambit . . . actors who had no idea that they were even dealing with sexually explicit material." *United States v. X-Citement Video, Inc.*, 513 U.S. at 69. In *Staples*, the Court held that a statute making it unlawful to possess a machinegun that is not properly registered required the Government to prove that the defendant knew the firearm was a machinegun (but not the gun's registration status), reasoning that, absent such proof, "the statute potentially would impose criminal sanctions on a class of persons whose mental state--ignorance of the characteristics of weapons in **\*51** their possession-- makes their actions entirely innocent" given the "common experience that owning a gun is usually licit and blameless conduct." *Staples v. United States*, 511 U.S. at 602, 608, 614-15.

Here, by contrast, there is no risk that the securities fraud statute would impose criminal penalties on people who reasonably believed they were engaged in blameless conduct, because the Government had to prove the defendants knew an insider-tipper disclosed material, nonpublic information in breach of a duty of trust and confidence. Trading securities based on nonpublic information disclosed by an insider in violation of such a duty "is easily sufficient to trigger an expectation of regulation in a reasonable person and to distinguish in his or her mind innocent from wrongful conduct." *Weintraub*, 273 F.3d at 149.

For similar reasons, Newman's and Chiasson's claim that the Government must prove a tippee knew of the tipper's benefit because the securities fraud statute imposes criminal liability only on defendants who act "willfully," 15 U.S.C. § 78ff(a), has no merit. (Newman Br. 35; Chiasson Br. 24 n.10, 32). Contrary to their contentions, Section 78ff(a) "do[es] not require a showing that a defendant had awareness of the general unlawfulness of his conduct, but rather that he had an awareness of the general wrongfulness of his conduct." *United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010); *United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir. 1976) (Friendly, *J.*) (stating that a person can willfully violate the securities laws without knowing of their existence, and that "the prosecution need only establish a realization on the **\*52** defendant's part that he was doing a wrongful act" so long as the act is "wrongful under the securities laws" and "involves a significant risk of effecting the violation that has occurred" (citation and internal quotation marks omitted)); *United States v. Peltz*, 433 F.2d 48, 55-56 (2d Cir. 1970) (Friendly, *J.*) (same); *see also United States v. Tarallo*, 380 F.3d 1174, 1188 (9th Cir. 2004) ("Under our jurisprudence, then, 'willfully' as it is used in § 78ff(a) means intentionally undertaking an act that one knows to be wrong; 'willfully' in this context does *not* require that the actor know specifically that the conduct was unlawful." (emphasis in original); cited favorably in *Kaiser*). [25]

---

[25] In *United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005), this Court stated that *Peltz* had held that "willfulness," as used in Section 78ff(a), means "a realization on the defendant's part that he was doing a wrongful act under the securities laws," *id.* at 98 (citation and internal quotation marks omitted). This characterization of *Peltz*'s holding was *dicta*, as the *Cassese* Court ruled that the Government had failed to prove that Cassese realized he was committing a wrongful act at all. This statement was also an inaccurate characterization of *Peltz*'s holding. As set forth in the text, and as this Court subsequently recognized in *Kaiser*, *Peltz* held that the willfulness requirement of Section 78ff(a) requires a showing that a defendant "had an awareness of the general wrongfulness of his conduct." *United States v. Kaiser*, 609 F.3d at 569; *United States v. Peltz*, 433 F.2d at 54-55 (holding that "[a] person can willfully violate an SEC rule even if he does not know if its existence" and that the Government need only establish that the defendant realized he was doing a wrongful act, so long as the act was in fact wrongful under the securities laws and "involve[d] a significant risk of effecting the violation that has occurred").

**\*53** Establishing that Newman and Chiasson understood their conduct was wrongful (and thus willful) required no more than showing that they traded on material, nonpublic information they knew insiders had disclosed in violation of a duty of confidentiality. Not only did the District Court instruct the jury that it could convict only upon such a finding, but it also instructed the jury that, in order to convict, it must find that the defendants acted both "with intent to defraud" and "with a bad purpose to disobey and disregard the law." (Tr. 4036-37). No more was required.

Nor is there any traction in Newman's claim--echoed by Chiasson--that "nearly thirty years of precedent in the Southern District of New York" has required the Government to prove a tippee's knowledge of the tipper's benefit. (Newman Br. 36; Chiasson Br. 26-27). To characterize a small handful of district court decisions as "nearly thirty years of precedent" is a substantial overstatement. This is particularly so given that, since 1993, this Court has repeatedly discussed the requirements for tippee liability and, in each case, stated that the Government need prove that the tippee knew only that the tipper had disclosed material, nonpublic information in breach of a duty of confidentiality. *See United States v. Jiau*, 2013 WL 5735348, at *3; *Obus*, 693 F.3d 289; **\*54** *United States v. Falcone*, 257 F.3d at 234; *SEC v. Warde*, 151 F.3d at 47; *United States v. Mylett*, 97 F.3d at 668; *United States v. Libera*, 989 F.2d at 600.

Neither Newman nor Chiasson so much as acknowledges *Warde*.[26] And they largely ignore *Falcone, Libera* and *Mylett*, other than to assert in footnotes that, before *Obus*, this Court had never required proof of a personal benefit received by the tipper in a misappropriation case. (Newman Br. 38 n.20; Chiasson Br. 39 n.13).[27] This is incorrect. *See SEC v. Materia*, 745 F.2d 197, 203 (2d Cir. 1984) (pre-*Obus* misappropriation case stating that insider must obtain "his own advantage" from misappropriated information); *see also United States v. O'Hagan*, 521 U.S. 642, 653-54 (1997) (stating that a misappropriator defrauds the principal by pretending loyalty while **\*55** converting the principal's information "for personal gain" (citation and internal quotation marks omitted)).

[26] At the time the defendants filed their briefs on appeal, this Court had not yet decided *United States v. Jiau*, 2013 WL 5735348.

[27] Under the misappropriation theory, "persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence" are guilty of insider trading if they "breach a fiduciary duty to the source of the information to gain personal profit in the securities market." *Obus*, 693 F.3d at 284. Under the classical theory of insider trading, by contrast, "a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders." *Id.*

In any event, that *Falcone, Mylett*, and *Libera* (and *Obus*, for that matter) were misappropriation cases does not undermine their force as precedent here. *Libera* cited *Dirks* as establishing the requirements for tippee liability, and did not interpret it to require that a tippee have knowledge of any benefit to the tipper. Indeed, this Court has explicitly recognized that, for purposes of tippee liability, there is no material difference between a classical insider-trading case and a misappropriation case. *See Obus*, 693 F.3d at 285-86 ("The Supreme Court's tipping liability doctrine was developed in a classical case, *Dirks*[ ], but the same analysis governs in a misappropriation case."). The defendants' attempt to distinguish these cases is particularly fruitless given that this Court has stated--in both civil and criminal classical insider trading cases--that the Government need prove that a tippee knew only that an insider-tipper disclosed material, nonpublic information in breach of a duty of trust and confidence. *Jiau*, 2013 WL 5735348, at *3; *Warde*, 151 F.3d at 47. Additionally, in claiming that a handful of district court cases support their position, the defendants ignore two district court cases that undermine their argument. *See SEC v. Thrasher*, 152 F. Supp. 2d 291, 304 (S.D.N.Y. 2001) ("The Plaintiff does not have to prove [ ] . . . that a remote tippee knew for certain how the initial breach of fiduciary duty occurred."); *SEC v. Musella*, 678 F. Supp. 1060 (S.D.N.Y. 1988) (granting summary judgment for the SEC, finding that there was **\*56** no issue of material fact regarding the defendants' scienter even though the defendants did not know who the insiders were).

Moreover, the reasoning of the district court decisions upon which the defendants rely is flawed. In the first of those decisions, *State Teachers Ret. Bd. v. Fluor Corp.*, 592 F. Supp. 592 (S.D.N.Y. 1984), the district court reasoned that *Dirks* required tippee knowledge "of each element [of tipper liability,] including the personal benefit," because, "[w]ere it otherwise, Dirks, in acknowledged possession of material inside information, would have been a tippee," *id.* at 594-95. This analysis was plainly incorrect. Dirks was not liable as a tippee because the insider-tipper was a whistleblower who did not receive any personal benefit. *See Dirks*, 463 U.S. at 666-67 (stating that the tipper did not violate any duty because he was "motivated by a desire to expose the fraud," and that there was thus "no derivative breach by Dirks"). Simply put, absent personal benefit to the insider-tipper, there is no tippee liability. The district courts in *United States v. Rajaratnam*, 802 F. Supp. 2d 491, 498-99 (S.D.N.Y.

Case 17-1405, Document 28, 06/06/2017, 2052263, Page74 of 467

2011), and *United States v. Santoro*, 647 F. Supp. 153, 170 (E.D.N.Y. 1986), merely followed *Fluor* without any additional analysis, and are accordingly based on the same flawed reading of *Dirks*.

As for *United States v. Whitman*, No. 12 Cr. 125 (JSR), 2012 WL 5505080 (S.D.N.Y. Nov. 19, 2012), the cornerstone of the district court's analysis was that the purpose of the *Dirks* classical theory of insider trading is "to protect shareholders against selfdealing **\*57** by an insider who exploits for his own gain the duty of confidentiality he owes to his company and its shareholders." *United States v. Whitman*, 2012 WL 5505080, at \*5. That purpose is satisfied by requiring the Government to prove, as it did here, that an insider benefitted from the tip. Indeed, requiring proof that a successive tippee knew the insider benefitted would thwart this purpose by allowing tippees who knew of the insider's breach of duty--but not the benefit--to escape liability. [28]

[28]     The district court in *Whitman* also sought to distinguish contrary authority such as *Obus* and *Falcone* on the ground that they were misappropriation cases. As discussed in the text, however, there is no material distinction between classical and misappropriation cases for purposes of tippee liability.

Insofar as they address this Court's precedents setting forth the elements of tippee liability, Newman and Chiasson emphasize *Obus* and seek to distinguish it. They first contend that *Obus* is not controlling because the parties in the case did not argue that the defendants (including a successive tippee) had to know the tipper received a benefit. (Newman Br. 37-38; Chiasson Br. 37-38). The level of knowledge required on the tippee's part as to the tipper's breach, however, was squarely presented in *Obus*, and this Court held that the SEC had to show only that the successive tippee "knew or had reason to know" that the inside information "was obtained through a breach of fiduciary duty." *Obus*, 693 F.3d at 288. In so holding, this Court recognized that a lesser standard **\*58** of knowledge is required on the part of a tippee as to the circumstances of the tipper's breach of duty than is required for the act of trading on inside information. *See id.* Given the issue in dispute in *Obus*, its description of the requirements for tipping liability--including its conclusion that a tippee need know only that the tipper breached a duty of confidentiality-- governs here. *Cf. United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) (citing *Obus* for the proposition that the Government must show a tippee either knew or should have known of the insider's breach of duty).

Newman further argues that *Obus* is not controlling because it was a civil case, and that criminal prosecutions for securities fraud require willfulness. (Newman Br. 38-39). As discussed above, however, the willfulness requirement of Section 78ff(a) requires only that a defendant "had an awareness of the general wrongfulness of his conduct." *Kaiser*, 609 F.3d at 569. This requirement was satisfied by the jury's finding that the defendants traded on material, nonpublic information they knew insiders had disclosed in breach of a duty of confidentiality.

In sum, the District Court properly instructed the jury that the Government was required to prove only that the defendants knew insiders had disclosed material, nonpublic information in breach of a duty of confidentiality, as this was all that was required to establish that the defendants knowingly engaged in wrongful conduct. This instruction was consistent with *Dirks* and this Court's precedent setting forth **\*59** the elements of tippee liability. Newman's and Chiasson's arguments to the contrary should be rejected.

## ii. There Was No Due Process Violation

Relying on *State Teachers Ret. Bd. v. Fluor Corp.*, 592 F. Supp. 592, and the district court cases that followed it, both Newman and Chiasson further argue that the law was settled prior to *Obus* that a tippee is liable for insider trading only if he knew the insider-tipper acted for personal benefit, and contend that if *Obus* changed the law, its application here violates due process. (Newman Br. 39 n.21; Chiasson Br. 40). This claim is unavailing. For the reasons already given, the defendants had notice that by trading on information an insider had disclosed in violation of a duty of confidentiality, they were engaged in wrongful conduct. More importantly, as discussed above, *Obus* followed this Court's precedent in both classical and misappropriation

UNITED STATES OF AMERICA, Appellee, v. Uch..., 2015 WL 6163307...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page75 of 467

cases establishing that the Government need prove only that the tippee knew an insider disclosed information in breach of a duty of confidentiality.

### iii. Any Error Was Harmless

Even if this Court were to conclude that the Government was required to prove the defendants knew the Dell and NVIDIA insiders received some benefit for disclosing inside information, any instructional error here was harmless. Given the jury's conclusion that Newman and Chiasson knew the insiders had provided inside tips in violation of a duty of confidentiality and in light of the nature and timing of those **\*60** tips--disclosures of earnings information shortly before quarterly announcements--the jury's verdict would have been the same absent the error. *See, e.g., Botti*, 711 F.3d at 308 (instructional error is harmless "if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error" (internal citations and quotation marks omitted)).

At best for the defendants, the jury should have been instructed--as Judge Rakoff instructed the jury in *Whitman*--that "it is not necessary" that the defendants "know . . . the specific benefit given or anticipated by the insider in return for disclosure of inside information; rather, it is sufficient that the defendant[s] had a general understanding that the insider was improperly disclosing inside information for personal benefit." *Whitman*, 2012 WL 5505080, at \*6. Moreover, Newman and Chiasson are incorrect in suggesting that, in order to establish knowledge of the insiders' benefits, the Government was required to prove that the defendants were explicitly told about those benefits. (Newman Br. 40; Chiasson Br. 44). Instead, the jury could find such knowledge by concluding that the defendants inferred from the circumstances that some benefit was provided to (or anticipated by) the insiders. *See United States v. Werner*, 160 F.2d 438, 441-42 (2d Cir. 1947) (Hand, *J.*) (holding that, to support a conviction for receipt of stolen goods, the evidence need establish only that the receiver "infer[red] the theft from the circumstances"); *United States v. Pabon-Cruz*, 255 F. Supp. 2d 200, 207-08 (S.D.N.Y. 2003) (Lynch, *J.*) (explaining that knowledge is established where the factfinder **\*61** "conclude[s] that the defendant believed" a fact, and "the circumstances were such that the defendant's belief was well supported and turned out to be accurate").

As recounted above, both defendants knew they were receiving material, nonpublic information from insiders at Dell and NVIDIA. (Tr. 160-61, 1708, 1878; GX 805). These tips included highly material information concerning Dell's and NVIDIA's financial performance, shortly before the companies made quarterly earnings announcements. (*See, e.g.*, GX 214 (August 5, 2008 e-mail from Tortora to Newman explaining that Dell would report gross margins of approximately 17.5 percent), 806 (e-mail documenting Choi's February 2009 tip regarding NVIDIA's revenues and gross margins in advance of quarterly announcement)). Moreover, the insiders provided multiple updates in the weeks leading up to the earnings announcements, as the companies consolidated their earnings data. (*See, e.g.*, GX 214 (e-mail dated August 5, 2008, concerning Dell and stating, "Q finished on fri, numbers still coming in"), 296 (e-mail concerning Dell in which Goyal wrote, "waiting for qtr to end or come closer so that numbers more firm"), 438 (e-mail from Level Global trader explaining, as to Adondakis's source on Dell, "initial check was neg earlier in the week, next one is later next week I believe (not sure of exact timing), then one more right before the q")). Given the nature, specificity, and timing of these disclosures, the jury had ample basis for its conclusion that Newman and Chiasson knew the insiders had disclosed the information "in breach of a duty of trust and confidence." (*See* Tr. 4033).

**\*62** Faced with this evidence, Newman and Chiasson contend that these tips could have been selective disclosures (*i.e.*, authorized leaks) carried out for purposes other than self-dealing. (Newman Br. 41; Chiasson Br. 46-47). The jury, however, rejected this selective-disclosure argument and found that the defendants knew the insiders disclosed the information in violation of a duty of confidentiality. It had good reason for doing so. The information provided by legitimate sources at Dell and NVIDIA was not specific and did not permit the defendants to trade around quarterly earnings announcements. The information these insiders provided, by contrast, allowed the defendants to execute highly profitable trades. And there was substantial evidence that the defendants knew their inside sources were not authorized to disclose the information:
• Newman knew Goyal obtained information from the Dell insider outside of business hours, at night and on the weekend. (*See, e.g.*, GX 322 (e-mail from Tortora to Newman stating that Goyal "usually wont hear back from [the Dell insider] til evening as calls him outside of work")). Newman also authorized substantial payments to Goyal for the tips, through a sham consulting

UNITED STATES OF AMERICA, Appellee, v. Dou..., 2015 WL 6153367...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page76 of 467

arrangement with Goyal's wife. (GX 2269, 2270). Had Goyal obtained the tips through a Dell insider who was authorized to disclose the information to investors, there would have been no reason to pay Goyal so much for the information.

**\*63** • Newman was told the NVIDIA source was an "accounting manager" at the company. (GX 805). Based on his extensive experience in the financial industry, Newman understood that such employees were not authorized to communicate with investors. *Cf. Obus,* 693 F.3d at 292-93 (stating that tippee was a "sophisticated financial analyst" who would know that nonpublic information about an acquisition would be material). [29]

[29] Newman also believed (incorrectly) that Goyal's contact was not a member of Dell's investor relations department, which undermines his claim that he could have thought Goyal's contact was legitimately communicating information about Dell's earnings. (GX 242 (distinguishing Goyal's communications with investor relations from Goyal's "check" with "his guy"), 322 (referring to the fact that Goyal had a friend in investor relations who was someone other than Goyal's "main contact")).

• Chiasson told a friend at another investment firm that he had "checks on gm" concerning Dell shortly before the company's August 2008 quarterly announcement. (GX 448). In response to the friend's question as to how Chiasson could have "checks on gm%," Chiasson wrote, "Not your concern. I just do." (GX 448). Chiasson's response demonstrated that he understood the Dell insider **\*64** was not authorized to disclose such information.

• Chiasson sought to conceal the bases for his Dell and NVIDIA trades from Level Global's internal reporting system, directing Adondakis to create sham reports reflecting false reasons for the trades. (Tr. 1785; GX 928).

This evidence demonstrated that Newman and Chiasson were well aware that the Dell and NVIDIA insiders had provided inside information without authorization.

Based on its well-supported finding that Newman and Chiasson knew insiders at Dell and NVIDIA had disclosed material, nonpublic information in violation of a duty of confidentiality (and not for a legitimate corporate purpose), the jury further would have found that the defendants inferred from the circumstances that some benefit was provided to (or anticipated by) the insiders. *See United States v. Werner,* 160 F.2d at 441-42; *United States v. Pabon-Cruz,* 255 F. Supp. 2d at 207-08. Given how the Supreme Court and this Court have defined benefit-- to include "a reputational benefit or the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend," *Obus,* 693 F.3d at 285 (citation and internal quotation marks omitted); *see id.* at 292 (stating that, although the SEC had to prove the insider obtained some benefit, "[i]n light of the broad definition of personal benefit set forth in *Dirks,* this bar is not a high one")--the jury would have found that the defendants understood the insiders would **\*65** not have undertaken the highly risky step of disclosing earnings information shortly before a quarterly announcement unless they expected to receive something in return. Put differently, the jury would have concluded that the defendants knew insiders disclosed the information for some personal reason rather than for no reason at all. *Cf. Libera,* 989 F.2d at 600 (in a misappropriation case, stating that *tipper's* knowledge that he breached establishes his knowledge that the tippee will misuse the information because "it may be presumed that the tippee's interest in the information is, in contemporary jargon, not for nothing"). Alternatively, because the defendants' involvement in the offenses was so overwhelmingly suspicious, the jury would have found that if they did not know the insiders received (or expected to receive) some benefit in return for disclosing material, nonpublic information, it was only because the defendants deliberately avoided learning that fact. *See* Point I(B)(2), *infra.* [30]

[30] For the same reasons that any instructional error was harmless, Newman and Chiasson are wrong that there was insufficient evidence to establish their knowledge of the insiders' benefits. (Newman Br. 40-42; Chiasson Br. 42-49). Accordingly, Newman's requests for a judgment of acquittal or a new trial and Chiasson's request for a remand with instructions to dismiss the Indictment should be rejected.

UNITED STATES OF AMERICA, Appellee, v. Joh..., 2013 WL 6163307...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page77 of 467

**\*66  2. The District Court Properly Instructed the Jury on Conscious Avoidance**

Newman next contends that there was an insufficient factual predicate to support a conscious avoidance instruction, arguing that there was no evidence he deliberately decided to avoid learning that information he received regarding Dell and NVIDIA was improperly obtained from company insiders. (Newman Br. 42-45). Newman is mistaken. His involvement in the criminal schemes was so suspicious that the jury could properly infer from his failure to question the circumstances of the tips that he purposefully contrived to avoid guilty knowledge.

**a. Relevant Facts**

Over the defendants' objections, the District Court instructed the jury on conscious avoidance as follows:
[A] Defendant's knowledge may be established by proof that the Defendant you are considering deliberately closed his eyes to what otherwise would have been obvious to him. If you find a reasonable doubt that the Defendant's ignorance was solely and entirely the result of a conscious purpose to avoid learning the truth, then this element may be satisfied. However, guilty knowledge may not be established by demonstrating that the Defendant was merely negligent, foolish or mistaken.

If, for example, you find beyond a reasonable doubt that the Defendant you  **\*67**  are considering was aware that there was a high probability that he obtained information that had been disclosed in violation of a duty of trust and confidence, but deliberately and consciously avoided confirming this fact, then you may find that the defendant acted knowingly. However, if you find that the Defendant actually believed that the information he obtained was not disclosed in violation of a duty of trust and confidence, he may not be convicted. It is entirely up to you whether you find that the Defendant you are considering deliberately closed his eyes and any inferences to be drawn from the evidence on this issue.

(Tr. 4037-38).

**b. Applicable Law**

"A conscious-avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Cuti*, 720 F.3d 453, 463 (2d Cir. 2013) (citation and internal quotation marks omitted). A conscious avoidance instruction "is not inappropriate merely because the government has primarily attempted to prove that the defendant had actual knowledge, while urging in the alternative that if the  **\*68**  defendant lacked such knowledge it was only because he had studiously sought to avoid knowing what was plain." *United States v. Hopkins*, 53 F.3d 533, 541 (2d Cir. 1995).

"[T]he same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise an inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct." *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) (citation and internal quotation marks omitted); *see also United States v. Goffer*, 721 F.3d at 127 ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance."). Thus, "the second prong [of the conscious avoidance test] may be established where[ ] a defendant's involvement in the criminal offense may have been *so overwhelmingly suspicious* that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *United States v. Svoboda*, 347 F.3d at 480 (citation and internal quotation marks omitted; emphasis in original); *United States v. Cuti*, 720 F.3d at 463; *United States v. Kozeny*, 667 F.3d 122, 133-34 (2d Cir. 2011).

Moreover, "[i]t is not uncommon for a finding of conscious avoidance to be supported primarily by circumstantial evidence," as "the very nature of conscious avoidance makes it unlikely that the record will contain directly incriminating statements."

UNITED STATES OF AMERICA, Appellee, v. Vch..., 2013 WL 6163387...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page78 of 467

*United States v. Kozeny*, 667 F.3d at 134. Thus, "[a] conscious-avoidance instruction is appropriate when a **\*69** defendant claims to lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance." *United States v. Gabriel*, 125 F.3d 89, 98 (2d Cir. 1997) (citation and internal quotation marks omitted).

### c. Discussion

Newman disputed at trial that he knowingly received material, nonpublic information that corporate insiders at Dell and NVIDIA had disclosed in violation of a duty of confidentiality. He argued that he believed the information was the product of legitimate research or had been properly released by the companies. He did so in opening statement (*see, e.g.*, Tr. 68 (stating that Newman "hired Jesse Tortora . . . to do honest legitimate research, and honest research is exactly what he thought he was getting"), in cross-examining certain Government witnesses (*see, e.g.*, Tr. 723-24 (suggesting that Dell's investor relations team prematurely leaked quarterly results)), and in summation (*see, e.g.*, Tr. 3766 ("[W]hen Newman sees specific numbers, he doesn't think that must come from an improper or illegal source."), 3767 (arguing that when Newman received specific numbers, he did not "assume . . . that is inside information, that is improper and that is from an unauthorized source at the company")). The first prerequisite for a conscious avoidance instruction--that the defendant assert "the lack of some specific aspect of knowledge required for conviction--was therefore satisfied here. *See United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003).

**\*70** The second prerequisite for the instruction was also met. Contrary to Newman's claim, there was ample evidence from which a rational juror could have concluded that Newman was aware of a high probability that he received tips from Dell and NVIDIA insiders who disclosed the information in violation of a duty of trust and confidence, but deliberately avoided confirming that fact. The evidence from which the jury could have reached this conclusion included the following:
• Tortora told Newman that his source at Dell had access to the internal consolidation process (Tr. 160-61), and that the NVIDIA insider was an accounting manager at the company (GX 805);

• Newman received specific tips concerning Dell's and NVIDIA's revenues and gross margins before the information was publicly announced, which information Newman--a sophisticated hedge fund manager--knew was confidential;

• Newman received multiple, frequent tips of such information during Dell's and NVIDIA's consolidation processes leading up to multiple quarterly earnings announcements;

• Newman knew that Goyal communicated with his "contact" at Dell at night and on the weekend (GX 197, 242, 322); and

• Newman paid Goyal a substantial sum for the Dell tips.

**\*71** In short, the information Tortora provided to Newman was so overwhelmingly suspicious that the jury could reasonably conclude that if Newman did not know he was receiving confidential information disclosed by insiders in breach of a duty of confidentiality, it was only because he purposely avoided confirming that fact. *See Goffer*, 721 F.3d at 124; *Cuti*, 720 F.3d at 463; *Kozeny*, 667 F.3d at 134; *Svoboda*, 347 F.3d at 480.

In pressing a contrary position, Newman relies on *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2071-72 (2011), to argue that the standard set forth in *Svoboda, Kozeny*, and *Cuti* was erroneous. (Newman Br. 44). Under this Court's controlling precedents, however, where a defendant's involvement in an offense was "so overwhelmingly suspicious," a jury is entitled to infer that any lack of actual knowledge on the defendant's part is attributable to the defendant's deliberate decision to avoid confirming a disputed fact. *Svoboda*, 347 F.3d at 480 (citation, internal quotation marks, and emphasis omitted); *Cuti*, 720 F.3d at 463; *Kozeny*, 667 F.3d at 133-34. The Supreme Court in *Global-Tech*--a civil patent case--did not purport to undermine these precedents or set forth a new standard for conscious avoidance. Indeed, this Court recently held that *Global-Tech* "did not alter the conscious avoidance standard." *Goffer*, 721 F.3d at 128.

UNITED STATES OF AMERICA, Appellee, v. Joh..., 2015 WL 6163307...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page79 of 467

In this regard, Newman contends there was no evidence that he deliberately avoided confirming any facts and ample evidence that he asked Tortora questions regarding the reliability and accuracy of the information **\*72** Tortora provided. (Newman Br. 43). Obviously, Newman could ask certain questions to confirm the reliability and accuracy of the information and at the same time deliberately avoid asking others that would confirm that insiders were improperly disclosing confidential information. Indeed, the jury could reasonably infer that Newman asked some questions but not others as part of an effort to avoid such knowledge. The jury could thus properly find that by failing to question the overwhelmingly suspicious tips Tortora provided, Newman purposefully avoided confirming that the information came from insiders in breach of a duty.

Newman also argues that the circumstances here were not "overwhelmingly suspicious" because, among other reasons, he received much of the information from Tortora via his office e-mail account, which he contends "could be read by the compliance department and the SEC." (Newman Br. 44). Contrary to this claim, receiving multiple, specific updates from an insider in anticipation of a quarterly earnings announcement is highly suspicious. That Newman received the information via e-mail makes it no less suspicious, particularly given that Newman instructed Tortora not to be explicit in e-mails about the insiders' access to information and that Diamondback's compliance office conducted only limited reviews of e-mails. (Tr. 530, 1313-15). Newman's decision to use e-mail reflects his assessment of the probability that his illicit behavior would be detected, but in no way suggests that the circumstances were not highly suspicious.

### **\*73** 3. The Instruction on Nonpublic Information Was Correct

Newman further contends that the District Court erred in its instruction defining "nonpublic" information. He argues that the Court failed to provide the jury with adequate guidance in determining whether the information he received regarding Dell and NVIDIA was "truly confidential." (Newman Br. 45-46). This claim is unavailing. The concepts contained in Newman's proposed instruction were adequately conveyed by the charge that was given, which reflected the defense theory. Moreover, the instruction Newman argues should have been given applies in misappropriation cases to aid the jury in finding whether allegedly misappropriated information was confidential and, as a result, a type of property. The Court's instruction on nonpublic information, by contrast, closely tracked the instruction approved in *United States v. Contorinis*, 692 F.3d 136, 142-44 (2d Cir. 2012). In any event, given the overwhelming evidence that Dell and NVIDIA took all appropriate steps to ensure the confidentiality of their earnings information, any error was harmless.

### a. Relevant Facts

Before trial, the defendants jointly submitted requests to charge, including a proposed addition to the District Court's draft instruction defining "nonpublic" information. (A. 206-07). The defendants asked that the following language be added to the draft charge:

> [I]n considering whether corporate information is non-public, you must consider **\*74** what steps the corporation has taken to maintain and protect confidentiality. The factors will vary, but may include written company policies, employee training, measures the employer has taken to guard the information's secrecy, the extent to which the information is known outside the employer's place of business and the ways in which other employees may access and use the information. Even if a corporation "considers" information to be confidential, if that corporation does not take affirmative steps to treat it as such, particularly when the corporation is alerted to the possibility that it is being disclosed or at risk of being disclosed, then the information is "available" to the public.

(A. 206-07).

Commenting that "the instruction I have covers this," the District Court declined to add the defendants' proposed language. (Tr. 3610). The Court, consistent with its draft instruction, subsequently defined "nonpublic" information for the jury as follows:

Case 17-1405, Document 29, 06/06/2017, 2052263, Page80 of 467

Information is nonpublic if it is not available to the public through sources such as press releases, Securities and Exchange Commission filings, trade publications, analysts' reports, newspapers, magazines, television, radio, rumors word of mouth, websites, internet chat rooms, or online message boards. In *75 assessing whether information is nonpublic, the keyword is "available." If information is available in the public media or in SEC filings, it is public. However, the fact that information has not appeared in the newspaper or other widely available public medium does not alone determine whether the information is nonpublic. Sometimes a corporation authorizes the release of information or is otherwise willing to make information available to securities analysts, prospective investors, or members of the press who ask for it even though it may never have appeared in any newspaper or other publication. Such information would be public. Accordingly, information is not necessarily nonpublic simply because there has been no formal announcement or because only a few people have been made aware of it. Whether information is nonpublic is an issue of fact for you to decide.

(Tr. 4031).

### b. Discussion

Newman argues that because he contended at trial that Dell and NVIDIA regularly disclosed the kind of information he received through company insiders, the District Court erred in refusing to give his proposed instruction regarding the steps a company takes to maintain confidentiality. (Newman Br. 45). *76 The Court's charge, however, addressed such disclosures, instructing the jury that information released by a company to certain analysts or investors, even if not disseminated through a widely available public medium, is public information. (Tr. 4031 ("[T]he fact that information has not appeared in the newspaper or other widely available public medium does not alone determine whether the information is nonpublic. Sometimes a corporation authorizes the release of information or is otherwise willing to make information available to securities analysts, prospective investors, or members of the press who ask for it even though it may never have appeared in any newspaper or other publication. Such information would be public."). This instruction adequately represented the defense theory that Dell and NVIDIA leaked earnings information to analysts by making clear that if, in fact, those companies authorized the disclosure of certain information, such information was public and could properly be used in executing trades.

Moreover, the District Court's instruction on nonpublic information was materially indistinguishable from the instruction approved in *United States v. Contorinis*, 692 F.3d at 142-44. Because the instruction adequately defined "nonpublic" information, the Court did not err in declining to use the defendants' proposed language. *See, e.g., United States v. Coplan*, 703 F.3d 46, 87 (2d Cir. 2012) ("Although a defendant is entitled to have the court charge the jury on any defense theory for which a foundation existed in the record, he is not necessarily entitled to have that instruction communicated to the jury in the language of his choice." (alteration, citation, and internal quotation *77 marks omitted)); *United States v. Wexler*, 522 F.3d 194, 205 (2d Cir. 2008) ("A defendant is not entitled to prescribe the exact language of a jury instruction, and the charge is sufficient if it adequately appr[ises] the jury of the crime and offense." (internal quotations omitted)).; *United States v. Alkins*, 925 F.2d at 550 ("A court has discretion to determine what language to use in instructing the jury as long as it adequately states the law.").

In arguing that the instruction was erroneous, Newman relies solely on *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012). [31] That reliance is misplaced. The defendants in *Mahaffy* were stockbrokers employed by various brokerage firms, who were charged with misappropriating those firms' confidential business information by disclosing information concerning pending orders for blocks of securities (which orders were broadcast over an internal communication system known as "squawk boxes") to traders at another firm; those traders then placed trades in the securities before the brokerage firms executed their customers' orders. *United States v. Mahaffy*, 693 F.3d at 119-20. In order to establish that the pending orders were a form of property that the defendants had stolen, the Government was required to prove that the orders were confidential. *Id.* at 118, 120 (citing *Carpenter v. United States*, 484 U.S. 19 (1987)).

UNITED STATES OF AMERICA, Appellee, v. Gen..., 2015 WL 6163307...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page81 of 467

31      Similarly, the defendants cited only *Mahaffy* in support of their proposed instruction. (A. 207).

**\*78** Having vacated the convictions based on violations of *Brady v. Maryland*, 373 U.S. 83 (1963), this Court stated that the Supreme Court in *Carpenter* "require[d] proof that [ ] information was both considered and treated by an employer in a way that maintained the employer's exclusive right to the information" for the Government to establish a property right in information sufficient to support a misappropriation charge. *Mahaffy*, 693 F.3d at 135 n.14. In that context, this Court instructed district courts to provide guidance to juries in misappropriation cases "regarding how to evaluate whether employers treat information as confidential," and set forth a list of "pertinent factors" juries could be instructed to consider. *Id.*

Newman's proposed instruction closely tracked this discussion in *Mahaffy*. Because this discussion addressed how to evaluate whether information qualifies as property in misappropriation cases, the District Court did not err in declining to give Newman's requested instruction. This is particularly so given that this Court in *Contorinis* approved an instruction on nonpublic information materially indistinguishable from the instruction given here.

In any event, even if the District Court somehow erred in declining to give the requested instruction, any such error was harmless in light of the extensive evidence that both Dell and NVIDIA treated nonpublic earnings information as highly confidential prior to its announcement. As the Government proved at trial, (1) both Dell and NVIDIA restricted access to earnings information prior to its public release **\*79** (Tr. 2816, 3095-96); (2) both companies had policies prohibiting the disclosure of earnings information to outsiders, and both corporate insiders signed confidentiality agreements with their employers (GX 1659, 1957; Tr. 2758, 3098-101, 3103); and (3) Ray, as a member of Dell's investor relations team, received training on Dell's confidentiality policy and how to respond to investors' questions without disclosing confidential information (Tr. 2774-75, 2823-27). *Cf. Mahaffy* 693 F.3d at 121-122 (firms did not train brokers on the proper use of squawks, firms had no policy specifically addressing how employees should treat squawks, and squawks were broadcast throughout the firms' offices, including in areas where nonemployees were visiting). Given the ample evidence that Dell and NVIDIA took affirmative steps to maintain the confidentiality of their earnings information before its public release, any error in the Court's refusal to give the defendants' requested instruction was harmless.

## POINT II

### There Was Sufficient Evidence that the Dell and NVIDIA Insiders Breached a Duty for a Personal Benefit

Newman claims that the evidence at trial was insufficient to support the jury's verdict. (Newman Br. 47-52). Specifically, he argues that the Government failed to prove that the Dell and NVIDIA insiders--Rob Ray and Chris Choi, respectively--intentionally breached duties they owed their employers. (Newman Br. 47-48). He further contends **\*80** that there was insufficient evidence that either insider received a personal benefit. (Newman Br. 49-52). For the reasons set forth below, both claims are unavailing.

### A. Applicable Law

A defendant challenging the sufficiency of the evidence bears a "heavy burden," *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004), as the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). Specifically, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (citations, brackets, and internal quotation marks omitted). Moreover, a reviewing court must "consider the evidence in its totality, not in isolation." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). A conviction must therefore be affirmed if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Case 17-1405, Document 29, 06/06/2017, 2052263, Page82 of 467

**\*81  B. Discussion**

**1. There Was Sufficient Evidence that the Insiders Intentionally Breached a Duty of Confidentiality**

Newman's claim that the Government failed to prove Ray intentionally breached a duty to Dell has no force. (Newman Br. 47-48). In eight straight quarters, Ray disclosed Dell's financial data to Goyal before the information was publicly announced, providing multiple updates during the internal consolidation process. He provided precise information concerning Dell's revenues and gross margins, typically during telephone calls with Goyal at night or on the weekend. (*See, e.g.*, GX 26, 27, 214, 257, 600A; Tr. 1631). Ray did so even though he was never authorized to disclose Dell's nonpublic financial information to outsiders, Dell's policies strictly prohibited such disclosures, and Ray was specifically warned not to reveal Dell's financial results before the company announced its earnings in May and August of 2008. (Tr. 2766-68, 2780-81, 2807; GX 1712, 1730). Based on this evidence, the jury could properly conclude that, in providing tips to Goyal, Ray intentionally breached his duty of confidentiality to Dell.

Faced with this evidence, Newman contends that there was insufficient proof of an intentional breach because Goyal "affirmatively misled" Ray to believe that Goyal was not trading on the tips and was merely working on a model. (Newman Br. 47). Of course, Goyal's use of Ray's information in models that formed the basis of stock recommendations he made  **\*82** to portfolio managers was improper. In any event, the jury was entitled to find that Ray knew perfectly well--regardless of what Goyal told him--that Goyal wanted Dell's current financial information in advance of quarterly earnings announcements in order to trade on the information. Such a conclusion was plainly warranted, given that Goyal repeatedly requested updates on Dell's financial data shortly before quarterly announcements, when such information was highly relevant to executing profitable trades. [32]  As this Court has noted, "it may be presumed that the tippee's interest in the information is, in contemporary jargon, not for nothing." *Libera*, 989 F.2d at 600.

---

[32]   In this regard, Newman emphasizes that Goyal did not tell Ray that he was sharing Ray's tips with analysts at other firms. This fact is irrelevant, as the Government was not required to prove that Ray knew the full extent of Goyal's intended use of the inside information in order to establish that Ray knowingly breached a duty to Dell.

Newman further claims that the Government failed to prove an intentional breach on Ray's part because Dell did not prohibit investor relations personnel from assisting analysts with models and speaking to them at night. (Newman Br. 47). Newman fails to acknowledge, however, that Dell permitted its investor relations team to help analysts with models pertaining only to historical data and prohibited them from disclosing current quarter earnings numbers before their public release. (Tr. 2926). More  **\*83** over, the jury could properly rely on the fact that Ray spoke to Goyal almost exclusively at night and on weekends--while Goyal spoke to a different member of Dell's investor relations team during business hours--in concluding that Ray intentionally breached his duty to Dell.

Additionally, Newman argues that the purported evidence of leaks by Dell "undermined any inference that advance disclosure of quarterly results was such a serious infraction so as to imply a knowing breach." (Newman Br. 47). As set forth above, the evidence did not show that Dell leaked earnings numbers before they were publicly announced. Moreover, Ray received training on how to communicate with investors without disclosing confidential financial data, and was explicitly warned in advance of Dell's May and August 2008 announcements not to disclose current quarter information. (*See, e.g.*, GX 1712 (the head of Dell's investor relations warning that she would "hunt . . . down" anyone who "breath[ed] a peep" of the results)). The jury had ample basis for concluding that Ray intentionally breached a duty in disclosing nonpublic financial information--including revenue and gross margin data--shortly before its public announcement.

Newman's claim that there was insufficient evidence that Choi intentionally breached a duty to NVIDIA similarly lacks traction. (Newman Br. 48). Choi repeatedly disclosed nonpublic information concerning NVIDIA's financial results in advance of the company's quarterly earnings announcements. Before NVIDIA's quarterly announcements in February and  **\*84**  April of 2009,

for example, Choi disclosed the company's revenues and gross margins. (*See* GX 806, 820). Choi did so even though NVIDIA prohibited such disclosures, Choi had signed a confidentiality agreement, and Choi was not authorized to speak to investors. (GX 1953; Tr. 3098-103). The jury was entitled to rely on this evidence and find that, in disclosing confidential financial information shortly before quarterly earnings announcements, Choi intentionally breached a duty he owed NVIDIA.

As to both Ray and Choi, Newman emphasizes that the Government has not charged either man, and claims that this fact shows there was insufficient proof of an intentional breach. (Newman Br. 47-48). Of course, the Government's charging decisions have no bearing on the sufficiency of the trial evidence demonstrating that Ray and Choi intentionally breached duties they owed their employers. Nor is there any basis for Newman's completely unfounded assertion that the Government considers both insiders to lack culpability. (Newman Br. 47-48 (asserting that the absence of charges against Ray is "a telling indication of the government's view of his culpability")). Indeed, based on extensive evidence of Ray's and Choi's wrongdoing, the Government argued at trial--and the jury found--that both men intentionally breached their duties of confidentiality. That finding should not be disturbed.

### *85  2. There Was Sufficient Evidence that the Insiders Received Personal Benefits

Contrary to Newman's contention, the evidence was sufficient to establish that Ray benefitted from his tips of inside information to Goyal. Not only were the two men friends, but Goyal provided Ray with career advice and assistance. While Goyal did not view Ray as a "close" friend (Tr. 1411), the men had known each other for years, having both attended business school and worked at Dell together (Tr. 1469-70). Moreover, they knew each other's wives, talked about going on vacation together, and spoke frequently, often for long periods of time, late at night while each of them was at home. (Tr. 1469-70). Additionally, Ray--who wanted to become a Wall Street analyst like Goyal-- benefitted from the tips by receiving career advice and assistance from Goyal. (*See, e.g.*, GX 700 (Ray writing to Goyal, "As you know, I am extremely interested in the equity research area and it will be great to get some perspective from you.")). Goyal provided advice, reviewed Ray's résumé, sent Ray's résumé to a Wall Street recruiter, and "put in a good word" for Ray with a potential employer. (GX 703, 705, 708, 720, 725, 729, 729B, 720, 733; Tr. 1396-1403). On occasion, Goyal even provided career advice in the very same conversation during which Ray gave him inside information on Dell. (*See, e.g.*, Tr. 1461; GX 39, 734). Based on this evidence, the jury could properly conclude that Ray received personal benefits for providing inside information to Goyal.

In urging a contrary conclusion, Newman emphasizes Goyal's testimony that the men were not "close"  **\*86**  friends. (Newman Br. 50). The Government, however, was not required to prove a particularly intimate friendship in order to establish that Ray received a benefit. *See Obus*, 693 F.3d at 292 (stating that the SEC had to prove tipper derived some benefit from tip, but that, "[i]n light of the broad definition of personal benefit set forth in *Dirks*, this bar is not a high one"). The Government merely had to prove a friendship such that the tip resembled trading by Ray followed by a tip of the profits to Goyal. *See Warde*, 151 F.3d at 48-49. The jury could permissibly reach that conclusion based on Goyal's description of his relationship with Ray, including his testimony that the men discussed taking family vacations together. [33]  In  **\*87**  any event, the career advice Goyal provided Ray was an independent basis for the jury's conclusion that Ray benefitted from his tips to Goyal.

---

[33]  In support of his argument that the relationship between Ray and Goyal did not support an inference that Ray benefitted from his tips to Goyal, Newman relies on *SEC v. Maxwell*, 341 F.Supp.2d 941 (S.D. Ohio 2004), and *SEC v. Anton*, No. 06-2274, 2009 WL 1109324 (E.D. Pa. Apr. 23, 2009). (Newman Br. 49). Neither case is comparable to this one. In *Maxwell*, the court found that a one-off tip from a corporate executive to his barber--in the absence of a close friendship, family relationship, or business association-- provided an inadequate basis for finding any benefit to the tipper. *SEC v. Maxwell*, 341 F.Supp.2d at 947-48. And *Anton* involved a single tip from a corporate insider to a financial analyst who was not a friend and with whom the tipper "could not recall spending any social time." *SEC v. Anton*, 2009 WL 1109324, at *1 n.3. Assuming that these cases were correctly decided--and the Government does not concede that they were--Ray's relationship with Goyal did not resemble the relationships at issue in either case.

That Goyal began giving Ray career advice some time before Ray supplied Goyal with inside information on Dell was insignificant. (Newman Br. 50). In September 2007--shortly before Ray began disclosing Dell's consolidated earnings numbers

UNITED STATES OF AMERICA, Appellee, v. Joh..., 2013 WL 6163367...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page84 of 467

to Goyal--Ray told Goyal he was "*desperately* looking to break into the buy/sell side." (GX 708 (emphasis added)). The jury could reasonably conclude that Goyal's advice and assistance to Ray during this period was materially different from any prior guidance Goyal had provided Ray, and that Goyal's assistance to Ray in this regard was a personal benefit.

Newman further contends that the career assistance Goyal provided Ray "amounted to routine and ultimately ineffective courtesies," and thus did not qualify as a benefit. (Newman Br. 50). The premise of this argument is incorrect. Goyal need not have succeeded in obtaining employment for Ray in order to have provided him with a benefit. The jury was entitled to find that Goyal's assistance to Ray--which included providing advice, reviewing Ray's résumé, sending it to a Wall Street recruiter, and recommending **\*88** Ray to a potential employer--was a meaningful benefit. *Cf. Jiau,* 2013 WL 5735348, at \*4 (holding that the Government proved benefit by showing insider-tipper joined tippee's investment club, which gave the insider opportunities to access inside information, even though the insider did not in fact receive tips through the club).

Nor is there any force to Newman's assertion that Goyal's career advice was not a benefit because "Goyal would have given the advice even without receiving the information." (Newman Br. 51). Even if true, this would not undermine the jury's verdict, as the jury nonetheless properly could have concluded that Ray provided inside information in return for Goyal's assistance. *Cf. United States v. Quinn,* 359 F.3d 666, 675 (4th Cir. 2004) (holding, in a bribery case, that "it does not matter whether the government official would have to change his or her conduct to satisfy the payor's expectations"). In any event, Newman's assertion is undermined by Goyal's testimony that he had more frequent and lengthier telephone calls with Ray than with other people (Tr. 1515), and that he had such lengthy and frequent calls with Ray because Diamondback was paying him for the information Ray provided (Tr. 1630).

Newman also argues that there was insufficient evidence that Ray received a benefit for the inside information he provided because Ray never explicitly "connected the career advice as a *quid pro quo*" to the tips. (Newman Br. 51). No such explicit agreement was required. *Cf. United States v. Garcia,* 992 F.2d 409, 414 (2d Cir. 1993) (holding, in a bribery case, **\*89** that a "*quid pro quo* [need not be stated] in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods" (citation and internal quotation marks omitted)). The jury could reasonably infer from the evidence--including the proof that Ray and Goyal swapped career advice for inside information in the same telephone call (GX 39, 734; Tr. 1461)--that the men had implicitly reached such an agreement.

The jury also had ample basis for finding that Choi disclosed inside information concerning NVIDIA to Lim in return for a personal benefit, namely, friendship. Lim described Choi as a "family friend" he had known for years, and the men attended church and socialized together. (Tr. 3032-33). Newman all but ignores this friendship, and insists there was insufficient proof of a benefit because Lim testified he never gave Choi "anything of value in exchange for information." (Newman Br. 51). The Government, however, was not required to show that Lim gave Choi cash or gifts for inside information. The jury was entitled to find that, in light of the friendship between Choi and Lim, Choi received a benefit by tipping Lim. *See Warde,* 151 F.3d at 48-49 (finding benefit to the tipper based on friendship between tipper and tippee, because tip resembled trading by tipper followed by a gift of profits to the recipient). Newman argues that the jury could not properly reach this conclusion, because Choi did not know Lim was trading NVIDIA stock and Lim did not trade the stock between April and July of 2009. (Newman Br. 51). He is mistaken. Lim told Choi that he traded NVIDIA stock, and he in fact traded the stock in March, April, **\*90** July, and August of 2009. (Tr. 3044, 3083; GX 3510-6 at 2-3). He also passed the information to another analyst, Kuo, in exchange for cash and gifts. (Tr. 3010, 3039, 3042). In any event, as discussed above, that Choi knew he was breaching a duty in disclosing information to Lim "suffice[d] to establish [Choi's] expectation that the breach w[ould] lead to some kind of a misuse of the information." *Libera,* 989 F.2d at 600. Thus, contrary to Newman's claims, Choi's tips resembled "trading by the insider himself followed by a gift of the profits to the recipient." *Dirks,* 463 U.S. at 664.

In sum, the evidence was sufficient to support the jury's conclusion that the Dell and NVIDIA insiders disclosed inside information in breach of a duty and for a benefit. Newman's challenges to the sufficiency of the evidence should therefore be rejected.

UNITED STATES OF AMERICA, Appellee, v. Geh..., 2015 WL 6163307...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page85 of 467

## POINT III

### There Was No Prejudicial Variance as to Count Two

Newman next contends that the proof at trial regarding inside tips he received in advance of Dell's May 2008 earnings announcement constituted a prejudicial variance from the allegations in Count Two of the Indictment. (Newman Br. 52-55). Newman raised no such complaint in the proceedings below, and his claim is therefore subject to review solely for plain error. Newman's claim would fail under any standard of review, because the evidence at trial did not prove facts materially different from those alleged in Count Two and because, even if there were a variance, **\*91** Newman was on notice of it through the exhibits and witness statements provided to him in advance of trial.

### A. Applicable Law

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Salmonese*, 352 F.2d 608, 621 (2d Cir. 2003) (citation and internal quotation marks omitted). This Court "has consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983) (citation and internal quotation marks omitted).

"A defendant alleging variance must show 'substantial prejudice' to warrant reversal." *United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007) (quoting *United States v. McDermott*, 918 F.2d 319, 326 (2d Cir. 1990)). A variance is prejudicial only when it "infringes on the 'substantial rights' that indictments exist to protect--to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy." *United States v. Dupre*, 462 F.3d 131, 141 (2d Cir. 2006) (citation and internal quotation marks omitted); *see also United States v. Mucciante*, 21 F.3d 1228, 1236 (2d Cir. 1994) ("A variance is immaterial--and hence not prejudicial-- where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and **\*92** where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." (citation and internal quotation marks omitted)).

### B. Relevant Facts

The speaking allegations in the Indictment described an insider-trading scheme in which Jesse Tortora--an analyst at Diamondback--obtained inside information from employees of publicly traded technology companies both directly and through a network of corrupt analysts at other hedge funds. (A. 149-50). This information related to, among other things, the companies' earnings, revenues, and gross margins. (A. 150). The Indictment alleged that Tortora passed such inside information to Newman, who used it to execute securities trades. (A. 150).

The Indictment provided specific details about trades based on inside information in connection with two quarterly earnings announcements by Dell in 2008 and one such announcement by NVIDIA in 2009. (A. 153-55, 156-57). As to Dell's May 2008 earnings announcement (which is the subject of Count Two), the Indictment alleged that a Dell insider had disclosed "Inside Information concerning Dell's financial results for the quarter ended May 2, 2008," and that the "Inside Information indicated, among other things, that gross margins would be higher than market expectations." (A. 153). The Indictment further alleged that, based on this information, Newman bought 475,000 shares of Dell stock in advance of the earnings announcement. (A. 153, 163).

**\*93** The evidence at trial established that, in advance of Dell's quarterly earnings announcement in May 2008, the Dell insider provided multiple updates on Dell's financial results to Goyal, which tips Goyal shared with Tortora. (*See* GX 26). Tortora, in turn, provided the information to Newman and other corrupt analysts. (GX 29, 30, 31, 32, 33, 34, 2604, 2607). The cooperating witnesses did not remember precisely which metrics the Dell insider had provided for the May 2008 quarter, but each of them

Case 17-1405, Document 29, 06/06/2017, 2052263, Page86 of 467

recalled that the information led to the conclusion that Dell's earnings per share would beat market expectations. (Tr. 179, 1451, 2463). [34]

[34]  Goyal believed he had received information from Ray regarding revenues and margins (Tr. 1451); Tortora recalled that he had received Dell's revenue information and either its gross margins or operating margin (Tr. 179, 788); and Adondakis recalled receiving revenue information but not margins (Tr. 2464).

Documentary evidence provided to the defendants six weeks in advance of trial (in accordance with the District Court's order regarding the production of marked Government exhibits) showed that the defendants received information in advance of Dell's quarterly announcement that Dell's earnings would beat market expectations. One of the corrupt analysts spoke to Tortora regarding Dell on May 12, 2008, and took notes of the conversation. Those notes indicated that, as of May 12, Dell would report revenues of $15.8 billion (which was one percent greater than market expectations at the time), gross margins of **\*94** "18.5-18.6%" (which was slightly better than the current market expectations of 18.5 percent), and operating expenses of 13 percent. (GX 600A). A few days later, after another update from the Dell insider, Goyal and Tortora used the information he had provided to calculate an earnings per share ("EPS") number of 36 to 37 cents, which exceeded market expectations of 33 cents per share. (GX 187; Tr. 197). [35]

[35]  As Tortora explained, Goyal did not provide Dell's EPS number; Tortora calculated that number using other metrics Goyal had given him, such as revenues, gross margins, operating margins, and expenses. (Tr. 147, 198).

On May 16--the very same day Tortora confirmed that Dell's EPS would beat market expectations by three to four cents--Newman took a large long position in Dell stock. (GX 2501-DA). Only hours before Dell announced its earnings on May 29, following an additional update on Dell, Newman purchased additional shares. (GX 2501-DA). [36] While no documentary evidence records precisely what information Tortora conveyed to Newman on May 29, the information was **\*95** obviously positive, given that Newman increased his Dell holdings after speaking to Tortora.

[36]  Telephone records showed that (1) Ray and Goyal spoke on the evening of May 28, (2) Goyal called Tortora later that same evening, and (3) Tortora called Newman at 7:48 a.m. the next morning. (GX 25, 2606, 2607, 2610). Newman purchased the 220,000 additional shares between 9:32 a.m. and 12:48 p.m. that day. When Dell announced its earnings shortly after 4:00 p.m., Newman held a total of 450,000 shares. (GX 2501-DA).

Dell ultimately reported revenues and operating margins that beat consensus projections, with the result that Dell's EPS number was 38 cents per share. (GX 1803; Tr. 834). Gross margins, however, were slightly below market expectations. (GX 1723; DX 8228). As Newman had correctly predicted based on the inside information he had received, Dell's stock price increased following the earnings announcement. (GX 1842 (showing stock price increase of five percent within one day of the announcement)).

**C. Discussion**

Contrary to Newman's claim, there was no variance at all here, let alone a prejudicial variance. While it may have been preferable for the Indictment to allege that Dell's financial results generally would beat expectations in May 2008 without highlighting gross margins, the allegation was not limited to margins. The Indictment alleged, among other things, that Newman received inside information regarding Dell's quarterly financial results in advance of the company's quarterly announcement in May 2008. (A. 153). As Newman himself acknowledges, the Indictment's allegation that the tips included gross margin numbers was merely illustrative of the information that was disclosed. (A. 153 (alleging that the "Inside Information indicated, among other things, that gross margins would be higher than market expectations"); Newman Br. 52 n.25 (conceding that the language of the Indictment was not limited to tips **\*96** concerning gross margins and "leaves room for other parameters")). Indeed, the thrust of the allegation was that Newman received inside information that Dell's financial results would exceed market

UNITED STATES OF AMERICA, Appellee, v. Joh..., 2015 WL 6163367...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page87 of 467

expectations, leading him to purchase a large volume of Dell stock so that he could capitalize on the rise in stock price following the announcement of those results. The proof at trial was consistent with--and certainly not materially different from--these allegations.

The trial evidence established that, in May 2008, Goyal received multiple tips from a Dell insider concerning the company's financial results for the preceding quarter and shared that information with Tortora, who, in turn, passed it along to Newman. The tips included information regarding revenues and operating expenses, in addition to gross margins. (*See* GX 600A). Newman emphasizes that while the Indictment alleged a tip that gross margins would exceed expectations, gross margins were ultimately lower than analysts' projections. (Newman Br. 52). The inside tip Tortora received on May 12, 2008, however, showed that revenues, gross margins, and operating expenses all would beat market projections. (*See* GX 600A). That Dell's gross margin numbers were subsequently revised downward during the consolidation process does not establish a variance. (*See* GX 1712A (showing gross margins of 18.5 to 18.6 percent as of May 12, consistent with the tip)). The evidence established that Newman received inside tips regarding Dell's quarterly financial results-- including its gross margins--in advance of the company's May 2008 earnings announcement, just as the Indictment alleged.

 **\*97**  Even if the Indictment's allegation that the inside information regarding Dell's quarterly financial results included, "among other things, that gross margins would be higher than market expectations" could somehow be interpreted as different from the evidence presented at trial, Newman has fallen far short of demonstrating that any such variance resulted in substantial prejudice. (A. 153). This Court has held that "[a] variance is immaterial--and hence not prejudicial--where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *United States v. LaSpina*, 299 F.3d 165, 183 (2d Cir. 2002) (internal quotation marks omitted). Newman does not assert that the purported variance would impede his ability to avoid double jeopardy. Instead, he claims that he was surprised by what he contends was a shift in the Government's theory at trial. (Newman Br. 54).

Newman's claim of surprise has no traction. As discussed, the Indictment put him on notice that the Government intended to prove he received inside tips in advance of Dell's May 2008 quarterly announcement that the company's financial results would beat market expectations, leading him to take a substantial long position in Dell stock. Moreover, the Government produced marked exhibits to him six weeks before the trial began. Those exhibits included a record of the tip provided in mid-May indicating that Dell's revenues, gross margins, and operating expenses would all exceed market projections.  **\*98**  (GX 600A). The exhibits also included an e-mail between Tortora and Goyal--which was both quoted and discussed at length in the criminal complaint filed against the defendants--reflecting the Government's theory that the inside information Newman obtained was, on the whole, positive. (GX 187 (e-mail indicating that Dell's EPS would beat market expectations by several cents per share)). *See United States v. Dupre*, 426 F.3d at 141-42 (variance not prejudicial where there was no claim of surprise because Government had produced documents containing evidence presented at trial well in advance of trial).

Perhaps the most powerful proof that Newman was not in fact surprised by the theory the Government pursued at trial was his own counsel's comments in opening statement. At the outset of the trial, even though the Government had not mentioned the May 2008 tips in its opening statement, Newman's counsel twice described the Government's theory as being that Newman received inside information that month that Dell would report positive results in its quarterly announcement. (Tr. 87 (stating that Count Two alleged that "Newman bought 475,000 shares of Dell because he had been given inside information, according to the [Government], that Dell would report positive results a few weeks later on May 29"), 88 (describing "May 16" as "when the government says [Newman] got inside information telling him he knew that the company[, that is, Dell,] was going to report positively")). As these comments demonstrate, Newman well understood the Government's theory as to the May 2008 Dell tips and was  **\*99**  not surprised at trial when the Government did not limit its proof to tips regarding gross margins.

Newman further asserts that the claimed prejudice was "particularly severe" because the District Court did not allow him to "fully explor[e] the inconsistencies in the government's allegations." (Newman Br. 54-55). Specifically, he contends that the District Court improperly prevented him from (1) seeking to refresh the cooperating witnesses' recollections, using the

UNITED STATES OF AMERICA, Appellee, v. Joh..., 2015 WL 6163567...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page88 of 467

Indictment, as to whether they had told the Government they received tips in May 2008 related to gross margins; and (2) questioning the case agent about the criminal complaint he signed, which stated that Tortora received gross margin information in advance of Dell's May 2008 earnings announcement. These complaints regarding restrictions on Newman's examination of certain witnesses have no bearing on his claim of prejudicial variance, given this Court's precedent that a variance is prejudicial only when it "infringes on the 'substantial rights' that indictments exist to protect--to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy." *Dupre*, 462 F.3d at 141 (citation and internal quotation marks omitted). The complaints have no merit in any event.

Although Newman claims that the District Court prohibited him from showing three cooperating witnesses the Indictment "to refresh their memories" as to whether they had previously told the Government that, in May 2008, they received inside information related to gross margins, this is not what happened at trial. Newman's counsel did not ask to show **\*100** Tortora the Indictment. Instead, after confirming with Tortora on cross-examination that Tortora did not recall which "financial performance line items" he had received that quarter, Newman proposed to read aloud to the jury a paragraph from the Indictment in order to put the testimony "in context." (Tr. 826-27). The Court did not abuse its discretion in precluding Newman's counsel from doing so and directing him instead to "[a]sk [the witness] questions." (Tr. 827). *See* Fed. R. Evid. 611(a); *cf. United States v. Polizzi*, 500 F.2d 856, 876 (9th Cir. 1974) ("The decision to read the indictment to the jury is within the sound discretion of the trial court.").

Moreover, Newman fails to acknowledge that the District Court allowed him to attempt to refresh Goyal's and Adondakis's recollections on this very point with the informations containing the charges to which each of them had pleaded guilty. (Tr. 1571-72, 2463-67, 3431-32). In any event, it would not have been an abuse of discretion for the Court to prevent Newman from attempting to refresh the cooperating witnesses' recollections with the Indictment (had he sought to do so), given that it was a legal document based on a composite of information obtained from various sources and that Newman could have sought to refresh their memories with their own prior statements, as documented by the Government. *See Berkovich v. Hicks*, 922 F.2d 1018, 1025 (2d Cir. 1991) ("A trial judge has broad discretion to organize or limit the use of evidence to refresh recollection." (citation and internal quotation marks omitted)).

**\*101** Nor is there any force to Newman's claim that the District Court abused its discretion in preventing him from questioning the case agent about the allegation in the criminal complaint that Dell's gross margins would beat market expectations. As Newman's counsel explained at trial, he sought to ask the case agent whether Goyal and Tortora were the source of this information in order to impeach them with a prior inconsistent statement. (Tr. 3432-37). The Court correctly found that there was no inconsistency between the witnesses' testimony and any prior statements they had made, because they had each testified that they did not recall what type of financial information they had received concerning Dell in May 2008. (Tr. 3437; *see also* Tr. 178-79 (Tortora testifying that he did not remember "the specific details of the line items" he received on Dell in May 2008), 788-89 (Tortora testifying on cross-examination that he was not certain whether he had received gross margin information on Dell in May 2008), 1571 (Goyal testifying on cross-examination that he did not recall what information he had received on Dell in May 2008)).

In any event, even if Newman's counsel had identified a prior inconsistent statement, he could not offer extrinsic evidence of any such statement under Rule 613(b) of the Federal Rules of Evidence without giving either Tortora or Goyal "an opportunity to explain or deny the statement," Fed. R. Evid. 613(b), which he failed to do. In these circumstances, the District Court cannot be said to have abused its discretion. *See United States v. Strother*, 49 F.3d 869, 874-75 (2d Cir. 1995) ("We review a district court's **\*102** determination of whether statements are inconsistent with each other for an abuse of discretion.").

In sum, there was no variance here, prejudicial or otherwise. Newman's claim should therefore be rejected.

**POINT IV**

UNITED STATES OF AMERICA, Appellee, v. Gen..., 2013 WL 6163307...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page89 of 467

## Chiasson's Sentence Was Reasonable

Chiasson challenges his sentence of 78 months' imprisonment as both procedurally and substantively unreasonable. (Chiasson Br. 53-70). He contends that his sentence was procedurally unreasonable because the District Court included in its calculation of gain the illicit profits generated not only by Chiasson's own trades on behalf of Level Global, but also the trades made by Level Global's other co-founder, David Ganek, who the Court found was a co-conspirator. Contrary to Chiasson's claim, that finding was not clearly erroneous, and the inclusion of Ganek's trades in the gain calculation was therefore proper. Moreover, Chiasson's further argument that his sentence was substantively unreasonable because the Court placed undue emphasis on gain and failed to account for unwarranted sentencing disparities also lacks merit. Chiasson's sentence--which was substantially below the applicable Guidelines range--was reasonable.

## A. Relevant Facts

In advance of Chiasson's sentencing, the Probation Office prepared a Presentence Report. In calculating **\*103** the applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), the Probation Office determined that Chiasson was responsible for unlawful trading gains of approximately $40 million. (PSR ¶¶ 32, 36, 41, 42, 51). [37] Accordingly, the Probation Office concluded that Chiasson's total offense level was 30, that he fell within Criminal History Category I, and that his Guidelines range was 97 to 121 months' imprisonment. (PSR ¶ 93). The Probation Office recommended a sentence of 97 months' imprisonment. (PSR at 28-29, Sentencing Recommendation).

[37]  Although the actual trading gains realized by Level Global were in excess of $50 million, the Probation Office utilized the same "24-hour rule" that the District Court had applied at Newman's sentencing, and calculated insider trading gains based on the stock price 24 hours after the public announcement of the inside information, on the assumption that the information was fully embedded in the stock price by that time.

In his sentencing submission, Chiasson challenged the Probation Office's Guidelines calculation, arguing that the trading gains should be limited to trades executed by Chiasson himself. (A. 2574-77). Chiasson further requested that the District Court grant a "substantial downward variance" from the Guidelines range. (A. 2578). Chiasson's submission included an extensive discussion of other insider-trading defendants and their sentences, arguing that a substantially below-Guidelines sentence was necessary to avoid **\*104** unwarranted sentencing disparities. (A. 2579-92). Chiasson also argued that such a sentence was warranted because of Chiasson's personal history and family circumstances; the Guidelines' emphasis on profits; and the aberrational nature of Chiasson's criminal conduct. (A. 2592-607).

In its sentencing submission, the Government advocated for a sentence within the Guidelines range of 97 to 121 months' imprisonment, noting the extraordinary scope of the conspiracy, Chiasson's role in it, and the enormous trading gains realized by Chiasson and his co-conspirators at Level Global. (A. 2777-93). With respect to the Guidelines calculation, the Government argued that the calculation of gains should include not only trades Chiasson executed himself, but also trades directed by co-conspirator David Ganek, who had co-founded Level Global with Chiasson. (A. 2796-97). On that point, the Government argued that to the extent Ganek had directed some of the trades at issue, he and Chiasson had been acting in concert with one another. (The District Court had previously made a finding at trial by a preponderance of the evidence that Ganek was also a member of the conspiracy, as discussed in Point V, *infra*.)

On May 13, 2013, the parties appeared before the District Court for sentencing. The Court first addressed the Guidelines calculation, noting that the principal dispute between the parties was whether to include trades at Level Global that were directed by Ganek. (A. 2880-81). Chiasson argued that he should be treated similarly as certain downstream tippees in an unrelated case, **\*105** *United States v. Goffer*, 10 Cr. 56 (RJS), where the tippee defendants where held responsible for the profits resulting from their own trades and not those of co-conspirators. (A. 2881-83). The Government countered that the two cases were not factually analogous, as the tippee-defendants in *Goffer* worked at different firms and traded independently of one another; in

UNITED STATES OF AMERICA, Appellee, v. Ven..., 2015 WL 6163367...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page90 of 467

contrast, the trades at Level Global, whether directed by Ganek or Chiasson, were all part of a single trade built up over time-- namely, a short of Dell stock based on inside information Adondakis had obtained indirectly from inside Dell. (A. 2883-88). The Court agreed with the Government largely for the reasons set forth in its sentencing submission and found, consistent with the Presentence Report, that the gain attributable to Chiasson was more than $20 million, resulting in a Guidelines range of 97 to 121 months. (A. 2888).

The District Court next identified the different factors it was required to consider under Section 3553(a) of Title 18, United States Code, in determining an appropriate sentence, including the need to avoid unwarranted sentencing disparities among similarly situated defendants, and then heard from both parties. (A. 2888-91). Chiasson's counsel requested that the Court show leniency based on Chiasson's personal history and the sentences imposed on other insider trading defendants. (A. 2912-20). The Government reiterated its view of the seriousness of the offense. (A. 2920-21).

The District Court then discussed the application of the various Section 3553(a) factors. With respect to the circumstances of the offense, the Court commented **\*106** that the criminal conduct took place over a "long period of time" and "wasn't just one error in judgment" because "[i]t was repeated over multiple months and even years." (A. 2927). The Court also noted that the incentives for Chiasson to commit the crime should have been greatly diminished since he was a wealthy individual earning more than $10 million a year. (A. 2927). The Court agreed that Chiasson was less culpable than certain other insider trading defendants, like Zvi Goffer, who received a sentence of 120 months' imprisonment. (A. 2930). At the same time, the Court remarked that Chiasson had engaged in efforts to conceal his criminal conduct and that the size of the illegal profits was extraordinary. (A. 2930-31). The Court explained that "the size of the bet matters and the size of the gains matter. I think that they should be discounted to some extent. I agree with [counsel for Chiasson], they shouldn't be the only thing that matters, but they do matter." (A. 2931). Balancing all the different factors, the Court concluded that a sentence of 78 months' imprisonment was warranted.

## B. Applicable Law

### 1. Appellate Review of Sentences

Appellate review of a district court's sentence "encompasses two components: procedural review and substantive review." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc); see generally United States v. Booker, 543 U.S. 220 (2005); United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). A district court "commits procedural error where it fails to **\*107** calculate the Guidelines range (unless the omission of the calculation is justified), makes a mistake in its Guidelines calculation, [ ] treats the Guidelines as mandatory[,] . . . does not consider the Section 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact." United States v. Cavera, 550 F.3d at 190 (internal citations omitted); see also Gall v. United States, 552 U.S. 38, 51 (2007).

If the Court determines that there was no procedural error, it "should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Gall v. United States, 552 U.S. at 51. In applying that standard, the Court must "take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion and bearing in mind the institutional advantages of district courts." Cavera, 550 F.3d at 190; see also United States v. Fernandez, 443 F.3d 19, 26 (2d Cir. 2006). The Court has elaborated on the definition of substantive reasonableness and, in doing so, indicated that the substantive reasonableness standard "provide[s] a backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." United States v. Rigas, 583 F.3d 108, 123 (2d Cir. 2009); see also Cavera, 550 F.3d at 190 (stating that the Court will "set aside a district court's substantive determination only in exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions' " (emphasis **\*108** in original; quoting United States v. Rigas, 490 F.3d at 238)).

### 2. Consideration of Sentencing Disparities

When sentencing a defendant, a court "shall consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The "primary purpose of th[is] provision was to reduce unwarranted sentence disparities nationwide," although the statute does not limit the sentencing court from considering other types of disparities, including comparisons with codefendants' sentences. United States v. Wills, 476 F.3d 103, 109 (2d Cir. 2007); see United States v. Frias, 521 F.3d 229, 236 (2d Cir. 2008).

This Court has repeatedly reaffirmed that sentencing disparities are not "unwarranted" where defendants are not "similarly situated." United States v. Wills, 476 F.3d at 109-10; United States v. Fernandez, 443 F.3d at 32 ("[A] sentencing difference is not a forbidden 'disparity' if it is justified by legitimate considerations, such as rewards for cooperation."(citation and internal quotation marks omitted)). Moreover, as this Court has explained, even where a sentencing judge acknowledges the existence of a disparity, such acknowledgment does not necessarily require the judge to "adjust a sentence downward from the advisory guidelines range in order for that sentence to be reasonable." United States v. Florez, 447 F.3d 145, 157-58 (2006) (citation and internal quotation marks omitted). That is, "if sentencing disparities . . . are **\*109** properly considered, the weight to be given such disparities, like the weight to be given any '3553(a) factor,' is a matter firmly committed to the discretion of the sentencing judge and is beyond our [appellate] review, as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented." Id. at 158 (quoting Fernandez, 443 F.3d at 32). This Court has further explained that "[a] reviewing court's concern about unwarranted disparities is at a minimum when a sentence is within the Guidelines range." United States v. Irving, 554 F.3d 64, 76 (2d Cir. 2009) (internal quotation marks omitted).

### C. Discussion

### 1. Chiasson's Sentence Was Procedurally Reasonable

Chiasson contends that the District Court incorrectly calculated Chiasson's trading gains by including the gains from trades placed on behalf of Level Global by both Chiasson and Ganek. (Chiasson Br. 59-62). He argues that Ganek's trades should not have been included "[a]bsent evidence that Ganek joined a conspiracy with Chiasson." (Chiasson Br. 61). But that is precisely the finding the Court made at trial. Because that finding was not clearly erroneous, see Point V, infra, the Court's inclusion of Ganek's trades in the gain calculation was proper.

Under the Guidelines, gain in insider trading cases includes all gains that result from "trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information." U.S.S.G. § 2B1.4, comment. **\*110** background (emphasis added). That was plainly the case here. The Dell trades made at Level Global in July and August 2008 by Chiasson and Ganek, the co-founders of the firm, were all part of a single position built up over time--a massive short in Dell stock based on the inside tip Adondakis had received about Dell's surprisingly weak margins for the quarter.

As set forth in greater detail in Point V, infra, in July and August 2008, Ganek received multiple updates about Dell's upcoming quarterly results based on inside tips. (See, e.g., GX 459 (Adondakis informing Chiasson and Ganek that he would get "the DELL check mid-week"), 513 (e-mail from Chiasson to Ganek stating that while an analyst was predicting gross margins for Dell of 18 percent, "our call is 17.5ish"--a reference to the inside information Adondakis had received about Dell's disappointing margins and the basis for the firm's short position in Dell)). Ganek's communications with others at Level Global demonstrated that he understood the source of the information was an insider at Dell. (See, e.g., GX 438 (instant message in which Ganek asked another co-conspirator at Level Global, "did sam here [sic] from his dell contact?"), 515 (Chiasson informing Ganek that a certain analyst believed Dell would miss margin expectations and specifically advising Ganek that although that analyst "has a few guys there [i.e., at Dell]," they were "not sam's people")). Indeed, as a matter of common sense, it defies logic to believe that Ganek would permit his firm to take a $220 million short position--the second largest short in its history--based on an unknown source. (DX 39; **\*111** GX 64). As the District Court explained, the nature of the information and Ganek's awareness of "the series of incremental checks spaced out over several weeks, which is consistent with financial results being

Case 17-1405, Document 29, 06/06/2017, 2052263, Page92 of 467

firmed up as the roll up process is taking place, as the reporting date approaches," provided ample evidence that he knew the source of the tips. (Tr. 3255).

Other evidence also supported the conclusion that Chiasson and Ganek acted in concert with one another. In August 2008, for example, after Adondakis prepared an analysis of how Dell's stock would react to the public announcement of the inside information he had received from Tortora, Adondakis printed the analysis and took it to a meeting with Chiasson and another senior Level Global employee with whom he discussed the analysis. (Tr. 1778). Adondakis then observed Chiasson and the other Level Global employee take the analysis into Ganek's office in a closed door meeting without Adondakis. (Tr. 1779). And the day before the earnings announcement, on August 27, 2008, Adondakis had a 40 minute call with Chiasson, Ganek and two other coconspirators at Level Global in which Adondakis informed the group he "ha[d] another Dell update" indicating gross margins were coming in below expectations. (Tr. 1805; GX 523). In light of the extensive evidence of Ganek's participation in the conspiracy with Chiasson, the District Court's finding that the gain attributable to Chiasson was more than $20 million was not clearly erroneous.

Chiasson also suggests that he should have been held accountable only for his own trades in light of  **\*112**  the District Court's approach to sentencing downstream tippees in *Goffer*. There, several downstream tippees--Emanuel Goffer, Michael Kimelman and Craig Drimal--received inside tips from the same source, but for Guidelines purposes, were held responsible only for their own trades. Chiasson's reliance on *Goffer* is unavailing.

First, while Chiasson relies on the District Court's approach in *Goffer* to argue that a downstream tippee can be held accountable only for his or her own trades, or for the trades of those tipped by the defendant, the language of the Guidelines is not so limited. The Guidelines provide that gain in insider trading cases includes the gain resulting from trades by (1) the defendant, (2) people the defendant tipped, *and* (3) persons acting in concert with the defendant. *See* U.S.S.G. § 2B1.4, comment. background.

Second, and in any event, Chiasson is not similarly situated to the *Goffer* tippees vis-à-vis Ganek. In *Goffer,* at the time of the trades in question, the downstream tippees worked at three different firms, received information from the same source (Goffer) but through different tipping chains, and traded independently of one another. The relationship among those tippees is most analogous to the relationship between Chiasson and Newman, not Chiasson and Ganek. Consistent with its approach in *Goffer*, the District Court did *not* include Newman's gains (or those of co-conspirators at other investment firms) in Chiasson's gain calculation.

Finally, Chiasson's claim that the District Court did not make sufficiently specific findings to permit  **\*113**  review for clear error by this Court is belied by the record. (Chiasson Br. 59). The Court stated that it largely agreed with the reasons set forth in the Government's sentencing submission, which described the evidence supporting the inclusion of Ganek's trades. On top of that, the Court had already explained at trial its finding that Ganek was a coconspirator. (Tr. 3254-56; *see* Point V, *infra*). This record is easily sufficient for this Court to conclude that the District Court's finding was not clearly erroneous.

## 2. Chiasson's Sentence Was Substantively Reasonable

Chiasson further contends that his sentence was substantively unreasonable, claiming that the District Court placed undue emphasis on the amount of gain and failed adequately to take into account the need to avoid unwarranted sentencing disparities. (Chiasson Br. 62-70). At Chiasson's sentencing, the Court expressly recognized its statutory obligation to consider, among other factors, the need to avoid unwarranted sentencing disparities. The Court balanced each of those factors and concluded that a sentence of 78 months-- substantially below the Guidelines range--was appropriate. In light of all the factors set forth in Section 3553(a), Chiasson's sentence was reasonable.

Chiasson's unlawful conduct spanned a period of nearly two years and encompassed multiple trades in various securities based on a number of different illegal tips. Chiasson repeatedly and deliberately traded  **\*114**  on inside information--information he knew had been disclosed by company insiders in intentional breach of their duties of confidentiality. Chiasson also understood

UNITED STATES OF AMERICA, Appellee, v. Joh..., 2015 WL 6163367...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page93 of 467

the enormous scope of the conspiracy; in addition to the massive trades made at Level Global, the inside information was being exchanged with other firms that also were trading on the information. Further, Chiasson took steps to conceal the illicit sources of information on which his trades were based. Indeed, he took an internal system at Level Global that was designed to create transparency and turned it on its head, using it to create a bogus paper trail to justify his unlawful trades while concealing their true basis. Chiasson was a sophisticated market professional who plainly understood the illegality of his conduct; to make matters worse, Chiasson was one of three people designated by Level Global to answer employees' questions about the firm's compliance policies, including its insider trading policy. (GX 595).

The magnitude of Chiasson's unlawful trades and resulting profits was truly staggering. The $220 million short of Dell stock in August 2008--based on inside information about the company's quarterly financial results--was Level Global's second largest short position ever, and it led to profits in excess of $50 million. (DX 39; GX 64). The unlawful profits from that position were enormous and unprecedented.

As even Chiasson is forced to concede, the size of the gains is a relevant sentencing consideration. The enormous gain from Chiasson's criminal conduct is **\*115** certainly a reflection of the extent of his criminal conduct, the extent of his corruption of the capital markets, and the harm caused to others. Many of the harms caused by insider trading are magnified when the unlawful trades and resulting profits are as massive as they were here. *See Goffer,* 721 F.3d at 132 (insider trading gain of approximately $11 million "had major deleterious effects on the market"). For one, the greater the gain resulting from the unlawful trades, the greater the loss to other participants in the market. Further, as Congress has found, insider trading undermines the public's confidence in the integrity of the financial markets. *See* Insider Trading and Securities Fraud Enforcement Act of 1988, H.R. Rep. No. 100-910, at 7-8 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6043, 6044 (stating that "[i]nsider trading damages the legitimacy of the capital market and diminishes the public's faith . . . . [T]he small investor will be--and has been--reluctant to invest in the market if he feels it is rigged against him"); *see also* Insider Trading Sanctions Act of 1984, H.R. Rep. No. 98-355, at 5 (1983), *reprinted in* 1984 U.S.C.C.A.N. 2274, 2278 (emphasizing that "[t]he abuse of informational advantages that other investors cannot hope to overcome through their own efforts is unfair and inconsistent with the investing public's legitimate expectation of honest and fair securities markets where all participants play by the same rules"). The resulting damage is particularly severe where, as here, a multi-billion-dollar hedge fund reaps profits of more than $50 million from a single insider trade.

Even apart from its relevance to the "nature and circumstances of the offense," however, gain is also **\*116** relevant to another Section 3553(a) factor that Chiasson overlooks, namely, the need to provide adequate deterrence. Because insider trading has the potential, as demonstrated by the facts of this case, to be an extraordinarily profitable crime, substantial sentences are necessary to counter the incentives to engage in such activity. *See Goffer,* 721 F.3d at 132 ("The district court's assertion that insider trading requires high sentences to alter th[e] calculus" that insider trading is "a game worth playing" given the potential for large profits "is a Congressionally-approved example of giving meaning to the 18 U.S.C. § 3553(a) factors").

Chiasson's contention that his sentence was substantively unreasonable rests largely on comparisons to sentences received by a handful of other insider trading defendants. Of course, the District Court expressly recognized that the need to avoid unwarranted sentencing disparities was one of a number of factors the sentencing court had to consider; the weight to be given that factor, however, was a matter committed to the discretion of the District Court. *United States v. Florez,* 447 F.3d at 157-58. In any event, the comparisons upon which Chiasson relies are inapt.

In comparing himself to other insider trading defendants, Chiasson highlights facts from those cases that are favorable to him, while ignoring important differences. Chiasson compares himself, for example, to Joseph Contorinis, a tippee who received a 72-month sentence. Chiasson correctly notes that Contorinis testified untruthfully at trial, but overlooks that Contorinis's criminal conduct was more limited **\*117** in duration and scope than Chiasson's, as Contorinis traded only a single stock, over a short period of time, based on tips from one source about a single transaction.

UNITED STATES OF AMERICA, Appellee, v. Todd..., 2015 WL 6163307...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page94 of 467

Chiasson focuses most, however, on the 66-month sentence imposed on Craig Drimal, a downstream tippee in *Goffer*. Chiasson points to certain aggravating factors present in that case, but does not account for the fact that Drimal accepted responsibility and pleaded guilty. (Had Chiasson done so, his Guidelines range would have been substantially reduced.) Further, Chiasson's gains were nearly four times the size of Drimal's, which this Court described as having "major deleterious effects on the market." *Goffer*, 721 F.3d at 132.

Chiasson fails to acknowledge that the key differentiating factor between Drimal and other downstream tippees in *Goffer* (who received substantially lower sentences than he did) was the size of their respective gains. Emanuel Goffer, for example, received a sentence of 36 months' imprisonment even though he shared virtually all of the aggravating factors Chiasson highlights for Drimal (and, unlike Drimal, went to trial); Emanuel Goffer's profits, however, were far smaller than Drimal's. Significantly, this Court affirmed Drimal's 66-month sentence, agreeing with the District Court's consideration of gain as an important sentencing factor. *See Goffer*, 721 F.3d at 132.

Finally, Chiasson argues that a sentence two years longer than that received by Newman was not justified. Chiasson's gain, however, exceeded Newman's **\*118** by a factor of ten. That Chiasson disagrees with the District Court's balancing of the different factors does not render his sentence unreasonable. As this Court has made clear, "[t]he weight to be afforded any given argument made pursuant to one of the § 3553 factors is a matter firmly committed to the discretion of the sentencing judge and is beyond our review, as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented." *United States v. Nektalov*, 461 F.3d 309, 319 (2d Cir. 2006) (quoting *Fernandez*, 443 F.3d at 32). Here, in light of all the Section 3553(a) factors, Chiasson's below-Guidelines sentence was reasonable.

## POINT V

### The Forfeiture Order Was Proper

Chiasson finally challenges two aspects of the forfeiture order imposed by the District Court, claiming that the Court committed clear error in finding that David Ganek was a co-conspirator and contending that he was entitled to a jury determination, beyond a reasonable doubt, as to the amount of forfeiture. (Chiasson Br. 70-79). Neither of Chiasson's arguments has merit.

### A. Relevant Facts

The evidence at trial established that Ganek was aware that Sam Adondakis (Chiasson's analyst at Level Global) had a source who was a Dell insider, and that Ganek knew Adondakis received numerous updates on Dell's financial results leading up to the company's August 2008 earnings announcement. On **\*119** August 5, 2008, Adondakis received an initial inside tip concerning Dell's performance in the quarter that had just ended, and passed the information along to Chiasson. (GX 214; Tr. 1761). Three days later, Ganek sent an instant message to another trader at Level Global asking whether Adondakis had heard "from his dell contact." (GX 438). The trader responded, "initial check was neg earlier in the week, next one is later next week I believe (not sure of exact timing), then one more right before the q." (GX 438).

Around that same time, Adondakis used the inside information he had received to prepare an analysis of how the market would react to Dell's quarterly earnings report. (Tr. 1774-78). Adondakis discussed the document in a meeting with Chiasson and another senior Level Global employee; Chiasson and the other employee then took the document to Ganek's office. (Tr. 1778-79). Following this meeting, Level Global increased its short position in Dell. Subsequently, on August 15, Adondakis wrote an e-mail to Chiasson, Ganek, and others, explaining that he would "get the DELL check mid-week & the company reports the following Thurs." (GX 459).

On August 26, Chiasson wrote to Ganek that an analyst had predicted that Dell would report a gross margin of 18 percent, but--consistent with the tip Adondakis had received--stated, "[o]ur call is 17.5ish." (GX 513). Chiasson also informed Ganek that an analyst named Fortuna was predicting a gross margin "miss." (GX 513). In a series of instant messages later that same

day, Chiasson told Ganek that "[For]tuna smells it" and that Fortuna "has a **\*120** few guys" at Dell, but that they "are not sam's people." (GX 515).

On August 27, the day before Dell's quarterly announcement, Adondakis had a lengthy telephone call with Chiasson, Ganek, and two other Level Global employees during which Adondakis informed the group that he had another Dell update indicating that the company's gross margins would be lower than expectations. (Tr. 1805; GX 523). While he was still on the call with Adondakis, Ganek instructed a trader to increase Level Global's short position in Dell.

The evidence also established that Ganek knew Adondakis had a source of inside information on NVIDIA, and that this insider provided a series of updates leading up to NVIDIA's May 7, 2009 earnings announcement. On April 27, 2009, Adondakis received an initial tip regarding NVIDIA's gross margins for the quarter (that the company would report 30 percent), and passed it along to Chiasson. (GX 813, 900). The very next day, Chiasson sent an e-mail to Ganek in which he explained that "Sammy [Adondakis] thinks we will get a firmer read shortly," and that "[p]relim call [on gross margins] is Street is 34/our check is 30 GM." (GX 907). Adondakis got his next inside tip on NVIDIA on May 4. (GX 820). That same day, a Level Global trader wrote Ganek that Chiasson was shorting NVIDIA "500k for starters" based on "Sam's latest check" that "GM's will be light when [NVIDIA] report[s] on Thursday." (GX 927). That evening, Ganek and Chiasson had the following instant message exchange:

| Ganek: | nvda? |
|---|---|
| Chiasson: | starting to do a little here . . . gm call remains bad and bad for this qtr and guide[.] [C]alls so far we are doing this aft suggest people not prepared for what is coming in print and guide versus our checks . . . . |
| Ganek: | have gotten anything incremental to last weeks call? |
| Chiasson: | yes this call today. |

(GX 923).

**\*121** At trial, the District Court admitted Ganek's statements in these various instant message and email communications as co-conspirator statements, pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, finding that the Government had established by a preponderance of the evidence that Ganek was a co-conspirator of Chiasson's. (Tr. 3257). The Court stated that, although Adondakis did not explicitly tell Ganek he had a source inside Dell, a preponderance of the evidence showed that "Ganek was aware of the source and the nature of th[e] information" Adondakis provided. (Tr. 3254). In this regard, the Court commented that Ganek knew Adondakis had a Dell contact, that Ganek "was aware that the Dell contact was providing Adondakis with a series of incremental checks . . . spaced out over several **\*122** weeks, which is consistent with financial results being firmed up as the roll up process is taking place," and that Ganek knew "Adondakis was providing Dell checks to Ganek during a black-out period for Dell." (Tr. 3255). As for NVIDIA, the Court emphasized that Ganek was aware Adondakis's information would become "firmer as the earnings report approached." (Tr. 3255). The Court further found that Ganek's authorization of "large trading positions" in Dell and NVIDIA shortly after receiving information from Adondakis was "circumstantial evidence of his knowledge." (Tr. 3255).

Consistent with these findings at trial, in determining the forfeiture amount, the Court stated that Ganek was an unindicted co-conspirator and ordered Chiasson to forfeit $1,382,217, a sum representing incentive and management fees received by both Chiasson and Ganek. (A. 3003).

## B. Applicable Law

UNITED STATES OF AMERICA, Appellee, v. Dell..., 2015 WL 6163507...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page96 of 467

The forfeiture statute pertaining to securities fraud broadly provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation." 18 U.S.C. § 981(a)(1)(C). [38] "[A] court may order a defendant to forfeit proceeds received by others who **\*123** participated jointly in the crime, provided the actions generating those proceeds were reasonably foreseeable to the defendant." *Contorinis*, 692 F.3d at 147; *United States v. Fruchter*, 411 F.3d 377, 384 (2d Cir. 2005) ("So long as the sentencing court finds by a preponderance of the evidence that the criminal conduct through which the proceeds were made was foreseeable to the defendant, the proceeds should form part of the forfeiture judgment."); *see also United States v. Royer*, 549 F.3d 886, 904 (2d Cir. 2008) (affirming forfeiture amount which, like the gain amount found at sentencing, incorporated the fraudulent conduct of persons who acted in concert with the defendant).

[38]     Although Section 981 is a civil forfeiture provision, 28 U.S.C. § 2461 provides that criminal forfeiture is mandated where federal law provides for civil forfeiture but there is no parallel criminal forfeiture provision.

The Government must prove the facts supporting forfeiture only by a preponderance of the evidence. *See United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011); *United States v. Gaskin*, 364 F.3d at 461. Moreover, "[t]he Court's determination [as to the proper forfeiture amount] may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). "When a forfeiture award is challenged on appeal, this Court reviews the district court's legal conclusions *de novo* and its factual findings for clear error." *United States v. Treacy*, 639 F.3d at 47. Under this standard, if the district court's factual findings are " 'plausible in light of the record viewed in its entirety,' " *United States v. Reilly*, 76 F.3d 1271, 1276 (2d Cir. 1996) (quoting *Anderson v. City of Bessemer* **\*124** *City*, 470 U.S. 564, 574 (1985)), then the district court's findings should be affirmed.

## C. Discussion

### 1. The District Court's Factual Findings Were Not Clearly Erroneous

Chiasson contends that the District Court committed clear error in finding, by a preponderance of the evidence, that Ganek was a co-conspirator. (Chiasson Br. 72-74). This claim is unavailing. As the Court found at trial, a preponderance of the evidence showed that Ganek "was aware of the source and the nature of th [e] information" Adondakis provided regarding Dell and NVIDIA. (Tr. 3254).

As to Dell, e-mails and instant messages showed that Ganek knew Adondakis had a contact at Dell (GX 438 (Ganek writing, "did sam here [sic] from his dell contact?"), and that Adondakis was providing incremental updates as Dell consolidated its internal financial numbers before reporting them (GX 438 (trader writing to Ganek on August 8, 2008, that Adondakis's "initial check was neg earlier in the week, next one is later next week I believe (not sure of exact timing), then one more right before the q"), 459 (Adondakis writing to Ganek and others on August 15, 2008, that he would "get the DELL check mid-week & the company reports the following Thurs")). Based on information Adondakis provided, Ganek approved increasing Level Global's short position in Dell (which was the second largest short position Level Global had ever taken in any stock) in advance of Dell's August 2008 earnings announcement. **\*125** In light of the documentary evidence--and given that it is highly unlikely Ganek would have approved such a large short position without knowing the basis for the trade--the District Court had ample basis for its conclusion that Ganek knew Adondakis had inside information on Dell's financial results.

As to NVIDIA, documentary evidence established that Ganek knew Adondakis had received specific information regarding the gross margin number the company would report in its May 2009 earnings announcement and expected to "get a firmer read shortly." (GX 907). Ganek was also informed that Adondakis received an update on NVIDIA's gross margins only days before the announcement, and that Adondakis's source had stated that gross margins would be lower than market expectations. (GX 923, 927). The District Court was entitled to rely on this evidence to conclude that Ganek knew he was obtaining nonpublic information regarding the consolidation of NVIDIA's financial data leading up to the quarterly earnings announcement.

In pressing a contrary conclusion, Chiasson emphasizes that Adondakis testified "he did *not* reveal his inside sources to Ganek." (Chiasson Br. 72 (emphasis in original)). That Adondakis did not do so was hardly surprising, given that he reported to Chiasson and had little interaction with Ganek before the summer of 2008. (Tr. 1955). The documentary evidence, however, provided ample basis for the District Court to conclude that Ganek was aware of Adondakis's sources, either through Chiasson or other employees at Level Global.

**\*126** Chiasson further argues that "even if Ganek knew that Adondakis got inside information," he nonetheless was not a co-conspirator because "[t]here was no evidentiary basis for finding that Ganek knew that Adondakis's sources disclosed information in violation of confidentiality duties, let alone in exchange for personal benefit." (Chiasson Br. 72). Given Ganek's knowledge that Adondakis had access to consolidated earnings numbers as Dell and NVIDIA prepared their quarterly reports, the District Court could properly conclude by a preponderance of the evidence that Ganek knew Adondakis's source was disclosing the information improperly, in violation of a duty of confidentiality. Moreover, as explained above, Ganek need not have known that the insiders disclosed the information for a personal benefit. In any event, the Court could properly infer that Ganek was aware an insider would disclose such information only in exchange for some benefit.

Chiasson also asserts that Ganek's trades in Dell and NIVIDIA were not "unusually large given [Level Global's] size," and contends that the District Court placed undue weight on the volume of those trades. (Chiasson Br. 73). Contrary to this claim, the Court properly considered the size of the trades, given that Level Global's Dell trade in August 2008 was the second largest short position the firm had ever taken (DX 39), and that the Dell and NVIDIA trades (involving positions of $220 and $45 million, respectively) were indisputably significant (GX 62, 73).

As a last ditch effort to attack the District Court's finding, Chiasson argues that the Court improperly **\*127** speculated that, after Adondakis presented to Chiasson and a Level Global trader an analysis of Dell based on his inside information, Chiasson, the trader, and Ganek discussed Adondakis's analysis (and his source) in a closed-door meeting. (Chiasson Br. 73; Tr. 3256-57). In light of the documentary evidence demonstrating Ganek's knowledge of Adondakis's source, the Court had ample basis to draw this inference. Nor is there any traction to Chiasson's claim that this meeting did not occur because Ganek "was not in the office" on the day Adondakis testified it occurred. (Chiasson Br. 73). Even if Adondakis were incorrect as to the date of the meeting, the Court did not clearly err in crediting Adondakis's testimony that it happened.

Because the District Court did not commit clear error in determining that Ganek was a coconspirator, Chiasson's challenge to the forfeiture amount should be rejected.

## 2. The District Court Properly Determined Forfeiture by a Preponderance of the Evidence

Chiasson further argues that, even if the District Court's factual findings were correct, the forfeiture order should be vacated because "the operative facts had to be found by a jury beyond a reasonable doubt." (Chiasson Br. 74). Chiasson contends that his position finds support in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and "evolving Supreme Court case law." (Chiasson Br. 74). He is mistaken. The Supreme Court has expressly held that "the right to a jury verdict **\*128** on forfeitability does not fall within the Sixth Amendment's constitutional protection." *Libretti v. United States*, 516 U.S. 29, 49 (1995).

Following the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220, this Court rejected an earlier iteration of the argument Chiasson presses here. In *United States v. Fruchter*, 411 F.3d 377, this Court considered a claim that *Apprendi* and its progeny had "so undercut *Libretti* as to have overruled it sub silentio." *United States v. Fruchter*, 411 F.3d at 381. Acknowledging that "*Libretti* remains the law until the Supreme Court expressly overturns it," the Court nonetheless considered and rejected the defendant's claim on the merits. *Id.* at 381-82 (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)). The Court held that the rule of *Apprendi* that reserves to juries the determination of any fact (other than the fact of a prior conviction) that increases a defendant's maximum sentence does not apply to criminal forfeiture, because such forfeiture is "*not* a determinate [sentencing] scheme" and is a "different animal from determinate sentencing" in that there

UNITED STATES OF AMERICA, Appellee, v. Deni..., 2015 WL 6163367...

Case 17-1405, Document 28, 06/06/2017, 2052263, Page98 of 467

is "no . . . previously specified range" that applies to forfeiture. *Fruchter*, 411 F.3d at 383 (emphasis in original). The Court thus squarely held in *Fruchter* that forfeiture need not be proven to a jury beyond a reasonable doubt.

In arguing that *Libretti* and *Fruchter* are no longer good law, Chiasson relies on the Supreme Court's recent decisions in *Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012), and *Alleyne v. United States*, 133 S. Ct. 2151 (2013). (Chiasson Br. 76-77). **\*129** Neither case purported to overrule *Libretti*. Accordingly, *Libretti* remains binding precedent. *See Fruchter*, 411 F.3d at 381-82. In any event, the reasoning of those cases does not undermine *Libretti*'s holding.

In *Southern Union*, which does not address forfeiture at all, the Supreme Court held that the *Apprendi* rule applies to criminal fines. The criminal statute at issue in the case, which prohibited storing liquid mercury without a permit, authorized a maximum fine of $50,000 for each day of violation. *Southern Union Co. v. United States*, 132 S. Ct. at 2349. The Court ruled that, in order for a district court to impose a fine greater than $50,000, the jury must make a finding as to the duration of the violation. In so holding, the Court recognized that there could be no "*Apprendi* violation where no maximum is prescribed." *Id.* at 2353. Thus, far from requiring jury determinations as to forfeiture, *Southern Union* acknowledges that *Apprendi* is not implicated where a statute--like the forfeiture statutes at issue here--does not set a maximum penalty. Indeed, two Courts of Appeals have rejected *Apprendi*-type challenges to criminal forfeiture based on *Southern Union*, relying on the very reason this Court identified in *Fruchter. See United States v. Day*, 700 F.3d 713, 732-33 (4th Cir. 2012) (Wilkinson, *J.*); *United States v. Phillips*, 704 F.3d 754, 770 (9th Cir. 2012) (Rakoff, *J.*).

Nor does *Alleyne*, which also does not address forfeiture, support Chiasson's argument. *Alleyne* held that "any fact that increases the mandatory minimum [sentence for a crime] is an 'element' that must be submitted to the jury." **\*130** *Alleyne v. United States*, 133 S. Ct. at 2155. In so holding, the Court emphasized that "the essential Sixth Amendment inquiry is whether a fact is an element of the crime," and stated that "[w]hen a fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." *Id.* at 2162. Applying this holding, the Court found that Section 924(c) of Title 18, United States Code, establishes an offense of using or carrying a firearm in relation to a crime of violence (which carries a mandatory minimum sentence of five years' imprisonment) and an aggravated offense of brandishing a firearm in relation to a crime of violence (which carries a mandatory minimum sentence of seven years' imprisonment). *Id.* Section 924(c) thus establishes multiple offenses with aggravating elements that trigger enhanced mandatory minimum penalties.

If Chiasson were correct that *Alleyne* applied to the forfeiture statute at issue here, that statute would create an infinite number of separate, aggravated offenses, with each additional dollar (or other quantum of criminal proceeds subject to forfeiture representing an element of an aggravated offense. As this Court has recognized, however, forfeiture statutes are a "different animal" from determinate sentencing regimes--like the one established in Section 924(c)--that "authorize[ ] the imposition of a sentence within a specified range." *Fruchter*, 411 F.3d at 383. Indeed, rather than defining gradations of offenses, the forfeiture statute applicable here simply provides that all property representing proceeds of illegal activity is subject to forfeiture. *See* **\*131** 18 U.S.C. § 981(a)(1)(C). It is thus unlike the statute at issue in *Alleyne*, because there are "no . . . previously specified range[s]." *Fruchter*, 411 F.3d at 383.

Moreover, and contrary to Chiasson's claim, Section 981(a)(1)(C) does not establish a mandatory minimum at all. Even if the statute could somehow be interpreted as designating the District Court's finding of fact as to the forfeiture amount as a mandatory minimum, however, that finding was authorized by the jury's verdict. This is because Chiasson's conviction authorized forfeiture of a specific sum, namely, any property constituting or derived from proceeds of his crimes. The District Court, in determining the extent of those proceeds, was merely giving definite shape to the forfeiture permitted by the jury's verdict. *Cf. United States v. Leahy*, 438 F.3d 328, 337-38 (3d Cir. 2006) (en banc) (relying on similar reasoning to reject *Apprendi*-type challenge to restitution; cited favorably in *United States v. Reifler*, 446 F.3d 65, 118-19 (2d Cir. 2006)). Chiasson is thus wrong in asserting that, because forfeiture is mandatory, the forfeiture statute creates "a statutory mandatory minimum penalty" not authorized by the verdict. (Chiasson Br. 76 (quoting 28 U.S.C. § 2461(c), which provides that district courts "shall order" forfeiture)).

UNITED STATES OF AMERICA, Appellee, v. Joh..., 2015 WL 6163367...

Case 17-1405, Document 29, 06/06/2017, 2052263, Page99 of 467

In this regard, Chiasson's argument that the District Court's findings concerning forfeiture effectively created a statutory mandatory minimum penalty is inconsistent with this Court's ruling in *Fruchter*. If the Court's findings were understood as effectively establishing a mandatory minimum penalty, they should also be understood as establishing at the very **\*132** same time the maximum authorized forfeiture penalty. Taken to its logical conclusion, on this view, no amount of forfeiture is authorized until a sentencing court makes a factual finding as to the amount of proceeds of a crime. *Fruchter*, however, did not adopt the view that a trial court's factual findings are tantamount to the creation of a mandatory minimum/statutory maximum forfeiture penalty. Had it done so, the Court would have identified an *Apprendi*-type error. Instead, *Fruchter* correctly treated forfeiture as an open-ended punishment scheme without a statutory maximum (and thus implicitly without a mandatory minimum) that does not implicate the Sixth Amendment. [39]

[39]     Chiasson also contends that even if he had no right under the Sixth Amendment to a jury determination regarding forfeiture, the Fifth Amendment independently required the Government to prove the forfeiture amount beyond a reasonable doubt. (Chiasson Br. 78-79). He is mistaken. The Sixth Amendment's guarantee of the right to a jury trial, together with the Fifth Amendment's Due Process Clause, "require[] that each element of a crime be proved to the jury beyond a reasonable doubt." *Alleyne*, 133 S. Ct. 2156. Because Chiasson did not have a right to a jury determination as to forfeiture, the Government was not required to prove the forfeiture amount beyond a reasonable doubt.

In sum, the Supreme Court's recent Sixth Amendment jurisprudence--including *Southern Union* and *Alleyne*--does not require a jury determination, **\*133** beyond a reasonable doubt, as to forfeiture. In any event, *Libretti* remains controlling precedent. Accordingly, the District Court did not err in determining the forfeiture amount by a preponderance of the evidence.

## CONCLUSION

**The judgments of conviction should be affirmed.**

---

End of Document    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -x
                     :

UNITED STATES OF AMERICA     :

    -v.-              :

RAJ RAJARATNAM,        :

      Defendant.    :

- - - - - - - - - - - - - - - -x

**INDICTMENT**

S2 09 Cr. 1184 (RJH)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

## COUNT ONE

(Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Relevant Entities and Individuals

1.    At certain times relevant to this Indictment, the Galleon Group ("Galleon") operated a family of hedge funds based in New York, New York. During certain times relevant to this Indictment, Galleon had as much as $7 billion in assets under management. Galleon Management, L.P. ("Galleon Management") managed a number of Galleon's hedge funds including, but not limited to, Galleon Technology Offshore, Ltd. and Galleon Diversified Fund, Ltd. At all times relevant to this Indictment, RAJ RAJARATNAM, the defendant, served as the Managing Member of Galleon Management LLC, the general partner of Galleon Management.

2.    At all times relevant to this Indictment, RAJ RAJARATNAM, the defendant, served as the portfolio manager for Galleon Technology Offshore, Ltd. (referred to herein, along with any of its successors and predecessors, as "Galleon Tech"), as

well as certain accounts of Galleon Diversified Fund, Ltd.
(referred to herein, along with any of its successors and
predecessors, as "Diversified").

## The Rajaratnam-Galleon Insider Trading Scheme

3.     From in or about 2003 through in or about March
2009, RAJ RAJARATNAM, the defendant, certain then-current Galleon
employees, certain former Galleon employees, and others known and
unknown, participated in a scheme to defraud by obtaining, sharing
and disclosing material, nonpublic information ("Inside
Information") and/or executing securities transactions based on
Inside Information pertaining to various companies.  The Inside
Information related to merger and acquisition activity, quarterly
earnings announcements, business updates, and other corporate
events.  RAJARATNAM and his co-conspirators engaged in this
conduct for the purpose of executing profitable securities
transactions in accounts affiliated with Galleon, and with
knowledge that the Inside Information had been disclosed in
violation of duties of trust and confidence.

## The Conspiracy

4.     From at least in or about 2003 up to and including
in or about March 2009, in the Southern District of New York and
elsewhere, RAJ RAJARATNAM, the defendant, certain then-current
Galleon employees, certain former Galleon employees, and others
known and unknown, unlawfully, willfully, and knowingly did

2

combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

### Object of the Conspiracy

5.     It was a part and an object of the conspiracy that RAJ RAJARATNAM, the defendant, certain then-current Galleon employees, certain former Galleon employees, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-

3

5 and 240.10b5-2.

## Means and Methods of the Conspiracy

6.     Among the means and methods by which RAJ
RAJARATNAM, the defendant, certain then-current Galleon employees,
certain former Galleon employees, and others known and unknown,
would and did carry out the conspiracy were the following:

a.     Certain individuals with access to Inside
Information misappropriated that Inside Information in violation
of: (a) the fiduciary and other duties of trust and confidence
that these individuals owed to their respective employers and/or
their shareholders; (b) the expectations of confidentiality of
their respective employers; and (c) their respective employers'
written policies regarding the use and safekeeping of confidential
and material, nonpublic information.

b.     These individuals disclosed Inside Information
to RAJARATNAM, his co-conspirators or others in violation of
duties of trust and confidence, with the understanding that the
Inside Information would be used for the purpose of purchasing or
selling securities.

c.     RAJARATNAM and his co-conspirators shared
certain of this Inside Information with one another, all for the
purpose of engaging in profitable securities transactions in
accounts affiliated with Galleon, and with knowledge that the
Inside Information had been disclosed in violation of duties of

4

trust and confidence.

        d.    RAJARATNAM and his co-conspirators, while in possession of the Inside Information that had been disclosed in violation of duties trust and confidence, purchased and sold securities based on Inside Information and thereby received substantial illegal profits.

### Overt Acts

        7.    In furtherance of the conspiracy and to effect the illegal object thereof, RAJ RAJARATNAM, the defendant, and his co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

        a.    In or about 2005, a co-conspirator provided RAJARATNAM with Inside Information relating to Integrated Circuit Systems, Inc.

        b.    In or about 2006, RAJARATNAM obtained Inside Information relating to Xilinx, Inc.

        c.    In or about March 2008, RAJARATNAM provided a co-conspirator with Inside Information relating to Clearwire Corporation.

        d.    In or about May 2008, in New York, New York, a co-conspirator provided RAJARATNAM with Inside Information relating to Vishay Intertechnology, Inc.

        e.    In or about May 2008, RAJARATNAM provided one or more co-conspirators with Inside Information relating to

Spansion Inc.

f.  In or about August 2008, RAJARATNAM provided a co-conspirator with Inside Information relating to Advanced Micro Devices Inc. ("AMD").

g.  In or about October 2008, RAJARATNAM provided a co-conspirator with Inside Information relating to Goldman Sachs Group, Inc.

h.  In or about January 2009, a co-conspirator called RAJARATNAM in New York, New York, and provided him with Inside Information relating to Atheros Communications, Inc.

i.  In or about January 2009, a co-conspirator called RAJARATNAM in New York, New York, and provided him with Inside Information relating to Marvell Technology Group, Ltd.

(Title 18, United States Code, Section 371.)

### COUNT TWO

(Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

### Relevant Entities and Individuals

8.  The allegations contained in paragraphs 1 and 2 of this Indictment are repeated and realleged as though fully set forth herein.

9.  At all times relevant to this Indictment, Roomy Khan, a co-conspirator not named as a defendant herein, traded securities on her own behalf and, at certain times relevant to

6

this Indictment, exchanged Inside Information about certain companies with RAJ RAJARATNAM, the defendant.

### The Rajaratnam-Khan Insider Trading Scheme

10.   From in or about January 2006 through in or about July 2007, RAJ RAJARATNAM, Roomy Khan, and others known and unknown, participated in a scheme to defraud by disclosing Inside Information and/or executing securities transactions based on Inside Information pertaining to at least the following publicly traded companies:  Polycom, Inc. ("Polycom"), Hilton Hotels Corp. ("Hilton"), and Google Inc. ("Google").  The means by which RAJARATNAM and Roomy Khan effectuated the scheme were as follows: Khan obtained Inside Information regarding Polycom, Hilton and Google from various sources (the "Khan Inside Sources"), who disclosed the Inside Information in violation of duties of trust and confidence that the Khan Inside Sources owed to their respective employers, their employers' shareholders, and/or their employers' clients.  Khan communicated this Inside Information to RAJARATNAM, who, knowing that the Inside Information had been disclosed in violation of duties of trust and confidence, caused Galleon Tech and Diversified to execute securities transactions on the basis of this Inside Information, earning a total profit of approximately $14 million from the scheme.  In exchange, RAJARATNAM provided Khan with information regarding Intel and other technology companies.

## The Conspiracy

11.  From at least in or about January 2006 up to and including in or about July 2007, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, Roomy Khan, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Object of the Conspiracy

12.  It was a part and an object of the conspiracy that RAJ RAJARATNAM, the defendant, Roomy Khan, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

8

(c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

<u>**Means and Methods of the Conspiracy**</u>

13.   Among the means and methods by which RAJ RAJARATNAM, the defendant, Roomy Khan, and others known and unknown, would and did carry out the conspiracy were the following:

a.   The Khan Inside Sources misappropriated Inside Information in violation of: (a) the fiduciary and other duties of trust and confidence that these sources owed to their respective employers, their shareholders, and/or their employers' clients; (b) the expectations of confidentiality of their respective employers; and (c) their respective employers' written policies regarding the use and safekeeping of confidential and material, nonpublic information.

b.   The Khan Inside Sources disclosed the Inside Information to Roomy Khan in breach of their duty of confidentiality to their respective employers, their shareholders, and/or their employers' clients, with the understanding that Khan and others would use the Inside Information to purchase and sell securities, and thereby receive substantial illegal profits.

c.   Khan disclosed the Inside Information to RAJARATNAM, knowing that the Khan Inside Sources had disclosed the Inside Information to her in breach of their duty of confidentiality to their respective employers, their shareholders, and/or their employers' clients.

d.   RAJARATNAM, while in possession of the Inside Information that he knew had been misappropriated by the Khan Inside Sources in breach of their duty of confidentiality to their respective employers, their shareholders, and/or their employers' clients, purchased and sold securities based on such information and thereby received substantial illegal profits.

### Overt Acts

14.   In furtherance of the conspiracy and to effect the illegal object thereof, RAJ RAJARATNAM, the defendant, and Roomy Khan and their co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about January 9, 2006, Khan sent the following instant message to RAJARATNAM, in New York, New York: "donot [sic] buy plcm till i het [sic] guidance; want to make sure guidance OK."

b.   In or about January 2006, in New York, New York, RAJARATNAM caused Galleon Tech to purchase shares of Polycom common stock, which traded under the symbol "PLCM."

c.   On or about July 3, 2007, in New York, New

10

York, RAJARATNAM caused Galleon Tech to purchase approximately 400,000 shares of Hilton common stock, which traded under the symbol "HLT."

        d.  In or about July 2007, in New York, New York, RAJARATNAM caused Galleon Tech and Diversified to execute transactions in the securities of Google.

        (Title 18, United States Code, Section 371.)

## COUNT THREE

(Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

### Relevant Entities and Individuals

15.  The allegations contained in paragraphs 1 and 2 of this Indictment are repeated and realleged as though fully set forth herein.

16.  At all times relevant to this Indictment, Rajiv Goel, a co-conspirator not named as a defendant herein, worked at Intel.  Goel worked in Intel's Treasury Group and was responsible for assisting Intel Capital, the investment arm of Intel, with its strategic investment decisions.

### The Rajaratnam-Goel Insider Trading Scheme

17.  From at least in or about 2007 through in or about 2009, RAJ RAJARATNAM, the defendant, Rajiv Goel, and others known and unknown, participated in a scheme to defraud by disclosing Inside Information and/or executing securities transactions based

11

on Inside Information relating to Intel. The means by which
RAJARATNAM and Goel effectuated the fraudulent scheme were as
follows: Goel obtained Inside Information relating to Intel,
including (i) in or about April 2007, Inside Information relating
to Intel's earnings announcement for the quarter ending in March
2007, and (ii) in or about 2008, Inside Information relating to
Intel's plans to invest in a joint venture involving Clearwire
Corp. (collectively, the "Intel Inside Information"). Goel
disclosed the Intel Inside Information to RAJARATNAM in violation
of duties of trust and confidence that Goel owed to Intel.
RAJARATNAM, knowing that Goel had disclosed the Intel Inside
Information to him in violation of duties of trust and confidence,
then caused Galleon Tech and Diversified to execute securities
transactions on the basis of this Inside Information, earning a
total profit (or avoiding losses) of approximately $3 million from
the scheme. Goel provided the Intel Inside Information to
RAJARATNAM because of his friendship with RAJARATNAM. Goel
benefitted from his friendship with RAJARATNAM in various ways,
some of which were financial. For example, in or about 2005 and
2006, RAJARATNAM gave Goel money to help Goel with personal
financial matters, and, from in or about October 2005 to in or
about 2009, RAJARATNAM executed securities transactions on behalf
of Goel in Goel's personal brokerage account, earning Goel trading
profits. For example, in or about October 2008, RAJARATNAM

executed a profitable trade in PeopleSupport common stock in
Goel's personal brokerage account based on Inside Information that
RAJARATNAM obtained from his colleague at Galleon who served on
PeopleSupport's Board of Directors.

### The Conspiracy

18.   From at least in or about 2007 up to and including
in or about 2009, in the Southern District of New York and
elsewhere, RAJ RAJARATNAM, the defendant, Rajiv Goel, and others
known and unknown, unlawfully, willfully, and knowingly did
combine, conspire, confederate and agree together and with each
other to commit offenses against the United States, to wit,
securities fraud, in violation of Title 15, United States Code,
Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations,
Sections 240.10b-5 and 240.10b5-2.

### Object of the Conspiracy

19.   It was a part and an object of the conspiracy that
RAJ RAJARATNAM, the defendant, Rajiv Goel, and others known and
unknown, unlawfully, willfully and knowingly, directly and
indirectly, by the use of the means and instrumentalities of
interstate commerce, and of the mails, and of facilities of
national securities exchanges, would and did use and employ, in
connection with the purchase and sale of securities, manipulative
and deceptive devices and contrivances in violation of Title 17,
Code of Federal Regulations, Section 240.10b-5 by: (a) employing

devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

### Means and Methods of the Conspiracy

20.　Among the means and methods by which RAJ RAJARATNAM, the defendant, Rajiv Goel, and others known and unknown, would and did carry out the conspiracy were the following:

a.　Goel misappropriated the Intel Inside Information in violation of: (a) the fiduciary and other duties of trust and confidence that Goel owed Intel; (b) the expectations of confidentiality of Intel; and (c) Intel's written policies regarding the use and safekeeping of confidential and material, nonpublic information.

b.　Goel disclosed the Intel Inside Information to RAJARATNAM in breach of Goel's duty of confidentiality to his employer, with the understanding that RAJARATNAM and others would use the Inside Information to purchase and sell securities, and

thereby receive substantial illegal profits.

       c. RAJARATNAM, while in possession of the Intel Inside Information that he knew had been misappropriated by Goel in breach of Goel's duty of confidentiality to Goel's employer, purchased and sold securities based on such information and thereby received substantial illegal profits.

### Overt Acts

       21. In furtherance of the conspiracy and to effect the illegal object thereof, RAJ RAJARATNAM, the defendant, Rajiv Goel, and their co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

       a. In or about April 2007, Goel provided RAJARATNAM with Inside Information about Intel's quarterly earnings announcement for the quarter ending in March 2007.

       b. On or about March 20, 2008, Goel made a call to a cellphone used by RAJARATNAM.

       c. On or about March 24, 2008, in New York, New York, RAJARATNAM caused Galleon Tech to purchase approximately 125,800 shares of Clearwire common stock.

       (Title 18, United States Code, Section 371.)

## COUNT FOUR

(Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

### Relevant Entities and Individuals

22. The allegations contained in paragraphs 1 and 2 of this Indictment are repeated and realleged as though fully set forth herein.

23. At all times relevant to this Indictment, Anil Kumar, a co-conspirator not named as a defendant herein, worked at McKinsey & Company, Inc. ("McKinsey"), a global management consulting firm, as a senior partner and director. In that capacity, Kumar advised various clients in the technology industry concerning their business strategies, including potential acquisitions and reorganizations.

### The Rajaratnam-Kumar Insider Trading Scheme

24. From in or about 2003 through in or about October 2009, RAJ RAJARATNAM, the defendant, Anil Kumar, and others known and unknown, participated in a scheme to defraud by disclosing Inside Information and/or executing securities transactions based on Inside Information obtained from clients of McKinsey. The means by which RAJARATNAM and Kumar effectuated the fraudulent scheme were as follows: Kumar obtained Inside Information from certain of McKinsey's clients, including, for example, Inside Information relating to AMD, ATI Technologies Inc. ("ATI") and

16

eBay Inc. ("eBay"). Kumar communicated the Inside Information to RAJARATNAM in violation of duties of trust and confidence that Kumar owed to McKinsey and/or its clients. RAJARATNAM then caused Galleon Tech and Diversified to execute securities transactions based on the Inside Information, earning a total profit of at least approximately $24.5 million from the scheme. In exchange for this Inside Information, RAJARATNAM arranged for Galleon to wire money to an offshore account designated by Kumar. That money was subsequently reinvested in certain Galleon funds in the name of Kumar's domestic worker and then subsequently, in the name of an offshore entity designated by Kumar. In addition, in or about January 2007, RAJARATNAM wired approximately $1 million to an offshore account controlled by Kumar.

### The Conspiracy

25. From in or about 2003 through in or about October 2009, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, Anil Kumar, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

17

## Object of the Conspiracy

26. It was a part and an object of the conspiracy that RAJ RAJARATNAM, the defendant, Anil Kumar, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Means and Methods of the Conspiracy

27. Among the means and methods by which RAJ RAJARATNAM, the defendant, Anil Kumar, and others known and unknown, would and did carry out the conspiracy were the following:

a.   Kumar misappropriated the Inside Information in violation of: (a) the fiduciary and other duties of trust and confidence that Kumar owed to McKinsey and/or its clients; (b) the expectations of confidentiality of McKinsey and its clients; and (c) McKinsey's written policies regarding the use and safekeeping of confidential and material, nonpublic information.

b.   Kumar disclosed the Inside Information to RAJARATNAM in breach of Kumar's duty of confidentiality to his employer and/or its clients, with the understanding that RAJARATNAM and others would use the Inside Information to purchase and sell securities, and thereby receive substantial illegal profits.

c.   RAJARATNAM, while in possession of the Inside Information that he knew had been misappropriated by Kumar in breach of Kumar's duty of confidentiality to Kumar's employer and/or its clients, purchased and sold securities based on such information and thereby received substantial illegal profits.

### Overt Acts

28.   In furtherance of the conspiracy and to effect the illegal object thereof, RAJ RAJARATNAM, the defendant, Anil Kumar and their co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about 2006, Kumar spoke to RAJARATNAM by telephone about AMD's planned acquisition of ATI.

19

b. On or about August 15, 2008, Kumar spoke with RAJARATNAM on RAJARATNAM's cellphone.

c. On or about August 15, 2008, in New York, New York, RAJARATNAM caused Galleon Tech to purchase shares of AMD common stock.

(Title 18, United States Code, Section 371.)

## COUNT FIVE

(Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

### Relevant Entities and Individuals

29. The allegations contained in paragraphs 1 and 2 of this Indictment are repeated and realleged as though fully set forth herein.

30. At certain times relevant to this Indictment, Danielle Chiesi, a co-conspirator not named as a defendant herein, worked for a hedge fund called New Castle Partners ("New Castle"), which, in early 2008, was the equity hedge fund group of Bear Stearns Asset Management Inc. ("BSAM"). Following the acquisition of BSAM's parent company by JPMorgan Chase & Co. ("JPMorgan"), New Castle operated as a hedge fund affiliated with JPMorgan. At certain times relevant to this Indictment, New Castle had assets under management of approximately $1 billion.

## The Rajaratnam-Chiesi Insider Trading Scheme

31.     From at least in or about July 2008 through in or about October 2008, RAJ RAJARATNAM, the defendant, Danielle Chiesi, and others known and unknown, participated in a scheme to defraud by disclosing Inside Information and/or executing securities transactions based on Inside Information pertaining to publicly traded companies, including, for example, Akamai Technologies, Inc. ("Akamai") and AMD.  The means by which RAJARATNAM and Chiesi effectuated the fraudulent scheme included, for example, the following: Chiesi obtained Inside Information regarding Akamai from an employee of Akamai (the "Akamai Source"), and Chiesi and RAJARATNAM obtained Inside Information regarding AMD from Anil Kumar and/or other sources (the "AMD Sources" and, together with the Akamai Source, the "AMD/Akamai Sources").  The AMD/Akamai Sources disclosed the Inside Information in violation of duties of trust and confidence owed by the AMD/Akamai Sources to their respective employers, their shareholders, and/or their employers' clients.  Chiesi communicated Inside Information regarding Akamai to RAJARATNAM.  In addition, RAJARATNAM and Chiesi provided one another with Inside Information regarding AMD. RAJARATNAM caused Galleon Tech and Diversified to execute securities transactions on the basis of Inside Information obtained from Chiesi, earning a total profit of approximately $3.5 million from the scheme.

## The Conspiracy

32. From at least in or about July 2008 up to and including in or about October 2008, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, Danielle Chiesi, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Object of the Conspiracy

33. It was a part and an object of the conspiracy that RAJ RAJARATNAM, the defendant, Danielle Chiesi, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

22

(c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

<u>**Means and Methods of the Conspiracy**</u>

34. Among the means and methods by which RAJ RAJARATNAM, the defendant, Danielle Chiesi, and others known and unknown, would and did carry out the conspiracy were the following:

a. The AMD/Akamai Sources misappropriated the Inside Information in violation of: (a) the fiduciary and other duties of trust and confidence that they owed to their respective employers, their shareholders, and/or their employers' clients; (b) the expectations of confidentiality of their respective employers, their shareholders, and/or their employers' clients; and (c) their respective employers' written policies regarding the use and safekeeping of confidential and material, nonpublic information.

b. The Akamai Source disclosed Inside Information regarding Akamai to Chiesi. The AMD Sources disclosed Inside Information regarding AMD to Chiesi or RAJARATNAM. RAJARATNAM and Chiesi provided one another with Inside Information regarding AMD, and Chiesi provided RAJARATNAM with Inside information regarding

Akamai, all with knowledge that the Inside Information had been disclosed in violation of the duties of confidentiality owed by the sources of the Inside Information to their respective employers, their shareholders, and/or their employers' clients, and with the understanding that RAJARATNAM, Chiesi and others would use the Inside Information to purchase and sell securities, and thereby receive substantial illegal profits.

        c.    RAJARATNAM and Chiesi, while in possession of the Inside Information that they knew had been misappropriated in breach of the duties of confidentiality owed by the AMD/Akamai Sources to their respective employers, their shareholders, and/or their employers' clients, purchased and sold securities based on such information and thereby received substantial illegal profits.

### Overt Acts

      35.   In furtherance of the conspiracy and to effect the illegal object thereof, RAJ RAJARATNAM, the defendant, Danielle Chiesi, and their co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

        a.   On or about July 24, 2008, Chiesi called RAJARATNAM from New York, New York.

        b.   On or about July 25, 2008, in New York, New York, RAJARATNAM caused Galleon Tech to sell short approximately 138,550 shares of Akamai common stock, which traded under the

symbol "AKAM."

c. On or about September 30, 2008, RAJARATNAM
spoke on the telephone with Chiesi, who was in New York, New York.

(Title 18, United States Code, Section 371.)

### COUNTS SIX THROUGH TWELVE

(Securities Fraud)

The Grand Jury further charges:

36. The allegations contained in paragraphs 1-3, 6-7,
16-17, 20-21, 30-31, and 34-35 of this Indictment are repeated and
realleged as though fully set forth herein.

37. On or about the dates set forth below, in the
Southern District of New York and elsewhere, RAJ RAJARATNAM, the
defendant, unlawfully, willfully and knowingly, directly and
indirectly, by the use of the means and instrumentalities of
interstate commerce, and of the mails and of the facilities of
national securities exchanges, in connection with the purchase and
sale of securities, did use and employ manipulative and deceptive
devices and contrivances, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by (a) employing devices,
schemes and artifices to defraud; (b) making untrue statements of
material facts and omitting to state material facts necessary in
order to make the statements made, in the light of the
circumstances under which they were made, not misleading; and (c)
engaging in acts, practices and courses of business which operated

and would operate as a fraud and deceit upon persons, to wit: (i) RAJARATNAM caused Galleon Tech and/or Diversified to execute the securities transactions listed below in the securities of: (a) Clearwire on the basis of material, nonpublic information he obtained from Rajiv Goel, and (b) Akamai, on the basis of material, nonpublic information he obtained from Danielle Chiesi; and (ii) RAJARATNAM executed the securities transactions listed below in the securities of PeopleSupport, on the basis of material, nonpublic information he obtained from a source at PeopleSupport:

| COUNT | APPROX. DATE | SECURITY | TRANSACTION (AMOUNT APPROXIMATE) |
|-------|-------------|----------|----------------------------------|
| SIX | March 24, 2008 | Clearwire (CLWR) | Galleon Tech purchased 125,800 shares of common stock |
| SEVEN | March 25, 2008 | Clearwire (CLWR) | Galleon Tech purchased 136,000 shares of common stock |
| EIGHT | July 25, 2008 | Akamai (AKAM) | Galleon Tech sold short 138,550 shares of common stock |
| NINE | July 29, 2008 | Akamai (AKAM) | Galleon Tech sold short 173,300 shares of common stock |
| TEN | July 30, 2008 | Akamai (AKAM) | Galleon Tech sold short 86,650 shares of common stock and purchased 1,400 put options |
| ELEVEN | July 28, 2008 | PeopleSupport (PSPT) | Rajaratnam purchased 15,000 shares of common stock |

| TWELVE | October 7, 2008 | PeopleSupport (PSPT) | Rajaratnam purchased 30,000 shares of common stock |
| --- | --- | --- | --- |

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.)

### COUNT THIRTEEN

(Securities Fraud)

The Grand Jury further charges:

38. The allegations contained in paragraphs 1-3, 6-7, 23-24, and 27-28 of this Indictment are repeated and realleged as though fully set forth herein.

39. From in or about March 2006 to in or about July 2006, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of

27

business which operated and would operate as a fraud and deceit upon persons, to wit: RAJARATNAM caused Galleon Tech and/or Diversified to execute transactions in the securities of ATI on the basis of material, nonpublic information.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.)

## COUNT FOURTEEN

(Securities Fraud)

The Grand Jury further charges:

40.  The allegations contained in paragraphs 1-3, 6-7, 16-17, and 20-21 of this Indictment are repeated and realleged as though fully set forth herein.

41.  In or about April 2007, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which

28

they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, RAJARATNAM caused Galleon Tech and/or Diversified to execute transactions in the securities of Intel on the basis of material, nonpublic information.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.)

### FORFEITURE ALLEGATION

42. As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Section 371; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, as alleged in Counts One through Fourteen of this Indictment, RAJ RAJARATNAM, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities fraud offenses, in an amount of at least approximately $45 million.

## **Substitute Assets Provision**

43.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (i)         cannot be located upon the exercise of due diligence;

    (ii)        has been transferred or sold to, or deposited with, a third party;

    (iii)       has been placed beyond the jurisdiction of the court;

    (iv)        has been substantially diminished in value; or

    (v)         has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

(Title 15, United States Code, Sections 78j(b), 78ff;
Title 18, United States Code, Sections 371 and 981;
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461;
and Title 17, Code of Federal Regulations,
Sections 240.10b-5 and 240.10b5-2.)

_____         _____
FOREPERSON                      PREET BHARARA
                                United States Attorney

30

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

- v.-

**RAJ RAJARATNAM,**

Defendant.

---

<u>**INDICTMENT**</u>

**S2 09 Cr. 1184 (RJH)**

(Title 15, United States Code, Sections
78j(b), 78ff; Title 17, Code of Federal
Regulations, Sections 240.10b-5,
240.10b5-2; Title 18, United States Code,
Section 2)

---

<u>PREET BHARARA</u>
United States Attorney

**A TRUE BILL.**

---

**Foreperson.**

1/20/11    Filed indictment    Cott, USMJ

# Exhibit G

**COUNTS, TRADES AND TRADE CHARACTERISTICS**
**(TRADES CHALLENGED ON NEWMAN GROUNDS ARE BOLDED)**

| Count | Trade(s) | Date | Trade Value | Intermediary | Insider/Tipper |
|---|---|---|---|---|---|
| One (Galleon Conspiracy) | **ICST** | June 2005 | $2,825,527 | Adam Smith | Kamal Ahmed (at Morgan Stanley) |
| | AMD acquisition of ATI | Mar. 2006 | $22,938,866 | Adam Smith | Kamal Ahmed (at Morgan Stanley) |
| | Xilinx | Nov./Dec. 2006 | $978,684 | Raj R. | Kris Chellam (at Xilinx) |
| | Vishay | May 2008 | No Trade Executed | Adam Smith | Kamal Ahmed (at Morgan Stanley) |
| | Goldman | Sept. 2008 | $4,641,555 | None | Rajat Gupta (Goldman) |
| Two (Khan Conspiracy) | **Polycom** | Jan. 2006 | $482,960 | Roomy Khan | Sunil Bhalla (Polycom) |
| | **Hilton** | July 2007 | $4,171,763 | Roomy Khan | Deep Shah (Moody's) |
| | **Google** | July 2007 | $18,264,041 | Roomy Khan | Shammara Hussein (Market Share Partners) |
| Three (Goel Conspiracy) | Intel (earnings) | Apr. 2007 | $2,481,271 | None | Rajiv Goel (Intel) |
| | Intel (investment in Clearwire) | Mar. 2008 | $851,724 | None | Rajiv Goel (Intel) |
| Four (Kumar Conspiracy) | AMD (acquisition of ATI) | Mar. 2006 | $22,938,866 | None | Anil Kumar (McKinsey) |
| | AMD (Mubadala) | Mid to Late 2008 | None | None | Anil Kumar (McKinsey) |
| | eBay | Oct. 2008 | $883,973 | None | Anil Kumar (McKinsey) |

| Count | Trade(s) | Date | Trade Value | Intermediary | Insider/Tipper |
|---|---|---|---|---|---|
| Four (Kumar Conspiracy) (cont'd) | Business Objects | October 2007 | None | None | Anil Kumar (McKinsey) |
| | Spansion | May 2008 | No Trade Executed | None | Anil Kumar (McKinsey) |
| Five (Chiesi Conspiracy) | **Akamai** | July 2008 | $5,139,851 | Danielle Chiesi | Kieran Taylor (Akamai) |
| | ATI (Mubadala) | Mid/Late 2008 | None | Danielle Chiesi or Raj R. | Bob Moffatt (IBM) and Hector Ruiz (ATI) and Anil Kumar (McKinsey) |
| Six | Intel (investment in Clearwire) | Mar. 24, 2008 | Same as in Count Three (Intel/Clearwire trade) | | |
| Seven | Intel (investment in Clearwire) | Mar. 25, 2008 | Same as in Count Three (Intel/Clearwire trade) | | |
| Eight | **Akamai** | July 25, 2008 | Same as in Count Five (Akamai) | | |
| Nine | **Akamai** | July 29, 2008 | Same as in Count Five (Akamai) | | |
| Ten | **Akamai** | July 30, 2008 | Same as in Count Five (Akamai) | | |
| Eleven | People Support | July 28, 2008 | $102,143 | None | Raj R. |
| Twelve | People Support | Oct. 7, 2008 | $49,806 | None | Raj R. |
| Thirteen | ATI acquisition of AMD | Mar. 2006 | Same as in Count Four (ATI acquisition of AMD) | | |
| Fourteen | Intel (earnings) | Apr. 2007 | Same as in Count Three (Intel earnings trade) | | |
| **Total** | **$63,812,164** | | **$63,812,164** | | |

# Exhibit F

```
13TFRAJ1                      Trial
 1   UNITED STATES DISTRICT COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3
 3   UNITED STATES OF AMERICA,
 4
 4                v.                      09 CR 1184 (RJH)
 5
 5   RAJ RAJARATNAM,
 6
 6                Defendant.
 7
 7   ------------------------------x
 8
 8                                        New York, N.Y.
 9                                        March 29, 2011
 9                                        9:20 a.m.
10
10
11   Before:
11
12                  HON. RICHARD J. HOLWELL
12
13                                        District Judge
13
14
14                        APPEARANCES
15
15   PREET BHARARA
16        United States Attorney for the
16        Southern District of New York
17   JONATHAN R. STREETER
17   REED M. BRODSKY
18   ANDREW MICHAELSON
18        Assistant United States Attorneys
19
19   AKIN GUMP STRAUSS HAUER & FELD LLP
20        Attorneys for Defendant
20   JOHN M. DOWD
21   TERENCE J. LYNAM
22   MICHAEL STARR
23   MICHAEL STARR
24
24   ALSO PRESENT:  B.J. KANG, FBI
25
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```

13TFRAJ3                    Smith - direct

1                   (In open court)
2                   THE COURT:  Ladies and gentlemen, I'm going to give
3       you the instruction I've given you sometime in the past and
4       that is when this witness testifies to what Kamal said to him,
5       it is not being offered for the truth of what Kamal said, it's
6       only evidence that he said it.  It's up to you to decide
7       whether or not in fact Kamal said it, but you can't take the
8       answer to accept the truth of the witness' testimony as to what
9       Kamal said.  Proceed.
10                  MR. MICHAELSON:  Thank you, your Honor.
11      BY MR. MICHAELSON:
12      Q.  What did Kamal Ahmed tell you about ICST?
13      A.  He told me that they were in the process of being acquired
14      by another company.
15      Q.  Who was in the process of being acquired?
16      A.  ICST.
17      Q.  Did he tell you the name of the other company?
18      A.  Yes.  IDTI, Integrated Devices Technology.
19      Q.  Let's break it down.  What was the name of the other
20      company?
21      A.  It's called Integrated Devices Technology.
22      Q.  What is IDTI?
23      A.  That's that company's ticker symbol.
24      Q.  So IDTI was going to acquire ICST?
25      A.  That's correct.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

13TFRAJ3                    Smith - direct
1   Q.  What was the significance of learning that?
2   A.  Well, the significance was that when a company gets
3   acquired, it's typically at a large premium to the current
4   price, stock price, so you could buy the shares of the company
5   that's going to get bought and make a lot of money if the
6   announcement comes.
7   Q.  What is a premium?
8   A.  A premium is a price that is higher than the current price
9   of the stock.
10  Q.  So what in general is the impact of an acquisition on the
11  price of the stock of a company being acquired?
12  A.  It's to cause it to go up.
13  Q.  And here what was the company being acquired?
14  A.  ICST.
15  Q.  And when Ahmed told you about this, what was his position
16  at Morgan Stanley?
17  A.  He was an investment banker in the technology group.  I
18  believe he was a senior member of the team there.
19  Q.  What was the significance of his position at that time?
20  A.  The significance was that he would have access to this type
21  of information.  I knew that because of the deals that we had
22  worked on and the types of information that I had seen when I
23  was at Morgan Stanley.
24  Q.  When he told you about the IDTI acquisition of ICST, were
25  you an analyst at Galleon?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

2491
13TFRAJ3                      Smith - direct
 1   A.  Yes.
 2   Q.  Did you cover either of these companies?
 3   A.  No, I did not.
 4   Q.  And at that time what had you heard about a possible
 5   acquisition of ICST by IDTI?
 6   A.  I hadn't heard anything about it.
 7   Q.  What if anything did you do to determine whether this news
 8   was already out there?
 9   A.  Nothing.
10   Q.  What was your understanding as to whether Ahmed was allowed
11   to tell you about that deal?
12   A.  I knew that he wasn't allowed to tell me about that.
13   Q.  What did you do with this information that you obtained
14   from Kamal Ahmed?
15   A.  I shared it with Raj.
16   Q.  What did you tell Rajaratnam regarding the source of that
17   information?
18   A.  I told him that it was from Kamal.
19   Q.  At that time, what had you told Rajaratnam about Kamal?
20   A.  That Kamal was one of my former colleagues at Morgan
21   Stanley.
22   Q.  After the initial conversation with Kamal Ahmed about this
23   deal, did you have any further conversations with Kamal Ahmed
24   about the deal?
25   A.  Yes.  I had occasion to communicate with Kamal after the
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

13TFRAJ3                     Smith - direct
1    initial conversation about the deal.
2    Q.  And what in general did you learn about the deal during
3    those subsequent communications?
4    A.  He informed me that the deal was still progressing forward,
5    and at one point told me when he thought the deal would be
6    announced.
7    Q.  What did you do with the subsequent updates?
8    A.  I shared them with Raj.
9    Q.  Why did you share them with Mr. Rajaratnam?
10   A.  I thought that it was an important piece of information
11   that would potentially be money making, and I had nothing else
12   to do with it.  I couldn't trade on my own, and I wasn't going
13   to tell anybody else.  So I shared it with him.
14   Q.  Why wouldn't you tell anybody else?
15   A.  Because I knew that it was sensitive information.
16   Q.  What was sensitive about it?
17   A.  Well, the fact that I was learning about a deal in progress
18   that wasn't yet public was what was sensitive.  And that it was
19   also going to -- any merger -- any piece of information about a
20   merger is sensitive in such that it can have a big effect on
21   the stock price if announced.
22               MR. MICHAELSON:  Your Honor, may I approach?
23               THE COURT:  Yes.
24   Q.  I've placed before you Government Exhibit 2477.  Do you see
25   that in front of you or on your screen?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                        2493
        13TFRAJ3                      Smith - direct
 1    A.  Yes.
 2    Q.  What is this document?
 3    A.  This is an expense approval form.  Any time that as an
 4    employee of Galleon we traveled that was going to involve us
 5    getting reimbursed for our expenses, we would need to submit a
 6    form, this form, for approval prior to spending the money,
 7    basically.
 8    Q.  What is the date on the form?
 9    A.  January 28, 2005.
10    Q.  Does it relate to a Morgan Stanley conference?
11    A.  Yes.
12              MR. MICHAELSON:  The government offers Government
13    Exhibit 2477.
14              MR. LYNAM:  No objection.
15              THE COURT:  Admitted.
16              (Government's Exhibit 2477 received in evidence)
17              MR. MICHAELSON:  Highlight where it says business
18    travel request form, Adam Smith.
19    Q.  What are the reasons, the purposes for filling out this
20    form?
21    A.  To make sure that any expenses were approved prior to
22    making them.
23    Q.  And what does this indicate with respect to when you were
24    going to start traveling and when you were going to return?
25    A.  I entered the dates February 24 to March 9th.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

13TFRAJ3                    Smith - direct
1   Q.  And where were you going on this trip?
2   A.  I was going to go to Asia, or I went to Asia and then to
3   the Morgan Stanley conference, which was in California.  So I
4   flew back from Asia via California to New York.
5   Q.  And how much was this trip going to cost?
6   A.  I estimated $17,500 at that time.
7   Q.  Who was going to pay?
8   A.  Galleon would reimburse my expenses.
9   Q.  What is the Morgan Stanley conference that's referenced
10  here?
11  A.  That's an annual conference that Morgan Stanley sponsors
12  for investors.  They invited a number of companies in the
13  technology space to come and present their stories, and
14  investors come to meet with those companies.
15  Q.  And you generally attend these conferences?
16  A.  Yes.  I attend it every year.
17  Q.  There was one per year?
18  A.  Yes.
19  Q.  Did Kamal Ahmed attend these conferences?
20  A.  Yes.
21  Q.  At these conferences, what if anything did the companies
22  say about their current quarter or earnings information?
23  A.  The opportunity for investors to interview the executives
24  of those companies would include a general discussion about how
25  their quarters were progressing, but typically and unless by
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

2507

13TFRAJ3                    Smith - direct
1  Q.  Could you read the subject line?
2  A.  It's a forward, it says time line and attendance proposal.
3  Q.  Directing your attention to the second page.  Please
4  highlight just the title.  Can you please read that Mr. Smith?
5  A.  Golf diligence execution plan.
6  Q.  What is the date there?
7  A.  April 18, 2005.
8  Q.  And towards the bottom of the portion that's been blown up,
9  do you see attendees from Doral?
10  A.  Yes.
11  Q.  Do you recognize any of the names down there?
12  A.  Gregg Lang and Clyde Hussein.
13  Q.  Who were they at this time period?
14  A.  They were executives at those companies.
15  Q.  Which companies?
16  A.  ICST and IDTI.
17  Q.  If we could zoom out and take a look at the next page of
18  this document and highlight week of May 16.  What does it say,
19  Mr. Smith, under week of May 16?
20  A.  It says "announcement."
21  Q.  What is the date of this e-mail, the date on which this
22  e-mail is sent to Kamal Ahmed?
23  A.  April 19.
24  Q.  What does it say regarding the timing of the announcement?
25  A.  That the announcement will be made May 16.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2508

13TFRAJ3                    Smith - direct

1   Q.  Going back to Government Exhibit 2456, what is the date of
2   your e-mail to Mr. Rajaratnam?
3   A.  It's two days after, on April 21.
4   Q.  And what does your e-mail convey with respect to the date
5   of the announcement?
6   A.  That it will be May 16.
7   Q.  You mentioned that you and Mr. Kamal Ahmed were friends.
8   What if anything did you do to help his business?
9   A.  I had a number of conversations with him through the time
10  that I was at Galleon about the market.  I would tell him my
11  thoughts about what was going on in the market and what issues
12  there were in the marketplace with regard to certain stocks,
13  and I expected that he would use that information to help in
14  his communications with those executives to try and win
15  business.  If he was better educated about current issues, he
16  would be more fluent and appear more experienced, I guess, when
17  speaking to those executives.
18          I also had provided some introductions to him to
19  executives of companies when he had requested one in
20  particular, and to the extent that I had conversations with
21  executives at technology companies and the subject came up, I
22  would tell them my thoughts, that he was a good banker and a
23  good person, a good person to do business with.  I think that's
24  one category of things that I did.
25          At times after 2007 when Galleon had launched a fund
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

13TFRAJ3                    Smith - direct
1    which had some focus on private companies or companies that
2    were going to become public, I also helped Kamal to be part of
3    conversations with companies that Galleon was potentially
4    looking to invest in so that he could be part of those deals.
5    Q.  So in that latter scenario Galleon was a potential client
6    of Mr. Ahmed?
7                MR. LYNAM:  Your Honor, leading.  Objection.
8                THE COURT:  Sustained.
9    Q.  In the second category of assistance that you discussed,
10   what was the relationship between Morgan Stanley and Galleon?
11   A.  It wouldn't be that Galleon was a direct client, but more
12   of an indirect participant in a potential deal.  If we were an
13   investor in a private company, we would have influence over
14   which bank was selected to represent that company were it to go
15   public.  So while we wouldn't be the actual customer, we being
16   Galleon, there was a potential that we could influence the
17   decision about which bank was selected for any future deal.
18   Q.  How would Galleon help Ahmed do his job, if at all?
19   A.  Well, Ahmed's job was to win banking business, which
20   includes taking private companies public or being selected as
21   an advisor for capital raising or mergers and acquisitions.
22   The selection of advisers made by the companies' executives and
23   to the extent Galleon had any influence over the decisions of
24   those executives, we would help him do his job.
25   Q.  What ultimately happened with respect to the acquisition of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

2635

13U8RAJ1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

         v.                      09 CR 1184 (RJH)

RAJ RAJARATNAM,

              Defendant.

------------------------------x

                              New York, N.Y.
                              March 30, 2011
                              9:40 a.m.


Before:

                  HON. RICHARD J. HOLWELL

                              District Judge



                     APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
JONATHAN R. STREETER
REED M. BRODSKY
ANDREW MICHAELSON
    Assistant United States Attorneys

AKIN GUMP STRAUSS HAUER & FELD LLP
    Attorneys for Defendant
JOHN M. DOWD
TERENCE J. LYNAM

ALSO PRESENT:  B.J. KANG, FBI




              SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

13U8RAJ5                    Smith - cross
1   A.  Correct.
2   Q.  But you had conversations with people all day long about
3   what is going on in the market, right?
4   A.  I did.
5   Q.  So then he asked you, well, did you do something two years
6   later in 2007?  Do you remember that?
7   A.  I don't remember the specific time frame.  I remember
8   testifying that I had made an introduction to an executive and
9   that I had said something nice about Kamal to another
10  executive.
11  Q.  Well, you said that in 2007 you could help Kamal Ahmed, who
12  was working at Morgan Stanley, get some business by making some
13  introductions for him, right?
14  A.  Yes, that's right.
15  Q.  But you have no ability to determine what investment bank
16  gets hired on a particular deal, do you?
17  A.  No.  I had no ability at that time.
18  Q.  In 2005, when you say that Kamal Ahmed gave you this
19  information, you didn't have a deal with him that you were
20  going to make introductions for him two years later, did you?
21  A.  No, sir.
22  Q.  Whatever Ahmed said to you in 2005 was just an inadvertent
23  comment, isn't that right?
24  A.  Well, it turned out to be true.  I don't remember saying
25  inadvertent comment.  Those are your words.

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

2806

13U8RAJ5                        Smith - cross

1   Q.  Isn't that what you told the lawyers that you met with in
2   2010?
3   A.  No.  I don't recall saying that.  That is your word.
4   Q.  It was not part of any agreement with Kamal Ahmed, where he
5   is going to tell you something, and two years later you're
6   going to make an introduction, because there was no agreement
7   with Kamal Ahmed like that, isn't that right?
8   A.  What agreement did I not agree to?
9   Q.  I am asking you, when you discussed this with Kamal Ahmed
10  in 2005, you did not have an agreement that two years later you
11  would make an introduction for him that would benefit him,
12  right?
13  A.  No.  I had not offered him any benefit for that information
14  that he gave me at that time.
15  Q.  I am going to ask you some questions about Intel.
16          Am I correct, Mr. Smith, that with regard to Intel,
17  you did not think that Mr. Rajaratnam had any inside
18  information on Intel because he tended to lose money trading on
19  it as much as he made money, correct?
20  A.  I don't agree with the premise of your question because
21  having inside information such as a revenue number doesn't
22  automatically mean that you make money trading stock.
23  Q.  My question is, it was your opinion that Mr. Rajaratnam did
24  not have inside information on Intel because he lost money on
25  Intel as much as he made it, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13U8RAJ5                     Smith - cross
1   A.  No, that was not my testimony.  My testimony was that he
2   did receive revenue data prior to its public release.  It may
3   also be true that he lost money on the stock, but I don't see
4   the two as connected necessarily.
5   Q.  When you met with the lawyers for Mr. Rajaratnam and
6   Galleon last year in 2010, before you negotiated a deal with
7   the government, didn't you tell them in those meetings that you
8   doubted that Mr. Rajaratnam had any inside information on Intel
9   because he tended to lose money as much as he made money on
10  Intel?
11  A.  I don't remember saying that to those lawyers.
12  Q.  You don't remember anything you said in that meeting to
13  those lawyers, you don't remember anything about Intel or
14  insider trading or what ICST was all about, you don't remember
15  any of that, is that your testimony?
16          MR. MICHAELSON:  Objection, your Honor.  Form.
17          THE COURT:  Sustained.
18  A.  I have testified that --
19          THE COURT:  Wait for another question.
20  Q.  Didn't you also tell the lawyers in that meeting, the
21  lawyers for Mr. Rajaratnam and Galleon, in 2007, that you did
22  not have any particular knowledge or expertise in Intel?
23  A.  Did I tell them in 2007 that I didn't have any expertise in
24  Intel?
25  Q.  Did you tell them in your meeting last year that you did
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

3102

1448RAJ1

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  UNITED STATES OF AMERICA,
3
4                  v.                        09 CR 1184 (RJH)
4
5  RAJ RAJARATNAM,
5
6                  Defendant.
6
7  ------------------------------x
7
8                                           New York, N.Y.
8                                           April 4, 2011
9                                           9:35 a.m.
9
10
10  Before:
11
11                    HON. RICHARD J. HOLWELL
12
12                                           District Judge
13
13
14                         APPEARANCES
14
15  PREET BHARARA
15       United States Attorney for the
16       Southern District of New York
16  JONATHAN R. STREETER
17  REED M. BRODSKY
17  ANDREW MICHAELSON
18       Assistant United States Attorneys
18
19  AKIN GUMP STRAUSS HAUER & FELD LLP
19       Attorneys for Defendant
20  JOHN M. DOWD
20  TERENCE J. LYNAM
21  MICHAEL STARR
22
22  ALSO PRESENT:  B.J. KANG, FBI
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

3126

1448RAJ1                    Horne - direct
1  ticker symbol -- hereby retains Market Street Partners (MSP),
2  effective as of December 1, 2006, to provide investment
3  community consulting and investor relations services and advice
4  with respect to financial community relations, shareholder
5  relations and related matters."
6  Q.  Can you turn to the second page of the document.
7         MR. STREETER:  If we can blow up paragraph 5.  Just
8  the first paragraph is fine.
9  Q.  Can you read the first sentence there?
10 A.  "GOOG will furnish to MSP certain material nonpublic and
11 confidential information concerning GOOG.  As a condition of
12 receiving such information, MSP agrees to treat any information
13 concerning GOOG, which is furnished to MSP by or on behalf of
14 GOOG (herein collectively referred to as information) in
15 accordance with the provisions this agreement."
16        MR. STREETER:  Can we move back out and look at the
17 first sentence in the next paragraph and blow that up, the
18 paragraph that begins MSP.
19 Q.  Can you read that paragraph?
20 A.  "MSP hereby agrees that the information will be kept
21 confidential by MSP and will not be disclosed to any outside
22 party except as so directed by GOOG.  The provisions of this
23 paragraph shall survive the expiration or termination of this
24 agreement and for a period of five years thereafter."
25 Q.  What exchange does Google trade on?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

3127

1448RAJ1                    Horne - direct
1    A.  NASDAQ.
2    Q.  Do you know an individual named Shammara Hussain?
3    A.  I do.
4    Q.  Who is Ms. Shammara Hussain?
5    A.  We hired her as an analyst at Market Street Partners.
6    Q.  When approximately did you hire her, in what year?
7    A.  May 2007.
8    Q.  I am showing you a photograph that's been marked for
9    identification as Government Exhibit 3624.  Do you recognize
10   the person in that photograph?
11   A.  Yes.  That's Shammara Hussain.
12              MR. STREETER:  The government offers 3624.
13              MR. STARR:  No objection.
14              THE COURT:  Admitted.
15              (Government's Exhibit 3624 received in evidence)
16   Q.  Can you take a look at Government Exhibit 1531.
17              What is Government Exhibit 1531?
18   A.  That's Shammara's resume that she gave us the day she came
19   to interview.
20              MR. STREETER:  The government offers 1531.
21              MR. STARR:  No objection.
22              THE COURT:  Admitted.
23              (Government's Exhibit 1531 received in evidence)
24   Q.  Looking at the top, first of all, can you tell us what
25   address she provided and what phone number?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1448RAJ1                    Horne - direct

1   A.  43667 Skye Road, Fremont, California  94530.  And her phone
2   is (510) 921-4190.
3   Q.  Do you know that number independent of looking at this
4   resume?
5   A.  I do.  I phoned her on that number a number of times.
6   Q.  Then can we look at the first several bullet points down
7   below.
8        Where was she working before she came to work at
9   Market Street Partners?
10  A.  Prior to working with us she was at Stratix Asset
11  Management, which is a small hedge fund.
12  Q.  Can you read the first two bullet points?
13  A.  "Managing a personal stock portfolio while receiving
14  apprenticeship from a well-established hedge fund manager at
15  Stratix Asset Management.
16        "Extensive research and analysis on companies within
17  the tech industry."
18  Q.  Can you continue reading?
19  A.  "Attend investor conferences for tech companies as well as
20  one-on-one meetings with CEOs and CFOs of these companies.
21        "Maintained an impressive P&L ratio in my personal
22  account through my own technical and fundamental analysis.
23        "Networked with people within the hedge fund industry,
24  venture capitalists, employees within the tech industry, and
25  individual investors."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1448RAJ1                    Horne - direct

1    A.  "At all times we are in possession of insider information,
2    which must be respected by all firm employees."
3    Q.  Were firm employees permitted to trade based on the
4    information they learned from clients at Market Street?
5    A.  No.  They were precluded by owning any stocks of the
6    companies that we work with.
7    Q.  Were they permitted to share the information that they
8    learned about clients from their work at Market Street with
9    individuals outside the company?
10   A.  Absolutely not.
11   Q.  Were they permitted to tip people so that they can trade on
12   that information?
13   A.  Absolutely not.  That's why we had all these documents in
14   place, for that very reason.
15   Q.  What accounts did Ms. Hussain, what accounts was she
16   assigned to after she was hired?
17   A.  She was assigned to Google, Visual Sciences and Ariba.
18   Q.  What types of things did she do on the Google account?
19   A.  On Google, she was the third person, there were three
20   people on the account, and she did a lot of backup work.  She
21   did scanning for information in the press about the company,
22   doing some projects, looking at how the company was trading,
23   things like that.
24   Q.  Did you have a distribution list within the company for
25   people who were working on Google?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1448RAJ1                    Horne - direct
1  A.  We did.  Google at Market Street Partners had a
2  distribution list that went -- any documents that came to that
3  address went to the three people on the account.
4  Q.  Those people included Ms. Hussain?
5  A.  It did, yes.
6  Q.  Directing your attention to the beginning of July 2007,
7  what information did you learn about Google's financial status?
8  A.  I knew toward the end of the quarter that the company was
9  not going to achieve what the street expected for the quarter.
10 Q.  What do you mean by what the street expected?
11 A.  The sell-side analysts would have estimates on the company,
12 what they thought the company would do, how they would perform
13 for the quarter, revenues and earnings, net income and earnings
14 per share.  Those numbers were put -- basically, an average was
15 taken, it was called first call, and that number, which was
16 referred to as a consensus number, is what the street would be
17 expecting the company to report at the end of the July.
18 Q.  What did you know about the actual performance versus that
19 reported?
20 A.  I knew that the company was going to fall short of
21 expectations of the consensus number.
22 Q.  What did that mean in terms of the work that Market Street
23 Partners had to do with the three people working on the
24 account, what did they have to do in response to that?
25 A.  We were spending a lot of time thinking about how we would

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1448RAJ1                    Horne - direct

1   answer a lot of questions.  This is the first time since Google
2   went public that they would have missed expectations, and
3   expectations were very high for the quarter.  The street
4   actually thought they would exceed consensus as opposed to
5   falling short.  So we spent a lot of time thinking of how we
6   would discuss the issues that contributed to the shortfall.  We
7   started to draft the CEO's script and the CFO's script, and
8   also put together a document of what we called hot topics, the
9   key things the street would want to explore when they did learn
10  the numbers.
11  Q.  Was Ms. Hussain part of that process?
12  A.  Yes, she was.
13  Q.  Was she included in the dialogue that you had inside the
14  company about that?
15  A.  Inside the company, yes.
16  Q.  Did she learn that Google was going to miss expectations of
17  the street that quarter?
18  A.  Yes.  She would have known that.
19  Q.  And you said something about how Google had never missed
20  before.  Can you explain what that means?
21  A.  Sure.  A lot of companies give guidance; they tell the
22  street what they expect to do for the following quarter.
23  Google did not give guidance.  Since they went public, they
24  have never given guidance.  So the analysts came up with their
25  own expectations, and they came up with a consensus number that

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

3138

1448RAJ1                        Horne - direct

1  they would be expecting the numbers that the street expected
2  the company to report.
3            (Continued on next page)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1449RAJ2                    Horne - direct

1  Q.  And how long had Google been a publicly traded company at
2  this point approximately?
3  A.  I think it was about three years, I think.  And they had
4  never missed expectations.  So this was going to be a big
5  surprise.
6  Q.  So they had about twelve quarters so far?
7  A.  Correct.
8  Q.  And was there anything else significant about Google's
9  history in terms of its earnings reporting?
10  A.  They had always showed increasing operating earnings, every
11  quarter.  And what we had started to call it, it was called
12  Eric's golden rule, referring to Eric Schmidt, who was the CEO
13  at the time.  And this was the first time that the company
14  would break that rule basically.  So that was one of the things
15  we were concerned about, was how the Street would react to the
16  fact that they were breaking Eric's golden rule.
17  Q.  Was the fact that Eric's golden rule, they weren't going to
18  increase earnings, was that a fact that was publicly known or
19  was that a fact that was confidential?
20  A.  It was absolutely confidential.
21         And the way the stock was appreciating during that
22  time showed that people did not expect them to meet.  The stock
23  was going up, which meant that people had high expectations.
24  Q.  Was the fact that Google was not going to meet with the
25  consensus expectations about its performance, in truth that it

3140

1449RAJ2                    Horne - direct
1   wasn't going to meet that, was that a fact that was publicly
2   available or was that confidential?
3   A.  No.  It was absolutely confidential.
4   Q.  Take a look at Government Exhibit 1519.  What's this?
5   A.  This --
6              MR. STREETER:  Actually if we could start from the
7   bottom.  If we could blow up the bottom half of the document
8   instead.
9   A.  This was an article that had appeared -- as I said, one of
10  the Shammara's responsibilities was to be looking in the press
11  to see what the press was saying about Google.  And she found
12  this article that talked about Google had hit an all-time
13  closing high, meaning it was the highest price the stock had
14  ever achieved since they had gone public.
15  Q.  Let me stop you right there.  Is this article forwarded to
16  you and your partner?
17  A.  This was from Shammara.  It went to me and also Nate, who
18  also worked on the Google account.
19             MR. STREETER:  Government offers 1519.
20             MR. STARR:  No objection.
21             THE COURT:  Admitted.
22             (Government's Exhibit 1519 received in evidence)
23  Q.  So what we're looking at on the screen right now is the
24  bottom half of this document; is that correct?
25  A.  Yes.

3141

1449RAJ2                    Horne - direct
 1          So the article is referring to Google's market cap and
 2   saying because the way the stock was going up, its market cap
 3   was bigger than IBM; was getting close to Cisco.
 4          So this was a very big move in the stock.
 5   Q.  So let's break it down.  It's from whom?
 6   A.  It's from Shammara.
 7   Q.  And who -- what date is it sent?
 8   A.  Thursday, July 5.
 9   Q.  And by that time what did Market Street Partners know about
10   what was going to happen -- when was Google scheduled to report
11   its next earnings?
12   A.  I believe it was July 19.
13   Q.  So about two weeks after this?
14   A.  Correct.
15   Q.  What did Market Street Partners know about what was
16   actually going to be reported two weeks later?
17   A.  We knew the numbers would miss expectations.
18   Q.  And when is article dated?
19   A.  July 5.
20   Q.  The subject line of the e-mail, can you read that?
21   A.  "Google closes at all-time high."
22   Q.  And can you read the title of the article.
23   A.  "Google hits all-time closing high; bigger than IBM;
24   closing in on Cisco."
25   Q.  Can you read the sentence that begins "the search giant"

3142

1449RAJ2                    Horne - direct
1   inside the article.
2   A.  "The search giant today rose $7.29 to $541.63, a new
3   all-time closing high."
4           MR. STREETER:  Can you blow up the top half of the
5   document.
6   Q.  What's happening in the top half of the document here?
7   A.  Well I forwarded it to Maria Shim at Google, who was our
8   internal IR contact, because I wanted her to see what we had
9   found.  And as she said, "Sigh, great, fall from high levels, I
10  guess," because she also knew that the company was going to
11  miss expectations.
12          MR. STARR:  Objection, your Honor, to what someone
13  else knew.
14          THE COURT:  Rephrase the question.
15  Q.  Why don't we focus on what you wrote there.
16  A.  Sure.  At the top I was telling her I was getting back to
17  her saying --
18  Q.  Why don't we go ahead and read what you wrote.  What's the
19  date on this?
20  A.  Thursday, July 5.
21  Q.  Can you read what you wrote.
22  A.  "Um, yes.  I think what may have been disappointing could
23  very well get very ugly due to all the new and most likely
24  momentum money that has jumped in over the past few weeks,
25  months."

1449RAJ2                        Horne - direct

1   Q.  What are you referring to, "disappointing could well get
2   very ugly"?
3   A.  Obviously, we knew the numbers were -- at this point, the
4   numbers were going to disappoint the Street.  And because the
5   way the stock was moving, we assumed that there was a lot of
6   momentum money, and these are investors that come in maybe
7   right before the quarter, based on the fact that they thought
8   the company would have very good numbers, and were driving the
9   stock price higher so that when the company did disappoint it
10  was going to be -- it was going to fall from even a higher
11  point.  And those kind of investors get out right away when
12  there's a disappointment.
13  Q.  What does that mean in terms of what you anticipated would
14  happen to Google's stock when this news was made public?
15  A.  It was going to drop hard; more than it would have even if
16  it hadn't been going up so fast.
17  Q.  Can you take a look at Government Exhibit 1520.  What's
18  this?
19  A.  This was an e-mail -- one of the things we did for Google,
20  going into the quarter, was that we would come up with a grid.
21       We looked at all the analyst reports, all the written
22  reports on the company, what their expectations were in terms
23  of earnings, the numbers; and also just kind of what they were
24  looking for.  And we would put this in a grid so that we knew
25  going into earnings what the expectations were and we could

1449RAJ2                    Horne - direct
1   help advise the company on how to answer those questions.
2           So, that's what -- Maria is referring to the grid that
3   Nate, my colleague, used to put together.
4           And then here Shammara had reviewed that grid, which
5   would have included all the financial estimates.  And she said
6   there's a few concerns in the analyst round-up grid for Google
7   that are not addressed in the Q and A.
8   Q.  What's the Q and A?
9   A.  Again, going into the quarter, we would come up with a
10  document that had a lot of the questions that we felt the
11  Street -- the Street would ask based on the results.  So we
12  would help develop answers to those questions.
13  Q.  Did the Q and A include information at this time, July 6,
14  2007, about what Google thought it was going to be reporting on
15  July 19?
16  A.  Absolutely.  We were spending a lot of time dealing with
17  that issue, the fact that the numbers were not going to meet
18  expectations.
19  Q.  And Ms. Hussain was working on that Q and A as well?
20  A.  Yes, she was.
21  Q.  Can you take a look at Government Exhibit 1523.  What's
22  this?
23  A.  As I said, we put together what we called the hot topics,
24  the key things that the Street would want to explore once the
25  press release, the earnings press release came out.  So this

3145

1449RAJ2                     Horne - direct
1  was the list of the key things we felt management should focus
2  on.
3  Q.  Looking at the top of the document.  When is it dated?
4  A.  Monday, July 9.
5           MR. STREETER:  Government offers 1523.
6           MR. STARR:  One moment, please.
7           (Pause)
8           Your Honor, may we approach very briefly, sidebar?
9           THE COURT:  Yes.
10           (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3146

1449RAJ2                    Horne - direct
 1              (At the sidebar)
 2              MR. STARR:  Just looking at the face of the document,
 3    I don't know whether there's any evidence that Ms. Hussain
 4    would receive or would have known.
 5              MR. STREETER:  She's going to testify that
 6    Ms. Hussain, that's the distribution list, that the three of
 7    them were on, Ms. Hussain and the two other people working on
 8    the account.
 9              MR. STARR:  That's fine.
10              (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1449RAJ2                    Horne - direct
1     (In open court)
2                MR. STREETER:  Your Honor, I'm told I didn't offer
3     1520.
4                MR. STARR:  There is no objection.
5                THE COURT:  Admitted.
6                (Government's Exhibit 1520 received in evidence)
7                MR. STREETER:  And I offer 1523.
8                MR. STARR:  No objection.
9                THE COURT:  Admitted.
10               (Government's Exhibit 1523 received in evidence)
11    Q.  Looking at the top of this document --
12               MR. STREETER:  Can we zoom back out, look at the whole
13    first page.  So is this the hot topics document you were just
14    mentioning?
15    A.  Yes, it is.
16    Q.  Looking at the top of the document, what's the date?
17    A.  Monday, July 9, 2007.
18    Q.  And who is it from?
19    A.  It is from me to Maria Shim at Google.
20    Q.  Who is CCed?
21    A.  Market Street -- Google at Market Street Partners which
22    would have been the internal distribution list I mentioned
23    before.
24    Q.  Who were the recipients on that?
25    A.  Myself, Nate, and Shammara.

3148

1449RAJ2                    Horne - direct
1    Q.  Those are the three people working on the engagement?
2    A.  Correct.
3    Q.  And this is Q207 earnings conversation call.  Key messages
4    and hot topics.  What's Q207 earnings conference call refer to?
5    A.  To the second quarter earnings conference call.  There
6    would be a press release and then followed by a conference
7    call.
8    Q.  When does the second quarter actually end?
9    A.  June 30.
10   Q.  And you said the conference call was going to occur when?
11   A.  I believe it was around July 19.
12              MR. STREETER:  And can we go to the bottom of the page
13   and blow up the hot topics at the bottom.
14   Q.  Could you read number one.
15   A.  "Number one.  Operating profit decline.  Breaking Eric's
16   golden rule.  Is the rule no longer a rule?"
17   Q.  Can you unpack that for us?
18   A.  As I talked about before, the company always had successive
19   sequentially, meaning quarter over quarter, increases in
20   operating income.  And this is the first time since going
21   public they wouldn't.
22              So since they had always operated under that
23   principle, we wanted to explore should we be telling the Street
24   that they no longer should be relying on the company to be
25   increasing every quarter.

1449RAJ2                    Horne - direct
1    Q.  And Eric's golden rule is a reference to what?
2    A.  The fact that there would be increases every quarter in
3    operating income.
4    Q.  Eric was who?
5    A.  Eric Schmidt, CEO.
6    Q.  So what he had -- what had he said, if anything, about that
7    to the public?
8    A.  Since the company had gone public, that had been one of the
9    operating premises of the company; that they would always
10   increase earnings every quarter.
11   Q.  What was going to happen when they did the announcement
12   this quarter?
13   A.  They would be breaking that rule.  Operating income would
14   be down.  And that's going to be a big surprise.
15   Q.  Was the fact that that was going to happen something that
16   was publicly known or was that confidential?
17   A.  Confidential.
18   Q.  Turn to the second page.
19            MR. STREETER:  Blow up the top.
20   Q.  What's it say in number three?
21   A.  "Sharp deceleration in clicks growth 0.2 percent
22   quarter-over-quarter, 47 percent year-over-year.
23   Q.  What does that mean in terms of how the earnings are going
24   to be?
25   A.  Clicks growth is a key.  As I said, it's an internet search

1449RAJ2                    Horne - direct
1    company.  So clicks growth is a key indicator of how the
2    company is going to perform.  So the fact that it's up -- it's
3    basically flat quarter-over-quarter.  It was going to be very
4    surprising.
5    Q.  What are clicks?
6    A.  Clicks are when people actually do a search and click on an
7    ad.
8    Q.  And number five, can you read that.
9    A.  "Revenue growth slowing faster than anticipated.  Six
10   percent sequential revenue growth.  Historic low."
11   Q.  Can you read number six.
12   A.  "International growth slowing.  Six percent sequential
13   revenue growth.  Historic low.  International revenues as a
14   percentage of total company revenues declined."
15   Q.  Can you turn to Government Exhibit 1524.  What's this?
16   A.  This is the Q and A document that I referred to before.
17   This is when we looked at what the company would actually
18   report and help try to generate answers to the company's -- to
19   the questions that the Street would have about those results.
20              MR. STREETER:  Government offers 1524.
21              MR. STARR:  No objection.
22              THE COURT:  Admitted.
23              (Government's Exhibit 1524 received in evidence)
24   Q.  Who is this from?
25   A.  This is from me again to Maria Shim, our contact within

3151

1449RAJ2                    Horne - direct
1  Google.  And I'm CCing the internal Google distribution list
2  within Market Street Partners.
3  Q.  That includes?
4  A.  Shammara.
5  Q.  Now how many days are we away from the actual announcement?
6  A.  We're still about ten days.
7  Q.  And attached to this is the draft Q and A?
8  A.  Yes.
9            MR. STREETER:  Can you turn to the fourth page of the
10  document.  Actually fifth page.
11            Blow up that box at the top down to the first
12  question.
13  Q.  Can you explain at the bottom of the page, pro forma EPS.
14  Do you see that?
15  A.  Yes.
16  Q.  What is EPS?
17  A.  That's earnings per share.  That's a key number that the
18  Street would look to, to see how the company performed.
19            If you look at the top, it says actual; and then the
20  right-hand column is consensus.
21            MR. STREETER:  Can we highlight those two words.
22            THE WITNESS:  So as I said, consensus is the number --
23  it's basically an average of what the analysts on the Street
24  were looking for.  That would have been a public number that
25  the Street -- Wall Street would look at that number versus the

3332

1458RAJ1

 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 2
 3  UNITED STATES OF AMERICA,
 3
 4            v.                          09 CR 1184 (RJH)
 4
 5  RAJ RAJARATNAM,
 5
 6            Defendant.
 6
 7  ------------------------------x
 7
 8                                   New York, N.Y.
 8                                   April 5, 2011
 9                                   9:20 a.m.
 9
10
10  Before:
11
11            HON. RICHARD J. HOLWELL
12
12                                   District Judge
13
13
14                      APPEARANCES
14
15  PREET BHARARA
15       United States Attorney for the
16       Southern District of New York
16  JONATHAN R. STREETER
17  REED M. BRODSKY
17  ANDREW MICHAELSON
18       Assistant United States Attorneys
18
19  AKIN GUMP STRAUSS HAUER & FELD LLP
19       Attorneys for Defendant
20  JOHN M. DOWD
20  TERENCE J. LYNAM
21
22  ALSO PRESENT:  B.J. KANG, FBI
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

145FRAJ2                         Barnacle - direct
1     A.  That's correct.
2     Q.  And then the mobile number there, can we highlight that,
3     the mobile number down in the middle of the -- where it has all
4     the subscriber information.  Could we blow that up a little
5     bit, the document?  Let me ask you to look at Government
6     Exhibit 26 in evidence.
7     A.  Okay.
8     Q.  Blow that up.  Did you use the Government Exhibit 282 now
9     in evidence relating to the phone records for 646-206-2040,
10    that cellular telephone number, to prepare, in part to prepare
11    this chart?
12    A.  Yes, sir.
13    Q.  Can you take us through this chart regarding certain
14    communications in February 2005?
15    A.  Certainly.  On February 10, 2005, at 6:29 there's a call
16    from the phone subscribed to Mr. Smith to the phone subscribed
17    to Mr. Ahmed that lasted approximately 9 minutes.
18          On February 17, 2005 at approximately 4:10 p.m., there
19    was a call from the phone subscribed to Mr. Ahmed to the phone
20    subscribed to Mr. Smith that lasted approximately three
21    minutes, and also on the 17th of February, 2005, at 8:51 p.m.,
22    there's a phone call from the phone subscribed to Mr. Smith to
23    the phone subscribed to Mr. Ahmed that lasted approximately two
24    minutes.
25    Q.  Let me ask you can you put up Exhibit 2379 in evidence?
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

145FRAJ2                    Barnacle - direct
1    Could you read the title of that chart?
2    A.   This chart is titled Galleon Tech daily closing position in
3    Integrated Circuit System stock, ticker symbol ICST, from the
4    period February 1, 2005 through June 30, 2005.
5    Q.   And again the left axis shows what?
6    A.   The left access tells the number of shares long, the number
7    of shares that were held.
8    Q.   And the bottom contains the dates?
9    A.   That is correct.
10   Q.   From this chart for the tech manager code GRC associated
11   with Mr. Rajaratnam, what's the first day of trading, of
12   purchasing in February 2005 shown on this chart with respect to
13   stock in ICST?
14   A.   The first purchase by manager code GRC is on the 11th of
15   February, 2005.
16            MR. BRODSKY:   Can we highlight that?  Can we put this
17   side by side or up and down with Government Exhibit 26?  Blow
18   up both of those portions?
19   Q.   So what can you tell us the relationship in time between
20   the telephone call between Mr. Smith and Ahmed and Mr. Ahmed on
21   February 10, 2005 at 6:29 p.m. and the first purchases by the
22   tech manager code GRC in ICST?
23   A.   All I can tell you from these two charts is that there's a
24   telephone call on the 10th of February at 6:29 p.m. and there's
25   a purchase the next day, which is the 11th of February 2005.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

3450

145FRAJ2                        Barnacle - direct

1   Q.  Let's talk about those purchases on February 11, 2005.  I
2   want to show you what's in evidence as Government Exhibit 150-I
3   and 150-J.  I'd like you to take a look at those and we'll put
4   up on the screen, if we can, 150-I first.  Do you want to blow
5   up the top, the bottom?  Thank you.  Maybe we can blow up the
6   first half so we can read it.  Thank you.
7           Can you tell us what these are, what records these are
8   in Government Exhibit 150-I?
9   A.  Yes.  These are Morgan Stanley & Company brokerage
10  statements for the Galleon Tech offshore fund.
11  Q.  Highlight that.  And in the upper right-hand corner it says
12  Morgan Stanley & Co. Incorporated.  What does that mean?
13  A.  That is the broker, the executing broker.  I'm sorry, this
14  is the broker where the shares are held.
15  Q.  What does it mean to be the broker where the shares are
16  held?
17  A.  Firms use broker dealers to help them buy and sell
18  positions and then also to hold their positions, so in this
19  case Morgan Stanley & Company is the broker that is holding
20  positions for Galleon Tech's offshore fund and this statement
21  is just for the month of February, 2005.
22  Q.  Would you go to the February 11th date, 11, 2005 in 150-I?
23  Tell us what page it appears on with respect to the trading in
24  ICST?
25  A.  February 11 is page 26.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4514

14EFRAJ1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

         v.                      09 CR 1184 (RJH)

RAJ RAJARATNAM,

         Defendant.

------------------------------x

                           New York, N.Y.
                           April 14, 2011
                           9:20 a.m.

Before:

                HON. RICHARD J. HOLWELL

                           District Judge

                    APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
JONATHAN R. STREETER
REED M. BRODSKY
ANDREW MICHAELSON
    Assistant United States Attorneys

AKIN GUMP STRAUSS HAUER & FELD LLP
    Attorneys for Defendant
JOHN M. DOWD
TERENCE J. LYNAM
MICHAEL STARR

ALSO PRESENT: B.J. KANG, FBI

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14EFRAJ7                    Jarrell - direct
 1    reaction.  That might indicate there are no talks.  No comment,
 2    well, there might be talks.
 3            So you learn, the professionals learn these -- market
 4    traders and professionals learn how to sort of figure out from
 5    the body language and from these types of behaviors, you know,
 6    whether or not something is going on.
 7    Q.  And after these events are observed, do analysts and market
 8    observers write about them in their reports?
 9    A.  Oh, sure.  Because, corporate takeovers generally when a
10    company buys another company, they pay a premium price.  So if
11    you buy the stock, if you can buy the stock of a company that's
12    going to be bought at the market price and own it when one of
13    these acquisitions is made, you'll make money.  Because the
14    acquisition price is usually much higher than the market price
15    on the market.  Usually on average, over time, it's a
16    30 percent premium.  So that's a big number and that's why
17    people, investors and professional traders spend so much time
18    and energy trying to anticipate which company is going to get a
19    takeover offer, because if you can anticipate it and buy that
20    stock, then you can do well for yourself for your investors.
21    Q.  Are there ever incentives of companies that are being
22    acquired to informally disclose information about the
23    acquisition before it's formally announced?
24    A.  Oh, sure.
25    Q.  What would be a incentive for a company to do that?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

4718
14EFRAJ7                        Jarrell - direct
1   A.  Well, for example, suppose you're a buyer and you're
2   negotiating with a target company and the target company's
3   price is already run up in the market because the market
4   anticipates that it might get a deal.  And you're the buying
5   company and you're trying to get this target to accept a lower
6   price rather than a higher one.  And one of the things you
7   might do is leak to the market that, hey, we're not going to do
8   a deal with them.  We're not going to do a deal.  Well, then
9   the price falls and the target gets scared and their investors
10  get upset and their stockholders get upset and they put
11  pressure on them.
12  Q.  Conversely, what if you're the target company that's going
13  to be acquired?  Are there sometimes incentives for the target
14  company to informally disclose that they're a target because it
15  might affect their price?
16  A.  Well, sure.  Remember I said there's normally a 30 percent
17  premium over the market price.  Well, sometimes the target has
18  incentives to leak to the market that they are indeed a
19  takeover target to cause the price to go up in the market.
20  Then you go back to the bidder and you say, hey, come on, my
21  price has gone up, you have to pay me more, I want 30 percent
22  above that.
23          So, you know, in the negotiations themselves there
24  can be incentives for one side or the other to leak the
25  information to create a strategic advantage in the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

4719

14EFRAJ7                        Jarrell - direct
1    negotiations.  There's so much money at stake that those types
2    of advantages can be important.
3    Q.  And are there any market signs that you can identify where
4    this phenomenon of informally disclosing information or leaking
5    information is apparent in the market?
6    A.  Yes.  However it leaks out, the telltale signs of it being
7    leaked out are stock price runup.  The stock price of the
8    target will start to run up.  There's no announcement of the
9    deal, but you'll see it move up.
10            What we do in our studies is after the fact of course
11   we know there are deals and we take all the companies where we
12   have deals and we look at them, and if you put them all in one
13   group and center them on the date they got this announcement of
14   a deal and put them all as a group you'll see as a group their
15   stock price moved up in the two weeks prior, and indeed by the
16   time the deal is announced on average 20 to 30 percent of the
17   purchase price of the acquisition has already been embedded in
18   the stock price of the target.  So the first telltale sign is
19   stock price runup.
20            The other telltale sign is market volume.  The trading
21   activity in the company will pick up.  You'll see volume go up
22   in the two weeks prior to the deal and get higher and higher
23   and higher as you get closer to the formal announcement.
24   Q.  Finally, what about the increase in option activity?  Is
25   that sometimes significant?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

14EFRAJ7                    Jarrell - direct
 1   specific to the company?
 2   A.  Yes, sir.
 3   Q.  All right.  Let's go to the first stock that we're going to
 4   examine, AMD, which is the next slide that begins on 16.
 5   A.  Okay.
 6   Q.  Let's go to slide 17.  Now, can you just set a frame of
 7   reference and a context for what the allegation is and what you
 8   did?
 9   A.  Yes.  The alleged tip had to do with AMD spinning off its
10   semiconductor operations into a joint venture.  This was, the
11   buzz words for this case were fabless or asset light, asset
12   smart.  So this was the allegation about AMD.  There was a
13   period of time when there was a lot of discussion about them
14   spinning off basically their fabrication plants, selling them
15   to a big investor and that was the transaction in question.  So
16   this was actually announced on October 7, 2008, and the alleged
17   tip came on August 15, 2008 with a wiretapped intercept
18   involving Mr. Kumar.
19   Q.  Let's go to slide 18.  Did you review the publicly
20   available information about whether AMD was going to sell off
21   its fabrication facilities?
22   A.  Yes.  And this is a summary of the information that I'll
23   talk for a moment about this.  On the left-hand side is simply
24   a count -- I found 22 stories.  What I did was I searched, as I
25   said, the financial press in the period preceding, the period
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

4726

14EFRAJ7                          Jarrell - direct

1   in question.  You see on the right hand graph down below there
2   from April 1, 2008 through October 7, 2008.  So over that
3   period I searched the financial press, all the publicly
4   available news for publicly available information that said
5   that it was likely or it would happen that AMD would indeed do
6   this fabless asset light transaction, and so I found 22 stories
7   of that nature.
8            Now, 17 analyst reports were discussing, again, this,
9   and so these are publicly available information that's related
10  to the tip in the sense that the tip allegedly said AMD is
11  going to do this transaction, and these analyst reports and
12  news stories are consistent with that.  They're saying that AMD
13  is going to do this transaction.
14  Q.  All right.  Now, what do you have on the right-hand side of
15  slide 18?  You have AMD stock price in that graph.  Can you
16  just explain that?
17  A.  Yes.  Well, the blue line is AMD's stock price, daily stock
18  price over the period.  So you can sort of see what that does.
19  The red dots are the news stories that I'm going to discuss
20  sequentially as we go through this.  I'm going to do it very
21  quickly, but those are the stories that I'm going to do.  We're
22  going to do one red dot at a time over the next slides.
23  Q.  Let's go to the next slide --
24  A.  Back up.  Also for this slide we have for reference, the
25  arrow there, there's where the alleged tip came on August 15,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

4727
14EFRAJ7                    Jarrell - direct

1   right?  And then the joint venture was announced all the way at
2   the end.  So this slide kind of gives you a frame of reference
3   for when did the tip come, when was the announcement made, what
4   was the stock price doing and when did these news stories occur
5   relative to these key dates, so all of that information is
6   right there.
7   Q.  So you found publicly available sources, stories and
8   analyst reports regarding the asset light strategy with AMD
9   before the alleged tip date of August 15?
10  A.  And specifically, asset light chatter that was consistent
11  with the tip, where the tip was that it would occur.
12              MR. STREETER:  Your Honor, could we have a sidebar?
13              THE COURT:  Yes.
14              (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

4730

14EFRAJ7                    Jarrell - direct
1              (In open court; jury present)
2    BY MR. LYNAM:
3    Q.  Can you go to the next slide and can you describe the
4    information -- is the court reporter ready?  I apologize.  Can
5    we go to the next slide?  Can you begin to take us through
6    then, what information you were summarizing here as we move
7    through the time line you developed?
8    A.  Yes.  Before I get to the first dot,the first slide here is
9    just indicating that in as early as April 2007 there are
10   publications about discussing this asset light business model.
11   So even before we get into my chart, there is a Bloomberg
12   transcript, Albany Times Union, there are stories and mentions
13   and discussions about this AMD going to adopt a so-called asset
14   light approach.  So that's the first thing I'm noting is that
15   this is actually something that's in the public discussion
16   prior to the start of my chart.
17   Q.  So in 2007 you found stories about that?
18   A.  Yes, sir.  That's like a year before the start of my chart.
19   I'm starting in April '08, and that's a year before.
20   Q.  Let's go to slide 20, then?
21   A.  That's the first red dot and this is a story, the Inquirer,
22   a story in the Inquirer April 7, '08 and what I did was I took
23   out the quote from the article that was the reason why I
24   selected it, and put it in this exhibit in the first place.  So
25   the quote is AMD is going to go fabless.  That's this, you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

14EFRAJ7                    Jarrell - direct
 1  know, this jargon for selling off these fabricating plants,
 2  they just call it going fabless.  Spin off the fabs to a
 3  separate company, that is exactly what they're going to do.
 4  The real question is to whom, and that is easy, Abu Dhabi.  And
 5  it turns out that Abu Dhabi was indeed, that was the group that
 6  did buy it.  So this was as early as April 2, 2008.
 7  Q.  All right, let's go to the next slide.  The next dot?
 8  A.  This is an analyst report FTN Midwest Securities, April 18,
 9  2008 and the quote is Hector Ruiz.  Hector Ruiz was the head of
10  AMD, reiterated, repeated AMD's move towards an asset smart
11  strategy, noting further progress and an intention to make a
12  formal announcement in the, quote, "near term."
13  Q.  Let's go to the next slide.
14  A.  Lehman Brothers -- Electronic News is reporting on a Lehman
15  Brothers -- Lehman Brothers is an analyst, big company that
16  does analyst reports, so Electronic News is reporting that
17  Lehman Brothers believes one approach the company could
18  consider may include selling its fabs to a third party such as
19  the Mubadala Development Company, which it is what they did.
20  Q.  Is that the company from Abu Dhabi?
21  A.  Yes.
22  Q.  Let's move to the next slide.  What did you find here?
23  A.  This is another securities firm, JMP Securities and they
24  are saying AMD is making steady progress in announcing its
25  asset smart outsourced manufacturing strategy.  Outsourced
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14EFRAJ7                    Jarrell - direct
1    means once they sell the plants to this separate company, then
2    they're going to have to buy the components from the plant,
3    they'll buy the components as they go and they call that
4    outsourcing.  We call that outsourcing in business.  Also, when
5    you sell the plants in the first place, you will get money for
6    them.  So AMD is hoping to sell the plants and get a lot of
7    money for the plants to the tune of, here it's estimated 1.5 to
8    $2 billion cash infusion.
9    Q.  This was reported in May?
10   A.  Yes, sir.  May 6, 2008.
11   Q.  All right, let's go to the next slide.
12   A.  Another Lehman Brothers, "we continue to believe a long
13   awaited asset light announcement could follow in the coming
14   weeks from AMD.  We believe negotiations with a lead partner
15   ongoing."  Now, this is in May 15 and we know after the fact
16   that the announcement was made in October, so and May 15,
17   they're thinking it's going to come, it's been long awaited,
18   it's going to come in a few weeks.
19   Q.  All right, let's go to slide 25.  What did you find there
20   in June?
21   A.  Another Lehman Brothers, still, Lehman Brothers in June is
22   saying a high probability for a deal to be announced in the
23   next few months.  So they continue to say that this is going to
24   happen.  They're having trouble with knowing exactly when, but
25   they pretty much have it, they know what's going to happen and

4733
14EFRAJ7                      Jarrell - direct
 1   who's going to get it.  "AMD management remains committed to
 2   unveiling its asset light plans in calendar year 2008."  And
 3   presumably they're getting this from management.
 4   Q.  All right.  Let's go to slide 26.
 5            MR. STREETER:  Objection, your Honor.  Can I move to
 6   strike that last statement?
 7            THE COURT:  Yes.
 8   A.  I'm sorry.
 9            Goldman Sachs, which we heard a lot about, a source of
10   research and an important business company for Galleon, says,
11   their analysts say there continues to be speculation in the
12   market the Mubadala Development Company will increase its
13   investment in AMD by $1 billion over the coming months.
14   Q.  Let's look at slide 27.  What did you find in July?
15   A.  More stories that talk about this same upcoming
16   transaction.  Analysts speculate that AMD will spin off its
17   global manufacturing operations, and that spinoff will require
18   a substantial investment from the governor of Abu Dhabi.
19   That's July 18 from the Austin American Statesman, and then
20   Midwest Securities, the research is saying we are promised that
21   asset light will be announced in the not-too-distant future.
22   These are coming in mid-July.
23   Q.  Now, do you know any particular significance about a report
24   in the Austin American Statesman with regard to AMD?  Do you
25   know where AMD's headquarters are and whether they have

```
        14EFRAJ7                    Jarrell - direct
 1    facilities in Austin?
 2    A.  Yes, they do.  That's the significance.
 3    Q.  All right.  Let's go to slide 28.
 4    A.  Lehman Brothers, which has been following this says
 5    management says it's coming soon in, quote, "calendar year
 6    '08," with CEO Hector Ruiz focusing on finalizing the asset
 7    smart deal.  So we're still in July.
 8    Q.  Let's look at slide 29.  What did you find there?
 9    A.  The Inquirer says the likely suitor for AMD's manufacturing
10    operations is from Abu Dhabi.  It's a done deal now, there's
11    just paperwork left to do.  This is coming in July.
12    Q.  All right, let's go to slide 30.
13    A.  EE Times, company executives have hinted AMD is already
14    well into the implementation stage of the asset smart program.
15    Q.  Does the word "implementation" there, how would you
16    analyze -- what is your opinion of what "implementation" means
17    in this document?
18    A.  Well, "implementation" means --
19              MR. STREETER:  Objection, your Honor.
20              THE COURT:  The witness may answer.
21    A.  Generally implementation means you're actually doing it,
22    you're actually doing things.
23    Q.  Go to slide 31.
24    A.  Now we're in August, Lehman Brothers believes negotiations
25    in asset smart strategy are ongoing with possible partners.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

4735
14EFRAJ7            Jarrell - direct
1   Q.  All right, let's look at slide 32.
2   A.  EE Times reports AMD's constant leaks about its asset light
3   plans are getting tiresome.  By the time AMD announces its
4   asset light strategy, will anyone care?
5   Q.  That was reported when?
6   A.  August 8, 2008.
7   Q.  Slide 33.
8   A.  Business Week, which of course is a very prominent
9   financial publication.  "A leading candidate in AMD's asset
10  light plan might be a sovereign wealth fund like Mubadala
11  Development."
12  Q.  And Mubadala is the company from Abu Dhabi?
13  A.  Yes, sir.
14  Q.  Let's look at slide 34.
15  A.  We get this from TG Daily.  "AMD split rumors
16  accelerating."  AMD split refers to this fabless transaction.
17  It's widely expected asset light will part AMD into two
18  companies.  Critical decisions are being made at this time and
19  the official announcement will be made next month.
20  Q.  What was the date of that report?
21  A.  Now we're in August 12, 2008.
22  Q.  Let's look at slide 35.
23  A.  AMD's chief marketing officer fuels asset smart rumors.
24  That's in PC Magazine.  JPMorgan announcement re: asset
25  light/asset smart just weeks away?
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

4736
14EFRAJ7                    Jarrell - direct
 1   Q.  What about slide 36?  What did you find on August 13?
 2   A.  Now, this is two days before the alleged tip.  Analysts
 3   expect AMD to get a sizable infusion of cash from its partner
 4   and that's from Reuters, a major news wire service.
 5   Q.  Okay.  Let's look at slide 37.
 6   A.  Amtech Research, "We believe that asset smart will likely
 7   be announced before the next earnings call."
 8   Q.  All right, let's go --
 9   A.  Earnings call refers to these quarterly earnings
10   announcements.
11   Q.  Okay, let's go to slide 38 and focus on September.  What
12   did you find then?
13   A.  Jeffries & Company is, again, a big resource investment
14   company and they do a lot of research.  "Sources indicate
15   fab-lite plan and cash buttress may be imminent."  Cash
16   buttress is referring to the fact that they're going to get
17   money coming in when they sell the plans.
18           "Our channel checks indicate that AMD may announce its
19   official fab-lite strategy in two weeks."  Channel checks,
20   normally what that means is analysts are talking to companies
21   that either supply the company or maybe buy products from the
22   company, so they're talking with people that aren't in the
23   company but that deal with the company.  They call those
24   channel checks.  And then, finally, "Middle East investment
25   group to contribute cash for stake in new foundry."  All of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

4737

14EFRAJ7                    Jarrell - direct

1   that is being reported in September '08 by Jeffries.
2   Q.  Is the foundry another name for the manufacturing facility?
3   A.  Foundry is another name for these fabrication plants.  In
4   fact, when they did the deal they named the new company that
5   owned them Foundry.
6   Q.  Let's look at slide 39.
7   A.  Bank of America, "Checks," again, checks, channel checks,
8   "suggest asset light transition is imminent."  This is coming
9   after hours on September 7.
10         Market Watch after hours, "AMD appears to have begun
11  implementing its much-anticipated shift to an asset light
12  strategy."
13  Q.  All right.  Let's look later at September, slide 40.  What
14  did you find there?
15  A.  Again, Midwest Securities, which has been following this
16  says AMD's asset light plans could include Abu Dhabi's Mubadala
17  Development Company and the creation of a joint venture.  Turns
18  out, that turns out to have been correct.  "Contacts report
19  that AMD's Hector Ruiz met recently with New York's governor to
20  discuss contract modifications, which would allow AMD to
21  develop the New York facility with a partner."
22         One of the side benefits of this deal, if it were to
23  occur, was that AMD had a big plant in New York that it was
24  trying to update and had run short of cash, and this deal is
25  going to allow them to continue with that updating and the New

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

4738

14EFRAJ7                    Jarrell - direct

1  York governor was interested in that, because that would create
2  jobs in New York State.  When this plant was then updated they
3  could hire people and so that's what this is referring to.
4  Q.  And now let's look at slide 41.
5  A.  Again, Reuters, "Chief executive Dirk Meyer told Fortune
6  magazine this month," that Dirk Meyer, now the head of AMD at
7  this point in time, told Fortune magazine AMD will sell its
8  manufacturing plants known as fabs.
9  Q.  So this actually quotes the chief executive of AMD saying
10  that they're going to sell these facilities before there was
11  actually a public announcement of it, formal announcement by
12  the company, is that right?
13  A.  Yes.  Yes.
14  Q.  All right.  Now, we've gone through a number of articles
15  and information.  Let's go to slide 42.  Can you kind of give
16  us a summary before you give us your analysis?
17  A.  On the left I'm just giving highlights, bullet points from
18  what I just went through, all of these stories, and in my
19  judgment these are the highlights, AMD was pursuing an asset
20  light business model, they were expected to partner with Abu
21  Dhabi's Mubadala Development Company.  Mubadala was expected to
22  increase its equity stake by 1-1/2 to $2 billion.  Quotes such
23  as, "we've begun implementing it," and "it's imminent" were in
24  the public domain prior to the official announcement.  And on
25  the right we can compare that with the alleged tip information.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4739

14EFRAJ7                          Jarrell - direct
1    Q.  All right, now, in your opinion, Professor, is the public
2    information that we've just seen consistent with an
3    event-driven hedge fund manager buying shares of AMD during
4    this period?
5    A.  If you're an --
6                MR. STREETER:  Objection, your Honor.
7                THE COURT:  Counsel approach.
8                (Continued on next page)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
                                                             4762
     14F8RAJ1
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   UNITED STATES OF AMERICA,
 3
 4               v.                        09 CR 1184 (RJH)
 4
 5   RAJ RAJARATNAM,
 5
 6                 Defendant.
 6
 7   ------------------------------x
 7
 8                                        New York, N.Y.
 8                                        April 15, 2011
 9                                        9:30 a.m.
 9
10
10   Before:
11
11                    HON. RICHARD J. HOLWELL
12
12                                        District Judge
13
13
14                         APPEARANCES
14
15   PREET BHARARA
15        United States Attorney for the
16        Southern District of New York
16   JONATHAN R. STREETER
17   REED M. BRODSKY
17   ANDREW MICHAELSON
18        Assistant United States Attorneys
18
19   AKIN GUMP STRAUSS HAUER & FELD LLP
19        Attorneys for Defendant
20   JOHN M. DOWD
20   TERENCE J. LYNAM
21   MICHAEL STARR
22
22   ALSO PRESENT:  B.J. KANG, FBI
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

4866

14F8RAJ3                      Jarrell - direct

1  that the deal will close, and that the buyer has cash and will
2  close the deal and pay 12.25, then when the stock price drops
3  to 9.25 on 10/7, that would be a great time to go long.
4  Q.  Did PeopleSupport's buyer publicly report that it had the
5  cash to close the deal?
6  A.  Yes.
7  Q.  Did PeopleSupport's buyer publicly report that it was
8  looking even past this deal to the next deal?
9  A.  Yes.
10  Q.  And was the delay in closing of this transaction any actual
11  real delay compared to what was originally announced as the
12  closing day?
13  A.  No, sir.
14  Q.  All right.  Let's look at the next stock, which is Google.
15          Look at slide 215.  Can you tell us what the
16  allegation is here?
17  A.  The allegation here is that Google's earnings will be
18  lower, so it's a negative alleged tip, and the allegation is
19  that the tip was received on July 13, which was six days prior
20  to the formal announcement of the earnings on July 19, 2007.
21  Q.  Let's go to the next slide.
22          Did you identify information in newspapers and the
23  financial press and analyst reports that were pertinent to how
24  Google was doing that quarter?
25  A.  Yes, sir.  We are going to talk about some financial
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14F8RAJ3                    Jarrell - direct
1   stories from the Wall Street Journal and Bloomberg, as well as
2   some analyst reports from Lehman Brothers, Merrill Lynch, etc.
3   Q.  Again, you graphed out the price of Google stock on the
4   right?
5   A.  Yes, sir.
6   Q.  It looks like Google stock is a stock that trades in triple
7   numbers there, it's a 4 to $500 per share stock?
8   A.  Yes, sir.
9   Q.  Let's look at slide 217.  What did you find that was
10  relevant with regard to Google's quarter as reported on April
11  19, 2007?
12  A.  Well, I think this sets the stage.  Google at this time had
13  a reputation for being a real high-flying stock.  It always
14  reported increasing growth and increasing earnings and the
15  stock price had been rising.  And now here is kind of a warning
16  sign from AP Newswires on April 19 saying, "It has become more
17  difficult for Google to impress Wall Street because its stock
18  is scaling lofty heights," saying that the stock is so high and
19  Wall Street expects so much from Google, it might be hard for
20  Google to continue to satisfy Wall Street's lofty expectations.
21  Q.  What was Google's stock price at around that time?
22  A.  It looks to be about 4, $470 I am looking at there,
23  approximately.
24  Q.  Let's look at slide 218.  What did you note there on May
25  23?

14F8RAJ3                        Jarrell - direct

1    A.  The Wall Street Journal has a caution that there are still
2    warnings from analysts that Google's margins could erode from
3    competition from its big rivals.  So competition causes price
4    decreases and profit decreases is what is being referred to
5    there.
6    Q.  Let's look at the next slide.  What did you find in the
7    late June time frame?
8    A.  RBC Capital in June is saying, "We are cautious near term."
9    They are saying that the upside, meaning that the prospect for
10   better than expected reports, are minimal and likely already
11   priced into the stock, but there are some key short-term
12   negatives that could pressure Google's revenue.
13   Q.  What does it mean that something is priced into the stock?
14   A.  That is what we were referring to before about whether
15   information has already been impounded into the stock price or
16   not.
17   Q.  The stock price already reflects these expectations of
18   Google?
19   A.  Yes.  That's what is being referred to by sophisticated
20   investors taking a variant view or a contrary view.  They are
21   trying to figure out what information has already been priced
22   into the stock, and if they have information that they think is
23   different, or they have a different viewpoint, then that's how
24   they make their judgment about whether to go long or short.
25   Q.  Let's look at the next slide.  What did you find there that

4869

14F8RAJ3                      Jarrell - direct
1    was pertinent in July?
2    A.  Merrill Lynch in July is giving negative information
3    saying, "We assume EBITDA" -- that's a type of profit --
4    "margins will fall."  And they are blaming it on Google
5    investing in partnerships and adding people and spending money.
6    Capex is short for capital expenditures.  And Google is
7    increasing head count, hiring people, and spending money, and
8    they think that's going to reduce profit margins.
9    Q.  Then you noted in the lower right-hand corner a Galleon
10   document that you identified.  What is that?
11   A.  Galleon's proprietary research, they are following this
12   internally, and the Galleon analyst has a near term Google
13   price target of 550.  We have heard testimony about that.  As
14   you can see from the chart, although it's not -- you can't tell
15   the exact number, but it would appear that Google's stock price
16   is very close to that $550 target.
17   Q.  Let's go to the next slide.  What did you note there,
18   several hours before the alleged tip, being reported on July
19   13?
20   A.  Lehman Brothers is reducing their EBITDA margin, so they
21   are reducing the profit margin projection, again, blaming the
22   increases in head count, the adding of people and the costs
23   associated with adding people.
24   Q.  Adding employees?
25   A.  Yes, sir.

                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

4870

14F8RAJ3                      Jarrell - direct

1   Q.  This is actually going to lower their profitability for
2   this quarter?
3   A.  In the short-term, yes, sir.
4   Q.  OK.  Let's look at slide 222.  What did you note there that
5   Galleon had identified in its research?
6   A.  They are saying, "Less enthusiastic, more cautious about
7   setup into this week's earnings print."
8   Q.  What does "earnings print" mean?
9   A.  That's analyst speak for the announcement of the earnings
10  itself.
11  Q.  In addition to being less enthusiastic, what did you also
12  note that Galleon had identified with regard to the upside and
13  the downside?
14  A.  Well, this Galleon researcher is saying, stock currently at
15  second half '07 target.  So it's already at the second half '07
16  target of 550, making the near term risk reward less favorable
17  into print.  So going into the earnings report, they are
18  thinking, look, this could go up maybe 15, but it could go down
19  40.  So that's their way of quantifying what they think are the
20  risks.  There is much more risk that it's going to go down than
21  an opportunity that it's going to go up.
22  Q.  Then on slide 223, did you notice what another analyst
23  group said about the expectations here for Google?
24  A.  Again, the consensus view is that expectations for Google
25  are high, it's a high-flying stock, and the concern here is

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

14F8RAJ3                    Jarrell - direct
1   that the expectations are high and will not be met.  And if the
2   expectations are high and the reality is good but not
3   consistent with those high expectations, the price will fall.
4   Q.  Let's look at the next slide.  Did Bloomberg News report
5   something about whether those expectations could be met?
6   A.  Yes.  It's the same theme here from Bloomberg News on July
7   19.  The stock is trading close to all-time highs, and that
8   sets the bar so high, the bar being expectations so high, that
9   it can be difficult to keep up with expectations.  If that's
10  true, then the stock will decline.  Then they are saying, stock
11  was selling off earlier today on chatter -- rumors -- that
12  earnings may disappoint expectations.
13  Q.  This is on July 19?
14  A.  Yes, sir.
15  Q.  Let's go to slide 225.  Did you prepare your summary of the
16  market information there?
17  A.  Yes.  That's my summary on the left, and then on the right
18  it can be compared with the alleged tip information.
19  Q.  In your summary, you noted that it was trading at an
20  all-time high already, is that one of the things you noted
21  there?
22  A.  Yes, sir.  What I take away from that, and what these
23  analysts are cautioning about, is that the expectations are
24  high and the stock price is high, and that Google is going to
25  have trouble, or the concern is that Google's actual results,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

4872

14F8RAJ3                    Jarrell - direct
1   although good, will not be as high as the expectations,
2   therefore causing the stock price to drop.
3   Q.  Professor, in your opinion, based on the public information
4   that you just described and you have just gone through, is that
5   consistent with a reasonably sophisticated investor selling the
6   stock of Google during this period?
7   A.  Yes.  Or shorting it or selling it.  That type of analysis
8   would support that position, yes.
9   Q.  Even though there was negative information in the market
10  about Google, did the market fully anticipate what the price of
11  Google would be after the earnings announcement?
12  A.  No.  The market was surprised.
13  Q.  Let's look at slide 226.  Did you do a market model for
14  Google?
15  A.  Yes, sir, I did.
16  Q.  Can you tell us what the expected market return was and the
17  excess return attributable to how Google was doing?
18  A.  The market went down that day, so the expected return for
19  Google if it had no information would be minus 1.27 percent.
20  The actual return for Google on that day, the day of the
21  earnings report, was minus 5.19 percent.  So it went down more
22  than we thought it would go down by 3.29 percent.  So the
23  excess is minus 3.92 percent.
24  Q.  Looking at the next slide, was that level considered
25  statistically significant?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4873

14F8RAJ3                    Jarrell - direct

1   A.  Yes.  You see the T-statistic there, ignoring the minus
2   sign, is greater than 2.  So in my opinion, on this day, July
3   20, 2007, after the earnings announcement, Google's stock price
4   fell a statistically significant 3.9 percent.
5   Q.  Even though there was this negative information in the
6   market, the market did not fully anticipate the price Google
7   would trade at and it did go down even lower on that day?
8   A.  Yes.  The market consensus it turns out was still too
9   optimistic prior to the announcement so they had to correct.
10  Q.  Let's look at the next slide.  Did you compare the
11  frequency of Mr. Rajaratnam's trading in Google in the period
12  that the government is alleging compared to his trading for the
13  prior 12 months?
14  A.  Yes, sir.
15  Q.  Give us, if you can, the number of shares on the left-hand
16  side.
17  A.  12 months prior Mr. Rajaratnam traded 2,054,800 shares,
18  compared with the shares involved in the alleged insider
19  transaction of 348,170 shares.
20          And in value terms, the trading in value 12 months
21  prior to the alleged tip is almost a billion dollars, 979.6
22  million.  And the trading value of the transactions involved in
23  the alleged insider trades were $191.8 million.
24  Q.  So even before the period that the government is alleging,
25  Mr. Rajaratnam traded almost a billion dollars worth of Google

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14F8RAJ3                          Jarrell - direct
1    stock in the prior 12 months?
2    A.  Yes, sir.
3    Q.  That concludes my questions about Google.
4            Let me now ask you about Hilton.
5    A.  OK.
6    Q.  Can you summarize the allegation there?
7    A.  Yes, sir.  Hilton is a takeover case.  Hilton was acquired
8    in what is called a leveraged buyout by Blackstone, a private
9    equity company.  The takeover was announced on July 3, 2007.
10   That was half of a trading day because it preceded a holiday.
11   The takeover was announced after the close of trading at 1:00
12   on July 3, and the alleged tip came the day before on July 2,
13   2007.
14   Q.  Let's go to the next slide.  Did you review public
15   information in the financial press and analyst reports that
16   were relevant to the takeover of Hilton that ultimately was
17   announced on July 3?
18   A.  Yes, sir.  There were six stories in the press and many,
19   many analyst reports were publicly discussing Hilton's
20   prospects of being a target of a leveraged buyout over this
21   period.
22   Q.  Let's look at some of those stories that you found
23   beginning on slide 232.  What did you find back in February?
24   A.  Back in February, Bloomberg News was reporting about Hilton
25   LBO prospects saying, "The robust market for hotel acquisitions
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14F8RAJ3                    Jarrell - direct
 1  puts bond investors at risk if Hilton were to pursue a
 2  going-private transaction."
 3          The point here is that, as early as February, Hilton
 4  was being discussed as a potential target of a particular kind
 5  of transaction, a going-private or a leveraged buyout
 6  transaction.  That's a very specific kind of transaction.  It's
 7  not just a merger with another company, but it's a merger, a
 8  buyout by a private equity company that is using lots of debt.
 9  So it's a very specific kind of transaction, and it's already
10  being discussed as a potential target for that back in
11  February.
12  Q.  So the potential target that was being discussed here was
13  not a public company, but rather a private company that does
14  not sell shares on the stock market?
15  A.  Yes.  The buyer would be a private company, like Kohlberg
16  Kravis, KKR, which is big one here in New York.  These are big
17  companies and back in these days they were not publicly traded,
18  and they do very highly levered, they use a lot of debt when
19  they buy the company.
20  Q.  They borrow money to buy a company?
21  A.  They borrow -- 95 percent of the purchase price is debt.
22  Q.  So in February, you noted articles that there may be
23  prospects that Hilton would be a target?
24  A.  Yes.
25  Q.  Let's go to slide 233.  Did you identify more information
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

4876
14F8RAJ3                    Jarrell - direct
 1  suggesting that Hilton may be a target?
 2  A.  Yes.  JP Morgan in late February, "Potential LBO target,
 3  potentially attractive to private equity."
 4  Q.  Slide 234.
 5  A.  Again, continuing with this, Bear Stearns, another analyst,
 6  is discussing the likelihood that Hilton will be sold or
 7  bought.  They are saying here -- notice the stock price is 35
 8  or less.  The price that these people are projecting is a
 9  number like 40, 41, that's what I was seeing through this
10  period was 40, 41 was the projected price if there is an LBO.
11  Q.  So there were public reports as to not only the possibility
12  that Hilton might be bought or sold, but what that price might
13  be?
14  A.  Yes, sir.
15  Q.  Let's look at slide 235.  Did you find more reports?
16  A.  Yes.  Another analyst, Lehman Brothers, "Potential LBOs in
17  the lodging space."  Hilton is considered a lodging company.
18  Space means industry.  "Hilton has an LBO catalyst to support
19  its valuations."  What it's saying there is the stock price of
20  Hilton is already building in or discounting some prospect of
21  an LBO.
22  Q.  Let's look at slide 236.  What did you note there about
23  Hilton's prospects for being acquired?
24  A.  Here we go again.  This is interesting because Hilton had a
25  poison pill in their capital structure which would guard
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

4877

14F8RAJ3                    Jarrell - direct
 1  against hostile takeovers.  This poison pill expired, and
 2  Hilton let it expire, got rid of it.
 3  Q.  What is the significant of letting a poison pill expire?
 4  A.  That's consistent with the company saying, we don't mind
 5  being taken over, we would be happy to consider takeover
 6  offers.
 7  Q.  Is that a signal to the market when these poison pills
 8  expire --
 9  A.  It can be.  It depends on the circumstances, but it's
10  consistent with that in.
11  Q.  Let's look at the next slide 237.  What did you find in
12  April?
13  A.  Lehman Brothers is picking up on this elimination of the
14  poison pill.  "It's almost like Hilton is asking for it," says
15  Lehman Brothers.  They are saying what I was just saying.
16  "Continuing to have LBO rumors.  If someone is ever going to
17  take a run at these companies, now certainly seems like the
18  time."  These companies mean Hilton, Starwood, those are the
19  companies that are being discussed here.
20  Q.  Starwood is another big hotel chain?
21  A.  Yes.  It has the symbol HOT for some reason.
22  Q.  Let's look at slide 238.  What did you note there?
23  A.  Again, Bear Stearns in April, the same theme, they continue
24  to talk about these companies as potential LBO targets, private
25  equity being the type of a buyer.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

4878

14F8RAJ3                    Jarrell - direct

1   Q.  For both which two hotel chains?
2   A.  For both Hilton and HOT, which is Starwood.
3   Q.  Let's look at slide 239.  What did you note there?
4   A.  Morgan Stanley is giving a little finer point.  They are
5   saying Hilton is a great leveraged buyout candidate because
6   Hilton has little leverage.  Leverage refers to debt.  So
7   Hilton has not much debt on its balance sheet.  That's good for
8   a private equity firm that wants to buy the company.  They are
9   going to use a lot of debt to buy the company.  They want to
10  find a company that doesn't have a lot of debt already.  So
11  that's good for LBO.  JP Morgan, "Private equity eyeballing
12  public lodging companies."
13  Q.  Let's look at slide 240.  What did Citigroup note in May?
14  A.  They are saying that, "We believe a number of investors own
15  Hilton based strictly on the prospect of a near term take
16  private transaction."  Take private is another word for
17  leveraged buyout being purchased by a private equity company
18  that will take them private.
19  Q.  Let's look at slide 241.  What did Lehman Brothers note on
20  May 31?
21  A.  Continuing to talk about Hilton and Starwood as potential
22  LBO candidates.  "If Hilton or Starwood were to be LBO'd, you
23  are talking about major premiums to where the stocks are
24  trading now."
25  Q.  Let's look at slide 242.  What did Merrill Lynch say?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14F8RAJ3                          Jarrell - direct
 1   A.  Merrill Lynch is again pointing to the private equity
 2   interest will continue.  "Demand is still far outstripping
 3   supply."  Private equity during these days had a lot of money
 4   to invest and they were looking for targets.  So that's a
 5   demand, that's the money that they have to invest.  Supply
 6   would be, well, how many good investments are there?  And they
 7   say, "PE love good brands."
 8   Q.  PE is private equity?
 9   A.  Yes.  So private equity buyers love good brands, they like
10   to buy companies that have good brands, and Hilton is a good
11   brand.
12   Q.  Hilton has a famous brand name?
13   A.  Yes, sir.
14   Q.  Let's look at slide 243.  What did you note there?
15   A.  Continuing with the theme.  Jefferies & Company is saying,
16   "Hilton is better positioned in the industry, yet continues to
17   trade at a significant discount.  Should trade at a premium."
18          So Jefferies is recommending purchasing the stock
19   because its price does not reflect this possibility of a
20   takeover, and if you buy it at this price and there is a
21   takeover, you will do well.
22   Q.  Look at slide 244.  What did you note there about option
23   activity and what is the significance of option activity?
24   A.  This is what I was talking about earlier about market
25   anticipation.  And one of the things that is a sign of market

4880

14F8RAJ3                     Jarrell - direct
 1  anticipation, as well as a factor that causes people to
 2  anticipate, is the observable trading in call options.  Bear
 3  Stearns alerted Galleon that there is a large trade in call
 4  options on Hilton.
 5  Q.  What are call options?
 6  A.  Call options are securities that allow you to take a long
 7  position in a stock, and they enable you to have a very, very
 8  large exposure for a low investment.
 9  Q.  And a particular kind of option called a call option means
10  what?
11  A.  A call option is you buy it, and it gives you the right to
12  buy at a particular price.  So you buy a call option, which
13  gives you the right to buy a company in the future at a
14  particular price.  If the stock price of the company goes up,
15  and I have the right to buy it at 10 bucks, and it goes up to
16  20, then that right becomes very valuable because I can buy it
17  at 10 and sell it at 20.
18  Q.  So a call option is an indication you're expecting the
19  stock price to go up?
20  A.  Yes.  And it's a highly levered type of transaction, and
21  it's a type that favored by sophisticated investors who are
22  trying to make big, big gambles or big bets one way or the
23  other.  So that's why Bear Stearns alerted Galleon, saying,
24  look, there is big trade in a call option, that could be
25  telling us something, that could be a clue.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

4881

14F8RAJ3                    Jarrell - direct
1   Q.  That there was a trade in Hilton call options?
2   A.  Yes.
3   Q.  That was four days before the alleged tip?
4   A.  Yes, sir.
5   Q.  Let's look at slide 245.  What did you note there from
6   Jefferies & Company?
7   A.  Jefferies & Company named Hilton their pick of the week.
8   That's saying this is a good company to buy.
9   Q.  Let's look at slide 246.  There you looked at the intraday
10  stock prices on July 3, the day the acquisition was announced?
11  A.  Yes.
12  Q.  Can you tell us what you noted during the course of that
13  day, July 3?
14              THE COURT:  Mr. Lynam, we are not going to get through
15  Hilton now before lunch, so maybe this would be a good place to
16  stop and pick up with Hilton after lunch.
17              We will reassemble at 2:00.
18              (Jury exits courtroom)
19              THE COURT:  2:00, counsel.
20              (Luncheon recess)
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

4882

14FFRAJ3                    Jarrell - direct
 1                    AFTERNOON SESSION
 2                      (2:05 p.m.)
 3              THE COURT:  Mr. Lynam.
 4              MR. LYNAM:  May I proceed, your Honor?
 5              THE COURT:  Yes, please.
 6   BY MR. LYNAM:
 7   Q.  Good afternoon, Professor Jarrell.
 8   A.  Good afternoon.
 9   Q.  This afternoon we were looking at Hilton and we were up to
10   slide 246, I believe.  Could you put that up on the screen?
11   Could you tell the ladies and gentlemen of the jury why you
12   analyzed the intra-day stock prices on Hilton just on the one
13   day July 3, 2007, the day of the announcement?
14   A.  Yes, sir.  This is my market anticipation analysis.  This
15   July 3 starts with trading at 9:30 in the morning and the
16   trading on July 3 ended at 1:00, because it was a shortened
17   session due to a holiday.  You see the stock price, you can see
18   with the blue line that's trade by trade by trade throughout
19   the day and you can see that it's steadily rising throughout
20   the day.
21   Q.  Does this particular graph of the increase of stock price
22   in your opinion reflect market anticipation for this
23   announcement regarding Hilton?
24   A.  Yes, it does.  Consistent with the news that's being
25   disclosed there.

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

4883

14FFRAJ3                          Jarrell - direct

1   Q.  Excuse me.
2   A.  Yes.
3   Q.  We have a little disturbance.
4           Could you just summarize what points you noticed on
5   market anticipation that day?
6   A.  Well, you see the stock price is rising steadily throughout
7   this morning's session and Lehman Brothers is talking in the
8   morning at 10:00 about Hilton's LBO candidacy.  Now, you see
9   the value coming in at the mid-40's.  Prior to this, there has
10  been notations in the public record and the number was like 41
11  and this is a little higher, this is 45, mid-40's.
12          11:15, Bear Stearns is again talking about option
13  volume and as we'll see in a minute in another slide option
14  volume is very, very high in the morning session.
15          And then at 12:03, Wachovia reports this chatter
16  Blackstone -- Blackstone is the actual buyer of Hilton, and the
17  statement here, chatter, Blackstone looking at Hilton stock
18  rippin' -- that's trader speak -- increasing on heavy volume.
19  Q.  Your horizontal line on the bottom, is that the clock time
20  during the day?
21  A.  Yes, sir.  That's the clock time.  So 9:30 in the morning
22  on the left all the way up to 1:00 p.m., so that's the stock
23  price throughout the trading day.
24  Q.  Let's look at the next slide.  Is that your summary of
25  market information that you found relative to Hilton and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

14FFRAJ3                    Jarrell - direct
1   whether it was likely to be acquired?
2   A.  Yes.  As we showed it prior to lunch, there were many
3   stories over that period of time over the public information
4   that named Hilton and specifically named them as being the
5   target of an LBO transaction, and done by a private equity
6   buyer, and all of that turned out to be true.
7   Q.  Professor, in your opinion, is the public information we've
8   seen consistent with a reasonably sophisticated investor buying
9   Hilton stock during this period?
10  A.  Yes, in anticipation of an LBO at a premium price, yes.
11  Q.  Let's take a look at slide 248.  Did you prepare a market
12  model for Hilton?
13  A.  Yes, sir.
14  Q.  Tell us again what you found there.
15  A.  The market went up on this day, so the expected return for
16  Hilton was positive 3.84 percent, so we would expect a positive
17  return even if there was no news.  The actual return on this
18  day is 25.91 percent, reflecting the announcement of the
19  takeover, so the excess return is the difference between those
20  two figures, which is 22.07 percent.
21  Q.  All right, let's look at the next slide.  Did you find
22  whether the stock price movement after the announcement was
23  statistically significant?
24  A.  Yes, sir.  You see the T statistic of 19.82 is greater than
25  2, so this statistic, this is a statistically significant
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

14FFRAJ3                    Jarrell - direct
1   increase in stock price on the announcement day.  This is
2   July 5, 2007.
3   Q.  So even though there was market anticipation of an
4   acquisition, the market did not fully anticipate the actual
5   price that the acquisition would go through at?
6           MR. STREETER:  Object to the leading, your Honor.
7           THE COURT:  Rephrase the question.
8           MR. LYNAM:  I'll rephrase.
9   Q.  Professor Jarrell, did you find that there was market
10  anticipation of an acquisition?
11  A.  As we saw from the news stories, there was quite a bit of
12  information in the marketplace, expectation that Hilton was a
13  good candidate for a leveraged buyout by private equity.  So I
14  think that the market anticipated to some degree the fact that
15  Hilton would be a candidate of an LBO.  They couldn't be sure,
16  but there seemed to be quite a bit of anticipation of the fact
17  of a transaction in the near future.
18          What was not anticipated, I don't think, was the
19  actual deal price.  This was a very rich deal.  It was $47.50,
20  which constituted a premium that was very high compared to
21  normal, and as we saw, the market was talking about numbers
22  that were more like 41.  So I think the reason, the main reason
23  why you see this big stock price effect on the day was because
24  of the market learning about the high price as opposed to the
25  fact of the acquisition.  That's my opinion.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14FFRAJ3                      Jarrell - direct
1   Q.  And the acquisition was actually announced, you said, at
2   $47?
3   A.  $47.50 was the actual deal price.
4   Q.  So the market began bidding the price of Hilton shares up
5   above $45 by the end of the day?
6   A.  Yes, sir.
7   Q.  Now, let's take a look at slide 250.  Did you analyze the
8   trading volume in Hilton shares on July 3 -- and in the days
9   leading up to July 3?
10  A.  Yes, sir.  That's what that chart shows.  The trading
11  volume on the New York Stock Exchange in Hilton for the four
12  days, 6/28, 6/29, 7/2 and July 3, and you see that the trading
13  volume is 3.1 million, 3.6 million.  On July 7 it's
14  3.8 million.  And then on July 3, even though it's only a half
15  day session, it ends at 1:00, you see a big spike in volume
16  7-1/2 million shares traded in that shortened session.  That
17  was the day when we saw that stock price rising on the
18  intra-day chart, steadily rising throughout the day,
19  Blackstone.
20  Q.  During the course of July 3?
21  A.  Yes, sir.
22  Q.  Could you also look at the increase in option activity
23  associated with the Hilton acquisition?
24  A.  Yes, sir.
25  Q.  Let's go to the next slide.  And again, what does option
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

4887
14FFRAJ3                    Jarrell - direct
1  activity indicate to a sophisticated investor?
2  A.  Well, as we discussed earlier, option activity can indicate
3  that sophisticated investors have information that anticipates
4  transactions.
5  Q.  And what did you find with regard to the increase in
6  Hilton's option activity on July 2 and then in comparison to
7  July 3?
8  A.  Well, if I just go through the whole chart.
9  Q.  Sure.
10  A.  You have every day's call option volume throughout the
11  period from June 15 through and including July 3.  And the
12  black dotted line there is the average over that period and you
13  can see some days are higher and some days are lower.
14          First thing I'll note is on June 27, remember, we had
15  a story earlier that we discussed about Bear Stearns alerting
16  Galleon that a large trade in call options had turned some
17  heads.  That's that day.  So you see there evidence of the
18  large call option volume on that day consistent with that story
19  that we noted.
20          The other thing I want to notice is the huge increase
21  in option activity prior to the announcement on July 3rd, 2007.
22  Bloomberg News reported that Hilton's option volume and
23  volatility were elevated and indeed you can see visually that
24  it's quite elevated.
25  Q.  And is that a signal to the market that a significant
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

4888

14FFRAJ3                    Jarrell - direct

 1  transaction affecting Hilton is underway or about to be
 2  announced?
 3  A.  The increase in stock price over July 3, steady increase in
 4  stock price, the increase in volume on the New York Stock
 5  Exchange, the very heavy option volume, together with the
 6  comments that we saw are all indications of market anticipation
 7  or leakage of information, that news of the deal is in the
 8  marketplace, at least to some degree.
 9  Q.  All right.  Now, Professor Jarrell, most of the stocks that
10  we covered so far have been technology stocks.  Hilton is a
11  hotel company.  Did you review Mr. Rajaratnam's trades in
12  non-technology stocks to see if this was anything unusual for
13  him to be purchasing a non-technology stock?
14  A.  Yes, I did.
15  Q.  Let's take a look at slide 252.  Would you tell us what you
16  found when you did your review?
17  A.  Well, I went to the records and computed, first I divided
18  all of the stocks that he traded in into non-tech stocks versus
19  tech stocks, and that was based on SIC codes, which are
20  standard industrial classification codes, as well as the
21  descriptions of the companies themselves.  Once I divided them
22  up into tech and non-tech stock, I then computed the
23  transaction value of trading in the tech versus the non-tech
24  and these are the results by year.
25  Q.  And what did you conclude each year?

14FFRAJ3                        Jarrell - direct
1    A.  Well, the year by year differs, but on average about
2    20 percent of the trading volume is in non-tech, is in non-tech
3    stocks and 80 percent of the trading volume is in tech stocks.
4    Q.  And these are trades that were made by Mr. Rajaratnam
5    during those years?
6    A.  Yes, sir.  Yes, sir.  Core tech funds managed by Mr.
7    Rajaratnam, so these are the, this is the actual data.  So if
8    one wants to know how rare or how common it is, I would simply
9    note that 20 percent of the transaction value of Mr. Rajaratnam
10   are in stocks that I think it's fair to say are non-tech
11   stocks, such as Hilton.
12   Q.  And how many different companies did he have stock
13   transactions in during that period that were not technology
14   companies?
15   A.  246.  Over this five-year period.
16   Q.  Now, let's go two slides ahead and then we'll go back to
17   the one in between.  Did you look at the frequency of
18   Mr. Rajaratnam's trading in Hilton before allegedly receiving
19   the government's allegation about receiving inside information
20   on Hilton?
21   A.  Yes.
22   Q.  Did you find any prior trading in Hilton in the prior 12
23   months before this particular transaction?
24   A.  No.
25   Q.  All right.  Now, let's go back to the slide -- and 254, is
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

4890
14FFRAJ3                    Jarrell - direct
1   that what's depicted there, that there was no prior trading in
2   Hilton before?
3   A.  Yes.  This is a one-time purchase and sale.
4   Q.  Let's go back to slide 253.  Did you study the frequency of
5   Mr. Rajaratnam's trading where he only was -- he had only
6   engaged in a transaction in a stock one time?
7   A.  Yes.
8   Q.  And what did you find when you did that review?
9   A.  That that occurred with respect over the five-year period
10  2005 to 2009, there were 213 other stocks that were subject to
11  one-time only investments by Mr. Rajaratnam in other than
12  Hilton.
13  Q.  And those investments could be either a buy or a short with
14  no additional investment activity in any other days?
15  A.  Yes, sir.
16  Q.  So Hilton was not the only time he purchased a stock just
17  one time?
18  A.  No, sir, not over this period.  It happened 213 times.
19  Q.  All right.  Let's move from Hilton now to Polycom.  Slide
20  255, please.  And let's go to the next slide and tell us what
21  the allegation is here?
22  A.  The earnings announcement that we're discussing was
23  announced on 1/25, January 25, 2006, and the allegation is that
24  the tip was received January 1, 2006 concerning Polycom's
25  financial results and guidance.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

5155

14K8RAJ1

1 UNITED STATES DISTRICT COURT
1 SOUTHERN DISTRICT OF NEW YORK
2 ------------------------------x
2
3 UNITED STATES OF AMERICA,
3
4                    v.                    09 CR 1184 (RJH)
4
5 RAJ RAJARATNAM,
5
6                    Defendant.
6
7 ------------------------------x
7
8                                          New York, N.Y.
8                                          April 20, 2011
9                                          9:35 a.m.
9

10
10 Before:
11
11                    HON. RICHARD J. HOLWELL
12
12                                          District Judge
13
13
14                         APPEARANCES
14
15 PREET BHARARA
15      United States Attorney for the
16      Southern District of New York
16 JONATHAN R. STREETER
17 REED M. BRODSKY
17 ANDREW MICHAELSON
18      Assistant United States Attorneys
18
19 AKIN GUMP STRAUSS HAUER & FELD LLP
19      Attorneys for Defendant
20 JOHN M. DOWD
20 TERENCE J. LYNAM
21 MICHAEL STARR
22
22 ALSO PRESENT:  B.J. KANG, FBI
23
24
25

5305
14KFRAJ4                    Summation - Mr. Brodsky
1   the way to here?  Of course.  You know that.  You make some
2   easy money.  Let's put up the stock chart for Akamai.  Would a
3   reasonable investor want to know over here that Akamai is going
4   to guide down and it could go to 25, according to an insider?
5   Of course, because if you knew that, you'd make a lot of money
6   over here.
7               Let's put up Government Exhibit 118 for Intel, in
8   April of 2007.  Would a reasonable investor want to know from
9   Mr. Goel around this time that earnings were good, that
10  earnings were really bad and then good as the stock price here
11  rises, right before the stock price rises?  Of course a
12  reasonable investor would want to know that from an insider.
13              And let's put up the Clearwire chart, Government
14  Exhibit 117.  Would a reasonable investor want to know right
15  over here, which is when the defendant received the tips on
16  Clearwire from Goel, right here at the lower point of this
17  spike at the very bottom, would a reasonable investor want to
18  know that information so they could make a trade and look what
19  happens to the stock?  It goes up.  Of course.  This is not
20  complicated.  It's simple.
21              Now, with respect to the substantive counts.  We also
22  expect that you'll have to find that the -- I expect Judge
23  Holwell will instruct you about finding the insider got a
24  benefit.  Now, with respect to Intel and Clearwire, the
25  substantive counts, Goel got the benefits, right, and
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

5306
14KFRAJ4                 Summation - Mr. Brodsky
 1    Rajaratnam knows Goel is getting the benefits because
 2    Rajaratnam is getting him the benefits, over $700,000 in the
 3    brokerage account and Mr. Goel is receiving some of those
 4    benefits from Mr. Rajaratnam.  For People Support it's the
 5    defendant himself who is breaching the duty and he's the one
 6    giving Mr. Goel the benefit.  For Akamai, you know that Kieran
 7    Taylor was breaching the duty and giving the information to
 8    Ms. Chiesi, that's that call where Ms. Chiesi says Akamai is
 9    going to guide down and you know from that call, you can go
10    back to and listen to it, and some of the other calls,
11    Mr. Rajaratnam knows, he's friends with Ms. Taylor and he knows
12    the relationship, he knows Taylor is giving those tips to
13    Chiesi because of that friendship.
14             Now, with regard to substantive counts, let's talk
15    about public and non-public.  You also have to find with
16    respect to the substantive counts, not the conspiracy but the
17    substantive counts, that the information was not public.  I
18    expect you'll hear from Judge Holwell and he'll instruct you
19    that the information isn't public simply because it appears in
20    a newspaper.  If information is more specific and more private
21    than what appears in a newspaper, then it's not public, and if
22    the information is not generally available and the company
23    would not make it available in response to a request, it's not
24    public.  Now, I think it should be clear from the evidence that
25    the information the defendant received relating to each of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

14KFRAJ4                    Summation - Mr. Brodsky

 1   securities wasn't public.  Merely because the defendant's paid
 2   expert found news articles from the Inquirer and Tech Crunch
 3   and some rumor attributed to some anonymous source and guessing
 4   about some possible deal or earnings doesn't make it public.
 5   If the information's more reliable, more specific, more
 6   accurate than what you can get from some analyst report that
 7   are all conflicting, then the insider is giving you information
 8   that's not public.
 9           Now, the defense through Mr. Jarrell's testimony and
10   Mr. Schutte's testimony it seems to be suggesting that every
11   illegal tip that Mr. Rajaratnam got, every single one was
12   already public.  That doesn't make any sense.  It's wrong to
13   assume that just because there's a single news story out there
14   from Bloomberg quoting an anonymous source from Focus Magazine,
15   which is quoting somebody else who's anonymous, has speculated
16   about a possible deal or quarterly earnings, that that makes it
17   public.  If that were correct and there was some rumor out
18   there that Pepsi was going to take over Coca-Cola, every hedge
19   fund could go pay an insider at Pepsi, or an insider at
20   Coca-Cola, pay them a lot of money just because there was a
21   rumor out there, get the actual, real information, trade based
22   on that information, make a ton of money at the expense of all
23   ordinary investors and that's not the law.
24           Now, the professor didn't know the allegations well.
25   For example, on Clearwire, he didn't know that Goel was getting

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

5324

14K8RAJ5                    Summation - Mr. Dowd
1   show him he is wrong.
2           You have seen in this case what a rough business this
3   can be.  You saw how the prosecutors pressured Adam Smith, how
4   they threatened to break up his family, to the point that Smith
5   confessed to crimes he tells his friends he didn't commit.
6           The government called a series of witnesses just like
7   Adam Smith, witnesses who have been coerced to testify.  You
8   saw Mr. Schutte and you can evaluate him for yourself.  I
9   respectfully suggest to you that he was a straightforward and
10  honest man.  You saw how he called it down the middle
11  throughout his testimony, direct or cross.  He never changed on
12  direct and cross.
13          You compare Mr. Schutte to the government's witnesses.
14  How did Mr. Schutte stack up to Anil Kumar or Rajiv Goel or
15  Adam Smith?  There is no comparison.  That's why the government
16  had to smear him by suggesting there was something improper
17  about Raj's investment in Mr. Schutte's fund.  That's absurd
18  and it should offend you too.
19          Raj hired Rick Schutte in 2004 because he was the best
20  in the business.  Raj invested with Rick Schutte in 2010
21  because he still is the best in the business.  That's all there
22  is to it.  Nothing changed and there was nothing improper about
23  that investment.  And, by the way, none of that has anything to
24  do with Mr. Schutte's testimony before you.  None of that has
25  anything to do with the hundreds of Galleon documents Mr.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

5325

14K8RAJ5                    Summation - Mr. Dowd

1   Schutte showed you, documents the government admits are
2   authentic.
3           I also told you the government was going to rely on
4   snippets of recorded conversations taken out of context, and
5   that's exactly what they did.  But we have shown you the
6   factual context that you need to evaluate all the tapes the
7   government played.  We have shown you the public information
8   and the Galleon analysis that Raj relied on when he made the
9   trades in issue in this case.  We have shown you times when Raj
10  had taken a position before the recorded conversation.  We have
11  shown you other times when Raj didn't trade at all, and when he
12  traded in the opposite direction of what was communicated on
13  the calls.
14          I told you the government was going to ignore what
15  things are like in the real world.  I told you the government
16  was going to rely on fictions and plights of imagination to
17  make its case, and that is exactly what it has done.
18          The government's case rests on the fictional idea that
19  information can't ever become public until a company issues a
20  press release about it.  But we have shown you that in the real
21  world, information can become public in all sorts of ways,
22  whether the company wants it or not and whether the company has
23  made a formal announcement or not.  And the government can't
24  stand it.  In the real world, there are billions of people
25  talking to one another.  This is the media age, the age of the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

14K8RAJ5                    Summation - Mr. Dowd

1   Internet, blogs and e-mail and instant communication.  In the
2   real world, public companies are operating and functioning and
3   communicating in public, with the press, with investors, with
4   competitors, with customers, with distributors and with
5   government agencies.  But in the government's imaginary world,
6   the only way to find out what is happening in Intel is to wait
7   for Intel to hold a press conference.  That's ridiculous.  It's
8   a fiction and you cannot convict Raj based on a fiction.
9           The government tries to say that all this public
10  information we have shown you is just speculation, like it is
11  worthless, like it doesn't count.  But let's get real about
12  something.  If the information is correct, then it's not
13  speculation and it's not rumor, it's news.  And that's how
14  things become public in the real world.
15          Remember, Raj's business is all about predicting the
16  future and anticipating the market.  It's all about gathering
17  all information available, analyzing it, and placing a bet on
18  where a stock is going to go.  It's about distinguishing
19  between accurate predictions and inaccurate predictions.
20          The government's case also rests on the fictional idea
21  that Raj is supposed to know or is to assume that the people he
22  is talking to are giving out information they are not supposed
23  to give out, but the evidence shows that's not the case either.
24  In the real world, it is Raj's job to ask questions and gather
25  information.  That's his duty to his investors, and Raj is
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

14K8RAJ5                    Summation - Mr. Dowd
 1   company representatives and investors, such as on analyst days
 2   or during one-on-one meetings.  We showed you an example of
 3   that with AMD's acquisition of ATI, where AMD's CEO, Hector
 4   Ruiz, goes out talking to analysts about the deal as part of
 5   regular biz before either company made an official
 6   announcement.  We showed you another example of that with
 7   Intel's investment in Clearwire, where Intel was touting the
 8   plan at its analyst day conference weeks before the
 9   announcement.
10            It can even become public through rumors and chatter
11   and speculation in the marketplace, which results in the
12   information becoming impounded into the stock price.  That's
13   something our expert witness, Professor Jarrell, talked to you
14   about.  And that's something we showed you with AMD's
15   asset-light restructuring, which was so widely expected that by
16   the time it was officially announced in October 2008, AMD's
17   stock price didn't react at all and continued its downward
18   slide for the rest of the year.  That's what impounded means.
19   The information was already reflected in the stock price and
20   the market didn't care when the company finally issued its
21   press release.
22            We have shown you that information at issue in this
23   case became public in all these different lights, in newspapers
24   and trade publications, published analyst reports, on the
25   Internet, through company communications with the market on

5336

14K8RAJ5                    Summation - Mr. Dowd

1    analyst days, one-on-one meetings with analysts, through
2    chatter and speculation of the marketplace.  It was never our
3    burden to prove this information was public, but we have proved
4    it.  And the government hasn't even tried to prove that it
5    wasn't public.  For that reason alone you must acquit.
6            And keep in mind all the instances where the
7    government hasn't even proved to you what the substance of the
8    alleged tip was.  All the instances where the government
9    witness testified, I told Raj something, but I don't remember
10   what it was.  Because if you don't know exactly what was
11   supposed to have been said to Raj, how can you evaluate whether
12   the information was public or not?  You can't.  The government
13   hasn't proven its case.
14           The government must also establish the other elements
15   of insider trading beyond a reasonable doubt.  It must prove
16   that the information was material.  Material simply means very
17   important or very significant.  But as you assess whether a
18   particular piece of information was important or significant,
19   make sure you keep in mind all of the other information that
20   was available at the time, because a particular piece of
21   information might not be material if the same information or a
22   lot of similar information was already available.
23           For example, let's say somebody tells you that the
24   parties to a deal have shaken hands.  That information might be
25   material if it was the only piece of information out there.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14K8RAJ5                    Summation - Mr. Dowd

 1   But it's not material if it's already public and you already
 2   know that the parties have said they are implementing the deal.
 3   That's what happened with the AMD asset-light deal.
 4            You also need to ask yourself if the information is
 5   specific enough to be material, because as Judge Holwell will
 6   instruct you, information isn't material unless it's specific
 7   enough to tell you something meaningful about the stock.  For
 8   example, if someone tells you that a company is going to
 9   receive a term sheet in the next few days, that's not material.
10   Because if you don't know what the terms are, then the term
11   sheet isn't material.  Or someone tells you the company is
12   losing two bucks a share, earnings per share, it tells you in
13   the middle of the quarter, a month before the quarter closes,
14   and two months before the quarterly earnings are announced,
15   that information is not material either because it's premature.
16   It's too early to tell what the earnings are going to be.
17            And ask yourself if the government has even put on any
18   evidence at all about what the alleged tip was, if you know the
19   substance of the information communicated to Raj.  Because if
20   you don't, you can't assess whether the information was
21   material and the government hasn't proven its case.
22            So ask yourself those things when you assess the
23   information in this case.  Was it significant in light of the
24   total mix of information out there?  Was it specific enough to
25   be material?  Has the government proven it was material beyond

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

14K8RAJ5                        Summation - Mr. Dowd
1    a reasonable doubt?
2            Another element that the government must prove beyond
3    a reasonable doubt is the alleged insider trading has breached
4    a fiduciary duty by disclosing the information for a personal
5    benefit.  It's not enough for the government to show that
6    information came from an insider.  It's not enough for the
7    government to show the company considered the information
8    confidential.  The government must also prove that the insider
9    personally received something of value for the information.
10   And it's important that you test the government's evidence
11   carefully on this element because the government hasn't even
12   tried to show that many of the insiders in this case acted for
13   personal gain or that they received anything of value in return
14   for the information that they disclosed.
15           For example, the government hasn't shown or even tried
16   to show that Rajat Gupta, Kamal Ahmed or Kieran Taylor received
17   anything of value in return for their alleged tips.  Even when
18   the alleged insider did receive something of value, at some
19   point in time the government hasn't shown that they received a
20   thing of value in return for the alleged tips.
21           For example, the government claims Anil Kumar provided
22   Mr. Rajaratnam with tips about business objects of AMD and eBay
23   and Spansion in 2007 and 2008.  But they have presented no
24   evidence that Mr. Kumar received anything at all from these
25   supposed tips, and Kumar admitted that he received nothing.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

5339

14K8RAJ5                    Summation - Mr. Dowd

1          Rajiv Goel admitted on the stand that there was no
2  nexus between the money he received from Raj and the
3  information he supposedly provided.
4          The government must also prove beyond a reasonable
5  doubt that Raj traded on the basis of material nonpublic
6  information.  So it's important that you ask yourself whether
7  the government has proven beyond a reasonable doubt that Raj
8  traded on the basis of the alleged tips and not based on other
9  information.  And the evidence shows that Mr. Rajaratnam traded
10  on the basis of public information, Galleon research, not on
11  the basis of any of these alleged tips.  How do you know for
12  sure? For instance, you could tell that Raj did not trade on
13  the basis of a supposed tip if he had already taken a position
14  before receiving the tip.  Like with Akamai, Polycom, Goldman
15  Sachs, AMD, where Raj had already taken his position in the
16  stock before the alleged tips.
17          You also have to consider all of the other information
18  Raj had when he made a trade.  The government has to prove
19  beyond a reasonable doubt that Raj did not rely on that
20  information.  He relied on the alleged tip instead.
21          For example, on Google, the government has to prove
22  beyond a reasonable doubt that Raj did not trade on the basis
23  of Steve Granoff's analysis setting a target price for the
24  stock.
25          On Goldman Sachs, the government has to prove that Raj

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

5340
14K8RAJ5                    Summation - Mr. Dowd
1   did not trade on the basis of the analysis of his legislative
2   consultant who was reporting on the progress of the TARP
3   legislation.
4           Finally, the government must prove beyond a reasonable
5   doubt that Raj acted knowingly and willfully.  And that means
6   the government must prove beyond a reasonable doubt that Raj
7   knew every one of the elements I just went through at the time
8   he placed his trade, and he acted with the intent to commit the
9   crime of insider trading.
10          As to the conspiracy counts, the key element the
11  government must prove is the agreement to commit the crime of
12  insider trading.  If you find that Raj and his alleged
13  co-conspirator did not have an agreement to commit insider
14  trading, then you must acquit.  For example, it's not enough
15  for you to find that Raj had an agreement with someone to seek
16  out information and then trade stock based on that information.
17  That's not the crime that Raj is charged with.  That's not a
18  crime at all.  It is legal to seek out information and trade
19  stock based on it.  That's Raj's job.  To convict you must find
20  he actually agreed with someone else to engage in the crime of
21  insider trading.
22          That's why all the elements of the insider trading
23  counts are also relevant to your consideration of the
24  conspiracy counts as well.  Because if Raj didn't trade the
25  stock, it shows there was no conspiracy to engage in insider
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

5367

14LFRAJ1

1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   UNITED STATES OF AMERICA,
3
4                   v.                          09 CR 1184 (RJH)
4
5   RAJ RAJARATNAM,
5
6                   Defendant.
6
7   ------------------------------x
7
8                                              New York, N.Y.
8                                              April 21, 2011
9                                              9:45 a.m.
9
10
10  Before:
11
11                      HON. RICHARD J. HOLWELL
12
12                                              District Judge
13
13
14                         APPEARANCES
14
15  PREET BHARARA
15       United States Attorney for the
16       Southern District of New York
16  JONATHAN R. STREETER
17  REED M. BRODSKY
17  ANDREW MICHAELSON
18       Assistant United States Attorneys
18
19  AKIN GUMP STRAUSS HAUER & FELD LLP
19       Attorneys for Defendant
20  JOHN M. DOWD
20  TERENCE J. LYNAM
21  MICHAEL STARR
22
23  ALSO PRESENT:  B.J. KANG, FBI
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

14L8RAJ4                    Summation - Mr. Dowd

1    all kinds of inside information all the time, this one call was
2    all they can come up with.  They want you to think this was
3    some kind of hot tip, but obviously Raj didn't think so.  Smith
4    told him about the bake-off.  Raj asked about fundamentals.  Is
5    it liquid?  Smith told him that the stock looked very good on
6    fundamentals, it was cheap and low risk.  It was a good buy on
7    the fundamentals and that's why Raj bought it.
8            It wasn't a hot tip.  It was at least a month old by
9    the time Smith heard about it.  Remember the bake-off that
10   Morgan Stanley didn't win had occurred around the end of March
11   and beginning of April, a full month before this call.  And
12   Morgan Stanley wasn't involved after that.  The only
13   information it had received was preliminary and incomplete.
14   Morgan Stanley was missing large chunks of information.  That's
15   what they said in the documents that we showed Smith.
16           Smith had no idea what had happened after the bake-off
17   and he didn't tell Raj what had happened during the month.  He
18   admitted that on cross.  Smith didn't know whether the deal was
19   going forward or whether it had fallen apart.  And it did fall
20   apart, it never happened.  Whatever it was they baked in April,
21   it was stale by May.  That's why this so-called tip isn't
22   material.  It's about the most preliminary step in a potential
23   deal, something so preliminary that the deal itself isn't firm
24   yet and can still fall apart, just as it did in this case.
25           Finally, remember all of these Smith stocks --
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

14L8RAJ4                    Summation - Mr. Dowd

1  Intersil, ICST and Vishay -- that the government has offered no
2  evidence at all of any benefit to Kamal Ahmed.  That's a
3  necessary element of insider trading.  In the absence of any
4  evidence on it, it shows there was no insider trading and no
5  agreement to commit insider trading, and that's why you must
6  acquit.
7        Roomy Khan.  The government also alleges that Raj
8  conspired with Roomy Khan to obtain material nonpublic
9  information about Google, Hilton and Polycom.  But you never
10 heard from Roomy Khan.  The government has the burden of
11 proving beyond a reasonable doubt that Roomy Khan and Raj
12 agreed with each other to commit insider trading.  But all you
13 saw was a photo of Roomy Khan.  You never heard from her.  The
14 government, which has the burden of proof, never called Khan.
15       Khan wasn't the only person missing.  You never heard
16 from any of Khan's supposed inside sources here.  You never
17 heard from Shammara Hussain, Khan's supposed source at Google.
18 You never heard from Deep Shah, Khan's supposed source on
19 Hilton.  And you never heard from Sunil Bhalla, Khan's supposed
20 source at Polycom.  The government didn't call them.  You have
21 no idea what any of these people said to Roomy because the
22 government presented no evidence of them.  You have no idea
23 whether these people actually spoke to Roomy Khan, when, what
24 they talked about, because the government presented no evidence
25 of that either.

5477

14L8RAJ4                    Summation - Mr. Dowd

1            Let that sink in for a minute.  This is supposedly an
2   insider trading conspiracy, but you haven't heard from any of
3   the insiders or any of the co-conspirators.  And there are no
4   recorded phone calls.  The government just showed you charts of
5   telephone records.  You saw that some of those were a minute or
6   less, and they may not have even connected.  You don't know who
7   was on the calls or what they said to each other.
8            The government also put on some representatives from
9   the companies to talk about what was going on inside the
10  companies at the time.  But the government provided you with
11  absolutely no evidence that any of the information was ever
12  passed to Raj.  And you can't evaluate whether that information
13  was material or nonpublic because you don't even know what it
14  was.  You can only make assumptions and you can't convict Raj
15  based on assumptions.  The government hasn't proven its case.
16  They haven't even come close.
17            Let's talk about Google.  The government alleges that
18  Raj sold and shorted Google in July 2007 after a call from
19  Roomy Khan.  What you know from the evidence is that Market
20  Street Partners worked for Google and helped with its earnings
21  announcements, that Shammara Hussain worked at Market Street
22  Partners, that market Street was privy to the fact that Google
23  was going to miss its earnings when it announced its results on
24  July 19, 2007.
25            But then the government asked you to just take a leap
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

5478

14L8RAJ4                    Summation - Mr. Dowd

1   of faith here.  It showed you a chart, Government Exhibit 57.
2   They showed you this chart showing that Shammara Hussain and
3   Roomy Khan talked 150 times from January 2007 through July
4   2007.  So what?  JoAnn Horne from Market Street testified that
5   Hussain didn't even begin working there until May 2007.  So all
6   the calls from January to May weren't even when she was working
7   there.
8           And the government isn't even contending that Shammara
9   Hussain had information about what Google would announce on
10  July 18 until after the quarter closed on June 30.  Remember,
11  JoAnn Horne, the witness from Market Street, also told you that
12  Google starts to work on its upcoming announcement after the
13  quarter closes.  150 calls from January to July.  That's a lot
14  of calls that have nothing to do with this case.
15          And there is no evidence, none, that Shammara Hussain
16  breached any duty of confidentiality.  All Ms. Horne testified
17  about is that Ms. Hussain had access to confidential
18  information and the confidentiality policy at Market Street
19  Partners.  She said nothing at all about whether Ms. Hussain
20  breached that duty or did anything wrong.  The government has
21  shown you no evidence that she did.
22          The government showed you another chart, Government
23  Exhibit 58.  The government showed you this chart and focused
24  on this 22 minute call from Roomy Khan to a Galleon number on
25  July 13.  The government wants you to assume that Roomy was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5479

14L8RAJ4                    Summation - Mr. Dowd

1    talking with Raj.  The government showed you Raj's testimony to
2    the SEC, where Raj told them Roomy Khan was someone who used to
3    work at Galleon.  So think about that.  Roomy worked at Galleon
4    in years past.  Surely she knows people there besides just Raj.
5    But did the government put Roomy Khan or anyone else on the
6    stand to tell you who Roomy was talking to for 22 minutes?
7    Remember, this wasn't Raj's number, it this was the Galleon
8    number.  Was it a secretary who answered?  We don't know who it
9    was and there is no evidence in the record for you to know.
10   And that, ladies and gentlemen, is a reasonable doubt.  The
11   government hasn't proven its case.
12             The allegation boils down to the fact that Raj sold
13   Google shares on July 13 and shorted shares of Google from that
14   point until July 19 when it announced its earnings.  We
15   explained why.  We showed you the evidence.  It's not Roomy
16   Khan and it's not inside information.
17             Remember what Mr. Schutte told you.  He showed you the
18   trading data, that Raj traded Google for many quarters.  This
19   wasn't some trade he made suddenly because Roomy Khan called
20   him.  Remember Government Exhibit 61.
21             Call up 61, Joe.
22             This is a Google graph the government showed you.
23   They showed you that on July 13, Raj went from having a long
24   position to a short one.  See where the bar graphs go from top
25   to bottom.  We finished the story for you.  We gave you the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

5480

14L8RAJ4                    Summation - Mr. Dowd
 1  fuller picture.  We explained what actually was going on.
 2           Joe, if we could have DX 1102.
 3           This is the July 11th e-mail from Steve Granoff, a
 4  Galleon analyst who followed Google for Galleon.  He sent this
 5  e-mail two days before Mr. Rajaratnam sold his Google shares.
 6  On page 1, Mr. Granoff recommended to Galleon a near term
 7  target price of $550 for Google, meaning he didn't think in the
 8  short-term the stock price would go much higher.  Mr. Granoff
 9  didn't think the stock would go much higher than 550 for a
10  variety of reasons, including that the stock was already
11  trading an all-time high.  Its share price had never been so
12  high.  And Mr. Granoff wasn't the only person who noticed that.
13  Professor Jarrell summarized the public information that
14  expectations for Google were too high and it might not reach
15  the financial results that the market usually expected for
16  Google.
17           You saw on the government's stock price charts that
18  during the day on July 13, Google's stock hit the 550 price.
19  And what did Mr. Rajaratnam do?  You saw the instant message he
20  sent to his trader Mr. Horowitz at 1:39 p.m.
21           Joe, pull up Government Exhibit 58.
22           It's right there in the government's own summary
23  chart, July 13 at 1:39 p.m.  Raj instructed his trader to "sell
24  all the GOOG in all accounts."  And Raj even said exactly why
25  he was doing it.  He wrote, "reached my price target."
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

14L8RAJ4                    Summation - Mr. Dowd
1   again.  They want you to believe that Roomy Khan called and
2   told Raj something.  Another leap of faith.  Do you have any
3   evidence that Deep Shah told Roomy Khan anything about Hilton
4   being taken over?  No.  There is no evidence at all in this
5   case that Deep Shah ever breached any duty to Moody's, no
6   testimony about his telling Roomy Khan anything at all.
7          Do you know if Roomy Khan ever reached Raj when she
8   called, and if she did, what she said?  Do you know whether
9   they just spoke about all of the public info that was out there
10  about Hilton being a takeover candidate?  No.  You have no idea
11  because the government hasn't called Roomy Khan or introduced
12  any evidence at all about what they said to each other, if
13  anything.  They simply haven't proven their case.
14         The government showed you a summary chart, Government
15  Exhibit 52.  Remember this graph showing Raj's purchase on July
16  3rd of 400,000 shares of Hilton.  They left that big blank
17  space on the left to try to have you believe this purchase just
18  came out of left field.  Well, you know it didn't come out of
19  left field.  You know the 13F filings showed you that Galleon
20  had bought Hilton since January.
21         Joe, put up DDX 16.
22         The two blue bars show Galleon's positions in Hilton
23  as of the end of March and the end of June, as disclosed in the
24  13F filings.  And you know that there was a mountain of public
25  information out there for anyone who was smart enough to follow
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

14L8RAJ4                    Summation - Mr. Dowd

1   it.  We showed it to you.
2            Put up DDX 7, Joe.
3            Look at all of this public information we showed you
4   and the government didn't include anywhere in their charts.
5            Like the February 21 Galleon e-mail observing that JP
6   Morgan named Hilton a high potential LBO candidate.
7            The March 9 report by Raymond James announcing to the
8   public it was selling a foreign hotel chain.  That's something
9   Ms. Holloway from Moody's acknowledged would make a company
10  more attractive for a takeover.
11           The March 22 filing that Hilton made with the SEC,
12  which was publicly available on its Web site to anyone, saying
13  that Hilton was terminating its poison pill.  Again,
14  Ms. Holloway testified that that, too, would make it easier for
15  someone to take them over.
16           The article in the FlyontheWall.com, May 15, reporting
17  Hilton moves higher on unconfirmed LBO chatter.
18           The report from Lehman Brothers on May 31 saying
19  Hilton cheap, could be buyer of Hilton.
20           The report from UBS on July 2 that listed Hilton as
21  one of its top picks.
22           Of course, the Jefferies report at 7:44 a.m. on July
23  3, the same morning Raj bought his Hilton shares, they
24  recommended buying Hilton and called it Jefferies pick of the
25  week.

5485
14L8RAJ4                    Summation - Mr. Dowd
1          Mr. Starr showed Ms. Holloway the government's price
2    and volume chart on Hilton.  It was Government Exhibit 129T.
3    She read aloud the volume of Hilton trading for July 2 and July
4    3.  She testified that the volume of Hilton shares traded
5    increased from 3.82 million shares on July 2 to 7.47 million
6    shares on July 3 before the market closed, and the
7    Hilton/Blackstone deal was announced after closing.
8          Professor Jarrell testified that trading in Hilton
9    options increased more than four times that day.  Yesterday Mr.
10   Brodsky tried to dismiss that spike in options, arguing it was
11   just because Roomy Khan bought options.  But if you look at the
12   government's own summary in GX 49, Roomy Khan only bought a
13   total of 650 options over July 2 and 3.  It doesn't account for
14   the big increase in the general market of more than four times
15   in options volume that Professor Jarrell described to you.
16         Ladies and gentlemen, there was no secret about
17   Hilton.  A smart investor would know that Hilton was ripe to be
18   taken over on July 3.  It was a Jefferies pick of the week
19   recommendation, general trading volume in the market with
20   Hilton doubling in options trading, and Hilton skyrocketing to
21   more than four times its normal volume.  If Raj hadn't bought
22   Hilton that day, you would have to ask yourself why not.  He
23   bought it because it made sense to buy it, and he saw the
24   reports calling it low risk, with a potential higher reward if
25   it gets taken over.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

5486
14L8RAJ4                    Summation - Mr. Dowd
 1           The government hasn't offered any evidence to support
 2     its allegation that Roomy Khan told Raj about this deal.  Not a
 3     shred.  It's utter unfounded speculation.  You can't convict
 4     Raj on the basis of speculation.  You can only convict him
 5     based on the evidence and the evidence shows that everyone knew
 6     about this deal, and that's why you must acquit him.
 7           Polycom.  Let me talk to you about Polycom, the last
 8     of Roomy Khan's stocks.  The government alleges that Roomy Khan
 9     obtained some material nonpublic information about Polycom from
10     Sunil Bhalla, who worked with Polycom, and then gave it to Raj,
11     and then Raj bought Polycom.  The government never called Sunil
12     Bhalla to testify and never called Roomy Khan.  There is no
13     evidence at all Mr. Bhalla ever breached his duty to Polycom,
14     none.  There is no evidence at all that Mr. Bhalla told Roomy
15     Khan anything about Polycom.  Not a shred.  There is no
16     evidence that Roomy Khan told Raj anything that she heard from
17     Bhalla.
18           The government wants you to assume that when Khan sent
19     an instant message on January 9 to Raj and said, do not buy
20     Polycom until I get guidance, that means she must have passed
21     material nonpublic information to Raj when she called him the
22     following day.  They want you to assume the information she
23     gave Raj was information she got from Sunil Bhalla.  There is
24     no proof of any of that, none at all.  And those conversations
25     weren't recorded and the government has offered absolutely no
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

5487

14L8RAJ4                        Summation - Mr. Dowd
1   evidence of what was said.  You cannot convict Raj of trading
2   on material nonpublic information or conspiring to do so if the
3   government hasn't proven what the information was.  The
4   government's allegations just don't make sense.  Let me tell
5   you why they don't make sense.
6              Joe, put up Government Exhibit 64.
7              This is the government's summary chart on Polycom.
8   First, the top entry, the government lists the instant message,
9   "Do not buy Polycom till I get guidance."  That's what the
10  government wants you to fixate on to the exclusion of
11  everything else.  That's why the government didn't tell you,
12  and this chart does not show, that Raj had already bought
13  Polycom three weeks earlier.  He had already taken his
14  position.  He was already long.  Roomy told Raj do not buy.  He
15  had already bought.
16             Joe, Defense Exhibit 4682M.
17             We showed you the trade data when Mr. Schutte
18  testified.  Raj bought 40,000 shares of Polycom on December 21,
19  weeks before that instant message from Roomy Khan.
20             Second, we showed you the documents from the Needham
21  conference proving that Nat Cohn, a Galleon analyst who
22  followed policy Polycom, was at the conference on January 10,
23  the day after this instant message.  He was there with a
24  Polycom executive one-on-one.
25             Joe, pull up Defense Exhibit 0187, at page 5.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14L8RAJ6                    Rebuttal - Mr. Streeter

1  Rajaratnam, who gives things back to him as well.  You also
2  have Mr. Goel benefiting because Mr. Rajaratnam is trading in
3  his account.
4          With respect to PeopleSupport, Mr. Rajaratnam himself
5  is the person who gets that information from PeopleSupport.  He
6  has that inside access to PeopleSupport, and he is the one who
7  benefits by giving it to Mr. Goel.  He is the one who actually
8  has the benefit of giving that information to Mr. Goel, scratch
9  Mr. Goel's back so that Mr. Goel can scratch his back sometime
10  later with respect to some other information Mr. Goel comes
11  across.
12          I mentioned to you Akamai.  On this one, Kieran
13  Taylor's benefit includes that benefit of giving the gift of
14  information, which he says right on the recorded call, to
15  Ms. Chiesi, but it also includes the benefit he gets from her.
16  You heard on another call that he had with her, in which she
17  says specifically, I have got a tip for you, I have got the Abu
18  Dhabi tip on AMD, here's the tip.  It's clear that they have I
19  scratch your back, you scratch mine kind of a relationship, and
20  that's enough for a benefit if you look carefully at the
21  Court's instructions.
22          Now, how do you know that Mr. Rajaratnam, with respect
23  to the substantive counts, how do you know that he knew about
24  the benefit?  Well, in most cases it's because he is the one
25  who is directly conferring it.  He is paying the cash to

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

14L8RAJ6                    Rebuttal - Mr. Streeter

1    Mr. Kumar.  He is giving the PeopleSupport tip to -- basically
2    giving the tip to Mr. Goel by trading in his account.  He is
3    the one who is in this relationship with Mr. Goel, where
4    Mr. Goel gives tips to him, in exchange he gets friendship back
5    to him.  That is adequate in terms of his knowledge of a
6    benefit.
7              Now, with respect to Kieran Taylor, listen to that
8    call on July 24, listen to the call on July 30.  It's clear
9    from the call that Kieran Taylor and Danielle Chiesi have a
10   close personal relationship.  They have a family relationship.
11   They know each other's families.  And it's clear that Mr.
12   Rajaratnam knows that Danielle Chiesi has that kind of a
13   relationship with Mr. Taylor whereby she gets gifts of
14   information from her close friend.
15             Now, with respect to the conspiracy counts, as I said,
16   with respect to the stocks subject to the conspiracy counts, we
17   don't need to prove Mr. Rajaratnam's knowledge of the benefit.
18   We don't need to prove it was benefit.  We just need to prove
19   an intention to enter into an agreement with another person to
20   engage in insider trading and some step taken in furtherance of
21   that.  But let me give you a couple of examples of how we have
22   proven it anyway.
23             With respect to Rajat Gupta, Mr. Gupta was an investor
24   in Galleon.  You heard that evidence both in the form of
25   documents that Mr. Smith put in and you heard it from

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

5547

14L8RAJ6                    Rebuttal - Mr. Streeter

1   Mr. Kumar.  You also heard Mr. Rajaratnam and Mr. Gupta talking
2   about the investment on that July phone call.  Mr. Gupta was an
3   investor in something called the Voyager fund at Galleon.  He
4   was also a president of something called Galleon International.
5   He was also involved with Mr. Rajaratnam in this thing called
6   NSR, New Silk Route.  He stood to benefit.  Give information to
7   Mr. Rajaratnam, Mr. Rajaratnam makes more money.  He benefits
8   from that.  He is an investor in Galleon.
9           With respect to Mr. Chellam, the same thing.  He was
10  an investor in Galleon.  Give information to Mr. Rajaratnam.
11  He does better in the fund.  I do better as an investor.
12          The same thing with Mr. Panu.
13          With respect to Mr. Gupta, it's not just that.  It's
14  also the relationship.  It's that thing I told you about, about
15  that intangible benefit of having a person who can do something
16  for you down the road if you do something for them now.
17          With respect to Kamal Ahmed, the same thing.  We don't
18  need to prove it.  ICST is not the subject of one of our
19  substantive counts.  But, nonetheless, it's clear from
20  Mr. Smith's testimony that Mr. Ahmed and Mr. Smith were friends
21  and that they did things for each other.  Mr. Ahmed gave
22  information to Mr. Smith.  Mr. Smith introduced Mr. Ahmed to
23  important marketing contacts in the investment banking world.
24          Those, ladies and gentlemen, are an overview of the
25  things we need to prove to you with respect to the substantive

5571

14P8RAJ1

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  UNITED STATES OF AMERICA,
3
4                v.                        09 CR 1184 (RJH)
4
5  RAJ RAJARATNAM,
5
6                  Defendant.
6
7  ------------------------------x
7
8                                         New York, N.Y.
8                                         April 25, 2011
9                                         9:40 a.m.
9
10
10  Before:
11
11                    HON. RICHARD J. HOLWELL
12
12                                         District Judge
13
13
14                         APPEARANCES
14
15  PREET BHARARA
15      United States Attorney for the
16      Southern District of New York
16  JONATHAN R. STREETER
17  REED M. BRODSKY
17  ANDREW MICHAELSON
18      Assistant United States Attorneys
18
19  AKIN GUMP STRAUSS HAUER & FELD LLP
19      Attorneys for Defendant
20  JOHN M. DOWD
20  TERENCE J. LYNAM
21  MICHAEL STARR
22
22  ALSO PRESENT:  B.J. KANG, FBI
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

5622

14PFRAJ2                    Jury charge
1    is an issue of fact for you to decide.
2              In order to find that the insider you are considering
3    breached his duty of trust, you must also be persuaded beyond a
4    reasonable doubt on the count that you're considering that the
5    information disclosed was material at the time that it was
6    disclosed.  Within the particular context of the purchase and
7    sale of securities, material information is information which a
8    reasonable investor would have considered significant in
9    deciding whether to buy, sell or hold securities and at what
10   price to buy or sell.  Put another way, there must be a
11   substantial likelihood that the fact would have been viewed by
12   a reasonable investor as having significantly altered the total
13   mix of information then available.
14             The government must also prove beyond a reasonable
15   doubt that the insider who disclosed the information personally
16   benefited in some way, directly or indirectly, from disclosing
17   that information.  Benefit may be monetary or financial.  The
18   benefit, however, need not be a specific or tangible benefit
19   received in exchange for the information.  It can also include
20   a reputational benefit that will translate into future
21   earnings, or the satisfaction which comes from making a gift to
22   a relative or friend.  Evidence of the relationship between the
23   insider and the recipient of the insider's intention may be
24   circumstantial evidence that the insider receive a benefit.
25   But whether the insider benefited directly or indirectly,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14PFRAJ2                          Jury charge

1    tangibly or intangibly, remains a question of fact for you, the
2    jury, to decide.
3            To meet its burden of establishing an insider trading
4    scheme, the government must also prove beyond a reasonable
5    doubt that Mr. Rajaratnam knew that the information had been
6    disclosed by an insider in breach of a duty of trust and
7    confidence.  The mere receipt of material, non-public
8    information by the defendant from an insider is not sufficient.
9    The government must show that Mr. Rajaratnam knew that the
10   information was material, non-public information that if
11   disclosed by an insider would directly or indirectly obtain
12   some personal benefit from the disclosure.
13           The government must prove beyond a reasonable doubt
14   that the defendant used material, non-public information in
15   connection with the purchase or sale of the stock identified in
16   the substantive count that you are considering.  A person uses
17   material, non-public information in connection with a stock
18   purchase or sale if that information is a factor in his
19   decision to buy or sell.  Now, how do you tell whether a person
20   who has material, non-public information and who buys or sells
21   a stock while in possession of that information uses the
22   information in doing so?  Bear in mind that the law requires
23   only that the information be a factor in the decision to buy
24   and sell.  It need not be the only consideration.  Consider how
25   significant the information would be in deciding upon whether

                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

5624

14PFRAJ2                    Jury charge

1   to buy or sell.  It need not be the only consideration.  In
2   many circumstances, the more important the information, the
3   more likely it is that the information was a factor in the
4   decision.  If after considering all the circumstances you are
5   persuaded beyond a reasonable doubt that material, non-public
6   information given to the defendant was a factor, however small,
7   in the defendant's decision to purchase or sell stock, then
8   this element of the fraud will have been established.
9           I've talked about the proof of the existence of a
10  fraudulent insider trading scheme, which is the first element
11  of proving securities fraud.  The second element of the
12  offenses charged in the substantive Counts Six through Fourteen
13  is that the defendant participated in the insider trading
14  scheme alleged in a particular count knowingly, willfully and
15  with the intent to defraud.  Knowingly means to act voluntarily
16  and deliberately, rather than mistakenly or inadvertently.
17  Willfully means to act knowingly and purposefully with an
18  intent to do something the law forbids, that is to say with bad
19  purpose either to disobey or disregard the law.  Intent to
20  defraud in the context of securities laws means to act
21  knowingly and with the specific intent to deceive.  To devise a
22  scheme to defraud is to concoct or plan it.  To participate in
23  a scheme to defraud means to associate one's self with it with
24  a view and intent to make it succeed.
25          The question of the defendant's intent is a question
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

# Exhibit G

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
                                    :
UNITED STATES OF AMERICA,
                                    :
          - v. -
                                    :   S2 09 Cr. 1184 (RJH)
RAJ RAJARATNAM,
                                    :
               Defendant.
                                    :
-----------------------------------x
```

GOVERNMENT'S REQUESTS TO CHARGE

```
                         PREET BHARARA
                         United States Attorney for the
                         Southern District of New York
                         Attorney for the United States
                          of America
```

```
JONATHAN R. STREETER
REED M. BRODSKY
Assistant United States Attorneys
ANDREW Z. MICHAELSON
Special Assistant United States Attorney
Southern District of New York

     - Of Counsel -
```

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
                                    :
UNITED STATES OF AMERICA,
                                    :
        - v. -
                                    :    S2 09 Cr. 1184 (RJH)
RAJ RAJARATNAM,
                                    :
                Defendant.
                                    :
-----------------------------------x
```

<u>GOVERNMENT'S REQUESTS TO CHARGE</u>

       Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the Government respectfully requests the Court to include the following instructions in its charge to the jury.

REQUEST NO. 21

Securities Fraud:  First Element --
Scheme or Artifice To Defraud -- Benefit

If you find that, in connection with the stock you are considering for a particular count, RAJARATNAM traded based on material non-public information that was disclosed in breach of a duty, then you must determine whether the insider you are considering personally benefited in some way, directly or indirectly, from disclosing that information.  The Government can establish that the insider you are considering benefited from his disclosure by showing that the insider received some tangible benefit, or that the insider would gain some future advantage, or that, based on the relationship between the insider and the person to whom he disclosed it, the insider gave the information with the intention to confer a benefit on the recipient, or as a gift, or to benefit himself in some other manner.  You are permitted to base your finding of a benefit to the insider on all the objective facts and inferences presented in this case.

> Adapted from the charges of the Hon. Richard J.
> Sullivan, United States v. Contorinis, 09 Cr. 1083
> (RJS)(S.D.N.Y.); The Hon. Robert P. Patterson,
> Jr., in United States v. Naseem, 07 Cr. 610 (RPP);
> see also Dirks v. SEC, 463 U.S. 646, 664 (1983)
> ("there may be a relationship between the insider
> and the recipient that suggests a quid pro quo
> from the latter, or an intention to benefit the
> particular recipient.  The elements of fiduciary
> duty and exploitation of non-public information
> also exist when an insider makes a gift of
> confidential information to a trading relative or friend"); SEC
> v. Warde, 151 F.3d 42, 48 (2d Cir. 1998)("[T]he Supreme Court has

made plain that to prove a § 10(b) violation, the SEC need not
show that the tipper expected or received a specific or tangible
benefit in exchange for the tip ... Rather, the 'benefit' element
of § 10(b) is satisfied when the tipper 'intend[s] to benefit the
... recipient' or 'makes a gift of confidential information to a
relative or friend.'"); <u>SEC</u> v. <u>Sargent</u>, 229 F.3d 68, 77 (1st Cir.
2000) ("the 'benefit' to the tipper need not be 'specific or
tangible'... "maintain[ing] a useful networking contact"
constitutes a benefit).

# Exhibit H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

       S2 09 Cr. 1184 (RJH)

       **CHARGE TO THE JURY**

RAJ RAJARATNAM,

          Defendant.

1. Role of the Court ..................................................................................... 3
2. Role of the Jury ...................................................................................... 4
3. Government as a Party ........................................................................... 6
4. Indictment Not Evidence, Burden of Proof, and Presumption of Innocence ........ 7
5. Reasonable Doubt ................................................................................... 9
6. Direct and Circumstantial Evidence ................................................... 10
7. Inferences ............................................................................................... 11
8. Consider Only the Charges .................................................................. 12
9. Persons Not On Trial ............................................................................ 13
10. Number of Witnesses Called .............................................................. 14
11. What Is and Is Not Evidence .............................................................. 15
12. Credibility of Witnesses ...................................................................... 16
13. Interest in Outcome .............................................................................. 19
14. Law Enforcement Witnesses ............................................................... 20
15. Character Testimony ............................................................................ 21
16. Preparation of Witnesses ..................................................................... 22
17. The Defendant's Right Not to Testify ................................................ 23
18. Expert Testimony .................................................................................. 24
19. Cooperating Witnesses ........................................................................ 25
20. Cooperator Testimony—Guilty Plea ................................................. 28
21. Stipulations of Fact .............................................................................. 29
22. Summary Charts .................................................................................... 30
23. Use of Recordings and Transcripts .................................................... 31
24. The Indictment ...................................................................................... 32
25. Summary of the Indictment ................................................................ 33
26. Multiple Counts .................................................................................... 35
27. Defendant's Theory of the Case ......................................................... 36

28. Securities Fraud:  The Statute ............................................................ 38
29. The Statutory Purpose .......................................................................... 39
30. Securities Fraud:  Elements of the Offense ..................................... 40
31. First Element: Insider Trading Scheme - General ........................... 41

31 - A.  Insider Trading Scheme: Relationship of Trust or Confidence 44
31- B. Insider Trading Scheme:  Breach of the Duty ............................. 45
31 - C. Insider Trading Scheme:  Knowledge of the Breach .................. 48
31– D. Insider Trading Scheme:  Use of the Information ...................... 49
32. Securities Fraud—Second Element: Knowledge, Intent, and Willfulness ......... 50
33. Securities Fraud—Third Element: Interstate Commerce .................................... 52

34. Conspiracy—Charges ............................................................................................ 53
35. Conspiracy—General Instructions ...................................................................... 55
36. Conspiracy—Elements of the Offense ................................................................ 56
37. Conspiracy: First Element—Existence of the Conspiracy ................................ 57
38. Multiple Conspiracies .......................................................................................... 60
39. Conspiracy: Second Element—Membership in the Conspiracy ......................... 62
40. Conspiracy: Third Element—Overt Acts ............................................................ 65
41. Timing of Conspiracy .......................................................................................... 67
42. Venue ...................................................................................................................... 68

43. Punishment Not To Be Considered ..................................................................... 69
44. Right to See Exhibits and Have Testimony Read during Deliberations ............. 70
45. Improper Considerations: Race, Religion, National Origin, Sex or Age ............. 71
46. Sympathy: Oath as Juror ...................................................................................... 72
47. Submitting the Indictment ................................................................................... 73
48. Verdict Form .......................................................................................................... 74
49. Selection of Foreperson ........................................................................................ 75
50. Conclusion ............................................................................................................. 76

### 31 - C. Insider Trading Scheme:  Knowledge of the Breach

To meet its burden, the government must also prove beyond a reasonable doubt that Mr. Rajaratnam knew that the information had been disclosed by an insider in breach of a duty of trust and confidence.  The mere receipt of material, non-public information by the defendant from an insider is not sufficient.  The government must show that Mr. Rajaratnam knew that the information was material nonpublic information that had been disclosed by an insider who directly or indirectly obtained some personal benefit from the disclosure.

# Exhibit I

1

1ADHRAJ1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                    09 CR 1184 (RJH)

RAJ RAJARATNAM,

            Defendant.

------------------------------x

                        New York, N.Y.
                        October 13, 2011
                        10:35 a.m.


Before:

                HON. RICHARD J. HOLWELL

                        District Judge



                  APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
JONATHAN R. STREETER
REED M. BRODSKY
ANDREW MICHAELSON
    Assistant United States Attorneys

AKIN GUMP STRAUSS HAUER & FELD LLP
    Attorneys for Defendant
TERENCE J. LYNAM
SAMIDH J. GUHA
JAMES SHERRY

ALSO PRESENT:  B.J. KANG, FBI



              SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

1ADHRAJ1

```
 1                  (In open court)
 2             THE DEPUTY CLERK:  United States of America v. Raj
 3   Rajaratnam.
 4             Counsel, please state your name for the record.
 5             MR. BRODSKY:  Good morning, your Honor.  Reed Brodsky
 6   on behalf of the government.  With me at counsel table are
 7   assistant U.S. attorneys Andrew Michaelson and Jonathan
 8   Streeter, and special agent B.J. Kang of the FBI.
 9             THE COURT:  Good morning, counsel.
10             MR. LYNAM:  Good morning, your Honor.  Terence Lynam
11   for Mr. Rajaratnam.  With me is Mr. Rajaratnam, Samidh Guha,
12   and James Sherry.
13             THE COURT:  Good morning, counsel.  Good morning,
14   Mr. Rajaratnam.
15             I have received and reviewed the presentence report,
16   including the addendum and the sentencing recommendation of the
17   probation officer, all approved on September 20, 2011.  I have
18   also received and reviewed the series of memoranda filed by
19   counsel for the government and counsel for the defendant, the
20   attached declarations and exhibits, as well as 200 or more
21   letters received from the defendant's family, friends and
22   associates and public third-party letters as well.
23             Mr. Lynam, have you had the opportunity to review the
24   presentence report and discuss it with Mr. Rajaratnam?
25             MR. LYNAM:  Yes, your Honor, we have.
```

3

1ADHRAJ1

```
 1              THE COURT:  Mr. Rajaratnam, have you had the
 2   opportunity to review that report and discuss it with Mr.
 3   Lynam?
 4              THE DEFENDANT:  Yes, your Honor.
 5              THE COURT:  Do either of you have any objections to
 6   the factual recitations in the report?
 7              MR. LYNAM:  None other than the ones we noted
 8   previously in our memorandum, your Honor.
 9              THE COURT:  Mr. Brodsky, does the government have any
10   objections to the factual recitations in the report?
11              MR. BRODSKY:  No, your Honor, other than what we have
12   submitted to the court.
13              THE COURT:  At this point I will ask Mr. Lynam if you
14   could address the issue of what a fair and just sentence is in
15   the case and address the recommendations made by the probation
16   officer.
17              MR. LYNAM:  Thank you, your Honor.  Your Honor, we
18   appreciate the court's thoughtfulness and fairness throughout
19   this long case and we appreciate the careful consideration that
20   the court has given to the sentencing issues, particularly the
21   opportunity to submit the various briefs at the hearing last
22   week.  So I won't be going through all that again.
23              This case has had a lot of attention focused on it.
24   There has been media coverage nonstop.  But we are confident
25   that the court will rise above all that and impose a sentence
```

4

1ADHRAJ1

1   that is fair and just under the law, a sentence that gives fair
2   weight to all the factors in the statute, Section 3553,
3   particularly the history and characteristics of the defendant,
4   a sentence that is sufficient but not greater than necessary to
5   comply with the purposes of sentencing.
6          The information that we provided the court and is now
7   contained in the presentence report provide a great deal of
8   insight into the history and characteristics of Raj Rajaratnam.
9   The letters that were submitted to the court by hundreds of
10  people all over the world describe the real Raj Rajaratnam.  He
11  is the person whom I have come to know over the past two years,
12  a very kind, considerate, polite, generous and caring person, a
13  man genuinely concerned about helping others.  I would like to
14  quote from a few of the provisions that the probation office
15  put in the presentence report about Mr. Rajaratnam.
16        The report says:  "Mr. Rajaratnam cares deeply about
17  leaving behind a better world than the one to which he was
18  born."  The report says that his charitable efforts go far
19  beyond his ability to write a check.  The report said:  "He
20  truly cares about the causes he champions, wants to see
21  children receive good educations, wants to help those struck by
22  natural disasters, and wants to help provide others with the
23  advantages that he was able to enjoy in his own life."  Those
24  are not my words; those are the words that the Probation
25  Department put in the presentence report.

5

1ADHRAJ1

```
 1              As the court has learned, his compassion and
 2    generosity have manifest themselves in many ways, from serving
 3    on the board of the Harlem Children's Zone here in New York
 4    City, a very worthwhile organization, to providing millions of
 5    dollars to worthwhile organizations and individuals around the
 6    world, from supporting global efforts like fighting AIDS and
 7    poverty and natural disasters to helping needy individuals pay
 8    for their cancer treatment or their children's education.
 9              Raj Rajaratnam has attempted to make the world a
10    better place.  If there is a ledger of one's life, he should
11    have some credit in that ledger to draw upon now that things
12    have gone bad.
13              Many of the people who love and support Mr. Rajaratnam
14    would like to be here today, including members of his own
15    family, but he is mindful of the media crush and does not want
16    them subjected to that spotlight.  It is typical of his desire
17    to put the comfort of others ahead of his own.
18              So what is a fair and just sentence in this case?
19    Mr. Rajaratnam stands convicted of insider trading.  The
20    sentence that the government seeks is comparable only to murder
21    and is greater than violent dangerous crimes such as
22    manslaughter, kidnapping and sexual abuse.  The statute,
23    Section 3553, emphasizes the need to avoid unwarranted
24    disparities with defendants found guilty of similar conduct.
25    The sentence that the government seeks would create such
```

6

1ADHRAJ1

1   disparity, and there is no precedent for it.  The government
2   can't cite one insider trading case with such a long sentence.
3   So instead the government has compared Mr. Rajaratnam to the
4   cases of Bernard Madoff and Bernard Ebbers and Jeffrey
5   Skilling, whose conduct caused incredible loss and suffering
6   for many, many people.  That is not this case.  That didn't
7   happen here.
8          The government seeks this sentence because of the way
9   they apply the sentencing guidelines.  Please permit me to make
10  a personal observation.  When I was a federal prosecutor with
11  the Justice Department -- it wasn't that long ago -- there were
12  no sentencing guidelines.  In many courts around the country,
13  and particularly the Eastern District of Virginia where I spent
14  a fair amount of time, prosecutors did not take positions at
15  sentencing.  It was considered uniquely within the purview of
16  the court.  Now the sentencing guidelines have given
17  prosecutors a tool to push for greater and greater sentences by
18  taking aggressive positions on guideline enhancements, as we've
19  seen here, and by using the fraud loss table for a purpose for
20  which it was never intended, which is calculating gain in an
21  insider trading case.
22         But the vast majority of the gain that was realized
23  here did not go to Mr. Rajaratnam but went to Galleon's
24  investors.  In fact, overall the insider trading stocks lost
25  more money than they gained.  But a rigid application of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

1ADHRAJ1

1    fraud loss table does not recognize that, and instead that
2    rigid application results in a guideline range that overstates
3    the seriousness of the offense because it equates the offense
4    to conduct that is far more serious and egregious, like the
5    crimes I mentioned a moment ago.
6           The court should consider the amount that
7    Mr. Rajaratnam received.  That is $7.4 million, and that is
8    even theoretical and overstated because, as we went over last
9    week, in 2008 the market was down overall.  Galleon did not
10   make any money.  Mr. Rajaratnam did not receive anything for
11   those trades in 2008.
12          Now other courts have considered how much the
13   defendant received when sentencing defendants in securities
14   fraud cases.  We cited Judge Rakoff's decision in United States
15   v. Oakford Corporation, where he imposed a downward departure
16   in part because each defendant realized only a small portion of
17   the overall gain.
18          The offense that Mr. Rajaratnam was convicted of was
19   insider trading.  It was not putting the government to its
20   burden of proof at trial.  He should not be punished more
21   because he chose to go to trial and make the government carry
22   that burden to prove its case.  He should not receive a
23   sentence that is so much greater than those defendants who pled
24   guilty in some of the other cases that were mentioned in the
25   presentence report.

8

1ADHRAJ1

```
 1              Defendants who plead guilty are only entitled to a
 2    three-level guideline reduction.  But as we know, when
 3    defendants cooperate with the government, the gain amount under
 4    the guidelines is negotiated and manipulated into lower ranges
 5    before that is ever presented to the court and then a
 6    three-level reduction is imposed there.
 7              So there are many reasons, your Honor -- we have
 8    detailed a lot of them in our briefs -- why the guidelines
 9    should not determine the sentence here.  Rather, a sentence
10    that takes into account all the factors in Section 3553 is
11    appropriate.
12              One of the most important factors at sentencing is
13    deterrence, specific and general.  Specific deterrence has
14    already been accomplished here.  Mr. Rajaratnam's career in
15    finance is over.  He will never return to that field no matter
16    what happens today.  General deterrence has already been
17    accomplished too.  This case has already sent a message to Wall
18    Street that insider trading can mean the loss of your
19    livelihood, of your business, of your career, of everything
20    that you have built in your whole life, and that it can subject
21    you to intense media scrutiny and ridicule and exposure of your
22    most private matters.
23              No one here or anyone running a hedge fund would want
24    to trade places with Mr. Rajaratnam today regardless of what
25    sentence you impose.  A lengthy sentence of imprisonment is not
```

9

1ADHRAJ1
1   necessary to accomplish deterrence.
2           Section 3553 also requires consideration of any
3   medical care that a defendant may need.  The government seems
4   to suggest that the need for medical care should be considered
5   only if the defendant did not know of his medical problems when
6   the offense was committed.  But that is not what the statute
7   says.  The statute says that the need for medical care is a
8   factor to consider in imposing sentence.
9           As the court knows, your Honor, Mr. Rajaratnam suffers
10  from a progressive degenerative disease.  He has required
11  several hospitalizations this year.  Based on the information
12  that we have provided there are serious doubts as to whether
13  the Bureau of Prisons can provide the care that he needs.  Any
14  lengthy term of imprisonment will surely shorten his life.
15  Based on the conduct for which he was convicted, he does not
16  deserve to die in prison.
17          We submit that a fair and just sentence in this case
18  is one that takes this into account, as well as takes into
19  account the other factors of Section 3553 that I have
20  mentioned -- the history and characteristics of the defendant,
21  that I have described and are in the PSR, the need to avoid
22  sentencing disparities with other insider trading cases, and a
23  sentence that is sufficient but not greater than necessary to
24  comply with these purposes.
25          Thank you, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1ADHRAJ1

```
 1              THE COURT:  Thank you, Mr. Lynam.
 2              I will now give the government the opportunity to
 3  comment upon the recommendations made by the probation office.
 4              Mr. Brodsky, are you going to do that?
 5              MR. BRODSKY:  Yes, your Honor.  Your Honor, today you
 6  sentence a man who is the modern face of illegal insider
 7  trading.  He is a man who, despite being born into privilege,
 8  educated at the most prestigious universities in the world,
 9  from the University of Sussex in England to Wharton Business
10  School in the United States, and a man who rose to the top of
11  the securities industry, despite having all those advantages
12  and privileges, repeatedly, consistently and knowingly violated
13  the securities laws of the United States by committing multiple
14  insider trading schemes.  He did his criminal conduct in a
15  brazen, pervasive and egregious way.
16              The guidelines are high in his case.  The government
17  seeks a high sentence in his case, not because it
18  distinguishes -- it just treats him differently than other
19  people because of who he is, but because of his conduct.  He is
20  arguably the most egregious insider trader to face sentencing
21  in a federal courthouse in the United States, and that is
22  because of his conduct and the extent of his conduct and no one
23  else's.  The government asks for a sentence commensurate with
24  his actions and his crimes.
25              I would like to briefly touch upon a few important
```

11

1ADHRAJ1

```
 1   items that your Honor should consider in sentencing.  We
 2   submitted lengthy sentencing briefs so we won't go into all
 3   those issues.
 4              The first is I would like to talk a little bit about
 5   the significance of general deterrence in insider trading
 6   cases; second, why insider trading is illegal and harms
 7   individuals, companies and investors; mention briefly recent
 8   sentences for insider trading, directly address probation's
 9   recommendation, and then summarize some of the reasons why the
10   government seeks a sentence within the range that the
11   government calculates of 235 months to 293 months.
12              Mr. Lynam says that there is a lot of media coverage
13   and asks your Honor not to sentence the defendant based on
14   media coverage.  The government agrees.  The sentence of the
15   defendant shouldn't be based on media coverage.  It should be
16   based on the defendant's crimes and actions.  We submit
17   respectfully, your Honor, the reason there is so much media
18   coverage of the defendant in this case is because of those
19   actions, because of his conduct, and because of his position.
20   It distinguishes him from all other insider trading defendants
21   arguably in history.
22              With respect to general deterrence, your Honor, Mr.
23   Lynam agrees this is one of the most widely watched sentencings
24   of an insider trading defendant.  Your Honor's sentence, in our
25   view, will have an impact in the future on the behavior of
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

1ADHRAJ1

```
 1  others.  Surely defense counsel will be arguing in this
 2  courthouse and in other courthouses throughout the country that
 3  your Honor's sentence in this case sets the upper threshold of
 4  a prison sentence for a defendant in insider trading because
 5  many future defendants, their conduct, won't even rise to
 6  nearly the level of Mr. Rajaratnam.
 7          The U.S. markets are the largest equity markets in the
 8  world.  They are the most open, the most fair, the most
 9  orderly.  They ensure investors, from the average, ordinary
10  investor to the institutional investor, are equally protected.
11  Insider trading simply makes a mockery of the principle that no
12  one participant has an unfair advantage through thievery.  And
13  insider trading, your Honor, is thievery.  It is theft.  It is
14  no different than somebody embezzling money from a bank or an
15  employee stealing information from a company.  And yet insider
16  trading has become rampant, and Mr. Rajaratnam did it also and
17  repeatedly, over and over again and by smart, educated people.
18  So one must ask why.
19          Your Honor, we submit that the reasons why are the
20  reasons your Honor should consider in sentencing the defendant.
21  They apply to Mr. Rajaratnam.  The incentives to commit this
22  crime are extraordinarily high, higher today than ever before,
23  and the difficulty in detecting it is extremely difficult.  It
24  is very difficult to detect insider trading.
25          Money is the primary motive.  It was no different for
```

13

1ADHRAJ1

```
 1   Mr. Rajaratnam.  Hedge funds charge 2 percent management fees,
 2   20 percent and up incentive fees, and by stealing material
 3   non-public information they can make millions of dollars.
 4   There is nothing wrong with making money, your Honor.  It is
 5   stealing inside information, to do it is illegal and very
 6   wrong.
 7           There is increasing pressure today for money managers
 8   to beat the competition, and you heard that over the phone
 9   calls recorded in Mr. Rajaratnam's own voice.  Money flows to
10   those with the highest returns.  Unfortunately, as it becomes
11   commonplace, as people trade on inside information, as
12   Mr. Rajaratnam and his friends did that, they begin to think to
13   themselves that they can justify it.  They know they are
14   committing crimes, but it's OK because they need to beat the
15   competition, it's OK because they need to achieve the best,
16   it's OK because is it really so bad.  That was Mr. Rajaratnam's
17   attitude, reflected in the phone calls.
18           As your Honor knows, the crime is particularly hard to
19   detect.  Your Honor observed that there is a built-in defense
20   for people in Mr. Rajaratnam's position.  It is very difficult
21   to detect insider trading committed by individuals like
22   Mr. Rajaratnam because when regulators are looking at all the
23   trading of a particular hedge fund, there is trading by a
24   number of portfolio managers and traders in the same stock,
25   back and forth, in different ways, in and out, and it is hard
```

14

1ADHRAJ1

1  to identify which trades go with the particular individual.
2  But more than that, you heard in Mr. Rajaratnam's own voice the
3  methods he used to mask his trading.  He traded in and out of
4  stocks.  You heard him say it and then you saw the evidence
5  that he actually did it, that before an acquisition that he
6  knew about, like ATI was going to be announced, he sold some of
7  the stock, knowing that later on down the road he can simply
8  claim to the regulators no one in their right mind would sell
9  stock knowing that the company is going to be acquired.
10          These are the methods that he used, and others, to
11  avoid detection.  And for a while he was successful in doing
12  that.  He knew, as he did during the trial and as he did
13  throughout in his instructions to subordinates, that he could
14  point to research, the massive research that he received and
15  the publicly available information, that he could create cover
16  stories and false e-mails and direct subordinates to do that.
17  The reason, your Honor, is that the crime of insider trading is
18  essentially committed through communication -- by telephone
19  often, in person, through other means over the internet -- and
20  in most cases the government won't have the resources or it
21  won't have a cooperating witness or other means to obtain a
22  wiretap over a particular individual's phone.  That is why it
23  is very difficult to detect.
24          Given the strong incentives to commit the crime, the
25  difficulty to detect it, it is not surprising it's become all

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    15
1ADHRAJ1
 1   too prevalent.  This case against Mr. Rajaratnam reflects those
 2   incentives.  Mr. Rajaratnam's conduct reflects it, and it shows
 3   how what the government -- the enormous resources the
 4   government had to commit to obtain the evidence against
 5   Mr. Rajaratnam.
 6            Now, some like Mr. Rajaratnam seem to believe,
 7   although they say insider trading is a serious crime, at the
 8   same time speaking out of the same mouth they sort of say it's
 9   really a victimless crime.  Who is harmed by it?  Underlying
10   all the submissions by the defense, underlying Mr. Rajaratnam's
11   statements to probation is sort of who's harmed by it.  It is
12   completely wrong that it is a victimless crime.
13            In the wake of the insider trading scandals in the
14   1980s, with respect to Ivan Boesky and Michael Milken, Congress
15   conducted numerous hearings in the mid 19 to late 1980s and
16   they called a litany of experts from the financial industry to
17   the government, and those experts, based on that testimony,
18   Congress concluded insider trading was not a victimless crime
19   and Congress concluded that although it was difficult to
20   quantify, insider trading was responsible for the erosion of
21   investor confidence in our capital markets.  In fact, four
22   former SEC chairmen submitted a letter to your Honor
23   yesterday -- William Donaldson, Roderick Hills, Harvey Pitt,
24   and David Ruder, all former SEC chairmen.
25            In that letter, your Honor, they say what Congress
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

16

1ADHRAJ1

```
 1   found.  They say that there are both specific and general
 2   victims when the kind of illegal conduct of which the defendant
 3   has been convicted occurs.  They talk about the diminishing
 4   confidence that the public will have in our markets because of
 5   insider trading, that the harm is felt by public companies and
 6   those who seek to utilize our capital markets to generate
 7   capital for business growth and expansion, and they also say,
 8   will make it more difficult for U.S. corporations to raise
 9   capital, fund and expand operations, increase employment and
10   otherwise prosper.
11           Insider trading shakes investor confidence in the
12   fairness and integrity of the capital markets.  There are
13   actual victims.  In some cases, your Honor, they are
14   specifically identifiable.  There is a case in this courthouse
15   against Joseph Stalin, who is a portfolio manager of another
16   hedge fund, where the trading occurred in block trades and
17   there are specific identifiable people on the other side of
18   those trades who lost millions of dollars.  But in a lot of
19   cases, like this one, there are so many victims of little
20   amounts of money that they are not clearly identifiable because
21   of the liquidity of the stocks.
22           Well, there are still actual victims because for
23   Mr. Rajaratnam to have pocketed the 70 to 75 million dollars in
24   gains and losses avoided, for him to have done that -- it is a
25   zero sum game in the stock market -- others had to lose that
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

1ADHRAJ1

 1   money.  And let's not forget, your Honor, that Mr. Lynam and
 2   the defense has never disputed, nor could they, that there are
 3   actual real victims here in terms of the public companies.
 4   Public companies and third parties like McKinsey suffered
 5   greatly because their inside information, their secret
 6   information, their confidential information was stolen.
 7           McKinsey is a great example, your Honor, and we
 8   submitted a quote from the McKinsey current chairman, who said
 9   that their reputation has suffered greatly as a result of this
10   and that they will continue to suffer in the near future.  That
11   is real harm from public companies and third parties whose
12   information was stolen by the defendant.
13           Now, underlying Mr. Rajaratnam's request also, and Mr.
14   Lynam seemed to say it, is that the guidelines, they are too
15   strong or the ranges are simply too long for white collar
16   crimes overall.  Your Honor, what they forget -- and they
17   mention arguments that there are statistics of various crimes,
18   including violent ones where defendants receive lesser
19   sentences.  Now those are all generalizations.  Nobody knows
20   the facts of those cases.  But these same arguments against the
21   guidelines for white collar crimes were made, exactly the same
22   arguments, in the Ebbers case and the Rigases cases.
23           Rigas argued that the 12 and 17 years that both of the
24   Rigases received were far below the sentences received by
25   terrorists.  Ebbers argued the same thing for violent crimes,

18

1ADHRAJ1

1    before he received his 25-year sentence.  But in the Rigas case
2    the Second Circuit explained, and the Ebbers case, they said:
3    "We concluded in Ebbers that in the circumstances presented
4    stiff guideline sentences for white collar crimes reflected
5    Congress' judgment as to the appropriate national policy for
6    such crimes."  The same holds true here.
7            In particular with insider trading, insider trading
8    under the guidelines comes under 2B1.4, as your Honor knows,
9    not 2B1.1.  2B1.4 has one base offense level and then an
10   enhancement for the gain.  That's it.  There are no
11   enhancements for the numbers of companies whose information was
12   stolen, for the number of years in which a particular inside
13   trader committed his crime, for the number of different
14   associates they corrupted.  There are all sorts of ways that
15   could be enhanced under 2B1.4 and it's not.
16           Now, Mr. Lynam and Mr. Rajaratnam and counsel for
17   Mr. Rajaratnam may not like Congress' judgment.  They may think
18   Congress is being too harsh.  But Congress over and over again
19   has heard about insider trading and they have heard about other
20   white collar crimes and it gets no sympathy from them,
21   appropriately so, and that is why the ranges are high.  And
22   increasingly over time the sentences have become stronger,
23   which I will talk about in a moment.
24           It doesn't give Mr. Rajaratnam the license to steal
25   information, trade on it, and then come into court and claim

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1ADHRAJ1

1   the penalties are simply too harsh, penalties that he certainly
2   knew about or should have known about given his position, his
3   experience, and given where he was in the industry and his
4   education.
5           Now the recent sentences in this courthouse for
6   insider trading only -- not Bernie Madoff, not Marc Dreier, not
7   some of the other cases.  Let's talk about insider trading
8   cases.  The judges in this courthouse, different judges, have
9   concluded that there were prior like sentences for insider
10   trading and that was not a sufficient deterrent.  That's clear.
11   In the last few years the number of insider trading cases that
12   have been brought by the Southern District of New York alone
13   show how pervasive it is.
14           Judge Patterson a few years ago sentenced investor
15   banker Hafiz Naseem to ten years of imprisonment.  Hafiz
16   Naseem's crimes do not come anywhere close to Mr. Rajaratnam's.
17   Judge Sullivan only a few weeks ago sentenced Zvi Goffer, who
18   worked for Mr. Rajaratnam at Galleon, to ten years of
19   imprisonment.  Mr. Goffer's crimes -- serious, extensive -- do
20   not come close to Mr. Rajaratnam's crimes.  Judge Sullivan also
21   sentenced 72 months to a hedge fund portfolio manager Joseph
22   Contorinis.  Mr. Contorinis' conduct didn't even come close to
23   what Mr. Rajaratnam committed.  Judge Batts --
24           THE COURT:  Mr. Brodsky, I don't find those
25   comparisons particularly helpful because there are just as many

20

1ADHRAJ1

1    that go the other side. So the real issue here is what this
2    individual did as opposed to attempting to discern what numbers
3    were given in other cases, and that is what I am focused on.
4            MR. BRODSKY: Yes, your Honor. I agree with your
5    Honor that it is completely an individual-based decision.
6            I would submit, your Honor, that with respect to Zvi
7    Goffer it is a little closer than being just another sentence
8    simply because Zvi Goffer's crimes, as we submitted in our
9    submission, are connected to Mr. Rajaratnam, and Zvi Goffer
10    worked at Galleon. So I think because of that, because of that
11    relationship, which we submitted in our sentencing memorandum,
12    that is an important sentence that would be a guide for the
13    defendant.
14            Now probation recommended a sentence of 15 years here
15    after doing an investigation, looking at the trial record and
16    focusing solely on the defendant. Probation speculated as to
17    why Mr. Rajaratnam committed his crimes. They didn't have the
18    benefit of all the years of investigation that we had.
19            What we know -- and we know the reasons why
20    Mr. Rajaratnam committed his crimes, which we submit, your
21    Honor, should be relevant to your Honor's sentence.
22    Mr. Rajaratnam was committing this crime since the late 1990s.
23    Although the defense disputes the evidence with respect to
24    Roomy Khan, your Honor knows the video camera caught Ms. Khan
25    faxing confidential Intel information to Mr. Rajaratnam in the

1ADHRAJ1

1  late 1990s.
2         Now even putting that aside, the charges in this case
3  and the evidence proved at trial showed that Mr. Rajaratnam was
4  committing this crime since 2003, for years.  For about six
5  years.  That is extensive.  Mr. Rajaratnam also thought he
6  wouldn't be caught, and I think that was evident from the tapes
7  and the methods that he used to evade detection.
8  Mr. Rajaratnam found, unfortunately, it was all too easy to
9  corrupt insiders, like Mr. Kumar and Mr. Goel.
10        Now, in 2008 it became necessary and part of
11  Rajaratnam's desperate attempt to ensure his hedge fund didn't
12  fail.  It may seem surprising, your Honor, but your Honor knows
13  from the evidence that in 2008, after the collapse of Bear
14  Stearns and the later collapse of Lehman, investors were
15  pulling out funds out of Galleon just like every other hedge
16  fund, and redemptions were coming fast and furious.  A former
17  executive at Galleon told us there were only two times when he
18  believed Galleon would collapse -- late 2008 and after
19  Mr. Rajaratnam's arrest.
20        Now, probation, your Honor -- I think it is
21  significant -- probation concluded that a sentence of 15 years
22  here was necessary because, to quote probation, the American
23  public has lost confidence in the financial market and in those
24  who have illegally profited or manipulated.  The defendant's
25  conduct in this case has proven to many regular citizens that

22

1ADHRAJ1

1   they were right in their suspicions that the financial markets
2   are rigged, that insiders are playing with a stacked deck, and
3   that the average citizen is really a pawn in a much larger game
4   that operates by secret rules.
5       Probation looked at all the issues, including medical
6   care.  What probation concluded was that the Bureau of Prisons
7   could handle Mr. Rajaratnam's medical conditions, and we
8   submitted, your Honor, evidence to that effect, an affidavit
9   from a BOP doctor to that effect.  There are others who are in
10  the Bureau of Prisons who suffer from similar maladies as
11  Mr. Rajaratnam.
12      The government doesn't submit -- that is the
13  government's main argument as to why what the court should
14  consider is whether the Bureau of Prisons can adequately care
15  for the defendant's condition.  We think we have proven that
16  they can.
17      Now it is important, and we put it in our submission,
18  that Mr. Rajaratnam has known about these conditions.  It is
19  certainly a factor your Honor should consider.  It is one other
20  courts have considered.  He's known about his conditions since
21  2007 at least.  He knew about some of his conditions earlier.
22  That is important because despite knowing about those
23  conditions he continued with his criminal conduct.
24      Now, your Honor, I will summarize some of the reasons
25  why we ask for this sentence.

1ADHRAJ1

```
 1              There is no one who is Mr. Rajaratnam's equal in terms
 2    of the breadth and scope of his insider trading crimes.  At
 3    least 19 public companies were victims.  The duration of his
 4    crimes and schemes is extraordinary.  The number of corrupt
 5    insiders and traders involved was extraordinary.  There were at
 6    least 20, and that is being conservative.  Mr. Rajaratnam
 7    corrupted or attempted to corrupt at least 16 insiders.  There
 8    were multiple interlocking conspiracies.  There were hundreds,
 9    if not thousands, of overt acts committed by Mr. Rajaratnam in
10    furtherance of his schemes.  His gains, the gains as a result
11    of these crimes, were far more, far in excess than the other
12    insider trading cases sentenced by other judges in this
13    courthouse.
14              Your Honor, second, Mr. Rajaratnam took extensive
15    steps to evade detection.  We have listed those before your
16    Honor.  I don't think that it is necessary to repeat them.
17              Third, he was the head of one of the world's largest
18    hedge funds.  He had great power and influence over the markets
19    given that position.
20              Fourth, through his own actions, through his
21    statements on recordings, he demonstrated the utter lack of
22    respect for the insider trading laws.
23              Now, there is in part some significance to the fact
24    that he hasn't accepted responsibility.  It does have an effect
25    on the guidelines, and we submit it should have an effect on
```

24

1ADHRAJ1

1  your Honor's sentencing.
2          Mr. Lynam mentioned cooperating witnesses.  With
3  respect to cooperating witnesses, when the government submits
4  5K letters to courts, as your Honor knows, we put in all the
5  facts, the good, the bad and the ugly, all gains as a result of
6  particular cooperating witness's involvement, and we leave the
7  sentence to the court.  What is negotiated -- what Mr. Lynam
8  mentioned that there is negotiation over the gain, that is
9  factually incorrect with respect to cooperators.  What is
10  negotiated, your Honor, are forfeiture, and that is negotiated
11  in this case as well.  We have negotiated forfeiture with the
12  defense.  So it is no different.
13          In short, your Honor, the government asks this court
14  to sentence Mr. Rajaratnam based on his conduct to the longest
15  term of imprisonment for an insider trading defendant because
16  he doesn't compare to others, a sentence that punishes him for
17  his extensive crimes, reflects the seriousness and brazenness
18  of those crimes, and sends a clear and unmistakable message to
19  money managers and hedge funds that insider trading must stop
20  and if you get caught, no matter how powerful, no matter how
21  rich, no matter what your position is in the securities
22  industry, you will be punished accordingly.
23          All defendants, your Honor, are complex human beings.
24  All defendants have a variety of motives, and there is no one
25  human being who is all bad or who is all good.  That's no

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

1ADHRAJ1

1    different than when your Honor sentences any other defendant in
2    this courthouse, be it a drug trafficker or a violent criminal
3    or somebody who participated in a robbery.  Each of those
4    individuals also has loved ones, each of those individuals -- I
5    would respectfully submit most of them -- not all of them,
6    unfortunately, but most of them -- have done good acts, have
7    done good things in life.  Maybe they don't have the resources,
8    maybe they don't have the ability to provide the court with
9    hundreds of letters or articulate what they have done that is
10   good in life, but all human beings are like that.
11           We ask your Honor to sentence this defendant based on
12   the conduct, the criminal conduct that he committed.
13           Thank you, your Honor.
14           THE COURT:  Thank you, Mr. Brodsky.
15           Mr. Rajaratnam, you are not required to say anything
16   today.  Mr. Lynam has spoken on your behalf.  But you have the
17   opportunity to say something if you would like to.
18           THE DEFENDANT:  No thank you, your Honor.
19           THE COURT:  I adopt the factual recitations of the
20   presentence report.
21           With respect to the calculation of the sentencing
22   guideline range, because the defendant has no prior offenses,
23   he is properly placed in Criminal History Category number I.
24           His total offense level for his insider trading crimes
25   is 38, calculated as follows:  The base offense level for the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1ADHRAJ1
1  insider trading offense is 8.  This is increased by 24 levels
2  because a reasonable estimate of the total gains resulting from
3  the offenses are greater than $50 million but less than $100
4  million.  In making this calculation, I have included estimated
5  actual gains based on the increase in the price of the
6  company's shares from the date of the defendant's purchases to
7  a time shortly after the public learned of the inside
8  information.
9          My gain calculation also includes estimated losses
10 avoided in the Intel and Google shares based on a decrease in
11 price of the shares from the date the defendant sold the shares
12 to the time shortly after the public learned of the inside
13 information.  The losses avoided on the Goldman Sachs stock
14 were calculated based on the date that certain analysts made
15 public estimates of Goldman's fourth quarter loss for 2008.
16         The gain amount also includes both the defendant's
17 personal gains from insider trading as well as the much larger
18 gains realized by Galleon investors, who of course did not
19 participate in the criminal activity but benefited thereby.
20 That brings the gain to an amount well over $50 million.
21         I have excluded any gains or losses avoided that
22 relate to the Galleon Crossover Fund because I conclude there
23 is insufficient evidence to find that all of these trades
24 originate with the defendant.  In any event, I note that their
25 inclusion would have no impact whatsoever on the offense level
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

27

1ADHRAJ1

1    calculation.
2            I also find that there is an additional four-level
3    enhancement in the offense level because the defendant played a
4    leadership role in his crimes.  Specifically, the government
5    has established that the defendant was the organizer and leader
6    of the conspiracy charged in Count One of the indictment and
7    that there were at least five knowing participants in the
8    conspiracy alleged.
9            Finally, I conclude that a two-level enhancement is
10   appropriate under the guidelines for obstruction of justice.
11   Specifically I find that the defendant acted with the specified
12   intent to obstruct the SEC's investigation when at his
13   deposition he was asked whether he had any reason to believe
14   that AMD was going to be acquired by ATI before the public
15   announcement of the acquisition.  His answer that he did not
16   was clearly false, as the evidence in the case has shown, and
17   obviously pertained to an issue material to the SEC's
18   proceeding and the crimes for which he has been convicted in
19   this case.
20           This brings the defendant's total offense level to 38.
21           At offense level 38 and Criminal History Category I,
22   the Probation Department has correctly calculated the
23   sentencing guideline range as 235 to 293 months in prison.
24           Mr. Lynam, is there anything further that you would
25   like to say before the court pronounces sentence?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

1ADHRAJ1

```
 1              MR. LYNAM:  No, your Honor.
 2              THE COURT:  Mr. Brodsky, is there anything further the
 3    government would like to say?
 4              MR. BRODSKY:  No, your Honor.
 5              THE COURT:  Mr. Rajaratnam, would you please stand and
 6    I will state the sentence and then allow the parties to make
 7    any legal objections.
 8              It is the judgment of this court the defendant, Raj
 9    Rajaratnam, is hereby committed to the custody of the United
10    States Bureau of Prisons to be imprisoned for a term of 132
11    months.
12              Upon release from imprisonment, the defendant shall be
13    placed on supervised release for a term of two years, with the
14    conditions recommended by the Probation Department; namely, the
15    following mandatory conditions:  The defendant shall not commit
16    another federal, state or local crime; the defendant shall not
17    possess a controlled substance; the defendant shall not possess
18    a firearm, dangerous weapon or destructive device.
19              The mandatory drug testing is suspended because the
20    court finds there is a low risk of future drug abuse.
21              The defendant shall cooperate in the collection of DNA
22    as directed by the probation officer.
23              In addition, defendant shall comply with standard
24    conditions 1 through 13, which will be explained,
25    Mr. Rajaratnam, at the time of your release.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

1ADHRAJ1

```
 1              In addition, the following special conditions shall
 2    apply:  The defendant shall provide the probation officer with
 3    access to any requested financial information.
 4              Within 72 hours of release from custody of the Bureau
 5    of Prisons, the defendant shall report in person to the
 6    probation office in the district of his residence.
 7              I am imposing a fine in the amount of $10 million, as
 8    recommended by the probation office.
 9              I have not imposed restitution because there are no
10    individual identifiable victims under the statute.
11              Have the parties agreed to the form of a forfeiture
12    order?
13              MR. LYNAM:  Yes, your Honor.
14              MR. BRODSKY:  Yes.
15              MR. LYNAM:  We have signed one, your Honor, and I
16    believe Mr. Brodsky has it.
17              MR. BRODSKY:  Yes, your Honor.  The forfeiture order
18    is in the amount of $53,816,434.
19              THE COURT:  I will enter that order.
20              It is further ordered that the defendant shall pay to
21    the United States a special assessment of $1400, which shall be
22    due immediately.
23              You may sit down.
24              In imposing this sentence I have taken into account
25    all of the factors that are set forth in the sentencing
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1ADHRAJ1
```
 1   statute, including the nature of the crimes, the need for just
 2   punishment, the need for deterrence, the risk of sentencing
 3   disparities, the guideline calculation, and finally the
 4   defendant's individual circumstances.  In considering those
 5   factors, the court is directed to impose a sentence sufficient
 6   but not greater than necessary to achieve all the statutory
 7   goals.
 8           Considering the nature of the defendant's crimes, the
 9   government is absolutely correct that insider trading is an
10   assault on the free markets that are a fundamental element of
11   our democratic society.  There may not be readily identifiable
12   victims, but when the playing field is not level, the integrity
13   of the marketplace is called into question and the public
14   suffers.  That is not to say that the defendant's insider
15   trading is the cause of the economic dislocations that our
16   society now faces.  That would be too easy an answer.  But his
17   crimes and the scope of his crimes reflect a virus in our
18   business culture that needs to be eradicated.  Simple justice
19   requires a lengthy sentence.
20           In addition to simple justice, general deterrence is
21   an important factor in any sentence.  There is no crystal ball
22   to tell us what length of sentence will deter other fund
23   managers, traders and brokers from engaging in insider trading,
24   but certainly eleven years is the high end of the sentencing
25   range for similar crimes and the court's view is highly likely
```

31

1ADHRAJ1

1  to act as a strong and necessary deterrent.
2           In reaching that conclusion a court has to consider
3  meaningful distinctions between different types of criminal
4  behavior and avoid unjustified wide disparities with similarly
5  situated defendants convicted of similar crimes.  The
6  sentencing guidelines can be helpful in drawing these
7  distinctions, but particularly in financial crimes can point to
8  widely disparate sentences that very similar offenses reflect
9  depending on the vagaries of stock price movements and other
10 factors that can ratchet up or down the guideline gain
11 calculation.
12          It is preferable then to place more focus on the
13 nature of the crime, the evil of insider trading and its impact
14 on the markets.  The defendant downplays the seriousness of the
15 offenses while the government declines to draw any
16 distinctions.  Perhaps it is sufficient to observe that insider
17 trading is insidious but poses a different danger in Enron-type
18 frauds and Madoff-like Ponzi schemes.  Some distinction,
19 therefore, is reasonable.
20          With respect to the risk of unfair disparity vis-a-vis
21 other insider trading defendants, while this sentence is, as
22 noted, at the high end of the range, it properly reflects the
23 breadth of the defendant's crimes.  It also takes into account
24 personal circumstances, that I will now address.
25          It is tempting in high-profile cases such as this one

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1ADHRAJ1

1    to ignore factors that one might argue in favor of a moderated
2    sentence.  The clear message is important and anything less is
3    less than satisfying.  But the court has an obligation to
4    consider individual circumstances, and here there are two
5    factors that help to determine a fair sentence.
6              First, I concur with the Probation Department that the
7    defendant's good works figure in the equation here.  It is true
8    that many wealthy people are in the position to make the usual
9    charitable contributions, but defendant's responsiveness to and
10   care for the less privileged goes considerably beyond the norm
11   and can be seen in the scores of letters I received detailing
12   his efforts to help tsunami victims in that Sri Lanka,
13   earthquake victims in Pakistan, a homeless shelter here in New
14   York, and 9/11 victims as well.
15             Second, I consider the defendant's medical condition a
16   factor that the Probation Department declined to consider.  As
17   detailed in certain of the sentencing submissions to the court,
18   that I will unseal today, his advanced diabetes leading to
19   imminent kidney failure, the need for transplant surgery, and a
20   host of related problems.  Will the Bureau of Prisons be able
21   to provide not the level of care he is now receiving but the
22   basic level of care necessary to address those complex set of
23   illnesses.  Perhaps, but it is far from a given and my
24   experience leads me to be less optimistic than others.
25             I am more certain of the fact that prison provides a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1ADHRAJ1

```
 1   more intense form of punishment for critically ill prisoners.
 2   Illness does not provide a get-out-of-jail-free card, but some
 3   form of forbearance, however constrained by circumstances, is
 4   fundamental to our system of justice and is appropriate here.
 5           Do either counsel know of any legal reason why the
 6   sentence should not be imposed as stated?
 7           MR. BRODSKY:  No, your Honor.
 8           MR. LYNAM:  No, your Honor.
 9           THE COURT:  I hereby order the sentence to be imposed
10   as so stated.  A complete copy of the presentence report shall
11   be provided to the Bureau of Prisons and the Sentencing
12   Commission.
13           Mr. Rajaratnam, you have the right to appeal this
14   sentence.  If you are unable to pay the costs of the appeal,
15   you have the right to apply for leave to appeal as a poor
16   person.  If you request, the clerk of the court will prepare
17   and file a notice of appeal on your behalf immediately.
18           Do you understand this?
19           THE DEFENDANT:  Yes, sir.
20           THE COURT:  My understanding from the government's
21   submission is that they do not oppose voluntary surrender.
22           MR. BRODSKY:  That is correct, your Honor.
23           THE COURT:  I am going to order that the defendant
24   shall surrender for service of his sentence at an institution
25   designated by the Bureau of Prisons on or before November 28th
```

34

1ADHRAJ1

1   of this year.
2           MR. GUHA:  Your Honor, may we be heard on behalf of
3   Mr. Rajaratnam regarding the issue of bail pending appeal?
4           THE COURT:  Yes, you may.  Let me first ask the
5   parties whether there are any other issues with respect to the
6   sentencing issue to be addressed?
7           MR. BRODSKY:  No, your Honor.  I do think the
8   government would move to dismiss the underlying counts in the
9   original indictment, superseder 1.  He was convicted in
10  superseder 2.  Other than that, I think the bail pending appeal
11  is the remaining issue.
12          THE COURT:  All right.
13          MR. GUHA:  Thank you, your Honor.  Good morning.  Your
14  Honor, with regard to the issue of bail pending appeal, the law
15  is very clear, and I don't think it is being disputed by the
16  government, and that law requires under these circumstances and
17  on this record that Mr. Rajaratnam shall be granted bail
18  pending appeal.
19          The test is very simple.  There must be -- your Honor
20  must find by clear and convincing evidence, first, that
21  Mr. Rajaratnam does not pose a risk of flight or danger to the
22  community.  On this record, your Honor, we respectfully submit
23  your Honor can make those findings by clear and convincing
24  evidence.
25          With respect to the issue of dangerousness to the

1ADHRAJ1

 1  community, there has never been any allegation, nor can there
 2  be, that Mr. Rajaratnam ever has posed or ever will pose a
 3  danger to the community.
 4          With respect to the issue of flight, a few points,
 5  your Honor.  First of all, this court, both your Honor and two
 6  different magistrate judges, have found on four separate
 7  occasions that Mr. Rajaratnam is not a flight risk.  Certainly
 8  not one that can't be addressed by bail conditions short of
 9  remand.  I think your Honor's observation after the verdict
10  when the government moved for remand was telling and correct.
11  Your Honor said:  "I believe that based on the defendant's
12  track record to date that he is not a risk, a significant risk
13  of flight, and I'm not sure there is anything more that the
14  defendant could do to establish that other than what he has
15  done."
16          Your Honor's finding at that time has been only
17  supported and buttressed by the findings of the Probation
18  Department.  The Probation Department in their PSR, issued on
19  September 20th, just roughly under a month ago, also found that
20  Mr. Rajaratnam is not a risk of flight, and the probation
21  office's finding on this point I think should be given heavy
22  weight.  The probation office made this finding independently,
23  after interviewing Mr. Rajaratnam as part of the process,
24  meeting with his family, exploring in detail his extensive ties
25  to this community.

36

1ADHRAJ1
```
 1              Your Honor, what shouldn't be lost in this is
 2    Mr. Rajaratnam has been a resident of this country and in the
 3    New York area in particular for over 30 years.  He lives with
 4    his family, including his elderly parents, and really has been
 5    an integral part of this community.
 6              The Probation Department also assessed his medical
 7    situation and observed the need for Mr. Rajaratnam to meet
 8    regularly with his team of physicians to address the health
 9    issues, that your Honor is aware of.  They also are aware
10    obviously of whatever ties he may have had abroad, and the
11    Probation Department came to the conclusion that he is not a
12    risk of flight.
13              Perhaps the best evidence, your Honor, that
14    Mr. Rajaratnam is not and has not ever posed a risk of flight
15    is the fact that Mr. Rajaratnam sits here today.  From the date
16    of his arrest, which is just under two years ago, there have
17    been broad pronouncements both by the government and through
18    the media of lengthy sentences.  In fact, much lengthier than
19    your Honor just imposed.  Throughout that one constant has been
20    there -- Mr. Rajaratnam has abided by every term of his bail
21    and has appeared before this court whenever asked to do so, and
22    he will continue to do so.  Candidly, on this record, there is
23    nothing to suggest to the contrary.
24              We believe your Honor can make a finding of clear and
25    convincing evidence that Mr. Rajaratnam does not impose a risk
```

1ADHRAJ1

```
 1   of flight and he does not impose a dangerousness to the
 2   community -- he is not a danger to the community.
 3            The second prong is a determination as to whether the
 4   appeal in this case presents a substantial issue of law or
 5   fact.  As your Honor is certainly aware, Mr. Rajaratnam intends
 6   to appeal your Honor's finding on the motion to suppress the
 7   wiretaps.  A substantial issue under the Second Circuit law --
 8   and again, I don't think this is in dispute -- defines a
 9   substantial issue as one that raises a close question or one
10   that very well could be decided the other way.  That is the
11   United States v. Randall, 761 F.2d 122, 125.  That is a widely
12   viewed, seminal case on this issue.
13            All we are asking your Honor to do in terms of
14   granting Mr. Rajaratnam bail pending appeal is to confirm what
15   your Honor already found in your opinion.  Namely, that the
16   issues raised in the wiretap, and specifically the issue of
17   necessity, presents a close question, one that could be decided
18   the other way.  Your Honor found that in his order and your
19   Honor also identified in your order several other legal issues
20   of which there are mixed opinions.
21            Now, one thing to be clear.  Finding that there is a
22   substantial issue does not require your Honor to find that
23   there was an error in the order that you issued with respect to
24   the wiretaps.  All it requires is that there is a close
25   question that may be decided the other way.  As one example,
```

38

1ADHRAJ1

1    Judge Jones in the Bernie Ebbers case granted Mr. Ebbers bail
2    pending appeal despite both the length of his sentence and her
3    written opinion that she believed her ruling on the conscious
4    avoidance of guilt instruction was correct.  But Judge Jones in
5    the Ebbers sentencing recognized that there was a close issue
6    that may be decided the other way and that therefore following
7    the law allowed Mr. Ebbers to remain out on bail pending his
8    appeal, as should be the case with Mr. Rajaratnam.
9         The lead issue on appeal, your Honor, is fairly
10   straightforward.  The Fourth Amendment constitution in Title
11   III require that prior judicial approval of a wiretap be based
12   on a full and complete statement of necessity in the wiretap
13   affidavit the government submits ex parte to an authorizing
14   judge.
15        Now, your Honor found that the affidavit submitted by
16   the government in order to gain this wiretap contained "a
17   nearly complete omission by the government of critical facts
18   necessary for Judge Lynch's deliberation."  Now your Honor
19   proceeded to find that it was immaterial because of
20   supplemental information provided by the government at the
21   Franks hearing, and while we respectfully disagree with your
22   Honor's conclusion, we do note that that is a close question,
23   and it is almost indisputably a close question.  I say
24   indisputably because the Seventh Circuit has addressed that
25   very issue as to whether post hoc supplemental information can

1ADHRAJ1

1    be used to prop up an otherwise deficient affidavit in the
2    context of a Franks hearing.  That case is the United States v.
3    Harris.  It is 464 F.3d 733, 739.
4             This issue is a close issue, your Honor.  The Second
5    Circuit has not had an opportunity to rule on it and it will
6    when this issue is presented to it on appeal.  If it follows
7    the guidance of the Seventh Circuit, it may well reverse your
8    Honor's order in terms of the conclusion and we may well be
9    back before your Honor on remand.  That is all that the statute
10   requires your Honor to find in order to grant Mr. Rajaratnam
11   bail pending appeal.
12            There are two other issues, your Honor, that we intend
13   to raise that we also suspect will independently present a
14   substantial issue that warrants Mr. Rajaratnam's bail pending
15   appeal.  One, the impact of the government's misstatements and
16   omissions regarding probable cause and, second, the broader
17   question as to whether Title III permits wiretaps for insider
18   trading cases.  On its face Title III does not do so, and we
19   are mindful of your Honor's findings but we respectfully submit
20   that this is an issue that the Second Circuit needs to address
21   and will have the opportunity to address once our appeal is
22   under way.
23            In the government's submissions on this matter, the
24   government has said very little on the substantial nature of
25   the issues presented on the wiretap.  Your Honor, I understand

40

1ADHRAJ1

1  why.  While we respectfully disagree with your Honor's
2  conclusion on the wiretap, we fully intend at appeal to embrace
3  many of the factual findings your Honor properly made in
4  connection with the wiretap application.  Your Honor found in
5  his order that the government "failed to disclose the heart and
6  soul of its investigation, without which a reasoned evaluation
7  of the necessity of employing wiretaps was impossible."  Your
8  Honor found that was a glaring omission and found that you were
9  "at a loss to understand how the government could have ever
10 believed that Judge Lynch could determine whether a wiretap was
11 necessary to this investigation without knowing the most
12 important part of that investigation."  The first quote was
13 from page 43 of your order the second is from page 36.
14          Your Honor found that the government's representation
15 was nearly a full and complete omission of what investigative
16 procedures had in fact been tried and deprived Judge Lynch the
17 opportunity to assess the necessity of a wiretap.  That is page
18 40.
19          Your Honor found that the government recklessly
20 withheld from Judge Lynch "precisely the nuts and bolts of an
21 investigation that must be presented to a court if it is to
22 fulfill the function of determining whether conventional
23 investigative techniques are likely to prove inadequate."
24          I understand why the government doesn't want to
25 address those findings and pretend they didn't happen.  I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1ADHRAJ1

```
 1   wouldn't want to and I wouldn't want to have to defend it in
 2   front of the Second Circuit, but they are going to have to do
 3   so when this appeal is taken, and the Second Circuit may well
 4   rule in a different direction.
 5            The third prong of the test for bail pending appeal
 6   asks if the appeal is decided in the defendant's favor will a
 7   new trial be required.  I note again the government has made no
 8   submission contesting that in fact if the wiretaps are -- if
 9   the appeal is granted and the wiretaps are suppressed there
10   will be the need for a new trial, and frankly I don't think
11   they have a choice given the openings and closings in this case
12   before the jury.
13            During both the openings and closings the government
14   repeatedly referred to the wiretaps as the centerpiece of their
15   case, which is clearly a factor in the jury's verdict on all
16   counts.  The government said "the tapes were devastating
17   evidence of the defendant's crime in realtime and, as you have
18   seen, they alone are powerful evidence that the defendant is
19   guilty of all the crimes."  The trial in the closing at page
20   5160.
21            They said again, these recordings alone lead to the
22   unshakeable conclusion that he is guilty as charged of engaging
23   in an illegal scheme with Kumar.  They said again, "Once again,
24   the best evidence of the scheme, the most powerful evidence of
25   the scheme, are once again the wiretaps."  They described it as
```

42

1ADHRAJ1

1  the best, the most powerful, and the core evidence of the
2  government's case.
3              On that record, the government cannot credibly stand
4  up and suggest that if the wiretaps are suppressed there won't
5  likely be an order for a new trial, and that is what the court
6  must find and if so, Mr. Rajaratnam's entitled to bail pending
7  appeal.
8              Just in summation, your Honor, one point very briefly.
9  I want to repeat Mr. Lynam's comments, to thank you, the court
10 and the courtroom staff for all the consideration it's shown to
11 Mr. Rajaratnam throughout this ordeal.  Your Honor, this is no
12 doubt a somber day for Mr. Rajaratnam, as it is for all of us
13 who have grown to know him and care about him, but
14 Mr. Rajaratnam has faced this day, has faced many somber days
15 from the date of his arrest almost two years ago and many dire
16 predictions about what would happen, and the one constant, as I
17 mentioned before, is that Mr. Rajaratnam has followed all of
18 his obligations to probation, this court and the government
19 since that day with dignity and discipline.  He has followed
20 his bail conditions to the letter of the law and he
21 unquestionably will continue to do so if, as the law requires
22 under the circumstances, bail is granted while his appeal is
23 pending.
24             Thank you, your Honor.
25             (Continued on next page)
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

43

1adnraj2                    Sentence

 1              THE COURT:  Thank you.
 2              MR. BRODSKY:  Your Honor, the standard here, and I
 3    think it's undisputed, is that Mr. Rajaratnam bears the burden
 4    of demonstrating by clear and convincing evidence that he is
 5    not likely to flee.  He bears the burden of demonstrating that
 6    his appeal raises a substantial question of law or fact, and he
 7    bears the burden that that substantial question, if one exists,
 8    will likely result in a reversal or an order for a new trial.
 9              Your Honor, unfortunately for Mr. Rajaratnam, he can't
10    demonstrate by clear and convincing evidence that he is not
11    likely to flee.  The reason for that, your Honor, is today is a
12    serious changed circumstance for Mr. Rajaratnam, and I don't
13    think anybody can reasonably dispute that.
14              Unlike any day prior to today, Mr. Rajaratnam had
15    hoped that his sentence would be low, he had hoped based on his
16    arguments with respect to his medical conditions and his other
17    arguments.  Today that changed completely.  He learned that the
18    Court sentenced him to 11 years, which by anybody's analysis or
19    review is a very serious sentence.  He knows, in light of what
20    he believes are his medical conditions, what future he faces.
21    And I believe for that reason alone, your Honor, compliance
22    with bail conditions prior to today doesn't provide good
23    meaning with respect to the statute.  The statute has a
24    presumption that he should should surrender and there should
25    not be bail pending appeal.  He, like other defendants, like

44

1adnraj2                    Sentence

1   Mr. Contorinis, has dual citizenship, he has strong ties to
2   foreign countries, stronger than Mr. Contorinis did in that
3   case.
4           The probation report I do think is helpful in the
5   sense that it shows his strong ties to Sri Lanka.  It shows the
6   millions of dollars that he's given to people and organizations
7   in Sri Lanka.  He owns property there in Sri Lanka.  He owns a
8   home, and he has a lot of family and friends in Sri Lanka.  He
9   also owns a multimillion dollar property in Singapore and has
10  ties to that country.
11          These ties are not to be taken lightly.  Yes,
12  Mr. Rajaratnam complied with his bail conditions, but as of
13  today, in light of his sentence, there is no clear and
14  convincing evidence that he is not a flight risk given, those
15  ties, given his financial means, and given the 11-year sentence
16  he's facing.
17          We addressed a few other issues as to why.  I think
18  your Honor's finding today that Mr. Rajaratnam did lie in his
19  SEC deposition is another further indication from the
20  government's standpoint that Mr. Rajaratnam's behavior and
21  conduct from 2003 through 2009 is a reflection of a person who
22  is willing to violate the law to accomplish what he wants.
23          With respect to bail pending appeal, the issue of
24  whether his appeal will raise a substantial question of law or
25  fact, your Honor know very well the findings.  Your Honor sat

45

          1adnraj2                    Sentence
 1   through the Franks hearing and made the determination.  We did
 2   not try and didn't need to rehash all of that in our reply
 3   memo.  What we did emphasize in our reply memo I think is
 4   significant, which is the standard of review on appeal for
 5   Mr. Rajaratnam is a very difficult one.
 6             It's one where the Second Circuit grants considerable
 7   deference to the district court, issuing judge on the wiretap.
 8   It's one where the issuing judge, so long as there are enough
 9   facts that are minimally adequate to physically support the
10   determination, the wiretap will be upheld.  And it's one where
11   the Second Circuit has applied Franks.  I know the defense has
12   this belief, two-pronged belief; one that Franks doesn't apply
13   and one that they hope one day to convince a Court that insider
14   trading can't be a means to obtain a wiretap, the insider
15   trading conduct.
16             Your Honor, courts that have looked at this, including
17   Judge Sullivan and your Honor, completely rejected the notion
18   that the wiretap statute does not allow investigations and the
19   use of a wiretap for investigating insider trading.  The
20   Supreme Court in Carpenter v. United States said wire fraud
21   includes insider trading conduct.  Congress has repeatedly said
22   wire fraud includes insider trading conduct.
23             So, while they have hope for that, that hope has no
24   reasonable basis on appeal.
25             With respect to Franks, we cited a number of cases in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1adnraj2                    Sentence

1   which, with respect to search warrants and with respect to, in
2   the Bianco case the necessity section of a wiretap application,
3   the Second Circuit applied Franks, and they applied the
4   analysis different from the Seventh Circuit, and this is the
5   Second Circuit to whom they are appealing.
6           Your Honor, they do not have an appeal that raises a
7   substantial question of law and fact in light of that.  And we
8   submit, your Honor, respectfully, that he should be denied bail
9   pending appeal and that his surrender data, based on our
10  communications with the Bureau of Prisons, should be in
11  approximately 21 days.  Thank you, your Honor.
12          MR. GUHA:  Your Honor, if I may, just one point of
13  clarification.
14          THE COURT:  Yes.
15          MR. GUHA:  I believe Mr. Brodsky is incorrect on one
16  point of law.  At appeal the legal issue as to whether post hoc
17  supplemental information can be used to support an otherwise
18  infirm affidavit will be determined de novo.  There is no
19  deference given; it is a pure legal issue, your Honor.  I think
20  that is one of the many factors that make it such a close
21  question, your Honor, and one that candidly may be decided the
22  other way, and that's all that the law requires.  And making
23  that determination the law requires that Mr. Rajaratnam shall
24  be permitted bail pending appeal.
25          THE COURT:  Thank you.

47

1adnraj2                    Sentence

1      With respect to the surrender date, I have been
2  providing defendants as a matter of standard practice with a
3  45-day surrender date, and even in those situations I have had
4  situations where I have had to extend it because the Bureau of
5  Prisons has not been able to categorize the defendant.  So
6  Mr. Rajaratnam will be treated like any other defendant in the
7  courtroom, and the surrender date remains unchanged.
8      I deny the defendant's motion for bail pending appeal.
9  I conclude that he has established by clear and convincing
10  evidence that he is unlikely to flee by his conduct to date,
11  including his conduct since his conviction in this case, as
12  well as by the new information regarding his medical needs.
13  But I don't believe that an appeal raises a substantial
14  question of law likely to result in reversal or a new trial.
15      Though I was obviously less than happy with the
16  government's failure to present Judge Lynch with information
17  relevant to his evaluation of whether the use of a wiretap was
18  necessary, it seems clear that suppression is not the remedy,
19  given the factual and the legal findings that I made on the
20  record at the conclusion of the Franks hearing and in the
21  Court's opinion.  Therefore, the motion for bail pending appeal
22  is denied.
23      Is there anything further to address?
24      MR. GUHA:  Yes, your Honor.  We would respectfully ask
25  that your Honor stay your ruling on bail pending appeal so we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

1adnraj2                    Sentence

1   may seek an appeal an that issue, your Honor.
2           THE COURT:  I don't think you need a stay at this
3   juncture.
4           MR. LYNAM:  Your Honor, there is one other issue then.
5   In light of your ruling on bail, we would ask the Court to make
6   a recommendation of a designation to the Bureau of Prisons, and
7   we would ask that that be the federal medical center in Butner,
8   North Carolina.
9           THE COURT:  I will make that recommendation.
10          MR. LYNAM:  Thank you, your Honor.
11          THE COURT:  Anything further?
12          MR. BRODSKY:  Yes, your Honor.
13          We move to dismiss the underlying counts including the
14  first superseding indictment.
15          THE COURT:  That motion is granted.
16          If there is nothing further, we will adjourn.
17          (Adjourned)
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# GX 26

**GX 26**

### Certain Communications In February 2005

GOVERNMENT
EXHIBIT
26
S2 09 Cr. 1184 (RJH)

| Date | Time* | From | To | Duration | GX |
|------|-------|------|------|----------|-----|
| 2/10/05 | 6:29 pm | Smith | Ahmed | 9 minutes | 282 |
| 2/17/05 | 4:10 pm | Ahmed | Smith | 3 minutes | 282 |
| 2/17/05 | 8:51 pm | Smith | Ahmed | 2 minutes | 282 |

\* Eastern Standard Time.

# GX 27

**GX 27**



GOVERNMENT
EXHIBIT
27
S2 09 Cr. 1184 (RJH)

# GX 28

**GX 28**

**Galleon Tech Profit on Stock in Integrated Circuit Systems (ICST)
Held at Time of its Acquisition by Integrated Device Technology (IDTI)**

| Fund (Manager) | Realized Profit | GX |
|---|---|---|
| Galleon Tech (GRC) | $ 2,678,211 | 150, 161, 162 |

GOVERNMENT
EXHIBIT
28
S2 09 Cr. 1184 (RJH)

# GX 39

**GX 39**

## Certain Communications On July 24, 2008

| Time* | From | To | Duration / Content | GX |
|-------|------|-----|--------------------|-----|
| 2:27 pm | Chiesi | Taylor | 2 minutes | 219, 220 |
| 2:29 pm | Chiesi | Taylor | 13 minutes | 219, 220 |
| 8:41 pm | Rajaratnam | Chiesi | 9 minutes | 200 |
| 8:52 pm | Taylor | Chiesi | 15 minutes | 219, 221 |
| 9:07 pm | Chiesi | Kurland | 6 minutes | 263-A |
| 9:14 pm | Chiesi | Rajaratnam | "Akamai.... They're gonna guide down... I just got a call from my guy... They think internally the stock goes to 25...." | 200, 532 |

* Eastern Standard Time.

GOVERNMENT
EXHIBIT
39
S2 09 Cr. 1184 (RJH)

# GX 42

**GX 42**



GOVERNMENT
EXHIBIT
42

SZ 09 Cr. 1184 (RJH)

# GX 44

**GX 44**

**Galleon Tech Profit From Trades in
Akamai Securities Beginning on July 25, 2008**

GOVERNMENT
EXHIBIT
44
SZ 09 CF 1184 (RJH)

| Fund (Manager) | Realized Profit | GX |
|---|---:|---|
| Galleon Tech (TAM) | $ 5,139,851 | 150 |

# GX 47

**GX 47**

## Telephone Communications Between Roomy Khan and Deep Shah
### January 2007 – July 2007

| NUMBER OF PHONE CALLS: | 119 |
|---|---|

GOVERNMENT
EXHIBIT
47
S2 09 Cr. 1184 (RJH)

# GX 48

**GX 48**

GOVERNMENT
EXHIBIT
48
S2 09 Cr. 1184 (RJH)

### Certain Communications On July 2, 2007

| Time* | From | To | Duration | GX |
|-------|------|-----|----------|-----|
| 2:20 pm | Hilton | Holloway | 7 minutes | 246 |
| 3:06 pm | Shah | Khan | 1 minutes | 233 |
| 3:10 pm | Shah | Khan | 2 minutes | 233 |
| 3:14 pm | Shah | Khan | 1 minutes | 233 |
| 3:53 pm | Khan | Rajaratnam | 1 minutes | 1400-A |
| 3:59 pm | Khan | Rajaratnam | 25 seconds | 1400-A |
| 4:02 pm | Khan | Rajaratnam | 3 minutes | 1400-A |

* Eastern Standard Time

# GX 57

**GX 57**

**Telephone Communications Between Roomy Khan and Shammara Hussain**
**January 2007 – July 2007**

| NUMBER OF PHONE CALLS: | 150 |
|---|---|

GOVERNMENT
EXHIBIT
**57**
S2 09 Cr. 1184 (RJH)

# GX 58

**GX 58**

## Certain Communications From July 5, 2007 Through July 19, 2007

| Date | Time* | From | To | Duration/ Content | GX |
|------|-------|------|-----|-------------------|-----|
| 7/5/07 | 10:14 pm | Hussain | Khan | 10 min | 248 |
| 7/6/07 | 3:40 pm | Khan | Hussain | 3 min | 248, 249 |
| 7/7/07 | 11:47 am | Khan | Hussain | 1 min | 249 |
| 7/7/07 | 11:48 am | Khan | Hussain | 12 min | 248, 249 |
| 7/10/07 | 11:44 pm | Khan | Hussain | 16 min | 249 |
| 7/11/07 | 9:34 pm | Hussain | Khan | 11 min | 248 |
| 7/12/07 | 9:00 am | Hussain | Khan | 1 min | 248 |
| 7/12/07 | 9:01 am | Hussain | Khan | 5 min | 248 |
| 7/13/07 | 1:17 pm | Galleon | Khan | 22 min | 1400-B |
| 7/13/07 | 1:39 pm | Rajaratnam | Horowitz | "se ll all the goog in all accounts.. reached my price [t]arget" | 1537, 2450 |
| 7/16/07 | 4:09 pm | Rajaratnam | Khan | 1 min | 200 |
| 7/16/07 | 5:07 pm | Hussain | Khan | 2 min | 248 |
| 7/17/07 | 7:17 am | Rajaratnam | Khan | 5 min | 200 |
| 7/17/07 | 4:56 pm | Khan | Rajaratnam | 12 min | 200 |
| 7/19/07 | 10:33 am | Khan | Rajaratnam | 5 min | 200 |

* Eastern Standard Time.

GOVERNMENT
EXHIBIT
58
S2 09 Cr. 1184 (RJH)

# GX 59

**Roomy Khan Trading in Google Securities**
**From July 13, 2007 Through July 20, 2007**

| Person / Account | Date | Buy/Sell | Description | GX |
|---|---|---|---|---|
| Roomy Khan | 7/12/07 | Buy | 100 put option contracts | 156 |
| Roomy Khan | 7/13/07 | Buy | 16 put option contracts | 156 |
| Roomy Khan | 7/16/07 | Buy | 200 put option contracts | 156 |
| Roomy Khan | 7/18/07 | Buy | 250 put option contracts | 156 |
| Roomy Khan | 7/19/07 | Buy | 566 put option contracts | 156 |
| Roomy Khan | 7/20/07 | Buy | 400 put option contracts | 156 |

GOVERNMENT
EXHIBIT
59
S2 09 Cr. 1184 (RJH)

# GX 60

**GX 60**



GOVERNMENT
EXHIBIT
60
S2 09 Cr. 1184 (RJH)

## Galleon Tech and Diversified Trading in Google Securities
### From July 13, 2007 Through July 20, 2007

| Fund | Manager Code | Date | Time | Buy/ Sell | Description | GX |
|---|---|---|---|---|---|---|
| Galleon Tech | TAM | 7/13/07 | 3:03 pm* | Sell | 125,000 shares | 150, 100-I |
| Galleon Tech | TAM | 7/13/07 | 3:20 pm* | Sell short | 48,170 shares | 150, 100-I |
| Galleon Tech | TMT | 7/13/07 | 3:34 pm | Buy | 2,000 put option contracts | 150, 104-C, 304 |
| Diversified | DIV | 7/13/07 | 3:03 pm* | Sell | 10,000 shares | 150, 100-I |
| Galleon Tech | TMT | 7/16/07 | 10:40 am | Buy | 2,000 put option contracts | 150, 104-C, 304 |
| Galleon Tech | TMT | 7/17/07 | 11:55 am | Sell short | 25,000 shares | 150, 100-I, 350 |
| Galleon Tech | TMT | 7/17/07 | 11:55 am | Buy | 1,000 put option contracts | 150, 104-C, 304 |
| Diversified | DIV | 7/17/07 | 12:01 pm | Sell Short | 15,000 shares | 150, 100-I, 350 |
| Galleon Tech | TMT | 7/18/07 | 10:48 am | Buy | 1,600 put option contracts | 150, 104-C, 304, 305 |
| Galleon Tech | TMT | 7/18/07 | 10:58 am | Sell | 500 put option contracts | I50, 104-C, 305 |
| Galleon Tech | TMT | 7/19/07 | 9:40 am | Sell short | 100,000 shares | 150, 100-I, 350 |
| Diversified | DIV | 7/19/07 | 10:43 am | Sell short | 25,000 shares | 150, 100-I, 350 |

\* Order time based on Galleon OMS data.

# GX 61

**GX 61**



GOVERNMENT
EXHIBIT
**61**
S2 09 Cr. 1184 (RJH)



**Galleon Tech and Diversified Daily Closing Position in Google Stock (GOOG), May 1, 2007 Through July 27, 2007**

Tech Manager Codes: TAM, TMT (blue)
Diversified Manager Code: DIV (green)

Number of Shares Held

July 12: 135,000 sh

July 13: - 48,170 sh

July 19: - 213,170 sh

# GX 64

**GX 64**

GOVERNMENT
EXHIBIT
64
S2 09 Cr. 1184 (RJH)

## Certain Communications In January 2006

| Date | Time* | From | To | Duration/Content | GX |
|---|---|---|---|---|---|
| 1/9/06 | 2:47 pm | Khan | Rajaratnam | "donot buy plcm till I [g]et guidance; want to make sure guidance OK" | 1453 |
| 1/9/06 | 5:45 pm | Khan | Rajaratnam | "hi" | 1457 |
| 1/10/06 | 9:58 am | Khan | Rajaratnam | "hi; uthere?" | 1458 |
| 1/10/06 | 10:14 am | Khan | Rajaratnam** | 1 minute | 250 |
| 1/10/06 | 10:59 am | Khan | Rajaratnam | 1 minute | 200, 250 |
| 1/11/06 | 12:53 pm | Khan | Rajaratnam** | 1 minute | 250 |
| 1/11/06 | 4:34 pm | Khan | Rajaratnam | 1 minute | 200, 250 |
| 1/11/06 | 9:01 pm | Bhalla | Khan** | 6 minutes | 227 |
| 1/12/06 | 10:30 am | Khan | Rajaratnam | "hi; u there?" | 1459 |
| 1/12/06 | 10:33 am | Rajaratnam | Horowitz | "buy 60 plcm" | 1460 |
| 1/13/06 | 12:43 pm | Khan | Rajaratnam | "hi; u there?; want to go through some things" | 1461 |
| 1/17/06 | 9:50 am | Rajaratnam | Horowitz | "buy 50 plcm" | 1462 |
| 1/20/06 | 4:30 pm | Khan | Bhalla | 1 minute | 227, 250 |
| 1/20/06 | 9:46 pm | Bhalla | Khan** | 2 minute | 227, 250 |
| 1/20/06 | 9:47 pm | Bhalla | Khan** | 1 minute | 227 |
| 1/20/06 | 11:07 pm | Bhalla** | Khan | 1 minute | 250 |
| 1/24/06 | 11:30 am | Khan | Rajaratnam | "hi" | 1463 |
| 1/24/06 | 1:50 pm | Rajaratnam | Horowitz | "buy 75 plcm" | 1464 |

| | | | | | |
|---|---|---|---|---|---|
| 1/25/06 | 4:38 pm | Khan | Rajaratnam | "great call isil" | 1454 |
| 1/26/06 | 2:31 pm | Rajaratnam | Khan | "hey..tks for plcm idea" | 1455 |

\*  Eastern Standard Time.

\*\* Call does not appear in this phone record.

# GX 65

**GX 65**

GOVERNMENT
EXHIBIT
65
S2 09 Cr. 1184 (RJH)

## Galleon Tech Trading in Polycom Stock (PLCM)
## From January 10 to January 25, 2006

| Fund | Manager Code | Date | Order Time | Buy/ Sell | Description | GX |
|---|---|---|---|---|---|---|
| Galleon Tech | GLT | 1/10/06 | 12:05 pm* | Buy | 7,500 shares | 150, 100-C |
| Galleon Tech | GLT | 1/11/06 | 12:06 pm* | Buy | 5,000 shares | 150, 100-C |
| Galleon Tech | GRC | 1/12/06 | 10:36 am | Buy | 60,000 shares | 150, 100-C, 302 |
| Galleon Tech | GLT | 1/12/06 | 10:48 am* | Buy | 15,000 shares | 150, 100-C |
| Galleon Tech | GRC | 1/17/06 | 9:51 am | Buy | 50,000 shares | 150, 100-C 300 |
| Galleon Tech | GRC | 1/19/06 | 11:53 am | Buy | 25,000 shares | 150, 100-C 303 |
| Galleon Tech | GRC | 1/24/06 | 1:53 pm | Buy | 75,000 shares | 150, 100-C 301 |
| Galleon Tech | GLT | 1/24/06 | 3:44 pm* | Buy | 7,500 shares | 150, 100-C |

* Order time from Galleon OMS data.

# GX 532-T

**GX 532-T**

```
GOVERNMENT
  EXHIBIT
  532-T
SZ 09 Cr. 1184 (RJH)
```

| 1  | DATE:            | July 24, 2008                                            |
|----|-----------------|---------------------------------------------------------|
| 3  | TIME:           | 9:18 PM                                                  |
| 5  | WIRETAP:        | OVER 917-907-2350                                        |
| 7  | CALL FROM:      | DANIELLE CHIESI (212-838-5321)                           |
| 9  | CALL TO:        | RAJ RAJARATNAM (917-907-2350)                            |

| 11 | KEY: | Unintelligible: | UI |
|----|------|-----------------|-----|
| 12 |      | Inaudible:      | IA |
| 13 |      | Phonetic Spelling: | PH |
| 14 |      | Voice Overlap:  | // |

---

**DANIELLE CHIESI:** (UI), Raj.

**RAJ RAJARATNAM:** Hello.

**DANIELLE CHIESI:** Raj, you better listen to me. Now you got two choices. ███

**RAJ RAJARATNAM:** Uh-huh.

**DANIELLE CHIESI:** O.K. Or you can just let me make a little bit of money too. O.K.? Akamai.

**RAJ RAJARATNAM:** Uh-huh.

**DANIELLE CHIESI:** They're gonna, please don't fuck me on this (UI) I'm not short anything. I'm not trading it anymore, but I'm trading it tomorrow.

**RAJ RAJARATNAM:** Yeah.

**DANIELLE CHIESI:** They're gonna guide down. I just got a call from my guy. I played him like a finely tuned piano. And then...

**RAJ RAJARATNAM:** Uh-huh.

**DANIELLE CHIESI:** ...he just called me now. I was talking about the family and everything, and then he said, "People think it's gonna go to 25. They print on Wednesday."

1

| | | |
|---|---|---|
| 1 | | |
| 2 | RAJ RAJARATNAM: | I'm short it you know that, right? |
| 3 | | |
| 4 | DANIELLE CHIESI: | Yeah, but please just give me a chance to short it a little bit. I'm |
| 5 | | not involved. |
| 6 | | |
| 7 | RAJ RAJARATNAM: | I'm not gonna say anything. You short it as much as you want. |
| 8 | | |
| 9 | DANIELLE CHIESI: | O.K. I haven't... I'm not shorted it at all. What I want to do, we |
| 10 | | have 'til Wednesday. If we... But just between the two of us, and |
| 11 | | just between us, that's it. |
| 12 | | |
| 13 | RAJ RAJARATNAM: | Right, yep. |
| 14 | | |
| 15 | DANIELLE CHIESI: | Let's just play this thing. They think it's gonna go to 25. We just |
| 16 | | short into this. Short into this. They guide down, Raj. Nobody. |
| 17 | | |
| 18 | RAJ RAJARATNAM: | Yeah. |
| 19 | | |
| 20 | DANIELLE CHIESI: | Right? |
| 21 | | |
| 22 | RAJ RAJARATNAM: | Nobody expects it. Yeah. |
| 23 | | |
| 24 | DANIELLE CHIESI: | Nobody will expect it. It sucks, but you know what? They think |
| 25 | | internally the stock goes to 25. And you know what, baby, I don't |
| 26 | | know about you, but I need it. |
| 27 | | |
| 28 | RAJ RAJARATNAM: | That's an easy one for you. |
| 29 | | |
| 30 | DANIELLE CHIESI: | No. For me? |
| 31 | | |
| 32 | RAJ RAJARATNAM: | Yeah, well I'm there already. |
| 33 | | |
| 34 | DANIELLE CHIESI: | For, uh... Honey, you know what? It's for us. You know what, I |
| 35 | | could very easily start shortening it without telling you. I'd never |
| 36 | | do that, because we share everything. |
| 37 | | |
| 38 | RAJ RAJARATNAM: | No. No. No. |
| 39 | | |
| 40 | DANIELLE CHIESI: | I want you to be on top. We need to be a team, but, Raj... |
| 41 | | |
| 42 | RAJ RAJARATNAM: | (UI) |
| 43 | | |

2

| 1 | DANIELLE CHIESI: | ███████████████████████████ |
| 2 | | ██████████████████████████ I'll |
| 3 | | tell you how I got this guy to trust me again. |
| 4 | | |
| 5 | RAJ RAJARATNAM: | Right. |
| 6 | | |
| 7 | DANIELLE CHIESI: | But took, like it took a little bit of time, but, but this is the, the fact |
| 8 | | that...and I, I acted like I didn't even care. I was just talking about |
| 9 | | the family and like, "You're the only person in the family that |
| 10 | | helps me." And then... |
| 11 | | |
| 12 | RAJ RAJARATNAM: | (UI) |
| 13 | | |
| 14 | DANIELLE CHIESI: | ...he, and then he, and then he said, You know, oh, by the way |
| 15 | | we're gonna guide down on Wednesday. And then I said, Oh, |
| 16 | | really? And then whatever, I skirted it over it, and then he said, |
| 17 | | Yeah. We're gonna guide down a lot. People internally are saying |
| 18 | | it's gonna go to 25. Our stock. I don't know if it's gonna go down |
| 19 | | that low. But we, you know what? We figure out if we don't, I |
| 20 | | don't want, you know, fuck Peter Schwartz and fuck your whole |
| 21 | | desk. I don't want anybody to know. |
| 22 | | |
| 23 | RAJ RAJARATNAM: | Yeah. Radio silent. If you just do radio silent. You do what you |
| 24 | | have to do. |
| 25 | | |
| 26 | DANIELLE CHIESI: | Believe me, I'm... Yeah. Yeah. I'm radio silent, but, but... |
| 27 | | |
| 28 | RAJ RAJARATNAM: | When do they report? On Wednesday? |
| 29 | | |
| 30 | DANIELLE CHIESI: | Wednesday. |
| 31 | | |
| 32 | RAJ RAJARATNAM: | Yeah. |
| 33 | | |
| 34 | DANIELLE CHIESI: | Can't wait. (Exhales) |
| 35 | | |
| 36 | RAJ RAJARATNAM: | We got few more days, Friday, Monday, Tuesday. |
| 37 | | |
| 38 | DANIELLE CHIESI: | (UI) well yeah. We just, we go slow. |
| 39 | | |
| 40 | RAJ RAJARATNAM: | Yeah. |
| 41 | | |
| 42 | DANIELLE CHIESI: | Just keep shorting, everyday. We've got a lot of days. Nobody |
| 43 | | knows anything. Short. Short. Short. Nobody's gonna know |

3

| | | |
|---|---|---|
| 1 | | anything. And then nobody we'll to and then Wednesday we'll see |
| 2 | | where the stock is. We'll just go (UI). If nobody knows anything, |
| 3 | | nobody knows anything, we have a chance, O.K. This thing could |
| 4 | | gap down so huge and I want, I... |
| 5 | | |
| 6 | RAJ RAJARATNAM: | (UI). |
| 7 | | |
| 8 | DANIELLE CHIESI: | ...I want Peter Schwartz to call me and I'll say, "I have no idea. I |
| 9 | | have no idea. I have no idea." |
| 10 | | |
| 11 | RAJ RAJARATNAM: | Right. O.K. (UI)... |
| 12 | | |
| 13 | DANIELLE CHIESI: | That's the best thing I've heard today. How about you? |
| 14 | | |
| 15 | RAJ RAJARATNAM: | That's... Yeah. That's good news. Yep. O.K. |
| 16 | | |
| 17 | DANIELLE CHIESI: | All right. Bye. |
| 18 | | |
| 19 | RAJ RAJARATNAM: | O.K. |
| 20 | | |
| 21 | | |
| 22 | | [END OF CALL] |

4

# GX 543-T

**GX 543-T**

```
GOVERNMENT
EXHIBIT
543-T
SZ 09 Cr. 1184 (RJH)
```

| | | | |
|---|---|---|---|
| 1 | DATE: | July 30, 2008 | |
| 2 | | | |
| 3 | TIME: | 5:30 PM | |
| 4 | | | |
| 5 | WIRETAP: | OVER 917-907-2350 | |
| 6 | | | |
| 7 | CALL FROM: | RAJ RAJARATNAM (917-907-2350) | |
| 8 | | | |
| 9 | CALL TO: | DANIELLE CHIESI (212-888-9434) | |
| 10 | | | |
| 11 | KEY: | Unintelligible: | UI |
| 12 | | Inaudible: | IA |
| 13 | | Phonetic Spelling: | PH |
| 14 | | Voice Overlap: | // |
| 15 | | | |

16

17 DANIELLE CHIESI: Dani.

18

19 RAJ RAJARATNAM: Hi Dani, Raj. I just wanted to say, thank you.

20

21 DANIELLE CHIESI: And I want to tell you, that it's my pleasure. I'm, well you know, I
22 think we did a great...

23

24 RAJ RAJARATNAM: // You know what, I think you did it in such a classy way. In the
25 sense that you didn't call him, you know, and that way you
26 maintain the relationship. You don't have to tell him that you
27 played it hard, you know whatever, right?

28

29 DANIELLE CHIESI: No, I know, but I think you, you know I thought it through, and,
30 and part of this whole, you know, with game that we're playing
31 and the job that we've chosen to do.

32

33 RAJ RAJARATNAM: Uh-hum.

34

35 DANIELLE CHIESI: // Is about talking to somebody like you, you and I can... I
36 strategize with you, you do whatever you want to do, but I need.

37

38 RAJ RAJARATNAM: // Uh-hum.

39

40 DANIELLE CHIESI: Sometimes I need to think out loud. So I wanna to talk to you...

41

42 RAJ RAJARATNAM: // Right.

43

1

| 1  | DANIELLE CHIESI: | ...and say like, "Do you think that," and I can go back and forth on |
| 2  |                  | my strategy. |
| 3  |                  | |
| 4  | RAJ RAJARATNAM:  | Yeah. |
| 5  |                  | |
| 6  | DANIELLE CHIESI: | But I think that my strategy will be... You know, 'cause you said, |
| 7  |                  | you know, "Dani, let's just go for it." And, and, you know, I, it, it |
| 8  |                  | worked out, in, you know, in our favor. And I really am beyond |
| 9  |                  | excited because I needed this, but, I really did. |
| 10 |                  | |
| 11 | RAJ RAJARATNAM:  | I hope you (UI) because you were (UI) |
| 12 |                  | |
| 13 | DANIELLE CHIESI: | And, you know what... |
| 14 |                  | |
| 15 | RAJ RAJARATNAM:  | // (UI)..., right? |
| 16 |                  | |
| 17 | DANIELLE CHIESI: | ... it's not, it's not that much of... |
| 18 |                  | |
| 19 | RAJ RAJARATNAM:  | But it's a conquest, right? |
| 20 |                  | |
| 21 | DANIELLE CHIESI: | It's a conquest. It's mentally, it's mentally fabulous for me. |
| 22 |                  | Mentally fabulous for me. And on top of that, though, uh, I feel as |
| 23 |                  | though, like, let's go. And then I make decisions from a position |
| 24 |                  | of strength. And I feel that, no, I, I, love the way that I feel, like |
| 25 |                  | the, you know you put, "What are you gonna do, Danielle, you |
| 26 |                  | connect the dots, if you lose and you're wrong." You're a warrior, |
| 27 |                  | I'm a warrior. So, like, I can take the pain, but I'm gonna go with |
| 28 |                  | what I think is the right thing to do. I shut... |
| 29 |                  | |
| 30 | RAJ RAJARATNAM:  | // Yeah. |
| 31 |                  | |
| 32 | DANIELLE CHIESI: | ...my mouth, this poor thing is gonna go down. [Chuckles] |
| 33 |                  | |
| 34 | RAJ RAJARATNAM:  | This thing went down so much. Because I was looking at... |
| 35 |                  | |
| 36 | DANIELLE CHIESI: | // Are you surprised? |
| 37 |                  | |
| 38 | RAJ RAJARATNAM:  | // Uh, I though it might go to 27 or something, right? If they |
| 39 |                  | guided down. |
| 40 |                  | |
| 41 | DANIELLE CHIESI: | Yeah, but you know what? It's because they didn't... |
| 42 |                  | |
| 43 | RAJ RAJARATNAM:  | // You know but... |

1
2    DANIELLE CHIESI:          ...guide down enough.
3
4    RAJ RAJARATNAM:           // (UI). You know what I did though?
5
6    DANIELLE CHIESI:          What?
7
8    RAJ RAJARATNAM:           // I saw the (UI) and the stock was at 28.50. And, I banged it,
9                              because I sold another 150 thousand.
10
11   DANIELLE CHIESI:          Yeah.
12
13   RAJ RAJARATNAM:           Because I knew that uh, (UI) uh, that's uh, what you call it uh, that
14                             price... When the, the commentary, the interview that he did,
15                             seemed to indicate that he was uh, going to guide badly, you
16                             know?
17
18   DANIELLE CHIESI:          Yeah.
19
20   RAJ RAJARATNAM:           And, so you don't have to, you know, you can be if your focused.
21
22   DANIELLE CHIESI:          If you're focused.
23
24   RAJ RAJARATNAM:           Right.
25
26   DANIELLE CHIESI:          It's not just about numbers, it's about listening to...
27
28   RAJ RAJARATNAM:           Listening carefully.
29
30   DANIELLE CHIESI:          // And it's about knowing the people that you, that are speaking.
31
32   RAJ RAJARATNAM:           Right.
33
34   DANIELLE CHIESI:          Right so if somebody says something. I don't even, I never even
35                             asked a question, and we nailed the stock.
36
37   RAJ RAJARATNAM:           // Right.
38
39   DANIELLE CHIESI:          The interesting part about what we just accomplished is, I never
40                             asked a question.
41
42   RAJ RAJARATNAM:           Right, that's (UI)...
43

3

| | | |
|---|---|---|
| 1 | DANIELLE CHIESI: | // But I got the answer. |
| 2 | | |
| 3 | RAJ RAJARATNAM: | Exactly |
| 4 | | |
| 5 | DANIELLE CHIESI: | // With never asking a question. And so, when you know the way |
| 6 | | somebody changes. |
| 7 | | |
| 8 | RAJ RAJARATNAM: | Um-hum. |
| 9 | | |
| 10 | DANIELLE CHIESI: | // And I am, and you know, I, like days like today. And then I feel |
| 11 | | like, let's just go with Cisco, I don't ever get too cocky, Raj. |
| 12 | | (Chuckles) But, I got tell you something. You know, right now, |
| 13 | | I'm going to the consulate, the Chinese consulate to meet these |
| 14 | | Chinese people. I wanna own China as you know, I need to own |
| 15 | | them. |
| 16 | | |
| 17 | RAJ RAJARATNAM: | Yeah. |
| 18 | | |
| 19 | DANIELLE CHIESI: | // So, I'm gonna' meet the ambassador, you know the coolest |
| 20 | | part? I'm going in there with so much confidence right now. I, |
| 21 | | this, this is so big for me. I got it actually. |
| 22 | | |
| 23 | RAJ RAJARATNAM: | // (UI) you know what, I really you know, I had, I feel the same |
| 24 | | way (UI) with all these things. I mean, any... I have like, (UI) |
| 25 | | position, it's like 300,000 for me , right? So that's like 300,000, |
| 26 | | Akamai had 300,000... (UI) right? |
| 27 | | |
| 28 | DANIELLE CHIESI: | Yeah. |
| 29 | | |
| 30 | RAJ RAJARATNAM: | I feel like, you know |
| 31 | | |
| 32 | DANIELLE CHIESI: | Talk into the phone, you're breaking up though. What? Baby? |
| 33 | | |
| 34 | RAJ RAJARATNAM: | Yeah. |
| 35 | | |
| 36 | DANIELLE CHIESI: | Talk into... say that again. So, about Google and Akamai. |
| 37 | | |
| 38 | | [END OF CALL] |

4

# GX 1406

**GX 1406**



| | Invoice Number | Invoice Date | Account Number | Page |
|---|---|---|---|---|
| | 2-211-55458 | Aug 17, 2007 | 2412-0107-4 | 3 of 4 |

FedEx Express Shipment Detail By Payor Type (Original)

Dropped off: Jul 19, 2007    Cust. Ref.: NO REFERENCE INFORMATION    Ref. #2:
Payor: Shipper    Ref. #3:
   Fuel Surcharge - FedEx has applied a fuel surcharge of 13.50% to this shipment.
   Distance Based Pricing, Zone 2
   Package Delivered to Recipient Address - Release Authorized

| Automation | USAB | Sender | Recipient | |
|---|---|---|---|---|
| Tracking ID | 857528176049 | MARLEEN | MS HUSSAIN | |
| Service Type | FedEx Standard Overnight | DIGITAL AGE MANAGEMENT | | |
| Package Type | FedEx Envelope | 168 ISABELLA AVE | 43667 SKYE RD | |
| Zone | 02 | ATHERTON CA 94027-4034 US | FREMONT CA 94539 US | |
| Packages | 1 | | | |
| Rated Weight | N/A | | | |
| Delivered | Jul 20, 2007 11:15 | Transportation Charge | | 12.45 |
| Svc Area | A2 | Fuel Surcharge | | 1.98 |
| Signed by | 9999999999999 | Residential Delivery | | 2.20 |
| FedEx Use | 020022221/0000200/02 | Total Charge | USD | $16.63 |

Dropped off: Jul 23, 2007    Cust. Ref.: NO REFERENCE INFORMATION    Ref. #2:
Payor: Shipper    Ref. #3:
   Fuel Surcharge - FedEx has applied a fuel surcharge of 13.50% to this shipment.
   Distance Based Pricing, Zone 2

| Automation | USAB | Sender | Recipient | |
|---|---|---|---|---|
| Tracking ID | 857528176071 | ROOMY KHON | JON DOWNEY | |
| Service Type | FedEx Priority Overnight | DIGITAL AGE MANAGEMENT | BEAR STEARNS & CO | |
| Package Type | FedEx Envelope | 168 ISABELLA AVE | ONE SANSOME ST | |
| Zone | 02 | ATHERTON CA 94027-4034 US | SAN FRANCISCO CA 94104 US | |
| Packages | 1 | | | |
| Rated Weight | N/A | | | |
| Delivered | Jul 24, 2007 09:26 | | | |
| Svc Area | A1 | Transportation Charge | | 14.50 |
| Signed by | G.CORTEZA | Fuel Surcharge | | 1.96 |
| FedEx Use | 020422232/000186/_ | Total Charge | USD | $16.46 |

Dropped off: Aug 03, 2007    Cust. Ref.: NO REFERENCE INFORMATION    Ref. #2:
Payor: Shipper    Ref. #3:
   Fuel Surcharge - FedEx has applied a fuel surcharge of 13.50% to this shipment.
   Distance Based Pricing, Zone 4
   FedEx has audited this shipment for correct packages, weight, and service. Any changes made are reflected in the invoice amount.

| Automation | USAB | Sender | Recipient | |
|---|---|---|---|---|
| Tracking ID | 862054811146 | SAKHAWAT KHAN | CONSULATE GENERAL OF ARGENTINA | |
| Service Type | FedEx Priority Overnight | DIGITAL AGE MANAGEMENT | 5055 WILSHIRE BLVD STE 210 | |
| Package Type | FedEx Pak | 168 ISABELLA AVE | LOS ANGELES CA 90036 US | |
| Zone | 04 | ATHERTON CA 94027-4034 US | | |
| Packages | 1 | | | |
| Rated Weight | 1.0 lbs, 0.5 kgs | | | |
| Delivered | Aug 06, 2007 09:40 | | | |
| Svc Area | A1 | Transportation Charge | | 26.85 |
| Signed by | F.MARTINE | Fuel Surcharge | | 3.62 |
| FedEx Use | 021520145/0001530/_ | Total Charge | USD | $30.47 |

Dropped off: Aug 08, 2007    Cust. Ref.: NO REFERENCE INFORMATION    Ref. #2:
Payor: Shipper    Ref. #3:
   Fuel Surcharge - FedEx has applied a fuel surcharge of 14.00% to this shipment.
   Distance Based Pricing, Zone 7

| Automation | USAB | Sender | Recipient | |
|---|---|---|---|---|
| Tracking ID | 862054812407 | SAKHAWAT KHAN | REFUNDS DEPT | |
| Service Type | FedEx 2Day | DIGITAL AGE MANAGEMENT | ORBITZ INC | |
| Package Type | FedEx Envelope | 168 ISABELLA AVE | 1961 PREMIER DR STE 150 | |
| Zone | 07 | ATHERTON CA 94027-4034 US | MANKATO MN 56001 US | |
| Packages | 1 | | | |
| Rated Weight | N/A | | | |

Continued on next page

GOVERNMENT
EXHIBIT
1406
S2 09 Cr. 1184 (RJH)

 

FedEx Services | eCQS | EDR Home Page | Data Viewer

Searching database instance old0 for Airbill # 857528176049 with a ship date of 07/19/2007 and a range of +/- 15 days.

## PACKAGE DETAILS:

| Tracking No: 857528176049 Shipper Account No: 241201074 | | Ship Date: 07/19/2007 |
|---|---|---|
| Shipper: | MARLEEN<br>DIGITAL AGE MANAGEMENT<br><br>168 ISABELLA AVE<br><br>ATHERTON, CA 940274034<br>US | Recipient: | MS HUSSAIN<br>-<br>43667 SKYE RD<br><br>FREMONT, CA 94539<br><br>US |

## DELIVERY INFORMATION/SPOD Letter:

| Signed For By: | 9999999999999 |
|---|---|
| Delivered to: | 43667 SKYE RD |
| Delivery Date: | 07/20/2007 |
| Delivery Time: | 11:15 |

1 airbill(s) matched your query.

WEB Development by Toby Smischny
Copyright, 2001. FedEx Services.
All rights reserved.

Feedback          Page updated:03/18/2000 00:10:26          Access Count: 4344456

http://spod.prod.fedex.com/~edrdv/bin/find.cgi?QUERY=TRACKQUERY&AIRBILL=8...   12/10/2009

USA-000143999



FedEx Services | eCQS | EDR Home Page | Data Viewer

Searching database instance old0 for airbill # 857528176049 with a ship date of 20070719

| | |
|---|---|
| AIRBILL_NBR: | 857528176049 |
| SEQUENCE_NBR: | 2454301000 |
| FORM_CD: | 215 |
| PICKUP_STATUS_CD: | 00 |
| MASTER_AIRBILL_NBR: | |
| SEP_ASSOCIATION_TYPE_CD: | |
| SEP_PKG_CREATE_DT: | 23:46 07/19/2007 |
| PICKUP_TMSTP: | 16:46 07/19/2007 |
| PICKUP_LOC_CD: | PAOA |
| PICKUP_EMPLOYEE_NBR: | |
| SERVICE_TYPE_CD: | 05 |
| HANDLING_CODE_GRP: | |
| COMMITMENT_CD: | A2 |
| DEST_LOC_CD: | HWDA |
| SHIPPER_ACCOUNT_NBR: | 241201074 |
| SHIPPER_COUNTRY_CD: | US |
| SHIPPER_POSTAL_CD: | 940274034 |
| SHIPPER_STATE_CD: | CA |
| SHIPPER_CUSTOMER_NM: | MARLEEN |
| SHIPPER_COMPANY_NM: | DIGITAL AGE MANAGEMENT |
| SHIPPER_ADDRESS_DESC: | 168 ISABELLA AVE |
| SHIPPER_ADDRESS2_DESC: | |
| SHIPPER_CITY_NM: | ATHERTON |
| RECIPIENT_COUNTRY_CD: | US |
| RECIPIENT_POSTAL_CD: | 94539 |
| RECIPIENT_STATE_CD: | CA |
| RECIPIENT_CUSTOMER_NM: | MS HUSSAIN |
| RECIPIENT_COMPANY_NM: | - |
| RECIPIENT_ADDRESS_DESC: | 43667 SKYE RD |
| RECIPIENT_ADDRESS2_DESC: | |
| RECIPIENT_CITY_NM: | FREMONT |
| ACCOUNT_NBR: | |
| SHIPPER_REFERENCE_NBR: | |
| DOCUMENT_CONTROL_NBR: | 071986928001587 |
| DELIVERY_STATUS_CD: | Release Signature on File (DDEX 02) |
| SIGNATURE_REC_NBR: | |
| SIGNATURE_REC_LINE_NBR: | |
| RECEIVER_NM: | 9999999999999 |
| PLACE_PACKAGE_LEFT_CD: | Residential (4) |
| DELIVERY_TMSTP: | 11:15 07/20/2007 |

USA-000144000

Case 17-1405, Document 29, 06/06/2017, 2052263, Page370 of 467

DELIVERY_ADDRESS_DESC:    43667 SKYE RD
DELIVERY_ADDRESS2_DESC:
DELIVERY_ROUTE_NBR:       254
DELIVERY_EMPLOYEE_NBR:    112089
DELIVERY_COMMENT_DESC:    FRONT DOOR
RELEASE_FLG:
EXCEPTION_HISTORY_GRP:
UPDATE_QTY:
LAST_UPDATE_TMSTP:
TIMEZONE_CHANGE_CD:

---

WEB Development by Toby Smischny      Feedback      Page updated:08/04/1998 11:12:18
Copyright, 2001. FedEx Services.
All rights reserved.                                                              Access Count: 1562522

http://spod.prod.fedex.com/~edrdv/bin/find.cgi?QUERY=DETAILS&AIRBILL=857528...    12/10/2009

USA-000144001

i 4
92

**FedEx** Express   **US Airbill**     8575 2817 6049     0215     SAC11     FedEx Copy

**1 From**
Date   July 19

Sender's FedEx
Account Number   2412-0107-4

Sender's
Name   Haleen   Phone   650 327-1524

Company   DIGITAL AGE MANAGEMENT

Address   168 ISABELLA AVE

City   ATHERTON   State   CA   ZIP   94027-4034

**2 Your Internal Billing Reference**

**3 To**
Recipient's
Name   Ms. Hussain   Phone   510 921-4190

Company

Recipient's
Address   43667 Skye Road

Address

City   Fremont   State   CA   ZIP   94539

0339412143

8575 2817 6049

**4a Express Package Service**
Packages up to 150 lbs.

1 ☐ FedEx Priority Overnight          5 ☒ FedEx Standard Overnight       6 ☐ FedEx First Overnight
3 ☐ FedEx 2Day          20 ☐ FedEx Express Saver

**4b Express Freight Service**
Packages over 150 lbs.

7 ☐ FedEx 1Day Freight          8 ☐ FedEx 2Day Freight       83 ☐ FedEx 3Day Freight

**5 Packaging**
6 ☐ FedEx Envelope   2 ☐ FedEx Pak   3 ☐ FedEx Box   4 ☐ FedEx Tube   1 ☐ Other

**6 Special Handling**
3 ☐ SATURDAY DELIVERY   1 ☐ HOLD Weekday   31 ☐ HOLD Saturday

Does this shipment contain dangerous goods?
☒ No   4 ☐ Yes   ☐ Yes   6 ☐ Dry Ice   ☐ Cargo Aircraft Only

**7 Payment**   Bill to:
1 ☐ Sender   2 ☐ Recipient   3 ☐ Third Party   4 ☐ Credit Card   5 ☐ Cash/Check

Total Packages   Total Weight   Total Declared Value   Total Charges

**8 NEW Residential Delivery Signature Options**
☐ No Signature Required   18 ☐ Direct Signature   34 ☐ Indirect Signature

517

USA-000144011

Case 17-1405, Document 29, 06/06/2017, 2052263, Page372 of 467

**FedEx** Express **US Airbill**

8617 7209 7943

0200

**FedEx Copy**

**1 From**

Date

Sender's FedEx Account Number

Sender's Name **Mohammad Rouf**   Phone **618 531-1629**

Company

Address **12 Sierra Dr.**

City **Glen Carbon**   State **IL**   ZIP **62034**

**2 Your Internal Billing Reference**

**3 To**

Recipient's Name **Raymond Rouf**   Phone **217 390-8251**

Company **c/o Shanimara Hussain**

Recipient's Address **43667 Skye Road**

Address

City **Fremont**   State **CA**   ZIP **94539**

8617 7209 7943

**4a Express Package Service**

**4b Express Freight Service**

**5 Packaging**

**6 Special Handling**
SATURDAY DELIVERY

**7 Payment**

**8 Residential Delivery Signature Options**

Total Declared Value **30 99**

520

 

FedEx Services | eCQS | EDR Home Page | Data Viewer

Searching database instance old0 for Airbill # 857528176049 with a ship date of 07/19/2007 and a range of +/- 15 days.

## PACKAGE DETAILS:

| Tracking No: | 857528176049 | Ship Date: | 07/19/2007 |
|---|---|---|---|
| Shipper Account No: | 241201074 | | |
| Shipper: | MARLEEN<br>DIGITAL AGE MANAGEMENT<br>168 ISABELLA AVE<br>ATHERTON, CA 940274034<br>US | Recipient: | MS HUSSAIN<br>-<br>43667 SKYE RD<br>FREMONT, CA 94539<br>US |

## DELIVERY INFORMATION/SPOD Letter:

| Signed For By: | 9999999999999 |
|---|---|
| Delivered to: | 43667 SKYE RD |
| Delivery Date: | 07/20/2007 |
| Delivery Time: | 11:15 |

1 airbill(s) matched your query.

WEB Development by Toby Smischny
Copyright, 2001. FedEx Services.
All rights reserved.

Feedback          Page updated:03/18/2000 00:10:26                    Access Count: 4344456

http://spod.prod.fedex.com/~edrdv/bin/find.cgi?QUERY=TRACKQUERY&AIRBILL=8...   12/10/2009

USA-000144013



FedEx Services | eCQS | EDR Home Page | Data Viewer

Searching database instance old0 for airbill # 857528176049 with a ship date of 20070719

| | |
|---|---|
| AIRBILL_NBR: | 857528176049 |
| SEQUENCE_NBR: | 2454301000 |
| FORM_CD: | 215 |
| PICKUP_STATUS_CD: | 00 |
| MASTER_AIRBILL_NBR: | |
| SEP_ASSOCIATION_TYPE_CD: | |
| SEP_PKG_CREATE_DT: | 23:46 07/19/2007 |
| PICKUP_TMSTP: | 16:46 07/19/2007 |
| PICKUP_LOC_CD: | PAOA |
| PICKUP_EMPLOYEE_NBR: | |
| SERVICE_TYPE_CD: | 05 |
| HANDLING_CODE_GRP: | |
| COMMITMENT_CD: | A2 |
| DEST_LOC_CD: | HWDA |
| SHIPPER_ACCOUNT_NBR: | 241201074 |
| SHIPPER_COUNTRY_CD: | US |
| SHIPPER_POSTAL_CD: | 940274034 |
| SHIPPER_STATE_CD: | CA |
| SHIPPER_CUSTOMER_NM: | MARLEEN |
| SHIPPER_COMPANY_NM: | DIGITAL AGE MANAGEMENT |
| SHIPPER_ADDRESS_DESC: | 168 ISABELLA AVE |
| SHIPPER_ADDRESS2_DESC: | |
| SHIPPER_CITY_NM: | ATHERTON |
| RECIPIENT_COUNTRY_CD: | US |
| RECIPIENT_POSTAL_CD: | 94539 |
| RECIPIENT_STATE_CD: | CA |
| RECIPIENT_CUSTOMER_NM: | MS HUSSAIN |
| RECIPIENT_COMPANY_NM: | - |
| RECIPIENT_ADDRESS_DESC: | 43667 SKYE RD |
| RECIPIENT_ADDRESS2_DESC: | |
| RECIPIENT_CITY_NM: | FREMONT |
| ACCOUNT_NBR: | |
| SHIPPER_REFERENCE_NBR: | |
| DOCUMENT_CONTROL_NBR: | 071986928001587 |
| DELIVERY_STATUS_CD: | Release Signature on File (DDEX 02) |
| SIGNATURE_REC_NBR: | |
| SIGNATURE_REC_LINE_NBR: | |
| RECEIVER_NM: | 9999999999999 |
| PLACE_PACKAGE_LEFT_CD: | Residential (4) |
| DELIVERY_TMSTP: | 11:15 07/20/2007 |

USA-000144014

DELIVERY_ADDRESS_DESC:  43667 SKYE RD
DELIVERY_ADDRESS2_DESC:
DELIVERY_ROUTE_NBR:     254
DELIVERY_EMPLOYEE_NBR:  112089
DELIVERY_COMMENT_DESC:  FRONT DOOR
RELEASE_FLG:
EXCEPTION_HISTORY_GRP:
UPDATE_QTY:
LAST_UPDATE_TMSTP:
TIMEZONE_CHANGE_CD:

WEB Development by Toby Smischny
Copyright, 2001. FedEx Services.
All rights reserved.   <u>Feedback</u>      Page updated:08/04/1998 11:12:18                Access Count: 1562522

# GX 1539

**GX 1539**



**GOVERNMENT
EXHIBIT
1539**

S2 09 Cr. 1184 (RJH)

# LEHMAN BROTHERS

**Security Account
Limited Discretionary Authorization**

This authorization is a limited discretionary authorization. It does not empower the agent named herein to withdraw any money, securities or other property either in the name of the principal(s) or otherwise.

Please read carefully, sign and return
To Lehman Brothers Inc.
Compliance Division
Church Street Station
P.O. Box 3763
New York, NY 10008-3763

| Account Number | Account | T | C | R |
|---|---|---|---|---|
| Branch 833 | 027931 | 1 | 9 | 286 |

#833-02793-286

| Check One: | ☐ IR AGENT | CODE 64 | ☐ THIRD PARTY AGENT | CODE 74 |
|---|---|---|---|---|

**WARNING**

This is an important legal document. It creates a durable power of attorney. Before executing this document, you should know these important facts:
a) This document may provide the person you designate as your attorney-in-fact with broad powers to dispose, sell, convey and encumber your property.
b) These powers will exist for an indefinite period of time and will continue to exist notwithstanding your subsequent disability, incompetency or incapacity.
c) You have the right to revoke or terminate this durable power of attorney by giving us written notice addressed to the branch office servicing your account. Such revocation shall not affect your liability for any transaction initiated prior to our receipt of said revocation.

1. The undersigned hereby authorizes (agent's name)

**Ms. Roomy Khan**

(whose signature appears on the reverse) as undersigned's agent and attorney-in-fact to buy, sell (including short sales) and trade in stocks, bonds, options (including uncovered short positions in option contracts or in the uncovering of any existing short position in option contracts) and any other securities and/or contracts relating to the same on margin or otherwise in accordance with your terms and conditions for the undersigned's account and risk in the undersigned's name, or number on your books. The undersigned also authorizes the agent to provide direction regarding corporate actions, reorganizations and dividend options. The undersigned understands that transactions may be effected with you as principal or dealer or through you as agent or broker, and that any such purchase may involve securities in the distribution of which you may have an interest as underwriter, member of selling group, or otherwise. The undersigned hereby agrees to indemnify and hold you harmless from and to pay you promptly on demand any and all losses arising therefrom or debit balance due thereon.

2. In all such purchases, sales or trades you are authorized to follow the instructions of the above-named person in every respect concerning the undersigned's account with you, and he or she is authorized to act for the undersigned and in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do with respect to such purchases, sales or trades.

3. The undersigned hereby ratifies and confirms any and all transactions with you heretofore or hereafter made by the aforesaid agent or for the undersigned's account.

4. This authorization and indemnity is in addition to (and in no way limits or restricts) any rights which you may have under any other agreement or agreements between the undersigned and your corporation.

5. To revoke this authorization, the undersigned hereby agrees to submit a written notice addressed to you and delivered to the branch office serving the account, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation.

6. This agreement shall inure to the benefit of your present corporation and of any successor corporation(s) or assigns.

7. Arbitration Disclosures

● ARBITRATION IS FINAL AND BINDING ON THE PARTIES.

● THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.

● PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.

● THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.

● THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

ARBITRATION. Any controversy: (1) arising out of or relating to any of my accounts maintained individually or jointly with any other party, in any capacity with you; or (2) relating to my transactions or accounts with any of your predecessor firms by merger, acquisition or other business combination from the inception of such accounts; or (3) with respect to transactions of any kind executed by, through or with you, your officers, directors, agents and/or employees; or (4) with respect to this agreement or any other agreements entered into with you relating to my accounts, or the breach thereof, shall be resolved by arbitration conducted only at the New York Stock Exchange, Inc., National Association of Securities Dealers, Inc., or the American Stock Exchange, Inc., or any self-regulatory organization ("SRO") subject to the jurisdiction of the Securities and Exchange Commission and pursuant to the arbitration procedures then in effect of any such exchange or SRO as I may elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you will have the right to elect the arbitration tribunal of your choice. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. This agreement shall be governed by the laws of the State of New York without giving effect to the choice of law or conflict of laws provisions thereof.

Continued on reverse side



CONFIDENTIAL TREATMENT REQUESTED BY TRUSTEE FOR LBI

HHR_LBI_RAJ_000020

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**

State of California

County of _San Mateo_ } ss.

On _17th September 2003_ before me, _Babul Sheth_
           _Date_                        Name and Title of Officer (e.g., "Jane Doe, Notary Public")
                               _Roomy Khan_

personally appeared _____
                            Name(s) of Signer(s)

☐ personally known to me —
☒ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Babul K. Sheth_
_____
Signature of Notary Public

**BABUL K. SHETH**
COMM. # 1289709
NOTARY PUBLIC - CALIFORNIA
SAN MATEO COUNTY
My Comm. Exp. June 27, 2005

_Roomy Kha_ ——— **OPTIONAL** ——— _Sept 17, 03_

_Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document._

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer**

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.nationalnotary.org     Prod. No. 5907     Reorder: Call Toll-Free 1-800-876-6827

CONFIDENTIAL TREATMENT REQUESTED BY TRUSTEE FOR LBI

No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class action is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

8. This authorization shall remain in full force and effect unless revoked by the undersigned in accordance with the procedures stated above or until you receive actual notice of my death or other legally mandated causes for revocation.

9. If any provision of this agreement is or becomes inconsistent with any applicable present or future law, rule or regulation, that provision will be deemed rescinded or modified in order to comply with the relevant law, rule, or regulation. All other provisions of this agreement will continue and remain in full force and effect.

10. This authorization shall not be affected by the subsequent disability, incapacity or incompetency of the undersigned nor by a lapse of time between its execution and exercise.

11. I(We) acknowledge receiving a copy of this agreement.

| Complete name of account | SUNIL K. BHALLA | | |
|---|---|---|---|

This authorization contains a pre-dispute arbitration agreement which appears on the front of this form at paragraph 7.

| A. CLIENT'S SIGNATURE(S) THIS AGREEMENT MUST BE SIGNED BEFORE A NOTARY PUBLIC | Client's Signature | | Date 9/11/03 |
|---|---|---|---|
| | Client's Signature | | |

State of *California* } SS
County of *Alameda*

On this *11th* day of *September* 2003, before me a Notary Public for the County of *Josephine L Harde*

personally appeared *Sunil K. Bhalla*

and to me known and known to me to be the individual(s) described in and who executed the above instrument, and acknowledged to me that he/she/they executed the same.

*Josephine L Harde*
SIGNATURE OF NOTARY PUBLIC OR WITNESS
IN NON - U.S. JURISDICTION

[Notary Seal: JOSEPHINE L HARDE, Commission # 1432673, Notary Public - California, Alameda County, My Comm. Expires Aug 27, 2007]

| B. AGENT'S SIGNATURE(S) | By signing below, I the agent for the principal(s) named herein, accept this appointment and agree to be bound by the terms of this authorization including the provisions for arbitration of disputes. Being first duly sworn, I do hereby state that this authorization was executed by the principal(s) at a time when he or she was legally competent to perform such act and that it has not been terminated by any means including voluntary revocation or death of the principal(s). | |
|---|---|---|
| | SIGNATURE OF AGENT (individual to whom authorization is granted) Roomy Khan | Date 9/17/03 |

| Approved by Branch Mgr. | Compliance Division |
|---|---|

CPI 5121

CONFIDENTIAL TREATMENT REQUESTED BY TRUSTEE FOR LBI

**Discretionary Account Information**
*(to be completed for all discretionary security accounts)*

| Account Number Branch | Account | T | C | SM |
|---|---|---|---|---|
| 833 | 02793 | 1 | 9 | 286 |

## CONFIDENTIAL INFORMATION

**I. ACCOUNT INFORMATION** - *Complete part A1 for individual, joint or partnership accounts or part A2, if trust, employee benefit plan, other tax-exempt organization or corporate account. All accounts must complete part B, and sign at part C.*

**Complete for ALL accounts**

Complete Name of Account: Sunil K. Bholla
Street Address: 48 485 Arkansas Place  City: Fremont  State: CA  ZIP Code: 94539

### I. A1 - Individual, Joint or Partnership Accounts *(if more than two owners, attach additional sheets as needed)*

| | | Joint Party's Name | |
|---|---|---|---|
| Name: Sunil K. Bholla | | Name: | |
| Birthdate: 10/10/56 | Social Security No. | No. of Dependents: 4 | Birthdate: | Social Security No. | No. of Dependents |
| Occupation: General Manager | Position/Title: Sr. VP & G.M. | Occupation | Position/Title |
| Employer: Polycom, Inc. | Type of Business: Communications | Employer | Type of Business |
| Home Phone: (510) 683-8585 | Business Phone: (408) 474-2879 | Home Phone | Business Phone |
| Annual Income: $350,000. | Marital Status: ☑ Married ☐ Separated ☐ Single ☐ Divorced ☐ Widowed | Annual Income: $ | Marital Status: ☐ Married ☐ Separated ☐ Single ☐ Divorced ☐ Widowed |
| Liquid Net Worth: $300,000.00 | Total Net Worth: $700,000.00 | Liquid Net Worth | Total Net Worth |

### A2- Trusts, Corporations, Benefit Plans and Partnerships

| Type of Plan/Organization | | Federal Tax I.D. No. |
|---|---|---|
| Contact Person | Title | Phone No. |
| Annual Gross Revenues: $ | | |

### I. B Investment Objectives

| Investment Objectives | Risk Tolerance |
|---|---|
| ☑ Growth  ☐ Current Income  ☐ Tax Deferral  ☐ Liquidity | ☑ Aggressive  ☐ Moderate  ☐ Conservative |

Discretion Granted To: Ms. Roomy Khan

Reason for Granting Discretionary Authority: To utilize Roomy's investment expertise.

| No. of Years Involved in Trading Securities: 15 yrs. | No. of Years Involved in Trading Options: 5 yrs. | Date Account Opened |
|---|---|---|

Discretion will be for: ☑ Securities  ☑ Sales of Covered Calls  ☑ Purchase of Options  ☑ Spreads  ☑ Sales of Uncovered Options  ☐ Debit Options  ☐ Foreign Currency Options

### I. C Signatures *If Joint Account, Both Parties Must Sign*

*I agree to notify Lehman Brothers Inc. in writing of any change in my circumstances or investment objective.*

Client's Signature: *[signature]*
Joint Party's Signature:

| For Lehman Brothers Inc. Use Only | Name of IR: Thomas Casey | Initials: TEC | Branch Manager's Approval: *[signature]* | Date: 10/1/03 | Registered Options Principal: *[signatures]* | Date: 10/1/03 / 10/7/03 |
|---|---|---|---|---|---|---|

CONFIDENTIAL TREATMENT REQUESTED BY TRUSTEE FOR LBI

HHR_LBI_RAJ_000023

**Discretionary Account Information** *(continued)*

**II. Complete this section for "third party" discretionary accounts only.** *Third Party discretionary accounts are those accounts in which the agent is NOT an employee of Lehman Brothers Inc. or one of its affiliates, divisions or subsidiaries. The information which follows pertains to the AGENT.*

| | |
|---|---|
| Agent's Name <br> *Rodney KHAN* | Agent's Employer |
| Agent's Home Address <br> *168 Isabella Avenue* | Agent's Employer's Address |
| City, State and ZIP Code <br> *Atherton, CA 94027* | City, State and ZIP Code |
| Agent's Citizenship <br> *American* | Type of Business | Position |
| Agent's Home Telephone No. <br> *(650) 1327 1524* | Agent's Business Telephone No. <br> ( ) |

| | |
|---|---|
| How long has agent known client? <br> *10 years* | What is the agent's relationship to client? <br> *FRIEND* |

| | |
|---|---|
| Does agent have a direct financial interest in the account? | ☑ No ☐ Yes: Explain Thoroughly: |
| Does agent receive a fee? | ☑ No ☐ Yes: How Much? |
| Does agent have an account with LB or its affiliates, etc? | ☐ No ☑ Yes: Give Account No.: *8330076* |
| Is agent related to an employee of LB or its affiliates, etc? | ☑ No ☐ Yes: Give Employee's Name: |
| Is agent an INVESTMENT ADVISOR registered with the State and/or the S.E.C.? | ☑ No ☐ Yes    Yes or No: Complete the following section |

| | Registered with the State | | | Registered with the S.E.C. | |
|---|---|---|---|---|---|
| | State | File No. | Eff. Date | File No. | Eff. Date |
| **If YES** | | | | | |
| **If NO** | Over how many accounts does agent have discretion? | | At LB or its affiliates etc? ~~one~~ | At other firms? *NONE* | |

List names and account numbers of other LB or affiliates etc. discretionary accounts

| Account No. | Account Name |
|---|---|
| *833-04674-17* | *Sangeeta KHAN* |
| *833-04254-17* | *Rodney Khan / TRIPTA NAGPAL* |
| | |
| | |
| | |
| | |
| | |
| | |

| | |
|---|---|
| Agent's Experience in Handling Discretionary Accounts *(number of years and average assets managed)* | *10 yrs.* |

Banking and/or Commercial References
Bank Name and Address

CONFIDENTIAL TREATMENT REQUESTED BY TRUSTEE FOR LBI

HHR_LBI_RAJ_000024

# GX 2454

**GX 2454**

| | |
|---|---|
| **From:** | Adam Smith <ASmith@galleongrp.com> |
| **Sent:** | Wednesday, March 9, 2005 1:41 PM |
| **To:** | Raj Rajaratnam <RajRajaratnam@galleongrp.com> |
| **Subject:** | The two eyes |

GOVERNMENT
EXHIBIT
2454
ST 05 Cr. 1184 (R.JH)

I had a chance to update and we are still on track

-------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

CONFIDENTIAL

USAO GALLEON 00179211

# GX 2455

**GX 2455**

| | |
|---|---|
| **From:** | Adam Smith <ASmith@galleongrp.com> |
| **Sent:** | Thursday, March 17, 2005 10:20 PM |
| **To:** | Raj Rajaratnam <RajRajaratnam@galleongrp.com> |
| **Subject:** | Eyes |



GOVERNMENT
EXHIBIT
2455

Game on.

Also, I've been doing some work on EPNY. Might be interesting for us to take a look.
-------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

CONFIDENTIAL

USAO GALLEON 00179215

# GX 2456

**GX 2456**

GOVERNMENT
EXHIBIT
2456

| | |
|---|---|
| **From:** | Adam Smith <ASmith@galleongrp.com> |
| **Sent:** | Thursday, April 21, 2005 2:08 PM |
| **To:** | Raj Rajaratnam <RajRajaratnam@galleongrp.com> |
| **Subject:** | eyes |

the date is set for may 16

USAO GALLEON 00179220

# GX 2562

**GX 2562**

## Thomson StreetEvents™

### AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

Event Date/Time: Jul. 30. 2008 / 4:30PM ET

| THOMSON | www.streetevents.com | Contact Us |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

GOVERNMENT
EXHIBIT
__2562__
S2 09 Cr. 1184 (RJH)

Confidential Treatment Requested by Akamai Technologies, Inc.

AK_USAO0005162

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Noelle Faris**
*Akamai Technologies Inc. - Senior Manager, Investor Relations*

**Paul Sagan**
*Akamai Technologies Inc. - President, CEO*

**J.D. Sherman**
*Akamai Technologies Inc. - CFO*

## CONFERENCE CALL PARTICIPANTS

**Mark Kelleher**
*Canaccord Adams - Analyst*

**Michael Turits**
*Raymond James & Associates - Analyst*

**Mark Mahaney**
*Citigroup - Analyst*

**Thomas Watts**
*Cowen & Co. - Analyst*

**Rob Sanderson**
*American Technology Research - Analyst*

**Tim Klasell**
*Thomas Weisel Partners - Analyst*

**Colby Synesael**
*Merriman Curhan Ford & Co. - Analyst*

**Rod Ratliff**
*Stanford Group Co. - Analyst*

**Srinivas Anantha**
*Oppenheimer & Co. - Analyst*

**Garrett Becker**
*Merrill Lynch - Analyst*

**Kirk Materne**
*Banc of America Securities - Analyst*

**Derek Bingham**
*Goldman Sachs - Analyst*

## PRESENTATION

**Operator**

Good day, ladies and gentlemen, and welcome to the Q2 2008 Akamai Technologies earnings conference call. My name is Antoine and I will be your operator for today. At this time, all participants are in listen-only mode. We will conduct a question-and-answer session towards the end of this conference at which time you may press star followed by 1 to participate.

(OPERATOR INSTRUCTIONS). I would now like to turn the call over to Ms. Noelle Faris, Senior Manager of Investor Relations. Please proceed, ma'am.

| THOMSON | www.streetevents.com | Contact Us | |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

**Noelle Faris** - *Akamai Technologies Inc. - Senior Manager, Investor Relations*

Good afternoon, and thank you for joining Akamai's investor conference call to discuss our second quarter 2008 financial results. Speaking today will be Paul Sagan, Akamai's President and Chief Executive Officer; and J.D. Sherman, Akamai's Chief Financial Officer.

Today's presentation contains estimates and other statements that are forward-looking under the Private Securities Litigation Reform Act of 1995. These forward-looking statements are subject to risks and uncertainties and involve a number of factors that could cause actual results to differ materially from those expressed or implied by such statements.

Additional information concerning these factors is contained in Akamai's filing with the SEC, including our Annual Report on Form 10-K and quarterly reports on Form 10-Q.

The forward-looking statements included in this call represent the Company's views on July 30, 2008. Akamai disclaims any obligation to update these statements to reflect future events or circumstances. During this call, we will be referring to some non-GAAP financial measures that we believe are helpful to better understand our financial results and operations.

These non-GAAP measures are not prepared in accordance with Generally Accepted Accounting Principles. You can find definitions of these non-GAAP terms and reconciliations of these non-GAAP metrics to the most directly comparable GAAP financial measures under the News and Publications portion of the Investor Relations section of our website.

Now let me turn the call over to Paul.

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Thank you, Noelle, and thank you all for joining us today. Q2 was a solid quarter for Akamai with healthy earnings and revenue growth. Financial highlights for the second quarter include record revenue of $194 million, a 27% increase over the second quarter of last year and a 4% increase over the first quarter this year, a normalized net income of $76.5 million, or $0.41 per diluted share.

That's a 38% increase over normalized net income from Q2 of last year and consistent with our strong Q1 results. We're especially pleased to achieve these Q2 results even as we began to see the impact of a more challenging economic environment in some customer verticals. At the same time, we continue to experience growth in many of our newer service areas such as application acceleration for business-to-business services and Dynamic Site solutions for e-commerce .

I will be back to talk about some of the trends we're seeing in the market, but first let me turn the call over to J.D. to review our second quarter results in

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

Thanks, Paul. As Paul just highlighted, our business performed well in the second quarter in a more challenging environment. For the second quarter, we grew revenue 27% year-over-year and 4% sequentially to $194 million, at the low end of our expectation range coming into the quarter.

Our median entertainment vertical grew roughly in line with the overall business and it remained an important contributor to our second quarter financial results. But, as I mentioned last quarter, media growth has moderated from the pace we saw for several years during the period of rapid broadband adoption. Growth in our commerce vertical continued to be very strong. Again, it was our fastest growing vertical with more than a 50% increase year-over-year.

| THOMSON | www.streetevents.com | Contact Us | |
|---|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

We also continued to make progress with our newer value-added solutions such as application performance services, Dynamic Site solutions and Stream OS. These higher margin areas contributed to the improvement in probability in the quarter as demonstrated in both our gross margin and EBITDA results.

During the second quarter, international sales represented 26% of total revenue, up 1 point from first quarter levels. Our international business performed very well growing 8% sequentially and 45% year-over-year. Revenue in North America, where we saw the largest impact both from the economic factors and media trends grew 2% sequentially and 22% year-over-year.

Resellers represented 16% of total revenue, consistent with the prior quarter. Once again, no customer accounted for 10% or more of our revenue in Q2. Our consolidated ARPU, or average revenue per customer, was up 19% year-over-year to $23,700 in the second quarter. This is the result of our focus on building deeper and broader relationships with our enterprise-class customers by selling new, more advanced solutions into our customer base.

We added 53 net new customers in Q2 bringing our total customer count to 2,725. Our gross adds, brand new customers to Akamai, increased to about 170 this quarter. Churn was, again, just over 4%, primarily due to churn from smaller customers. T he ARPU of our new customer adds continued to be well above the average revenue of our churn customers.

Our cash gross margins for the quarter were 82%, up from 81% in Q1 and down about a point from the same period last year. As we had expected, our gross margins stabilized with the growth in sales of our Dynamic Site solutions and application performance services which have a higher gross margin than our media delivery deals. Our GAAP gross margin, which includes both depreciation and stock-based compensation, was 72% for the quarter, consistent with Q1 and down about 2 points from Q2 of last year.

GAAP operating expenses were $88 million in the second quarter. These GAAP numbers include depreciation, amortization of intangible assets and stock-based compensation charges. Excluding these non-cash charges, our operating expenses for the quarter were $65.9 million, up $900,000 from the prior quarter.

Adjusted EBITDA for the second quarter was $92.7 million, up 6% from the prior quarter and up 41% from the same period last year. And our adjusted EBITDA margin of 48% was up 5 points over the same period last year and up 1 point from the first quarter.

For the second quarter, total depreciation and amortization was $23.4 million, up from $22.6 million in the first quarter. These charges include $17.7 million of network-related depreciation, $2.2 million of G&A depreciation, and $3.5 million of amortization of intangible assets. Net interest income for the second quarter was $4.8 million. That's down $2.6 million from Q1 as interest rates declined despite a growing cash balance.

Moving on to earnings, GAAP net income for the quarter for $34.3 million, or $0.19 of earning per diluted share. As a reminder, our GAAP net income includes non-cash charges for stock compensation related to FAS 123R and book tax charges at an effective annual rate of approximately 40%. However, because of our significant deferred tax assets we are paying cash taxes at an annualized rate of about 2%.

During the second quarter, our stock-based compensation expense was $18 million, or $0.10 per diluted share on a pre-tax basis. A break down of our stock-based compensation charges by operating department is available in the supplemental metrics sheet posted in the Investor Relations section of our website.

Additional non-cash items in GAAP net income for the quarter include $3.5 million from amortization of intangible assets and a $20.7 million non-cash tax charge. Excluding these non-cash items our normalized net income for the second quarter was $76.5 million, 38% higher than our normalized net income for the same period last year and up $900,000 from a strong Q1.

| THOMSON | www.streetevents.com | Contact Us | |
|---|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

In the second quarter we earned $0.41 per diluted share on a normalized basis. That is a 37% increase year-over-year and consistent with the prior year quarter. Our normalized weighted average diluted share count for the second quarter was 189 million shares.

Now let me review some balance sheet items. Our cash generation continued to be very strong. Cash from operations for the second quarter was $70 million. Year-to-date we've generated $158 million of cash from operations or 41% of revenue. That is up 78% compared to last year.

At the end of Q2, we had $745 million in cash, cash equivalents and marketable securities on the balance sheet. This balance includes $280 million of AAA-rated, federally insured student loan auction rate securities which we continued to treat as long-term investments in Q2. In the second quarter, capital expenditures, excluding equity compensation, were roughly $30 million.

Days sales outstanding for the quarter were 58 days, down one day from the prior quarter. Overall, we delivered a solid Q2. We were pleased with the continued growth in our traditional market verticals as well as the increased traction of our new solutions across our broad customer base which helped to improve our operating margins.

With the first half of 2008 behind us, it is becoming clear that the pressures being felt by many of our customers from the economic environment will not ease in the short term. Further, in the media space, while our clients continue to develop higher quality video initiatives, we are not expecting this trend to impact the back half of 2008 significantly enough to offset the pressure from the general economic environment.

Based on the trends we are seeing, we now expect to come in for the full year at the low end of our earlier revenue guidance or slightly below. So we are updating the guidance of revenue to $785 million and $800 million for the full year, or 23% to 26% growth.

As for our earnings expectations, we expect cash gross margins will trend downward by 1 to 2 points for the full year, slightly better than our previous guidance. And our full year adjusted EBITDA margins should expand by roughly 2 points compared to the full year 2007 as we said earlier.

However, with the lower than anticipated interest rates impacting our interest income as well as the slower top line growth we are also likely to be at the low end of our earnings guidance or slightly below. So we are updating our earnings guidance to $1.63 to $1.69 of normalized earnings per share. That would translate into year-over-year normalized net income growth of 23% to 28%.

We continue to expect capital expenditures, excluding equity compensation, to be about 15% to 16% of revenue for the year. As I mentioned on our call last quarter, this capital investment level also includes leasehold improvements we have planned for our two primary offices, costs that will offset some of the efficiencies we expect to achieve from our network operations. On a non-cash item, we now expect equity compensation to be about $0.34 to $0.35 per diluted share compared to our previous guidance of $0.37 to $0.39 per diluted share on a pre-tax basis.

Looking more near term, the third quarter tends to be the seasonally slowest quarter for our customers especially to those that are most sensitive to the seasonal changes in traffic levels. For the third quarter this year we are expecting revenue in the range of $193 million to $198 million. At the midpoint that translates into 21% growth over Q3 of last year.

But this revenue range, which is a bit wider than our typical guidance, we are expecting normalized earnings per diluted share for the third quarter in the range of $0.39 to $0.40. We expect gross margins to decline modestly, by less than a point sequentially and EBITDA margins in the range of 46% to 47% for the quarter.

While we have seen a slowdown in growth in media, we believe that the longer term prospects for rich media online remains very attractive and we think we are well positioned to capture that opportunity. In addition, our success in verticals beyond

| THOMSON | www.streetevents.com | Contact Us |
|---------|----------------------|------------|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

media, as well as with our value-added solutions, help to sustain growth and improve profitability in the first half of the year. And we believe they represent a significant additional growth opportunity going forward.

Given the investments we've made and continue to make in these areas we believe that Akamai is well-positioned to benefit from the long-term trends of business moving online even in a more difficult external environment. Now let me turn the call back over to Paul. Paul?

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Thanks, J.D. Clearly the economic climate has changed significantly from where we were even a couple of months ago.

But as our second quarter results demonstrate, we believe we are well positioned (inaudible) and the diversity of our enterprise-class customer base and our broad portfolio of value-added solutions. J.D. mentioned that growth in our media and entertainment vertical has moderated a bit from prior years and I would like to focus a bit more detail on what we're seeing there.

It's not that this market is less promising. The explosion in traffic growth that we saw over the past couple of years has simply moderated, but we remain very excited about the future of media and entertainment online. This is particularly true because the industry is moving toward higher quality video and that is where Akamai can deliver at a scale and quality level that we believe is unmatched.

Many of our conversations with customers in the media go beyond improving the performance and quality of the rich content and extend to how we can help them with their monetization models. We are pleased with the results from our investment in Stream OS because it helps our customers manage and monetize their assets, for example.

Outside of media, we have seen strong growth particularly for some of our newest offerings, such as application acceleration and our Dynamic Site solutions. Innovating in these categories and continually adding enhancements to these newer solutions is not by chance, it's a deliberate strategy to diversify and extend our portfolio and invest our R&D dollars where we believe we will see the best returns and we think that's exactly what's happened.

One example is our commitment to the application space and our recent announcement that we partnered with Citrix to complement the NetScaler product. By teaming a premise-based product like NetScaler with our cloud-based Web Application Accelerator service we are able to bring true end-to-end web application delivery performance to enterprise customers worldwide.

We believe more and more of the market is coming to understand there are inherent issues with Internet performance in the clouds and that our capabilities provide an ideal complement to what customers are trying to do in their own data centers. We're very excited about growth in the area of Web Application Accelerator. We're currently providing these services to hundreds of customers and accelerating many critical business processes.

And these newer services have allowed us to penetrate new verticals such as farm and healthcare where we're helping to accelerate applications used in initiatives like clinical trials. You might have seen a recent study by Net Forecast that highlighted how Akamai can significantly improve the performance of Internet-connected SAP users around the world. The business benefit of this is that enterprisers can extend productivity tools from the consolidated data centers to a global user base.

Another of our value-added services is Dynamic Site Accelerator. This is especially valuable to clients with online commerce sites. In just a year we've more than doubled the number of customers leveraging this capability from Akamai. One customer example is JC Whitney, a large direct marketer of auto parts and accessories.

---

| THOMSON | www.streetevents.com | Contact Us | |
|---------|---------------------|------------|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

They have leveraged our services to achieve significant improvement in site performance. They have seen an increase of almost 10% in online shopping conversion rates since deploying our solution. So we remain very excited about traction with our value-added offerings and their acceptance out in the market.

While companies are adjusting to the current climate, most are finding they don't want to cut back significantly on their Internet investments and our solutions remain critical to helping them grow their businesses online.

Much of our continued success will come from our ability to help our diverse customer base find ways to drive new revenue online and to help them become more efficient by moving more and more business processes onto the Internet.

Now J.D. and I would be pleased to take your questions. Operator, if you could set the queue and take the first question, please?

---

## QUESTIONS AND ANSWERS

**Operator**

(OPERATOR INSTRUCTIONS) Your first question comes from the line of Mark Kelleher with Canaccord Adams. Please proceed with your question.

---

**Mark Kelleher** - *Canaccord Adams - Analyst*

Thanks, hi, guys. I was just wondering if you could talk about the competitive environment in the media and entertainment market? What makes you think it's a slowing media and entertainment market and not a competitive situation there?

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Well, I think we have always said we are in competitive markets for a decade of history. That has always been a fact of life and it remains a competitive market. I want to be careful that people understand what we're saying, we are not saying that the media and entertainment market is slowing online. What we're saying is that traffic growth on many of these sites, the rate of the growth is not the pace we saw a couple of years ago.

And I think that there's not there are fewer users. But we've seen is we got to broadband adoption particularly in the U.S. and that drove, not just the number of users, but how much each user was consuming. What we're seeing now is that users continue to do more and more, but the pace at which they can consume it is effectively fixed by the amount of broadband they have.

As the pipes get bigger, people can consume more things like rich media, video, et cetera, and we believe we will see adoption all the way up to HD where Internet video is effectively competitive with traditional video to the home today over cable or satellite or whatever means people are using. So what we are seeing isn't a slowing in that market at all.

We continue to believe that our win rates are good, that we have great relationships with most of the major players not just here but internationally in the media space. We benefit as they grow, but what we're seeing is that they are just not seeing the pace of growth of traffic that they had experienced, say on average, a couple of years ago.

The competitive environment remains and we face that all the time. It's why we focus on monetization tools, software tools that differentiate us, higher quality and scale. But what we are seeing is the rate at which an average site is growing in the media space doesn't appear to be today what it was, say, 18 months ago.

---

| THOMSON | www.streetevents.com | Contact Us | |
|---|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

**Mark Kelleher** - *Canaccord Adams - Analyst*

Okay, and just lastly could you give a quick number on the bursting? Was that around 30% again?

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Bursting was on the low side this quarter. You know, we are sort of got us to where we are on the low end of our guidance. The other point I'd make on bursting, particularly in the media space, we've seen our customers rather than make the traditional period commitments in terms of a monthly commitment they are making longer term commitments, say an an annual commitment or a quarterly commitment.

It allows them to balance their usage patterns better with their business, but it also does put a little bit more sensitivity in our business into usage. In some sense, particularly in the media space, usage is growing in importance. And the 70/30 guideline, at least in the media space, is becoming a little less of a guideline.

---

**Mark Kelleher** - *Canaccord Adams - Analyst*

Okay. Thanks.

---

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

Operator?

---

**Operator**

Your next question comes from the line of Michael Turits of Raymond James. Please proceed with your question.

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Hi, Michael.

---

**Michael Turits** - *Raymond James & Associates - Analyst*

Let me ask a couple questions. First of all, you said that because of macro you are bringing down the numbers and you think it's more of a traffic issue. Another questioner asked about competitive. But you said, I think, didn't change.

Has there been any effect on pricing? Is pricing any worse than it has been? And, second, why are you guiding down on margins sequentially if revenue is about the same? And if you can drill into the gross adds and churn which have kind of gone in a different direction than they have sequentially. Why are you adding a lot less -- excuse me adding a lot more gross but still churning a lot?

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Okay, Michael, I think we got all three parts of the question. You're breaking up a little. As they say on drive time radio we will answer that offline for you. But I think we got all three points and I think J.D. can take them.

---

| THOMSON | www.streetevents.com | Contact Us | |
|---------|----------------------|------------|--|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

Yes, okay. Let me start with the pricing. I think, Michael, the pricing, environment has been, as we've talked about, pretty competitive for quite some time. And I don't see any major changes in that.

We got to the point, particularly in the media space, several quarters ago where there is not a major deal out there where there is not a competitive commodity benchmark in terms of this price. I think we expect that to continue for a long time. I don't see any difference there.

The one difference, as Paul pointed out, we don't see that natural growth in traffic at the same level as we saw with the broadband explosion. I think the second question was on margins on a quarter-over-quarter basis. We will see a modest decline in margins even with revenue roughly flat because depreciation is going to grow quarter-over-quarter as we continue to add CapEx.

That is a major feature of that. And also we continue to grow just the head count to manage a larger and larger network. But I think overall we have seen the trend moderate just as we thought we would as the business started to transition and shift towards more value-added services. And what was the third part of the question?

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

The churn question.

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

Yes, the churn. I think 170 new adds was sort of consistent with the rate we had been at before the prior couple of quarters which maybe were a little bit lower in the 140 to 150. So I don't think there is a major difference there.

We were really pleased with the new adds, particularly given that a lot of the new adds are at larger ARPU levels and are buying our advanced, our value-added services. The churn continues to be around 4% and as I said that continues to be from smaller customers where we really have turned our focus more towards the enterprise-class customers. So I think we felt pretty good about the customer dynamic this quarter.

**Michael Turits** - *Raymond James & Associates - Analyst*

(multiple speakers)

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

The margin performance was extremely strong and I think goes to the value that we are getting in accounts, particularly in enterprises. Operator, next question, please, thank you.

**Michael Turits** - *Raymond James & Associates - Analyst*

Thanks.

**Operator**

Your next question comes from the line of Mark Mahaney with Citigroup. Please proceed with your question.

| THOMSON | www.streetevents.com | Contact Us | |
|---------|----------------------|------------|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

**Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call**

**Mark Mahaney** - *Citigroup - Analyst*

Thank you. Can you talk about the quality of those customer adds you had in the quarter? Any since of where they come from? Were they greenfield new to the CDN industry, did they come from other companies? And could you just go over and clarify exactly how the economic weakening macroenvironment impacts your business? Do you see it more in terms of an inability to get pricing? Is it really traffic from end consumers that is falling off? How exactly does a recession impact your business? Thank you.

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

The quality of the adds has been very good worldwide. And we are really focused on quality enterprise customers and that is who we are targeting for our growth and for the value-added services because it's e-commerce sites, it's the business-to-business portals, it's the mission critical business processes that are going online along with the media and entertainment sites that we are targeting.

And we are looking for large enterprises who can grow and build the volumes in our customer base both of absorbing new product as well as traffic growth. We are very pleased with the quality of the pipeline and the work that the sales staff did, really in every region around the world, particularly in international which has been really strong and that is no surprise given the general economic news of the U.S. economy being weaker and the international and Asia being much stronger.

I have been to Asia once and Europe twice in the last few months and it validates what we are hearing. And I have seen that first hand and heard that. We shouldn't mix up the economic factors and traffic. I don't think that consumers are hurting in the pocketbook or in the mortgage market or something and, therefore, are not consuming as much.

The consumption issue is really a question of how much can people consume. If they are going to be online for an hour a day and they are going to consume video and they don't have high def and they can only do it at cable modem speed that limits how much traffic growth. So what you'll see is not that the same hour month-over-month is more data, it's if they go from an hour to an hour and 15 minutes that the growth is there.

But the amount they can consume in an hour, or if you will, 10 minutes of experience can't grow if the band width doesn't grow. So what we're seeing is really a leveling out of the last mile bandwidth. But that has nothing really to do with the economic situation. I wasn't trying to imply that people were not upgrading their connectivity because of the economy. It's not that at all.

The economic issue is really either verticals that we sell into where people are feeling strong pressure in the economy, manufacturing, automotive and they may be slowing down purchases or being much more sensitive to how much they buy or if they start a new project how many features they add online.

In the media space where the economy does have some effect is in the pressure on advertising, both online advertising, but in particularly, offline advertising and where the media companies are really feeling squeezed they have fewer dollars to invest in new online initiatives that might drive people to drive people to consume more right now and there is not one single event there.

We think taken as a whole it is creating a little more headwind at the middle part of the year and it has made us be a little more conservative about the back half of '08. But it doesn't in any way dampen our enthusiasm about the core business or that really every industry is going more and more to put their process online, but in some cases they have slowed down some of the pace of that rollout.

| THOMSON | www.streetevents.com | Contact Us |  |
| --- | --- | --- | --- |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.  AK USAO0005171

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

**Mark Mahaney** - *Citigroup - Analyst*

Thank you, Paul. That is very helpful.

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Thanks, Mark. Next?

---

**Operator**

Your next question comes from the line of Tom Watts with Cowen & Company. Please proceed with your question.

---

**Thomas Watts** - *Cowen & Co. - Analyst*

Thanks for the clarification between the effects of the economy and the broadband usage. If the economy were to recover, what would be the areas you think would pick up? Is that going to be attraction of new customers or a trade up to additional applications? And then, secondly, if you could comment on the cash flow.

Clearly, you are starting to establish a very attractive free cash flow profile. Are there any, other than starting to pay cash taxes, is there anything in the future that could interrupt those free cash flow trends such as a major CapEx investment or something else?

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

I'm I'll take the first part. The general economic issue really is vertical specific for us. Commerce, how much people are driving more efforts online. Particularly B to B, not B to C, there's a lot of growth there, but more B to B initiatives, automotive is really a hammered sector which was trying to make a lot of changes to the digital world.

Those are the kinds of things where anecdotally some of the regions are starting to see longer sales cycles and people being a little more conservative about rolling out projects. We don't see them being canceled wholesale. To us this is not a stoppage in growth, but we are being a little more conservative about the pace at which these things are coming online and we wanting to make sure we have our expectations set correctly.

If there was a shorter impact on the economy overall we would see the pickup in those sectors. One would presume it would impact the broader add market, and that would drive more spending by the media companies. And a lot of that could be spending in their traditional non-online initiatives, revenue in them allowing them to invest more online.

They are doing more online. The question is the pace at which they feel they can afford to go there. And I will let J.D. talk about the cash flow. But I will make the comment there is no — and Tom, you have known us for 10 years nearly. We don't have a single upgrade event in our CapEx or network model that would necessitate some major change in

---

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

Right. That is pretty much what I was going to say, Paul. We talked about our long-term model at our last analyst day. And as Paul said we don't have a step function or need a step function the way we build out our network. We think it's a nice incremental investment. We think we spend CapEx in the range of 13% to 16% of our revenue.

---

| THOMSON | www.streetevents.com | Contact Us | 16 |
|---|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

And you can see as our performance over the last few years the model really scales nicely when you look at it on a cash flow basis. And I don't see any major, significant event changing that in the near term.

---

**Thomas Watts** - *Cowen & Co. - Analyst*

Okay. Thanks.

---

**Operator**

Your next question comes from the line of Rob Sanderson with American Technology Research. Please proceed with your question.

---

**Rob Sanderson** - *American Technology Research - Analyst*

Thank you. Good afternoon, gentleman.

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Hi, Rob.

---

**Rob Sanderson** - *American Technology Research - Analyst*

Hi. I had a couple of questions. First, on the media and entertainment vertical do you think there is a rationalization of that monetization model going on there? We have heard about the video portals missing their expected add revenues and social networks coming in a little bit light as well:

Do you think there is some sort of a bigger trend there with bit more of a rationalization of the business model and a little bit of slowdown on that? And then I have a follow-up.

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

We are seeing one of the areas where traffic is growing strongly is in some of the social networking categories. So it's always dangerous to over generalize. You have heard me say, I think, quarter-over-quarter for a year now that I thought there were some of those models that were more suspect than others and that there would be a rationalization of that market.

So that may be a piece of what's going on. I'm not sure it ties directly to what we have seen affecting the traffic growth. In fact, I'm not sure that it does. Some of those sites report crazy levels of traffic with no means of supporting it. And their business models, particularly if tougher times come economically will get rationalized, it probably means that there seed funding would dry up or some such thing.

But I think that may be going on, but I don't think that is what we are seeing in terms of general traffic. Most of it is across the board of, I think, just the limitation on broadband consumption has just, again, dampened the pace of growth.

I think it's very important here that all we're talking about here is the slope of the curve up. We're not talking about less time online or less consumption, but it's just the rate of that growth, we think, has moderated a bit more than we expected or modeled.

---

| THOMSON | www.streetevents.com | Contact Us | |
|---------|----------------------|------------|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

AK USAO0005173

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

And I would just add to Paul's point earlier there is definitely an imperative from these businesses and sites to improve their monetization which is why some of the discussions we have with our customers around how to better and more effectively monetize their websites, that is really something we are seeing heating up.

**Rob Sanderson** - *American Technology Research - Analyst*

That makes sense.

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Do you have a follow-up, Rob?

**Rob Sanderson** - *American Technology Research - Analyst*

Yes, I did. Just more of a macro level. You guys are in a unique position seeing so much of the world's Internet traffic. And I know you spend a lot of time looking at traffic trends, any notable clues there that could help us figure out the macroeconomic climate, if it's strength or weakness in certain industry verticals or anything notable that jumps out from the global traffic trends you monitor?

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Yes, traffic trends in commerce are very, very strong. And that continues. And I think that is a number of things. One, there was a trend of people doing more and more shopping online and they're doing more media online just not at the same pace. And some of macro things may be influencing it.

We've all read high gas prices. People are not going to the mall as much so they still need to do some of their shopping, they're doing it online. So we're seeing strong trends there in traffic. So that is one of the things we could peek out, one of the things that gives us confidence about the e-commerce sector for the rest of the year, one of the verticals that is very important to the services that we provide or we think those services are important to that vertical.

And we continue to see very strong or stronger growth internationally which is not a new trend. We've talked about that. But we don't see any impairment there. Also we should be cautious about trying to read too much into traffic trends and correlate it.

People are using the Internet more and more even if they are in more uncertain economic terms. I don't think anyone has talked about people disconnecting their Internet connection because they cannot pay their bill. People will be using the Internet more. Maybe we'll even see them use more if they default away from taking vacations or things like that.

But really difficult to draw any kind of specific conclusion like that or to look into the data and understand it. At the more macro level, I think, it's strong e-commerce , continuing growth in business-to-business usage of online applications. People maybe being a little more cautious about how fast they are investing in new online B to B initiatives. Again, all of these things are growing, it's just a question of

| THOMSON | www.streetevents.com | Contact Us | |
|---|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

**Rob Sanderson** - *American Technology Research - Analyst*

Thank you very much much.

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Thanks, Rob.

---

**Operator**

Your next question comes from the line of Tim Klasell with Thomas Weisel Partners. Please proceed with your question.

---

**Tim Klasell** - *Thomas Weisel Partners - Analyst*

Good afternoon, everybody. You mentioned the commerce site is growing at 50% year-over-year. I know you only do this once a year, but could you give us some color around the media and entertainment space? What is the growth profile there?

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

That is about 40% to 45% of our business. And as I said on the call, it grew roughly in line, Tim, with our overall growth rate of 27%. Slightly below that, but roughly in line.

---

**Tim Klasell** - *Thomas Weisel Partners - Analyst*

Okay. And your guidance going forward what do you assume for bursting around the media and entertainment?

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Again, as I said to an earlier question, a lot of what is happening in media and entertainment we are seeing longer term volume commitments rather than a standard monthly deal. What that means is for our customers they realize their usage is more seasonal, particularly in the volume driven parts of the business.

And so what this allows them to do is balance their commitment over a longer period. What it means for us is we are a bit more susceptible to seasonality. We saw it last year in our Q3 and Q4 dynamics. We had a very strong Q4 last year.

Just natural seasonality, particularly in the media and entertainment space as people go outside for the summer. And the new programs come online and the holiday season drives online advertising, et cetera. We see more of that.

I would say outside of that area, the bursting relationship stays the same. But that dynamic is changing a bit, the dynamic of our overall seasonality.

---

**Tim Klasell** - *Thomas Weisel Partners - Analyst*

Okay, great, thank you very much.

---



| | www.streetevents.com | Contact Us | |
|---|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies. Inc.



AK USAO0005175

FINAL TRANSCRIPT

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Thanks, Tim.

---

**Operator**

Your next question comes from line of Colby Synesael with Merriman. Please proceed with your question.

---

**Colby Synesael** - *Merriman Curhan Ford & Co. - Analyst*

Great. Thanks for taking my question. Just looking at your international revenues it looks like you have 26% of revenues which is up nicely from last year. Is there an opportunity for you guys to accelerate your growth in the international space?

Obviously, you mentioned the U.S. as being one of the areas of weakness. Maybe international could balance that out a little bit. And if you could talk about the competitive dynamics internationally verse domestic if there's any nuances there that changes how you guys compete? Thanks.

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

We have been really pleased with international performance over the last year, not just this year. And you have seen that in the steady increase. And given that the domestic business has grown very strongly means international has really been executing well to not just stay current but to catch up. Obviously, for 26% of the business to counter balance 74% they have to be really outstanding. We are seeing some of that.

And we are making investment in the international, we're opening new offices and expanding the staff in most of the regions. We continue to see new opportunities. As you may be aware, our habit is to move into a region first, if you will, by parachuting in, meaning we fly people in and out of one of the other capitals where we operate offices and if we get enough traction we will open offices in new cities or new countries.

We are opening several, or already have this year in Europe and Asia and are very pleased with that performance. And I think that is an area where we will buy some incremental investment. The opportunity is strong and you're seeing the payoff. Frankly, there are just more Internet users outside the U.S. than there are inside.

And in many countries they have broadband already that exceeds ours. If you look at Korea, just came back from Europe. France now has 20 megabit a second service available to homes at very competitive rates and they are seeing uptake there that I think exceeds what we are seeing, way exceeds what we're seeing in the U.S.

Some of those markets have for all verticals, including media and entertainment, more growth opportunity than they have, than we are seeing here even so far. And in no way are we discouraged about the U.S. market, but there are just really interesting Internet things going on internationally.

And you're right to ask the question about competition. We see some of the names you would recognize as U.S. competitors in some of the international markets. We deal with that kind of competition in some areas and in some countries there are domestic, local competitors. Some are -- try to sell a content delivery service similar to ours, others might try to mix in production or some kind of professional services as a local differentiator.

I think we compete effectively. One of the things that we have that really differentiates us is global scale, and we are generally targeting enterprises with global operations or global suppliers. And in this world economy, almost any decent-sized company

---

| THOMSON | www.streetevents.com | Contact Us |
|---------|----------------------|------------|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

today is dealing with suppliers, partners, marketers in distributed geographies and they are looking for WAN-like performance for global Web operations and we can offer that and we think that most of the competition internationally can't do that at all.

It really helps us there. In other ways it is kind of similar. We look at channel partners, developing local extensions of sales operations as well. Some of those are a bit more regionalized as we go.

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

The other thing I would add to that. The investment that we need to make and we are making to grow internationally is a go-to-market investment. It doesn't require a new level of buildout on our network. We already have the massively distributed global footprint and that is a significant advantage.

**Colby Synesael** - *Merriman Curhan Ford & Co. - Analyst*

Great, thank you.

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Operator?

**Operator**

Your next question comes from the line of Rod Ratliff with the Stanford Group. Please proceed with your question.

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Hi, Rod.

**Rod Ratliff** - *Stanford Group Co. - Analyst*

Hey, guys. Obviously, nice expansion in the gross margin there. Is that just the greater presence in the mix of higher margin verticals?

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

I think that is certainly the major driver of that. It's something that we talked about for a while that as we get more and more penetration of our value-added services we start to see that benefit.

We also even in a -- forgive my term -- in a more basic delivery deal we still command a significant premium just based on our fundamental performance advantage and reliability. But I would say it has been our strategy to upsell our customers with value-added services and build out on our differentiation and we're starting to see some of the benefit of that.

**Rod Ratliff** - *Stanford Group Co. - Analyst*

All right. Two very quick ones. What are you seeing in online casual gaming? Video gaming?

| THOMSON | www.streetevents.com | Contact Us | |
|---------|----------------------|------------|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

A large growth in the gaming space. That has been a very strong area for us for probably about 18 months. And as we see more connected devices that will grow.

**Rod Ratliff** - *Stanford Group Co. - Analyst*

And I was -- there was a press release out, I believe, yesterday that listed NBC's partners for streaming the Olympics. Do you think you guys will you see any notable benefit from that at all?

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

We are looking forward to the summer games and the role we are playing there across the globe. I can touch on a number of them. We are working for the first time with partners inside China to support their efforts to distribute the games on the Web which is quite interesting.

We are working with the EBU to deliver the Olympics across the European continent. We'll also going to be delivering the summer games throughout the U.K with a partnership there. And domestically we are really excited to be working once again with our partners at NBC-Universal to deliver the NBCOlympics.com site. We think it should be a very sizable Olympics.

As we've said, there is no one single event or customer who at our scale is that significant to the quarter. At the same time, we are happy to have all that business and to work on a global event, which we think will be interesting. You never know how exciting it will be until we see how good the individual games are and whether people capture someone's attention.

And the time zone differences. Also we're going to have to see how that plays and it will be regionally different where the games are live or not how significant the Internet is.

We've been doing the summer games every four years and we get some version every two years because of the winter games as well. It always has been an interesting traffic driver on our network and we're looking forward to it, but, again, on our scale we don't think any one thing is so significant. But we'll be involved in the Olympics in almost every geography in the world including here with NBC.

**Rod Ratliff** - *Stanford Group Co. - Analyst*

Can I throw out a follow-up, Paul?

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Sure.

**Rod Ratliff** - *Stanford Group Co. - Analyst*

How do you feel about gaining a foothold in China?

| THOMSON | www.streetevents.com | Contact Us | |
|---------|----------------------|------------|--|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

As everybody says, particularly in tech, actually in any industry. It's a hugely exciting and intriguing market because of its scale. In many ways it's a very different place to operate because of the state of development, regulation, et cetera. We have worked there with partners successfully and we are very pleased about it to deliver content into China on behalf of some of our customers.

And we look forward to working with our partners there to expand our ability to really make the Internet in China achieve all of its potential. And we think that that presents a growth opportunity for us, as well, over the next couple of years. We think our technology and services can help benefit Internet performance there as they do everywhere else in the world.

---

**Rod Ratliff** - *Stanford Group Co. - Analyst*

Thanks a lot.

---

**Operator**

Your next question comes from the line of Srinivas Anantha with Oppenheimer. Please proceed with your question.

---

**Srinivas Anantha** - *Oppenheimer & Co. - Analyst*

Yes, thank you. Couple of questions. One of the things you guys highlight is the newer value-added solutions such as app services and Dynamic Site solutions that helps differentiate in the marketplace.

Could you guys quantify what percentage of revenue comes from these services and how much they have been growing year-over-year?

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

We talked about that at our analyst day last year. We said at that point it was about 30% of our revenue came from customers using our Dynamic Solutions including those and that continues to grow. We haven't quantified that number externally since then. Probably will give an update later in the year as we have an analyst day this year. But that number continues to grow as a portion of our business. And that's a major strategic thrust for us.

---

**Srinivas Anantha** - *Oppenheimer & Co. - Analyst*

And, Paul, you talked about the overall slowdown in traffic. Do you see any killer applications whether on the enterprise side, on the consumer side you think will reaccelerate the growth in IP traffic?

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

There is no slowdown in traffic. What I said was and I just want to be very clear everybody gets this, a slower rate of growth in some of the media sites. There is no slowdown in traffic, it's really a growth rate question in some verticals. There is no slowdown in Internet traffic or Internet usage. I don't think it's a question of killer apps.

I think for media it's a question of last mile bandwidth accessibility and the ability to consume data or the rate at which people can consume it. And in the reality in the U.S. you are lucky to get a television quality video picture over IP and all your neighbors better not be trying to share that same link to do that. We are looking forward to the day when you can do true HD to any home over IP.

---

| THOMSON | www.streetevents.com | Contact Us | |
|---------|---------------------|------------|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

AK USAO0005179

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

And if you looked at our HD Web demonstration site and you have the right last mile connectivity, probably more likely at work than at home today, you can watch a live stream of a fully competitive, if you will, HD picture. It will be as good on your big screen TV as your HD standard TV signal. If you will, I think that is the killer app. It's not that the content needs to be existent in HD, it exists. The last mile and then the monetization models that go with it are what we're needing to reaccelerate the growth rate there.

And on the business side, we are seeing those apps and we're seeing the adoption. That's why you see the strong uptake of those services and the reason, I think, the gross margin was so strong. And there some of the applications are B to B portals. Many of the buying, provisioning and data-based apps that people tend to do behind the firewall and let someone access over a phone or a call center that are now being opened up a secure portal. Those apps exist and the question there is the pace at which enterprises are putting a Web front end on a legacy system and saying to people, effectively, self-service. I think the apps exist there, but it's the question of the shift in the way the businesses are operating and that reengineering that we have been seeing over the last couple years and have driven the strong growth in our B to B services.

---

**Srinivas Anantha** - *Oppenheimer & Co. - Analyst*

Thanks for the clarification. And, J.D., one quick clarification on the expenses. I know you mentioned that gross margins are going to decline by a percentage or so. Are you talking about cash gross margins or GAAP gross margins? And the second one is the G&A declined quite a bit at least relative to your expectations in this quarter sequentially. Were there any one-time events that helped that? Thanks a lot.

---

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

Our G&A was actually up about $1 million quarter-over-quarter. And maybe that was a bit lower than we expected to spend. But I think you just have timing and managing how we have our expenses come in. In general, though, our expenses are largely resource-related and we did continue to add resources.

On GAAP gross margins -- I should mention that our litigation costs went down slightly quarter-over-quarter from 1Q to 2Q offsetting some of the increases that we had. On gross margin, I think both cash and GAAP gross margins will decline somewhere in less than a point range.

---

**Srinivas Anantha** - *Oppenheimer & Co. - Analyst*

Yes, thanks a lot.

---

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Operator? I think we have time for a couple more questions if people keep them short.

---

**Operator**

Your next question comes from the line of Garrett Becker with Merrill Lynch. Please proceed with your question.

---

**Garrett Becker** - *Merrill Lynch - Analyst*

I was wondering if you could talk about some of the new customers you added this quarter? Were any of those international?

---

| THOMSON | www.streetevents.com | Contact Us |
| --- | --- | --- |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

AK_USAO0005180

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Yes, all across the board in every region. We had very strong performance with enterprise new customers in Europe, where I just came back from recently, Asia as well. And the U.S. We had strong adds and, as J.D. mentioned, the ones we churned tended to be much smaller than the customers we bring on, which really is that process of getting better and better at managing the pipeline, of bringing in good customers and rolling off those that, for whatever reason, don't really make sense and tend to be small.

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

I don't know if I can mention any of the names, but one things that was very encouraging to me was to see that a good portion of the larger deals that came in were APS and DSA deals, some really high value-add service and relatively large deals coming in the door for a first time customer.

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

On the B to B side.

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

Right.

**Garrett Becker** - *Merrill Lynch - Analyst*

Okay. And then, maybe I misheard the previous question with respect to Dynamic Site Solutions. Can you give us any color on the Application Performance solutions? Obviously, it ticked up and it helped your margins. I think the last time you said it was about a $40 million run rate the last time you gave us any numbers. So any other color would be helpful.

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

We update that once a year. At this point we're not doing segment reporting quarter-by quarter. But we were very pleased with what we're seeing in not just Dynamic Sites, but Application Performance as well. And some of the deals that J.D. was referencing, domestic and international, those enterprise deals were for Application Acceleration and some were for for Dynamic Site Acceleration.

**Garrett Becker** - *Merrill Lynch - Analyst*

And if I can sneak on one other.

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Keep it short, now.

**Garrett Becker** - *Merrill Lynch - Analyst*

Short? Any thoughts about buybacks?

| THOMSON | www.streetevents.com | Contact Us |
|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

No, we're not going to speculate on things in the future. Obviously, we meet with our board on a regular basis, look at our balance sheet and think about all the opportunities for investment and tend to be opportunistic and we'll make the right moves at the right time we when we see them. But we won't speculate on might do this or might do that.

**Garrett Becker** - *Merrill Lynch - Analyst*

Great, okay, thanks.

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Thanks.

**Operator**

Your next question comes from the line of Kirk Materne with Banc of America. Please proceed with your question.

**Kirk Materne** - *Banc of America Securities - Analyst*

Yes, thanks very much. Just a little bit more color on the APS side. Can you guys talk a little bit about were most of the customers that were added this quarter, I guess, historical customers of yours, were they brand new customers? I'm just trying to get a sense on where some of the demand is coming from on that side?

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

I think you mean --

**Kirk Materne** - *Banc of America Securities - Analyst*

I guess what percentage were existing Akamai customers versus brand or greenfield opportunities for you?

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

Honestly, I don't know the answer off the top of my head. What we have been seeing is roughly a half and half type ratio.

One of the things about APS is that it has been an entree for us into markets where we didn't have a presence like pharma and manufacturing and some of the places where Web content delivery is less important. So we've added great penetration in there. But also we, even our biggest media customers have online applications so we are getting some penetration in there. So I apologize I don't have the stat for the number of things this quarter off the top of my head, but the rough ratio has been 50/50.

**Kirk Materne** - *Banc of America Securities - Analyst*

Just a follow-up on that point, J.D. When you are talking about some of your big media customers taking on the APS services it's a different part of their business. Do they have money to spend on IT or is it pushing more content out, they are taking a

| THOMSON | www.streetevents.com | Contact Us | |
|---|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

pause on that side? Is it just — is it more of a monetization issue for them on that side, I mean if they have money to spend on APS they have money, but is it a matter of where they are focusing their spend right now?

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

The great thing about APS, and, obviously, it's something we sell into these guys, not only does it boost productivity but it also drives cost savings. In an environment like this and as you would expect and as you've seen probably, anecdotally, IT budgets get scrutinized a little bit more closely.

So there is a sales challenge there. But fundamentally what our Application Performance Solutions do, also saves companies money in their data centers, as well. So that's a real powerful story, particularly in this type of environment.

And then — when you talk about DSA, particularly in the commerce area, the great thing about that is the benefits aren't in terms of an investment to make your site nicer or something like that, it's very easily translatable to the top line improvement. And in an environment like this that's something that people find very valuable.

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

Operator, why don't we take one more question and we'll make sure we're off in the hour we promised everybody.

**Operator**

Your final question comes from the line of Derek Bingham with Goldman Sachs. Please proceed with your question.

**Derek Bingham** - *Goldman Sachs - Analyst*

Hi, thanks. I wanted to ask kind of what your sense is for your outlook for new customer adds as you continue to churn off more smaller customers? Is that kind of 25 to 50 pace kind of the right way to think about it going forward on a net basis?

**J.D. Sherman** - *Akamai Technologies Inc. - CFO*

Derek, we don't really forecast that on a going forward basis. What we do is focus on making sure that the signings that we're delivering and the new customers we're bringing on are high quality customers, and then taking care of the customers that we have and making sure that the ones that are growing with Akamai and we have an opportunity to upsell and improve and deliver value for them that we keep.

But we don't have a forecast going forward on that.

**Paul Sagan** - *Akamai Technologies Inc. - President, CEO*

All right. Thank you. Operator, thank you, thank you all for tuning in. We'll be back in three months as usual to update you on the summer and the rest of the year. Thank you.

**Operator**

Thank you for your participation in today's conference. This concludes the presentation. You may now disconnect.

| THOMSON | www.streetevents.com | Contact Us | |
|---------|----------------------|------------|--|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

Jul. 30. 2008 / 4:30PM, AKAM - Q2 2008 Akamai Technologies Inc. Earnings Conference Call

DISCLAIMER

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2008, Thomson Financial. All Rights Reserved.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Confidential Treatment Requested by Akamai Technologies, Inc.

AK_USAO0005184

# DX-45

**Marion Harris**

| | |
|---|---|
| From: | Eric Rothdeutsch |
| Sent: | Thursday, February 10, 2005 11:33 PM |
| To: | Tech & Trading Group |
| Subject: | ICST update |

I like ICST as a LONG right here for a number of reasons:

- The company appears to be tracking to the high end of its flat to -4% seq. revenue guidance
- Clocks for PCs appear better than expected due to strong Grantsdale orders in January; Q4 orders were worse than expected but now looks like it was due to the timing of the Chinese New Year; last year, orders were placed in Dec, this year in Jan; there should be good growth in Q2 as well due to new platforms ramping
- Sony PS2 appears to not be seeing seasonal weakness as Sony catches up with shortfall last qtr; Xbox also appears slightly better than expected
- Orders from set-top box mfrs appear to have snapped back, likely due to inv correction having run its course
- The big issue that has plagued the stock has been fear of an increasingly competitive environment from MRVL, IDTI, & CY. While MRVL indeed has won a socket or two at Asustek, there's no way that MRVL will do the number of custom designs that ICST has made a business out of; the same goes for IDTI. MRVL & IDTI will simply offer a standard products that will capture a few designs, but cannot do the dozens of custom designs that are required to take much of a bite of ICST's 80% share at white box & 60% share at OEM customers. While each company will take incremental share from ICST, the stock at its 52-week low more than reflects this, in my view. CY is all but walking away from PC clock business because of botched product transitions (too late for Grantsdale).
- The weak relative performance of ICST in 2004 was largely due to the execution problems of INTC where there were essentially no new PC platforms introduced, except for the beginning of a transition to Grantsdale. In 2005, however, there are 5 significant transitions: 2 desktops (Grantsdale/Lakeport), 2 notebooks (Alviso/Calistoga), & server (Lakehurst). Each transition provides a higher ASP and higher margin to ICST. Additionally, the dual-core CPU platforms from INTC will require a higher pin-count package, leading to higher ASP & margin (Smithfield platform, although CY05 volumes will be small).
  Additionally, the company is rapidly gaining traction with its LCD TV & monitor families that no analysts have included in their models that could add $4m-$5m to CY05 revs and $15m-$20m to CY06 revs. I believe LG Philips is ramping into production now.
- Trading at only 23x CY05 EPS of $0.81 (or 19x ex- cash), I think there's a compelling trade to the low $20s as investors realize there's real opp'tys for ICST & potential upside to estimates going forward
- The RISK: the risk is that the company appears to be in an acquisitive mode, although my belief is that there is nothing imminent.

DEFENDANT'S
EXHIBIT
DX-0045
S2 09 Cr. 1184 (RJH)

# DX-1006

```
<DOCUMENT>
<TYPE>13F-HR
<SEQUENCE>1
<FILENAME>galq107.txt
<TEXT>
                         UNITED STATES
               SECURITIES AND EXCHANGE COMMISSION
                    Washington, D.C.  20549

                           FORM 13F

                      FORM 13F COVER PAGE

Report for the Calendar Year or Quarter Ended: 3/31/2007

Check here if Amendment [ ]; Amendment Number:
This amendment (Check only one.): [ ] is a restatement.
                              [ ] adds new holdings entries.

Institutional Investment Manager Filing this Report:
Name:    Galleon Management, L.P.
Address: 590 Madison Avenue, 34th Floor
         New York, New York 10022

13 File Number:  28-7016

The institutional investment manager filing this report and the
person by whom it is signed hereby represent that the person
signing the report is authorized to submit it, that all
information contained herein is true, correct, and complete, and
and that it is understood that all required items, statements,
schedules, lists, and tables, are considered integral parts of
this form

Person Signing this Report on Behalf of Reporting Manager:

Name:    George Lau
Title:   Managing Director - Finance
Phone:   212-829-4034
Signature, Place and Date of Signing:

    George Lau  5/11/2007

Report Type (Check only one.):
[X]        13F HOLDINGS REPORT.
[ ]        13F NOTICE.
[ ]        13F COMBINATION REPORT.

I AM SIGNING THIS REPORT AS REQUIRED BY THE SECURITIES EXCHANGE ACT OF 1934
<PAGE>
                      FORM 13F SUMMARY PAGE

Report Summary:

Number of Other Included Managers:           0

Form 13F Information Table Entry Total:       1322

Form 13F Information Table Value Total:        9186473
```

DEFENDANT'S
EXHIBIT

DX-1006

S2 09 Cr. 1184 (RJH)

```
<PAGE>
<TABLE>                                                                    <C>
    FORM 13F INFORMATION TABLE
                                                     Value   SHARES/  SH/ PUT/  INVSTMT   OTHER VOTING AUTHORITY
     NAME OF ISSUER              TITLE OF CLASS  CUSIP  x($1000) PRN AMT  PRN CALL DISCRETN MANAGERSOLE  SHARED NONE
   --------------------          --------------  -----  -------- -------- --- ---- -------- ---------- ------ ----
D  3COM CORP                     STOCK           885535104    3903  998109 SH           SOLE     998109     0    0
D  99 CENTS ONLY STORES          STOCK           65440K106     591   40100 SH           SOLE      40100     0    0
D  A C MOORE ARTS & CRAFTS INC   STOCK           00086T103     213   10000 SH           SOLE      10000     0    0
D  AAR CORP                      STOCK           000361105    2205   80000 SH           SOLE      80000     0    0
D  ABB LTD                       STOCK           000375204    2716  158100 SH           SOLE     158100     0    0
D  ABB LTD                       CALL            000375904    3092    1800 SH CALL       SOLE       1800     0    0
D  ABBOTT LABS                   PUT             002824950    2790     500 SH PUT        SOLE        500     0    0
D  ABITIBI-CONSOLIDATED INC      STOCK           003924107    4020 1425500 SH           SOLE    1425500     0    0
D  ABRAXIS BIOSCIENCE INC        STOCK           00383E106    3205  120000 SH           SOLE     120000     0    0
D  ABX AIR INC                   STOCK           00080S101    2055  300000 SH           SOLE     300000     0    0
D  ACCREDITED HOME LENDRS HLDG   STOCK           00437P107     992  107000 SH           SOLE     107000     0    0
D  ACCURAY INC                   STOCK           004397105     445   20000 SH           SOLE      20000     0    0
D  ACE LTD                       STOCK           00070K103    1204   21093 SH           SOLE      21093     0    0
D  ACME PACKET INC               STOCK           004764106    6683  452147 SH           SOLE     452147     0    0
D  ACTIONS SEMICONDUCTOR CO LTD  STOCK           00507E107    4101  555000 SH           SOLE     555000     0    0
D  ACTIVIDENTITY CORP            STOCK           00506P103    3072  608307 SH           SOLE     608307     0    0
D  ACTIVISION INC NEW            STOCK           004930202   11517  608092 SH           SOLE     608092     0    0
D  ACTUANT CORP                  STOCK           00508X203   16696  328600 SH           SOLE     328600     0    0
D  ADAPTEC INC                   STOCK           00651F108    4958 1281168 SH           SOLE    1281168     0    0
D  ADOBE SYS INC                 STOCK           00724F101    7587  181939 SH           SOLE     181939     0    0
D  ADTRAN INC                    CALL            00738A906    2435    1000 SH CALL       SOLE       1000     0    0
```

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| D | ADTRAN INC | STOCK | 00738A106 | 955 | 39230 SH | | SOLE | 39230 | 0 | 0 |
| D | ADVANCE AUTO PARTS INC | STOCK | 00751Y106 | 10991 | 285100 SH | | SOLE | 285100 | 0 | 0 |
| D | ADVANCED ANALOGIC TECHNOLOGI | STOCK | 00752J108 | 1513 | 230000 SH | | SOLE | 230000 | 0 | 0 |
| D | ADVANCED MEDICAL OPTICS INC | CALL | 00763M908 | 2232 | 600 SH CALL | | SOLE | 600 | 0 | 0 |
| D | ADVANCED MICRO DEVICES INC | CALL | 007903907 | 36435 | 27898 SH CALL | | SOLE | 27898 | 0 | 0 |
| D | ADVANCED MICRO DEVICES INC | PUT | 007903957 | 784 | 600 SH PUT | | SOLE | 600 | 0 | 0 |
| D | ADVANCED SEMICONDUCTOR ENGR | STOCK | 00756M404 | 3725 | 625000 SH | | SOLE | 625000 | 0 | 0 |
| D | AERCAP HOLDINGS NV | STOCK | N00985106 | 3639 | 125000 SH | | SOLE | 125000 | 0 | 0 |
| D | AEROFLEX INC | STOCK | 007768104 | 902 | 68565 SH | | SOLE | 68565 | 0 | 0 |
| D | AETNA INC NEW | STOCK | 00817T108 | 18611 | 425000 SH | | SOLE | 425000 | 0 | 0 |
| D | AFFILIATED COMPUTER SERVICES | STOCK | 008190100 | 2862 | 48600 SH | | SOLE | 48600 | 0 | 0 |
| D | AFFILIATED COMPUTER SERVICES | CALL | 008190900 | 3951 | 671 SH CALL | | SOLE | 671 | 0 | 0 |
| D | AFFILIATED COMPUTER SERVICES | PUT | 008190950 | 6341 | 1077 SH PUT | | SOLE | 1077 | 0 | 0 |
| D | AFFYMETRIX INC | STOCK | 00826T108 | 1504 | 50000 SH | | SOLE | 50000 | 0 | 0 |
| D | AFFYMETRIX INC | CALL | 00826T908 | 6014 | 2000 SH CALL | | SOLE | 2000 | 0 | 0 |
| D | AGILE SOFTWARE CORP DEL | STOCK | 00846X105 | 5881 | 846147 SH | | SOLE | 846147 | 0 | 0 |
| D | AIRTRAN HLDGS INC | STOCK | 00949P108 | 5905 | 575000 SH | | SOLE | 575000 | 0 | 0 |
| D | AK STL HLDG CORP | CALL | 001547908 | 2339 | 1000 SH CALL | | SOLE | 1000 | 0 | 0 |
| D | AKAMAI TECHNOLOGIES INC | STOCK | 00971T101 | 3994 | 80010 SH | | SOLE | 80010 | 0 | 0 |
| D | AKORN INC | STOCK | 009728106 | 4446 | 658606 SH | | SOLE | 658606 | 0 | 0 |
| D | ALADDIN KNOWLEDGE SYS LTD | STOCK | M0392N101 | 2591 | 150000 SH | | SOLE | 150000 | 0 | 0 |
| D | ALASKA AIR GROUP INC | STOCK | 011659109 | 529 | 13882 SH | | SOLE | 13882 | 0 | 0 |
| D | ALCATEL-LUCENT | STOCK | 013904305 | 6391 | 540681 SH | | SOLE | 540681 | 0 | 0 |
| D | ALCOA INC | STOCK | 013817101 | 12403 | 365868 SH | | SOLE | 365868 | 0 | 0 |
| D | ALCOA INC | CALL | 013817901 | 6780 | 2000 SH CALL | | SOLE | 2000 | 0 | 0 |
| D | ALCOA INC | PUT | 013817951 | 3390 | 1000 SH PUT | | SOLE | 1000 | 0 | 0 |
| D | ALEXION PHARMACEUTICALS INC | CALL | 015351909 | 3459 | 800 SH CALL | | SOLE | 800 | 0 | 0 |
| D | ALEXION PHARMACEUTICALS INC | STOCK | 015351109 | 259 | 6000 SH | | SOLE | 6000 | 0 | 0 |
| D | ALICO INC | STOCK | 016230104 | 527 | 9200 SH | | SOLE | 9200 | 0 | 0 |
| D | ALLETE INC | STOCK | 018522300 | 3552 | 76200 SH | | SOLE | 76200 | 0 | 0 |
| D | ALLIED WASTE INDS INC | STOCK | 019589308 | 10825 | 859800 SH | | SOLE | 859800 | 0 | 0 |
| D | ALLSCRIPTS HEALTHCARE SOLUTI | STOCK | 01988P108 | 4815 | 179600 SH | | SOLE | 179600 | 0 | 0 |
| D | ALLTEL CORP | STOCK | 020039103 | 863 | 13920 SH | | SOLE | 13920 | 0 | 0 |
| D | ALPHA NATURAL RESOURCES INC | CALL | 02076K902 | 1563 | 1000 SH CALL | | SOLE | 1000 | 0 | 0 |
| D | ALPHA NATURAL RESOURCES INC | STOCK | 02076K102 | 2738 | 175200 SH | | SOLE | 175200 | 0 | 0 |
| D | ALTAIR NANOTECHNOLOGIES INC | STOCK | 021373105 | 70 | 22800 SH | | SOLE | 22800 | 0 | 0 |
| D | ALTIRA GROUP INC | STOCK | 02096103 | 7191 | 81898 SH | | SOLE | 81898 | 0 | 0 |
| D | ALVARION LTD | STOCK | M0861T100 | 3107 | 385968 SH | | SOLE | 385968 | 0 | 0 |
| D | AMAZON COM INC | PUT | 023135956 | 29166 | 7330 SH PUT | | SOLE | 7330 | 0 | 0 |
| D | AMDOCS LTD | STOCK | 002602103 | 3205 | 87850 SH | | SOLE | 87850 | 0 | 0 |
| D | AMERICA MOVIL SAB DE CV | STOCK | 02364N105 | 10322 | 215980 SH | | SOLE | 215980 | 0 | 0 |
| D | AMERICAN ELEC PWR INC | STOCK | 025537101 | 10238 | 210000 SH | | SOLE | 210000 | 0 | 0 |
| D | AMERICAN EXPRESS CO | STOCK | 025816109 | 11393 | 202000 SH | | SOLE | 202000 | 0 | 0 |
| D | AMERICAN FINL RLTY TR | STOCK | 02601P101 | 3038 | 301400 SH | | SOLE | 301400 | 0 | 0 |
| D | AMERICAN INTL GROUP INC | STOCK | 026874107 | 39836 | 592616 SH | | SOLE | 592616 | 0 | 0 |
| D | AMERICAN INTL GROUP INC | CALL | 026874907 | 38315 | 5700 SH CALL | | SOLE | 5700 | 0 | 0 |
| D | AMERICAN ORIENTAL BIOENGR IN | CALL | 028731907 | 1878 | 2000 SH CALL | | SOLE | 2000 | 0 | 0 |
| D | AMERICAN ORIENTAL BIOENGR IN | STOCK | 028731107 | 887 | 94500 SH | | SOLE | 94500 | 0 | 0 |
| D | AMERICAN STD COS INC DEL | STOCK | 029712106 | 1060 | 20000 SH | | SOLE | 20000 | 0 | 0 |
| D | AMERICAN TECHNOLOGY CORP | STOCK | 030145205 | 1986 | 499100 SH | | SOLE | 499100 | 0 | 0 |
| D | AMERICAN TOWER CORP | STOCK | 029912201 | 1079 | 27700 SH | | SOLE | 27700 | 0 | 0 |
| D | AMERICREDIT CORP | PUT | 03060R951 | 3429 | 1500 SH PUT | | SOLE | 1500 | 0 | 0 |
| D | AMERIPRISE FINL INC | STOCK | 03076C106 | 349 | 6100 SH | | SOLE | 6100 | 0 | 0 |
| D | AMERISOURCEBERGEN CORP | STOCK | 03073E105 | 285 | 5400 SH | | SOLE | 5400 | 0 | 0 |
| D | AMERISTAR CASINOS INC | CALL | 03070Q901 | 1606 | 500 SH CALL | | SOLE | 500 | 0 | 0 |
| D | AMGEN INC | STOCK | 031162100 | 36848 | 659413 SH | | SOLE | 659413 | 0 | 0 |
| D | AMGEN INC | CALL | 031162900 | 38948 | 6970 SH CALL | | SOLE | 6970 | 0 | 0 |
| D | AMGEN INC | PUT | 031162950 | 34925 | 6250 SH PUT | | SOLE | 6250 | 0 | 0 |
| D | AMR CORP | STOCK | 001765106 | 4642 | 152433 SH | | SOLE | 152433 | 0 | 0 |
| D | AMTECH SYS INC | STOCK | 032332604 | 688 | 94265 SH | | SOLE | 94265 | 0 | 0 |
| D | AMVESCAP PLC | STOCK | 03235E100 | 294 | 13300 SH | | SOLE | 13300 | 0 | 0 |
| D | ANALOG DEVICES INC | STOCK | 032654105 | 276 | 8000 SH | | SOLE | 8000 | 0 | 0 |
| D | ANALOG DEVICES INC | CALL | 032654905 | 23926 | 6937 SH CALL | | SOLE | 6937 | 0 | 0 |
| D | ANALOG DEVICES INC | PUT | 032654955 | 3449 | 1000 SH PUT | | SOLE | 1000 | 0 | 0 |
| D | ANDREW CORP | STOCK | 034425108 | 688 | 65000 SH | | SOLE | 65000 | 0 | 0 |
| D | ANHEUSER BUSCH COS INC | STOCK | 035229103 | 8183 | 162159 SH | | SOLE | 162159 | 0 | 0 |
| D | ANIMAL HEALTH INTL INC | STOCK | 03525N109 | 181 | 15000 SH | | SOLE | 15000 | 0 | 0 |
| D | ANNALY CAP MGMT INC | STOCK | 035710409 | 2322 | 150000 SH | | SOLE | 150000 | 0 | 0 |
| D | ANNTAYLOR STORES CORP | STOCK | 036115103 | 1551 | 40000 SH | | SOLE | 40000 | 0 | 0 |
| D | ANSWERTHINK INC | STOCK | 036916104 | 5285 | 1616149 SH | | SOLE | 1616149 | 0 | 0 |
| D | ANSYS INC | STOCK | 03662Q105 | 5433 | 107019 SH | | SOLE | 107019 | 0 | 0 |
| D | ANTARES PHARMA INC | STOCK | 036642106 | 774 | 600000 SH | | SOLE | 600000 | 0 | 0 |
| D | AON CORP | STOCK | 037389103 | 1898 | 50000 SH | | SOLE | 50000 | 0 | 0 |
| D | APPLE INC | CALL | 037833900 | 19056 | 2051 SH CALL | | SOLE | 2051 | 0 | 0 |
| D | APPLE INC | PUT | 037833950 | 39719 | 4275 SH PUT | | SOLE | 4275 | 0 | 0 |
| D | APPLE INC | STOCK | 037833100 | 62989 | 677952 SH | | SOLE | 677952 | 0 | 0 |
| D | APPLERA CORP | CALL | 038020903 | 2506 | 1765 SH CALL | | SOLE | 1765 | 0 | 0 |
| D | APPLIED MATLS INC | PUT | 038222955 | 34108 | 18618 SH PUT | | SOLE | 18618 | 0 | 0 |
| D | APPLIED MICRO CIRCUITS CORP | STOCK | 03822W109 | 3770 | 1032988 SH | | SOLE | 1032988 | 0 | 0 |
| D | APPLIX INC | STOCK | 038316105 | 671 | 50000 SH | | SOLE | 50000 | 0 | 0 |
| D | AQUANTIVE INC | PUT | 03839G955 | 6419 | 2300 SH PUT | | SOLE | 2300 | 0 | 0 |
| D | AQUANTIVE INC | STOCK | 03839G105 | 357 | 12800 SH | | SOLE | 12800 | 0 | 0 |
| D | AQUILA INC | STOCK | 03840F102 | 2215 | 530000 SH | | SOLE | 530000 | 0 | 0 |
| D | ARCH COAL INC | STOCK | 039380100 | 3345 | 109000 SH | | SOLE | 109000 | 0 | 0 |
| D | ARCH COAL INC | CALL | 039380900 | 3683 | 1200 SH CALL | | SOLE | 1200 | 0 | 0 |
| D | ARCHER DANIELS MIDLAND CO | STOCK | 039483102 | 734 | 20000 SH | | SOLE | 20000 | 0 | 0 |
| D | ARCHER DANIELS MIDLAND CO | CALL | 039483902 | 2936 | 800 SH CALL | | SOLE | 800 | 0 | 0 |
| D | ARENA PHARMACEUTICALS INC | STOCK | 040047102 | 456 | 42000 SH | | SOLE | 42000 | 0 | 0 |
| D | ARENA PHARMACEUTICALS INC | CALL | 040047902 | 4032 | 3713 SH CALL | | SOLE | 3713 | 0 | 0 |
| D | ARIAD PHARMACEUTICALS INC | CALL | 04033A900 | 449 | 1000 SH CALL | | SOLE | 1000 | 0 | 0 |
| D | ARIBA INC | CALL | 04033V903 | 1504 | 1600 SH CALL | | SOLE | 1600 | 0 | 0 |
| D | ARIBA INC | STOCK | 04033V203 | 8939 | 950911 SH | | SOLE | 950911 | 0 | 0 |

DX-1006-00002
GOV-00004898

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| D | ARM HLDGS PLC | STOCK | 042068106 | 675 | 85950 SH | SOLE | 85950 | 0 | 0 |
| D | ARMOR HOLDINGS INC | STOCK | 042260109 | 673 | 10000 SH | SOLE | 10000 | 0 | 0 |
| D | ARMSTRONG WORLD INDS INC NEW | STOCK | 04247X102 | 3051 | 60000 SH | SOLE | 60000 | 0 | 0 |
| D | AROTECH CORP | STOCK | 042682203 | 170 | 50000 SH | SOLE | 50000 | 0 | 0 |
| D | ART TECHNOLOGY GROUP INC | STOCK | 04289L107 | 26 | 11381 SH | SOLE | 11381 | 0 | 0 |
| D | ASE TEST LTD | STOCK | Y02516105 | 1844 | 162000 SH | SOLE | 162000 | 0 | 0 |
| D | ASML HLDG NV | PUT | N07059951 | 68308 | 27599 SH PUT | SOLE | 27599 | 0 | 0 |
| D | ASPEN TECHNOLOGY INC | STOCK | 045327103 | 2054 | 157970 SH | SOLE | 157970 | 0 | 0 |
| D | ASSISTED LIVING CONCPT NEV N | STOCK | 04544X102 | 708 | 60000 SH | SOLE | 60000 | 0 | 0 |
| D | ASSURANT INC | STOCK | 04621X108 | 910 | 16974 SH | SOLE | 16974 | 0 | 0 |
| D | ASSURED GUARANTY LTD | STOCK | G0585R106 | 1366 | 50000 SH | SOLE | 50000 | 0 | 0 |
| D | AT&T INC | STOCK | 00206B102 | 1108 | 28100 SH | SOLE | 28100 | 0 | 0 |
| D | ATHEROS COMMUNICATIONS INC | PUT | 04743P958 | 6195 | 2589 SH PUT | SOLE | 2589 | 0 | 0 |
| D | ATHEROS COMMUNICATIONS INC | STOCK | 04743P108 | 500 | 20900 SH | SOLE | 20900 | 0 | 0 |
| D | ATLAS AMER INC | STOCK | 049167109 | 2077 | 36774 SH | SOLE | 36774 | 0 | 0 |
| D | ATMEL CORP | STOCK | 049513104 | 7558 | 1502599 SH | SOLE | 1502599 | 0 | 0 |
| D | ATMI INC | STOCK | 00207R101 | 3215 | 105166 SH | SOLE | 105166 | 0 | 0 |
| D | AU OPTRONICS CORP | STOCK | 002255107 | 174 | 12200 SH | SOLE | 12200 | 0 | 0 |
| D | AUDIOCODES LTD | STOCK | M15342104 | 356 | 52600 SH | SOLE | 52600 | 0 | 0 |
| D | AURORA OIL & GAS CORP | STOCK | 052036100 | 783 | 300000 SH | SOLE | 300000 | 0 | 0 |
| D | AUTODESK INC | STOCK | 052769106 | 16718 | 444623 SH | SOLE | 444623 | 0 | 0 |
| D | AUTOLIV INC | STOCK | 052800109 | 1856 | 32500 SH | SOLE | 32500 | 0 | 0 |
| D | AUTOMATIC DATA PROCESSING IN | STOCK | 053015103 | 7749 | 160100 SH | SOLE | 160100 | 0 | 0 |
| D | AVANEX CORP | STOCK | 05348N109 | 8917 | 4925626 SH | SOLE | 4925626 | 0 | 0 |
| D | AVENTINE RENEWABLE ENERGY | CALL | 05356X903 | 1822 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | AVERY DENNISON CORP | STOCK | 053611109 | 283 | 4400 SH | SOLE | 4400 | 0 | 0 |
| D | AVID TECHNOLOGY INC | STOCK | 05367P100 | 1744 | 50000 SH | SOLE | 50000 | 0 | 0 |
| D | AVNET INC | PUT | 053807953 | 42725 | 11822 SH PUT | SOLE | 11822 | 0 | 0 |
| D | AVOCENT CORP | STOCK | 053893103 | 2854 | 105832 SH | SOLE | 105832 | 0 | 0 |
| D | AVON PRODS INC | STOCK | 054303102 | 3346 | 89800 SH | SOLE | 89800 | 0 | 0 |
| D | BAIDU COM INC | PUT | 056752958 | 10707 | 1109 SH PUT | SOLE | 1109 | 0 | 0 |
| D | BAIDU COM INC | STOCK | 056752108 | 7588 | 78593 SH | SOLE | 78593 | 0 | 0 |
| D | BALDOR ELEC CO | STOCK | 057741100 | 1887 | 50000 SH | SOLE | 50000 | 0 | 0 |
| D | BANKRATE INC | PUT | 06646V958 | 1762 | 500 SH PUT | SOLE | 500 | 0 | 0 |
| D | BANKRATE INC | STOCK | 06646V108 | 1938 | 55000 SH | SOLE | 55000 | 0 | 0 |
| D | BARNES & NOBLE INC | PUT | 067774109 | 1386 | 671 SH CALL | SOLE | 671 | 0 | 0 |
| D | BARNES & NOBLE INC | CALL | 067774909 | 1973 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | BARRICK GOLD CORP | CALL | 067901908 | 4854 | 1700 SH CALL | SOLE | 1700 | 0 | 0 |
| D | BARRICK GOLD CORP | STOCK | 067901108 | 15996 | 560273 SH | SOLE | 560273 | 0 | 0 |
| D | BAYER A G | CALL | 072730902 | 3838 | 600 SH CALL | SOLE | 600 | 0 | 0 |
| D | BE AEROSPACE INC | STOCK | 073302101 | 476 | 15000 SH | SOLE | 15000 | 0 | 0 |
| D | BEA SYS INC | CALL | 073325902 | 5644 | 4870 SH CALL | SOLE | 4870 | 0 | 0 |
| D | BEA SYS INC | STOCK | 073325102 | 8799 | 759188 SH | SOLE | 759188 | 0 | 0 |
| D | BEACON ROOFING SUPPLY INC | STOCK | 073685109 | 1685 | 104121 SH | SOLE | 104121 | 0 | 0 |
| D | BEAR STEARNS COS INC | STOCK | 073902108 | 18042 | 120000 SH | SOLE | 120000 | 0 | 0 |
| D | BEARINGPOINT INC | STOCK | 074002106 | 51919 | 6777885 SH | SOLE | 6777885 | 0 | 0 |
| D | BEBE STORES INC | STOCK | 075571109 | 7866 | 452599 SH | SOLE | 452599 | 0 | 0 |
| D | BECTON DICKINSON & CO | STOCK | 075887109 | 246 | 3200 SH | SOLE | 3200 | 0 | 0 |
| D | BED BATH & BEYOND INC | STOCK | 075896100 | 9342 | 232569 SH | SOLE | 232569 | 0 | 0 |
| D | BELL MICROPRODUCTS INC | STOCK | 078137106 | 1280 | 200000 SH | SOLE | 200000 | 0 | 0 |
| D | BEMIS INC | STOCK | 081437105 | 501 | 15000 SH | SOLE | 15000 | 0 | 0 |
| D | BENCHMARK ELECTRS INC | CALL | 08160H901 | 1386 | 671 SH CALL | SOLE | 671 | 0 | 0 |
| D | BENCHMARK ELECTRS INC | STOCK | 08160H101 | 18634 | 901940 SH | SOLE | 901940 | 0 | 0 |
| D | BEST BUY INC | CALL | 086516901 | 12667 | 2600 SH CALL | SOLE | 2600 | 0 | 0 |
| D | BEST BUY INC | STOCK | 086516101 | 39426 | 809237 SH | SOLE | 809237 | 0 | 0 |
| D | BHP BILLITON LTD | STOCK | 088606108 | 242 | 5000 SH | SOLE | 5000 | 0 | 0 |
| D | BHP BILLITON LTD | PUT | 088606958 | 3976 | 800 SH PUT | SOLE | 800 | 0 | 0 |
| D | BIG LOTS INC | PUT | 089302953 | 7820 | 2500 SH PUT | SOLE | 2500 | 0 | 0 |
| D | BIOGEN IDEC INC | CALL | 09062X903 | 6657 | 1500 SH CALL | SOLE | 1500 | 0 | 0 |
| D | BIOMIMETIC THERAPEUTICS INC | STOCK | 09064X101 | 4148 | 250802 SH | SOLE | 250802 | 0 | 0 |
| D | BIOTECH HOLDRS TR | PUT | 09067D951 | 35200 | 2000 SH PUT | SOLE | 2000 | 0 | 0 |
| D | BIOVAIL CORP | CALL | 09067J909 | 6558 | 3000 SH CALL | SOLE | 3000 | 0 | 0 |
| D | BISYS GROUP INC | STOCK | 055472104 | 20380 | 1778355 SH | SOLE | 1778355 | 0 | 0 |
| D | BJ SVCS CO | PUT | 055482953 | 6417 | 2300 SH PUT | SOLE | 2300 | 0 | 0 |
| D | BJS WHOLESALE CLUB INC | STOCK | 05548J106 | 8430 | 249200 SH | SOLE | 249200 | 0 | 0 |
| D | BLOUNT INTL INC NEW | STOCK | 095180105 | 1299 | 104300 SH | SOLE | 104300 | 0 | 0 |
| D | BLUE COAT SYSTEMS INC | CALL | 09534T908 | 2755 | 750 SH CALL | SOLE | 750 | 0 | 0 |
| D | BLUE COAT SYSTEMS INC | STOCK | 09534T508 | 1841 | 50115 SH | SOLE | 50115 | 0 | 0 |
| D | BLUE COAT SYSTEMS INC | PUT | 09534T958 | 2204 | 600 SH PUT | SOLE | 600 | 0 | 0 |
| D | BLUEGREEN CORP | STOCK | 096231105 | 342 | 30300 SH | SOLE | 30300 | 0 | 0 |
| D | BLUELINX HLDGS INC | STOCK | 09624R109 | 1050 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | BMC SOFTWARE INC | STOCK | 055921100 | 4544 | 147587 SH | SOLE | 147587 | 0 | 0 |
| D | BOEING CO | CALL | 097023905 | 889 | 100 SH CALL | SOLE | 100 | 0 | 0 |
| D | BON-TON STORES INC | STOCK | 09776J101 | 2109 | 37500 SH | SOLE | 37500 | 0 | 0 |
| D | BORDERS GROUP INC | STOCK | 09970P107 | 623 | 30500 SH | SOLE | 30500 | 0 | 0 |
| D | BORLAND SOFTWARE CORP | STOCK | 099849101 | 1886 | 357878 SH | SOLE | 357878 | 0 | 0 |
| D | BOSTON PROPERTIES INC | STOCK | 101121101 | 799 | 6805 SH | SOLE | 6805 | 0 | 0 |
| D | BOSTON SCIENTIFIC CORP | STOCK | 101137107 | 7029 | 483400 SH | SOLE | 483400 | 0 | 0 |
| D | BOSTON SCIENTIFIC CORP | CALL | 101137907 | 15267 | 10500 SH CALL | SOLE | 10500 | 0 | 0 |
| D | BOWATER INC | STOCK | 102183100 | 1429 | 60000 SH | SOLE | 60000 | 0 | 0 |
| D | BOWNE & CO INC | STOCK | 103043105 | 1674 | 106400 SH | SOLE | 106400 | 0 | 0 |
| D | BOYD GAMING CORP | STOCK | 103304101 | 534 | 11200 SH | SOLE | 11200 | 0 | 0 |
| D | BRE PROPERTIES INC | STOCK | 05564E106 | 297 | 4700 SH | SOLE | 4700 | 0 | 0 |
| D | BRIGHTPOINT INC | STOCK | 109473405 | 12666 | 1107172 SH | SOLE | 1107172 | 0 | 0 |
| D | BRINKS CO | STOCK | 109696104 | 1269 | 20000 SH | SOLE | 20000 | 0 | 0 |
| D | BRISTOL MYERS SQUIBB CO | CALL | 110122908 | 4164 | 1500 SH CALL | SOLE | 1500 | 0 | 0 |
| D | BROADBAND HOLDRS TR | PUT | 111300104 | 7835 | 500000 SH | SOLE | 500000 | 0 | 0 |
| D | BROADCOM CORP | STOCK | 111320107 | 14197 | 442675 SH | SOLE | 442675 | 0 | 0 |
| D | BROADCOM CORP | CALL | 111320907 | 8207 | 2559 SH CALL | SOLE | 2559 | 0 | 0 |
| D | BROOKFIELD ASSET MGMT INC | STOCK | 112585104 | 1254 | 24000 SH | SOLE | 24000 | 0 | 0 |
| D | BROOKS AUTOMATION INC | PUT | 114340952 | 1919 | 1119 SH PUT | SOLE | 1119 | 0 | 0 |
| D | BROWN SHOE INC NEW | STOCK | 115736100 | 3797 | 90400 SH | SOLE | 90400 | 0 | 0 |

DX-1006-00003

GOV-00004899

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| D | BRUNSWICK CORP | STOCK | 117043109 | 1911 | 60000 SH | SOLE | 60000 | 0 | 0 |
| D | BUCKLE INC | STOCK | 118440106 | 280 | 7851 SH | SOLE | 7851 | 0 | 0 |
| D | BUILDING MATLS HLDG CORP | STOCK | 120113105 | 11551 | 637822 SH | SOLE | 637822 | 0 | 0 |
| D | BURGER KING HLDGS INC | STOCK | 121208201 | 1944 | 90007 SH | SOLE | 90007 | 0 | 0 |
| D | BURLINGTON NORTHN SANTA FE C | STOCK | 12189T104 | 11268 | 140100 SH | SOLE | 140100 | 0 | 0 |
| D | BUSINESS OBJECTS S A | STOCK | 12328X107 | 51375 | 1419589 SH | SOLE | 1419589 | 0 | 0 |
| D | C H ROBINSON WORLDWIDE INC | PUT | 12541W959 | 17077 | 3554 SH PUT | SOLE | 3554 | 0 | 0 |
| D | CA INC | CALL | 12673P905 | 6610 | 2551 SH CALL | SOLE | 2551 | 0 | 0 |
| D | CABLEVISION SYS CORP | STOCK | 12686C109 | 3793 | 124642 SH | SOLE | 124642 | 0 | 0 |
| D | CABOT CORP | CALL | 127055901 | 477 | 100 SH CALL | SOLE | 100 | 0 | 0 |
| D | CABOT MICROELECTRONICS CORP | PUT | 12709P953 | 838 | 250 SH PUT | SOLE | 250 | 0 | 0 |
| D | CABOT OIL & GAS CORP | STOCK | 127097103 | 6732 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | CACI INTL INC | STOCK | 127190304 | 6879 | 146800 SH | SOLE | 146800 | 0 | 0 |
| D | CADBURY SCHWEPPES PLC | STOCK | 127209302 | 257 | 5000 SH | SOLE | 5000 | 0 | 0 |
| D | CAL DIVE INTL INC DEL | STOCK | 12802T101 | 830 | 68000 SH | SOLE | 68000 | 0 | 0 |
| D | CALIFORNIA PIZZA KITCHEN INC | STOCK | 13054D109 | 1316 | 40000 SH | SOLE | 40000 | 0 | 0 |
| D | CAMBREX CORP | STOCK | 132011107 | 3445 | 140060 SH | SOLE | 140060 | 0 | 0 |
| D | CAMECO CORP | STOCK | 13321L108 | 1433 | 35000 SH | SOLE | 35000 | 0 | 0 |
| D | CAMERON INTERNATIONAL CORP | STOCK | 13342B105 | 3453 | 55000 SH | SOLE | 55000 | 0 | 0 |
| D | CANADIAN NATL RY CO | STOCK | 136375102 | 1986 | 45000 SH | SOLE | 45000 | 0 | 0 |
| D | CANADIAN SOLAR INC | STOCK | 136635109 | 195 | 20004 SH | SOLE | 20004 | 0 | 0 |
| D | CANARGO ENERGY CORP | STOCK | 137225108 | 739 | 697500 SH | SOLE | 697500 | 0 | 0 |
| D | CAPITAL ONE FINL CORP | STOCK | 14040H105 | 2362 | 31300 SH | SOLE | 31300 | 0 | 0 |
| D | CARACO PHARMACEUTICAL LABS L | STOCK | 14075T107 | 12487 | 1025184 SH | SOLE | 1025184 | 0 | 0 |
| D | CARDINAL HEALTH INC | STOCK | 14149Y108 | 6142 | 84200 SH | SOLE | 84200 | 0 | 0 |
| D | CARDIOME PHARMA CORP | STOCK | 14159U202 | 1015 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | CARRIER ACCESS CORP | STOCK | 144460102 | 2020 | 395233 SH | SOLE | 395233 | 0 | 0 |
| D | CARRIZO OIL & CO INC | STOCK | 144577103 | 2622 | 75000 SH | SOLE | 75000 | 0 | 0 |
| D | CASCADE MICROTECH INC | STOCK | 147322101 | 605 | 42475 SH | SOLE | 42475 | 0 | 0 |
| D | CASH SYSTEMS INC | STOCK | 14756B102 | 576 | 97220 SH | SOLE | 97220 | 0 | 0 |
| D | CASTLE BRANDS INC | STOCK | 148435100 | 139 | 20000 SH | SOLE | 20000 | 0 | 0 |
| D | CATERPILLAR INC DEL | STOCK | 149123101 | 16728 | 249558 SH | SOLE | 249558 | 0 | 0 |
| D | CELADON GROUP INC | STOCK | 15083B100 | 2987 | 178865 SH | SOLE | 178865 | 0 | 0 |
| D | CELESTICA INC | CALL | 15101Q908 | 1624 | 2649 SH CALL | SOLE | 2649 | 0 | 0 |
| D | CELGENE CORP | STOCK | 151020104 | 1574 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | CELGENE CORP | PUT | 151020954 | 2623 | 500 SH PUT | SOLE | 500 | 0 | 0 |
| D | CEMEX SAB DE CV | STOCK | 151290889 | 7343 | 224200 SH | SOLE | 224200 | 0 | 0 |
| D | CENTENNIAL COMMUNCTNS CORP N | STOCK | 15133V208 | 1125 | 136645 SH | SOLE | 136645 | 0 | 0 |
| D | CENTEX CORP | STOCK | 152312104 | 5824 | 139400 SH | SOLE | 139400 | 0 | 0 |
| D | CENTILLIUM COMMUNICATIONS IN | STOCK | 15231M109 | 384 | 200000 SH | SOLE | 200000 | 0 | 0 |
| D | CENVEO INC | STOCK | 15670S105 | 486 | 20000 SH | SOLE | 20000 | 0 | 0 |
| D | CEPHALON INC | PUT | 15670B959 | 3276 | 460 SH PUT | SOLE | 460 | 0 | 0 |
| D | CERIDIAN CORP NEW | STOCK | 156779100 | 874 | 25100 SH | SOLE | 25100 | 0 | 0 |
| D | CHARTER COMMUNICATIONS INC D | STOCK | 16167M107 | 2803 | 1004500 SH | SOLE | 1004500 | 0 | 0 |
| D | CHECK POINT SOFTWARE TECH LT | STOCK | M22465104 | 34561 | 15511 92 SH | SOLE | 15511 92 | 0 | 0 |
| D | CHECK POINT SOFTWARE TECH LT | CALL | M22465904 | 5793 | 2600 SH CALL | SOLE | 2600 | 0 | 0 |
| D | CHEESECAKE FACTORY INC | STOCK | 163072101 | 3742 | 140400 SH | SOLE | 140400 | 0 | 0 |
| D | CHEMTURA CORP | STOCK | 163893100 | 2982 | 272830 SH | SOLE | 272830 | 0 | 0 |
| D | CHENIERE ENERGY INC | CALL | 16411R908 | 1658 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | CHENIERE ENERGY INC | STOCK | 16411R208 | 2487 | 116500 SH | SOLE | 116500 | 0 | 0 |
| D | CHENIERE ENERGY INC | STOCK | 16411R208 | 1308 | 42000 SH | SOLE | 42000 | 0 | 0 |
| D | CHESAPEAKE ENERGY CORP | CALL | 165167907 | 926 | 300 SH CALL | SOLE | 300 | 0 | 0 |
| D | CHICAGO BRIDGE & IRON CO N V | STOCK | 167250109 | 3702 | 120400 SH | SOLE | 120400 | 0 | 0 |
| D | CHICAGO MERCANTILE HLDGS INC | STOCK | 167760107 | 10543 | 19800 SH | SOLE | 19800 | 0 | 0 |
| D | CHICOS FAS INC | CALL | 168615902 | 4642 | 1900 SH CALL | SOLE | 1900 | 0 | 0 |
| D | CHICOS FAS INC | STOCK | 168615102 | 4411 | 180550 SH | SOLE | 180550 | 0 | 0 |
| D | CHINA BAK BATTERY INC | STOCK | 16936Y100 | 523 | 160779 SH | SOLE | 160779 | 0 | 0 |
| D | CHINA GRENTECH CORP LTD | STOCK | 16938P107 | 2569 | 230000 SH | SOLE | 230000 | 0 | 0 |
| D | CHINA MED TECHNOLOGIES INC | STOCK | 169483104 | 233 | 10110 SH | SOLE | 10110 | 0 | 0 |
| D | CHINA TECHFAITH WIRLS COMM T | STOCK | 169424108 | 977 | 106750 SH | SOLE | 106750 | 0 | 0 |
| D | CHINA UNICOM LTD | STOCK | 16945R104 | 991 | 70000 SH | SOLE | 70000 | 0 | 0 |
| D | CHIQUITA BRANDS INTL INC | CALL | 170032909 | 1402 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | CHIQUITA BRANDS INTL INC | STOCK | 170032809 | 3505 | 250000 SH | SOLE | 250000 | 0 | 0 |
| D | CHORDIANT SOFTWARE INC | STOCK | 170404305 | 3304 | 319200 SH | SOLE | 319200 | 0 | 0 |
| D | CHRISTOPHER & BANKS CORP | CALL | 171046905 | 4283 | 2200 SH CALL | SOLE | 2200 | 0 | 0 |
| D | CHRISTOPHER & BANKS CORP | STOCK | 171046105 | 15089 | 775000 SH | SOLE | 775000 | 0 | 0 |
| D | CHUBB CORP | STOCK | 171232101 | 670 | 12970 SH | SOLE | 12970 | 0 | 0 |
| D | CIENA CORP | STOCK | 171779309 | 15007 | 536915 SH | SOLE | 536915 | 0 | 0 |
| D | CIGNA CORP | STOCK | 125509109 | 4993 | 35000 SH | SOLE | 35000 | 0 | 0 |
| D | CINTAS CORP | STOCK | 172908105 | 793 | 21968 SH | SOLE | 21968 | 0 | 0 |
| D | CIPHERGEN BIOSYSTEMS INC | STOCK | 17252Y104 | 168 | 120000 SH | SOLE | 120000 | 0 | 0 |
| D | CIRCUIT CITY STORE INC | CALL | 172737908 | 1853 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | CIRCUIT CITY STORE INC | STOCK | 172737108 | 5561 | 300100 SH | SOLE | 300100 | 0 | 0 |
| D | CIRRUS LOGIC INC | STOCK | 172755100 | 3283 | 428602 SH | SOLE | 428602 | 0 | 0 |
| D | CISCO SYS INC | STOCK | 17275R102 | 3128 | 122511 SH | SOLE | 122511 | 0 | 0 |
| D | CITIGROUP INC | PUT | 172967951 | 3080 | 600 SH PUT | SOLE | 600 | 0 | 0 |
| D | CITIGROUP INC | STOCK | 172967101 | 10268 | 200000 SH | SOLE | 200000 | 0 | 0 |
| D | CITIGROUP INC | CALL | 172967901 | 2054 | 400 SH CALL | SOLE | 400 | 0 | 0 |
| D | CITRIX SYS INC | STOCK | 177376100 | 42423 | 1324485 SH | SOLE | 1324485 | 0 | 0 |
| D | CKX INC | STOCK | 12562M106 | 4040 | 364000 SH | SOLE | 364000 | 0 | 0 |
| D | CLEARWIRE CORP | STOCK | 18538S309 | 5379 | 262792 SH | SOLE | 262792 | 0 | 0 |
| D | CLECO CORP NEW | STOCK | 12561W105 | 3257 | 126100 SH | SOLE | 126100 | 0 | 0 |
| D | CLOROX CO DEL | STOCK | 189054109 | 1904 | 29900 SH | SOLE | 29900 | 0 | 0 |
| D | CMGI INC | STOCK | 125750109 | 70 | 33068 SH | SOLE | 33068 | 0 | 0 |
| D | CMS ENERGY CORP | STOCK | 125896100 | 11038 | 620100 SH | SOLE | 620100 | 0 | 0 |
| D | CNET NETWORKS INC | STOCK | 12613R104 | 131 | 15000 SH | SOLE | 15000 | 0 | 0 |
| D | CNX GAS CORP | STOCK | 12618H309 | 1374 | 48500 SH | SOLE | 48500 | 0 | 0 |
| D | COCA COLA CO | STOCK | 191216100 | 21877 | 455777 SH | SOLE | 455777 | 0 | 0 |
| D | COCA COLA ENTERPRISES INC | STOCK | 191219104 | 352 | 17400 SH | SOLE | 17400 | 0 | 0 |
| D | COEUR D ALENE MINES CORP IDA | STOCK | 192108108 | 2256 | 548900 SH | SOLE | 548900 | 0 | 0 |
| D | COGENT INC | STOCK | 19239Y108 | 6584 | 489504 SH | SOLE | 489504 | 0 | 0 |
| D | COGNIZANT TECHNOLOGY SOLUTIO | PUT | 192446952 | 13241 | 1500 SH PUT | SOLE | 1500 | 0 | 0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| D | COGNOS INC | STOCK | 19244C109 | 21122 | 536237 SH | | SOLE | 536237 | 0 | 0 |
| D | COGNOS INC | CALL | 19244C909 | 11900 | 3021 SH CALL | | SOLE | 3021 | 0 | 0 |
| D | COHEN & STEERS INC | STOCK | 19247A100 | 3800 | 88200 SH | | SOLE | 88200 | 0 | 0 |
| D | COHERENT INC | STOCK | 192479103 | 655 | 20644 SH | | SOLE | 20644 | 0 | 0 |
| D | COLDWATER CREEK INC | STOCK | 193068103 | 7792 | 384200 SH | | SOLE | 384200 | 0 | 0 |
| D | COLDWATER CREEK INC | CALL | 193068903 | 3042 | 1500 SH CALL | | SOLE | 1500 | 0 | 0 |
| D | COLGATE PALMOLIVE CO | STOCK | 194162103 | 3185 | 47680 SH | | SOLE | 47680 | 0 | 0 |
| D | COLUMBIA LABS INC | STOCK | 197779101 | 134 | 100000 SH | | SOLE | 100000 | 0 | 0 |
| D | COMCAST CORP NEW | STOCK | 20030N101 | 2595 | 100000 SH | | SOLE | 100000 | 0 | 0 |
| D | COMCAST CORP NEW | PUT | 20030N951 | 3114 | 1200 SH PUT | | SOLE | 1200 | 0 | 0 |
| D | COMCAST CORP NEW | STOCK | 20030N200 | 1146 | 45000 SH | | SOLE | 45000 | 0 | 0 |
| D | COMFORT SYS USA INC | STOCK | 199908104 | 2995 | 250000 SH | | SOLE | 250000 | 0 | 0 |
| D | COMMUNITY HEALTH SYS INC NEW | STOCK | 203668108 | 5288 | 150000 SH | | SOLE | 150000 | 0 | 0 |
| D | COMMVAULT SYSTEMS INC | STOCK | 204166102 | 2948 | 181963 SH | | SOLE | 181963 | 0 | 0 |
| D | COMPANHIA VALE DO RIO DOCE | STOCK | 204412209 | 553 | 14950 SH | | SOLE | 14950 | 0 | 0 |
| D | COMPUTER SCIENCES CORP | STOCK | 205363104 | 12473 | 239261 SH | | SOLE | 239261 | 0 | 0 |
| D | COMPUTER SCIENCES CORP | CALL | 205363904 | 6256 | 1200 SH CALL | | SOLE | 1200 | 0 | 0 |
| D | COMPUWARE CORP | STOCK | 205638109 | 4820 | 507882 SH | | SOLE | 507882 | 0 | 0 |
| D | COMSTOCK HOMEBUILDING COS IN | STOCK | 205684103 | 162 | 40000 SH | | SOLE | 40000 | 0 | 0 |
| D | COMTECH GROUP INC | STOCK | 205821200 | 354 | 20250 SH | | SOLE | 20250 | 0 | 0 |
| D | CONAGRA FOODS INC | CALL | 205887902 | 3737 | 1500 SH CALL | | SOLE | 1500 | 0 | 0 |
| D | CONAGRA FOODS INC | STOCK | 205887102 | 6115 | 245500 SH | | SOLE | 245500 | 0 | 0 |
| D | CONCURRENT COMPUTER CORP NEW | STOCK | 206710204 | 3362 | 2141587 SH | | SOLE | 2141587 | 0 | 0 |
| D | CONOCOPHILLIPS | PUT | 20825C954 | 2734 | 400 SH PUT | | SOLE | 400 | 0 | 0 |
| D | CONSOL ENERGY INC | PUT | 20854P959 | 978 | 250 SH PUT | | SOLE | 250 | 0 | 0 |
| D | CONSOL ENERGY INC | CALL | 20854P909 | 7826 | 2000 SH CALL | | SOLE | 2000 | 0 | 0 |
| D | CONSOL ENERGY INC | STOCK | 20854P109 | 10956 | 280000 SH | | SOLE | 280000 | 0 | 0 |
| D | CONSTELLATION BRANDS INC | STOCK | 21036P108 | 10272 | 485000 SH | | SOLE | 485000 | 0 | 0 |
| D | CONSTELLATION BRANDS INC | CALL | 21036P908 | 1514 | 715 SH CALL | | SOLE | 715 | 0 | 0 |
| D | CONVERA CORP | STOCK | 21191R105 | 77 | 24408 SH | | SOLE | 24408 | 0 | 0 |
| D | COPA HOLDINGS SA | STOCK | P31076105 | 1143 | 22200 SH | | SOLE | 22200 | 0 | 0 |
| D | COPART INC | STOCK | 217204106 | 630 | 22500 SH | | SOLE | 22500 | 0 | 0 |
| D | CORILLIAN CORP | STOCK | 218725109 | 1664 | 329415 SH | | SOLE | 329415 | 0 | 0 |
| D | CORINTHIAN COLLEGES INC | STOCK | 218868107 | 2764 | 201022 SH | | SOLE | 201022 | 0 | 0 |
| D | CORNING INC | STOCK | 219350105 | 855 | 37585 SH | | SOLE | 37585 | 0 | 0 |
| D | CORRECTIONS CORP AMER NEW | STOCK | 22025Y407 | 570 | 10800 SH | | SOLE | 10800 | 0 | 0 |
| D | COSTCO WHSL CORP NEW | STOCK | 22160K105 | 5050 | 93794 SH | | SOLE | 93794 | 0 | 0 |
| D | COVAD COMMUNICATIONS GROUP I | STOCK | 222814204 | 191 | 150000 SH | | SOLE | 150000 | 0 | 0 |
| D | COVENANT TRANS INC | STOCK | 22284P105 | 989 | 89722 SH | | SOLE | 89722 | 0 | 0 |
| D | CREE INC | STOCK | 225447101 | 242 | 14700 SH | | SOLE | 14700 | 0 | 0 |
| D | CRESCENT REAL ESTATE EQUITIE | CALL | 225756905 | 2006 | 1000 SH CALL | | SOLE | 1000 | 0 | 0 |
| D | CRESCENT REAL ESTATE EQUITIE | STOCK | 225756105 | 401 | 20000 SH | | SOLE | 20000 | 0 | 0 |
| D | CROCS INC | STOCK | 227046109 | 12049 | 254995 SH | | SOLE | 254995 | 0 | 0 |
| D | CROCS INC | PUT | 227046959 | 2315 | 490 SH PUT | | SOLE | 490 | 0 | 0 |
| D | CROCS INC | CALL | 227046909 | 7560 | 1600 SH CALL | | SOLE | 1600 | 0 | 0 |
| D | CROSS CTRY HEALTHCARE INC | STOCK | 227483104 | 1641 | 90000 SH | | SOLE | 90000 | 0 | 0 |
| D | CRUCELL N V | STOCK | 228769105 | 632 | 25000 SH | | SOLE | 25000 | 0 | 0 |
| D | CSK AUTO CORP | PUT | 125965953 | 3440 | 2000 SH PUT | | SOLE | 2000 | 0 | 0 |
| D | CSX CORP | STOCK | 126408103 | 2193 | 54750 SH | | SOLE | 54750 | 0 | 0 |
| D | CSX CORP | CALL | 126408903 | 801 | 200 SH CALL | | SOLE | 200 | 0 | 0 |
| D | CTRIP COM INTL LTD | STOCK | 22943F100 | 23445 | 350000 SH | | SOLE | 350000 | 0 | 0 |
| D | CUBIC CORP | STOCK | 229669106 | 3454 | 159600 SH | | SOLE | 159600 | 0 | 0 |
| D | CUMMINS INC | PUT | 231021956 | 2894 | 200 SH PUT | | SOLE | 200 | 0 | 0 |
| D | CV THERAPEUTICS INC | CALL | 126667904 | 590 | 750 SH CALL | | SOLE | 750 | 0 | 0 |
| D | CVS CORP | CALL | 126650900 | 3414 | 1000 SH CALL | | SOLE | 1000 | 0 | 0 |
| D | CVS CORP | STOCK | 126650100 | 10585 | 310050 SH | | SOLE | 310050 | 0 | 0 |
| D | CYCLACEL PHARMACEUTICALS INC | STOCK | 23254L108 | 1829 | 236000 SH | | SOLE | 236000 | 0 | 0 |
| D | CYMER INC | PUT | 232572957 | 3262 | 785 SH PUT | | SOLE | 785 | 0 | 0 |
| D | CYPRESS BIOSCIENCES INC | CALL | 232674907 | 3040 | 4000 SH CALL | | SOLE | 4000 | 0 | 0 |
| D | CYPRESS SEMICONDUCTOR CORP | STOCK | 232806109 | 4638 | 250000 SH | | SOLE | 250000 | 0 | 0 |
| D | CYPRESS SEMICONDUCTOR CORP | PUT | 232806959 | 2076 | 1119 SH PUT | | SOLE | 1119 | 0 | 0 |
| D | CYTEC INDS INC | STOCK | 232820100 | 7761 | 138000 SH | | SOLE | 138000 | 0 | 0 |
| D | CYTYC CORP | CALL | 232946903 | 3421 | 1000 SH CALL | | SOLE | 1000 | 0 | 0 |
| D | DAIMLERCHRYSLER AG | STOCK | D1668N123 | 733 | 8960 SH | | SOLE | 8960 | 0 | 0 |
| D | DANAHER CORP DEL | PUT | 235851952 | 4287 | 600 SH PUT | | SOLE | 600 | 0 | 0 |
| D | DANKA BUSINESS SYS PLC | STOCK | 236277109 | 1296 | 1200000 SH | | SOLE | 1200000 | 0 | 0 |
| D | DARDEN RESTAURANTS INC | STOCK | 237194105 | 515 | 12500 SH | | SOLE | 12500 | 0 | 0 |
| D | DARLING INTL INC | STOCK | 237266101 | 265 | 40710 SH | | SOLE | 40710 | 0 | 0 |
| D | DECKERS OUTDOOR CORP | PUT | 243537957 | 6392 | 900 SH PUT | | SOLE | 900 | 0 | 0 |
| D | DEERE & CO | PUT | 244199955 | 5975 | 550 SH PUT | | SOLE | 550 | 0 | 0 |
| D | DELIA'S INC NEW | STOCK | 246911101 | 1836 | 200000 SH | | SOLE | 200000 | 0 | 0 |
| D | DELL INC | CALL | 247028901 | 11489 | 4950 SH CALL | | SOLE | 4950 | 0 | 0 |
| D | DELL INC | STOCK | 24702R101 | 23742 | 1022914 SH | | SOLE | 1022914 | 0 | 0 |
| D | DENTSPLY INTL INC NEW | STOCK | 249030107 | 2948 | 90000 SH | | SOLE | 90000 | 0 | 0 |
| D | DEVON ENERGY CORP NEW | STOCK | 25179M103 | 5953 | 86000 SH | | SOLE | 86000 | 0 | 0 |
| D | DIAGEO P L C | STOCK | 25243Q205 | 405 | 5000 SH | | SOLE | 5000 | 0 | 0 |
| D | DIAMOND OFFSHORE DRILLING IN | STOCK | 25271C102 | 372 | 4600 SH | | SOLE | 4600 | 0 | 0 |
| D | DIAMONDS TR | PUT | 252787956 | 51908 | 4200 SH PUT | | SOLE | 4200 | 0 | 0 |
| D | DIGITAL RIV INC | STOCK | 253808954 | 8613 | 1559 SH PUT | | SOLE | 1559 | 0 | 0 |
| D | DILLARDS INC | CALL | 254067901 | 3273 | 1000 SH CALL | | SOLE | 1000 | 0 | 0 |
| D | DISCOVERY LABORATORIES INC N | STOCK | 254668106 | 551 | 232423 SH | | SOLE | 232423 | 0 | 0 |
| D | DISNEY WALT CO | PUT | 254687956 | 5165 | 1500 SH PUT | | SOLE | 1500 | 0 | 0 |
| D | DOBSON COMMUNICATIONS CORP | STOCK | 256069105 | 1424 | 165795 SH | | SOLE | 165795 | 0 | 0 |
| D | DOLLAR TREE STORES INC | CALL | 256747906 | 3824 | 1000 SH CALL | | SOLE | 1000 | 0 | 0 |
| D | DOMTAR CORP | STOCK | 257559104 | 2467 | 265000 SH | | SOLE | 265000 | 0 | 0 |
| D | DONNELLEY R R & SONS CO | STOCK | 257867101 | 6586 | 180000 SH | | SOLE | 180000 | 0 | 0 |
| D | DOUBLE-TAKE SOFTWARE INC | STOCK | 258598101 | 2281 | 168835 SH | | SOLE | 168835 | 0 | 0 |
| D | DOW CHEM CO | STOCK | 260543103 | 6682 | 145700 SH | | SOLE | 145700 | 0 | 0 |
| D | DOW CHEM CO | CALL | 260543903 | 6420 | 1400 SH CALL | | SOLE | 1400 | 0 | 0 |
| D | DOW JONES & CO INC | STOCK | 260561105 | 10343 | 300047 SH | | SOLE | 300047 | 0 | 0 |
| D | DR REDDYS LABS LTD | STOCK | 256135203 | 658 | 40000 SH | | SOLE | 40000 | 0 | 0 |
| D | DRDGOLD LTD | STOCK | 26152H103 | 1005 | 1500000 SH | | SOLE | 1500000 | 0 | 0 |

| | Name | Type | CUSIP | Val1 | Shares | | | | Value | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| D | DREAMWORKS ANIMATION SKG INC | CALL | 26153C903 | 2446 | 800 SH CALL | | SOLE | | 800 | 0 | 0 |
| D | DRESS BARN INC | STOCK | 261570105 | 579 | 27800 SH | | SOLE | | 27800 | 0 | 0 |
| D | DSP GROUP INC | STOCK | 23332B106 | 8671 | 456394 SH | | SOLE | | 456394 | 0 | 0 |
| D | DST SYS INC DEL | CALL | 233326907 | 3008 | 400 SH CALL | | SOLE | | 400 | 0 | 0 |
| D | DTE ENERGY CO | STOCK | 233331107 | 4785 | 99900 SH | | SOLE | | 99900 | 0 | 0 |
| D | E M C CORP MASS | STOCK | 268648102 | 13699 | 989133 SH | | SOLE | | 989133 | 0 | 0 |
| D | E TRADE FINANCIAL CORP | CALL | 269246904 | 2122 | 1000 SH CALL | | SOLE | | 1000 | 0 | 0 |
| D | E TRADE FINANCIAL CORP | STOCK | 269246104 | 14158 | 667224 SH | | SOLE | | 667224 | 0 | 0 |
| D | EAGLE HOSPITALITY PPTY TR IN | STOCK | 26959T102 | 677 | 60700 SH | | SOLE | | 60700 | 0 | 0 |
| D | EAGLE MATERIALS INC | STOCK | 26969p108 | 7605 | 170400 SH | | SOLE | | 170400 | 0 | 0 |
| D | EAGLE TEST SYS INC | STOCK | 270006109 | 1599 | 96118 SH | | SOLE | | 96118 | 0 | 0 |
| D | EARTHLINK INC | STOCK | 270321102 | 1611 | 219132 SH | | SOLE | | 219132 | 0 | 0 |
| D | EBAY INC | STOCK | 278642103 | 23673 | 714104 SH | | SOLE | | 714104 | 0 | 0 |
| D | ECI TELECOM LTD | STOCK | 268258100 | 2797 | 341131 SH | | SOLE | | 341131 | 0 | 0 |
| D | ECLIPSYS CORP | STOCK | 278856109 | 1734 | 90000 SH | | SOLE | | 90000 | 0 | 0 |
| D | ECLIPSYS CORP | CALL | 278856909 | 964 | 500 SH CALL | | SOLE | | 500 | 0 | 0 |
| D | EDGAR ONLINE INC | STOCK | 279765101 | 1250 | 459451 SH | | SOLE | | 459451 | 0 | 0 |
| D | EDO CORP | STOCK | 281347104 | 1514 | 57800 SH | | SOLE | | 57800 | 0 | 0 |
| D | EDWARDS AG INC | PUT | 281760958 | 2075 | 300 SH PUT | | SOLE | | 300 | 0 | 0 |
| D | EGL INC | CALL | 268484902 | 5945 | 1500 SH CALL | | SOLE | | 1500 | 0 | 0 |
| D | EL PASO CORP | STOCK | 28336L109 | 2894 | 200000 SH | | SOLE | | 200000 | 0 | 0 |
| D | ELAN PLC | PUT | 284131958 | 1595 | 1200 SH PUT | | SOLE | | 1200 | 0 | 0 |
| D | ELAN PLC | CALL | 284131908 | 9303 | 7000 SH CALL | | SOLE | | 7000 | 0 | 0 |
| D | ELECTRO OPTICAL SCIENCES INC | STOCK | 285192100 | 515 | 100000 SH | | SOLE | | 100000 | 0 | 0 |
| D | ELECTRO SCIENTIFIC INDS | STOCK | 285229100 | 962 | 50004 SH | | SOLE | | 50004 | 0 | 0 |
| D | ELECTRONIC ARTS INC | PUT | 285512959 | 10072 | 2000 SH PUT | | SOLE | | 2000 | 0 | 0 |
| D | ELECTRONIC ARTS INC | STOCK | 285512109 | 2014 | 40000 SH | | SOLE | | 40000 | 0 | 0 |
| D | ELECTRONIC DATA SYS NEW | PUT | 285661954 | 3322 | 1200 SH PUT | | SOLE | | 1200 | 0 | 0 |
| D | ELECTRONIC DATA SYS NEW | STOCK | 285661104 | 1089 | 39336 SH | | SOLE | | 39336 | 0 | 0 |
| D | ELECTRONICS FOR IMAGING INC | STOCK | 286082102 | 3710 | 158222 SH | | SOLE | | 158222 | 0 | 0 |
| D | ELITE PHARMACEUTICALS INC | STOCK | 28659T200 | 32 | 13470 SH | | SOLE | | 13470 | 0 | 0 |
| D | EMAGEON INC | STOCK | 29076V109 | 14523 | 1320308 SH | | SOLE | | 1320308 | 0 | 0 |
| D | EMAGEON INC | CALL | 29076V909 | 4158 | 3780 SH CALL | | SOLE | | 3780 | 0 | 0 |
| D | EMCORE CORP | STOCK | 290846104 | 304 | 60700 SH | | SOLE | | 60700 | 0 | 0 |
| D | EMDEON CORP | CALL | 290849908 | 1513 | 1000 SH CALL | | SOLE | | 1000 | 0 | 0 |
| D | EMERSON ELEC CO | STOCK | 291011104 | 12182 | 282700 SH | | SOLE | | 282700 | 0 | 0 |
| D | EMERSON ELEC CO | CALL | 291011904 | 3447 | 800 SH CALL | | SOLE | | 800 | 0 | 0 |
| D | EMMIS COMMUNICATIONS CORP | STOCK | 291525103 | 12662 | 1500222 SH | | SOLE | | 1500222 | 0 | 0 |
| D | EMPIRE RES INC DEL | STOCK | 292068100 | 839 | 75000 SH | | SOLE | | 75000 | 0 | 0 |
| D | EMPLOYERS HOLDINGS INC | STOCK | 292218104 | 1606 | 80200 SH | | SOLE | | 80200 | 0 | 0 |
| D | EMULEX CORP | STOCK | 292475209 | 14719 | 804749 SH | | SOLE | | 804749 | 0 | 0 |
| D | EMULEX CORP | CALL | 292475909 | 1829 | 1000 SH CALL | | SOLE | | 1000 | 0 | 0 |
| D | ENCANA CORP | CALL | 292505904 | 11392 | 2250 SH CALL | | SOLE | | 2250 | 0 | 0 |
| D | ENDO PHARMACEUTICALS HLDGS I | CALL | 29264F905 | 7350 | 2500 SH CALL | | SOLE | | 2500 | 0 | 0 |
| D | ENDO PHARMACEUTICALS HLDGS I | STOCK | 29264F205 | 3381 | 115000 SH | | SOLE | | 115000 | 0 | 0 |
| D | ENERGY CONVERSION DEVICES IN | PUT | 292659959 | 1747 | 500 SH PUT | | SOLE | | 500 | 0 | 0 |
| D | ENERGY CONVERSION DEVICES IN | STOCK | 292659109 | 5694 | 162963 SH | | SOLE | | 162963 | 0 | 0 |
| D | ENERGY EAST CORP | STOCK | 29266M109 | 3654 | 150000 SH | | SOLE | | 150000 | 0 | 0 |
| D | ENTRAVISION COMMUNICATIONS C | STOCK | 29382R107 | 3971 | 425200 SH | | SOLE | | 425200 | 0 | 0 |
| D | ENTRUST INC | STOCK | 293848107 | 10194 | 2529500 SH | | SOLE | | 2529500 | 0 | 0 |
| D | ENZON PHARMACEUTICALS INC | STOCK | 293904108 | 2430 | 298142 SH | | SOLE | | 298142 | 0 | 0 |
| D | EPIX PHARMACEUTICALS INC | STOCK | 26881Q309 | 5817 | 868196 SH | | SOLE | | 868196 | 0 | 0 |
| D | EQUITY RESIDENTIAL | STOCK | 29476L107 | 1894 | 39279 SH | | SOLE | | 39279 | 0 | 0 |
| D | ERICSSON L M TEL CO | CALL | 294821908 | 21805 | 5879 SH CALL | | SOLE | | 5879 | 0 | 0 |
| D | ERICSSON L M TEL CO | STOCK | 294821608 | 366 | 9875 SH | | SOLE | | 9875 | 0 | 0 |
| D | ESPEED INC | STOCK | 296643109 | 202 | 21277 SH | | SOLE | | 21277 | 0 | 0 |
| D | ESS TECHNOLOGY INC | STOCK | 269151106 | 221 | 172929 SH | | SOLE | | 172929 | 0 | 0 |
| D | ETHAN ALLEN INTERIORS INC | STOCK | 297602104 | 3131 | 88584 SH | | SOLE | | 88584 | 0 | 0 |
| D | EVCI CAREER COLLEGES INC | STOCK | 26926P100 | 76 | 143000 SH | | SOLE | | 143000 | 0 | 0 |
| D | EVERGREEN SOLAR INC | STOCK | 30033R108 | 1467 | 150421 SH | | SOLE | | 150421 | 0 | 0 |
| D | EXAR CORP | STOCK | 300645108 | 4003 | 302330 SH | | SOLE | | 302330 | 0 | 0 |
| D | EXCO RESOURCES INC | STOCK | 269279402 | 663 | 40000 SH | | SOLE | | 40000 | 0 | 0 |
| D | EXELIXIS INC | CALL | 30161Q904 | 1491 | 1500 SH CALL | | SOLE | | 1500 | 0 | 0 |
| D | EXELIXIS INC | STOCK | 30161Q104 | 1242 | 125000 SH | | SOLE | | 125000 | 0 | 0 |
| D | EXPRESS SCRIPTS INC | CALL | 302182900 | 4843 | 600 SH CALL | | SOLE | | 600 | 0 | 0 |
| D | EXPRESS SCRIPTS INC | STOCK | 302182100 | 7922 | 98146 SH | | SOLE | | 98146 | 0 | 0 |
| D | EXTREME NETWORKS INC | STOCK | 30226D106 | 3808 | 900155 SH | | SOLE | | 900155 | 0 | 0 |
| D | EXXON MOBIL CORP | STOCK | 30231G102 | 1886 | 25000 SH | | SOLE | | 25000 | 0 | 0 |
| D | F5 NETWORKS INC | PUT | 315616952 | 6001 | 900 SH PUT | | SOLE | | 900 | 0 | 0 |
| D | F5 NETWORKS INC | STOCK | 315616102 | 17674 | 265063 SH | | SOLE | | 265063 | 0 | 0 |
| D | FAIR ISAAC CORP | STOCK | 303250104 | 2325 | 60100 SH | | SOLE | | 60100 | 0 | 0 |
| D | FAIRCHILD SEMICONDUCTOR INTL | PUT | 303726953 | 836 | 500 SH PUT | | SOLE | | 500 | 0 | 0 |
| D | FALCONSTOR SOFTWARE INC | STOCK | 306137100 | 994 | 95415 SH | | SOLE | | 95415 | 0 | 0 |
| D | FAMILY DLR STORES INC | STOCK | 307000109 | 3140 | 106000 SH | | SOLE | | 106000 | 0 | 0 |
| D | FEDERAL REALTY INVT TR | STOCK | 313747206 | 236 | 2600 SH | | SOLE | | 2600 | 0 | 0 |
| D | FEDERATED INVS INC PA | STOCK | 314211203 | 3856 | 105000 SH | | SOLE | | 105000 | 0 | 0 |
| D | FEDEX CORP | PUT | 31428X956 | 10743 | 1000 SH PUT | | SOLE | | 1000 | 0 | 0 |
| D | FIBERTOWER CORP | STOCK | 31567R100 | 7792 | 1501335 SH | | SOLE | | 1501335 | 0 | 0 |
| D | FIDELITY NATL INFORMATION SV | STOCK | 31620M106 | 6364 | 140000 SH | | SOLE | | 140000 | 0 | 0 |
| D | FINISAR | STOCK | 31787A101 | 719 | 205536 SH | | SOLE | | 205536 | 0 | 0 |
| D | FINISH LINE INC | STOCK | 317923100 | 933 | 74065 SH | | SOLE | | 74065 | 0 | 0 |
| D | FIRST DATA CORP | PUT | 319963954 | 3228 | 1200 SH PUT | | SOLE | | 1200 | 0 | 0 |
| D | FIRST DATA CORP | STOCK | 319963104 | 23543 | 875200 SH | | SOLE | | 875200 | 0 | 0 |
| D | FIRST DATA CORP | CALL | 319963904 | 8339 | 3100 SH CALL | | SOLE | | 3100 | 0 | 0 |
| D | FIRST HORIZON NATL CORP | PUT | 320517955 | 2076 | 500 SH PUT | | SOLE | | 500 | 0 | 0 |
| D | FIRST MARBLEHEAD CORP | PUT | 320771958 | 2244 | 500 SH PUT | | SOLE | | 500 | 0 | 0 |
| D | FIRST MERCURY FINANCIAL CORP | STOCK | 32084L109 | 1531 | 74500 SH | | SOLE | | 74500 | 0 | 0 |
| D | FIRST SOLAR INC | STOCK | 336433107 | 13541 | 260357 SH | | SOLE | | 260357 | 0 | 0 |
| D | FLAMEL TECHNOLOGIES SA | PUT | 338488959 | 3072 | 1200 SH PUT | | SOLE | | 1200 | 0 | 0 |
| D | FLOWERS FOODS INC | STOCK | 343498101 | 302 | 10000 SH | | SOLE | | 10000 | 0 | 0 |
| D | FLUOR CORP NEW | PUT | 343412952 | 3589 | 400 SH PUT | | SOLE | | 400 | 0 | 0 |
| D | FMC TECHNOLOGIES INC | PUT | 30249U951 | 6976 | 1000 SH PUT | | SOLE | | 1000 | 0 | 0 |

DX-1006-00006
GOV-00004902

Case 17-1405, Document 29, 06/06/2017, 2052263, Page426 of 467

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| D | FOCUS MEDIA HLDG LTD | STOCK | 34415V109 | 10188 | 129850 SH | SOLE | 129850 | 0 | 0 |
| D | FOMENTO ECONOMICO MEXICANO S | STOCK | 344419106 | 4416 | 40000 SH | SOLE | 40000 | 0 | 0 |
| D | FOOT LOCKER INC | CALL | 344849904 | 1178 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | FOOT LOCKER INC | STOCK | 344849104 | 9538 | 405000 SH | SOLE | 405000 | 0 | 0 |
| D | FOREST LABS INC | PUT | 345838956 | 5144 | 1000 SH PUT | SOLE | 1000 | 0 | 0 |
| D | FOREST LABS INC | STOCK | 345838106 | 242 | 4700 SH | SOLE | 4700 | 0 | 0 |
| D | FORTUNE BRANDS INC | STOCK | 349631101 | 788 | 10000 SH | SOLE | 10000 | 0 | 0 |
| D | FORWARD INDS INC N Y | STOCK | 349862300 | 582 | 140000 SH | SOLE | 140000 | 0 | 0 |
| D | FOSTER WHEELER LTD | STOCK | G36535139 | 453 | 7750 SH | SOLE | 7750 | 0 | 0 |
| D | FOUNDATION COAL HLDGS INC | STOCK | 35039W100 | 5694 | 165800 SH | SOLE | 165800 | 0 | 0 |
| D | FOUNDATION COAL HLDGS INC | CALL | 35039W900 | 8242 | 2400 SH CALL | SOLE | 2400 | 0 | 0 |
| D | FOUNDRY NETWORKS INC | STOCK | 35063R100 | 32808 | 2417716 SH | SOLE | 2417716 | 0 | 0 |
| D | FOUNDRY NETWORKS INC | CALL | 35063R900 | 679 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | FOXHOLLOW TECHNOLOGIES INC | CALL | 35166A903 | 1044 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | FPL GROUP INC | STOCK | 302571104 | 7194 | 117600 SH | SOLE | 117600 | 0 | 0 |
| D | FRANCE TELECOM | STOCK | 35177Q105 | 1434 | 54300 SH | SOLE | 54300 | 0 | 0 |
| D | FREDS INC | STOCK | 356108100 | 838 | 57000 SH | SOLE | 57000 | 0 | 0 |
| D | FREEPORT-MCMORAN COPPER & GO | STOCK | 35671D857 | 20320 | 307000 SH | SOLE | 307000 | 0 | 0 |
| D | FRIEDMAN BILLINGS RAMSEY GRO | STOCK | 358434108 | 2876 | 520962 SH | SOLE | 520962 | 0 | 0 |
| D | FRONTIER OIL CORP | CALL | 35914P905 | 1632 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | FRONTIER OIL CORP | STOCK | 35914P105 | 1632 | 50000 SH | SOLE | 50000 | 0 | 0 |
| D | FUEL TECH INC | STOCK | 359523107 | 308 | 12500 SH | SOLE | 12500 | 0 | 0 |
| D | FULLER H B CO | STOCK | 359694106 | 2182 | 80000 SH | SOLE | 80000 | 0 | 0 |
| D | GAIAM INC | STOCK | 36268Q103 | 315 | 20000 SH | SOLE | 20000 | 0 | 0 |
| D | GALAXY ENERGY CORP | STOCK | 36318B106 | 12 | 75000 SH | SOLE | 75000 | 0 | 0 |
| D | GAP INC DEL | STOCK | 364760108 | 9126 | 530300 SH | SOLE | 530300 | 0 | 0 |
| D | GAP INC DEL | CALL | 364760908 | 2065 | 1200 SH CALL | SOLE | 1200 | 0 | 0 |
| D | GARMIN LTD | STOCK | G37260109 | 9614 | 177547 SH | SOLE | 177547 | 0 | 0 |
| D | GARTNER INC | STOCK | 366651107 | 805 | 33615 SH | SOLE | 33615 | 0 | 0 |
| D | GEMSTAR-TV GUIDE INTL INC | STOCK | 36866W106 | 27859 | 6649001 SH | SOLE | 6649001 | 0 | 0 |
| D | GENAERA CORP | STOCK | 36867G100 | 301 | 700000 SH | SOLE | 700000 | 0 | 0 |
| D | GENCORP INC | STOCK | 36868Q100 | 6921 | 500100 SH | SOLE | 500100 | 0 | 0 |
| D | GENELABS TECHNOLOGIES INC | STOCK | 368706206 | 368 | 200000 SH | SOLE | 200000 | 0 | 0 |
| D | GENENTECH INC | PUT | 368710956 | 14782 | 1800 SH PUT | SOLE | 1800 | 0 | 0 |
| D | GENERAL DYNAMICS CORP | STOCK | 369550108 | 237 | 3100 SH | SOLE | 3100 | 0 | 0 |
| D | GENERAL ELECTRIC CO | STOCK | 369604103 | 14786 | 418148 SH | SOLE | 418148 | 0 | 0 |
| D | GENERAL ELECTRIC CO | CALL | 369604903 | 10608 | 3000 SH CALL | SOLE | 3000 | 0 | 0 |
| D | GENERAL MLS INC | STOCK | 370334104 | 1747 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | GENERAL MTRS CORP | CALL | 370442905 | 460 | 150 SH CALL | SOLE | 150 | 0 | 0 |
| D | GENESCO INC | STOCK | 371532102 | 1454 | 35000 SH | SOLE | 35000 | 0 | 0 |
| D | GENESIS HEALTHCARE CORP | CALL | 37184D901 | 5680 | 900 SH CALL | SOLE | 900 | 0 | 0 |
| D | GENESIS HEALTHCARE CORP | STOCK | 37184D101 | 2840 | 45000 SH | SOLE | 45000 | 0 | 0 |
| D | GENESIS LEASE LTD | STOCK | 37183T107 | 6558 | 250800 SH | SOLE | 250800 | 0 | 0 |
| D | GENZYME CORP | CALL | 372917904 | 10203 | 1700 SH CALL | SOLE | 1700 | 0 | 0 |
| D | GENZYME CORP | STOCK | 372917104 | 5102 | 85000 SH | SOLE | 85000 | 0 | 0 |
| D | GERDAU AMERISTEEL CORP | STOCK | 37373P105 | 1471 | 125000 SH | SOLE | 125000 | 0 | 0 |
| D | GFI GROUP INC | CALL | 361652909 | 3399 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | GILEAD SCIENCES INC | STOCK | 375558103 | 2295 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | GILEAD SCIENCES INC | CALL | 375558903 | 4599 | 600 SH CALL | SOLE | 600 | 0 | 0 |
| D | GLATFELTER | STOCK | 377316104 | 2236 | 150000 SH | SOLE | 150000 | 0 | 0 |
| D | GLENAYRE TECHNOLOGIES INC | STOCK | 377899109 | 2645 | 1219051 SH | SOLE | 1219051 | 0 | 0 |
| D | GLOBAL CROSSING LTD | STOCK | G3921A175 | 316 | 11498 SH | SOLE | 11498 | 0 | 0 |
| D | GLOBAL PMTS INC | STOCK | 37940X102 | 4129 | 121228 SH | SOLE | 121228 | 0 | 0 |
| D | GLOBALSANTAFE CORP | PUT | G3930E951 | 7710 | 1250 SH PUT | SOLE | 1250 | 0 | 0 |
| D | GLOBALSANTAFE CORP | CALL | G3930E901 | 7402 | 1200 SH CALL | SOLE | 1200 | 0 | 0 |
| D | GLOBALSANTAFE CORP | STOCK | G3930E101 | 13737 | 222712 SH | SOLE | 222712 | 0 | 0 |
| D | GOLD RESV INC | STOCK | 38068N108 | 503 | 74900 SH | SOLE | 74900 | 0 | 0 |
| D | GOLDCORP INC NEW | CALL | 380956909 | 1441 | 600 SH CALL | SOLE | 600 | 0 | 0 |
| D | GOLDCORP INC NEW | STOCK | 380956409 | 335 | 13930 SH | SOLE | 13930 | 0 | 0 |
| D | GOLDEN STAR RES LTD CDA | STOCK | 38119T104 | 4686 | 1065080 SH | SOLE | 1065080 | 0 | 0 |
| D | GOLDEN STAR RES LTD CDA | CALL | 38119T904 | 352 | 800 SH CALL | SOLE | 800 | 0 | 0 |
| D | GOLDMAN SACHS GROUP INC | STOCK | 38141G104 | 105906 | 512538 SH | SOLE | 512538 | 0 | 0 |
| D | GOODYEAR TIRE & RUBR CO | STOCK | 382550101 | 546 | 17500 SH | SOLE | 17500 | 0 | 0 |
| D | GOOGLE INC | STOCK | 38259P508 | 92024 | 200856 SH | SOLE | 200856 | 0 | 0 |
| D | GRAFTECH INTL LTD | STOCK | 384313102 | 1824 | 200900 SH | SOLE | 200900 | 0 | 0 |
| D | GREENHILL & CO INC | STOCK | 395259104 | 1228 | 20000 SH | SOLE | 20000 | 0 | 0 |
| D | GROUP 1 AUTOMOTIVE INC | STOCK | 398905109 | 3178 | 79900 SH | SOLE | 79900 | 0 | 0 |
| D | GROUPE DANONE | STOCK | 399449107 | 357 | 10000 SH | SOLE | 10000 | 0 | 0 |
| D | GUESS INC | PUT | 401617955 | 2025 | 500 SH PUT | SOLE | 500 | 0 | 0 |
| D | HALLIBURTON CO | STOCK | 406216101 | 847 | 26694 SH | SOLE | 26694 | 0 | 0 |
| D | HALLIBURTON CO | CALL | 406216901 | 3809 | 1200 SH CALL | SOLE | 1200 | 0 | 0 |
| D | HALLIBURTON CO | PUT | 406216951 | 1270 | 400 SH PUT | SOLE | 400 | 0 | 0 |
| D | HALOZYME THERAPEUTICS INC | STOCK | 40637H109 | 1773 | 220000 SH | SOLE | 220000 | 0 | 0 |
| D | HALOZYME THERAPEUTICS INC | CALL | 40637H909 | 202 | 250 SH CALL | SOLE | 250 | 0 | 0 |
| D | HANSEN NAT CORP | STOCK | 411310105 | 3548 | 93668 SH | SOLE | 93668 | 0 | 0 |
| D | HARRIS CORP DEL | STOCK | 413875105 | 4076 | 80000 SH | SOLE | 80000 | 0 | 0 |
| D | HEALTH CARE PPTY INVS INC | STOCK | 421915109 | 299 | 8300 SH | SOLE | 8300 | 0 | 0 |
| D | HEALTH CARE REIT INC | STOCK | 42217K106 | 211 | 4800 SH | SOLE | 4800 | 0 | 0 |
| D | HEALTH NET INC | STOCK | 42222Q108 | 1345 | 25000 SH | SOLE | 25000 | 0 | 0 |
| D | HEINZ H J CO | CALL | 423074903 | 4712 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | HEINZ H J CO | STOCK | 423074103 | 14438 | 306411 SH | SOLE | 306411 | 0 | 0 |
| D | HELIX ENERGY SOLUTIONS GRP I | STOCK | 42330P107 | 2610 | 70000 SH | SOLE | 70000 | 0 | 0 |
| D | HELIX ENERGY SOLUTIONS GRP I | CALL | 42330P907 | 1354 | 363 SH CALL | SOLE | 363 | 0 | 0 |
| D | HERBALIFE LTD | STOCK | G44120101 | 392 | 10000 SH | SOLE | 10000 | 0 | 0 |
| D | HERSHEY CO | STOCK | 427866108 | 1367 | 25000 SH | SOLE | 25000 | 0 | 0 |
| D | HERSHEY CO | PUT | 427866958 | 4373 | 800 SH PUT | SOLE | 800 | 0 | 0 |
| D | HESS CORP | CALL | 42809H907 | 2219 | 400 SH CALL | SOLE | 400 | 0 | 0 |
| D | HESS CORP | STOCK | 42809H107 | 555 | 10000 SH | SOLE | 10000 | 0 | 0 |
| D | HEWITT ASSOCS INC | CALL | 42822Q900 | 1754 | 600 SH CALL | SOLE | 600 | 0 | 0 |
| D | HEWITT ASSOCS INC | STOCK | 42822Q100 | 582 | 19900 SH | SOLE | 19900 | 0 | 0 |
| D | HEWLETT PACKARD CO | STOCK | 428236103 | 18829 | 469083 SH | SOLE | 469083 | 0 | 0 |
| D | HILTON HOTELS CORP | STOCK | 432848109 | 8990 | 250000 SH | SOLE | 250000 | 0 | 0 |

DX-1006-00007

GOV-00004903

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| D | HIMAX TECHNOLOGIES INC | STOCK | 43289P106 | 1438 | 268342 SH | SOLE | 268342 | 0 | 0 |
| D | HOME DEPOT INC | STOCK | 437076102 | 603 | 16400 SH | SOLE | 16400 | 0 | 0 |
| D | HOME DEPOT INC | CALL | 437076902 | 4409 | 1200 SH CALL | SOLE | 1200 | 0 | 0 |
| D | HOME INNS & HOTELS MGMT INC | STOCK | 43713W107 | 2375 | 65350 SH | SOLE | 65350 | 0 | 0 |
| D | HONDA MOTOR LTD | STOCK | 438128308 | 2305 | 66100 SH | SOLE | 66100 | 0 | 0 |
| D | HONEYWELL INTL INC | STOCK | 438516106 | 1824 | 39600 SH | SOLE | 39600 | 0 | 0 |
| D | HOSPIRA INC | CALL | 441060900 | 888 | 217 SH CALL | SOLE | 217 | 0 | 0 |
| D | HOSPIRA INC | STOCK | 441060100 | 1227 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | HUMAN GENOME SCIENCES INC | STOCK | 444903108 | 531 | 50000 SH | SOLE | 50000 | 0 | 0 |
| D | HUMAN GENOME SCIENCES INC | CALL | 444903908 | 3398 | 3200 SH CALL | SOLE | 3200 | 0 | 0 |
| D | HUMANA INC | PUT | 444859952 | 3481 | 600 SH PUT | SOLE | 600 | 0 | 0 |
| D | HUNT J B TRANS SVCS INC | STOCK | 445658107 | 8405 | 320323 SH | SOLE | 320323 | 0 | 0 |
| D | HUNTINGTON BANCSHARES INC | STOCK | 446150104 | 367 | 16800 SH | SOLE | 16800 | 0 | 0 |
| D | HUNTSMAN CORP | CALL | 447011907 | 2291 | 1200 SH CALL | SOLE | 1200 | 0 | 0 |
| D | HUNTSMAN CORP | STOCK | 447011107 | 10500 | 550000 SH | SOLE | 550000 | 0 | 0 |
| D | HUTCHINSON TECHNOLOGY INC | STOCK | 448407106 | 46063 | 1972717 SH | SOLE | 1972717 | 0 | 0 |
| D | HUTCHINSON TECHNOLOGY INC | CALL | 448407906 | 7005 | 3000 SH CALL | SOLE | 3000 | 0 | 0 |
| D | HUTCHISON TELECOMM INTL LTD | STOCK | 44841T107 | 3477 | 113650 SH | SOLE | 113650 | 0 | 0 |
| D | HYPERCOM CORP | STOCK | 44913M105 | 3576 | 600000 SH | SOLE | 600000 | 0 | 0 |
| D | I D SYSTEMS INC | STOCK | 449489103 | 1402 | 116555 SH | SOLE | 116555 | 0 | 0 |
| D | IAC INTERACTIVECORP | PUT | 44919P950 | 14816 | 3929 SH PUT | SOLE | 3929 | 0 | 0 |
| D | ICF INTL INC | STOCK | 44925C103 | 10669 | 564500 SH | SOLE | 564500 | 0 | 0 |
| D | ICICI BK LTD | PUT | 45104G954 | 551 | 150 SH PUT | SOLE | 150 | 0 | 0 |
| D | IDACORP INC | STOCK | 451107106 | 2538 | 75000 SH | SOLE | 75000 | 0 | 0 |
| D | IDAHO GEN MINES INC | STOCK | 451272306 | 434 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | IKANOS COMMUNICATIONS | STOCK | 45173E105 | 6288 | 809306 SH | SOLE | 809306 | 0 | 0 |
| D | IKON OFFICE SOLUTIONS INC | STOCK | 451713101 | 417 | 29018 SH | SOLE | 29018 | 0 | 0 |
| D | ILLUMINA INC | CALL | 45232T909 | 1665 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | IMAGE ENTMT INC | STOCK | 452439201 | 98 | 23360 SH | SOLE | 23360 | 0 | 0 |
| D | IMAX CORP | STOCK | 45245E109 | 438 | 86925 SH | SOLE | 86925 | 0 | 0 |
| D | IMCLONE SYS INC | PUT | 45245W959 | 3995 | 980 SH PUT | SOLE | 980 | 0 | 0 |
| D | IMCLONE SYS INC | CALL | 45245W909 | 4485 | 1100 SH CALL | SOLE | 1100 | 0 | 0 |
| D | IMMUNOMEDICS INC | CALL | 452907908 | 403 | 880 SH CALL | SOLE | 880 | 0 | 0 |
| D | IMMUNOMEDICS INC | STOCK | 452907108 | 4651 | 1015458 SH | SOLE | 1015458 | 0 | 0 |
| D | INDEVUS PHARMACEUTICALS INC | STOCK | 454072109 | 2828 | 400000 SH | SOLE | 400000 | 0 | 0 |
| D | INDYMAC BANCORP INC | PUT | 456607950 | 2244 | 700 SH PUT | SOLE | 700 | 0 | 0 |
| D | INFINEON TECHNOLOGIES AG | STOCK | 45662N103 | 26458 | 1699305 SH | SOLE | 1699305 | 0 | 0 |
| D | INFOCROSSING INC | STOCK | 45664X109 | 1933 | 130000 SH | SOLE | 130000 | 0 | 0 |
| D | INFOCUS CORP | STOCK | 45665b106 | 1075 | 383813 SH | SOLE | 383813 | 0 | 0 |
| D | INFORMATICA CORP | CALL | 45666g902 | 1007 | 750 SH CALL | SOLE | 750 | 0 | 0 |
| D | INFORMATICA CORP | STOCK | 45666Q102 | 679 | 50552 SH | SOLE | 50552 | 0 | 0 |
| D | INFOSYS TECHNOLOGIES LTD | STOCK | 456788108 | 922 | 18350 SH | SOLE | 18350 | 0 | 0 |
| D | INFOSYS TECHNOLOGIES LTD | PUT | 456788958 | 9090 | 1809 SH PUT | SOLE | 1809 | 0 | 0 |
| D | INGRESOURCE SVCS INC | STOCK | 456R94102 | 763 | 25000 SH | SOLE | 25000 | 0 | 0 |
| D | INGERSOLL-RAND COMPANY LTD | STOCK | G47760101 | 10829 | 249700 SH | SOLE | 249700 | 0 | 0 |
| D | INNOVO GROUP INC | STOCK | 457954600 | 3060 | 2807290 SH | SOLE | 2807290 | 0 | 0 |
| D | INPHONIC INC | CALL | 45772G905 | 981 | 900 SH CALL | SOLE | 900 | 0 | 0 |
| D | INPHONIC INC | STOCK | 45772G105 | 11109 | 1019169 SH | SOLE | 1019169 | 0 | 0 |
| D | INPUT/OUTPUT INC | STOCK | 457652105 | 5238 | 380100 SH | SOLE | 380100 | 0 | 0 |
| D | INSPIRE PHARMACEUTICALS INC | STOCK | 457733103 | 1682 | 295000 SH | SOLE | 295000 | 0 | 0 |
| D | INTEGRAL SYS INC MD | STOCK | 45810H107 | 2900 | 120000 SH | SOLE | 120000 | 0 | 0 |
| D | INTEGRYS ENERGY GROUP INC | STOCK | 45822P105 | 17486 | 315000 SH | SOLE | 315000 | 0 | 0 |
| D | INTEL CORP | STOCK | 458140100 | 1681 | 87856 SH | SOLE | 87856 | 0 | 0 |
| D | INTEL CORP | CALL | 458140900 | 17504 | 9150 SH CALL | SOLE | 9150 | 0 | 0 |
| D | INTEL CORP | PUT | 458140950 | 1530 | 800 SH PUT | SOLE | 800 | 0 | 0 |
| D | INTERCONTINENTALEXCHANGE INC | STOCK | 45865V100 | 1352 | 11064 SH | SOLE | 11064 | 0 | 0 |
| D | INTERDIGITAL COMMUNICATIONS | PUT | 45866A955 | 8155 | 2575 SH PUT | SOLE | 2575 | 0 | 0 |
| D | INTERFACE INC | STOCK | 458665106 | 481 | 30076 SH | SOLE | 30076 | 0 | 0 |
| D | INTERMEC INC | CALL | 458786900 | 3351 | 1500 SH CALL | SOLE | 1500 | 0 | 0 |
| D | INTERMEC INC | PUT | 458786950 | 4468 | 2000 SH PUT | SOLE | 2000 | 0 | 0 |
| D | INTERMUNE INC | CALL | 45884X903 | 1480 | 600 SH CALL | SOLE | 600 | 0 | 0 |
| D | INTERNATIONAL BUSINESS MACHS | PUT | 459200951 | 219079 | 23242 SH PUT | SOLE | 23242 | 0 | 0 |
| D | INTERNATIONAL GAME TECHNOLOG | CALL | 459902902 | 4038 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | INTERNATIONAL GAME TECHNOLOG | STOCK | 459902102 | 14540 | 360085 SH | SOLE | 360085 | 0 | 0 |
| D | INTERNATIONAL RECTIFIER CORP | CALL | 460254905 | 6075 | 1590 SH CALL | SOLE | 1590 | 0 | 0 |
| D | INTERNATIONAL RECTIFIER CORP | PUT | 460254955 | 5498 | 1439 SH PUT | SOLE | 1439 | 0 | 0 |
| D | INTERNET CAP GROUP INC | STOCK | 46059C205 | 1070 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | INTERNET HOLDRS TR | STOCK | 46059W102 | 11158 | 200000 SH | SOLE | 200000 | 0 | 0 |
| D | INTERNET INFRASTRUCTR HOLDS | STOCK | 46059V104 | 1323 | 257900 SH | SOLE | 257900 | 0 | 0 |
| D | INTEROIL CORP | STOCK | 460951106 | 2097 | 78850 SH | SOLE | 78850 | 0 | 0 |
| D | INTERPUBLIC GROUP INC | CALL | 460951906 | 3562 | 1339 SH CALL | SOLE | 1339 | 0 | 0 |
| D | INTERPUBLIC GROUP COS INC | STOCK | 460690100 | 1826 | 148300 SH | SOLE | 148300 | 0 | 0 |
| D | INTERVOICE INC NEW | STOCK | 461142101 | 144 | 21670 SH | SOLE | 21670 | 0 | 0 |
| D | INTERWOVEN INC | PUT | 46114T958 | 845 | 500 SH PUT | SOLE | 500 | 0 | 0 |
| D | INTEVAC INC | PUT | 461148958 | 2637 | 1000 SH PUT | SOLE | 1000 | 0 | 0 |
| D | INTL PAPER CO | STOCK | 460146103 | 2184 | 60000 SH | SOLE | 60000 | 0 | 0 |
| D | INTL PAPER CO | CALL | 460146903 | 7826 | 2150 SH CALL | SOLE | 2150 | 0 | 0 |
| D | INTL SECS EXCHANGE HLDGS INC | STOCK | 46031W204 | 10277 | 210600 SH | SOLE | 210600 | 0 | 0 |
| D | INTUIT | CALL | 461202903 | 2736 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | INTUIT | STOCK | 461202103 | 2760 | 100886 SH | SOLE | 100886 | 0 | 0 |
| D | INVERNESS MED INNOVATIONS IN | STOCK | 46126P106 | 2189 | 50000 SH | SOLE | 50000 | 0 | 0 |
| D | INVITROGEN CORP | CALL | 46185R900 | 3183 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | INVITROGEN INC | STOCK | 462070103 | 10887 | 2336300 SH | SOLE | 2336300 | 0 | 0 |
| D | IPASS INC | STOCK | 46261V108 | 2016 | 400837 SH | SOLE | 400837 | 0 | 0 |
| D | IPC HLDGS LTD | STOCK | G4933P101 | 2885 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | IPG PHOTONICS CORP | STOCK | 44980X109 | 1922 | 100100 SH | SOLE | 100100 | 0 | 0 |
| D | IPSCO INC | STOCK | 462622101 | 307 | 2337 SH | SOLE | 2337 | 0 | 0 |
| D | IROBOT CORP | STOCK | 462726100 | 327 | 25037 SH | SOLE | 25037 | 0 | 0 |
| D | ISHARES INC | PUT | 464286953 | 984 | 200 SH PUT | SOLE | 200 | 0 | 0 |
| D | ISHARES INC | PUT | 464286953 | 16381 | 10200 SH PUT | SOLE | 10200 | 0 | 0 |
| D | ISHARES INC | STOCK | 464286830 | 4332 | 400000 SH | SOLE | 400000 | 0 | 0 |
| D | ISHARES INC | PUT | 464286953 | 1442 | 500 SH PUT | SOLE | 500 | 0 | 0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| D | ISHARES TR | PUT | 464287951 | 8005 | 1200 SH PUT | SOLE | 1200 | 0 | 0 |
| D | ISHARES TR | PUT | 464287951 | 19065 | 2500 SH PUT | SOLE | 2500 | 0 | 0 |
| D | ISHARES TR | PUT | 464287951 | 8196 | 1200 SH PUT | SOLE | 1200 | 0 | 0 |
| D | ISHARES TR | PUT | 464287951 | 44539 | 5500 SH PUT | SOLE | 5500 | 0 | 0 |
| D | ISHARES TR | PUT | 464287951 | 123789 | 15569 SH PUT | SOLE | 15569 | 0 | 0 |
| D | ISHARES TR | PUT | 464287951 | 37511 | 4950 SH PUT | SOLE | 4950 | 0 | 0 |
| D | ISHARES TR | PUT | 464287951 | 25188 | 2459 SH PUT | SOLE | 2459 | 0 | 0 |
| D | ISHARES TR | PUT | 464287951 | 8524 | 1000 SH PUT | SOLE | 1000 | 0 | 0 |
| D | ISHARES TR | CALL | 464287901 | 8524 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | ISHARES TR | CALL | 464287901 | 1932 | 243 SH CALL | SOLE | 243 | 0 | 0 |
| D | ISHARES TR | CALL | 464287901 | 15156 | 2000 SH CALL | SOLE | 2000 | 0 | 0 |
| D | ISHARES TR | PUT | 464287951 | 1076 | 125 SH PUT | SOLE | 125 | 0 | 0 |
| D | ISHARES TR | PUT | 464287951 | 22135 | 1900 SH PUT | SOLE | 1900 | 0 | 0 |
| D | ISILON SYS INC | STOCK | 464287432 | 3370 | 38178 SH | SOLE | 38178 | 0 | 0 |
| D | ISILON SYS INC | STOCK | 46432L104 | 14741 | 911654 SH | SOLE | 911654 | 0 | 0 |
| D | ISIS PHARMACEUTICALS INC | CALL | 464330909 | 3940 | 4250 SH CALL | SOLE | 4250 | 0 | 0 |
| D | ISIS PHARMACEUTICALS INC | STOCK | 464330109 | 2781 | 300000 SH | SOLE | 300000 | 0 | 0 |
| D | ITC HLDGS CORP | STOCK | 465685105 | 8688 | 200700 SH | SOLE | 200700 | 0 | 0 |
| D | ITT EDUCATIONAL SERVICES INC | PUT | 45068B959 | 4075 | 500 SH PUT | SOLE | 500 | 0 | 0 |
| D | IXIA | STOCK | 45071R109 | 279 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | J2 GLOBAL COMMUNICATIONS INC | STOCK | 46626E205 | 832 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | JA SOLAR HOLDINGS CO LTD | STOCK | 466090107 | 4126 | 228100 SH | SOLE | 228100 | 0 | 0 |
| D | JABIL CIRCUIT INC | PUT | 466313953 | 7018 | 3278 SH PUT | SOLE | 3278 | 0 | 0 |
| D | JACOBS ENGR GROUP INC DEL | PUT | 469814957 | 1866 | 400 SH PUT | SOLE | 400 | 0 | 0 |
| D | JAMBA INC | STOCK | 47023A101 | 1961 | 170000 SH | SOLE | 170000 | 0 | 0 |
| D | JDS UNIPHASE CORP | STOCK | 46612J507 | 20410 | 1340101 SH | SOLE | 1340101 | 0 | 0 |
| D | JDS UNIPHASE CORP | CALL | 46612J907 | 7128 | 4680 SH CALL | SOLE | 4680 | 0 | 0 |
| D | JETBLUE AWYS CORP | PUT | 477143101 | 7027 | 610519 SH PUT | SOLE | 610519 | 0 | 0 |
| D | JETBLUE AWYS CORP | CALL | 477143901 | 3660 | 3180 SH CALL | SOLE | 3180 | 0 | 0 |
| D | JOHNSON CTLS INC | PUT | 478366957 | 7097 | 750 SH PUT | SOLE | 750 | 0 | 0 |
| D | JONES APPAREL GROUP INC | STOCK | 480074103 | 375 | 12200 SH | SOLE | 12200 | 0 | 0 |
| D | JONES SODA CO | STOCK | 48023P106 | 708 | 35000 SH | SOLE | 35000 | 0 | 0 |
| D | JOS A BANK CLOTHIERS INC | STOCK | 480838101 | 1406 | 39767 SH | SOLE | 39767 | 0 | 0 |
| D | JOY GLOBAL INC | STOCK | 481165108 | 6038 | 140738 SH | SOLE | 140738 | 0 | 0 |
| D | JP MORGAN CHASE & CO | STOCK | 46625H100 | 5211 | 107715 SH | SOLE | 107715 | 0 | 0 |
| D | JUNIPER NETWORKS INC | STOCK | 48203M104 | 2055 | 104422 SH | SOLE | 104422 | 0 | 0 |
| D | K V PHARMACEUTICAL CO | STOCK | 482740206 | 8584 | 347120 SH | SOLE | 347120 | 0 | 0 |
| D | K2 INC | STOCK | 482732104 | 6045 | 500000 SH | SOLE | 500000 | 0 | 0 |
| D | KEANE INC | STOCK | 48666S102 | 4821 | 354977 SH | SOLE | 354977 | 0 | 0 |
| D | KELLOGG CO | STOCK | 487836108 | 1286 | 25000 SH | SOLE | 25000 | 0 | 0 |
| D | KEMET CORP | STOCK | 488360108 | 1836 | 240000 SH | SOLE | 240000 | 0 | 0 |
| D | KENDLE INTERNATIONAL INC | STOCK | 48880L107 | 888 | 25000 SH | SOLE | 25000 | 0 | 0 |
| D | KENNAMETAL INC | STOCK | 489170100 | 10195 | 150788 SH | SOLE | 150788 | 0 | 0 |
| D | KFORCE INC | STOCK | 493732101 | 1652 | 120000 SH | SOLE | 120000 | 0 | 0 |
| D | KINETIC CONCEPTS INC | PUT | 49460W958 | 5064 | 1000 SH PUT | SOLE | 1000 | 0 | 0 |
| D | KING PHARMACEUTICALS INC | STOCK | 495582108 | 12676 | 644452 SH | SOLE | 644452 | 0 | 0 |
| D | KING PHARMACEUTICALS INC | CALL | 495582908 | 18686 | 9500 SH CALL | SOLE | 9500 | 0 | 0 |
| D | KLA-TENCOR CORP | STOCK | 482480100 | 46207 | 866601 SH | SOLE | 866601 | 0 | 0 |
| D | KLA-TENCOR CORP | PUT | 482480950 | 11304 | 2120 SH PUT | SOLE | 2120 | 0 | 0 |
| D | KNOT INC | STOCK | 499184109 | 215 | 10000 SH | SOLE | 10000 | 0 | 0 |
| D | KODIAK OIL & GAS CORP | STOCK | 50015Q100 | 2850 | 545896 SH | SOLE | 545896 | 0 | 0 |
| D | KOHLS CORP | STOCK | 500255104 | 6470 | 84455 SH | SOLE | 84455 | 0 | 0 |
| D | KOMAG INC | CALL | 500453904 | 6742 | 2060 SH CALL | SOLE | 2060 | 0 | 0 |
| D | KOMAG INC | PUT | 500453954 | 2455 | 750 SH PUT | SOLE | 750 | 0 | 0 |
| D | KOMAG INC | STOCK | 500453204 | 17767 | 542823 SH | SOLE | 542823 | 0 | 0 |
| D | KONINKLIJKE PHILIPS ELECTRS | STOCK | 500472303 | 1905 | 50000 SH | SOLE | 50000 | 0 | 0 |
| D | KOPIN CORP | STOCK | 500600101 | 264 | 75000 SH | SOLE | 75000 | 0 | 0 |
| D | KRISPY KREME DOUGHNUTS INC | STOCK | 501014104 | 5095 | 500001 SH | SOLE | 500001 | 0 | 0 |
| D | KROGER CO | STOCK | 501044101 | 533 | 18780 SH | SOLE | 18780 | 0 | 0 |
| D | KRONOS INC | STOCK | 501052104 | 519 | 9700 SH | SOLE | 9700 | 0 | 0 |
| D | K-SWISS INC | STOCK | 482686102 | 676 | 25000 SH | SOLE | 25000 | 0 | 0 |
| D | KULICKE & SOFFA INDS INC | STOCK | 501242101 | 693 | 74910 SH | SOLE | 74910 | 0 | 0 |
| D | KYPHON INC | PUT | 501577950 | 4514 | 1000 SH PUT | SOLE | 1000 | 0 | 0 |
| D | L-3 COMMUNICATIONS HLDGS INC | CALL | 502424904 | 2624 | 300 SH CALL | SOLE | 300 | 0 | 0 |
| D | LABORATORY CORP AMER HLDGS | PUT | 50540R959 | 7263 | 1000 SH PUT | SOLE | 1000 | 0 | 0 |
| D | LAM RESEARCH CORP | STOCK | 512807108 | 35397 | 747726 SH | SOLE | 747726 | 0 | 0 |
| D | LANCE INC | STOCK | 514606102 | 607 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | LANDAMERICA FINL GROUP INC | STOCK | 514936103 | 2350 | 31801 SH | SOLE | 31801 | 0 | 0 |
| D | LAS VEGAS SANDS CORP | CALL | 517834907 | 1732 | 200 SH CALL | SOLE | 200 | 0 | 0 |
| D | LASALLE HOTEL PPTYS | STOCK | 517942108 | 1854 | 40000 SH | SOLE | 40000 | 0 | 0 |
| D | LAWSON SOFTWARE INC NEW | STOCK | 52078P102 | 10889 | 1345935 SH | SOLE | 1345935 | 0 | 0 |
| D | LCA-VISION INC | PUT | 501803958 | 2471 | 600 SH PUT | SOLE | 600 | 0 | 0 |
| D | LEADIS TECHNOLOGY INC | STOCK | 52171N103 | 4555 | 1138820 SH | SOLE | 1138820 | 0 | 0 |
| D | LEAP WIRELESS INTL INC | PUT | 521863958 | 3959 | 600 SH PUT | SOLE | 600 | 0 | 0 |
| D | LEHMAN BROS HLDGS INC | PUT | 524908950 | 5606 | 800 SH PUT | SOLE | 800 | 0 | 0 |
| D | LEVEL 3 COMMUNICATIONS INC | STOCK | 52729N100 | 19380 | 3176989 SH | SOLE | 3176989 | 0 | 0 |
| D | LEXMARK INTL NEW | STOCK | 529771107 | 1398 | 23920 SH | SOLE | 23920 | 0 | 0 |
| D | LIBERTY GLOBAL INC | STOCK | 530555101 | 659 | 20000 SH | SOLE | 20000 | 0 | 0 |
| D | LIBERTY MEDIA HLDG CORP | STOCK | 53071M104 | 1429 | 60000 SH | SOLE | 60000 | 0 | 0 |
| D | LIFE TIME FITNESS INC | STOCK | 53217R207 | 809 | 15727 SH | SOLE | 15727 | 0 | 0 |
| D | LIFECELL CORP | PUT | 531927951 | 4994 | 2000 SH PUT | SOLE | 2000 | 0 | 0 |
| D | LIFEWAY FOODS INC | STOCK | 531914109 | 270 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | LIMITED BRANDS INC | STOCK | 532716107 | 15920 | 610900 SH | SOLE | 610900 | 0 | 0 |
| D | LIMITED BRANDS INC | CALL | 532716907 | 3127 | 1200 SH CALL | SOLE | 1200 | 0 | 0 |
| D | LINCOLN NATL CORP IND | STOCK | 534187109 | 2034 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | LINEAR TECHNOLOGY CORP | CALL | 535678906 | 3535 | 1119 SH CALL | SOLE | 1119 | 0 | 0 |
| D | LINEAR TECHNOLOGY CORP | PUT | 535678956 | 3159 | 1000 SH PUT | SOLE | 1000 | 0 | 0 |
| D | LITHIA MTRS INC | STOCK | 53679T103 | 1129 | 41200 SH | SOLE | 41200 | 0 | 0 |
| D | LIZ CLAIBORNE INC | STOCK | 539320101 | 2670 | 62322 SH | SOLE | 62322 | 0 | 0 |
| D | LOEWS CORP | STOCK | 540424207 | 2091 | 27656 SH | SOLE | 27656 | 0 | 0 |
| D | LOGITECH INTL S A | CALL | H50430902 | 2783 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | LONGS DRUG STORES CORP | PUT | 543162951 | 4648 | 900 SH PUT | SOLE | 900 | 0 | 0 |

1/3/2011

DX-1006-00009
GOV-00004905

| D | LOWES COS INC | STOCK | 548661107 | 5467 | 173600 SH | SOLE | 173600 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|
| D | LSI LOGIC CORP | STOCK | 502161102 | 2950 | 282530 SH | SOLE | 282530 | 0 | 0 |
| D | LTX CORP | STOCK | 502392103 | 840 | 137200 SH | SOLE | 137200 | 0 | 0 |
| D | LUFKIN INDS INC | STOCK | 549764108 | 2994 | 53297 SH | SOLE | 53297 | 0 | 0 |
| D | LYONDELL CHEMICAL CO | PUT | 552078957 | 1499 | 500 SH PUT | SOLE | 500 | 0 | 0 |
| D | MACERICH CO | STOCK | 554382201 | 332 | 3600 SH | SOLE | 3600 | 0 | 0 |
| D | MACK CALI RLTY CORP | STOCK | 554489104 | 257 | 5400 SH | SOLE | 5400 | 0 | 0 |
| D | MAGAL SECURITY SYS LTD | STOCK | 867860104 | 3550 | 322422 SH | SOLE | 322422 | 0 | 0 |
| D | MAGNA ENTMT CORP | STOCK | 559211107 | 159 | 43700 SH | SOLE | 43700 | 0 | 0 |
| D | MAGNA INTL INC | STOCK | 559222401 | 3380 | 45000 SH | SOLE | 45000 | 0 | 0 |
| D | MAJESCO ENTERTAINMENT CO | STOCK | 560690208 | 216 | 144110 SH | SOLE | 144110 | 0 | 0 |
| D | MANHATTAN ASSOCS INC | PUT | 562750959 | 3807 | 1388 SH PUT | SOLE | 1388 | 0 | 0 |
| D | MANNATECH INC | STOCK | 563771104 | 241 | 15000 SH | SOLE | 15000 | 0 | 0 |
| D | MARATHON OIL CORP | CALL | 565849906 | 5930 | 600 SH CALL | SOLE | 600 | 0 | 0 |
| D | MARCHEX INC | STOCK | 56624R108 | 1061 | 69251 SH | SOLE | 69251 | 0 | 0 |
| D | MARSH & MCLENNAN COS INC | STOCK | 571748102 | 879 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | MARSH & MCLENNAN COS INC | PUT | 571748952 | 1757 | 600 SH PUT | SOLE | 600 | 0 | 0 |
| D | MARVELL TECHNOLOGY GROUP LTD | PUT | G5876H955 | 6724 | 4000 SH PUT | SOLE | 4000 | 0 | 0 |
| D | MARVELL TECHNOLOGY GROUP LTD | CALL | G5876H905 | 30203 | 17967 SH CALL | SOLE | 17967 | 0 | 0 |
| D | MARVELL TECHNOLOGY GROUP LTD | STOCK | G5876H105 | 39250 | 2334895 SH | SOLE | 2334895 | 0 | 0 |
| D | MASSEY ENERGY CORP | STOCK | 576206106 | 2399 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | MASSEY ENERGY CORP | CALL | 576206906 | 2879 | 1200 SH CALL | SOLE | 1200 | 0 | 0 |
| D | MASTEC INC | STOCK | 576323109 | 2202 | 200000 SH | SOLE | 200000 | 0 | 0 |
| D | MASTERCARD INC | PUT | 57636Q954 | 4250 | 400 SH PUT | SOLE | 400 | 0 | 0 |
| D | MASTERCARD INC | STOCK | 57636Q104 | 3187 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | MATTSON TECHNOLOGY INC | STOCK | 577223100 | 911 | 100100 SH | SOLE | 100100 | 0 | 0 |
| D | MAXIM INTEGRATED PRODS INC | STOCK | 57772K101 | 60311 | 2051392 SH | SOLE | 2051392 | 0 | 0 |
| D | MAXIM INTEGRATED PRODS INC | CALL | 57772K901 | 11451 | 3895 SH CALL | SOLE | 3895 | 0 | 0 |
| D | MBIA INC | STOCK | 55262C100 | 3929 | 60000 SH | SOLE | 60000 | 0 | 0 |
| D | MBIA INC | PUT | 55262C950 | 3275 | 500 SH PUT | SOLE | 500 | 0 | 0 |
| D | MCAFEE INC | PUT | 579064956 | 814 | 280 SH PUT | SOLE | 280 | 0 | 0 |
| D | MCDERMOTT INTL INC | STOCK | 580037109 | 16408 | 335000 SH | SOLE | 335000 | 0 | 0 |
| D | MCDONALDS CORP | STOCK | 580135101 | 2929 | 65009 SH | SOLE | 65009 | 0 | 0 |
| D | MCF CORP | STOCK | 580395309 | 81 | 18316 SH | SOLE | 18316 | 0 | 0 |
| D | MDS INC | STOCK | 55269F302 | 12564 | 664400 SH | SOLE | 664400 | 0 | 0 |
| D | MEDAREX INC | CALL | 583916901 | 8670 | 6700 SH CALL | SOLE | 6700 | 0 | 0 |
| D | MEDCO HEALTH SOLUTIONS INC | PUT | 58405U952 | 5077 | 700 SH PUT | SOLE | 700 | 0 | 0 |
| D | MEDIMMUNE INC | STOCK | 584699102 | 943 | 25905 SH | SOLE | 25905 | 0 | 0 |
| D | MEDIMMUNE INC | CALL | 584699902 | 25582 | 7030 SH CALL | SOLE | 7030 | 0 | 0 |
| D | MEDIMMUNE INC | PUT | 584699952 | 728 | 200 SH PUT | SOLE | 200 | 0 | 0 |
| D | MEDIS TECHNOLOGIES LTD | CALL | 58500P907 | 2156 | 1275 SH CALL | SOLE | 1275 | 0 | 0 |
| D | MEDTRONIC INC | STOCK | 585055106 | 240 | 4900 SH | SOLE | 4900 | 0 | 0 |
| D | MELCO PBL ENTMNT LTD | STOCK | 585464100 | 404 | 25000 SH | SOLE | 25000 | 0 | 0 |
| D | MELLANOX TECHNOLOGIES LTD | STOCK | M51363113 | 7602 | 520695 SH | SOLE | 520695 | 0 | 0 |
| D | MELLON FINL CORP | STOCK | 58551A108 | 6471 | 150000 SH | SOLE | 150000 | 0 | 0 |
| D | MELLON FINL CORP | CALL | 58551A908 | 4314 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | MEMC ELECTR MATLS INC | STOCK | 552715104 | 3629 | 59900 SH | SOLE | 59900 | 0 | 0 |
| D | MEMC ELECTR MATLS INC | PUT | 552715954 | 4846 | 800 SH PUT | SOLE | 800 | 0 | 0 |
| D | MEMORY PHARMACEUTICALS CORP | STOCK | 58606R603 | 504 | 300000 SH | SOLE | 300000 | 0 | 0 |
| D | MERCK & CO INC | STOCK | 589331107 | 7958 | 180175 SH | SOLE | 180175 | 0 | 0 |
| D | MERCK & CO INC | CALL | 589331907 | 3313 | 750 SH CALL | SOLE | 750 | 0 | 0 |
| D | MERIX CORP | STOCK | 59004R102 | 206 | 25000 SH | SOLE | 25000 | 0 | 0 |
| D | MERRILL LYNCH & CO INC | STOCK | 590188108 | 9131 | 111800 SH | SOLE | 111800 | 0 | 0 |
| D | METABOLIX INC | STOCK | 591018809 | 6726 | 404465 SH | SOLE | 404465 | 0 | 0 |
| D | METALLINE MINING INC | STOCK | 591257100 | 228 | 83738 SH | SOLE | 83738 | 0 | 0 |
| D | METLIFE INC | STOCK | 59156R108 | 12744 | 201800 SH | SOLE | 201800 | 0 | 0 |
| D | MGI PHARMA INC | CALL | 552880906 | 5842 | 2600 SH CALL | SOLE | 2600 | 0 | 0 |
| D | MGIC INVT CORP WIS | CALL | 552848903 | 2946 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | MGIC INVT CORP WIS | STOCK | 552848103 | 3535 | 60000 SH | SOLE | 60000 | 0 | 0 |
| D | MICREL INC | STOCK | 594793101 | 10849 | 984512 SH | SOLE | 984512 | 0 | 0 |
| D | MICROCHIP TECHNOLOGY INC | PUT | 595017954 | 7106 | 2000 SH PUT | SOLE | 2000 | 0 | 0 |
| D | MICRON TECHNOLOGY INC | CALL | 595112903 | 906 | 750 SH CALL | SOLE | 750 | 0 | 0 |
| D | MICRON TECHNOLOGY INC | STOCK | 595112103 | 8265 | 684212 SH | SOLE | 684212 | 0 | 0 |
| D | MICROS SYS INC | STOCK | 594901100 | 2010 | 37225 SH | SOLE | 37225 | 0 | 0 |
| D | MICROSEMI CORP | STOCK | 595137100 | 12289 | 590552 SH | SOLE | 590552 | 0 | 0 |
| D | MICROSEMI CORP | CALL | 595137900 | 8376 | 4025 SH CALL | SOLE | 4025 | 0 | 0 |
| D | MICROSOFT CORP | STOCK | 594918104 | 29495 | 1058304 SH | SOLE | 1058304 | 0 | 0 |
| D | MICROSTRATEGY INC | PUT | 594972958 | 4019 | 318 SH PUT | SOLE | 318 | 0 | 0 |
| D | MICROTUNE INC DEL | STOCK | 59514P109 | 1367 | 331800 SH | SOLE | 331800 | 0 | 0 |
| D | MIDCAP SPDR TR | PUT | 595635953 | 98152 | 6350 SH PUT | SOLE | 6350 | 0 | 0 |
| D | MILLENNIUM PHARMACEUTICALS I | PUT | 599902953 | 5029 | 4427 SH PUT | SOLE | 4427 | 0 | 0 |
| D | MIPS TECHNOLOGIES INC | STOCK | 604567107 | 359 | 40200 SH | SOLE | 40200 | 0 | 0 |
| D | MIRANT CORP NEW | STOCK | 60467R100 | 1618 | 40000 SH | SOLE | 40000 | 0 | 0 |
| D | MIVA INC | STOCK | 55311R108 | 423 | 110100 SH | SOLE | 110100 | 0 | 0 |
| D | MOHAWK INDS INC | STOCK | 608190104 | 205 | 2500 SH | SOLE | 2500 | 0 | 0 |
| D | MOMENTA PHARMACEUTICALS INC | PUT | 60877T950 | 10886 | 8400 SH PUT | SOLE | 8400 | 0 | 0 |
| D | MOMENTA PHARMACEUTICALS INC | CALL | 60877T900 | 1296 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | MONOLITHIC PWR SYS INC | STOCK | 609839105 | 1747 | 135450 SH | SOLE | 135450 | 0 | 0 |
| D | MONSANTO CO NEW | CALL | 61166W901 | 1649 | 300 SH CALL | SOLE | 300 | 0 | 0 |
| D | MONSANTO CO NEW | STOCK | 61166W101 | 3979 | 72400 SH | SOLE | 72400 | 0 | 0 |
| D | MONSTER WORLDWIDE INC | STOCK | 611742107 | 3212 | 67800 SH | SOLE | 67800 | 0 | 0 |
| D | MONSTER WORLDWIDE INC | CALL | 611742907 | 4737 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | MORGAN STANLEY | CALL | 617446908 | 11814 | 1500 SH CALL | SOLE | 1500 | 0 | 0 |
| D | MORGAN STANLEY | STOCK | 617446448 | 17327 | 220000 SH | SOLE | 220000 | 0 | 0 |
| D | MOSAIC CO | CALL | 61945A907 | 1333 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | MOTOROLA INC | STOCK | 620076909 | 18200 | 10300 SH CALL | SOLE | 10300 | 0 | 0 |
| D | MOTOROLA INC | PUT | 620076959 | 8816 | 4989 SH PUT | SOLE | 4989 | 0 | 0 |
| D | MSC SOFTWARE CORP | STOCK | 553531104 | 212 | 15401 SH | SOLE | 15401 | 0 | 0 |
| D | MUELLER WTR PRODS INC | CALL | 624758908 | 2072 | 1500 SH CALL | SOLE | 1500 | 0 | 0 |
| D | MUELLER WTR PRODS INC | STOCK | 624758108 | 1933 | 140000 SH | SOLE | 140000 | 0 | 0 |
| D | MULTI FINELINE ELECTRONIX IN | STOCK | 62541B101 | 7511 | 489303 SH | SOLE | 489303 | 0 | 0 |
| D | MULTI FINELINE ELECTRONIX IN | CALL | 62541B901 | 3838 | 2500 SH CALL | SOLE | 2500 | 0 | 0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| D | MULTIMEDIA GAMES INC | STOCK | 625453105 | 1428 | 120000 | SH | | SOLE | 120000 | 0 | 0 |
| D | MYERS INDS INC | STOCK | 628464109 | 747 | 40000 | SH | | SOLE | 40000 | 0 | 0 |
| D | MYLAN LABS INC | CALL | 628530907 | 29133 | 13781 | SH CALL | | SOLE | 13781 | 0 | 0 |
| D | MYLAN LABS INC | STOCK | 628530107 | 12870 | 608800 | SH | | SOLE | 608800 | 0 | 0 |
| D | NABORS INDUSTRIES LTD | CALL | G6359F903 | 4650 | 1500 | SH CALL | | SOLE | 1500 | 0 | 0 |
| D | NAPCO SEC SYS INC | STOCK | 630402105 | 5305 | 1001027 | SH | | SOLE | 1001027 | 0 | 0 |
| D | NAPSTER INC | STOCK | 630797108 | 580 | 140000 | SH | | SOLE | 140000 | 0 | 0 |
| D | NASDAQ STOCK MARKET INC | STOCK | 631103108 | 5296 | 180000 | SH | | SOLE | 180000 | 0 | 0 |
| D | NATCO GROUP INC | STOCK | 63227W203 | 1365 | 40000 | SH | | SOLE | 40000 | 0 | 0 |
| D | NATIONAL CINEMEDIA INC | STOCK | 635309107 | 590 | 22100 | SH | | SOLE | 22100 | 0 | 0 |
| D | NATIONAL SEMICONDUCTOR CORP | STOCK | 637640103 | 43042 | 1782998 | SH | | SOLE | 1782998 | 0 | 0 |
| D | NATIONAL SEMICONDUCTOR CORP | CALL | 637640903 | 3621 | 1500 | SH CALL | | SOLE | 1500 | 0 | 0 |
| D | NATIONSHEALTH INC | STOCK | 63860C100 | 1664 | 1116676 | SH | | SOLE | 1116676 | 0 | 0 |
| D | NAVTEQ CORP | STOCK | 63936L100 | 348 | 10100 | SH | | SOLE | 10100 | 0 | 0 |
| D | NCR CORP NEW | STOCK | 62886E108 | 2833 | 59300 | SH | | SOLE | 59300 | 0 | 0 |
| D | NESS TECHNOLOGIES INC | STOCK | 64104X108 | 22683 | 1774885 | SH | | SOLE | 1774885 | 0 | 0 |
| D | NET 1 UEPS TECHNOLOGIES INC | STOCK | 64107N206 | 17881 | 718682 | SH | | SOLE | 718682 | 0 | 0 |
| D | NET SERVICOS DE COMUNICACAO | STOCK | 64109T201 | 870 | 64360 | SH | | SOLE | 64360 | 0 | 0 |
| D | NETLOGIC MICROSYSTEMS INC | PUT | 64118B950 | 9317 | 3500 | SH PUT | | SOLE | 3500 | 0 | 0 |
| D | NETWORK APPLIANCE INC | STOCK | 64120L104 | 1132 | 31003 | SH | | SOLE | 31003 | 0 | 0 |
| D | NETWORK APPLIANCE INC | PUT | 64120L954 | 5478 | 1500 | SH PUT | | SOLE | 1500 | 0 | 0 |
| D | NEVSUN RES LTD | STOCK | 64156L101 | 630 | 300000 | SH | | SOLE | 300000 | 0 | 0 |
| D | NEW JERSEY RES | STOCK | 646025106 | 5711 | 114100 | SH | | SOLE | 114100 | 0 | 0 |
| D | NEW ORIENTAL ED & TECH GRP I | STOCK | 647581107 | 942 | 23250 | SH | | SOLE | 23250 | 0 | 0 |
| D | NEWMONT MINING CORP | CALL | 651639906 | 4829 | 1150 | SH CALL | | SOLE | 1150 | 0 | 0 |
| D | NEWSTAR FINANCIAL INC | STOCK | 65251F105 | 3000 | 179000 | SH | | SOLE | 179000 | 0 | 0 |
| D | NEWTEK BUSINESS SVCS INC | STOCK | 652526104 | 374 | 184069 | SH | | SOLE | 184069 | 0 | 0 |
| D | NEXTEST SYS CORP | STOCK | 65333P101 | 420 | 30000 | SH | | SOLE | 30000 | 0 | 0 |
| D | NII HLDGS INC | STOCK | 62913F201 | 13921 | 187664 | SH | | SOLE | 187664 | 0 | 0 |
| D | NIPPON TELEG & TEL CORP | STOCK | 654624105 | 1585 | 60000 | SH | | SOLE | 60000 | 0 | 0 |
| D | NOBLE ENERGY INC | STOCK | 655044105 | 5369 | 90000 | SH | | SOLE | 90000 | 0 | 0 |
| D | NOKIA CORP | PUT | 654902954 | 5730 | 2500 | SH PUT | | SOLE | 2500 | 0 | 0 |
| D | NORDSTROM INC | STOCK | 655664100 | 13860 | 261814 | SH | | SOLE | 261814 | 0 | 0 |
| D | NORDSTROM INC | PUT | 655664950 | 3971 | 750 | SH PUT | | SOLE | 750 | 0 | 0 |
| D | NORTHSTAR NEUROSCIENCE INC | STOCK | 66704V101 | 982 | 76714 | SH | | SOLE | 76714 | 0 | 0 |
| D | NOVARTIS A G | STOCK | 66987V109 | 3070 | 56200 | SH | | SOLE | 56200 | 0 | 0 |
| D | NOVARTIS A G | CALL | 66987V909 | 2732 | 500 | SH CALL | | SOLE | 500 | 0 | 0 |
| D | NOVAVAX INC | STOCK | 670002104 | 251 | 96819 | SH | | SOLE | 96819 | 0 | 0 |
| D | NOVELLUS SYS INC | PUT | 670008951 | 33547 | 10477 | SH PUT | | SOLE | 10477 | 0 | 0 |
| D | NRG ENERGY INC | STOCK | 629377508 | 3640 | 50100 | SH | | SOLE | 50100 | 0 | 0 |
| D | NSTAR | STOCK | 67019E107 | 3533 | 100600 | SH | | SOLE | 100600 | 0 | 0 |
| D | NUCOR CORP | PUT | 670346955 | 21584 | 3314 | SH PUT | | SOLE | 3314 | 0 | 0 |
| D | NUTRI SYS INC NEW | CALL | 67069D908 | 5765 | 1100 | SH CALL | | SOLE | 1100 | 0 | 0 |
| D | NUTRI SYS INC NEW | STOCK | 67069D108 | 23945 | 456887 | SH | | SOLE | 456887 | 0 | 0 |
| D | NVIDIA CORP | STOCK | 67066G104 | 32868 | 1142026 | SH | | SOLE | 1142026 | 0 | 0 |
| D | NVIDIA CORP | CALL | 67066G904 | 11512 | 4000 | SH CALL | | SOLE | 4000 | 0 | 0 |
| D | NYMEX HOLDINGS INC | STOCK | 62948N104 | 13630 | 100400 | SH | | SOLE | 100400 | 0 | 0 |
| D | NYMEX HOLDINGS INC | CALL | 62948N904 | 5430 | 400 | SH CALL | | SOLE | 400 | 0 | 0 |
| D | O REILLY AUTOMOTIVE INC | STOCK | 68609I109 | 2317 | 70000 | SH | | SOLE | 70000 | 0 | 0 |
| D | OCCIDENTAL PETE CORP DEL | STOCK | 674599105 | 1233 | 25000 | SH | | SOLE | 25000 | 0 | 0 |
| D | OCCIDENTAL PETE CORP DEL | PUT | 674599955 | 1479 | 300 | SH PUT | | SOLE | 300 | 0 | 0 |
| D | ODYSSEY MARINE EXPLORATION I | STOCK | 676118102 | 2186 | 600520 | SH | | SOLE | 600520 | 0 | 0 |
| D | OFFICE DEPOT INC | STOCK | 676220106 | 7319 | 208272 | SH | | SOLE | 208272 | 0 | 0 |
| D | OFFICE DEPOT INC | CALL | 676220906 | 1757 | 500 | SH CALL | | SOLE | 500 | 0 | 0 |
| D | OGE ENERGY CORP | STOCK | 670837103 | 7760 | 200000 | SH | | SOLE | 200000 | 0 | 0 |
| D | OIL SVC HOLDRS TR | PUT | 678002956 | 29873 | 2050 | SH PUT | | SOLE | 2050 | 0 | 0 |
| D | OLD DOMINION FGHT LINES INC | STOCK | 679580100 | 9667 | 335534 | SH | | SOLE | 335534 | 0 | 0 |
| D | OLD REP INTL CORP | STOCK | 680223104 | 1327 | 60000 | SH | | SOLE | 60000 | 0 | 0 |
| D | OM GROUP INC | STOCK | 670872100 | 1117 | 25000 | SH | | SOLE | 25000 | 0 | 0 |
| D | OMNIVISION TECHNOLOGIES INC | STOCK | 682128103 | 3104 | 239511 | SH | | SOLE | 239511 | 0 | 0 |
| D | ON SEMICONDUCTOR CORP | STOCK | 682189105 | 2072 | 232237 | SH | | SOLE | 232237 | 0 | 0 |
| D | ONEBEACON INSURANCE GROUP LT | STOCK | G6774Z109 | 1993 | 79700 | SH | | SOLE | 79700 | 0 | 0 |
| D | ONYX PHARMACEUTICALS INC | CALL | 68339B909 | 3478 | 1400 | SH CALL | | SOLE | 1400 | 0 | 0 |
| D | OPEN TEXT CORP | STOCK | 683715106 | 901 | 41042 | SH | | SOLE | 41042 | 0 | 0 |
| D | OPENTV CORP | STOCK | 68754J101 | 392 | 160000 | SH | | SOLE | 160000 | 0 | 0 |
| D | OPENWAVE SYS INC | STOCK | 683718308 | 8315 | 1020241 | SH | | SOLE | 1020241 | 0 | 0 |
| D | OPLINK COMMUNICATIONS INC | STOCK | 68375Q403 | 4067 | 226300 | SH | | SOLE | 226300 | 0 | 0 |
| D | OPSWARE INC | CALL | 68383A901 | 3625 | 5000 | SH CALL | | SOLE | 5000 | 0 | 0 |
| D | OPSWARE INC | STOCK | 68383A101 | 10602 | 1462356 | SH | | SOLE | 1462356 | 0 | 0 |
| D | OPTICAL COMMUNICATION PRODS | STOCK | 68382T101 | 650 | 485326 | SH | | SOLE | 485326 | 0 | 0 |
| D | OPTIMAL GROUP INC | STOCK | 68388R208 | 4536 | 540700 | SH | | SOLE | 540700 | 0 | 0 |
| D | ORACLE CORP | CALL | 68389X905 | 1813 | 1000 | SH CALL | | SOLE | 1000 | 0 | 0 |
| D | ORACLE CORP | STOCK | 68389X105 | 5840 | 305545 | SH | | SOLE | 305545 | 0 | 0 |
| D | ORCKIT COMMUNICATIONS LTD | STOCK | M7531&206 | 580 | 56900 | SH | | SOLE | 56900 | 0 | 0 |
| D | ORIGIN AGRITECH LIMITED | STOCK | 667828106 | 6586 | 739980 | SH | | SOLE | 739980 | 0 | 0 |
| D | OSHKOSH TRUCK CORP | STOCK | 688239201 | 9805 | 185000 | SH | | SOLE | 185000 | 0 | 0 |
| D | OSI PHARMACEUTICALS INC | CALL | 671040903 | 3300 | 1000 | SH CALL | | SOLE | 1000 | 0 | 0 |
| D | OSI PHARMACEUTICALS INC | STOCK | 671040103 | 6864 | 207990 | SH | | SOLE | 207990 | 0 | 0 |
| D | OSI SYSTEMS INC | STOCK | 671044105 | 2060 | 77917 | SH | | SOLE | 77917 | 0 | 0 |
| D | OVERLAND STORAGE INC | STOCK | 690310107 | 1868 | 451150 | SH | | SOLE | 451150 | 0 | 0 |
| D | P F CHANGS CHINA BISTRO INC | PUT | 69333Y958 | 3769 | 900 | SH PUT | | SOLE | 900 | 0 | 0 |
| D | PACCAR INC | PUT | 693718958 | 3670 | 500 | SH PUT | | SOLE | 500 | 0 | 0 |
| D | PACER INTL INC TENN | STOCK | 69371H106 | 5782 | 214622 | SH | | SOLE | 214622 | 0 | 0 |
| D | PACIFIC SUNWEAR CALIF INC | STOCK | 694873100 | 1535 | 73700 | SH | | SOLE | 73700 | 0 | 0 |
| D | PACKETEER INC | STOCK | 695210104 | 2575 | 207293 | SH | | SOLE | 207293 | 0 | 0 |
| D | PACTIV CORP | STOCK | 695257105 | 2699 | 80000 | SH | | SOLE | 80000 | 0 | 0 |
| D | PALM INC NEW | CALL | 696643905 | 363 | 200 | SH CALL | | SOLE | 200 | 0 | 0 |
| D | PALM INC NEW | STOCK | 696643105 | 74072 | 4085594 | SH | | SOLE | 4085594 | 0 | 0 |
| D | PANTRY INC | STOCK | 698657103 | 10289 | 227533 | SH | | SOLE | 227533 | 0 | 0 |
| D | PAR PHARMACEUTICAL COS INC | CALL | 69888P906 | 7915 | 3151 | SH CALL | | SOLE | 3151 | 0 | 0 |
| D | PARALLEL PETE CORP DEL | STOCK | 699157103 | 1148 | 50000 | SH | | SOLE | 50000 | 0 | 0 |
| D | PATNI COMPUTER SYS | STOCK | 703248203 | 1845 | 80000 | SH | | SOLE | 80000 | 0 | 0 |

DX-1006-00011

GOV-00004907

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| D | PDL BIOPHARMA INC | CALL | 69329y904 | 7595 | 3500 SH CALL | SOLE | 3500 | 0 | 0 |
| D | PEABODY ENERGY CORP | STOCK | 704549104 | 378 | 9400 SH | SOLE | 9400 | 0 | 0 |
| D | PEGASYSTEMS INC | STOCK | 705573103 | 333 | 36000 SH | SOLE | 36000 | 0 | 0 |
| D | PENNEY J C INC | PUT | 708160956 | 12817 | 1560 SH PUT | SOLE | 1560 | 0 | 0 |
| D | PENWEST PHARMACEUTICALS CO | CALL | 709754905 | 20823 | 20658 SH CALL | SOLE | 20658 | 0 | 0 |
| D | PENWEST PHARMACEUTICALS CO | STOCK | 709754105 | 25148 | 2494883 SH | SOLE | 2494883 | 0 | 0 |
| D | PEOPLESUPPORT INC | STOCK | 712714302 | 303 | 26500 SH | SOLE | 26500 | 0 | 0 |
| D | PEPSICO INC | STOCK | 713448108 | 11590 | 182350 SH | SOLE | 182350 | 0 | 0 |
| D | PERFORMANCE FOOD GROUP CO | STOCK | 713755106 | 620 | 20100 SH | SOLE | 20100 | 0 | 0 |
| D | PERRIGO CO | STOCK | 714290103 | 3011 | 170494 SH | SOLE | 170494 | 0 | 0 |
| D | PERU COPPER INC | STOCK | 715455101 | 616 | 150000 SH | SOLE | 150000 | 0 | 0 |
| D | PETROLEO BRASILEIRO SA PETRO | CALL | 71654V901 | 7463 | 750 SH CALL | SOLE | 750 | 0 | 0 |
| D | PETROLEO BRASILEIRO SA PETRO | STOCK | 71654V408 | 1791 | 18000 SH | SOLE | 18000 | 0 | 0 |
| D | PFIZER INC | STOCK | 717081103 | 402 | 15900 SH | SOLE | 15900 | 0 | 0 |
| D | PFSWEB INC | STOCK | 717098107 | 103 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | PHASE FORWARD INC | STOCK | 71721R406 | 1970 | 150000 SH | SOLE | 150000 | 0 | 0 |
| D | PHOTON DYNAMICS INC | CALL | 719364901 | 3153 | 2500 SH CALL | SOLE | 2500 | 0 | 0 |
| D | PHOTON DYNAMICS INC | STOCK | 719364101 | 8562 | 678963 SH | SOLE | 678963 | 0 | 0 |
| D | PHOTRONICS INC | STOCK | 719405102 | 700 | 44992 SH | SOLE | 44992 | 0 | 0 |
| D | PIER 1 IMPORTS INC | STOCK | 720279108 | 5703 | 825300 SH | SOLE | 825300 | 0 | 0 |
| D | PILGRIMS PRIDE CORP | STOCK | 721467108 | 1825 | 55000 SH | SOLE | 55000 | 0 | 0 |
| D | PIONEER NAT RES CO | STOCK | 723787107 | 431 | 10000 SH | SOLE | 10000 | 0 | 0 |
| D | PIXELWORKS INC | STOCK | 72581M107 | 565 | 342498 SH | SOLE | 342498 | 0 | 0 |
| D | PLAINS EXPL& PRODTN CO | STOCK | 726505100 | 3390 | 75100 SH | SOLE | 75100 | 0 | 0 |
| D | PLAYBOY ENTERPRISES INC | STOCK | 728117300 | 1027 | 99800 SH | SOLE | 99800 | 0 | 0 |
| D | PLAYTEX PRODS INC | STOCK | 72813P100 | 407 | 30000 SH | SOLE | 30000 | 0 | 0 |
| D | PLEXUS CORP | STOCK | 729132100 | 5574 | 325043 SH | SOLE | 325043 | 0 | 0 |
| D | PLEXUS CORP | CALL | 729132901 | 1715 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | PLX TECHNOLOGY INC | STOCK | 693417107 | 6702 | 688118 SH | SOLE | 688118 | 0 | 0 |
| D | PMC-SIERRA INC | STOCK | 69344F106 | 19577 | 2792692 SH | SOLE | 2792692 | 0 | 0 |
| D | POLO RALPH LAUREN CORP | PUT | 731572953 | 5289 | 600 SH PUT | SOLE | 600 | 0 | 0 |
| D | POLYCOM INC | PUT | 73172K954 | 6666 | 2000 SH PUT | SOLE | 2000 | 0 | 0 |
| D | PORTFOLIO RECOVERY ASSOCS IN | PUT | 73640Q955 | 2679 | 600 SH PUT | SOLE | 600 | 0 | 0 |
| D | POWERSHARES ETF TRUST | STOCK | 73935X500 | 9447 | 500093 SH | SOLE | 500093 | 0 | 0 |
| D | POWERWAVE TECHNOLOGIES INC | STOCK | 739363109 | 10492 | 1843880 SH | SOLE | 1843880 | 0 | 0 |
| D | POZEN INC | STOCK | 73941U102 | 1475 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | PPL CORP | STOCK | 69351T106 | 8998 | 220000 SH | SOLE | 220000 | 0 | 0 |
| D | PRICE T ROWE GROUP INC | STOCK | 74144T108 | 1449 | 30700 SH | SOLE | 30700 | 0 | 0 |
| D | PRIDE INTL INC DEL | CALL | 74153Q902 | 903 | 300 SH CALL | SOLE | 300 | 0 | 0 |
| D | PRIDE INTL INC DEL | STOCK | 74153Q102 | 6493 | 215702 SH | SOLE | 215702 | 0 | 0 |
| D | PRIDE INTL INC DEL | PUT | 74153Q952 | 2077 | 690 SH PUT | SOLE | 690 | 0 | 0 |
| D | PRINCIPAL FINANCIAL GROUP IN | STOCK | 74251V102 | 275 | 4600 SH | SOLE | 4600 | 0 | 0 |
| D | PROCTER & GAMBLE CO | STOCK | 742718109 | 3131 | 49579 SH | SOLE | 49579 | 0 | 0 |
| D | PROGRESSIVE GAMING INTL CORP | STOCK | 743328102 | 2289 | 508432 SH | SOLE | 508432 | 0 | 0 |
| D | PROSHARES TR | STOCK | 74347B883 | 440 | 7550 SH | SOLE | 7550 | 0 | 0 |
| D | PUBLIC SVC ENTERPRISE GROUP | STOCK | 744573106 | 10380 | 125000 SH | SOLE | 125000 | 0 | 0 |
| D | PULTE HOMES INC | STOCK | 745867101 | 6086 | 230000 SH | SOLE | 230000 | 0 | 0 |
| D | QIMONDA AG | STOCK | 746904101 | 1037 | 72200 SH | SOLE | 72200 | 0 | 0 |
| D | QLOGIC CORP | STOCK | 74727T101 | 5798 | 341078 SH | SOLE | 341078 | 0 | 0 |
| D | QUALCOMM INC | PUT | 747525953 | 36065 | 8454 SH PUT | SOLE | 8454 | 0 | 0 |
| D | QUALCOMM INC | CALL | 747525903 | 7146 | 1675 SH CALL | SOLE | 1675 | 0 | 0 |
| D | QUALCOMM INC | STOCK | 747525103 | 20394 | 478052 SH | SOLE | 478052 | 0 | 0 |
| D | QUANTA SVCS INC | STOCK | 74762E102 | 3153 | 125000 SH | SOLE | 125000 | 0 | 0 |
| D | QUANTUM CORP | STOCK | 747906204 | 236 | 87300 SH | SOLE | 87300 | 0 | 0 |
| D | QUEST SOFTWARE INC | STOCK | 74834T103 | 14205 | 873077 SH | SOLE | 873077 | 0 | 0 |
| D | QUESTAR CORP | STOCK | 748356102 | 5183 | 58100 SH | SOLE | 58100 | 0 | 0 |
| D | QUICKLOGIC CORP | STOCK | 74837P108 | 135 | 48296 SH | SOLE | 48296 | 0 | 0 |
| D | QUICKSILVER RESOURCES INC | STOCK | 74837R104 | 9549 | 240100 SH | SOLE | 240100 | 0 | 0 |
| D | QUIRSILVER INC | STOCK | 74838C106 | 469 | 40400 SH | SOLE | 40400 | 0 | 0 |
| D | RACKABLE SYS INC | STOCK | 750077909 | 2546 | 1500 SH CALL | SOLE | 1500 | 0 | 0 |
| D | RACKABLE SYS INC | PUT | 750077959 | 7669 | 4519 SH PUT | SOLE | 4519 | 0 | 0 |
| D | RACKABLE SYS INC | STOCK | 750077109 | 274 | 16168 SH | SOLE | 16168 | 0 | 0 |
| D | RADIO ONE INC | STOCK | 75040F405 | 8075 | 1250000 SH | SOLE | 1250000 | 0 | 0 |
| D | RADIO ONE INC | CALL | 75040F908 | 323 | 500 SH CALL | SOLE | 500 | 0 | 0 |
| D | RADISYS CORP | STOCK | 750459109 | 411 | 25150 SH | SOLE | 25150 | 0 | 0 |
| D | RAIT FINANCIAL TRUST | STOCK | 749227104 | 8383 | 300020 SH | SOLE | 300020 | 0 | 0 |
| D | RAMBUS INC DEL | STOCK | 750917106 | 12694 | 597388 SH | SOLE | 597388 | 0 | 0 |
| D | RAMBUS INC DEL | PUT | 750917956 | 3613 | 1700 SH PUT | SOLE | 1700 | 0 | 0 |
| D | RAMBUS INC DEL | CALL | 750917906 | 15387 | 7241 SH CALL | SOLE | 7241 | 0 | 0 |
| D | RANGE RES CORP | STOCK | 75281A109 | 2989 | 89500 SH | SOLE | 89500 | 0 | 0 |
| D | RAYONIER INC | STOCK | 754907103 | 3646 | 84800 SH | SOLE | 84800 | 0 | 0 |
| D | REALNETWORKS INC | STOCK | 75605L104 | 2669 | 340050 SH | SOLE | 340050 | 0 | 0 |
| D | RED HAT INC | CALL | 756577902 | 2293 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | REDDY ICE HLDGS INC | STOCK | 75734R105 | 453 | 15000 SH | SOLE | 15000 | 0 | 0 |
| D | REDIFF COM INDIA LTD | STOCK | 75747R100 | 467 | 28000 SH | SOLE | 28000 | 0 | 0 |
| D | REDWOOD TR INC | STOCK | 758075402 | 2087 | 40000 SH | SOLE | 40000 | 0 | 0 |
| D | REGAL ENTMT GROUP | STOCK | 758766109 | 1987 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | REGIONAL BK HOLDRS TR | PUT | 75902E950 | 11833 | 750 SH PUT | SOLE | 750 | 0 | 0 |
| D | RENT A CTR INC NEW | STOCK | 76009N100 | 9239 | 330200 SH | SOLE | 330200 | 0 | 0 |
| D | RESEARCH IN MOTION LTD | PUT | 760975952 | 12775 | 936 SH PUT | SOLE | 936 | 0 | 0 |
| D | RETAIL HOLDRS TR | PUT | 761270951 | 10105 | 1000 SH PUT | SOLE | 1000 | 0 | 0 |
| D | REUTERS GROUP PLC | STOCK | 76132M102 | 2214 | 40078 SH | SOLE | 40078 | 0 | 0 |
| D | RF MICRODEVICES INC | PUT | 749941950 | 3115 | 5000 SH PUT | SOLE | 5000 | 0 | 0 |
| D | RF MICRODEVICES INC | STOCK | 749941100 | 1869 | 300000 SH | SOLE | 300000 | 0 | 0 |
| D | RF MONOLITHICS INC | STOCK | 74955F106 | 537 | 105479 SH | SOLE | 105479 | 0 | 0 |
| D | RIGEL PHARMACEUTICALS INC | CALL | 766559903 | 1629 | 1500 SH CALL | SOLE | 1500 | 0 | 0 |
| D | RIO TINTO PLC | PUT | 767204950 | 10251 | 450 SH PUT | SOLE | 450 | 0 | 0 |
| D | RITE AID CORP | STOCK | 767754104 | 596 | 103300 SH | SOLE | 103300 | 0 | 0 |
| D | RIVERBED TECHNOLOGY INC | STOCK | 768573107 | 31675 | 1145993 SH | SOLE | 1145993 | 0 | 0 |
| D | ROCKWELL COLLINS INC | PUT | 774341951 | 2938 | 439 SH PUT | SOLE | 439 | 0 | 0 |
| D | ROCKWELL COLLINS INC | STOCK | 774341101 | 201 | 3000 SH | SOLE | 3000 | 0 | 0 |
| D | ROGERS COMMUNICATIONS INC | STOCK | 775109200 | 8059 | 246000 SH | SOLE | 246000 | 0 | 0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| D | ROGERS COMMUNICATIONS INC | CALL | 775109900 | 1966 | 600 SH CALL | SOLE | 600 | 0 | 0 |
| D | ROTECH HEALTHCARE INC | STOCK | 778669101 | 43 | 25000 SH | SOLE | 25000 | 0 | 0 |
| D | RYDER SYS INC | STOCK | 783549108 | 34539 | 700017 SH | SOLE | 700017 | 0 | 0 |
| D | RYDER SYS INC | CALL | 783549908 | 2260 | 458 SH CALL | SOLE | 458 | 0 | 0 |
| D | RYDER SYS INC | PUT | 783549958 | 2467 | 500 SH PUT | SOLE | 500 | 0 | 0 |
| D | RYLAND GROUP INC | STOCK | 783764103 | 1381 | 32737 SH | SOLE | 32737 | 0 | 0 |
| D | SAFEWAY INC | PUT | 786514958 | 1832 | 500 SH PUT | SOLE | 500 | 0 | 0 |
| D | SAIC INC | STOCK | 78390X101 | 5196 | 300000 SH | SOLE | 300000 | 0 | 0 |
| D | SAIFUN SEMICONDUCTORS LTD | STOCK | M82330102 | 2950 | 251100 SH | SOLE | 251100 | 0 | 0 |
| D | SALESFORCE COM INC | PUT | 79466L952 | 8564 | 2000 SH PUT | SOLE | 2000 | 0 | 0 |
| D | SALESFORCE COM INC | CALL | 79466L902 | 1070 | 250 SH CALL | SOLE | 250 | 0 | 0 |
| D | SALIX PHARMACEUTICALS INC | PUT | 795435956 | 1260 | 1000 SH PUT | SOLE | 1000 | 0 | 0 |
| D | SANDERSON FARMS INC | STOCK | 800013104 | 371 | 10000 SH | SOLE | 10000 | 0 | 0 |
| D | SANDISK CORP | PUT | 80004C951 | 2190 | 500 SH PUT | SOLE | 500 | 0 | 0 |
| D | SANDISK CORP | CALL | 80004C901 | 6079 | 1388 SH CALL | SOLE | 1388 | 0 | 0 |
| D | SANDISK CORP | STOCK | 80004C101 | 13841 | 316000 SH | SOLE | 316000 | 0 | 0 |
| D | SANOFI AVENTIS | PUT | 80105N955 | 8645 | 1987 SH PUT | SOLE | 1987 | 0 | 0 |
| D | SAP AKTIENGESELLSCHAFT | PUT | 803054954 | 45664 | 10227 SH PUT | SOLE | 10227 | 0 | 0 |
| D | SAPIENT CORP | STOCK | 803062108 | 5183 | 755577 SH | SOLE | 755577 | 0 | 0 |
| D | SATYAM COMPUTER SERVICES LTD | STOCK | 80409M101 | 5247 | 231150 SH | SOLE | 231150 | 0 | 0 |
| D | SBA COMMUNICATIONS CORP | STOCK | 78388J106 | 3542 | 119871 SH | SOLE | 119871 | 0 | 0 |
| D | SCHLUMBERGER LTD | STOCK | 806857108 | 493 | 7135 SH | SOLE | 7135 | 0 | 0 |
| D | SCHLUMBERGER LTD | PUT | 806857958 | 3455 | 500 SH PUT | SOLE | 500 | 0 | 0 |
| D | SCHWAB CHARLES CORP NEW | STOCK | 808513105 | 14647 | 800808 SH | SOLE | 800808 | 0 | 0 |
| D | SCHWEITZER-MAUDUIT INTL INC | STOCK | 808541106 | 249 | 10000 SH | SOLE | 10000 | 0 | 0 |
| D | SCIENTIFIC GAMES CORP | STOCK | 80874P109 | 5009 | 152586 SH | SOLE | 152586 | 0 | 0 |
| D | SCOTTISH RE GROUP LIMITED | STOCK | G73537410 | 118 | 29440 SH | SOLE | 29440 | 0 | 0 |
| D | SEAGATE TECHNOLOGY | STOCK | G7945J104 | 29057 | 1247100 SH | SOLE | 1247100 | 0 | 0 |
| D | SEAGATE TECHNOLOGY | CALL | G7945J904 | 15611 | 6700 SH CALL | SOLE | 6700 | 0 | 0 |
| D | SEATTLE GENETICS INC | STOCK | 812578102 | 313 | 38270 SH | SOLE | 38270 | 0 | 0 |
| D | SECURE COMPUTING CORP | STOCK | 813705100 | 1579 | 205100 SH | SOLE | 205100 | 0 | 0 |
| D | SELECT SECTOR SPDR TR | PUT | 81369Y950 | 2665 | 1000 SH PUT | SOLE | 1000 | 0 | 0 |
| D | SELECT SECTOR SPDR TR | PUT | 81369Y950 | 25920 | 4300 SH PUT | SOLE | 4300 | 0 | 0 |
| D | SELECT SECTOR SPDR TR | PUT | 81369Y950 | 14252 | 4000 SH PUT | SOLE | 4000 | 0 | 0 |
| D | SELECT SECTOR SPDR TR | PUT | 81369Y950 | 8162 | 3500 SH PUT | SOLE | 3500 | 0 | 0 |
| D | SELECT SECTOR SPDR TR | PUT | 81369Y950 | 40380 | 12000 SH PUT | SOLE | 12000 | 0 | 0 |
| D | SELECT SECTOR SPDR TR | PUT | 81369Y950 | 7606 | 2000 SH PUT | SOLE | 2000 | 0 | 0 |
| D | SELECTICA INC | STOCK | 816288104 | 135 | 69600 SH | SOLE | 69600 | 0 | 0 |
| D | SEMICONDUCTOR HLDRS TR | CALL | 816636903 | 21283 | 6374 SH CALL | SOLE | 6374 | 0 | 0 |
| D | SEMPRA ENERGY | STOCK | 816851109 | 6839 | 112100 SH | SOLE | 112100 | 0 | 0 |
| D | SEMTECH CORP | STOCK | 816850101 | 16718 | 1240238 SH | SOLE | 1240238 | 0 | 0 |
| D | SEPRACOR INC | STOCK | 817315104 | 121508 | 2605795 SH | SOLE | 2605795 | 0 | 0 |
| D | SEPRACOR INC | CALL | 817315904 | 80908 | 17351 SH CALL | SOLE | 17351 | 0 | 0 |
| D | SEPRACOR INC | PUT | 817315954 | 15155 | 3250 SH PUT | SOLE | 3250 | 0 | 0 |
| D | SHANDA INTERACTIVE ENTMT LTD | STOCK | 81941Q203 | 2685 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | SHANDA INTERACTIVE ENTMT LTD | CALL | 81941Q903 | 2685 | 1000 SH CALL | SOLE | 1000 | 0 | 0 |
| D | SHARPER IMAGE CORP | STOCK | 820013100 | 1429 | 129326 SH | SOLE | 129326 | 0 | 0 |
| D | SHERWIN WILLIAMS CO | PUT | 824348956 | 6604 | 1000 SH PUT | SOLE | 1000 | 0 | 0 |
| D | SHIRE PLC | CALL | 82481R906 | 11142 | 1800 SH CALL | SOLE | 1800 | 0 | 0 |
| D | SHUFFLE MASTER INC | STOCK | 825549108 | 1462 | 80089 SH | SOLE | 80089 | 0 | 0 |
| D | SI INTL INC | STOCK | 78427V102 | 870 | 30300 SH | SOLE | 30300 | 0 | 0 |
| D | SIERRA PAC RES NEW | STOCK | 826428104 | 10515 | 605016 SH | SOLE | 605016 | 0 | 0 |
| D | SIGMA DESIGNS INC | STOCK | 826565103 | 3648 | 138919 SH | SOLE | 138919 | 0 | 0 |
| D | SILICON IMAGE INC | STOCK | 82705T102 | 352 | 43149 SH | SOLE | 43149 | 0 | 0 |
| D | SILICON LABORATORIES INC | PUT | 826919952 | 3890 | 1300 SH PUT | SOLE | 1300 | 0 | 0 |
| D | SILICON MOTION TECHNOLOGY CO | STOCK | 82706C108 | 405 | 18000 SH | SOLE | 18000 | 0 | 0 |
| D | SILICONWARE PRECISION INDS L | STOCK | 827084864 | 19207 | 1957907 SH | SOLE | 1957907 | 0 | 0 |
| D | SIRENZA MICRODEVICES INC | STOCK | 82966T106 | 7381 | 856257 SH | SOLE | 856257 | 0 | 0 |
| D | SIRF TECHNOLOGY HLDGS INC | PUT | 82967H951 | 5552 | 2000 SH PUT | SOLE | 2000 | 0 | 0 |
| D | SIRVA INC | STOCK | 82967Y104 | 1071 | 300015 SH | SOLE | 300015 | 0 | 0 |
| D | SIX FLAGS INC | STOCK | 83001P109 | 6010 | 1000000 SH | SOLE | 1000000 | 0 | 0 |
| D | SKECHERS U S A INC | STOCK | 830566105 | 4703 | 140095 SH | SOLE | 140095 | 0 | 0 |
| D | SL GREEN RLTY CORP | STOCK | 78440X101 | 1550 | 11300 SH | SOLE | 11300 | 0 | 0 |
| D | SMITH INTL INC | PUT | 832110950 | 11532 | 2400 SH PUT | SOLE | 2400 | 0 | 0 |
| D | SMITH INTL INC | STOCK | 832110100 | 961 | 20000 SH | SOLE | 20000 | 0 | 0 |
| D | SMITH MICRO SOFTWARE INC | CALL | 832154908 | 2142 | 1150 SH CALL | SOLE | 1150 | 0 | 0 |
| D | SMITH MICRO SOFTWARE INC | STOCK | 832154108 | 188 | 10100 SH | SOLE | 10100 | 0 | 0 |
| D | SMITHFIELD FOODS INC | STOCK | 832248108 | 749 | 25000 SH | SOLE | 25000 | 0 | 0 |
| D | SOHU COM INC | STOCK | 83408W103 | 852 | 39750 SH | SOLE | 39750 | 0 | 0 |
| D | SOMAXON PHARMACEUTICALS INC | STOCK | 834453102 | 2025 | 165981 SH | SOLE | 165981 | 0 | 0 |
| D | SONIC CORP | STOCK | 835451105 | 1116 | 50090 SH | SOLE | 50090 | 0 | 0 |
| D | SONUS NETWORKS INC | STOCK | 835916107 | 6552 | 811943 SH | SOLE | 811943 | 0 | 0 |
| D | SONY CORP | PUT | 835699957 | 9088 | 1800 SH PUT | SOLE | 1800 | 0 | 0 |
| D | SOUTHERN COPPER CORP | PUT | 84265V955 | 2866 | 400 SH PUT | SOLE | 400 | 0 | 0 |
| D | SOUTHERN UN CO NEW | STOCK | 844030106 | 1523 | 50100 SH | SOLE | 50100 | 0 | 0 |
| D | SOUTHWESTERN ENERGY CO | STOCK | 845467109 | 3262 | 79600 SH | SOLE | 79600 | 0 | 0 |
| D | SPANISH BROADCASTING SYS INC | STOCK | 846425882 | 248 | 61950 SH | SOLE | 61950 | 0 | 0 |
| D | SPANSION INC | STOCK | 84649R101 | 5780 | 474150 SH | SOLE | 474150 | 0 | 0 |
| D | SPDR TR | STOCK | 78462F103 | 16200 | 100000 SH | SOLE | 100000 | 0 | 0 |
| D | SPDR TR | PUT | 78462F953 | 635720 | 44769 SH PUT | SOLE | 44769 | 0 | 0 |
| D | SPECTRUM BRANDS INC | STOCK | 84762L105 | 2375 | 375150 SH | SOLE | 375150 | 0 | 0 |
| D | SPECTRUM PHARMACEUTICALS INC | STOCK | 84763A108 | 2038 | 325000 SH | SOLE | 325000 | 0 | 0 |
| D | SPRINT NEXTEL CORP | STOCK | 852061100 | 14317 | 755100 SH | SOLE | 755100 | 0 | 0 |
| D | SRA INTL INC | STOCK | 78464R105 | 2923 | 120000 SH | SOLE | 120000 | 0 | 0 |
| D | ST JUDE MED INC | STOCK | 790849103 | 3061 | 81400 SH | SOLE | 81400 | 0 | 0 |
| D | ST JUDE MED INC | CALL | 790849903 | 7522 | 2000 SH CALL | SOLE | 2000 | 0 | 0 |
| D | STAMPS COM INC | STOCK | 852857200 | 1160 | 80000 SH | SOLE | 80000 | 0 | 0 |
| D | STANDARD MICROSYSTEMS CORP | STOCK | 853626109 | 1527 | 50000 SH | SOLE | 50000 | 0 | 0 |
| D | STANDARD PAC CORP NEW | STOCK | 85375C101 | 4710 | 225659 SH | SOLE | 225659 | 0 | 0 |
| D | STAPLES INC | STOCK | 855030102 | 3269 | 126509 SH | SOLE | 126509 | 0 | 0 |
| D | STARBUCKS CORP | STOCK | 855244109 | 391 | 12463 SH | SOLE | 12463 | 0 | 0 |
| D | STARBUCKS CORP | CALL | 855244909 | 3763 | 1200 SH CALL | SOLE | 1200 | 0 | 0 |

DX-1006-00013

GOV-00004909

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| D | STARWOOD HOTELS&RESORTS WRLD | STOCK | 85590A401 | 19158 | 280000 SH | | SOLE | 280000 | 0 | 0 |
| D | STEAK N SHAKE CO | STOCK | 857873103 | 2348 | 140000 SH | | SOLE | 140000 | 0 | 0 |
| D | STEIN MART INC | STOCK | 858375108 | 469 | 28738 SH | | SOLE | 28738 | 0 | 0 |
| D | STEINER LEISURE LTD | STOCK | P8744Y102 | 900 | 20000 SH | | SOLE | 20000 | 0 | 0 |
| D | STEMCELLS INC | STOCK | 85857R105 | 580 | 230000 SH | | SOLE | 230000 | 0 | 0 |
| D | STILLWATER MNG CO | STOCK | 86074Q102 | 2798 | 220500 SH | | SOLE | 220500 | 0 | 0 |
| D | STONEPATH GROUP INC | STOCK | 861837102 | 16 | 80000 SH | | SOLE | 80000 | 0 | 0 |
| D | STREETTRACKS GOLD TR | STOCK | 863307104 | 2393 | 36397 SH | | SOLE | 36397 | 0 | 0 |
| D | STREETTRACKS SER TR | STOCK | 86330E778 | 13026 | 200000 SH | | SOLE | 200000 | 0 | 0 |
| D | STREETTRACKS SER TR | PUT | 86330E955 | 3255 | 1000 SH PUT | | SOLE | 1000 | 0 | 0 |
| D | STRYKER CORP | PUT | 863667951 | 3316 | 500 SH PUT | | SOLE | 500 | 0 | 0 |
| D | SULPHCO INC | STOCK | 865378103 | 1571 | 459408 SH | | SOLE | 459408 | 0 | 0 |
| D | SUN HEALTHCARE GROUP INC | STOCK | 866933401 | 1235 | 100000 SH | | SOLE | 100000 | 0 | 0 |
| D | SUN MICROSYSTEMS INC | STOCK | 866810104 | 1298 | 215987 SH | | SOLE | 215987 | 0 | 0 |
| D | SUN MICROSYSTEMS INC | PUT | 866810954 | 3893 | 6478 SH PUT | | SOLE | 6478 | 0 | 0 |
| D | SUNCOR ENERGY INC | STOCK | 867229106 | 1985 | 26000 SH | | SOLE | 26000 | 0 | 0 |
| D | SUNRISE SENIOR LIVING INC | PUT | 86768K956 | 3952 | 1000 SH PUT | | SOLE | 1000 | 0 | 0 |
| D | SUNTECH PWR HLDGS CO LTD | STOCK | 86800C104 | 883 | 25500 SH | | SOLE | 25500 | 0 | 0 |
| D | SUPERIOR ESSEX INC | STOCK | 86815V105 | 344 | 9920 SH | | SOLE | 9920 | 0 | 0 |
| D | SUPERTEX INC | STOCK | 868532102 | 2481 | 74716 SH | | SOLE | 74716 | 0 | 0 |
| D | SWITCH & DATA FACILITIES COM | STOCK | 871043105 | 3399 | 187597 SH | | SOLE | 187597 | 0 | 0 |
| D | SYBASE INC | STOCK | 871130100 | 14234 | 563042 SH | | SOLE | 563042 | 0 | 0 |
| D | SYBASE INC | CALL | 871130900 | 3792 | 1500 SH CALL | | SOLE | 1500 | 0 | 0 |
| D | SYCAMORE NETWORKS INC | STOCK | 871206108 | 9308 | 2488711 SH | | SOLE | 2488711 | 0 | 0 |
| D | SYMANTEC CORP | CALL | 871503908 | 18165 | 10500 SH CALL | | SOLE | 10500 | 0 | 0 |
| D | SYMANTEC CORP | STOCK | 871503108 | 7846 | 453534 SH | | SOLE | 453534 | 0 | 0 |
| D | SYNAPTICS INC | STOCK | 87157D109 | 41834 | 1635422 SH | | SOLE | 1635422 | 0 | 0 |
| D | SYNOPSYS INC | STOCK | 871607107 | 1312 | 50000 SH | | SOLE | 50000 | 0 | 0 |
| D | SYNOVUS FINL CORP | STOCK | 87161C105 | 317 | 9800 SH | | SOLE | 9800 | 0 | 0 |
| D | SYNTAX BRILLIAN CORP | STOCK | 87163L103 | 27920 | 3323765 SH | | SOLE | 3323765 | 0 | 0 |
| D | TAIWAN SEMICONDUCTOR MFG LTD | PUT | 874039950 | 26861 | 24987 SH PUT | | SOLE | 24987 | 0 | 0 |
| D | TAKE-TWO INTERACTIVE SOFTWAR | STOCK | 874054109 | 15779 | 783467 SH | | SOLE | 783467 | 0 | 0 |
| D | TALBOTS INC | STOCK | 874161102 | 4724 | 200000 SH | | SOLE | 200000 | 0 | 0 |
| D | TALISMAN ENERGY INC | STOCK | 87425E103 | 9834 | 560000 SH | | SOLE | 560000 | 0 | 0 |
| D | TALISMAN ENERGY INC | CALL | 87425E903 | 878 | 500 SH CALL | | SOLE | 500 | 0 | 0 |
| D | TARGET CORP | PUT | 87612E956 | 7111 | 1200 SH PUT | | SOLE | 1200 | 0 | 0 |
| D | TASER INTL INC | CALL | 87651B904 | 964 | 1200 SH CALL | | SOLE | 1200 | 0 | 0 |
| D | TASER INTL INC | STOCK | 87651B104 | 2393 | 297950 SH | | SOLE | 297950 | 0 | 0 |
| D | TCF FINL CORP | STOCK | 872275102 | 1582 | 60000 SH | | SOLE | 60000 | 0 | 0 |
| D | TD AMERITRADE HLDG CORP | STOCK | 87236Y108 | 3849 | 258700 SH | | SOLE | 258700 | 0 | 0 |
| D | TECH DATA CORP | STOCK | 878237106 | 17146 | 478814 SH | | SOLE | 478814 | 0 | 0 |
| D | TECH DATA CORP | CALL | 878237906 | 2149 | 600 SH CALL | | SOLE | 600 | 0 | 0 |
| D | TECHNITROL INC | STOCK | 878555101 | 524 | 20000 SH | | SOLE | 20000 | 0 | 0 |
| D | TECK COMINCO LTD | STOCK | 878742204 | 4176 | 60000 SH | | SOLE | 60000 | 0 | 0 |
| D | TEKELEC | STOCK | 879101103 | 149 | 10000 SH | | SOLE | 10000 | 0 | 0 |
| D | TELE NORTE LESTE PART S A | STOCK | 879246106 | 1384 | 100000 SH | | SOLE | 100000 | 0 | 0 |
| D | TELECOMUNICACOES DE SAO PAUL | STOCK | 87929A102 | 1409 | 55000 SH | | SOLE | 55000 | 0 | 0 |
| D | TELETECH HOLDINGS INC | STOCK | 87939R106 | 367 | 10000 SH | | SOLE | 10000 | 0 | 0 |
| D | TELLABS INC | STOCK | 879664100 | 10885 | 1069150 SH | | SOLE | 1069150 | 0 | 0 |
| D | TELLABS INC | CALL | 879664900 | 4208 | 4250 SH CALL | | SOLE | 4250 | 0 | 0 |
| D | TENARIS S A | STOCK | 88031M109 | 10098 | 220000 SH | | SOLE | 220000 | 0 | 0 |
| D | TENET HEALTHCARE CORP | STOCK | 88033G100 | 178 | 27700 SH | | SOLE | 27700 | 0 | 0 |
| D | TERADYNE INC | PUT | 880770952 | 827 | 500 SH PUT | | SOLE | 500 | 0 | 0 |
| D | TESORO CORP | PUT | 881609951 | 14864 | 1480 SH PUT | | SOLE | 1480 | 0 | 0 |
| D | TESSERA TECHNOLOGIES INC | STOCK | 88164L100 | 35236 | 886655 SH | | SOLE | 886655 | 0 | 0 |
| D | TETRA TECH INC NEW | STOCK | 88162G103 | 960 | 50346 SH | | SOLE | 50346 | 0 | 0 |
| D | TEXAS INSTRS INC | PUT | 882508954 | 6020 | 2000 SH PUT | | SOLE | 2000 | 0 | 0 |
| D | TEXTRON INC | CALL | 883203901 | 9429 | 1050 SH CALL | | SOLE | 1050 | 0 | 0 |
| D | TEXTRON INC | STOCK | 883203101 | 14368 | 160000 SH | | SOLE | 160000 | 0 | 0 |
| D | THERMAGE INC | STOCK | 88343N101 | 1156 | 127000 SH | | SOLE | 127000 | 0 | 0 |
| D | THERMA-WAVE INC | STOCK | 88343A108 | 3760 | 2412949 SH | | SOLE | 2412949 | 0 | 0 |
| D | THERMO FISHER SCIENTIFIC INC | CALL | 883556902 | 9350 | 2000 SH CALL | | SOLE | 2000 | 0 | 0 |
| D | THERMOGENESIS CORP | STOCK | 883623209 | 465 | 127807 SH | | SOLE | 127807 | 0 | 0 |
| D | THINK PARTNERSHIP INC | STOCK | 88409N101 | 290 | 120000 SH | | SOLE | 120000 | 0 | 0 |
| D | THOMSON | STOCK | 885118109 | 554 | 28700 SH | | SOLE | 28700 | 0 | 0 |
| D | THORATEC CORP | PUT | 885175957 | 2090 | 1000 SH PUT | | SOLE | 1000 | 0 | 0 |
| D | THORATEC CORP | STOCK | 885175307 | 1045 | 50000 SH | | SOLE | 50000 | 0 | 0 |
| D | THORATEC CORP | CALL | 885175907 | 2090 | 1000 SH CALL | | SOLE | 1000 | 0 | 0 |
| D | TIBCO SOFTWARE INC | STOCK | 88632Q103 | 1172 | 137560 SH | | SOLE | 137560 | 0 | 0 |
| D | TIBCO SOFTWARE INC | CALL | 88632q903 | 6424 | 7540 SH CALL | | SOLE | 7540 | 0 | 0 |
| D | TIFFANY & CO NEW | CALL | 886547908 | 1364 | 300 SH CALL | | SOLE | 300 | 0 | 0 |
| D | TIM PARTICIPACOES S A | EQUITY | 88706P106 | 3120 | 96050 SH | | SOLE | 96050 | 0 | 0 |
| D | TIME WARNER INC | STOCK | 887317105 | 15506 | 786330 SH | | SOLE | 786330 | 0 | 0 |
| D | TITAN PHARMACEUTICALS INC DE | STOCK | 888314101 | 5726 | 2299646 SH | | SOLE | 2299646 | 0 | 0 |
| D | TJX COS INC NEW | STOCK | 872540109 | 6740 | 250000 SH | | SOLE | 250000 | 0 | 0 |
| D | TOLL BROTHERS INC | STOCK | 889478103 | 5476 | 200000 SH | | SOLE | 200000 | 0 | 0 |
| D | TOP TANKERS INC | STOCK | Y8897Y107 | 1258 | 270000 SH | | SOLE | 270000 | 0 | 0 |
| D | TOTAL S A | CALL | 89151E909 | 3489 | 500 SH CALL | | SOLE | 500 | 0 | 0 |
| D | TOTAL S A | STOCK | 89151E109 | 12560 | 180000 SH | | SOLE | 180000 | 0 | 0 |
| D | TRANSALTA CORP | EQUITY | 89346D107 | 1280 | 59100 SH | | SOLE | 59100 | 0 | 0 |
| D | TRANSWITCH CORP | STOCK | 894065101 | 796 | 500941 SH | | SOLE | 500941 | 0 | 0 |
| D | TRIAD HOSPITALS INC | STOCK | 89579K109 | 436 | 8340 SH | | SOLE | 8340 | 0 | 0 |
| D | TRIBUNE CO NEW | STOCK | 896047107 | 6123 | 190700 SH | | SOLE | 190700 | 0 | 0 |
| D | TRIDENT MICROSYSTEMS INC | PUT | 895919958 | 4012 | 2000 SH PUT | | SOLE | 2000 | 0 | 0 |
| D | TRIDENT MICROSYSTEMS INC | CALL | 895919908 | 4853 | 2419 SH CALL | | SOLE | 2419 | 0 | 0 |
| D | TRIDENT MICROSYSTEMS INC | STOCK | 895919108 | 50074 | 2845145 SH | | SOLE | 2845145 | 0 | 0 |
| D | TRIMBLE NAVIGATION LTD | STOCK | 896239100 | 7439 | 297234 SH | | SOLE | 297234 | 0 | 0 |
| D | TRUBION PHARMACEUTICALS INC | STOCK | 89778N102 | 2079 | 105565 SH | | SOLE | 105565 | 0 | 0 |
| D | TRUE RELIGION APPAREL INC | STOCK | 89784N104 | 2772 | 170690 SH | | SOLE | 170690 | 0 | 0 |
| D | TTM TECHNOLOGIES INC | STOCK | 87305R109 | 2997 | 314102 SH | | SOLE | 314102 | 0 | 0 |
| D | TUMBLEWEED COMMUNICATIONS CO | STOCK | 899690101 | 1535 | 500000 SH | | SOLE | 500000 | 0 | 0 |
| D | TURBOCHEF TECHNOLOGIES INC | STOCK | 900006206 | 4663 | 306354 SH | | SOLE | 306354 | 0 | 0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| D | TURKCELL ILETISIM HIZMETLERI | STOCK | 900111204 | 596 | 45000 SH | | SOLE | 45000 | 0 | 0 |
| D | TXU CORP | STOCK | 873168108 | 5128 | 80000 SH | | SOLE | 80000 | 0 | 0 |
| D | TYCO INTL LTD NEW | STOCK | 902124106 | 2821 | 89419 SH | | SOLE | 89419 | 0 | 0 |
| D | TYCO INTL LTD NEW | CALL | 902124906 | 6310 | 2000 SH | CALL | SOLE | 2000 | 0 | 0 |
| D | TYSON FOODS INC | STOCK | 902494103 | 194 | 10000 SH | | SOLE | 10000 | 0 | 0 |
| D | U S AIRWAYS GROUP INC | STOCK | 90341W108 | 1505 | 33100 SH | | SOLE | 33100 | 0 | 0 |
| D | U S CONCRETE INC | STOCK | 90333L102 | 4286 | 548056 SH | | SOLE | 548056 | 0 | 0 |
| D | U S ENERGY CORP WYO | STOCK | 911805109 | 3405 | 640000 SH | | SOLE | 640000 | 0 | 0 |
| D | U S G CORP | STOCK | 903293405 | 43422 | 930207 SH | | SOLE | 930207 | 0 | 0 |
| D | U S G CORP | CALL | 903293905 | 9336 | 2000 SH | CALL | SOLE | 2000 | 0 | 0 |
| D | U S XPRESS ENTERPRISES INC | STOCK | 90338N103 | 7899 | 457674 SH | | SOLE | 457674 | 0 | 0 |
| D | U S XPRESS ENTERPRISES INC | CALL | 90338N903 | 863 | 500 SH | CALL | SOLE | 500 | 0 | 0 |
| D | UAL CORP | STOCK | 902549807 | 6282 | 164571 SH | | SOLE | 164571 | 0 | 0 |
| D | UBS AG | CALL | H89231908 | 4754 | 800 SH | CALL | SOLE | 800 | 0 | 0 |
| D | UBS AG | STOCK | H89231338 | 7141 | 120166 SH | | SOLE | 120166 | 0 | 0 |
| D | ULTRA PETROLEUM CORP | STOCK | 903914109 | 2837 | 53400 SH | | SOLE | 53400 | 0 | 0 |
| D | ULTRA PETROLEUM CORP | PUT | 903914959 | 1594 | 300 SH | PUT | SOLE | 300 | 0 | 0 |
| D | ULTRAPETROL BAHAMAS LTD | STOCK | P94398107 | 3348 | 199522 SH | | SOLE | 199522 | 0 | 0 |
| D | UNION PAC CORP | PUT | 907818958 | 3047 | 300 SH | PUT | SOLE | 300 | 0 | 0 |
| D | UNION PAC CORP | STOCK | 907818108 | 11171 | 110000 SH | | SOLE | 110000 | 0 | 0 |
| D | UNISOURCE ENERGY CORP | STOCK | 909205106 | 1044 | 27800 SH | | SOLE | 27800 | 0 | 0 |
| D | UNITED AUTO GROUP INC | STOCK | 909440109 | 1027 | 50600 SH | | SOLE | 50600 | 0 | 0 |
| D | UNITED IND CORP | STOCK | 910671106 | 3312 | 60000 SH | | SOLE | 60000 | 0 | 0 |
| D | UNITED MICROELECTRONICS CORP | STOCK | 910873207 | 2817 | 886003 SH | | SOLE | 886003 | 0 | 0 |
| D | UNITED PANAM FINANCIAL CP | STOCK | 911301109 | 320 | 25600 SH | | SOLE | 25600 | 0 | 0 |
| D | UNITED RENTALS INC | STOCK | 911363109 | 1386 | 50400 SH | | SOLE | 50400 | 0 | 0 |
| D | UNITED STATES STL CORP NEW | STOCK | 912909108 | 833 | 8400 SH | | SOLE | 8400 | 0 | 0 |
| D | UNITED TECHNOLOGIES CORP | STOCK | 913017900 | 2600 | 400 SH | | SOLE | 400 | 0 | 0 |
| D | UNITED TECHNOLOGIES CORP | STOCK | 913017109 | 3133 | 48200 SH | | SOLE | 48200 | 0 | 0 |
| D | UNITEDHEALTH GROUP INC | CALL | 91324P902 | 18540 | 3500 SH | CALL | SOLE | 3500 | 0 | 0 |
| D | UNITEDHEALTH GROUP INC | PUT | 91324P952 | 1589 | 300 SH | PUT | SOLE | 300 | 0 | 0 |
| D | URBAN OUTFITTERS INC | STOCK | 917047102 | 2518 | 95000 SH | | SOLE | 95000 | 0 | 0 |
| D | US BIOENERGY CORP | STOCK | 90342V109 | 1255 | 109400 SH | | SOLE | 109400 | 0 | 0 |
| D | USANA HEALTH SCIENCES INC | STOCK | 90328M107 | 234 | 5000 SH | | SOLE | 5000 | 0 | 0 |
| D | USANA HEALTH SCIENCES INC | PUT | 90328M957 | 937 | 200 SH | PUT | SOLE | 200 | 0 | 0 |
| D | UTI WORLDWIDE INC | STOCK | 087210103 | 6391 | 260000 SH | | SOLE | 260000 | 0 | 0 |
| D | VALERO ENERGY CORP NEW | CALL | 91913Y900 | 9674 | 1500 SH | CALL | SOLE | 1500 | 0 | 0 |
| D | VANDA PHARMACEUTICALS INC | STOCK | 921659108 | 8701 | 357168 SH | | SOLE | 357168 | 0 | 0 |
| D | VARIAN SEMICONDUCTOR EQUIPMN | CALL | 922207905 | 5338 | 1000 SH | CALL | SOLE | 1000 | 0 | 0 |
| D | VARIAN SEMICONDUCTOR EQUIPMN | PUT | 922207955 | 52798 | 9891 SH | PUT | SOLE | 9891 | 0 | 0 |
| D | VASCO DATA SEC INTL INC | STOCK | 92230Y104 | 180 | 10100 SH | | SOLE | 10100 | 0 | 0 |
| D | VENDINGDATA CORPORATION | STOCK | 92261Q202 | 454 | 171300 SH | | SOLE | 171300 | 0 | 0 |
| D | VERTEX PHARMACEUTICALS INC | PUT | 92532F950 | 2748 | 980 SH | PUT | SOLE | 980 | 0 | 0 |
| D | VERTICALNET INC | STOCK | 92532L305 | 89 | 198356 SH | | SOLE | 198356 | 0 | 0 |
| D | VION PHARMACEUTICALS INC | STOCK | 92762A104 | 2771 | 1649539 SH | | SOLE | 1649539 | 0 | 0 |
| D | VIRAGE LOGIC CORP | STOCK | 92763R104 | 167 | 23000 SH | | SOLE | 23000 | 0 | 0 |
| D | VIRGIN MEDIA INC | STOCK | 92769L101 | 6773 | 268230 SH | | SOLE | 268230 | 0 | 0 |
| D | VISHAY INTERTECHNOLOGY INC | STOCK | 928298108 | 1915 | 136970 SH | | SOLE | 136970 | 0 | 0 |
| D | VISICU INC | STOCK | 92831L204 | 1131 | 145000 SH | | SOLE | 145000 | 0 | 0 |
| D | VIVO PARTICIPACOES S A | EQUITY | 92855E101 | 3578 | 1019400 SH | | SOLE | 1019400 | 0 | 0 |
| D | VIVUS INC | STOCK | 928551100 | 437 | 85100 SH | | SOLE | 85100 | 0 | 0 |
| D | VODAFONE GROUP PLC NEW | STOCK | 92857W209 | 405 | 15060 SH | | SOLE | 15060 | 0 | 0 |
| D | VOLTERRA SEMICONDUCTOR CORP | STOCK | 928708106 | 1078 | 82525 SH | | SOLE | 82525 | 0 | 0 |
| D | VYYO INC | STOCK | 918458209 | 2545 | 310000 SH | | SOLE | 310000 | 0 | 0 |
| D | WABASH NATL CORP | STOCK | 929566107 | 3209 | 208100 SH | | SOLE | 208100 | 0 | 0 |
| D | WABTEC CORP | STOCK | 929740108 | 2759 | 80000 SH | | SOLE | 80000 | 0 | 0 |
| D | WAL MART STORES INC | STOCK | 931142103 | 3663 | 77816 SH | | SOLE | 77816 | 0 | 0 |
| D | WALGREEN CO | STOCK | 931422109 | 477 | 10400 SH | | SOLE | 10400 | 0 | 0 |
| D | WALGREEN CO | PUT | 931422959 | 4130 | 900 SH | PUT | SOLE | 900 | 0 | 0 |
| D | WALTER INDS INC | STOCK | 93317Q105 | 12147 | 490800 SH | | SOLE | 490800 | 0 | 0 |
| D | WALTER INDS INC | CALL | 93317Q905 | 3713 | 1500 SH | CALL | SOLE | 1500 | 0 | 0 |
| D | WASHINGTON MUT INC | PUT | 939322953 | 1837 | 455 SH | PUT | SOLE | 455 | 0 | 0 |
| D | WASTE MGMT INC DEL | CALL | 94106L909 | 5506 | 1600 SH | CALL | SOLE | 1600 | 0 | 0 |
| D | WASTE MGMT INC DEL | STOCK | 94106L109 | 8998 | 261498 SH | | SOLE | 261498 | 0 | 0 |
| D | WATSCO INC | STOCK | 942622200 | 2809 | 55000 SH | | SOLE | 55000 | 0 | 0 |
| D | WATSON PHARMACEUTICALS INC | CALL | 942683903 | 3965 | 1500 SH | CALL | SOLE | 1500 | 0 | 0 |
| D | WATSON PHARMACEUTICALS INC | STOCK | 942683103 | 8722 | 330000 SH | | SOLE | 330000 | 0 | 0 |
| D | WEATHERFORD INTERNATIONAL LT | PUT | 095089951 | 3608 | 800 SH | PUT | SOLE | 800 | 0 | 0 |
| D | WEBEX COMMUNICATIONS INC | PUT | 947671959 | 2843 | 500 SH | PUT | SOLE | 500 | 0 | 0 |
| D | WEBMETHODS INC | STOCK | 94768C108 | 5995 | 833846 SH | | SOLE | 833846 | 0 | 0 |
| D | WEBSENSE INC | PUT | 947684956 | 6021 | 2619 SH | PUT | SOLE | 2619 | 0 | 0 |
| D | WEBSIDESTORY INC | STOCK | 94768S103 | 777 | 60000 SH | | SOLE | 60000 | 0 | 0 |
| D | WEBZEN INC | STOCK | 94846M102 | 1042 | 250000 SH | | SOLE | 250000 | 0 | 0 |
| D | WELLCARE HEALTH PLANS INC | PUT | 94946T956 | 5115 | 600 SH | PUT | SOLE | 600 | 0 | 0 |
| D | WELLMAN INC | STOCK | 949702104 | 108 | 30000 SH | | SOLE | 30000 | 0 | 0 |
| D | WESTERN UN CO | CALL | 959802909 | 3951 | 1800 SH | CALL | SOLE | 1800 | 0 | 0 |
| D | WESTERN UN CO | STOCK | 959802109 | 4928 | 224507 SH | | SOLE | 224507 | 0 | 0 |
| D | WET SEAL INC | STOCK | 961840105 | 671 | 102454 SH | | SOLE | 102454 | 0 | 0 |
| D | WEYERHAEUSER CO | PUT | 962166954 | 2990 | 400 SH | PUT | SOLE | 400 | 0 | 0 |
| D | WHEELING PITTSBURGH CORP | STOCK | 963142302 | 476 | 20100 SH | | SOLE | 20100 | 0 | 0 |
| D | WHIRLPOOL CORP | STOCK | 963320106 | 917 | 10804 SH | | SOLE | 10804 | 0 | 0 |
| D | WHITE ELECTR DESIGNS CORP | STOCK | 963801105 | 1285 | 193009 SH | | SOLE | 193009 | 0 | 0 |
| D | WHOLE FOODS MKT INC | STOCK | 966837106 | 1585 | 35336 SH | | SOLE | 35336 | 0 | 0 |
| D | WILLIAMS COS INC DEL | STOCK | 969457100 | 7855 | 276000 SH | | SOLE | 276000 | 0 | 0 |
| D | WIND RIVER SYSTEMS INC | STOCK | 973149107 | 8304 | 835410 SH | | SOLE | 835410 | 0 | 0 |
| D | WIRELESS FACILITIES INC | STOCK | 97653A103 | 111 | 85000 SH | | SOLE | 85000 | 0 | 0 |
| D | WISCONSIN ENERGY CORP | STOCK | 976657106 | 13943 | 285300 SH | | SOLE | 285300 | 0 | 0 |
| D | WNS HOLDINGS LTD | STOCK | 92932M101 | 443 | 15200 SH | | SOLE | 15200 | 0 | 0 |
| D | WORTHINGTON INDS INC | STOCK | 981811102 | 6449 | 313378 SH | | SOLE | 313378 | 0 | 0 |
| D | WPT ENTERPRISES INC | STOCK | 98211W108 | 3141 | 611178 SH | | SOLE | 611178 | 0 | 0 |
| D | WRIGLEY WM JR CO | STOCK | 982526105 | 255 | 5000 SH | | SOLE | 5000 | 0 | 0 |
| D | XENOPORT INC | STOCK | 98411C100 | 6408 | 230000 SH | | SOLE | 230000 | 0 | 0 |

DX-1006-00015

GOV-00004911

```
D  XEROX CORP                       STOCK    984121103    2388   141372 SH        SOLE         141372    0    0
D  XM SATELLITE RADIO HLDGS INC     CALL     983759901    5814     4500 SH CALL   SOLE           4500    0    0
D  XM SATELLITE RADIO HLDGS INC     STOCK    983759101   11989   927927 SH        SOLE         927927    0    0
D  XTO ENERGY INC                   STOCK    98385X106   11000   200693 SH        SOLE         200693    0    0
D  YAHOO INC                        PUT      984332956    8198     2620 SH PUT     SOLE           2620    0    0
D  YAHOO INC                        STOCK    984332106   29280   935762 SH        SOLE         935762    0    0
D  YAHOO INC                        CALL     984332906   39191    12525 SH CALL   SOLE          12525    0    0
D  YRC WORLDWIDE INC                PUT      984249952    4022     1000 SH PUT     SOLE           1000    0    0
D  ZALE CORP NEW                    STOCK    988858106    5276   200000 SH        SOLE         200000    0    0
D  ZHONE TECHNOLOGIES INC NEW       STOCK    98950P108     690   556400 SH        SOLE         556400    0    0
D  ZIMMER HLDGS INC                 PUT      989566P952   4270      500 SH PUT     SOLE            500    0    0
D  ZOLTEK COS INC                   PUT      98975W954    1747      500 SH PUT     SOLE            500    0    0
D  ZOLTEK COS INC                   STOCK    98975W104    4366   125000 SH        SOLE         125000    0    0

S REPORT SUMMARY 1322 DATA RECORDS          9186473      OTHER MANAGERS ON WHOSE BEHALF REPORT IS FILED
</TABLE>
</TEXT>
</DOCUMENT>
```

DX-1006-00016

GOV-00004912

# DX-1169

```
<DOCUMENT>
<TYPE>13F-HR
<SEQUENCE>1
<FILENAME>d72550_13f-hr.txt
<DESCRIPTION>QUARTERLY INITIAL HOLDING REPORT
<TEXT>
                            UNITED STATES
                  SECURITIES AND EXCHANGE COMMISSION
                       WASHINGTON, D.C. 20549

                            FORM 13F

                       FORM 13F COVER PAGE

Report for the Calendar Year or Quarter Ended: June 30, 2007
                                              ---------------------------

Check here if Amendment / /; Amendment Number:
                                              ---------
   This Amendment (Check only one.):   / / is a restatement.
                                       / / adds new holdings entries.

Institutional Investment Manager Filing this Report:

   Name:      Galleon Management, L.P.
              -----------------------------------
   Address:   590 Madison Avenue, 34th Floor
              -----------------------------
              New York, NY 10022
              -----------------------------


Form 13F File Number: 28-
                         -----------------------

The institutional investment manager filing this report and the person by whom
it is signed hereby represent that the person signing the report is authorized
to submit it, that all information contained herein is true, correct and
complete, and that it is understood that all required items, statements,
schedules, lists, and tables, are considered integral parts of this form.

Person Signing this Report on Behalf of Reporting Manager:

Name:    Mr. George Lau
         -----------------------------------
Title:   Chief Financial Officer
         -----------------------------------
Phone:   (212) 829-4034
         -----------------------------------

Signature, Place, and Date of Signing:

     /s/ George Lau                New York, NY        8/14/07
   --------------------------------   -----------------   --------------
         [Signature]                 [City, State]        [Date]

Report Type (Check only one.):

/X/ 13F HOLDINGS REPORT. (Check here if all holdings of this reporting
    manager are reported in this report.)

/ / 13F NOTICE. (Check here if no holdings reported are in this report,
    and all holdings are reported by other reporting manager(s).)

/ / 13F COMBINATION REPORT. (Check here if a portion of the holdings for this
    reporting manager are reported in this report and a portion are reported by
    other reporting manager(s).)

List of Other Managers Reporting for this Manager:
[If there are no entries in this list, omit this section.]

   Form 13F File Number          Name

   28-                           Mr. Raj Rajaratnam
   ------------------            ----------------------------------------------
   [Repeat as necessary.]

<Page>
                       FORM 13F SUMMARY PAGE

Report Summary:

Number of Other Included Managers:            1
                                      --------------------

Form 13F Information Table Entry Total:     1,384
                                      --------------------

Form 13F Information Table Value Total:    11,050,167
                                      ----------------------
                                            (thousands)
```

DEFENDANT'S
EXHIBIT

DX-1169

S2 09 Cr. 1184 (RJH)

http://www.sec.gov/Archives/edgar/data/1056829/000116923207003354/d72550_13f-hr.txt    1/3/2011

DX-1169-00001
GOV-00005108

Case 17-1405, Document 29, 06/06/2017, 2052263, Page438 of 467

List of Other Included Managers:

Provide a numbered list of the name(s) and Form 13F file number(s) of all
institutional investment managers with respect to which this report is filed,
other than the manager filing this report.

[If there are no entries in this list, state "NONE" and omit the column headings
and list entries.]

| No. | Form 13F File Number | Name |
| --- | --- | --- |
| 1 | 28- | Mr. Raj Rajaratnam |
| ------ | ----------------- | -------------------------------- |

[Repeat as necessary.]

<PAGE>

FORM 13F INFORMATION TABLE

<TABLE>
<CAPTION>

| NAME OF ISSUER | TITLE OF CLASS | CUSIP | VALUE (x$1000) | SHARES/ PRN AMT | SH/ PRN | PUT/ CALL | INVSTMT DSCRETN | OTHER MANAGERS | VOTING AUTHORITY SOLE | SHARED | NONE |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 3COM CORP | COM | 885535104 | 2,066,404 | 500340 | Sh | | Shared - Other | 1 | | 500340 | |
| 3M CO | COM | 88579Y951 | 5,207,400 | 60000 | | PUT | Shared - Other | 1 | | 60000 | |
| 99 CENTS ONLY STORES | COM | 65440K106 | 8,563,452 | 653200 | Sh | | Shared - Other | 1 | | 653200 | |
| ABITIBI-CONSOLIDATED INC | COM | 003924107 | 4,973,301 | 1691599 | Sh | | Shared - Other | 1 | | 1691599 | |
| ACCURAY INC | COM | 004397105 | 221,800 | 10000 | Sh | | Shared - Other | 1 | | 10000 | |
| ACE LTD | COM | G0070K103 | 1,318,734 | 21093 | Sh | | Shared - Other | 1 | | 21093 | |
| ACME PACKET INC | COM | 004764106 | 1,645,012 | 143169 | Sh | | Shared - Other | 1 | | 143169 | |
| ACTIONS SEMICONDUCTOR CO LTD | COM | 00507E107 | 9,341,955 | 1519017 | Sh | | Shared - Other | 1 | | 1519017 | |
| ACTIVISION INC NEW | COM | 004930202 | 22,756,378 | 1218874 | Sh | | Shared - Other | 1 | | 1218874 | |
| ACTUATE CORP | COM | 00508B102 | 339,500 | 50000 | Sh | | Shared - Other | 1 | | 50000 | |
| ADAPTEC INC | COM | 00651F108 | 1,096,160 | 287706 | Sh | | Shared - Other | 1 | | 287706 | |
| ADOBE SYS INC | COM | 00724F101 | 74,785,478 | 1862652 | Sh | | Shared - Other | 1 | | 1862652 | |
| ADOBE SYS INC | COM | 00724F901 | 7,026,250 | 175000 | | CALL | Shared - Other | 1 | | 175000 | |
| ADTRAN INC | COM | 00738A106 | 14,937,944 | 575200 | Sh | | Shared - Other | 1 | | 575200 | |
| ADVANCE AUTO PARTS INC | COM | 00751V106 | 2,026,500 | 50000 | Sh | | Shared - Other | 1 | | 50000 | |
| ADVANCED MAGNETICS INC | COM | 00753P903 | 12,155,440 | 209000 | | CALL | Shared - Other | 1 | | 209000 | |
| ADVANCED MICRO DEVICES INC | COM | 007903907 | 15,123,680 | 1057600 | | CALL | Shared - Other | 1 | | 1057600 | |
| ADVANCED MICRO DEVICES INC | COM | 007903107 | 153,105,009 | 10706644 | Sh | | Shared - Other | 1 | | 10706644 | |
| AECOM TECHNOLOGY CORP DELAWA | COM | 00766T100 | 496,200 | 20000 | Sh | | Shared - Other | 1 | | 20000 | |
| AEGON N V | COM | 007924103 | 1,546,435 | 78699 | Sh | | Shared - Other | 1 | | 78699 | |
| AERCAP HOLDINGS NV | COM | N00985106 | 11,603,200 | 362600 | Sh | | Shared - Other | 1 | | 362600 | |
| AEROPOSTALE | COM | 007865108 | 279,673 | 6710 | Sh | | Shared - Other | 1 | | 6710 | |
| AEROPOSTALE | COM | 007865958 | 4,168,000 | 100000 | | PUT | Shared - Other | 1 | | 100000 | |
| AES CORP | COM | 00130H105 | 5,470,000 | 250000 | Sh | | Shared - Other | 1 | | 250000 | |
| AES CORP | COM | 00130H905 | 1,531,600 | 70000 | | CALL | Shared - Other | 1 | | 70000 | |
| AETNA INC NEW | COM | 00817Y908 | 4,940,000 | 100000 | | CALL | Shared - Other | 1 | | 100000 | |
| AETNA INC NEW | COM | 00817Y958 | 2,470,000 | 50000 | | PUT | Shared - Other | 1 | | 50000 | |
| AFFILIATED COMPUTER SERVICES | COM | 008190100 | 6,055,427 | 106760 | Sh | | Shared - Other | 1 | | 106760 | |
| AFFILIATED COMPUTER SERVICES | COM | 008190950 | 10,209,600 | 180000 | | PUT | Shared - Other | 1 | | 180000 | |
| AFFILIATED MANAGERS GROUP | COM | 008252108 | 3,219,000 | 25000 | Sh | | Shared - Other | 1 | | 25000 | |
| AFFYMETRIX INC | COM | 00826T908 | 4,731,589 | 190100 | | CALL | Shared - Other | 1 | | 190100 | |
| AIRCASTLE LTD | COM | 00129M104 | 10,000 | 10000 | Sh | | Shared - Other | 1 | | 10000 | |
| AKAMAI TECHNOLOGIES INC | COM | 00971I951 | 12,160,000 | 250000 | | PUT | Shared - Other | 1 | | 250000 | |
| AKAMAI TECHNOLOGIES INC | COM | 00971I101 | 10,163,523 | 208954 | Sh | | Shared - Other | 1 | | 208954 | |
| AKAMAI TECHNOLOGIES INC | COM | 00971I901 | 20,428,800 | 420000 | | CALL | Shared - Other | 1 | | 420000 | |
| AKORN INC | COM | 009728106 | 7,514,250 | 1075000 | Sh | | Shared - Other | 1 | | 1075000 | |
| ALCAN INC | COM | 013716105 | 813,000 | 10000 | Sh | | Shared - Other | 1 | | 10000 | |
| ALCATEL-LUCENT | COM | 013904305 | 5,047,000 | 360500 | Sh | | Shared - Other | 1 | | 360500 | |
| ALCOA INC | COM | 013817101 | 60,369,435 | 1489500 | Sh | | Shared - Other | 1 | | 1489500 | |
| ALCOA INC | COM | 013817901 | 21,541,695 | 531500 | | CALL | Shared - Other | 1 | | 531500 | |
| ALLERGAN INC | COM | 018490102 | 297,999 | 5170 | Sh | | Shared - Other | 1 | | 5170 | |
| ALLIANT TECHSYSTEMS INC | COM | 018804104 | 1,993,000 | 20000 | Sh | | Shared - Other | 1 | | 20000 | |
| ALLIED WASTE INDS INC | COM | 019589308 | 14,806,000 | 1100000 | Sh | | Shared - Other | 1 | | 1100000 | |
| ALLSTATE CORP | COM | 020002101 | 1,405,504 | 22850 | Sh | | Shared - Other | 1 | | 22850 | |
| ALLTEL CORP | COM | 020039103 | 1,013,250 | 15000 | Sh | | Shared - Other | 1 | | 15000 | |
| ALPHA NATURAL RESOURCES INC | COM | 02076X902 | 6,860,700 | 330000 | | CALL | Shared - Other | 1 | | 330000 | |
| ALPHARMA INC | COM | 020813901 | 4,179,807 | 160700 | | CALL | Shared - Other | 1 | | 160700 | |
| ALPHARMA INC | COM | 020813101 | 11,665,485 | 448500 | Sh | | Shared - Other | 1 | | 448500 | |
| ALTERA CORP | COM | 021441950 | 11,065,000 | 500000 | | PUT | Shared - Other | 1 | | 500000 | |
| ALTRA HOLDINGS INC | COM | 02208R106 | 4,736,448 | 274100 | Sh | | Shared - Other | 1 | | 274100 | |
| ALTUS PHARMACEUTICALS INC | COM | 02216N105 | 1,327,100 | 115000 | Sh | | Shared - Other | 1 | | 115000 | |
| AMAZON COM INC | COM | 023135106 | 513,075 | 7500 | Sh | | Shared - Other | 1 | | 7500 | |
| AMAZON COM INC | COM | 023135956 | 19,154,800 | 280000 | | PUT | Shared - Other | 1 | | 280000 | |
| AMDOCS LTD | COM | G02602103 | 4,646,994 | 116700 | Sh | | Shared - Other | 1 | | 116700 | |
| AMERICA MOVIL SAB DE CV | COM | 02364W905 | 9,289,500 | 150000 | | CALL | Shared - Other | 1 | | 150000 | |
| AMERICA MOVIL SAB DE CV | COM | 02364W105 | 12,423,158 | 200600 | Sh | | Shared - Other | 1 | | 200600 | |
| AMERICAN EAGLE OUTFITTERS NE | COM | 02553E106 | 2,566,000 | 100000 | Sh | | Shared - Other | 1 | | 100000 | |

DX-1169-00002
GOV-00005109

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| AMERICAN ELEC PWR INC | COM | 025537101 | 7,243,423 | 160822 | Sh | | Shared - Other 1 | 160822 |
| AMERICAN EXPRESS CO | COM | 025816109 | 5,133,614 | 83910 | Sh | | Shared - Other 1 | 83910 |
| AMERICAN INTL GROUP INC | COM | 026874907 | 80,534,500 | 1150000 | | CALL | Shared - Other 1 | 1150000 |
| AMERICAN INTL GROUP INC | COM | 026874957 | 22,059,450 | 315000 | | PUT | Shared - Other 1 | 315000 |
| AMERICAN INTL GROUP INC | COM | 026874107 | 99,993,246 | 1427863 | Sh | | Shared - Other 1 | 1427863 |
| AMERICAN MED SYS HLDGS INC | COM | 02744M108 | 180,400 | 10000 | Sh | | Shared - Other 1 | 10000 |
| AMERICAN OIL & GAS INC NEW | COM | 028723104 | 1,648,230 | 243100 | Sh | | Shared - Other 1 | 243100 |
| AMERICAN ORIENTAL BIOENGR IN | COM | 028731907 | 1,335,000 | 150000 | | CALL | Shared - Other 1 | 150000 |
| AMERICAN STD COS INC DEL | COM | 029712906 | 5,098,000 | 100000 | Sh | | Shared - Other 1 | 100000 |
| AMERICAN STD COS INC DEL | COM | 029712106 | 9,960,306 | 168876 | Sh | | Shared - Other 1 | 168876 |
| AMERICAN TOWER CORP | COM | 029912201 | 5,043,234 | 120077 | Sh | | Shared - Other 1 | 120077 |
| AMERIPRISE FINL INC | COM | 03076C106 | 10,806,900 | 170000 | Sh | | Shared - Other 1 | 170000 |
| AMERISOURCEBERGEN CORP | COM | 03073E955 | 2,473,500 | 50000 | | PUT | Shared - Other 1 | 50000 |
| AMERISTAR CASINOS INC | COM | 03070Q101 | 4,516,200 | 130000 | Sh | | Shared - Other 1 | 130000 |
| AMETEK INC NEW | COM | 031100100 | 1,587,200 | 40000 | Sh | | Shared - Other 1 | 40000 |
| AMGEN INC | COM | 031162900 | 2,764,500 | 50000 | | CALL | Shared - Other 1 | 50000 |
| AMGEN INC | COM | 031162950 | 552,900 | 10000 | | PUT | Shared - Other 1 | 10000 |
| AMIS HLDGS INC | COM | 031538101 | 352,663 | 28168 | Sh | | Shared - Other 1 | 28168 |
| AMR CORP | COM | 001765906 | 3,952,500 | 150000 | | CALL | Shared - Other 1 | 150000 |
| AMR CORP | COM | 001765106 | 7,246,250 | 275000 | Sh | | Shared - Other 1 | 275000 |
| AMTECH SYS INC | COM | 032332504 | 175,000 | 20000 | Sh PAR $0.01N | | Shared - Other 1 | 20000 |
| ANADARKO PETE CORP | COM | 032511957 | 2,079,600 | 40000 | | PUT | Shared - Other 1 | 40000 |
| ANADIGICS INC | COM | 032515108 | 965,300 | 70000 | Sh | | Shared - Other 1 | 70000 |
| ANADIGICS INC | COM | 032515958 | 1,379,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| ANALOG DEVICES INC | COM | 032654105 | 29,527,677 | 784476 | Sh | | Shared - Other 1 | 784476 |
| ANDERSONS INC | COM | 034164103 | 1,359,900 | 30000 | Sh | | Shared - Other 1 | 30000 |
| ANGIODYNAMICS INC | COM | 03475V101 | 2,521,400 | 140000 | Sh | | Shared - Other 1 | 140000 |
| ANGLOGOLD ASHANTI LTD | COM | 035128206 | 6,202,480 | 164000 | Sh | | Shared - Other 1 | 164000 |
| ANHEUSER BUSCH COS INC | COM | 035229103 | 13,040,000 | 250000 | Sh | | Shared - Other 1 | 250000 |
| ANNALY CAP MGMT INC | COM | 035710409 | 70,000 | 70000 | Sh | | Shared - Other 1 | 70000 |
| ANSWERTHINK INC | COM | 036916104 | 5,990,430 | 1654815 | Sh | | Shared - Other 1 | 1654815 |
| ANSYS INC | COM | 03662Q105 | 3,731,200 | 140800 | Sh | | Shared - Other 1 | 140800 |
| ANTARES PHARMA INC | COM | 036642106 | 1,580,000 | 1000000 | Sh | | Shared - Other 1 | 1000000 |
| APACHE CORP | COM | 037411955 | 4,079,500 | 50000 | | PUT | Shared - Other 1 | 50000 |
| APPLE INC | COM | 037833950 | 7,932,600 | 65000 | | PUT | Shared - Other 1 | 65000 |
| APPLE INC | COM | 037833100 | 101,903,400 | 835000 | Sh | | Shared - Other 1 | 835000 |
| APPLEBEES INTL INC | COM | 037899101 | 323,181 | 13410 | Sh | | Shared - Other 1 | 13410 |
| APPLERA CORP | COM | 038020103 | 15,880,800 | 520000 | Sh | | Shared - Other 1 | 520000 |
| APPLERA CORP | COM | 038020903 | 16,341,954 | 535100 | | CALL | Shared - Other 1 | 535100 |
| APPLIED MATLS INC | COM | 038222955 | 58,622,461 | 2950300 | | PUT | Shared - Other 1 | 2950300 |
| APPLIED MICRO CIRCUITS CORP | COM | 03822W109 | 3,758,240 | 1503296 | Sh | | Shared - Other 1 | 1503296 |
| APPLIX INC | COM | 038316105 | 1,151,500 | 70000 | Sh | | Shared - Other 1 | 70000 |
| AQUILA INC | COM | 03840F102 | 5,643,791 | 1379900 | Sh | | Shared - Other 1 | 1379900 |
| ARCELOR MITTAL | COM | 03937E101 | 624,000 | 10000 | Sh | | Shared - Other 1 | 10000 |
| ARCH CAP GROUP LTD | COM | G0450A105 | 7,293,607 | 100546 | Sh | | Shared - Other 1 | 100546 |
| ARCH COAL INC | COM | 039380900 | 6,264,000 | 180000 | | CALL | Shared - Other 1 | 180000 |
| ARCH COAL INC | COM | 039380100 | 9,570,000 | 275000 | Sh | | Shared - Other 1 | 275000 |
| ARCHER DANIELS MIDLAND CO | COM | 039483102 | 9,099,750 | 275000 | Sh | | Shared - Other 1 | 275000 |
| ARCHER DANIELS MIDLAND CO | COM | 039483902 | 8,272,500 | 250000 | | CALL | Shared - Other 1 | 250000 |
| ARIBA INC | COM | 04033V903 | 792,800 | 80000 | | CALL | Shared - Other 1 | 80000 |
| ARMSTRONG WORLD INDS INC NEW | COM | 04247K102 | 250,750 | 5000 | Sh | | Shared - Other 1 | 5000 |
| AROTECH CORP | COM | 042682203 | 169,000 | 50000 | Sh | | Shared - Other 1 | 50000 |
| ARQULE INC | COM | 04269E107 | 1,058,205 | 150100 | Sh | | Shared - Other 1 | 150100 |
| ARROW ELECTRS INC | COM | 042735950 | 3,843,000 | 100000 | Sh | | Shared - Other 1 | 100000 |
| ART TECHNOLOGY GROUP INC | COM | 042891107 | 319,681 | 120181 | Sh | | Shared - Other 1 | 120181 |
| ARUBA NETWORKS INC | COM | 043176106 | 16,080,000 | 800000 | Sh | | Shared - Other 1 | 800000 |
| ASE TEST LTD | COM | Y02516105 | 2,310,600 | 150000 | Sh | | Shared - Other 1 | 150000 |
| ASHLAND INC NEW | COM | 044209954 | 3,197,500 | 50000 | | PUT | Shared - Other 1 | 50000 |
| ASML HLDG NV | COM | N07059951 | 42,547,500 | 1550000 | | PUT | Shared - Other 1 | 1550000 |
| ASSURANT INC | COM | 04621X108 | 1,000,100 | 16974 | Sh | | Shared - Other 1 | 16974 |
| ATHEROS COMMUNICATIONS INC | COM | 04743P108 | 925,200 | 30000 | Sh | | Shared - Other 1 | 30000 |
| ATHEROS COMMUNICATIONS INC | COM | 04743P958 | 3,084,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| ATMEL CORP | COM | 049513104 | 20,581,085 | 3701634 | Sh | | Shared - Other 1 | 3701634 |
| ATMI INC | COM | 00207N101 | 750,000 | 25000 | Sh | | Shared - Other 1 | 25000 |
| AU OPTRONICS CORP | COM | 002255107 | 1,764,720 | 102600 | Sh | | Shared - Other 1 | 102600 |
| AUDIOCODES LTD | COM | M15342104 | 847,215 | 150750 | Sh | | Shared - Other 1 | 150750 |
| AUTODESK INC | COM | 052769956 | 18,932,000 | 400000 | | PUT | Shared - Other 1 | 400000 |
| AUTOMATIC DATA PROCESSING IN | COM | 053015103 | 6,785,800 | 140000 | Sh | | Shared - Other 1 | 140000 |
| AUTOMATIC DATA PROCESSING IN | COM | 053015903 | 2,908,200 | 60000 | | CALL | Shared - Other 1 | 60000 |
| AUTOZONE INC | COM | 053332952 | 60,795,900 | 445000 | | PUT | Shared - Other 1 | 445000 |
| AUXILIUM PHARMACEUTICALS INC | COM | 05334D107 | 2,391,000 | 150000 | Sh | | Shared - Other 1 | 150000 |
| AVANEX CORP | COM | 05348M109 | 1,800,175 | 1000097 | Sh | | Shared - Other 1 | 1000097 |
| AVAYA INC | COM | 053499909 | 2,947,000 | 175000 | | CALL | Shared - Other 1 | 175000 |
| AVAYA INC | COM | 053499109 | 75,065,782 | 4457588 | Sh | | Shared - Other 1 | 4457588 |
| AVENTINE RENEWABLE ENERGY | COM | 05356X403 | 509,100 | 30000 | Sh | | Shared - Other 1 | 30000 |
| AVERY DENNISON CORP | COM | 053611909 | 8,974,800 | 135000 | | CALL | Shared - Other 1 | 135000 |
| AVERY DENNISON CORP | COM | 053611109 | 5,983,200 | 90000 | Sh | | Shared - Other 1 | 90000 |

DX-1169-00003
GOV-00005110

| Name | Type | CUSIP | Value | Shares | Sh | | Authority | | Amount |
|---|---|---|---|---|---|---|---|---|---|
| AVID TECHNOLOGY INC | COM | 05367P100 | 530,250 | 15000 | Sh | | Shared - Other | 1 | 15000 |
| AVNET INC | COM | 053807953 | 33,273,816 | 839400 | Sh | PUT | Shared - Other | 1 | 839400 |
| AVOCENT CORP | COM | 053893103 | 1,450,500 | 50000 | Sh | | Shared - Other | 1 | 50000 |
| AVON PRODS INC | COM | 054303102 | 735,000 | 20000 | Sh | | Shared - Other | 1 | 20000 |
| AXCELIS TECHNOLOGIES INC | COM | 054540109 | 649,422 | 100065 | Sh | | Shared - Other | 1 | 100065 |
| BAKER HUGHES INC | COM | 057224107 | 312,964 | 3720 | Sh | | Shared - Other | 1 | 3720 |
| BALLY TECHNOLOGIES INC | COM | 05874B107 | 3,051,510 | 115500 | Sh | | Shared - Other | 1 | 115500 |
| BANK OF AMERICA CORPORATION | COM | 060505104 | 5,636,870 | 115297 | Sh | | Shared - Other | 1 | 115297 |
| BANKRATE INC | COM | 06646V9S0 | 2,396,000 | 50000 | Sh | PUT | Shared - Other | 1 | 50000 |
| BARNES & NOBLE INC | COM | 067774109 | 5,398,418 | 140328 | Sh | | Shared - Other | 1 | 140328 |
| BARNES & NOBLE INC | COM | 067774909 | 1,154,100 | 30000 | Sh | CALL | Shared - Other | 1 | 30000 |
| BARR PHARMACEUTICALS INC | COM | 068306109 | 887,614 | 17671 | Sh | | Shared - Other | 1 | 17671 |
| BARR PHARMACEUTICALS INC | COM | 068306909 | 6,961,878 | 138600 | Sh | CALL | Shared - Other | 1 | 138600 |
| BARRETT BILL CORP | COM | 06846N104 | 7,211,314 | 195800 | Sh | | Shared - Other | 1 | 195800 |
| BARRETT BILL CORP | COM | 06846N904 | 1,104,900 | 30000 | Sh | CALL | Shared - Other | 1 | 30000 |
| BARRICK GOLD CORP | COM | 067901108 | 10,755,900 | 370000 | Sh | | Shared - Other | 1 | 370000 |
| BARRICK GOLD CORP | COM | 067901908 | 1,453,500 | 50000 | Sh | CALL | Shared - Other | 1 | 50000 |
| BAUSCH & LOMB INC | COM | 071707103 | 15,624,000 | 225000 | Sh | | Shared - Other | 1 | 225000 |
| BAUSCH & LOMB INC | COM | 071707903 | 20,950,048 | 301700 | Sh | CALL | Shared - Other | 1 | 301700 |
| BAUSCH & LOMB INC | COM | 071707953 | 6,944,000 | 100000 | Sh | PUT | Shared - Other | 1 | 100000 |
| BEA SYS INC | COM | 073325102 | 78,695,692 | 5748407 | Sh | | Shared - Other | 1 | 5748407 |
| BEA SYS INC | COM | 073325902 | 5,476,000 | 400000 | Sh | CALL | Shared - Other | 1 | 400000 |
| BEACON ROOFING SUPPLY INC | COM | 073685109 | 1,699,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| BEAR STEARNS COS INC | COM | 073902108 | 3,618,300 | 25845 | Sh | | Shared - Other | 1 | 25845 |
| BEARINGPOINT INC | COM | 074002106 | 49,284,020 | 6742000 | Sh | | Shared - Other | 1 | 6742000 |
| BEBE STORES INC | COM | 075571109 | 19,221,462 | 1200591 | Sh | | Shared - Other | 1 | 1200591 |
| BEBE STORES INC | COM | 075571909 | 4,322,700 | 270000 | Sh | CALL | Shared - Other | 1 | 270000 |
| BECKMAN COULTER INC | COM | 075811959 | 3,234,000 | 50000 | Sh | PUT | Shared - Other | 1 | 50000 |
| BECTON DICKINSON & CO | COM | 075887959 | 4,470,000 | 60000 | Sh | PUT | Shared - Other | 1 | 60000 |
| BED BATH & BEYOND INC | COM | 075896100 | 575,840 | 16000 | Sh | | Shared - Other | 1 | 16000 |
| BED BATH & BEYOND INC | COM | 075896950 | 17,995,000 | 500000 | Sh | PUT | Shared - Other | 1 | 500000 |
| BENCHMARK ELECTRS INC | COM | 08160H101 | 2,827,500 | 125000 | Sh | | Shared - Other | 1 | 125000 |
| BENTLEY PHARMACEUTICALS INC | COM | 082657907 | 607,000 | 50000 | Sh | CALL | Shared - Other | 1 | 50000 |
| BEST BUY INC | COM | 086516101 | 938,067 | 20100 | Sh | | Shared - Other | 1 | 20100 |
| BEST BUY INC | COM | 086516951 | 1,400,100 | 30000 | Sh | PUT | Shared - Other | 1 | 30000 |
| BHP BILLITON LTD | COM | 088606950 | 10,755,000 | 180000 | Sh | PUT | Shared - Other | 1 | 180000 |
| BIG LOTS INC | COM | 089302953 | 8,826,000 | 300000 | Sh | PUT | Shared - Other | 1 | 300000 |
| BIODEL INC | COM | 09064M105 | 4,057,990 | 204949 | Sh | | Shared - Other | 1 | 204949 |
| BIOGEN IDEC INC | COM | 09062K953 | 29,425,000 | 550000 | Sh | PUT | Shared - Other | 1 | 550000 |
| BIOLASE TECHNOLOGY INC | COM | 090911108 | 121,400 | 20000 | Sh | | Shared - Other | 1 | 20000 |
| BIOMARIN PHARMACEUTICAL INC | COM | 09061G101 | 1,794,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| BIOMIMETIC THERAPEUTICS INC | COM | 09064X101 | 6,865,399 | 439245 | Sh | | Shared - Other | 1 | 439245 |
| BIOTECH HOLDRS TR | COM | 09067D951 | 29,417,500 | 175000 | Sh | PUT | Shared - Other | 1 | 175000 |
| BJ SVCS CO | COM | 055482103 | 711,000 | 25000 | Sh | | Shared - Other | 1 | 25000 |
| BJ SVCS CO | COM | 055482903 | 1,990,800 | 70000 | Sh | CALL | Shared - Other | 1 | 70000 |
| BLACKROCK INC | COM | 09247K101 | 4,697,700 | 30000 | Sh | | Shared - Other | 1 | 30000 |
| BLOCK H & R INC | COM | 093671105 | 3,032,187 | 129747 | Sh | | Shared - Other | 1 | 129747 |
| BLOCK H & R INC | COM | 093671905 | 2,804,400 | 120000 | Sh | CALL | Shared - Other | 1 | 120000 |
| BLOCKBUSTER INC | COM | 09367R108 | 6,855,917 | 1590700 | Sh | | Shared - Other | 1 | 1590700 |
| BLUE COAT SYSTEMS INC | COM | 09534T908 | 3,714,000 | 75000 | Sh | CALL | Shared - Other | 1 | 75000 |
| BLUEGREEN CORP | COM | 096231105 | 341,675 | 29228 | Sh | | Shared - Other | 1 | 29228 |
| BLUELINX HLDGS INC | COM | 09624H109 | 1,049,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| BLUEPHOENIX SOLUTIONS LTD | COM | M20157109 | 4,161,500 | 350000 | Sh | | HShared - Other | 1 | 350000 |
| BMC SOFTWARE INC | COM | 055921100 | 3,216,648 | 106160 | Sh | | Shared - Other | 1 | 106160 |
| BMC SOFTWARE INC | COM | 055921950 | 1,515,000 | 50000 | Sh | PUT | Shared - Other | 1 | 50000 |
| BMC SOFTWARE INC | COM | 055921100 | 3,030,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| BOEING CO | COM | 097023105 | 12,573,497 | 130756 | Sh | | Shared - Other | 1 | 130756 |
| BOEING CO | COM | 097023905 | 9,616,000 | 100000 | Sh | CALL | Shared - Other | 1 | 100000 |
| BON-TON STORES INC | COM | 097762101 | 801,200 | 20000 | Sh | | Shared - Other | 1 | 20000 |
| BORDERS GROUP INC | COM | 099709907 | 5,718,000 | 300000 | Sh | CALL | Shared - Other | 1 | 300000 |
| BORDERS GROUP INC | COM | 099709107 | 16,587,537 | 870280 | Sh | | Shared - Other | 1 | 870280 |
| BORLAND SOFTWARE CORP | COM | 099849101 | 2,795,608 | 470641 | Sh | | Shared - Other | 1 | 470641 |
| BOSTON PROPERTIES INC | COM | 101121101 | 510,650 | 5000 | Sh | | Shared - Other | 1 | 5000 |
| BOSTON SCIENTIFIC CORP | COM | 101137107 | 1,851,845 | 120720 | Sh | | Shared - Other | 1 | 120720 |
| BOYD GAMING CORP | COM | 103304101 | 2,951,400 | 60000 | Sh | | Shared - Other | 1 | 60000 |
| BP PLC | COM | 055622954 | 3,607,000 | 50000 | Sh | PUT | Shared - Other | 1 | 50000 |
| BRIGHTPOINT INC | COM | 109473405 | 9,533,689 | 691348 | Sh | | Shared - Other | 1 | 691348 |
| BRISTOL MYERS SQUIBB CO | COM | 110122908 | 15,780,000 | 500000 | Sh | CALL | Shared - Other | 1 | 500000 |
| BROADBAND HOLDRS TR | COM | 11130P104 | 22,428,000 | 1400000 | Sh | | Shared - Other | 1 | 1400000 |
| BROADCOM CORP | COM | 111320107 | 10,896,210 | 372520 | Sh | | Shared - Other | 1 | 372520 |
| BROADCOM CORP | COM | 111320907 | 16,087,500 | 550000 | Sh | CALL | Shared - Other | 1 | 550000 |
| BROCADE COMMUNICATIONS SYS I | COM | 111621950 | 977,500 | 125000 | Sh | PUT | Shared - Other | 1 | 125000 x |
| BROOKFIELD ASSET MGMT INC | COM | 112585104 | 798,000 | 20000 | Sh | | Shared - Other | 1 | 20000 |
| BROWN SHOE INC NEW | COM | 115736100 | 11,430,400 | 470000 | Sh | | Shared - Other | 1 | 470000 |
| BRUSH ENGINEERED MATLS INC | COM | 117421107 | 5,878,600 | 140000 | Sh | | Shared - Other | 1 | 140000 |
| BUCKLE INC | COM | 118440106 | 202,949 | 5151 | Sh | | Shared - Other | 1 | 5151 |
| BUCYRUS INTL INC NEW | COM | 118759109 | 1,461,607 | 20650 | Sh | | Shared - Other | 1 | 20650 |
| BUILD A BEAR WORKSHOP | COM | 120076104 | 6,282,749 | 240350 | Sh | | Shared - Other | 1 | 240350 |
| BUILDING MATLS HLDG CORP | COM | 120113905 | 4,554,990 | 321000 | Sh | CALL | Shared - Other | 1 | 321000 |
| BUILDING MATLS HLDG CORP | COM | 120113105 | 14,267,676 | 1005474 | Sh | | Shared - Other | 1 | 1005474 |

DX-1169-00004

GOV-00005111

| Name | Type | CUSIP | Value | Shares | | Opt | Authority | | Amount |
|---|---|---|---|---|---|---|---|---|---|
| BUNGE LIMITED | COM | G16962955 | 10,140,000 | 120000 | | PUT | Shared - Other | 1 | 120000 |
| BURLINGTON NORTHN SANTA FE C | COM | 12189T104 | 7,070,026 | 83040 | Sh | | Shared - Other | 1 | 83040 |
| BUSINESS OBJECTS S A | COM | 12328X907 | 7,768,000 | 200000 | | CALL | Shared - Other | 1 | 200000 |
| BUSINESS OBJECTS S A | COM | 12328X107 | 7,502,334 | 193160 | Sh | | Shared - Other | 1 | 193160 |
| C D W CORP | COM | 12512N955 | 4,248,500 | 50000 | | PUT | Shared - Other | 1 | 50000 |
| C H ROBINSON WORLDWIDE INC | COM | 12541W959 | 950,612 | 18100 | | PUT | Shared - Other | 1 | 18100 |
| CA INC | COM | 12673P955 | 7,749,000 | 300000 | | PUT | Shared - Other | 1 | 300000 |
| CA INC | COM | 12673P905 | 7,749,000 | 300000 | | CALL | Shared - Other | 1 | 300000 |
| CABLEVISION SYS CORP | COM | 12686C109 | 4,371,897 | 120804 | Sh | | Shared - Other | 1 | 120804 |
| CABOT MICROELECTRONICS CORP | COM | 12709P953 | 1,774,500 | 50000 | | PUT | Shared - Other | 1 | 50000 |
| CABOT OIL & GAS CORP | COM | 127097103 | 3,239,539 | 87840 | Sh | | Shared - Other | 1 | 87840 |
| CACI INTL INC | COM | 127190904 | 3,663,750 | 75000 | | CALL | Shared - Other | 1 | 75000 |
| CACI INTL INC | COM | 127190304 | 13,738,672 | 281242 | Sh | | Shared - Other | 1 | 281242 |
| CADBURY SCHWEPPES PLC | COM | 127209302 | 6,287,940 | 115800 | Sh | | Shared - Other | 1 | 115800 |
| CADENCE DESIGN SYSTEM INC | COM | 127387108 | 658,800 | 30000 | Sh | | Shared - Other | 1 | 30000 |
| CADENCE DESIGN SYSTEM INC | COM | 127387108 | 9,943,049 | 452780 | Sh | | Shared - Other | 1 | 452780 |
| CAI INTERNATIONAL INC | COM | 12477X106 | 908,500 | 75000 | Sh | | Shared - Other | 1 | 75000 |
| CALLAWAY GOLF CO | COM | 131193104 | 11,598,228 | 651220 | Sh | | Shared - Other | 1 | 651220 |
| CAMPBELL SOUP CO | COM | 134429109 | 1,164,300 | 30000 | Sh | | Shared - Other | 1 | 30000 |
| CANADIAN NATL RY CO | COM | 136375102 | 1,252,369 | 24590 | Sh | | Shared - Other | 1 | 24590 |
| CANADIAN PAC RY LTD | COM | 13645T100 | 249,128 | 3620 | Sh | | Shared - Other | 1 | 3620 |
| CANADIAN SOLAR INC | COM | 136635109 | 94,949 | 10101 | Sh | | Shared - Other | 1 | 10101 |
| CANARGO ENERGY CORP | COM | 137225108 | 537,075 | 697500 | Sh | | Shared - Other | 1 | 697500 |
| CAPITAL ONE FINL CORP | COM | 14040B955 | 3,137,600 | 40000 | | PUT | Shared - Other | 1 | 40000 |
| CAPITAL PRODUCT PARTNERS L P | COM | Y11082107 | 427,800 | 15000 | Sh | | Shared - Other | 1 | 15000 |
| CARACO PHARMACEUTICAL LABS L | COM | 14075T107 | 13,765,103 | 906792 | Sh | | Shared - Other | 1 | 906792 |
| CARDINAL HEALTH INC | COM | 14149Y108 | 7,064,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| CARLISLE COS INC | COM | 142339100 | 804,623 | 17300 | Sh | | Shared - Other | 1 | 17300 |
| CARRIER ACCESS CORP | COM | 144460102 | 2,208,713 | 470941 | Sh | | Shared - Other | 1 | 470941 |
| CARTER INC | COM | 146229909 | 1,297,000 | 50000 | | CALL | Shared - Other | 1 | 50000 |
| CARTER INC | COM | 146229109 | 11,348,750 | 437500 | Sh | | Shared - Other | 1 | 437500 |
| CASTLE BRANDS INC | COM | 148435101 | 112,000 | 20000 | Sh | | Shared - Other | 1 | 20000 |
| CASUAL MALE RETAIL GRP INC | COM | 148711104 | 525,776 | 52057 | Sh | | Shared - Other | 1 | 52057 |
| CATERPILLAR INC DEL | COM | 149123951 | 8,613,000 | 110000 | | PUT | Shared - Other | 1 | 110000 |
| CAVIUM NETWORKS INC | COM | 14965A101 | 18,132,102 | 801596 | Sh | | Shared - Other | 1 | 801596 |
| CB RICHARD ELLIS GROUP INC | COM | 12497T101 | 365,000 | 10000 | Sh | | Shared - Other | 1 | 10000 |
| CBEYOND INC | COM | 149847105 | 385,100 | 10000 | Sh | | Shared - Other | 1 | 10000 |
| CBS CORP NEW | COM | 124857202 | 666,400 | 20000 | Sh | | Shared - Other | 1 | 20000 |
| CELESTICA INC | COM | 15101Q108 | 1,254,375 | 200700 | Sh | | Shared - Other | 1 | 200700 |
| CEMEX SAB DE CV | COM | 151290909 | 2,767,500 | 75000 | | CALL | Shared - Other | 1 | 75000 |
| CEMEX SAB DE CV | COM | 151290889 | 5,535,000 | 150000 | Sh | | Shared - Other | 1 | 150000 |
| CENTEX CORP | COM | 152312904 | 6,015,000 | 150000 | | CALL | Shared - Other | 1 | 150000 |
| CENTEX CORP | COM | 152312104 | 4,918,666 | 122660 | Sh | | Shared - Other | 1 | 122660 |
| CENTILLIUM COMMUNICATIONS IN | COM | 152319109 | 418,000 | 200000 | Sh | | Shared - Other | 1 | 200000 |
| CENTRAL GARDEN & PET CO | COM | 153527106 | 5,411,012 | 441355 | Sh | | Shared - Other | 1 | 441355 |
| CENTURY ALUM CO | COM | 156431108 | 6,009,300 | 110000 | Sh | | Shared - Other | 1 | 110000 |
| CEPHEID | COM | 15670R107 | 730,005 | 50000 | Sh | | Shared - Other | 1 | 50000 |
| CERNER CORP | COM | 156782954 | 5,547,000 | 100000 | | PUT | Shared - Other | 1 | 100000 |
| CHAMPION ENTERPRISES INC | COM | 158496109 | 983,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| CHAPARRAL STL CO DEL | COM | 159423102 | 7,187,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| CHARLOTTE RUSSE HLDG INC | COM | 161048103 | 2,283,950 | 85000 | Sh | | Shared - Other | 1 | 85000 |
| CHARTER COMMUNICATIONS INC D | COM | 16117M107 | 810,640 | 200158 | Sh | | Shared - Other | 1 | 200158 |
| CHECK POINT SOFTWARE TECH LT | COM | M22465104 | 18,234,519 | 799409 | Sh | | Shared - Other | 1 | 799409 |
| CHECK POINT SOFTWARE TECH LT | COM | M22465904 | 17,791,800 | 780000 | | CALL | Shared - Other | 1 | 780000 |
| CHEESECAKE FACTORY INC | COM | 163072101 | 4,904,000 | 200000 | Sh | | Shared - Other | 1 | 200000 |
| CHEMTURA CORP | COM | 163893900 | 6,110,500 | 550000 | | CALL | Shared - Other | 1 | 550000 |
| CHEMTURA CORP | COM | 163893100 | 27,998,089 | 2510179 | Sh | | Shared - Other | 1 | 2510179 |
| CHESAPEAKE ENERGY CORP | COM | 165167957 | 2,768,000 | 80000 | | PUT | Shared - Other | 1 | 80000 |
| CHEVRON CORP NEW | COM | 166764100 | 231,070 | 2743 | Sh | | Shared - Other | 1 | 2743 |
| CHICAGO BRIDGE & IRON CO N Y | COM | 167250109 | 1,890,774 | 50100 | Sh | | Shared - Other | 1 | 50100 |
| CHICAGO MERCANTILE HLDGS INC | COM | 167760107 | 9,351,300 | 17500 | Sh | | Shared - Other | 1 | 17500 |
| CHICOS FAS INC | COM | 168615102 | 1,740,310 | 71500 | Sh | | Shared - Other | 1 | 71500 |
| CHILDRENS PL RETAIL STORES I | COM | 168905107 | 1,033,220 | 35500 | Sh | | Shared - Other | 1 | 35500 |
| CHINA BAK BATTERY INC | COM | 16936Y100 | 697,099 | 177379 | Sh | | Shared - Other | 1 | 177379 |
| CHINA GRENTECH CORP LTD | COM | 16938P107 | 1,338,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| CHIPMOS TECH BERMUDA LTD | COM | G2110R106 | 431,400 | 60000 | Sh | | Shared - Other | 1 | 60000 |
| CHIPOTLE MEXICAN GRILL INC | COM | 169656955 | 4,264,000 | 50000 | | PUT | Shared - Other | 1 | 50000 |
| CHOICEPOINT INC | COM | 170308102 | 2,127,212 | 50111 | Sh | | Shared - Other | 1 | 50111 |
| CHRISTOPHER & BANKS CORP | COM | 171046105 | 3,001,250 | 175000 | Sh | | Shared - Other | 1 | 175000 |
| CHUBB CORP | COM | 171232101 | 702,196 | 12970 | Sh | | Shared - Other | 1 | 12970 |
| CHUNGHWA TELECOM CO LTD | COM | 17133Q205 | 1,895,430 | 100500 | Sh | | Shared - Other | 1 | 100500 |
| CIGNA CORP | COM | 125509109 | 2,655,387 | 50850 | Sh | | Shared - Other | 1 | 50850 |

DX-1169-00005
GOV-00005112

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| CINTAS CORP | COM | 172908905 | 2,562,950 | 65000 | | CALL | Shared - Other 1 | 65000 |
| CIRCUIT CITY STORE INC | COM | 172737108 | 3,332,680 | 221000 | Sh | | Shared - Other 1 | 221000 |
| CIRCUIT CITY STORE INC | COM | 172737908 | 3,317,600 | 220000 | | CALL | Shared - Other 1 | 220000 |
| CISCO SYS INC | COM | 17275N102 | 71,074,453 | 2552045 | Sh | | Shared - Other 1 | 2552045 |
| CIT GROUP INC | COM | 125581958 | 6,031,300 | 110000 | | PUT | Shared - Other 1 | 110000 |
| CIT GROUP INC | COM | 125581108 | 2,863,539 | 71861 | Sh | | Shared - Other 1 | 71861 |
| CITIGROUP INC | COM | 172967101 | 10,974,162 | 213963 | Sh | | Shared - Other 1 | 213963 |
| CITRIX SYS INC | COM | 177376100 | 2,188,550 | 65000 | Sh | | Shared - Other 1 | 65000 |
| CITRIX SYS INC | COM | 177376950 | 15,151,500 | 450000 | | PUT | Shared - Other 1 | 450000 |
| CITY NATL CORP | COM | 178566955 | 3,804,500 | 50000 | | PUT | Shared - Other 1 | 50000 |
| CKX INC | COM | 12562M106 | 2,414,354 | 174700 | Sh | | Shared - Other 1 | 174700 |
| CLAYMONT STEEL HOLDINGS INC | COM | 18302P104 | 2,029,612 | 94086 | Sh | | Shared - Other 1 | 94086 |
| CLECO CORP NEW | COM | 12561W105 | 9,129,680 | 372640 | Sh | | Shared - Other 1 | 372640 |
| CLEVELAND BIOLABS INC | COM | 185860103 | 438,400 | 40000 | Sh | | Shared - Other 1 | 40000 |
| CLEVELAND CLIFFS INC | COM | 185896107 | 3,393,791 | 43695 | Sh | | Shared - Other 1 | 43695 |
| CLOROX CO DEL | COM | 189054109 | 3,163,374 | 50940 | Sh | | Shared - Other 1 | 50940 |
| CMS ENERGY CORP | COM | 125896100 | 21,291,880 | 1237900 | Sh | | Shared - Other 1 | 1237900 |
| CNX GAS CORP | COM | 12618H309 | 3,613,860 | 118100 | Sh | | Shared - Other 1 | 118100 |
| COACH INC | COM | 189754104 | 6,161,932 | 130026 | Sh | | Shared - Other 1 | 130026 |
| COACH INC | COM | 189754954 | 2,369,500 | 50000 | | PUT | Shared - Other 1 | 50000 |
| COCA COLA CO | COM | 191216100 | 16,274,583 | 311118 | Sh | | Shared - Other 1 | 311118 |
| COEUR D ALENE MINES CORP IDA | COM | 192108108 | 2,964,263 | 825700 | Sh | | Shared - Other 1 | 825700 |
| COGENT INC | COM | 19239T108 | 4,407,000 | 300000 | Sh | | Shared - Other 1 | 300000 |
| COGNIZANT TECHNOLOGY SOLUTIO | COM | 192446102 | 89,274,900 | 1190332 | Sh | | Shared - Other 1 | 1190332 |
| COGNOS INC | COM | 19244C109 | 7,223,475 | 182050 | Sh | | Shared - Other 1 | 182050 |
| COHEN & STEERS INC | COM | 19247A100 | 3,111,020 | 71600 | Sh | | Shared - Other 1 | 71600 |
| COLDWATER CREEK INC | COM | 193068903 | 3,484,500 | 150000 | | CALL | Shared - Other 1 | 150000 |
| COLDWATER CREEK INC | COM | 193068103 | 3,143,321 | 135313 | Sh | | Shared - Other 1 | 135313 |
| COLGATE PALMOLIVE CO | COM | 194162103 | 17,955,668 | 276880 | Sh | | Shared - Other 1 | 276880 |
| COLUMBIA LABS INC | COM | 197779101 | 192,800 | 80000 | Sh | | Shared - Other 1 | 80000 |
| COMCAST CORP NEW | COM | 20030N200 | 3,900,895 | 139517 | Sh | | Shared - Other 1 | 139517 |
| COMCAST CORP NEW | COM | 20030N101 | 2,755,760 | 98000 | Sh | | Shared - Other 1 | 98000 |
| COMERICA INC | COM | 200340107 | 346,710 | 5830 | Sh | | Shared - Other 1 | 5830 |
| COMMERCE ENERGY GROUP INC | COM | 20061Q106 | 239,624 | 119812 | Sh | | Shared - Other 1 | 119812 |
| COMMVAULT SYSTEMS INC | COM | 204166102 | 12,449,287 | 720862 | Sh | | Shared - Other 1 | 720862 |
| COMPANHIA VALE DO RIO DOCE | COM | 204412209 | 17,823,386 | 400076 | Sh | | Shared - Other 1 | 400076 |
| COMPUTER SCIENCES CORP | COM | 205363904 | 4,436,250 | 75000 | | CALL | Shared - Other 1 | 75000 |
| COMPUTER SCIENCES CORP | COM | 205363104 | 426,235 | 7206 | Sh | | Shared - Other 1 | 7206 |
| COMTECH GROUP INC | COM | 205821200 | 3,303,420 | 200086 | Sh | | Shared - Other 1 | 200086 |
| CONVERGE INC | COM | 205859101 | 310,100 | 10000 | Sh | | Shared - Other 1 | 10000 |
| CONAGRA FOODS INC | COM | 205887102 | 4,969,100 | 185000 | Sh | | Shared - Other 1 | 185000 |
| CONCURRENT COMPUTER CORP NEW | COM | 206710204 | 4,603,678 | 2571887 | Sh | | Shared - Other 1 | 2571887 |
| CONEXANT SYSTEMS INC | COM | 20714Z100 | 3,588,131 | 2600095 | Sh | | Shared - Other 1 | 2600095 |
| CONOCOPHILLIPS | COM | 20825C954 | 5,887,500 | 75000 | | PUT | Shared - Other 1 | 75000 |
| CONSOL ENERGY INC | COM | 20854P109 | 4,149,900 | 90000 | Sh | | Shared - Other 1 | 90000 |
| CONSOL ENERGY INC | COM | 20854P909 | 3,227,700 | 70000 | | CALL | Shared - Other 1 | 70000 |
| CONSOLIDATED EDISON INC | COM | 209115104 | 1,553,166 | 34423 | Sh | | Shared - Other 1 | 34423 |
| CONSTELLATION BRANDS INC | COM | 21036P958 | 1,942,400 | 80000 | | PUT | Shared - Other 1 | 80000 |
| CONSTELLATION ENERGY GROUP I | COM | 210371100 | 8,717,000 | 100000 | Sh | | Shared - Other 1 | 100000 |
| CONTINENTAL AIRLS INC | COM | 210795308 | 411,317 | 12144 | Sh | | Shared - Other 1 | 12144 |
| CONVERA CORP | COM | 211919105 | 106,419 | 24408 | Sh | | Shared - Other 1 | 24408 |
| COPART INC | COM | 217204106 | 611,800 | 20000 | Sh | | Shared - Other 1 | 20000 |
| CORINTHIAN COLLEGES INC | COM | 218868107 | 407,250 | 25000 | Sh | | Shared - Other 1 | 25000 |
| CORN PRODS INTL INC | COM | 219023108 | 454,500 | 10000 | Sh | | Shared - Other 1 | 10000 |
| CORNING INC | COM | 219350105 | 21,841,673 | 854860 | Sh | | Shared - Other 1 | 854860 |
| COST PLUS INC CALIF | COM | 221485105 | 361,697 | 42653 | Sh | | Shared - Other 1 | 42653 |
| COSTCO WHSL CORP NEW | COM | 22160K905 | 7,022,400 | 120000 | | CALL | Shared - Other 1 | 120000 |
| COSTCO WHSL CORP NEW | COM | 22160K105 | 5,029,209 | 85940 | Sh | | Shared - Other 1 | 85940 |
| COTT CORP QUE | COM | 22163H106 | 431,700 | 30000 | Sh | | Shared - Other 1 | 30000 |
| COUNTRYWIDE FINANCIAL CORP | COM | 222372954 | 5,089,000 | 140000 | | PUT | Shared - Other 1 | 140000 |
| COUNTRYWIDE FINANCIAL CORP | COM | 222372104 | 3,177,615 | 106867 | Sh | | Shared - Other 1 | 106867 |
| COVANCE INC | COM | 222016950 | 6,956,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| COVENANT TRANSN GROUP INC | COM | 22284P105 | 184,680 | 16200 | Sh | | Shared - Other 1 | 16200 |
| CROCS INC | COM | 227046109 | 215,000 | 5000 | Sh | | Shared - Other 1 | 5000 |
| CROCS INC | COM | 227046959 | 1,721,200 | 40000 | | PUT | Shared - Other 1 | 40000 |
| CROCS INC | COM | 227046909 | 1,721,200 | 40000 | | CALL | Shared - Other 1 | 40000 |
| CROWN CRAFTS INC | COM | 228309100 | 263,948 | 60400 | Sh | | Shared - Other 1 | 60400 |
| CSX CORP | COM | 126408953 | 901,600 | 20000 | | PUT | Shared - Other 1 | 20000 |
| CSX CORP | COM | 126408103 | 8,211,277 | 182149 | Sh | | Shared - Other 1 | 182149 |
| CTRIP COM INTL LTD | COM | 22943F100 | 25,366,038 | 322600 | Sh | | Shared - Other 1 | 322600 |
| CUBIST PHARMACEUTICALS INC | COM | 229678907 | 3,942,000 | 200000 | | CALL | Shared - Other 1 | 200000 |
| CUBIST PHARMACEUTICALS INC | COM | 229678107 | 3,449,250 | 175000 | Sh | | Shared - Other 1 | 175000 |
| CUMMINS INC | COM | 231021106 | 1,366,335 | 13500 | Sh | | Shared - Other 1 | 13500 |
| CUTERA INC | COM | 23210P908 | 2,492,000 | 100000 | | CALL | Shared - Other 1 | 100000 |
| CV THERAPEUTICS INC | COM | 126667104 | 6,948,460 | 526000 | Sh | | Shared - Other 1 | 526000 |
| CV THERAPEUTICS INC | COM | 126667904 | 7,228,512 | 547200 | | CALL | Shared - Other 1 | 547200 |
| CVS CAREMARK CORPORATION | COM | 126650100 | 6,746,786 | 185097 | Sh | | Shared - Other 1 | 185097 |
| CVS CAREMARK CORPORATION | COM | 126650900 | 3,645,000 | 100000 | | CALL | Shared - Other 1 | 100000 |

DX-1169-00006
GOV-00005113

| Name | Type | CUSIP | Value | Shares | Sh | Opt | Discretion | | Shares |
|---|---|---|---|---|---|---|---|---|---|
| CYNOSURE INC | COM | 232577205 | 2,185,800 | 60000 | Sh | | Shared – Other | 1 | 60000 |
| CYPRESS SEMICONDUCTOR CORP | COM | 232806109 | 5,831,816 | 250400 | Sh | | Shared – Other | 1 | 250400 |
| CYTEC INDS INC | COM | 232820100 | 1,594,250 | 25000 | Sh | | Shared – Other | 1 | 25000 |
| D R HORTON INC | COM | 23331A109 | 2,718,851 | 136420 | Sh | | Shared – Other | 1 | 136420 |
| DAKTRONICS INC | COM | 234264109 | 1,404,792 | 65400 | Sh | | Shared – Other | 1 | 65400 |
| DANKA BUSINESS SYS PLC | COM | 236277109 | 2,726,513 | 2478648 | Sh | | Shared – Other | 1 | 2478648 |
| DARLING INTL INC | COM | 237266101 | 228,500 | 25000 | Sh | | Shared – Other | 1 | 25000 |
| DELCATH SYS INC | COM | 24661E104 | 862,125 | 192010 | Sh | | Shared – Other | 1 | 192010 |
| DELL INC | COM | 24702R901 | 7,137,500 | 250000 | Sh | CALL | Shared – Other | 1 | 250000 |
| DELL INC | COM | 24702R951 | 7,137,500 | 250000 | Sh | PUT | Shared – Other | 1 | 250000 |
| DELTA PETE CORP | COM | 247907207 | 3,564,200 | 177500 | Sh | | Shared – Other | 1 | 177500 |
| DENNYS CORP | COM | 24869F104 | 1,780,000 | 400000 | Sh | | Shared – Other | 1 | 400000 |
| DEVON ENERGY CORP NEW | COM | 25179M103 | 2,489,622 | 31800 | Sh | | Shared – Other | 1 | 31800 |
| DIAGEO P L C | COM | 25243Q205 | 1,249,650 | 15000 | Sh | | Shared – Other | 1 | 15000 |
| DIAMONDS TR | COM | 2527B7956 | 99,308,000 | 740000 | Sh | PUT | Shared – Other | 1 | 740000 |
| DIANA SHIPPING INC | COM | Y20660104 | 409,696 | 18290 | Sh | | Shared – Other | 1 | 18290 |
| DIEBOLD INC | COM | 253651103 | 3,132,000 | 60000 | Sh | | Shared – Other | 1 | 60000 |
| DIGITAL RIV INC | COM | 253988104 | 1,851,630 | 40920 | Sh | | Shared – Other | 1 | 40920 |
| DIGITAL RIV INC | COM | 25389B954 | 24,208,750 | 535000 | Sh | PUT | Shared – Other | 1 | 535000 |
| DIVX INC | COM | 255413106 | 300,000 | 20000 | Sh | | Shared – Other | 1 | 20000 |
| DOBSON COMMUNICATIONS CORP | COM | 256069105 | 1,333,200 | 120000 | Sh | | Shared – Other | 1 | 120000 |
| DOLLAR THRIFTY AUTOMOTIVE GP | COM | 256743105 | 6,534,400 | 160000 | Sh | | Shared – Other | 1 | 160000 |
| DOMINION RES INC VA NEW | COM | 25746U109 | 19,851,300 | 230000 | Sh | | Shared – Other | 1 | 230000 |
| DOMINOS PIZZA INC | COM | 25754A201 | 1,372,077 | 75100 | Sh | | Shared – Other | 1 | 75100 |
| DOMTAR CORP | COM | 257559104 | 3,013,200 | 270000 | Sh | | Shared – Other | 1 | 270000 |
| DONNELLEY R R & SONS CO | COM | 257867101 | 3,515,608 | 80800 | Sh | | Shared – Other | 1 | 80800 |
| DOUBLE-TAKE SOFTWARE INC | COM | 258598101 | 4,923,000 | 300000 | Sh | | Shared – Other | 1 | 300000 |
| DOW CHEM CO | COM | 260543903 | 14,150,400 | 320000 | Sh | CALL | Shared – Other | 1 | 320000 |
| DOW CHEM CO | COM | 260543103 | 31,195,132 | 705453 | Sh | | Shared – Other | 1 | 705453 |
| DPL INC | COM | 233293109 | 4,264,036 | 150460 | Sh | | Shared – Other | 1 | 150460 |
| DRDGOLD LTD | COM | 26152H103 | 949,130 | 1300000 | Sh | | Shared – Other | 1 | 1300000 |
| DRESS BARN INC | COM | 261570105 | 2,052,000 | 100000 | Sh | | Shared – Other | 1 | 100000 |
| DSP GROUP INC | COM | 23332B106 | 6,141,000 | 300000 | Sh | | Shared – Other | 1 | 300000 |
| DST SYS INC DEL | COM | 233326107 | 1,251,597 | 15801 | Sh | | Shared – Other | 1 | 15801 |
| DU PONT E I DE NEMOURS & CO | COM | 263534959 | 2,033,600 | 40000 | Sh | PUT | Shared – Other | 1 | 40000 |
| E M C CORP MASS | COM | 268648102 | 1,810,000 | 100000 | Sh | | Shared – Other | 1 | 100000 |
| E M C CORP MASS | COM | 268640902 | 8,145,000 | 450000 | Sh | CALL | Shared – Other | 1 | 450000 |
| E TRADE FINANCIAL CORP | COM | 269246104 | 14,364,751 | 650283 | Sh | | Shared – Other | 1 | 650283 |
| E TRADE FINANCIAL CORP | COM | 269246904 | 4,418,000 | 200000 | Sh | CALL | Shared – Other | 1 | 200000 |
| EARTHLINK INC | COM | 270321102 | 2,241,232 | 300031 | Sh | | Shared – Other | 1 | 300031 |
| EASTMAN KODAK CO | COM | 277461959 | 1,391,500 | 50000 | Sh | PUT | Shared – Other | 1 | 50000 |
| EATON CORP | COM | 278058902 | 5,580,000 | 60000 | Sh | CALL | Shared – Other | 1 | 60000 |
| EATON CORP | COM | 278058102 | 6,975,000 | 75000 | Sh | | Shared – Other | 1 | 75000 |
| EBAY INC | COM | 278642903 | 7,562,300 | 235000 | Sh | CALL | Shared – Other | 1 | 235000 |
| EBAY INC | COM | 278642103 | 19,987,835 | 621126 | Sh | | Shared – Other | 1 | 621126 |
| ECHOSTAR COMMUNICATIONS NEW | COM | 278762109 | 3,671,271 | 84650 | Sh | | Shared – Other | 1 | 84650 |
| ECI TELECOM LTD | COM | 268258100 | 2,973,750 | 325000 | Sh | | Shared – Other | 1 | 325000 |
| EDGAR ONLINE INC | COM | 279765101 | 1,351,218 | 500451 | Sh | | Shared – Other | 1 | 500451 |
| EDWARDS LIFESCIENCES CORP | COM | 28176E958 | 7,894,400 | 160000 | Sh | PUT | Shared – Other | 1 | 160000 |
| EINSTEIN NOAH REST GROUP INC | COM | 28257U104 | 1,233,139 | 73010 | Sh | | Shared – Other | 1 | 73010 |
| EL PASO CORP | COM | 28336L109 | 1,190,593 | 69100 | Sh | | Shared – Other | 1 | 69100 |
| EL PASO ELEC CO | COM | 283677854 | 4,270,984 | 173900 | Sh | | Shared – Other | 1 | 173900 |
| ELAN PLC | COM | 204131900 | 6,579,000 | 300000 | Sh | CALL | Shared – Other | 1 | 300000 |
| ELECTRO SCIENTIFIC INDS | COM | 285229100 | 1,250,038 | 60098 | Sh | | Shared – Other | 1 | 60098 |
| ELECTRONIC ARTS INC | COM | 285512909 | 5,678,400 | 120000 | Sh | CALL | Shared – Other | 1 | 120000 |
| ELECTRONIC ARTS INC | COM | 285512109 | 24,902,576 | 526259 | Sh | | Shared – Other | 1 | 526259 |
| ELECTRONIC DATA SYS NEW | COM | 285661954 | 2,773,000 | 100000 | Sh | PUT | Shared – Other | 1 | 100000 |
| ELECTRONICS FOR IMAGING INC | COM | 286082102 | 5,484,416 | 194345 | Sh | | Shared – Other | 1 | 194345 |
| ELECTRONICS FOR IMAGING INC | COM | 286082902 | 1,411,000 | 50000 | Sh | CALL | Shared – Other | 1 | 50000 |
| EMAGEON INC | COM | 29076U109 | 16,237,254 | 1800139 | Sh | | Shared – Other | 1 | 1800139 |
| EMAGEON INC | COM | 29076U909 | 10,463,200 | 1160000 | Sh | CALL | Shared – Other | 1 | 1160000 |
| EMCORE CORP | COM | 290846104 | 1,099,720 | 348574 | Sh | | Shared – Other | 1 | 348574 |
| EMERSON ELEC CO | COM | 291011104 | 2,710,188 | 57910 | Sh | | Shared – Other | 1 | 57910 |
| EMMIS COMMUNICATIONS CORP | COM | 291525103 | 1,443,585 | 156741 | Sh | | Shared – Other | 1 | 156741 |
| EMPIRE RES INC DEL | COM | 29206E100 | 772,000 | 80000 | Sh | | Shared – Other | 1 | 80000 |
| EMPLOYERS HOLDINGS INC | COM | 292218104 | 213,611 | 10057 | Sh | | Shared – Other | 1 | 10057 |
| ENDO PHARMACEUTICALS HLDGS I | COM | 29264F905 | 5,134,500 | 150000 | Sh | CALL | Shared – Other | 1 | 150000 |
| ENDO PHARMACEUTICALS HLDGS I | COM | 29264F205 | 7,701,750 | 225000 | Sh | | Shared – Other | 1 | 225000 |
| ENERGY CONVERSION DEVICES IN | COM | 292659109 | 1,086,405 | 35250 | Sh | | Shared – Other | 1 | 35250 |
| ENERNOC INC | COM | 29276A107 | 3,813,000 | 100000 | Sh | | Shared – Other | 1 | 100000 |
| ENI S P A | COM | 26874R108 | 1,808,750 | 25000 | Sh | | Shared – Other | 1 | 25000 |
| ENSCO INTL INC | COM | 26874Q950 | 3,050,500 | 50000 | Sh | PUT | Shared – Other | 1 | 50000 |
| ENSCO INTL INC | COM | 26874Q100 | 915,150 | 15000 | Sh | | Shared – Other | 1 | 15000 |
| ENTERGY CORP NEW | COM | 29364G103 | 6,754,677 | 62922 | Sh | | Shared – Other | 1 | 62922 |
| ENTERTAINMENT DIST CO INC | COM | 29382J105 | 3,031,417 | 1523325 | Sh | | Shared – Other | 1 | 1523325 |
| ENTRAVISION COMMUNICATIONS C | COM | 29382R107 | 261,739 | 25100 | Sh | | Shared – Other | 1 | 25100 |
| ENTRUST INC | COM | 293848107 | 13,096,253 | 3225678 | Sh | | Shared – Other | 1 | 3225678 |
| ENZON PHARMACEUTICALS INC | COM | 293904108 | 5,749,544 | 732426 | Sh | | Shared – Other | 1 | 732426 |

DX-1169-00007

GOV-00005114

| Name | Class | CUSIP | Value | Shares | Sh | Put/Call | Discretion | Mgr | Sole |
|------|-------|-------|-------|--------|----|----------|------------|-----|------|
| EQUINIX INC | COM | 29444U952 | 2,744,100 | 30000 | | PUT | Shared - Other | 1 | 30000 |
| EQUITY RESIDENTIAL | COM | 29476L107 | 912,600 | 20000 | Sh | | Shared - Other | 1 | 20000 |
| ERICSSON L M TEL CO | COM | 294821908 | 11,967,000 | 300000 | | CALL | Shared - Other | 1 | 300000 |
| ERICSSON L M TEL CO | COM | 294821608 | 3,390,650 | 85000 | Sh | | Shared - Other | 1 | 85000 |
| ESCO TECHNOLOGIES INC | COM | 296315104 | 5,076,400 | 140000 | Sh | | Shared - Other | 1 | 140000 |
| ESPEED INC | COM | 296643109 | 864,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| EURAND N V | COM | N31010106 | 11,544,951 | 736755 | Sh | | Shared - Other | 1 | 736755 |
| EVCI CAREER COLLEGES INC | COM | 26926P100 | 103,200 | 120000 | Sh | | Shared - Other | 1 | 120000 |
| EVERGREEN SOLAR INC | COM | 30033R108 | 744,000 | 80000 | Sh | | Shared - Other | 1 | 80000 |
| EXAR CORP | COM | 300645108 | 7,599,019 | 567091 | Sh | | Shared - Other | 1 | 567091 |
| EXCO RESOURCES INC | COM | 269279402 | 1,927,120 | 110500 | Sh | | Shared - Other | 1 | 110500 |
| EXELIXIS INC | COM | 30161Q104 | 2,117,500 | 175000 | Sh | | Shared - Other | 1 | 175000 |
| EXELIXIS INC | COM | 30161Q904 | 2,299,000 | 190000 | | CALL | Shared - Other | 1 | 190000 |
| EXELON CORP | COM | 30161N101 | 380,424 | 5240 | Sh | | Shared - Other | 1 | 5240 |
| EXPEDITORS INTL WASH INC | COM | 302130109 | 1,015,980 | 24600 | Sh | | Shared - Other | 1 | 24600 |
| EXPRESS SCRIPTS INC | COM | 302182950 | 5,001,000 | 100000 | | PUT | Shared - Other | 1 | 100000 |
| EXTREME NETWORKS INC | COM | 302260106 | 13,071,910 | 3227632 | Sh | | Shared - Other | 1 | 3227632 |
| F5 NETWORKS INC | COM | 315616102 | 60,450,000 | 750000 | Sh | | Shared - Other | 1 | 750000 |
| FAIRCHILD SEMICONDUCTOR INTL | COM | 303726103 | 8,114,400 | 420000 | Sh | | Shared - Other | 1 | 420000 |
| FBR CAPITAL MARKETS CORP | COM | 30247C301 | 1,098,500 | 65000 | Sh | | Shared - Other | 1 | 65000 |
| FEDERAL HOME LN MTG CORP | COM | 313400301 | 1,354,824 | 22320 | Sh | | Shared - Other | 1 | 22320 |
| FEDERAL NATL MTG ASSN | COM | 313586109 | 2,286,550 | 35000 | Sh | | Shared - Other | 1 | 35000 |
| FEDERAL NATL MTG ASSN | COM | 313586959 | 3,266,500 | 50000 | | PUT | Shared - Other | 1 | 50000 |
| FIBERTOWER CORP | COM | 31567R100 | 5,077,358 | 1172600 | Sh | | Shared - Other | 1 | 1172600 |
| FIFTH THIRD BANCORP | COM | 316773100 | 50,000 | 50000 | Sh | | Shared - Other | 1 | 50000 |
| FINISAR | COM | 31787A101 | 376,945 | 99721 | Sh | | Shared - Other | 1 | 99721 |
| FINISH LINE INC | COM | 317923100 | 911,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| FIRST SOLAR INC | COM | 336433107 | 48,426,164 | 542347 | Sh | | Shared - Other | 1 | 542347 |
| FLAMEL TECHNOLOGIES SA | COM | 338488959 | 1,572,750 | 75000 | | PUT | Shared - Other | 1 | 75000 |
| FLEETWOOD ENTERPRISES INC | COM | 339099103 | 634,405 | 70100 | Sh | | Shared - Other | 1 | 70100 |
| FLEXTRONICS INTL LTD | COM | Y2573F102 | 152,323 | 14104 | Sh | | Shared - Other | 1 | 14104 |
| FLOWERS FOODS INC | COM | 343498101 | 667,200 | 20000 | Sh | | Shared - Other | 1 | 20000 |
| FOCUS MEDIA HLDG LTD | COM | 34415V109 | 17,700,041 | 350600 | Sh | | Shared - Other | 1 | 350600 |
| FOMENTO ECONOMICO MEXICANO S | COM | 344419106 | 3,932,983 | 100025 | Sh | | Shared - Other | 1 | 100025 |
| FOOT LOCKER INC | COM | 344049104 | 5,450,000 | 250000 | Sh | | Shared - Other | 1 | 250000 |
| FORCE PROTECTION INC | COM | 345203202 | 629,314 | 30490 | Sh | | Shared - Other | 1 | 30490 |
| FORMFACTOR INC | COM | 346375108 | 44,429,226 | 1160032 | Sh | | Shared - Other | 1 | 1160032 |
| FORMFACTOR INC | COM | 346375908 | 3,830,000 | 100000 | | CALL | Shared - Other | 1 | 100000 |
| FORTUNE BRANDS INC | COM | 349631101 | 3,294,800 | 40000 | Sh | | Shared - Other | 1 | 40000 |
| FORWARD AIR CORP | COM | 349853101 | 511,350 | 15000 | Sh | | Shared - Other | 1 | 15000 |
| FORWARD INDS INC N Y | COM | 349862300 | 456,832 | 137600 | Sh | | Shared - Other | 1 | 137600 |
| FOUNDATION COAL HLDGS INC | COM | 35039W900 | 7,315,200 | 180000 | | CALL | Shared - Other | 1 | 180000 |
| FOUNDATION COAL HLDGS INC | COM | 35039W100 | 4,775,200 | 117500 | Sh | | Shared - Other | 1 | 117500 |
| FOUNDRY NETWORKS INC | COM | 35063R900 | 9,996,000 | 600000 | | CALL | Shared - Other | 1 | 600000 |
| FOUNDRY NETWORKS INC | COM | 35063R100 | 8,140,143 | 488604 | Sh | | Shared - Other | 1 | 488604 |
| FPL GROUP INC | COM | 302571104 | 5,674,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| FRANKLIN RES INC | COM | 354613951 | 5,298,800 | 40000 | | PUT | Shared - Other | 1 | 40000 |
| FREEPORT-MCMORAN COPPER & GO | COM | 35671D857 | 2,079,610 | 25110 | Sh | | Shared - Other | 1 | 25110 |
| FREEPORT-MCMORAN COPPER & GO | COM | 35671D907 | 4,969,200 | 60000 | | CALL | Shared - Other | 1 | 60000 |
| FREIGHTCAR AMER INC | COM | 357023100 | 1,914,509 | 40019 | Sh | | Shared - Other | 1 | 40019 |
| FSI INTL INC | COM | 302633102 | 959,153 | 300675 | Sh | | Shared - Other | 1 | 300675 |
| FUELCELL ENERGY INC | COM | 35952H106 | 799,690 | 100971 | Sh | | Shared - Other | 1 | 100971 |
| GAIAM INC | COM | 36268Q103 | 729,200 | 40000 | Sh | | Shared - Other | 1 | 40000 |
| GALAXY ENERGY CORP | COM | 36318B106 | 9,750 | 75000 | Sh | | Shared - Other | 1 | 75000 |
| GANNETT INC | COM | 364730101 | 5,538,960 | 100800 | Sh | | Shared - Other | 1 | 100800 |
| GAP INC DEL | COM | 364760108 | 10,222,320 | 535200 | Sh | | Shared - Other | 1 | 535200 |
| GAP INC DEL | COM | 364760908 | 1,910,000 | 100000 | | CALL | Shared - Other | 1 | 100000 |
| GARMIN LTD | COM | G37260109 | 12,505,996 | 170150 | Sh | | Shared - Other | 1 | 170150 |
| GARMIN LTD | COM | G37260959 | 2,219,100 | 30000 | | PUT | Shared - Other | 1 | 30000 |
| GARTNER INC | COM | 366651107 | 737,700 | 30000 | Sh | | Shared - Other | 1 | 30000 |
| GATEWAY INC | COM | 367626108 | 318,000 | 200000 | Sh | | Shared - Other | 1 | 200000 |
| GEMSTAR-TV GUIDE INTL INC | COM | 36866W106 | 11,120,066 | 2260176 | Sh | | Shared - Other | 1 | 2260176 |
| GENCORP INC | COM | 368682100 | 5,238,456 | 400800 | Sh | | Shared - Other | 1 | 400800 |
| GENENTECH INC | COM | 368710906 | 7,566,000 | 100000 | | CALL | Shared - Other | 1 | 100000 |
| GENENTECH INC | COM | 368710406 | 1,967,160 | 26000 | Sh | | Shared - Other | 1 | 26000 |
| GENENTECH INC | COM | 368710956 | 9,835,800 | 130000 | | PUT | Shared - Other | 1 | 130000 |
| GENERAL CABLE CORP DEL NEW | COM | 369300908 | 1,136,250 | 15000 | | CALL | Shared - Other | 1 | 15000 |
| GENERAL CABLE CORP DEL NEW | COM | 369300108 | 8,332,500 | 110000 | Sh | | Shared - Other | 1 | 110000 |
| GENERAL DYNAMICS CORP | COM | 369550108 | 8,008,946 | 102390 | Sh | | Shared - Other | 1 | 102390 |
| GENERAL ELECTRIC CO | COM | 369604903 | 7,656,000 | 200000 | | CALL | Shared - Other | 1 | 200000 |
| GENERAL ELECTRIC CO | COM | 369604103 | 14,303,322 | 373650 | Sh | | Shared - Other | 1 | 373650 |
| GENERAL MLS INC | COM | 370334104 | 2,921,000 | 50000 | Sh | | Shared - Other | 1 | 50000 |
| GENERAL MTRS CORP | COM | 370442105 | 1,643,280 | 27600 | Sh | | Shared - Other | 1 | 27600 |
| GENERAL MTRS CORP | COM | 370442905 | 1,890,000 | 50000 | | CALL | Shared - Other | 1 | 50000 |
| GENESSE & WYO INC | COM | 371559105 | 1,193,600 | 40000 | Sh | | Shared - Other | 1 | 40000 |
| GENESIS LEASE LTD | COM | 37183T107 | 4,795,000 | 175000 | Sh | | Shared - Other | 1 | 175000 |
| GENOMIC HEALTH INC | COM | 37244C101 | 1,800,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| GEN-PROBE INC NEW | COM | 36866T903 | 3,021,000 | 50000 | | CALL | Shared - Other | 1 | 50000 |
| GEN-PROBE INC NEW | COM | 36866T103 | 3,021,000 | 50000 | Sh | | Shared - Other | 1 | 50000 |
| GENZYME CORP | COM | 372917904 | 6,440,000 | 100000 | | CALL | Shared - Other | 1 | 100000 |

DX-1169-00008

GOV-00005115

Case 17-1405, Document 29, 06/06/2017, 2052263, Page445 of 467

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| GEORGIA GULF CORP | COM | 373200903 | 1,358,250 | 75000 | | CALL | Shared - Other | 1 | 75000 |
| GETTY IMAGES INC | COM | 374276103 | 956,200 | 20000 | Sh | | Shared - Other | 1 | 20000 |
| GIGAMEDIA LTD | COM | Y2711Y104 | 5,732,572 | 425265 | Sh | | Shared - Other | 1 | 425265 |
| GILEAD SCIENCES INC | COM | 375558903 | 7,370,100 | 190000 | | CALL | Shared - Other | 1 | 190000 |
| GLATFELTER | COM | 377316104 | 879,273 | 64700 | Sh | | Shared - Other | 1 | 64700 |
| GLOBAL PMTS INC | COM | 37940X102 | 2,421,029 | 61060 | Sh | | Shared - Other | 1 | 61060 |
| GLOBALSANTAFE CORP | COM | G3930G901 | 722,500 | 10000 | | CALL | Shared - Other | 1 | 10000 |
| GLOBALSANTAFE CORP | COM | G3930E101 | 1,806,250 | 25000 | Sh | | Shared - Other | 1 | 25000 |
| GLOBALSANTAFE CORP | COM | G3930E951 | 2,890,000 | 40000 | | PUT | Shared - Other | 1 | 40000 |
| GMARKET INC | COM | 38012G100 | 2,331,600 | 120000 | Sh | | Shared - Other | 1 | 120000 |
| GOLDCORP INC NEW | COM | 380956909 | 2,369,000 | 100000 | | CALL | Shared - Other | 1 | 100000 |
| GOLDCORP INC NEW | COM | 380956409 | 2,369,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| GOLDEN STAR RES LTD CDA | COM | 38119T104 | 9,386,114 | 2260408 | Sh | | Shared - Other | 1 | 2260408 |
| GOLDMAN SACHS GROUP INC | COM | 38141G954 | 95,370,000 | 440000 | | PUT | Shared - Other | 1 | 440000 |
| GOLDMAN SACHS GROUP INC | COM | 38141G904 | 5,418,750 | 25000 | | CALL | Shared - Other | 1 | 25000 |
| GOLDMAN SACHS GROUP INC | COM | 38141G104 | 23,801,751 | 109812 | Sh | | Shared - Other | 1 | 109812 |
| GOODRICH CORP | COM | 382388106 | 2,978,000 | 50000 | Sh | | Shared - Other | 1 | 50000 |
| GOODYEAR TIRE & RUBR CO | COM | 382550101 | 608,300 | 17500 | Sh | | Shared - Other | 1 | 17500 |
| GOOGLE INC | COM | 38259P908 | 7,840,500 | 15000 | | CALL | Shared - Other | 1 | 15000 |
| GOOGLE INC | COM | 38259P958 | 7,840,500 | 15000 | | PUT | Shared - Other | 1 | 15000 |
| GOOGLE INC | COM | 38259P508 | 74,354,089 | 142250 | Sh | | Shared - Other | 1 | 142250 |
| GRANITE CONSTR INC | COM | 387328107 | 1,017,253 | 15850 | Sh | | Shared - Other | 1 | 15850 |
| GRANT PRIDECO INC | COM | 38821G101 | 2,918,124 | 54210 | Sh | | Shared - Other | 1 | 54210 |
| GREENBRIER COS INC | COM | 393657101 | 7,539,890 | 249500 | Sh | | Shared - Other | 1 | 249500 |
| GROUP 1 AUTOMOTIVE INC | COM | 398905109 | 2,420,400 | 60000 | Sh | | Shared - Other | 1 | 60000 |
| GRUPO TELEVISA SA DE CV | | 40049J206 | 4,141,500 | 150000 | Sh | | Shared - Other | 1 | 150000 |
| GULF ISLAND FABRICATION INC | COM | 402307952 | 867,500 | 25000 | | PUT | Shared - Other | 1 | 25000 |
| H & E EQUIPMENT SERVICES INC | COM | 404030108 | 4,097,503 | 147711 | Sh | | Shared - Other | 1 | 147711 |
| HALLIBURTON CO | COM | 406216901 | 8,625,000 | 250000 | | CALL | Shared - Other | 1 | 250000 |
| HALLIBURTON CO | COM | 406216101 | 5,378,550 | 155900 | Sh | | Shared - Other | 1 | 155900 |
| HALOZYME THERAPEUTICS INC | COM | 40637H109 | 1,846,000 | 200000 | Sh | | Shared - Other | 1 | 200000 |
| HANOVER COMPRESSOR CO | COM | 410768105 | 8,586,000 | 360000 | Sh | | Shared - Other | 1 | 360000 |
| HANSEN NAT CORP | COM | 411310105 | 4,727,800 | 110000 | Sh | | Shared - Other | 1 | 110000 |
| HARMONIC INC | COM | 413160102 | 6,472,288 | 729683 | Sh | | Shared - Other | 1 | 729683 |
| HARRIS CORP DEL | COM | 413875105 | 4,556,398 | 83527 | Sh | | Shared - Other | 1 | 83527 |
| HARRIS STRATEX NTWRKS INC | COM | 41457P106 | 452,035 | 25141 | Sh | | Shared - Other | 1 | 25141 |
| HARSCO CORP | COM | 415864107 | 3,141,892 | 60421 | Sh | | Shared - Other | 1 | 60421 |
| HARTFORD FINL SVCS GROUP INC | COM | 416515104 | 614,111 | 6234 | Sh | | Shared - Other | 1 | 6234 |
| HASBRO INC | COM | 418056957 | 3,769,200 | 120000 | | PUT | Shared - Other | 1 | 120000 |
| HEALTH NET INC | COM | 42222Q108 | 223,872 | 4240 | Sh | | Shared - Other | 1 | 4240 |
| HEALTHSPRING INC | COM | 42222N101 | 2,287,200 | 120000 | Sh | | Shared - Other | 1 | 120000 |
| HEARTLAND PMT SYS INC | COM | 42235N108 | 588,067 | 20050 | Sh | | Shared - Other | 1 | 20050 |
| HEIDRICK & STRUGGLES INTL IN | COM | 422819102 | 256,200 | 5000 | Sh | | Shared - Other | 1 | 5000 |
| HEINZ H J CO | COM | 423074103 | 14,153,703 | 298161 | Sh | | Shared - Other | 1 | 298161 |
| HELIX ENERGY SOLUTIONS GRP I | COM | 42330P107 | 4,499,875 | 112500 | Sh | | Shared - Other | 1 | 112500 |
| HERBALIFE LTD | COM | G4412G101 | 594,750 | 15000 | Sh | | Shared - Other | 1 | 15000 |
| HERCULES OFFSHORE INC | COM | 427093909 | 6,398,288 | 197600 | | CALL | Shared - Other | 1 | 197600 |
| HERCULES OFFSHORE INC | COM | 427093109 | 11,009,200 | 340000 | Sh | | Shared - Other | 1 | 340000 |
| HERSHEY CO | COM | 427866108 | 4,555,800 | 90000 | Sh | | Shared - Other | 1 | 90000 |
| HESS CORP | COM | 42809H107 | 1,591,920 | 27000 | Sh | | Shared - Other | 1 | 27000 |
| HEWLETT PACKARD CO | COM | 428236103 | 17,893,959 | 401030 | Sh | | Shared - Other | 1 | 401030 |
| HIBBETT SPORTS INC | COM | 420567951 | 2,190,400 | 80000 | | PUT | Shared - Other | 1 | 80000 |
| HILTON HOTELS CORP | COM | 432848109 | 15,921,679 | 475700 | Sh | | Shared - Other | 1 | 475700 |
| HIMAX TECHNOLOGIES INC | COM | 43289M106 | 1,846,400 | 320000 | Sh | | Shared - Other | 1 | 320000 |
| HI-TECH PHARMACAL INC | COM | 42840B101 | 2,954,971 | 247485 | Sh | | Shared - Other | 1 | 247485 |
| HLTH CORPORATION | COM | 40422Y901 | 9,479,166 | 676600 | | CALL | Shared - Other | 1 | 676600 |
| HOME DEPOT INC | COM | 437076102 | 1,956,443 | 49719 | Sh | | Shared - Other | 1 | 49719 |
| HOME INNS & HOTELS MGMT INC | COM | 43713W107 | 7,115,167 | 220900 | Sh | | Shared - Other | 1 | 220900 |
| HONEYWELL INTL INC | COM | 438516106 | 5,987,573 | 106389 | Sh | | Shared - Other | 1 | 106389 |
| HOT TOPIC INC | COM | 441339108 | 3,141,430 | 289000 | Sh | | Shared - Other | 1 | 289000 |
| HSBC HLDGS PLC | COM | 404280956 | 18,216,345 | 198500 | | PUT | Shared - Other | 1 | 198500 |
| HUBBELL INC | EQUITY | 443510201 | 5,422,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| HUMAN GENOME SCIENCES INC | COM | 444903108 | 2,050,708 | 229900 | Sh | | Shared - Other | 1 | 229900 |
| HUMAN GENOME SCIENCES INC | COM | 444903908 | 6,600,800 | 740000 | | CALL | Shared - Other | 1 | 740000 |
| HUMANA INC | COM | 444859102 | 295,109 | 4845 | Sh | | Shared - Other | 1 | 4845 |
| HUMANA INC | COM | 444859952 | 9,136,500 | 150000 | | PUT | Shared - Other | 1 | 150000 |
| HUNTSMAN CORP | COM | 447011907 | 3,646,500 | 150000 | | CALL | Shared - Other | 1 | 150000 |
| HUTCHINSON TECHNOLOGY INC | COM | 448407906 | 5,643,000 | 300000 | | CALL | Shared - Other | 1 | 300000 |
| HUTCHINSON TECHNOLOGY INC | COM | 448407106 | 27,658,845 | 1470433 | Sh | | Shared - Other | 1 | 1470433 |
| HYPERCOM CORP | COM | 44913N105 | 1,776,546 | 300600 | Sh | | Shared - Other | 1 | 300600 |
| I D SYSTEMS INC | COM | 449489103 | 2,935,068 | 228055 | Sh | | Shared - Other | 1 | 228055 |
| IAC INTERACTIVECORP | COM | 44919P300 | 10,755,196 | 310754 | Sh | | Shared - Other | 1 | 310754 |
| IAC INTERACTIVECORP | COM | 44919P900 | 6,923,000 | 200000 | | CALL | Shared - Other | 1 | 200000 |
| IAC INTERACTIVECORP | COM | 44919P950 | 5,191,500 | 150000 | | PUT | Shared - Other | 1 | 150000 |
| ICON PUB LTD CO | COM | 45103T107 | 2,799,360 | 64000 | Sh | | Shared - Other | 1 | 64000 |
| IDT CORP | COM | 448947309 | 1,022,196 | 99050 | Sh | | Shared - Other | 1 | 99050 |
| IKANOS COMMUNICATIONS | COM | 45173E105 | 10,645,561 | 1398891 | Sh | | Shared - Other | 1 | 1398891 |
| IKON OFFICE SOLUTIONS INC | COM | 451713101 | 452,971 | 29018 | Sh | | Shared - Other | 1 | 29018 |
| IMAX CORP | COM | 45245E109 | 353,210 | 83701 | Sh | | Shared - Other | 1 | 83701 |
| IMMUNOGEN INC | COM | 45253H101 | 1,110,000 | 200000 | Sh | | Shared - Other | 1 | 200000 |
| IMMUNOMEDICS INC | COM | 452907108 | 9,798,615 | 2361112 | Sh | | Shared - Other | 1 | 2361112 |

DX-1169-00009
GOV-00005116

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| IMMUNOMEDICS INC | COM | 452907908 | 2,012,750 | 485000 | | CALL | Shared - Other 1 | 485000 |
| INDEVUS PHARMACEUTICALS INC | COM | 454072109 | 4,431,678 | 658496 | Sh | | Shared - Other 1 | 658496 |
| INDYMAC BANCORP INC | COM | 456607950 | 2,917,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| INFINEON TECHNOLOGIES AG | COM | 45662N103 | 25,714,399 | 1555620 | Sh | | Shared - Other 1 | 1555620 |
| INFINEON TECHNOLOGIES AG | COM | 45662N903 | 13,224,000 | 800000 | | CALL | Shared - Other 1 | 800000 |
| INFOCUS CORP | COM | 45665B106 | 855,903 | 383813 | Sh | | Shared - Other 1 | 383813 |
| INFORMATICA CORP | COM | 45666G902 | 2,215,500 | 150000 | | CALL | Shared - Other 1 | 150000 |
| INFORMATICA CORP | COM | 45666G102 | 1,435,378 | 97182 | Sh | | Shared - Other 1 | 97182 |
| INFOSYS TECHNOLOGIES LTD | COM | 456788108 | 29,450,536 | 504560 | Sh | | Shared - Other 1 | 504560 |
| INGERSOLL-RAND COMPANY LTD | COM | G4776G101 | 13,430,900 | 245000 | Sh | | Shared - Other 1 | 245000 |
| INGERSOLL-RAND COMPANY LTD | COM | G4776G951 | 5,070,850 | 92500 | | PUT | Shared - Other 1 | 92500 |
| INGERSOLL-RAND COMPANY LTD | COM | G4776G901 | 4,111,500 | 75000 | | CALL | Shared - Other 1 | 75000 |
| INNOVO GROUP INC | COM | 457954600 | 4,582,129 | 2508627 | Sh | | Shared - Other 1 | 2508627 |
| INPHONIC INC | COM | 45772G105 | 13,269,936 | 2835517 | Sh | | Shared - Other 1 | 2835517 |
| INPHONIC INC | COM | 45772G905 | 5,604,000 | 1200000 | | CALL | Shared - Other 1 | 1200000 |
| INPUT/OUTPUT INC | COM | 457652105 | 3,122,000 | 200000 | Sh | | Shared - Other 1 | 200000 |
| INSPIRE PHARMACEUTICALS INC | COM | 457733103 | 2,158,912 | 341600 | Sh | | Shared - Other 1 | 341600 |
| INSTEEL INDUSTRIES INC | COM | 45774W108 | 1,803,384 | 100188 | Sh | | Shared - Other 1 | 100188 |
| INTEGRAL SYS INC MD | COM | 45810H107 | 1,716,653 | 70611 | Sh | | Shared - Other 1 | 70611 |
| INTEGRATED DEVICE TECHNOLOGY | COM | 45811B106 | 9,264,477 | 606711 | Sh | | Shared - Other 1 | 606711 |
| INTEGRYS ENERGY GROUP INC | COM | 45822P105 | 10,655,938 | 210052 | Sh | | Shared - Other 1 | 210052 |
| INTEL CORP | COM | 458140100 | 25,863,778 | 1089254 | Sh | | Shared - Other 1 | 1089254 |
| INTEL CORP | COM | 458140950 | 4,746,000 | 200000 | | PUT | Shared - Other 1 | 200000 |
| INTEL CORP | COM | 458140900 | 26,103,000 | 1100000 | | CALL | Shared - Other 1 | 1100000 |
| INTERACTIVE BROKERS GROUP IN | COM | 45841N107 | 7,325,100 | 270000 | Sh | | Shared - Other 1 | 270000 |
| INTERCONTINENTALEXCHANGE INC | COM | 45865V100 | 3,696,250 | 25000 | Sh | | Shared - Other 1 | 25000 |
| INTERDIGITAL COMMUNICATIONS | COM | 45866A955 | 6,434,000 | 200000 | | PUT | Shared - Other 1 | 200000 |
| INTERFACE INC | COM | 45866S106 | 377,200 | 20000 | Sh | | Shared - Other 1 | 20000 |
| INTERNATIONAL BUSINESS MACHS | COM | 459200101 | 3,498,931 | 33244 | Sh | | Shared - Other 1 | 33244 |
| INTERNATIONAL GAME TECHNOLO | COM | 459902902 | 1,985,000 | 50000 | | CALL | Shared - Other 1 | 50000 |
| INTERNATIONAL GAME TECHNOLO | COM | 459902102 | 6,352,000 | 160000 | Sh | | Shared - Other 1 | 160000 |
| INTERNATIONAL RECTIFIER CORP | COM | 460254905 | 9,687,600 | 260000 | | CALL | Shared - Other 1 | 260000 |
| INTERNET INFRASTRUCTR HOLDS | COM | 46059V104 | 6,065,144 | 1200200 | Sh | | Shared - Other 1 | 1200200 |
| INTEROIL CORP | COM | 460951106 | 3,534,185 | 186599 | Sh | | Shared - Other 1 | 186599 |
| INTEROIL CORP | COM | 460951906 | 757,600 | 40000 | | CALL | Shared - Other 1 | 40000 |
| INTERPUBLIC GROUP COS INC | COM | 460690100 | 6,195,900 | 543500 | Sh | | Shared - Other 1 | 543500 |
| INTERPUBLIC GROUP COS INC | COM | 460690900 | 6,270,000 | 550000 | | CALL | Shared - Other 1 | 550000 |
| INTERSIL CORP | COM | 46069B309 | 1,573,000 | 50000 | Sh | | Shared - Other 1 | 50000 |
| INTERWOVEN INC | COM | 461147908 | 1,404,000 | 100000 | | CALL | Shared - Other 1 | 100000 |
| INTEVAC INC | COM | 461148108 | 3,228,331 | 151850 | Sh | | Shared - Other 1 | 151850 |
| INTL PAPER CO | COM | 460146903 | 8,591,000 | 220000 | | CALL | Shared - Other 1 | 220000 |
| INTL PAPER CO | COM | 460146953 | 214,775 | 5500 | | PUT | Shared - Other 1 | 5500 |
| INTL PAPER CO | COM | 460146103 | 2,073,828 | 53107 | Sh | | Shared - Other 1 | 53107 |
| INVESCO PLC | COM | 46127U104 | 3,761,175 | 145500 | Sh | | Shared - Other 1 | 145500 |
| INVESTOOLS INC | COM | 46145P103 | 1,095,600 | 110000 | Sh | | Shared - Other 1 | 110000 |
| IOMEGA CORP | COM | 462030305 | 867,690 | 186600 | Sh | | Shared - Other 1 | 186600 |
| IONATRON INC | COM | 462070103 | 20,295,651 | 5204013 | Sh | | Shared - Other 1 | 5204013 |
| IONATRON INC | COM | 462070903 | 1,525,290 | 391100 | | CALL | Shared - Other 1 | 391100 |
| IPASS INC | COM | 46261V108 | 2,256,492 | 416327 | Sh | | Shared - Other 1 | 416327 |
| IPC HLDGS LTD | COM | G4938F101 | 2,421,750 | 75000 | Sh | | Shared - Other 1 | 75000 |
| ISHARES INC | COM | 464286040 | 4,353,000 | 300000 | Sh | | Shared - Other 1 | 300000 |
| ISHARES INC | COM | 464286731 | 2,987,200 | 186700 | Sh | | Shared - Other 1 | 186700 |
| ISHARES SILVER TRUST | COM | 46428Q109 | 1,976,000 | 16000 | Sh | | Shared - Other 1 | 16000 |
| ISHARES TR | COM | 464287951 | 13,908,000 | 200000 | | PUT | Shared - Other 1 | 200000 |
| ISHARES TR | COM | 464287901 | 15,484,000 | 200000 | | CALL | Shared - Other 1 | 200000 |
| ISHARES TR | COM | 464287951 | 24,708,000 | 300000 | | PUT | Shared - Other 1 | 300000 |
| ISHARES TR | COM | 464287951 | 128,173,200 | 1545000 | | PUT | Shared - Other 1 | 1545000 |
| ISHARES TR | COM | 464287432 | 10,397,554 | 122080 | Sh | | Shared - Other 1 | 122080 |
| ISHARES TR | COM | 464287951 | 8,077,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| ISHARES TR | COM | 464287951 | 34,789,500 | 270000 | | PUT | Shared - Other 1 | 270000 |
| ISHARES TR | COM | 464287951 | 37,507,200 | 480000 | | PUT | Shared - Other 1 | 480000 |
| ISHARES TR | COM | 464287951 | 65,166,750 | 495000 | | PUT | Shared - Other 1 | 495000 |
| ISHARES TR | COM | 464288752 | 1,086,110 | 34700 | Sh | | Shared - Other 1 | 34700 |
| ISILON SYS INC | COM | 46432L104 | 7,012,846 | 454789 | Sh | | Shared - Other 1 | 454789 |
| ISIS PHARMACEUTICALS INC | COM | 464330109 | 1,936,484 | 200050 | Sh | | Shared - Other 1 | 200050 |
| ISIS PHARMACEUTICALS INC | COM | 464330909 | 1,936,000 | 200000 | | CALL | Shared - Other 1 | 200000 |
| ITT EDUCATIONAL SERVICES INC | COM | 45068B959 | 5,869,000 | 50000 | | PUT | Shared - Other 1 | 50000 |
| J CREW GROUP INC | COM | 46612H952 | 2,704,600 | 50000 | | PUT | Shared - Other 1 | 50000 |
| JA SOLAR HOLDINGS CO LTD | COM | 466090107 | 8,429,975 | 250000 | Sh | | Shared - Other 1 | 250000 |
| JABIL CIRCUIT INC | COM | 466313903 | 10,152,200 | 460000 | | CALL | Shared - Other 1 | 460000 |
| JABIL CIRCUIT INC | COM | 466313103 | 20,211,706 | 915800 | Sh | | Shared - Other 1 | 915800 |
| JAMBA INC | COM | 47023A101 | 2,249,372 | 246102 | Sh | | Shared - Other 1 | 246102 |
| JANUS CAP GROUP INC | COM | 47102K955 | 2,784,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| JANUS CAP GROUP INC | COM | 47102K105 | 404,237 | 14520 | Sh | | Shared - Other 1 | 14520 |
| JARDEN CORP | COM | 47110W108 | 9,462,200 | 220000 | Sh | | Shared - Other 1 | 220000 |
| JAZZ PHARMACEUTICALS INC | COM | 472147107 | 2,409,872 | 150617 | Sh | | Shared - Other 1 | 150617 |
| JEFFERIES GROUP INC NEW | COM | 472319102 | 2,023,500 | 75000 | Sh | | Shared - Other 1 | 75000 |
| JETBLUE AWYS CORP | COM | 477143101 | 9,400,482 | 800041 | Sh | | Shared - Other 1 | 800041 |
| JETBLUE AWYS CORP | COM | 477143901 | 4,700,000 | 400000 | | CALL | Shared - Other 1 | 400000 |
| JOHNSON CTLS INC | COM | 478366107 | 868,275 | 7500 | Sh | | Shared - Other 1 | 7500 |
| JONES SODA CO | COM | 48023P106 | 1,402,000 | 100000 | Sh | | Shared - Other 1 | 100000 |
| JOS A BANK CLOTHIERS INC | COM | 480838101 | 1,649,137 | 39767 | Sh | | Shared - Other 1 | 39767 |
| JP MORGAN CHASE & CO | COM | 46625H100 | 14,830,400 | 306097 | Sh | | Shared - Other 1 | 306097 |
| JP MORGAN CHASE & CO | COM | 46625H950 | 2,422,500 | 50000 | | PUT | Shared - Other 1 | 50000 |
| JP MORGAN CHASE & CO | COM | 46625H900 | 2,907,000 | 60000 | | CALL | Shared - Other 1 | 60000 |
| JUNIPER NETWORKS INC | COM | 48203R104 | 1,766,934 | 70200 | Sh | | Shared - Other 1 | 70200 |
| JUNIPER NETWORKS INC | COM | 48203R904 | 2,517,000 | 100000 | | CALL | Shared - Other 1 | 100000 |
| KBR INC | COM | 48242W106 | 2,229,550 | 85000 | Sh | | Shared - Other 1 | 85000 |
| KELLOGG CO | COM | 487836108 | 2,848,450 | 55000 | Sh | | Shared - Other 1 | 55000 |
| KEMET CORP | COM | 488360108 | 7,331,295 | 1039900 | Sh | | Shared - Other 1 | 1039900 |
| KEYCORP NEW | COM | 493267109 | 876,548 | 25533 | Sh | | Shared - Other 1 | 25533 |
| KFORCE INC | COM | 493732101 | 1,606,006 | 100501 | Sh | | Shared - Other 1 | 100501 |
| KIMBERLY CLARK CORP | COM | 494368103 | 517,060 | 7730 | Sh | | Shared - Other 1 | 7730 |
| KING PHARMACEUTICALS INC | COM | 495582108 | 242,042 | 11830 | Sh | | Shared - Other 1 | 11830 |

DX-1169-00010

GOV-00005117

Case 17-1405, Document 29, 06/06/2017, 2052263, Page447 of 467

| Name | Type | CUSIP | Value | Shares | Unit | Option | Disc | Vote | Shared |
|---|---|---|---|---|---|---|---|---|---|
| KIRBY CORP | COM | 497266106 | 1,621,978 | 42250 | Sh | | Shared - Other | 1 | 42250 |
| KLA-TENCOR CORP | COM | 482480950 | 19,232,500 | 350000 | Sh | PUT | Shared - Other | 1 | 350000 |
| KNIGHT TRANSN INC | COM | 499064103 | 1,550,400 | 80000 | Sh | | Shared - Other | 1 | 80000 |
| KODIAK OIL & GAS CORP | COM | 50015Q100 | 4,157,359 | 716786 | Sh | | Shared - Other | 1 | 716786 |
| KOHLS CORP | COM | 500255106 | 16,336,900 | 230000 | Sh | | Shared - Other | 1 | 230000 |
| KOMAG INC | COM | 500453904 | 1,594,500 | 50000 | Sh | CALL | Shared - Other | 1 | 50000 |
| KOMAG INC | COM | 500453204 | 5,583,461 | 175085 | Sh | | Shared - Other | 1 | 175085 |
| KONINKLIJKE PHILIPS ELECTRS | COM | 500472303 | 11,214,800 | 265000 | Sh | | Shared - Other | 1 | 265000 |
| KOPIN CORP | COM | 500460101 | 1,445,367 | 370607 | Sh | | Shared - Other | 1 | 370607 |
| KRAFT FOODS INC | COM | 50075N904 | 4,230,000 | 120000 | Sh | CALL | Shared - Other | 1 | 120000 |
| KRAFT FOODS INC | COM | 50075N104 | 40,254,478 | 1141971 | Sh | | Shared - Other | 1 | 1141971 |
| KRISPY KREME DOUGHNUTS INC | COM | 501014104 | 4,630,000 | 500000 | Sh | | Shared - Other | 1 | 500000 |
| KROGER CO | COM | 501044101 | 2,200,610 | 78230 | Sh | | Shared - Other | 1 | 78230 |
| K-SWISS INC | COM | 482686102 | 1,699,800 | 60000 | Sh | | Shared - Other | 1 | 60000 |
| LAM RESEARCH CORP | COM | 512807108 | 205,137 | 3991 | Sh | | Shared - Other | 1 | 3991 |
| LAMAR ADVERTISING CO | COM | 512815101 | 2,008,320 | 32000 | Sh | | Shared - Other | 1 | 32000 |
| LANCE INC | COM | 514606102 | 471,200 | 20000 | Sh | | Shared - Other | 1 | 20000 |
| LANDAMERICA FINL GROUP INC | COM | 514936103 | 8,684,100 | 90000 | Sh | | Shared - Other | 1 | 90000 |
| LANDRYS RESTAURANTS INC | COM | 51508L993 | 1,815,600 | 60000 | Sh | PUT | Shared - Other | 1 | 60000 |
| LAS VEGAS SANDS CORP | COM | 517934107 | 656,954 | 8600 | Sh | | Shared - Other | 1 | 8600 |
| LATTICE SEMICONDUCTOR CORP | COM | 518415104 | 3,546,972 | 620100 | Sh | | Shared - Other | 1 | 620100 |
| LAUDER ESTEE COS INC | COM | 518439104 | 576,293 | 12663 | Sh | | Shared - Other | 1 | 12663 |
| LAWSON SOFTWARE INC NEW | COM | 52078P102 | 5,309,348 | 536840 | Sh | | Shared - Other | 1 | 536840 |
| LAZARD LTD | COM | G54050102 | 3,230,452 | 71740 | Sh | | Shared - Other | 1 | 71740 |
| LDK SOLAR CO LTD | COM | 50183L107 | 10,484,718 | 334975 | Sh | | Shared - Other | 1 | 334975 |
| LEADIS TECHNOLOGY INC | COM | 52171N103 | 4,134,861 | 1178023 | Sh | | Shared - Other | 1 | 1178023 |
| LEAP WIRELESS INTL INC | COM | 521863998 | 8,450,000 | 100000 | Sh | PUT | Shared - Other | 1 | 100000 |
| LEGG MASON INC | COM | 524901105 | 3,935,200 | 40000 | Sh | | Shared - Other | 1 | 40000 |
| LEHMAN BROS HLDGS INC | COM | 524908900 | 758,000 | 10000 | Sh | | Shared - Other | 1 | 10000 |
| LEHMAN BROS HLDGS INC | COM | 524908100 | 12,149,520 | 166400 | Sh | | Shared - Other | 1 | 166400 |
| LEVEL 3 COMMUNICATIONS INC | COM | 52729N100 | 5,308,395 | 907418 | Sh | | Shared - Other | 1 | 907418 |
| LEXMARK INTL NEW | COM | 529771107 | 6,425,093 | 130300 | Sh | | Shared - Other | 1 | 130300 |
| LG PHILIP LCD CO LTD | COM | 50186V952 | 6,110,100 | 270000 | Sh | PUT | Shared - Other | 1 | 270000 |
| LHC GROUP INC | COM | 50187A107 | 1,713,480 | 65400 | Sh | | Shared - Other | 1 | 65400 |
| LIBERTY MEDIA HLDG CORP | COM | 53071N104 | 1,104,152 | 49447 | Sh | | Shared - Other | 1 | 49447 |
| LIFECELL CORP | COM | 531927901 | 1,374,300 | 45000 | Sh | CALL | Shared - Other | 1 | 45000 |
| LIFECELL CORP | COM | 531927101 | 13,132,200 | 430000 | Sh | | Shared - Other | 1 | 430000 |
| LIFEPOINT HOSPITALS INC | COM | 53219L109 | 780,098 | 20168 | Sh | | Shared - Other | 1 | 20168 |
| LIFEWAY FOODS INC | COM | 53191G109 | 338,700 | 30000 | Sh | | Shared - Other | 1 | 30000 |
| LILLY ELI & CO | COM | 532457100 | 749,127 | 13406 | Sh | | Shared - Other | 1 | 13406 |
| LIMELIGHT NETWORKS INC | COM | 53261M104 | 8,361,065 | 422703 | Sh | | Shared - Other | 1 | 422703 |
| LIMITED BRANDS INC | COM | 532716907 | 1,372,500 | 50000 | Sh | CALL | Shared - Other | 1 | 50000 |
| LINEAR TECHNOLOGY CORP | COM | 535678956 | 16,100,100 | 445000 | Sh | PUT | Shared - Other | 1 | 445000 |
| LINEAR TECHNOLOGY CORP | COM | 535678106 | 904,500 | 25000 | Sh | | Shared - Other | 1 | 25000 |
| LIVE NATION INC | COM | 538034109 | 503,550 | 22500 | Sh | | Shared - Other | 1 | 22500 |
| LOEWS CORP | COM | 540424207 | 2,716,504 | 35156 | Sh | | Shared - Other | 1 | 35156 |
| LOEWS CORP | COM | 540424108 | 4,078,400 | 80000 | Sh | | Shared - Other | 1 | 80000 |
| LOEWS CORP | COM | 540424958 | 4,636,200 | 60000 | Sh | PUT | Shared - Other | 1 | 60000 |
| LOGITECH INTL S A | COM | H50430952 | 1,870,400 | 70000 | Sh | PUT | Shared - Other | 1 | 70000 |
| LOWES COS INC | COM | 548661107 | 4,296,600 | 140000 | Sh | | Shared - Other | 1 | 140000 |
| LSI CORPORATION | COM | 502161102 | 13,955,302 | 1858240 | Sh | | Shared - Other | 1 | 1858240 |
| LTX CORP | COM | 502392103 | 800,379 | 143953 | Sh | | Shared - Other | 1 | 143953 |
| LUFKIN INDS INC | COM | 549766108 | 5,247,915 | 81300 | Sh | | Shared - Other | 1 | 81300 |
| LYONDELL CHEMICAL CO | COM | 552078107 | 2,227,200 | 60000 | Sh | | Shared - Other | 1 | 60000 |
| LYONDELL CHEMICAL CO | COM | 552078907 | 5,939,200 | 160000 | Sh | CALL | Shared - Other | 1 | 160000 |
| MACYS INC | COM | 55616P904 | 11,934,000 | 300000 | Sh | CALL | Shared - Other | 1 | 300000 |
| MACYS INC | COM | 55616P104 | 996,489 | 25050 | Sh | | Shared - Other | 1 | 25050 |
| MAGAL SECURITY SYS LTD | COM | M67860104 | 3,587,894 | 354535 | Sh | | Shared - Other | 1 | 354535 |
| MAGNA ENTMT CORP | COM | 559211107 | 98,404 | 33700 | Sh | | Shared - Other | 1 | 33700 |
| MANHATTAN ASSOCS INC | COM | 562750959 | 778,689 | 27900 | Sh | PUT | Shared - Other | 1 | 27900 |
| MANITOWOC INC | COM | 563571108 | 4,822,800 | 60000 | Sh | | Shared - Other | 1 | 60000 |
| MANKIND CORP | COM | 56600B201 | 897,624 | 72800 | Sh | | Shared - Other | 1 | 72800 |
| MANPOWER INC | COM | 56418H100 | 200,161 | 2170 | Sh | | Shared - Other | 1 | 2170 |
| MANPOWER INC | COM | 56418H950 | 3,689,600 | 40000 | Sh | | Shared - Other | 1 | 40000 |
| MARATHON OIL CORP | COM | 565849106 | 2,515,202 | 41948 | Sh | | Shared - Other | 1 | 41948 |
| MARKET VECTORS ETF TR | COM | 570600100 | 1,134,900 | 30000 | Sh | | Shared - Other | 1 | 30000 |
| MARSH & MCLENNAN COS INC | COM | 571748102 | 11,737,488 | 380100 | Sh | | Shared - Other | 1 | 380100 |
| MARTHA STEWART LIVING OMNIME | COM | 573083102 | 861,720 | 50100 | Sh | | Shared - Other | 1 | 50100 |
| MARVELL TECHNOLOGY GROUP LTD | COM | G5876W905 | 39,606,750 | 2175000 | Sh | CALL | Shared - Other | 1 | 2175000 |
| MARVELL TECHNOLOGY GROUP LTD | COM | G5876W105 | 50,774,506 | 2788276 | Sh | | Shared - Other | 1 | 2788276 |
| MASSEY ENERGY CORP | COM | 576206906 | 2,665,000 | 100000 | Sh | CALL | Shared - Other | 1 | 100000 |
| MASTEC INC | COM | 576323109 | 3,164,000 | 200000 | Sh | | Shared - Other | 1 | 200000 |
| MAXIM INTEGRATED PRODS INC | COM | 57772R101 | 79,791,433 | 2388250 | Sh | | Shared - Other | 1 | 2388250 |
| MAXIM INTEGRATED PRODS INC | COM | 57772R901 | 29,066,700 | 870000 | Sh | | Shared - Other | 1 | 870000 |
| MCAFEE INC | COM | 579064956 | 10,560,000 | 300000 | Sh | PUT | Shared - Other | 1 | 300000 |
| MCCLATCHY CO | COM | 579489105 | 2,565,599 | 101367 | Sh | | Shared - Other | 1 | 101367 |
| MCDERMOTT INTL INC | COM | 580037109 | 6,148,636 | 73973 | Sh | | Shared - Other | 1 | 73973 |
| MCDONALDS CORP | COM | 580135101 | 9,114,466 | 179560 | Sh | | Shared - Other | 1 | 179560 |
| MCGRAW HILL COS INC | COM | 580645959 | 13,616,000 | 200000 | Sh | PUT | Shared - Other | 1 | 200000 |
| MDS INC | COM | 55269P302 | 4,068,000 | 200000 | Sh | | Shared - Other | 1 | 200000 |
| MEASUREMENT SPECIALTIES INC | COM | 583421102 | 220,224 | 9300 | Sh | | Shared - Other | 1 | 9300 |
| MEDAREX INC | COM | 583916901 | 7,146,429 | 500100 | Sh | CALL | Shared - Other | 1 | 500100 |
| MEDCO HEALTH SOLUTIONS INC | COM | 58405U952 | 3,899,500 | 50000 | Sh | PUT | Shared - Other | 1 | 50000 |
| MEDICINES CO | COM | 584688905 | 1,762,000 | 100000 | Sh | CALL | Shared - Other | 1 | 100000 |
| MEDICINES CO | COM | 584688105 | 694,228 | 39400 | Sh | | Shared - Other | 1 | 39400 |
| MEDIS TECHNOLOGIES LTD | COM | 58500P107 | 501,708 | 34153 | Sh | | Shared - Other | 1 | 34153 |
| MEDIS TECHNOLOGIES LTD | COM | 58500P907 | 3,296,436 | 224400 | Sh | CALL | Shared - Other | 1 | 224400 |
| MEDIVATION INC | COM | 58501N101 | 2,043,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| MEDIVATION INC | COM | 58501N901 | 1,430,100 | 70000 | Sh | CALL | Shared - Other | 1 | 70000 |
| MELLANOX TECHNOLOGIES LTD | COM | M51363113 | 1,094,472 | 52822 | Sh | | Shared - Other | 1 | 52822 |
| MELLON FINL CORP | COM | 58551A108 | 9,240,000 | 210000 | Sh | | Shared - Other | 1 | 210000 |
| MEMC ELECTR MATLS INC | COM | 552715104 | 48,437,600 | 792500 | Sh | | Shared - Other | 1 | 792500 |
| MENS WEARHOUSE INC | COM | 587118100 | 766,050 | 15000 | Sh | | Shared - Other | 1 | 15000 |
| MERCK & CO INC | COM | 589331107 | 23,708,286 | 476070 | Sh | | Shared - Other | 1 | 476070 |

DX-1169-00011

GOV-00005118

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| MERCK & CO INC | COM | 589331907 | 16,438,980 | 330100 | | CALL | Shared - Other 1 | 330100 |
| MERIX CORP | COM | 590049102 | 197,250 | 25000 | Sh | | Shared - Other 1 | 25000 |
| MERRILL LYNCH & CO INC | COM | 590188958 | 5,850,600 | 70000 | | PUT | Shared - Other 1 | 70000 |
| MERRILL LYNCH & CO INC | COM | 590188108 | 17,500 | 17500 | Sh | | Shared - Other 1 | 17500 |
| METABOLIX INC | COM | 591018809 | 11,834,184 | 472800 | Sh | | Shared - Other 1 | 472800 |
| METALLINE MINING INC | COM | 591257100 | 1,328,261 | 348625 | Sh | | Shared - Other 1 | 348625 |
| METROPCS COMMUNICATIONS INC | COM | 591708102 | 3,066,112 | 92800 | Sh | | Shared - Other 1 | 92800 |
| MGI PHARMA INC | COM | 552880106 | 1,118,500 | 50000 | Sh | | Shared - Other 1 | 50000 |
| MGIC INVT CORP WIS | COM | 552848103 | 25,000 | 25000 | Sh | | Shared - Other 1 | 25000 |
| MICREL INC | COM | 594793101 | 10,691,478 | 840525 | Sh | | Shared - Other 1 | 840525 |
| MICROS SYS INC | COM | 594901100 | 1,632,000 | 30000 | Sh | | Shared - Other 1 | 30000 |
| MICROSEMI CORP | COM | 595137100 | 4,912,001 | 205094 | Sh | | Shared - Other 1 | 205094 |
| MICROSOFT CORP | COM | 594918904 | 2,947,000 | 100000 | | CALL | Shared - Other 1 | 100000 |
| MICROSOFT CORP | COM | 594918104 | 123,474,703 | 4189844 | Sh | | Shared - Other 1 | 4189844 |
| MICROTUNE INC DEL | COM | 59514P109 | 575,300 | 110000 | Sh | | Shared - Other 1 | 110000 |
| MIDCAP SPDR TR | COM | 595635953 | 181,689,250 | 1115000 | | PUT | Shared - Other 1 | 1115000 |
| MILLENNIUM PHARMACEUTICALS I | COM | 599902953 | 528,500 | 50000 | | PUT | Shared - Other 1 | 50000 |
| MILLER HERMAN INC | COM | 600544100 | 966,296 | 30579 | Sh | | Shared - Other 1 | 30579 |
| MINRAD INTL INC | COM | 60443P103 | 1,482,500 | 250000 | Sh | | Shared - Other 1 | 250000 |
| MIRANT CORP NEW | COM | 60467R900 | 3,412,000 | 80000 | | CALL | Shared - Other 1 | 80000 |
| MIRANT CORP NEW | COM | 60467R100 | 27,039,460 | 633985 | Sh | | Shared - Other 1 | 633985 |
| MOHAWK INDS INC | COM | 608190954 | 5,039,500 | 50000 | | PUT | Shared - Other 1 | 50000 |
| MOLSON COORS BREWING CO | COM | 60871R209 | 277,380 | 3000 | CL B | | Shared - Other 1 | 3000 |
| MOMENTA PHARMACEUTICALS INC | COM | 60877T956 | 8,839,152 | 876900 | | PUT | Shared - Other 1 | 876900 |
| MONOLITHIC PWR SYS INC | COM | 609839105 | 2,966,500 | 170000 | Sh | | Shared - Other 1 | 170000 |
| MONSANTO CO NEW | COM | 61166W101 | 5,403,200 | 80000 | Sh | | Shared - Other 1 | 80000 |
| MONSANTO CO NEW | COM | 61166W901 | 10,131,000 | 150000 | | CALL | Shared - Other 1 | 150000 |
| MONSTER WORLDWIDE INC | COM | 61174Q107 | 13,357,500 | 325000 | Sh | | Shared - Other 1 | 325000 |
| MONSTER WORLDWIDE INC | COM | 61174Q907 | 8,220,000 | 200000 | | CALL | Shared - Other 1 | 200000 |
| MORGAN STANLEY | COM | 617446908 | 5,032,800 | 60000 | | CALL | Shared - Other 1 | 60000 |
| MORGAN STANLEY | COM | 617446448 | 25,164,000 | 300000 | Sh | | Shared - Other 1 | 300000 |
| MOTOROLA INC | COM | 620076109 | 10,181,907 | 575249 | Sh | | Shared - Other 1 | 575249 |
| MOTOROLA INC | COM | 620076909 | 11,505,000 | 650000 | | CALL | Shared - Other 1 | 650000 |
| MSC SOFTWARE CORP | COM | 553531104 | 167,607 | 12397 | Sh | | Shared - Other 1 | 12397 |
| MTC TECHNOLOGIES INC | COM | 55377A106 | 1,751,226 | 71304 | Sh | | Shared - Other 1 | 71304 |
| MUELLER WTR PRODS INC | COM | 624758108 | 3,326,700 | 195000 | Sh | | Shared - Other 1 | 195000 |
| MULTI FINELINE ELECTRONIX IN | COM | 62541B901 | 4,290,000 | 250000 | | CALL | Shared - Other 1 | 250000 |
| MULTI FINELINE ELECTRONIX IN | COM | 62541B101 | 11,770,164 | 685907 | Sh | | Shared - Other 1 | 685907 |
| MURPHY OIL CORP | COM | 626717102 | 594,400 | 10000 | Sh | | Shared - Other 1 | 10000 |
| MYLAN LABS INC | COM | 628530907 | 8,029,066 | 441400 | | CALL | Shared - Other 1 | 441400 |
| NABORS INDUSTRIES LTD | COM | G6359F103 | 230,622 | 6909 | Sh | | Shared - Other 1 | 6909 |
| NABORS INDUSTRIES LTD | COM | G6359F903 | 3,338,000 | 100000 | | CALL | Shared - Other 1 | 100000 |
| NALCO HOLDING COMPANY | COM | 62985Q101 | 749,385 | 27300 | Sh | | Shared - Other 1 | 27300 |
| NAM TAI ELECTRS INC | COM | 629865205 | 135,888 | 11400 | Sh | | Shared - Other 1 | 11400 |
| NAPCO SEC SYS INC | COM | 630402105 | 5,681,970 | 901900 | Sh | | Shared - Other 1 | 901900 |
| NAPSTER INC | COM | 63079T108 | 510,000 | 150000 | Sh | | Shared - Other 1 | 150000 |
| NASDAQ STOCK MARKET INC | COM | 631103108 | 1,934,121 | 65100 | Sh | | Shared - Other 1 | 65100 |
| NATIONAL CITY CORP | COM | 635405953 | 3,332,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| NATIONAL SEMICONDUCTOR CORP | COM | 637640103 | 5,580,979 | 197417 | Sh | | Shared - Other 1 | 197417 |
| NATIONSHEALTH INC | COM | 63860C100 | 1,933,333 | 1255411 | Sh | | Shared - Other 1 | 1255411 |
| NBTY INC | COM | 628782104 | 7,128,000 | 165000 | Sh | | Shared - Other 1 | 165000 |
| NBTY INC | COM | 628782904 | 2,160,000 | 50000 | | CALL | Shared - Other 1 | 50000 |
| NCR CORP NEW | COM | 62886Q108 | 8,390,638 | 159700 | Sh | | Shared - Other 1 | 159700 |
| NCR CORP NEW | COM | 62886Q908 | 4,203,200 | 80000 | | CALL | Shared - Other 1 | 80000 |
| NESS TECHNOLOGIES INC | COM | 64104X108 | 36,106,146 | 2775261 | Sh | | Shared - Other 1 | 2775261 |
| NET 1 UEPS TECHNOLOGIES INC | COM | 64107N206 | 17,404,905 | 720700 | Sh | | Shared - Other 1 | 720700 |
| NETFLIX INC | COM | 64110L906 | 1,939,000 | 100000 | | CALL | Shared - Other 1 | 100000 |
| NETLOGIC MICROSYSTEMS INC | COM | 64118B950 | 955,200 | 30000 | | PUT | Shared - Other 1 | 30000 |
| NETWORK APPLIANCE INC | COM | 641201104 | 7,601,835 | 260426 | Sh | | Shared - Other 1 | 260426 |
| NETWORK APPLIANCE INC | COM | 641201904 | 2,190,000 | 75000 | | CALL | Shared - Other 1 | 75000 |
| NEURO HITECH INC | COM | 641244108 | 1,165,500 | 185000 | Sh | | Shared - Other 1 | 185000 |
| NEUSTAR INC | COM | 64126X201 | 1,164,594 | 40200 | Sh | | Shared - Other 1 | 40200 |
| NEVSUN RES LTD | COM | 64156L101 | 750,000 | 300000 | Sh | | Shared - Other 1 | 300000 |
| NEW YORK & CO INC | COM | 649296102 | 2,411,200 | 220000 | Sh | | Shared - Other 1 | 220000 |
| NEW YORK TIMES CO | COM | 650111107 | 5,041,900 | 198500 | Sh | | Shared - Other 1 | 198500 |
| NEWALLIANCE BANCSHARES INC | COM | 650203102 | 1,214,400 | 82500 | Sh | | Shared - Other 1 | 82500 |
| NEWELL RUBBERMAID INC | COM | 651229106 | 3,828,931 | 130103 | Sh | | Shared - Other 1 | 130103 |
| NEWFIELD EXPL CO | COM | 651290108 | 1,366,500 | 30000 | Sh | | Shared - Other 1 | 30000 |
| NEWPORT CORP | COM | 651824104 | 774,000 | 50000 | Sh | | Shared - Other 1 | 50000 |
| NEWSTAR FINANCIAL INC | COM | 65251F105 | 4,098,240 | 288000 | Sh | | Shared - Other 1 | 288000 |
| NEWTEK BUSINESS SVCS INC | COM | 652526104 | 349,731 | 184069 | Sh | | Shared - Other 1 | 184069 |
| NEXEN INC | COM | 65334H102 | 1,547,500 | 50000 | Sh | | Shared - Other 1 | 50000 |
| NII HLDGS INC | COM | 62913F201 | 19,390,103 | 240031 | Sh | | Shared - Other 1 | 240031 |
| NIKE INC | COM | 654106103 | 536,385 | 9202 | Sh | | Shared - Other 1 | 9202 |
| NOKIA CORP | COM | 654902904 | 19,677,000 | 700000 | | CALL | Shared - Other 1 | 700000 |
| NOKIA CORP | COM | 654902204 | 30,780,450 | 1095000 | Sh | | Shared - Other 1 | 1095000 |
| NORDSTROM INC | COM | 655664100 | 2,177,712 | 42600 | Sh | | Shared - Other 1 | 42600 |
| NORFOLK SOUTHERN CORP | COM | 655844108 | 6,542,337 | 124450 | Sh | | Shared - Other 1 | 124450 |
| NORTHEAST UTILS | COM | 664397106 | 5,672,000 | 200000 | Sh | | Shared - Other 1 | 200000 |
| NOVA BIOSOURCE FUELS INC | COM | 66989W103 | 114,750 | 45000 | Sh | | Shared - Other 1 | 45000 |
| NOVAGOLD RES INC | COM | 66987E206 | 451,065 | 30011 | Sh | | Shared - Other 1 | 30011 |
| NOVARTIS A G | COM | 66987V909 | 5,354,685 | 95500 | | CALL | Shared - Other 1 | 95500 |
| NOVELLUS SYS INC | COM | 670008101 | 3,661,858 | 129075 | Sh | | Shared - Other 1 | 129075 |
| NRG ENERGY INC | COM | 629377508 | 3,366,339 | 80980 | Sh | | Shared - Other 1 | 80980 |
| NSTAR | COM | 67019E107 | 1,934,020 | 59600 | Sh | | Shared - Other 1 | 59600 |
| NTELOS HLDGS CORP | COM | 67020Q107 | 829,200 | 30000 | Sh | | Shared - Other 1 | 30000 |
| NUCOR CORP | COM | 670346105 | 3,988,200 | 68000 | Sh | | Shared - Other 1 | 68000 |
| NUCOR CORP | COM | 670346955 | 2,932,500 | 50000 | | PUT | Shared - Other 1 | 50000 |
| NUVELO INC | COM | 67072M301 | 408,000 | 150000 | Sh | | Shared - Other 1 | 150000 |
| NVIDIA CORP | COM | 67066G954 | 2,065,500 | 50000 | | PUT | Shared - Other 1 | 50000 |
| NVIDIA CORP | COM | 67066G104 | 21,713,032 | 525612 | Sh | | Shared - Other 1 | 525612 |
| NVIDIA CORP | COM | 67066G904 | 2,065,500 | 50000 | | CALL | Shared - Other 1 | 50000 |
| NXSTAGE MEDICAL INC | COM | 67072V103 | 4,210,292 | 325622 | Sh | | Shared - Other 1 | 325622 |
| NYMEX HOLDINGS INC | COM | 62948N104 | 3,140,750 | 25000 | Sh | | Shared - Other 1 | 25000 |

DX-1169-00012

GOV-00005119

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| OCCIDENTAL PETE CORP DEL | COM | 674599105 | 1,591,700 | 27500 | Sh | | Shared - Other 1 | 27500 |
| OCCIDENTAL PETE CORP DEL | COM | 674599905 | 13,891,200 | 240000 | | CALL | Shared - Other 1 | 240000 |
| OCEANFREIGHT INC | COM | Y64202107 | 1,833,500 | 95000 | Sh | | Shared - Other 1 | 95000 |
| ODYSSEY MARINE EXPLORATION I | COM | 676118102 | 3,849,982 | 640596 | Sh | | Shared - Other 1 | 640596 |
| OFFICE DEPOT INC | COM | 676220106 | 20,890,244 | 689447 | Sh | | Shared - Other 1 | 689447 |
| OGE ENERGY CORP | COM | 670837103 | 11,178,250 | 305000 | Sh | | Shared - Other 1 | 305000 |
| OIL SVC HOLDRS TR | COM | 678002956 | 41,089,750 | 235000 | | PUT | Shared - Other 1 | 235000 |
| OLD DOMINION FGHT LINES INC | COM | 679580100 | 12,813,750 | 425000 | Sh | | Shared - Other 1 | 425000 |
| OM GROUP INC | COM | 670872950 | 1,587,600 | 30000 | | PUT | Shared - Other 1 | 30000 |
| OMNIVISION TECHNOLOGIES INC | COM | 682128103 | 39,517,197 | 2182065 | Sh | | Shared - Other 1 | 2182065 |
| OMNIVISION TECHNOLOGIES INC | COM | 682128903 | 9,055,000 | 500000 | | CALL | Shared - Other 1 | 500000 |
| ON SEMICONDUCTOR CORP | COM | 682189105 | 33,253,847 | 3102038 | Sh | | Shared - Other 1 | 3102038 |
| ON2 TECHNOLOGIES INC | COM | 68338A107 | 692,926 | 227642 | Sh | | Shared - Other 1 | 227642 |
| ONYX PHARMACEUTICALS INC | COM | 683399109 | 31,583,290 | 1174100 | Sh | | Shared - Other 1 | 1174100 |
| ONYX PHARMACEUTICALS INC | COM | 683399909 | 3,362,500 | 125000 | | CALL | Shared - Other 1 | 125000 |
| OPENTV CORP | COM | 683543101 | 339,200 | 160000 | Sh | | Shared - Other 1 | 160000 |
| OPLINK COMMUNICATIONS INC | COM | 68375Q403 | 1,200,000 | 80000 | Sh | | Shared - Other 1 | 80000 |
| OPNET TECHNOLOGIES INC | COM | 683757108 | 210,748 | 18310 | Sh | | Shared - Other 1 | 18310 |
| OPNEXT INC | COM | 68375V105 | 529,600 | 40000 | Sh | | Shared - Other 1 | 40000 |
| OPSWARE INC | COM | 68383A101 | 15,370,604 | 1614257 | Sh | | Shared - Other 1 | 1614257 |
| OPSWARE INC | COM | 68383A901 | 5,230,500 | 550000 | | CALL | Shared - Other 1 | 550000 |
| OPTICAL COMMUNICATION PRODS | COM | 68382T101 | 644,000 | 400000 | Sh | | Shared - Other 1 | 400000 |
| OPTIMAL GROUP INC | COM | 68388Q208 | 4,089,080 | 541600 | Sh | | Shared - Other 1 | 541600 |
| ORACLE CORP | COM | 68389X105 | 62,726,661 | 3182479 | Sh | | Shared - Other 1 | 3182479 |
| ORACLE CORP | COM | 68389X905 | 40,602,600 | 2060000 | | CALL | Shared - Other 1 | 2060000 |
| ORCKIT COMMUNICATIONS LTD | COM | M75318206 | 705,939 | 78700 | Sh | | Shared - Other 1 | 78700 |
| OREXIGEN THERAPEUTICS INC | COM | 686164104 | 1,942,116 | 129302 | Sh | | Shared - Other 1 | 129302 |
| ORIGIN AGRITECH LIMITED | COM | G67828106 | 4,125,000 | 500000 | Sh | | Shared - Other 1 | 500000 |
| OSHKOSH TRUCK CORP | COM | 688239901 | 1,573,000 | 25000 | | CALL | Shared - Other 1 | 25000 |
| OSI PHARMACEUTICALS INC | COM | 671040903 | 9,052,500 | 250000 | | CALL | Shared - Other 1 | 250000 |
| OSI PHARMACEUTICALS INC | COM | 671040953 | 3,621,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| OSI SYSTEMS INC | COM | 671044105 | 920,273 | 33648 | Sh | | Shared - Other 1 | 33648 |
| OVERLAND STORAGE INC | COM | 690310107 | 2,040,670 | 784873 | Sh | | Shared - Other 1 | 784873 |
| P F CHANGS CHINA BISTRO INC | COM | 69333Y958 | 1,760,000 | 50000 | | PUT | Shared - Other 1 | 50000 |
| P F CHANGS CHINA BISTRO INC | COM | 69333Y908 | 1,760,000 | 50000 | | CALL | Shared - Other 1 | 50000 |
| PACER INTL INC TENN | COM | 69373H906 | 1,891,600 | 80000 | | CALL | Shared - Other 1 | 80000 |
| PACER INTL INC TENN | COM | 69373H106 | 9,408,000 | 400000 | Sh | | Shared - Other 1 | 400000 |
| PACKETEER INC | COM | 695210954 | 781,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| PACKETEER INC | COM | 695210104 | 782,312 | 100168 | Sh | | Shared - Other 1 | 100168 |
| PANTRY INC | COM | 698657103 | 7,350,113 | 159612 | Sh | | Shared - Other 1 | 159612 |
| PAR PHARMACEUTICAL COS INC | COM | 69888P906 | 8,158,470 | 289000 | | CALL | Shared - Other 1 | 289000 |
| PARALLEL PETE CORP DEL | COM | 699157103 | 871,620 | 39800 | Sh | | Shared - Other 1 | 39800 |
| PARKER HANNIFIN CORP | COM | 701094954 | 7,343,250 | 75000 | | PUT | Shared - Other 1 | 75000 |
| PATNI COMPUTER SYS | COM | 703248203 | 2,521,000 | 100000 | Sh | | Shared - Other 1 | 100000 |
| PATTERSON UTI ENERGY INC | COM | 703481951 | 1,048,400 | 40000 | | PUT | Shared - Other 1 | 40000 |
| PATTERSON UTI ENERGY INC | COM | 703481101 | 224,882 | 8580 | Sh | | Shared - Other 1 | 8580 |
| PAYCHEX INC | COM | 704326107 | 326,222 | 8339 | Sh | | Shared - Other 1 | 8339 |
| PAYLESS SHOESOURCE INC | COM | 704379106 | 2,524,000 | 80000 | Sh | | Shared - Other 1 | 80000 |
| PC MALL INC | COM | 69323K100 | 1,105,592 | 90400 | Sh | | Shared - Other 1 | 90400 |
| PDL BIOPHARMA INC | COM | 69329Y904 | 13,907,770 | 596900 | | CALL | Shared - Other 1 | 596900 |
| PEABODY ENERGY CORP | COM | 704549904 | 5,805,600 | 120000 | | CALL | Shared - Other 1 | 120000 |
| PEABODY ENERGY CORP | COM | 704549954 | 4,838,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| PEABODY ENERGY CORP | COM | 704549104 | 34,107,900 | 705000 | Sh | | Shared - Other 1 | 705000 |
| PENNEY J C INC | COM | 708160106 | 641,793 | 8867 | Sh | | Shared - Other 1 | 8867 |
| PENWEST PHARMACEUTICALS CO | COM | 709754105 | 31,760,055 | 2546917 | Sh | | Shared - Other 1 | 2546917 |
| PENWEST PHARMACEUTICALS CO | COM | 709754905 | 33,382,190 | 2677000 | | CALL | Shared - Other 1 | 2677000 |
| PEOPLES UNITED FINANCIAL INC | COM | 712704105 | 2,038,950 | 115000 | Sh | | Shared - Other 1 | 115000 |
| PEOPLES UNITED FINANCIAL INC | COM | 712704905 | 8,510,400 | 480000 | | CALL | Shared - Other 1 | 480000 |
| PEOPLESUPPORT INC | COM | 712714302 | 31,733,998 | 2795947 | Sh | | Shared - Other 1 | 2795947 |
| PEP BOYS MANNY MOE & JACK | COM | 713278959 | 2,016,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| PEPSI BOTTLING GROUP INC | COM | 713409100 | 673,600 | 20000 | Sh | | Shared - Other 1 | 20000 |
| PEPSICO INC | COM | 713448108 | 9,313,757 | 143620 | Sh | | Shared - Other 1 | 143620 |
| PEROT SYS CORP | COM | 714265105 | 1,704,000 | 100000 | Sh | | Shared - Other 1 | 100000 |
| PERRIGO CO | COM | 714290103 | 3,916,000 | 20000 | Sh | | Shared - Other 1 | 20000 |
| PETMED EXPRESS INC | COM | 716382106 | 256,800 | 20000 | Sh | | Shared - Other 1 | 20000 |
| PETRO-CDA | COM | 716483952 | 7,974,000 | 150000 | | PUT | Shared - Other 1 | 150000 |
| PETSMART INC | COM | 716768956 | 8,112,500 | 250000 | | PUT | Shared - Other 1 | 250000 |
| PFIZER INC | COM | 717081103 | 454,635 | 17780 | Sh | | Shared - Other 1 | 17780 |
| PGT INC | COM | 69336V101 | 546,500 | 50000 | Sh | | Shared - Other 1 | 50000 |
| PHARMACEUTICAL HLDRS TR | COM | 71712A906 | 24,498,000 | 300000 | | CALL | Shared - Other 1 | 300000 |
| PHARMACEUTICAL PROD DEV INC | COM | 717124951 | 3,027,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| PHARMASSET INC | COM | 71715N106 | 4,378,740 | 501000 | Sh | | Shared - Other 1 | 501000 |
| PHARMION CORP | COM | 71715B409 | 12,318,225 | 425500 | Sh | | Shared - Other 1 | 425500 |
| PHARMION CORP | COM | 71715B909 | 3,763,500 | 130000 | | CALL | Shared - Other 1 | 130000 |
| PHOTON DYNAMICS INC | COM | 719364101 | 820,770 | 75300 | Sh | | Shared - Other 1 | 75300 |
| PHOTON DYNAMICS INC | COM | 719364901 | 3,815,000 | 350000 | | CALL | Shared - Other 1 | 350000 |
| PHYSICIANS FORMULA HLDGS INC | COM | 719627106 | 314,500 | 20000 | Sh | | Shared - Other 1 | 20000 |
| PIER 1 IMPORTS INC | COM | 720279108 | 5,662,754 | 666991 | Sh | | Shared - Other 1 | 666991 |
| PILGRIMS PRIDE CORP | COM | 721467108 | 5,343,800 | 140000 | Sh | | Shared - Other 1 | 140000 |
| PIONEER NAT RES CO | COM | 723787107 | 240,627 | 4940 | Sh | | Shared - Other 1 | 4940 |
| PIXELWORKS INC | COM | 72581M107 | 478,339 | 325400 | Sh | | Shared - Other 1 | 325400 |
| PLANAR SYS INC | COM | 726900103 | 1,705,466 | 238380 | Sh | | Shared - Other 1 | 238380 |
| PLAYBOY ENTERPRISES INC | COM | 728117300 | 3,399,000 | 300000 | Sh | | Shared - Other 1 | 300000 |
| PLAYTEX PRODS INC | COM | 728139100 | 592,400 | 40000 | Sh | | Shared - Other 1 | 40000 |
| PLX TECHNOLOGY INC | COM | 69341T107 | 3,012,754 | 269960 | Sh | | Shared - Other 1 | 269960 |
| PMC-SIERRA INC | COM | 69344F106 | 22,432,058 | 2901948 | Sh | | Shared - Other 1 | 2901948 |
| PMI GROUP INC | COM | 69344M101 | 2,862,454 | 64080 | Sh | | Shared - Other 1 | 64080 |
| PNC FINL SVCS GROUP INC | COM | 693475105 | 3,223,820 | 45038 | Sh | | Shared - Other 1 | 45038 |
| POLO RALPH LAUREN CORP | COM | 731572953 | 6,377,150 | 65000 | | PUT | Shared - Other 1 | 65000 |
| PONIARD PHARMACEUTICALS INC | COM | 732449301 | 680,000 | 100000 | Sh | | Shared - Other 1 | 100000 |
| PORTFOLIO RECOVERY ASSOCS IN | COM | 73640Q955 | 600,200 | 10000 | | PUT | Shared - Other 1 | 10000 |
| POWERSHARES ETF TRUST | COM | 73935A500 | 1,459,649 | 70108 | Sh | | Shared - Other 1 | 70108 |
| POWERSHARES QQQ TRUST | COM | 73935A104 | 3,568,800 | 75000 | Sh | | Shared - Other 1 | 75000 |
| POWERSHARES QQQ TRUST | COM | 73935A954 | 478,380,000 | 10050000 | | PUT | Shared - Other 1 | 10050000 |

DX-1169-00013

GOV-00005120

| Company | Type | CUSIP | Value | Shares | Sh | Option | Holding | | Amount |
|---|---|---|---|---|---|---|---|---|---|
| POWERWAVE TECHNOLOGIES INC | COM | 739363109 | 24,464,742 | 3651454 | Sh | | Shared - Other | 1 | 3651454 |
| POWERWAVE TECHNOLOGIES INC | COM | 739363909 | 5,360,000 | 800000 | | CALL | Shared - Other | 1 | 800000 |
| PPG INDS INC | COM | 693506957 | 3,044,400 | 40000 | Sh | | Shared - Other | 1 | 40000 |
| PPG INDS INC | COM | 693506107 | 1,476,534 | 19400 | Sh | | Shared - Other | 1 | 19400 |
| PPL CORP | COM | 69351T106 | 6,952,394 | 148600 | Sh | | Shared - Other | 1 | 148600 |
| PRIDE INTL INC DEL | COM | 74153Q102 | 10,168,704 | 271455 | Sh | | Shared - Other | 1 | 271455 |
| PRIDE INTL INC DEL | COM | 74153Q902 | 749,200 | 20000 | | CALL | Shared - Other | 1 | 20000 |
| PRIDE INTL INC DEL | COM | 74153Q952 | 1,873,000 | 50000 | | PUT | Shared - Other | 1 | 50000 |
| PROCTER & GAMBLE CO | COM | 742718109 | 11,176,782 | 182657 | Sh | | Shared - Other | 1 | 182657 |
| PROGENICS PHARMACEUTICALS IN | COM | 743187906 | 3,235,500 | 150000 | | CALL | Shared - Other | 1 | 150000 |
| PROGENICS PHARMACEUTICALS IN | COM | 743187106 | 6,471,000 | 300000 | Sh | | Shared - Other | 1 | 300000 |
| PROGRESS ENERGY INC | COM | 743263105 | 420,340 | 9220 | Sh | | Shared - Other | 1 | 9220 |
| PROGRESSIVE GAMING INTL CORP | COM | 74332S102 | 4,945,792 | 842554 | Sh | | Shared - Other | 1 | 842554 |
| PROLOGIS | COM | 743410102 | 569,000 | 10000 | Sh | | Shared - Other | 1 | 10000 |
| PROVIDENT BANKSHARES CORP | COM | 73859J100 | 396,638 | 12100 | Sh | | Shared - Other | 1 | 12100 |
| PRUDENTIAL FINL INC | COM | 744320102 | 2,916,900 | 30000 | Sh | | Shared - Other | 1 | 30000 |
| PULTE HOMES INC | COM | 745867101 | 5,693,545 | 253610 | Sh | | Shared - Other | 1 | 253610 |
| QAD INC | COM | 74727D108 | 376,579 | 45371 | Sh | | Shared - Other | 1 | 45371 |
| QIMONDA AG | COM | 746904101 | 3,476,945 | 225045 | Sh | | Shared - Other | 1 | 225045 |
| QLOGIC CORP | COM | 74727T101 | 13,110,843 | 787438 | Sh | | Shared - Other | 1 | 787438 |
| QLOGIC CORP | COM | 74727T901 | 3,330,000 | 200000 | | CALL | Shared - Other | 1 | 200000 |
| QLT INC | COM | 746927102 | 28,173,376 | 3807213 | Sh | | Shared - Other | 1 | 3807213 x |
| QLT INC | COM | 746927902 | 4,318,640 | 583600 | | CALL | Shared - Other | 1 | 583600 x |
| QUALCOMM INC | COM | 747525903 | 5,423,750 | 125000 | | CALL | Shared - Other | 1 | 125000 |
| QUALCOMM INC | COM | 747525103 | 22,788,428 | 525200 | Sh | | Shared - Other | 1 | 525200 |
| QUALCOMM INC | COM | 747525953 | 3,254,250 | 75000 | | PUT | Shared - Other | 1 | 75000 |
| QUANTA SVCS INC | COM | 74762E902 | 3,067,000 | 100000 | | CALL | Shared - Other | 1 | 100000 |
| QUANTA SVCS INC | COM | 74762E102 | 1,993,550 | 65000 | Sh | | Shared - Other | 1 | 65000 |
| QUANTUM CORP | COM | 747906204 | 276,741 | 87300 | Sh | | Shared - Other | 1 | 87300 |
| QUEST SOFTWARE INC | COM | 74834T103 | 24,448,179 | 1510079 | Sh | | Shared - Other | 1 | 1510079 |
| QUESTAR CORP | COM | 74834G902 | 3,699,500 | 70000 | | CALL | Shared - Other | 1 | 70000 |
| QUESTAR CORP | COM | 74834G952 | 3,963,750 | 75000 | | PUT | Shared - Other | 1 | 75000 |
| QUESTAR CORP | COM | 748356102 | 3,107,580 | 58800 | Sh | | Shared - Other | 1 | 58800 |
| QUIKSILVER INC | COM | 74838C906 | 2,543,400 | 180000 | | CALL | Shared - Other | 1 | 180000 |
| QUIKSILVER INC | COM | 74838C106 | 7,912,800 | 560000 | Sh | | Shared - Other | 1 | 560000 |
| RACKABLE SYS INC | COM | 750077109 | 21,135,303 | 1709976 | Sh | | Shared - Other | 1 | 1709976 |
| RACKABLE SYS INC | COM | 750077909 | 2,051,760 | 166000 | | CALL | Shared - Other | 1 | 166000 |
| RADIO ONE INC | COM | 75040P405 | 11,296,000 | 1600000 | Sh | | Shared - Other | 1 | 1600000 |
| RADIOSHACK CORP | COM | 750438953 | 8,285,000 | 250000 | | PUT | Shared - Other | 1 | 250000 |
| RADISYS CORP | COM | 750459109 | 1,470,652 | 118601 | Sh | | Shared - Other | 1 | 118601 |
| RADNET INC | COM | 750491102 | 1,143,600 | 120000 | Sh | | Shared - Other | 1 | 120000 |
| RADVISION LTD | COM | M81969105 | 3,564,396 | 169491 | Sh | | Shared - Other | 1 | 169491 |
| RADWARE LTD | COM | M81873107 | 1,091,250 | 75000 | Sh | | Shared - Other | 1 | 75000 |
| RAE SYS INC | COM | 75061P102 | 585,273 | 253365 | Sh | | Shared - Other | 1 | 253365 |
| RAIT FINANCIAL TRUST | COM | 749227104 | 2,152,374 | 82720 | Sh | | Shared - Other | 1 | 82720 |
| RAMBUS INC DEL | COM | 750917906 | 3,596,000 | 200000 | | CALL | Shared - Other | 1 | 200000 |
| RAMBUS INC DEL | COM | 750917106 | 12,184,471 | 677668 | Sh | | Shared - Other | 1 | 677668 |
| RANGE RES CORP | COM | 75281A109 | 2,267,794 | 60620 | Sh | | Shared - Other | 1 | 60620 |
| RAYTHEON CO | COM | 755111507 | 7,614,657 | 141300 | Sh | | Shared - Other | 1 | 141300 |
| REALNETWORKS INC | COM | 75605L104 | 2,045,409 | 250356 | Sh | | Shared - Other | 1 | 250356 |
| RED HAT INC | COM | 756577902 | 8,912,000 | 400000 | | CALL | Shared - Other | 1 | 400000 |
| RED ROBIN GOURMET BURGERS IN | COM | 75689M101 | 2,422,200 | 60000 | Sh | | Shared - Other | 1 | 60000 |
| REDDY ICE HLDGS INC | COM | 75734R105 | 285,200 | 10000 | Sh | | Shared - Other | 1 | 10000 |
| RELIANCE STEEL & ALUMINUM CO | COM | 759509102 | 1,535,898 | 27300 | Sh | | Shared - Other | 1 | 27300 |
| RENOVIS INC | COM | 759885106 | 1,685,160 | 468100 | Sh | | Shared - Other | 1 | 468100 |
| RENTECH INC | COM | 760112102 | 216,923 | 83754 | Sh | | Shared - Other | 1 | 83754 |
| REPSOL YPF S A | COM | 76026T995 | 3,096,000 | 80000 | | PUT | Shared - Other | 1 | 80000 |
| REPUBLIC SVCS INC | COM | 760759100 | 1,532,000 | 50000 | Sh | | Shared - Other | 1 | 50000 |
| RESEARCH IN MOTION LTD | COM | 760975102 | 17,499,125 | 87500 | Sh | | Shared - Other | 1 | 87500 |
| RESEARCH IN MOTION LTD | COM | 760975952 | 15,999,200 | 80000 | | PUT | Shared - Other | 1 | 80000 |
| REYNOLDS AMERICAN INC | COM | 761713106 | 577,150 | 8852 | Sh | | Shared - Other | 1 | 8852 |
| RF MICRODEVICES INC | COM | 749941100 | 4,372,774 | 700765 | Sh | | Shared - Other | 1 | 700765 |
| RF MONOLITHICS INC | COM | 74955F106 | 296,532 | 57691 | Sh | | Shared - Other | 1 | 57691 |
| RIGHTNOW TECHNOLOGIES INC | COM | 76657R106 | 3,377,391 | 205813 | Sh | | Shared - Other | 1 | 205813 |
| RIO TINTO PLC | COM | 767204950 | 9,183,600 | 30000 | | PUT | Shared - Other | 1 | 30000 |
| RITE AID CORP | COM | 767754104 | 1,276,000 | 200000 | Sh | | Shared - Other | 1 | 200000 |
| RIVERBED TECHNOLOGY INC | COM | 768573107 | 14,049,700 | 320623 | Sh | | Shared - Other | 1 | 320623 |
| RIVERBED TECHNOLOGY INC | COM | 768573957 | 4,382,000 | 100000 | | PUT | Shared - Other | 1 | 100000 |
| RIVERBED TECHNOLOGY INC | COM | 768573907 | 4,382,000 | 100000 | | CALL | Shared - Other | 1 | 100000 |
| ROGERS COMMUNICATIONS INC | COM | 775109200 | 212,450 | 5000 | Sh | | Shared - Other | 1 | 5000 |
| ROHM & HAAS CO | COM | 775371107 | 1,640,400 | 30000 | Sh | | Shared - Other | 1 | 30000 |
| ROYAL CARIBBEAN CRUISES LTD | COM | V7780T103 | 1,869,630 | 43500 | Sh | | Shared - Other | 1 | 43500 |
| RSC HOLDINGS INC | COM | 749721102 | 11,371,000 | 568550 | Sh | | Shared - Other | 1 | 568550 |
| RUSS BERRIE & CO | COM | 782233100 | 1,863,000 | 100000 | Sh | | Shared - Other | 1 | 100000 |
| RYDER SYS INC | COM | 783549108 | 7,892,460 | 146700 | Sh | | Shared - Other | 1 | 146700 |
| RYLAND GROUP INC | COM | 783764103 | 1,516,250 | 40574 | Sh | | Shared - Other | 1 | 40574 |
| SAFECO CORP | COM | 786429100 | 2,116,840 | 34000 | Sh | | Shared - Other | 1 | 34000 |
| SAFEGUARD SCIENTIFICS INC | COM | 786449108 | 154,831 | 55100 | Sh | | Shared - Other | 1 | 55100 |
| SAFEWAY INC | COM | 786514208 | 2,415,211 | 70973 | Sh | | Shared - Other | 1 | 70973 |
| SAIC INC | COM | 78390X101 | 2,168,400 | 120000 | Sh | | Shared - Other | 1 | 120000 |
| SALESFORCE COM INC | COM | 79466L902 | 1,285,800 | 30000 | | CALL | Shared - Other | 1 | 30000 |
| SALIX PHARMACEUTICALS INC | COM | 795435956 | 1,230,000 | 100000 | | PUT | Shared - Other | 1 | 100000 |
| SANDERSON FARMS INC | COM | 800013104 | 1,941,262 | 43120 | Sh | | Shared - Other | 1 | 43120 |
| SANDISK CORP | COM | 80004C902 | 8,564,500 | 175000 | | CALL | Shared - Other | 1 | 175000 |
| SANDISK CORP | COM | 80004C951 | 2,447,000 | 50000 | | PUT | Shared - Other | 1 | 50000 |
| SANDISK CORP | COM | 80004C101 | 28,268,282 | 577611 | Sh | | Shared - Other | 1 | 577611 |
| SANOFI AVENTIS | COM | 80105M955 | 2,013,500 | 50000 | | PUT | Shared - Other | 1 | 50000 |
| SAP AKTIENGESELLSCHAFT | COM | 803054956 | 15,321,000 | 300000 | | PUT | Shared - Other | 1 | 300000 |
| SAPIENT CORP | COM | 803062108 | 5,256,694 | 680038 | Sh | | Shared - Other | 1 | 680038 |
| SARA LEE CORP | COM | 803111103 | 367,123 | 21099 | Sh | | Shared - Other | 1 | 21099 |
| SARA LEE CORP | COM | 803111903 | 8,700,000 | 500000 | | CALL | Shared - Other | 1 | 500000 |
| SATYAM COMPUTER SERVICES LTD | COM | 804098101 | 4,952,000 | 200000 | Sh | | Shared - Other | 1 | 200000 |
| SBA COMMUNICATIONS CORP | COM | 78388J106 | 766,960 | 22833 | Sh | | Shared - Other | 1 | 22833 |
| SCHERING PLOUGH CORP | COM | 806605101 | 14,151,556 | 464900 | Sh | | Shared - Other | 1 | 464900 |

DX-1169-00014

GOV-00005121

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SCHLUMBERGER LTD | COM | 806857108 | 1,458,447 | 17135 | Sh | | Shared - Other 1 | 17135 |
| SCHWAB CHARLES CORP NEW | COM | 808513905 | 6,156,000 | 300000 | | CALL | Shared - Other 1 | 300000 |
| SCHWAB CHARLES CORP NEW | COM | 808513105 | 36,751,751 | 1791021 | Sh | | Shared - Other 1 | 1791021 |
| SCHWEITZER-MAUDUIT INTL INC | COM | 808541106 | 930,000 | 30000 | Sh | | Shared - Other 1 | 30000 |
| SCIENTIFIC GAMES CORP | COM | 80874P109 | 3,014,333 | 86247 | Sh | | Shared - Other 1 | 86247 |
| SEAGATE TECHNOLOGY | COM | G7945J104 | 15,240,089 | 700050 | Sh | | Shared - Other 1 | 700050 |
| SEAGATE TECHNOLOGY | COM | G7945J904 | 7,837,200 | 360000 | | CALL | Shared - Other 1 | 360000 |
| SEALED AIR CORP NEW | COM | 81211K900 | 1,861,200 | 60000 | | CALL | Shared - Other 1 | 60000 |
| SEALED AIR CORP NEW | COM | 81211K100 | 3,102,000 | 100000 | Sh | | Shared - Other 1 | 100000 |
| SEARS HLDGS CORP | COM | 812350906 | 4,237,500 | 25000 | | CALL | Shared - Other 1 | 25000 |
| SEARS HLDGS CORP | COM | 812350106 | 7,921,922 | 46737 | Sh | | Shared - Other 1 | 46737 |
| SEARS HLDGS CORP | COM | 812350956 | 4,237,500 | 25000 | | PUT | Shared - Other 1 | 25000 |
| SELECT SECTOR SPDR TR | COM | 81369Y950 | 5,937,000 | 150000 | | PUT | Shared - Other 1 | 150000 |
| SELECT SECTOR SPDR TR | COM | 81369Y886 | 5,937,000 | 150000 | Sh | | Shared - Other 1 | 150000 |
| SELECT SECTOR SPDR TR | COM | 81369Y950 | 7,062,000 | 200000 | | PUT | Shared - Other 1 | 200000 |
| SELECT SECTOR SPDR TR | COM | 81369Y950 | 10,240,000 | 400000 | | PUT | Shared - Other 1 | 400000 |
| SELECT SECTOR SPDR TR | COM | 81369Y950 | 16,371,450 | 452500 | | PUT | Shared - Other 1 | 452500 |
| SELECT SECTOR SPDR TR | COM | 81369Y950 | 13,798,000 | 200000 | | PUT | Shared - Other 1 | 200000 |
| SELECT SECTOR SPDR TR | COM | 81369Y950 | 3,123,200 | 80000 | | PUT | Shared - Other 1 | 80000 |
| SEMICONDUCTOR HLDRS TR | COM | 81663G203 | 1,712,250 | 45000 | Sh | | Shared - Other 1 | 45000 |
| SEMICONDUCTOR HLDRS TR | COM | 81663G903 | 26,635,000 | 700000 | | CALL | Shared - Other 1 | 700000 |
| SEMPRA ENERGY | COM | 816851909 | 8,984,500 | 150000 | | CALL | Shared - Other 1 | 150000 |
| SEMTECH CORP | COM | 816850101 | 12,902,740 | 744532 | Sh | | Shared - Other 1 | 744532 |
| SEPRACOR INC | COM | 817315904 | 13,712,986 | 334300 | | CALL | Shared - Other 1 | 334300 |
| SEPRACOR INC | COM | 817315104 | 4,112,337 | 100252 | Sh | | Shared - Other 1 | 100252 |
| SHANDA INTERACTIVE ENTMT LTD | COM | 81941Q203 | 7,774,800 | 250800 | Sh | | Shared - Other 1 | 250800 |
| SHANDA INTERACTIVE ENTMT LTD | COM | 81941Q903 | 3,720,000 | 120000 | | CALL | Shared - Other 1 | 120000 |
| SHERWIN WILLIAMS CO | COM | 824348106 | 275,718 | 4148 | Sh | | Shared - Other 1 | 4148 |
| SHIRE PLC | COM | 82401R906 | 5,559,750 | 75000 | | CALL | Shared - Other 1 | 75000 |
| SHIRE PLC | COM | 82481R106 | 14,798,720 | 199632 | Sh | | Shared - Other 1 | 199632 |
| SHUFFLE MASTER INC | COM | 825549108 | 943,876 | 56860 | Sh | | Shared - Other 1 | 56860 |
| SI INTL INC | COM | 78427V102 | 2,806,700 | 85000 | Sh | | Shared - Other 1 | 85000 |
| SIERRA WIRELESS INC | COM | 826516106 | 622,250 | 25000 | Sh | | Shared - Other 1 | 25000 |
| SIERRA WIRELESS INC | COM | 826516956 | 1,244,500 | 50000 | | PUT | Shared - Other 1 | 50000 x |
| SIGMA DESIGNS INC | COM | 826565103 | 20,914,996 | 801648 | Sh | | Shared - Other 1 | 801648 |
| SILICON IMAGE INC | COM | 82705T102 | 1,721,749 | 200670 | Sh | | Shared - Other 1 | 200670 |
| SILICON LABORATORIES INC | COM | 826919102 | 2,570,796 | 74279 | Sh | | Shared - Other 1 | 74279 |
| SILICONWARE PRECISION INDS L | COM | 827084964 | 15,904,669 | 1445879 | Sh | | Shared - Other 1 | 1445879 |
| SIMON PPTY GROUP INC NEW | COM | 828806109 | 1,036,466 | 11140 | Sh | | Shared - Other 1 | 11140 |
| SIPEX CORP | COM | 829909209 | 1,333,500 | 150000 | Sh | | Shared - Other 1 | 150000 |
| SIRENZA MICRODEVICES INC | COM | 82966T106 | 5,359,293 | 451499 | Sh | | Shared - Other 1 | 451499 |
| SIRF TECHNOLOGY HLDGS INC | COM | 82967H951 | 5,703,500 | 275000 | | PUT | Shared - Other 1 | 275000 |
| SIRVA INC | COM | 82967T104 | 594,000 | 300000 | Sh | | Shared - Other 1 | 300000 |
| SIX FLAGS INC | COM | 83001P109 | 3,727,987 | 612149 | Sh | | Shared - Other 1 | 612149 |
| SKECHERS U S A INC | COM | 830566105 | 5,111,460 | 175050 | Sh | | Shared - Other 1 | 175050 |
| SKILLED HEALTHCARE GROUP INC | COM | 83066R107 | 2,104,707 | 135700 | Sh | | Shared - Other 1 | 135700 |
| SKYWORKS SOLUTIONS INC | COM | 83088M102 | 2,305,254 | 313640 | Sh | | Shared - Other 1 | 313640 |
| SL GREEN RLTY CORP | COM | 78440X101 | 1,346,684 | 10870 | Sh | | Shared - Other 1 | 10870 |
| SMITH A O | COM | 831865209 | 4,786,800 | 120000 | Sh | | Shared - Other 1 | 120000 |
| SMITH MICRO SOFTWARE INC | COM | 832154908 | 1,505,000 | 100000 | | CALL | Shared - Other 1 | 100000 |
| SMITH MICRO SOFTWARE INC | COM | 832154108 | 1,420,630 | 94332 | Sh | | Shared - Other 1 | 94332 |
| SOHU COM INC | COM | 83408W103 | 3,998,750 | 125000 | Sh | | Shared - Other 1 | 125000 |
| SOHU COM INC | COM | 83408W903 | 4,158,700 | 130000 | | CALL | Shared - Other 1 | 130000 |
| SOMAXON PHARMACEUTICALS INC | COM | 834453102 | 4,744,139 | 390143 | Sh | | Shared - Other 1 | 390143 |
| SONICWALL INC | COM | 835470105 | 2,852,816 | 332109 | Sh | | Shared - Other 1 | 332109 |
| SONOCO PRODS CO | COM | 835495102 | 243,161 | 5680 | Sh | | Shared - Other 1 | 5680 |
| SONUS NETWORKS INC | COM | 835916107 | 7,369,800 | 865000 | Sh | | Shared - Other 1 | 865000 |
| SONUS PHARMACEUTICALS INC | COM | 835692104 | 2,640,000 | 500000 | Sh | | Shared - Other 1 | 500000 |
| SOTHEBYS | COM | 835898107 | 1,780,974 | 38700 | Sh | | Shared - Other 1 | 38700 |
| SOUTH JERSEY INDS INC | COM | 838518100 | 4,142,990 | 117100 | Sh | | Shared - Other 1 | 117100 |
| SOUTHERN COPPER CORP | COM | 84265V105 | 893,679 | 9481 | Sh | | Shared - Other 1 | 9481 |
| SOUTHERN COPPER CORP | COM | 84265V955 | 1,805,200 | 20000 | | PUT | Shared - Other 1 | 20000 |
| SOUTHERN UN CO NEW | COM | 844030106 | 1,632,759 | 50100 | Sh | | Shared - Other 1 | 50100 |
| SOUTHERN UN CO NEW | COM | 844030906 | 1,629,600 | 50000 | | CALL | Shared - Other 1 | 50000 |
| SOUTHWEST AIRLS CO | COM | 844741108 | 1,341,900 | 90000 | Sh | | Shared - Other 1 | 90000 |
| SPDR TR | COM | 78462F953 | 747,411,455 | 4968500 | | PUT | Shared - Other 1 | 4968500 |
| SPDR TR | COM | 78462F903 | 4,512,900 | 30000 | | CALL | Shared - Other 1 | 30000 |
| SPDR TR | COM | 78462F103 | 3,334,732 | 22168 | Sh | | Shared - Other 1 | 22168 |
| SPECTRA ENERGY CORP | COM | 847560109 | 2,606,304 | 100400 | Sh | | Shared - Other 1 | 100400 |
| SPECTRUM PHARMACEUTICALS INC | COM | 84763A108 | 3,226,500 | 450000 | Sh | | Shared - Other 1 | 450000 |
| SPIRIT AEROSYSTEMS HLDGS INC | COM | 848574109 | 3,965,500 | 110000 | Sh | | Shared - Other 1 | 110000 |
| SPRINT NEXTEL CORP | COM | 852061100 | 231,124 | 11160 | Sh | | Shared - Other 1 | 11160 |
| SRA INTL INC | COM | 78464B105 | 10,589,069 | 419203 | Sh | | Shared - Other 1 | 419203 |
| SRS LABS INC | COM | 78464M106 | 198,130 | 20321 | Sh | | Shared - Other 1 | 20321 |
| ST JOE CO | COM | 790148900 | 926,800 | 20000 | | CALL | Shared - Other 1 | 20000 |
| ST JUDE MED INC | COM | 790849103 | 321,548 | 7750 | Sh | | Shared - Other 1 | 7750 |
| ST MARY LD & EXPL CO | COM | 79228R108 | 4,577,500 | 125000 | Sh | | Shared - Other 1 | 125000 |
| STANDARD PAC CORP NEW | COM | 85375C101 | 7,039,505 | 401569 | Sh | | Shared - Other 1 | 401569 |
| STANDARD PAC CORP NEW | COM | 85375C901 | 2,629,500 | 150000 | | CALL | Shared - Other 1 | 150000 |
| STAPLES INC | COM | 855030102 | 4,079,590 | 171917 | Sh | | Shared - Other 1 | 171917 |
| STARBUCKS CORP | COM | 855244909 | 3,936,000 | 150000 | | CALL | Shared - Other 1 | 150000 |
| STARBUCKS CORP | COM | 855244109 | 20,616,768 | 785700 | Sh | | Shared - Other 1 | 785700 |
| STARENT NETWORKS CORP | COM | 85528P108 | 8,905,730 | 605832 | Sh | | Shared - Other 1 | 605832 |
| STARWOOD HOTELS&RESORTS WRLD | COM | 85590A901 | 4,024,200 | 60000 | | CALL | Shared - Other 1 | 60000 |
| STATE STR CORP | COM | 857477103 | 12,934,440 | 189100 | Sh | | Shared - Other 1 | 189100 |
| STEEL DYNAMICS INC | COM | 858119100 | 2,262,889 | 53994 | Sh | | Shared - Other 1 | 53994 |
| STEIN MART INC | COM | 858375108 | 2,635,900 | 215000 | Sh | | Shared - Other 1 | 215000 |
| STEINWAY MUSICAL INSTRS INC | COM | 858495104 | 1,383,600 | 40000 | Sh | | Shared - Other 1 | 40000 |
| STERIS CORP | COM | 859152900 | 10,348,920 | 338200 | | CALL | Shared - Other 1 | 338200 |
| STEWART ENTERPRISES INC | COM | 860370105 | 1,090,600 | 140000 | Sh | | Shared - Other 1 | 140000 |
| STILLWATER MNG CO | COM | 86074Q102 | 5,217,099 | 473850 | Sh | | Shared - Other 1 | 473850 |
| STREETTRACKS GOLD TR | COM | 86307I104 | 964,179 | 15002 | Sh | | Shared - Other 1 | 15002 |
| STREETTRACKS SER TR | COM | 86330E959 | 3,023,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| STREETTRACKS SER TR | COM | 86330E909 | 9,069,000 | 300000 | | CALL | Shared - Other 1 | 300000 |

DX-1169-00015
GOV-00005122

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SULPHCO INC | COM | 865378103 | 182,045 | 50428 | Sh | | Shared – Other 1 | 50428 |
| SUMTOTAL SYS INC | COM | 866615107 | 783,000 | 100000 | Sh | | Shared – Other 1 | 100000 |
| SUN MICROSYSTEMS INC | COM | 866810104 | 13,150,000 | 2500000 | Sh | | Shared – Other 1 | 2500000 |
| SUN MICROSYSTEMS INC | COM | 866810904 | 789,000 | 150000 | | CALL | Shared – Other 1 | 150000 |
| SUNCOR ENERGY INC | COM | 867229906 | 1,798,400 | 20000 | | CALL | Shared – Other 1 | 20000 |
| SUNOCO INC | COM | 86764P109 | 2,261,637 | 28384 | Sh | | Shared – Other 1 | 28384 |
| SUNPOWER CORP | COM | 867652109 | 31,525,000 | 500000 | Sh | | Shared – Other 1 | 500000 |
| SUNRISE SENIOR LIVING INC | COM | 86768K956 | 3,999,000 | 100000 | PUT | | Shared – Other 1 | 100000 |
| SUNTECH PWR HLDGS CO LTD | COM | 86800C904 | 2,735,250 | 75000 | | CALL | Shared – Other 1 | 75000 |
| SUNTECH PWR HLDGS CO LTD | COM | 86800C104 | 380,929 | 10445 | Sh | | Shared – Other 1 | 10445 |
| SUPERIOR ESSEX INC | COM | 86815V105 | 9,231,239 | 247155 | Sh | | Shared – Other 1 | 247155 |
| SUPERIOR OFFSHORE INTL INC | COM | 86825Q104 | 819,000 | 45000 | Sh | | Shared – Other 1 | 45000 |
| SUPERIOR WELL SVCS INC | COM | 86837X105 | 635,250 | 25000 | Sh | | Shared – Other 1 | 25000 |
| SUPERVALU INC | COM | 868536103 | 2,992,272 | 64600 | Sh | | Shared – Other 1 | 64600 |
| SWITCH & DATA FACILITIES COM | COM | 871043105 | 3,274,774 | 170650 | Sh | | Shared – Other 1 | 170650 |
| SYBASE INC | COM | 871130900 | 2,389,000 | 100000 | | CALL | Shared – Other 1 | 100000 |
| SYBASE INC | COM | 871130100 | 4,140,137 | 173300 | Sh | | Shared – Other 1 | 173300 |
| SYCAMORE NETWORKS INC | COM | 871206108 | 14,510,102 | 3609478 | Sh | | Shared – Other 1 | 3609478 |
| SYMANTEC CORP | COM | 871503108 | 11,126,039 | 550794 | Sh | | Shared – Other 1 | 550794 |
| SYMANTEC CORP | COM | 871503908 | 11,110,000 | 550000 | | CALL | Shared – Other 1 | 550000 |
| SYNAPTICS INC | COM | 87157D109 | 19,176,282 | 535800 | Sh | | Shared – Other 1 | 535800 |
| SYNERGY FINANCIAL GROUP INC | COM | 87162V102 | 526,930 | 39500 | Sh | | Shared – Other 1 | 39500 |
| SYNTAX BRILLIAN CORP | COM | 871631103 | 4,882,995 | 387574 | Sh | | Shared – Other 1 | 387574 |
| T-3 ENERGY SRVCS INC | COM | 87306E107 | 809,490 | 24200 | Sh | | Shared – Other 1 | 24200 |
| TAIWAN SEMICONDUCTOR MFG LTD | COM | 874039100 | 14,183,360 | 1274336 | Sh | | Shared – Other 1 | 1274336 |
| TAKE-TWO INTERACTIVE SOFTWAR | COM | 874054909 | 4,992,500 | 250000 | | CALL | Shared – Other 1 | 250000 |
| TAKE-TWO INTERACTIVE SOFTWAR | COM | 874054109 | 2,795,800 | 140000 | Sh | | Shared – Other 1 | 140000 |
| TALISMAN ENERGY INC | COM | 87425E103 | 7,080,579 | 366300 | Sh | | Shared – Other 1 | 366300 |
| TARGET CORP | COM | 87612E956 | 9,540,000 | 150000 | PUT | | Shared – Other 1 | 150000 |
| TASER INTL INC | COM | 87651B904 | 698,000 | 50000 | | CALL | Shared – Other 1 | 50000 |
| TCF FINL CORP | COM | 872275952 | 1,112,000 | 40000 | PUT | | Shared – Other 1 | 40000 |
| TCF FINL CORP | COM | 872275102 | 1,390,000 | 50000 | Sh | | Shared – Other 1 | 50000 |
| TD AMERITRADE HLDG CORP | COM | 87236Y908 | 2,000,000 | 100000 | | CALL | Shared – Other 1 | 100000 |
| TECH DATA CORP | COM | 878237106 | 4,812,115 | 125120 | Sh | | Shared – Other 1 | 125120 |
| TELETECH HOLDINGS INC | COM | 879433956 | 1,194,896 | 36800 | PUT | | Shared – Other 1 | 36800 |
| TELLABS INC | COM | 879664900 | 10,760,000 | 1000000 | | CALL | Shared – Other 1 | 1000000 |
| TELLABS INC | COM | 879664100 | 23,958,324 | 2226610 | Sh | | Shared – Other 1 | 2226610 |
| TENARIS S A | COM | 88031M109 | 4,406,400 | 90000 | Sh | | Shared – Other 1 | 90000 |
| TENET HEALTHCARE CORP | COM | 88033G100 | 69,592 | 10690 | Sh | | Shared – Other 1 | 10690 |
| TERADYNE INC | COM | 880770102 | 1,406,646 | 80014 | Sh | | Shared – Other 1 | 80014 |
| TEREX CORP NEW | COM | 880779103 | 896,739 | 11030 | Sh | | Shared – Other 1 | 11030 |
| TESORO CORP | COM | 881609951 | 3,429,000 | 60000 | PUT | | Shared – Other 1 | 60000 |
| TESSERA TECHNOLOGIES INC | COM | 881641100 | 27,968,754 | 689735 | Sh | | Shared – Other 1 | 689735 |
| TEVA PHARMACEUTICAL INDS LTD | COM | 881624209 | 10,312,500 | 250000 | Sh | | Shared – Other 1 | 250000 |
| TEVA PHARMACEUTICAL INDS LTD | COM | 881624909 | 28,875,000 | 700000 | | CALL | Shared – Other 1 | 700000 |
| TEXAS INDS INC | COM | 882491103 | 5,331,880 | 68000 | Sh | | Shared – Other 1 | 68000 |
| TEXAS INSTRS INC | COM | 882508104 | 3,793,744 | 100817 | Sh | | Shared – Other 1 | 100817 |
| TEXAS INSTRS INC | COM | 882508904 | 18,815,000 | 500000 | | CALL | Shared – Other 1 | 500000 |
| TEXAS ROADHOUSE INC | COM | 88268I109 | 640,779 | 50100 | Sh | | Shared – Other 1 | 50100 |
| TEXTRON INC | COM | 883203901 | 5,505,500 | 50000 | | CALL | Shared – Other 1 | 50000 |
| THERMO FISHER SCIENTIFIC INC | COM | 803556902 | 4,137,600 | 80000 | | CALL | Shared – Other 1 | 80000 |
| THERMO FISHER SCIENTIFIC INC | COM | 803556102 | 264,289 | 5110 | Sh | | Shared – Other 1 | 5110 |
| THINK PARTNERSHIP INC | COM | 88409M101 | 358,800 | 120000 | Sh | | Shared – Other 1 | 120000 |
| THOMAS & BETTS CORP | COM | 884315102 | 4,963,060 | 85570 | Sh | | Shared – Other 1 | 85570 |
| THOMSON | COM | 885118109 | 952,956 | 51400 | Sh | | Shared – Other 1 | 51400 |
| THORNBURG MTG INC | COM | 885218107 | 789,301 | 30149 | Sh | | Shared – Other 1 | 30149 |
| THQ INC | COM | 872443403 | 3,083,130 | 101020 | Sh | | Shared – Other 1 | 101020 |
| THQ INC | COM | 872443953 | 3,052,000 | 100000 | PUT | | Shared – Other 1 | 100000 |
| TIBCO SOFTWARE INC | COM | 88632Q903 | 1,810,000 | 200000 | | CALL | Shared – Other 1 | 200000 |
| TIBCO SOFTWARE INC | COM | 88632Q103 | 2,262,500 | 250000 | Sh | | Shared – Other 1 | 250000 |
| TIM PARTICIPACOES S A | EQUITY | 88706P106 | 4,929,210 | 143000 | Sh | | Shared – Other 1 | 143000 |
| TIMBERLAND CO | COM | 887100105 | 1,532,812 | 60850 | Sh | | Shared – Other 1 | 60850 |
| TIME WARNER CABLE INC | COM | 88732J108 | 1,958,500 | 50000 | Sh | | Shared – Other 1 | 50000 |
| TIME WARNER INC | COM | 887317105 | 23,144,947 | 1100045 | Sh | | Shared – Other 1 | 1100045 |
| TITAN INTL INC ILL | COM | 88830M102 | 1,264,400 | 40000 | Sh | | Shared – Other 1 | 40000 |
| TITAN PHARMACEUTICALS INC DE | COM | 88814X101 | 5,017,854 | 2312375 | Sh | | Shared – Other 1 | 2312375 |
| TITANIUM METALS CORP | COM | 888339207 | 797,500 | 25000 | Sh | | Shared – Other 1 | 25000 |
| TIVO INC | COM | 888706108 | 110,010 | 19000 | Sh | | Shared – Other 1 | 19000 |
| TJX COS INC NEW | COM | 872540109 | 2,930,025 | 102910 | Sh | | Shared – Other 1 | 102910 |
| TOLL BROTHERS INC | COM | 889478103 | 1,576,488 | 63110 | Sh | | Shared – Other 1 | 63110 |
| TRANSALTA CORP | COM | 89346D107 | 2,493,000 | 100000 | Sh | | Shared – Other 1 | 100000 |
| TRANSOCEAN INC | COM | G90078959 | 6,898,700 | 65000 | PUT | | Shared – Other 1 | 65000 |
| TRANSWITCH CORP | COM | 894065101 | 546,000 | 300000 | Sh | | Shared – Other 1 | 300000 |
| TREEHOUSE FOODS INC | COM | 89469A104 | 1,200,111 | 45100 | Sh | | Shared – Other 1 | 45100 |
| TRIAD HOSPITALS INC | COM | 95579K109 | 448,358 | 8340 | Sh | | Shared – Other 1 | 8340 |
| TRIBUNE CO NEW | COM | 896047957 | 4,565,820 | 155300 | PUT | | Shared – Other 1 | 155300 |
| TRIBUNE CO NEW | COM | 896047107 | 4,257,737 | 144821 | Sh | | Shared – Other 1 | 144821 |
| TRIDENT MICROSYSTEMS INC | COM | 895919108 | 17,131,890 | 933618 | Sh | | Shared – Other 1 | 933618 |
| TRIDENT MICROSYSTEMS INC | COM | 895919908 | 7,998,765 | 435900 | | CALL | Shared – Other 1 | 435900 |
| TRIMAS CORP | COM | 896215209 | 1,751,600 | 145000 | Sh | | Shared – Other 1 | 145000 |
| TRIZETTO GROUP INC | COM | 896882107 | 2,904,000 | 150000 | Sh | | Shared – Other 1 | 150000 |
| TRUMP ENTMT RESORTS INC | COM | 898016T103 | 343,434 | 27300 | Sh | | Shared – Other 1 | 27300 |
| TTM TECHNOLOGIES INC | COM | 87305R109 | 976,118 | 75086 | Sh | | Shared – Other 1 | 75086 |
| TUMBLEWEED COMMUNICATIONS CO | COM | 899690101 | 5,143,940 | 610253 | Sh | | Shared – Other 1 | 610253 |
| TURBOCHEF TECHNOLOGIES INC | COM | 900006206 | 15,810,587 | 1135818 | Sh | | Shared – Other 1 | 1135818 |
| TURBOCHEF TECHNOLOGIES INC | COM | 900006906 | 3,480,000 | 250000 | | CALL | Shared – Other 1 | 250000 |
| TXU CORP | COM | 873168908 | 2,692,000 | 40000 | | CALL | Shared – Other 1 | 40000 |
| TXU CORP | COM | 873168108 | 8,601,209 | 127804 | Sh | | Shared – Other 1 | 127804 |
| TYCO INTL LTD NEW | COM | 902124106 | 814,981 | 24119 | Sh | | Shared – Other 1 | 24119 |
| TYCO INTL LTD NEW | COM | 902124906 | 1,013,700 | 30000 | | CALL | Shared – Other 1 | 30000 |
| TYSON FOODS INC | COM | 902494953 | 1,302,400 | 60000 | PUT | | Shared – Other 1 | 60000 |
| TYSON FOODS INC | COM | 902494103 | 1,382,400 | 60000 | Sh | | Shared – Other 1 | 60000 |
| U S AIRWAYS GROUP INC | COM | 90341W908 | 2,270,250 | 75000 | Sh | | Shared – Other 1 | 75000 |
| U S CONCRETE INC | COM | 90333L102 | 4,655,363 | 535715 | Sh | | Shared – Other 1 | 535715 |

DX-1169-00016

GOV-00005123

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| U S ENERGY CORP WYO | COM | 911805109 | 4,146,151 | 770660 | Sh | | Shared - Other 1 | 770660 |
| U S G CORP | COM | 903293905 | 4,904,000 | 100000 | | CALL | Shared - Other 1 | 100000 |
| U S G CORP | COM | 903293405 | 29,240,296 | 596254 | Sh | | Shared - Other 1 | 596254 |
| U S XPRESS ENTERPRISES INC | COM | 90338N103 | 7,432,818 | 400044 | Sh | | Shared - Other 1 | 400044 |
| UAL CORP | COM | 902549807 | 5,073,750 | 125000 | Sh | | Shared - Other 1 | 125000 |
| UAL CORP | COM | 902549907 | 2,638,350 | 65000 | | CALL | Shared - Other 1 | 65000 |
| UIL HLDS CORP | COM | 902748102 | 5,645,271 | 170552 | Sh | | Shared - Other 1 | 170552 |
| ULTRA PETROLEUM CORP | COM | 903914959 | 2,762,000 | 50000 | | PUT | Shared - Other 1 | 50000 |
| ULTRA PETROLEUM CORP | COM | 903914109 | 21,597,792 | 390800 | Sh | | Shared - Other 1 | 390800 |
| ULTRA PETROLEUM CORP | COM | 903914909 | 552,400 | 10000 | Sh | | Shared - Other 1 | 10000 |
| UNIBANCO—UNIAO DE BANCOS BRA | COM | 90458E107 | 3,103,925 | 27500 | Sh | | Shared - Other 1 | 27500 |
| UNION PAC CORP | COM | 907818108 | 245,270 | 2130 | Sh | | Shared - Other 1 | 2130 |
| UNISOURCE ENERGY CORP | COM | 909205106 | 4,048,973 | 147430 | Sh | | Shared - Other 1 | 147430 |
| UNISYS CORP | COM | 909214108 | 7,711,418 | 843700 | Sh | | Shared - Other 1 | 843700 |
| UNITED MICROELECTRONICS CORP | COM | 910873207 | 1,744,200 | 510000 | Sh | | Shared - Other 1 | 510000 |
| UNITED PARCEL SERVICE INC | COM | 911312906 | 4,380,000 | 60000 | | CALL | Shared - Other 1 | 60000 |
| UNITED RETAIL GROUP INC | COM | 911380103 | 290,750 | 25000 | Sh | | Shared - Other 1 | 25000 |
| UNITED STATES NATL GAS FUND | COM | 912318102 | 3,318,750 | 75000 | Sh | | Shared - Other 1 | 75000 |
| UNITED STATES STL CORP NEW | COM | 912909998 | 2,718,750 | 25000 | | PUT | Shared - Other 1 | 25000 |
| UNITED STATES STL CORP NEW | COM | 912909108 | 10,330,960 | 210621 | Sh | | Shared - Other 1 | 210621 |
| UNITED STATES STL CORP NEW | COM | 912909108 | 4,894,838 | 45010 | Sh | | Shared - Other 1 | 45010 |
| UNITED TECHNOLOGIES CORP | COM | 913017909 | 709,300 | 10000 | | CALL | Shared - Other 1 | 10000 |
| UNITED TECHNOLOGIES CORP | COM | 913017109 | 13,665,066 | 184200 | Sh | | Shared - Other 1 | 184200 |
| UNITED THERAPEUTICS CORP DEL | COM | 91307C902 | 23,910,000 | 375000 | | CALL | Shared - Other 1 | 375000 |
| UNITEDHEALTH GROUP INC | COM | 91324P952 | 18,972,940 | 371000 | | PUT | Shared - Other 1 | 371000 |
| UNIVERSAL COMPRESSION HLDGS | COM | 913431102 | 5,978,775 | 82500 | Sh | | Shared - Other 1 | 82500 |
| UNIVERSAL HLTH SVCS INC | COM | 913903100 | 258,300 | 4200 | Sh | | Shared - Other 1 | 4200 |
| US BIOENERGY CORP | COM | 90342U109 | 284,000 | 25000 | Sh | | Shared - Other 1 | 25000 |
| USANA HEALTH SCIENCES INC | COM | 90328M107 | 447,400 | 10000 | Sh | | Shared - Other 1 | 10000 |
| UST INC | COM | 902911106 | 1,208,475 | 22500 | Sh | | Shared - Other 1 | 22500 |
| UTI WORLDWIDE INC | COM | G87210103 | 1,346,331 | 50255 | Sh | | Shared - Other 1 | 50255 |
| VALERO ENERGY CORP NEW | COM | 91913V100 | 1,138,183 | 15410 | Sh | | Shared - Other 1 | 15410 |
| VALUEVISION MEDIA INC | COM | 92047K107 | 113,200 | 10000 | Sh | | Shared - Other 1 | 10000 |
| VANDA PHARMACEUTICALS INC | COM | 921659908 | 19,405,028 | 957800 | | CALL | Shared - Other 1 | 957800 |
| VANDA PHARMACEUTICALS INC | COM | 921659108 | 36,319,514 | 1792671 | Sh | | Shared - Other 1 | 1792671 |
| VARIAN SEMICONDUCTOR EQUIPMN | COM | 922207955 | 1,061,590 | 26500 | | PUT | Shared - Other 1 | 26500 |
| VARIAN SEMICONDUCTOR EQUIPMN | COM | 922207105 | 2,406,004 | 60060 | Sh | | Shared - Other 1 | 60060 |
| VCG HLDG CORP | COM | 91821K101 | 492,480 | 60800 | Sh | | Shared - Other 1 | 60800 |
| VERASUN ENERGY CORP | COM | 92336G106 | 868,800 | 60000 | Sh | | Shared - Other 1 | 60000 |
| VERAZ NETWORKS INC | COM | 92335910 | 2,137,093 | 327775 | Sh | | Shared - Other 1 | 327775 |
| VERISIGN INC | COM | 92343E902 | 7,932,500 | 250000 | | CALL | Shared - Other 1 | 250000 |
| VERISIGN INC | COM | 92343E102 | 930,863 | 29337 | Sh | | Shared - Other 1 | 29337 |
| VERTEX PHARMACEUTICALS INC | COM | 92532F900 | 1,713,600 | 60000 | | CALL | Shared - Other 1 | 60000 |
| VERTEX PHARMACEUTICALS INC | COM | 92532F100 | 3,712,800 | 130000 | Sh | | Shared - Other 1 | 130000 |
| VIACOM INC NEW | COM | 92553P902 | 6,244,500 | 150000 | | CALL | Shared - Other 1 | 150000 x |
| VICOR CORP | COM | 925815102 | 1,375,179 | 103944 | Sh | | Shared - Other 1 | 103944 |
| VIEWPOINT CORP | COM | 92672P108 | 336,784 | 300700 | Sh | | Shared - Other 1 | 300700 |
| VIGNETTE CORP | COM | 926734951 | 766,400 | 40000 | | PUT | Shared - Other 1 | 40000 |
| VION PHARMACEUTICALS INC | COM | 927624106 | 37,090 | 34350 | Sh | | Shared - Other 1 | 34350 |
| VIRGIN MEDIA INC | COM | 92769L101 | 9,748,634 | 400026 | Sh | | Shared - Other 1 | 400026 |
| VIROPHARMA INC | COM | 928241958 | 2,760,000 | 200000 | | PUT | Shared - Other 1 | 200000 |
| VISHAY INTERTECHNOLOGY INC | COM | 928298958 | 791,000 | 50000 | | PUT | Shared - Other 1 | 50000 |
| VISICU INC | COM | 928311204 | 915,000 | 100000 | Sh | | Shared - Other 1 | 100000 |
| VISICU INC | COM | 928311904 | 3,660,000 | 400000 | | CALL | Shared - Other 1 | 400000 |
| VISTAPRINT LIMITED | COM | G93762954 | 2,677,500 | 70000 | | PUT | Shared - Other 1 | 70000 |
| VITAL IMAGES INC | COM | 92846N104 | 8,012,200 | 295000 | Sh | | Shared - Other 1 | 295000 |
| VIVO PARTICIPACOES S A | EQUITY | 928558101 | 1,363,221 | 272100 | Sh | | Shared - Other 1 | 272100 |
| VOLTERRA SEMICONDUCTOR CORP | COM | 928708106 | 312,187 | 21985 | Sh | | Shared - Other 1 | 21985 |
| WABASH NATL CORP | COM | 929566107 | 3,218,600 | 220000 | Sh | | Shared - Other 1 | 220000 |
| WACHOVIA CORP NEW | COM | 929903102 | 6,967,540 | 135952 | Sh | | Shared - Other 1 | 135952 |
| WADDELL & REED FINL INC | COM | 930059100 | 1,560,600 | 60000 | Sh | | Shared - Other 1 | 60000 |
| WAL MART STORES INC | COM | 931142103 | 31,662,538 | 658128 | Sh | | Shared - Other 1 | 658128 |
| WALGREEN CO | COM | 931422909 | 5,224,800 | 120000 | | CALL | Shared - Other 1 | 120000 |
| WALGREEN CO | COM | 931422109 | 16,380,837 | 376225 | Sh | | Shared - Other 1 | 376225 |
| WALTER INDS INC | COM | 93317Q105 | 2,287,840 | 79000 | Sh | | Shared - Other 1 | 79000 |
| WASHINGTON MUT INC | COM | 939322953 | 9,807,200 | 230000 | | PUT | Shared - Other 1 | 230000 |
| WASTE MGMT INC DEL | COM | 941061109 | 465,398 | 11918 | Sh | | Shared - Other 1 | 11918 |
| WASTE MGMT INC DEL | COM | 941061909 | 3,124,000 | 80000 | | CALL | Shared - Other 1 | 80000 |
| WASTE SERVICES INC DEL | COM | 941075202 | 303,750 | 25000 | Sh | | Shared - Other 1 | 25000 |
| WATSCO INC | COM | 942622200 | 272,000 | 5000 | Sh | | Shared - Other 1 | 5000 |
| WATSON PHARMACEUTICALS INC | COM | 942683903 | 5,019,379 | 154300 | | CALL | Shared - Other 1 | 154300 |
| WATSON PHARMACEUTICALS INC | COM | 942683103 | 3,253,000 | 100000 | Sh | | Shared - Other 1 | 100000 |
| WATTS WATER TECHNOLOGIES INC | COM | 942749102 | 764,308 | 20400 | Sh | | Shared - Other 1 | 20400 |
| WEATHERFORD INTERNATIONAL LT | COM | G95089901 | 3,866,800 | 70000 | | CALL | Shared - Other 1 | 70000 |
| WEATHERFORD INTERNATIONAL LT | COM | G95089101 | 4,557,300 | 82500 | Sh | | Shared - Other 1 | 82500 |
| WEBSENSE INC | COM | 947684106 | 1,072,913 | 50490 | Sh | | Shared - Other 1 | 50490 |
| WEBSENSE INC | COM | 947684956 | 2,125,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| WEBZEN INC | COM | 94846N102 | 1,553,436 | 346749 | Sh | | Shared - Other 1 | 346749 |
| WELLCARE HEALTH PLANS INC | COM | 94946Y956 | 2,715,300 | 30000 | | PUT | Shared - Other 1 | 30000 |
| WELLPOINT INC | COM | 94973V957 | 7,903,000 | 100000 | | PUT | Shared - Other 1 | 100000 |
| WELLS FARGO & CO NEW | COM | 949746951 | 1,758,500 | 50000 | | PUT | Shared - Other 1 | 50000 |
| WENDYS INTL INC | COM | 950590109 | 2,171,925 | 59100 | Sh | | Shared - Other 1 | 59100 |
| WERNER ENTERPRISES INC | COM | 950755108 | 1,125,635 | 50900 | Sh | | Shared - Other 1 | 50900 |
| WESCO INTL INC | COM | 95082P105 | 3,633,045 | 60100 | Sh | | Shared - Other 1 | 60100 |
| WESTERN DIGITAL CORP | COM | 958102105 | 9,055,800 | 468000 | Sh | | Shared - Other 1 | 468000 |
| WESTERN DIGITAL CORP | COM | 958102905 | 2,902,500 | 150000 | | CALL | Shared - Other 1 | 150000 |
| WESTERN UN CO | COM | 959802109 | 6,326,071 | 303700 | Sh | | Shared - Other 1 | 303700 |
| WESTSIDE ENERGY CORP | COM | 96149N100 | 2,206,755 | 614695 | Sh | | Shared - Other 1 | 614695 |
| WESTWOOD ONE INC | COM | 961015107 | 1,438,000 | 200000 | Sh | | Shared - Other 1 | 200000 |
| WET SEAL INC | COM | 961840105 | 601,000 | 100000 | Sh | | Shared - Other 1 | 100000 |
| WHEELING PITTSBURGH CORP | COM | 963142302 | 4,776,473 | 250997 | Sh | | Shared - Other 1 | 250997 |
| WHIRLPOOL CORP | COM | 963320106 | 489,502 | 4402 | Sh | | Shared - Other 1 | 4402 |
| WHITE ELECTR DESIGNS CORP | COM | 963801105 | 1,044,000 | 180000 | Sh | | Shared - Other 1 | 180000 |
| WHITING PETE CORP NEW | COM | 966387102 | 810,400 | 20000 | Sh | | Shared - Other 1 | 20000 |

DX-1169-00017

GOV-00005124

Case 17-1405, Document 29, 06/06/2017, 2052263, Page454 of 467

```
WILLIAMS COS INC DEL              COM   969457100    16,856,622    533100   Sh          Shared - Other  1           533100
WILLIAMS COS INC DEL              COM   969457950     3,162,000    100000   Sh   PUT     Shared - Other  1           100000
WILLIAMS SONOMA INC               COM   969904101     1,275,516     40390   Sh          Shared - Other  1            40390
WIND RIVER SYSTEMS INC            COM   973149107    16,466,494   1496954   Sh          Shared - Other  1          1496954
WINN DIXIE STORES INC             COM   974280307       559,689     19102   Sh          Shared - Other  1            19102
WORTHINGTON INDS INC              COM   981811102     2,052,420     94800   Sh          Shared - Other  1            94800
WPT ENTERPRISES INC               COM   98211W108     3,756,522    918465   Sh          Shared - Other  1           918465
WYNN RESORTS LTD                  COM   983134107     1,792,998     20000   Sh          Shared - Other  1            20000
XENOPORT INC                      COM   98411C100     2,221,000     50000   Sh          Shared - Other  1            50000
XENOPORT INC                      COM   98411C900     4,442,000    100000        CALL    Shared - Other  1           100000
XL CAP LTD                        COM   G98255955     4,214,500     50000   Sh   PUT     Shared - Other  1            50000
XM SATELLITE RADIO HLDGS INC      COM   983759101    12,952,885   1100500   Sh          Shared - Other  1          1100500
XM SATELLITE RADIO HLDGS INC      COM   983759951     2,354,000    200000        PUT     Shared - Other  1           200000
XM SATELLITE RADIO HLDGS INC      COM   983759901     2,942,500    250000        CALL    Shared - Other  1           250000
XTO ENERGY INC                    COM   98385X106    10,511,069    174893   Sh          Shared - Other  1           174893
YAHOO INC                         COM   984332106    64,734,269   2386077   Sh          Shared - Other  1          2386077
YAHOO INC                         COM   984332956     2,713,000    100000        PUT     Shared - Other  1           100000
YAHOO INC                         COM   984332906    15,328,450    565000        CALL    Shared - Other  1           565000
YINGLI GREEN ENERGY HLDG CO       COM   98584A103     1,539,900    106200   Sh          Shared - Other  1           106200
YM BIOSCIENCES INC                COM   984238105       541,371    299100   Sh          Shared - Other  1           299100
YPF SOCIEDAD ANONIMA              COM   984245100       836,200     18500   Sh          Shared - Other  1            18500
YRC WORLDWIDE INC                 COM   984249952     1,040,000     50000        PUT     Shared - Other  1            50000
YUM BRANDS INC                    COM   988849101       764,110     23353   Sh          Shared - Other  1            23353
ZALE CORP NEW                     COM   988858106     4,776,762    200620   Sh          Shared - Other  1           200620
ZHONE TECHNOLOGIES INC NEW        COM   98950P108       717,500    500000   Sh          Shared - Other  1           500000
ZIMMER HLDGS INC                  COM   98956P102       432,939      5100   Sh          Shared - Other  1             5100
ZOLTEK COS INC                    COM   98975W104     1,042,403     25100   Sh          Shared - Other  1            25100
ZORAN CORP                        COM   98975F101     9,463,429    472227   Sh          Shared - Other  1           472227
ZYMOGENETICS INC                  COM   98985T109     4,393,000    300000   Sh          Shared - Other  1           300000
                                                    11,058,166,642

</TABLE>
</TEXT>
</DOCUMENT>
```

DX-1169-00018
GOV-00005125

# DX-1829

| | |
|---|---|
| **From:** | Jessica Kourakos <jkourakos@galleongrp.com> |
| **To:** | Portfolio <Portfolio@galleongrp.com> |
| **Sent:** | 5/6/2008 3:56:59 PM [GMT -4] |
| **Subject:** | Sell short 75,000 AKAM |
| **X-IM:** | "Portfolio at GalleonAsia" <portfolio@galleonasia.com>;"Seb Calabro" <scalabro@galleongrp.com>;"Daniel Shrager" <DShrager@galleongrp.com>;"Rick Sherlund" <rsherlund@galleongrp.com>;"Ian Winer" <iwiner@galleongrp.com>;"Byron Walker" <bwalker@galleongrp.com>;"Ankur Desai" <adesai@galleongrp.com>;"Peter Swartz" <pswartz@galleongrp.com>;"Kris Tomasulo" <KTomasulo@galleongrp.com>;"Adam Smith" <ASmith@galleongrp.com>;"Raj Rajaratnam" <RajRajaratnam@galleongrp.com>;"Rengan Rajaratnam" <rengan@galleongrp.com>;"Paul Yook" <PYook@galleongrp.com>;"David Bauer" <dbauer@galleongrp.com>;"Charlie Benziger" <cbenziger@galleongrp.com>;"Leon Shaulov" <LShaulov@galleongrp.com>;"Ian Horowitz" <ihorowitz@galleongrp.com>;"Sanjay Santhanam" <ssanthanam@galleonasia.com>;"Rick Schutte" <rschutte@galleongrp.com>;"Todd Deutsch" <TDeutsch@galleongrp.com>;"Gary Rosenbach" <GRosenbach@galleongrp.com>;"Sarah Good" <sgood@galleongrp.com>;"Michael Cardillo" <MCardillo@galleongrp.com>;"Nathaniel Cohn" <Ncohn@galleongrp.com> |

I believe the bar is set higher this qtr versus last qtr for net customer adds and ARPU growth and that their very high penetration of customers within the media and ecommerce vertical will likely make improving these metrics more challenging in the existing environment. I also believe that intra-quarter jitters over how the quarter closed will put incremental pressure on the shares from current levels. Also, a potential actors' strike could create headline risk in the name in the short term. The Actors' Guild contract expires June 30.

Jessica Kourakos
The Galleon Group
(212) 318-3713
jkourakos@galleongrp.com

The Galleon Group archives and reviews incoming and outgoing e-mail. This e-mail is confidential and for use by the addressee only. If you are not the intended recipient of this e-mail and have received it in error, please return the message to the sender by replying to it and then delete it from your mailbox.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

this e-mail is confidential and for use by the addressee only. If you are not the intended recipient of this e-mail and have received it in error, please return the message to the sender by replying to it and then delete it from your mailbox.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

**DEFENDANT'S EXHIBIT**
DX-1829
S2 09 Cr. 1184 (RJH)

# DX-3416

**DX-3416**

| Security | Timestamp | | TradeDate | | | Side | Amount | Done | AvgPrc | Mgr | Trdr | Status | Alcd | Ntfy | Broker | Comm | TradeID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ICST | 1/3/2005 9 | 56 48 AM | 1/3/2005 12 | 0 | 12:00 PM | Short | 20000 | 20000 | 21.045 | COM | RJ | DONE | A | B | FCAP | 0.04 | 2005010300T0 |
| ICST | 1/6/2005 2 | 5 20 PM | 1/6/2005 12 | 0 | 12:00 PM | Cover | 20000 | 20000 | 19.6175 | COM | MC | DONE | A | B | SILK | 0.02 | 2005010600EW |
| ICST | 1/7/2005 2 | 44 35 PM | 1/7/2005 12 | 0 | 12:00 PM | Short | 20000 | 20000 | 19.36 | COM | RJ | DONE | A | B | PRUS | 0.05 | 2005010700KT |
| ICST | 1/10/2005 10 | 33 58 AM | 1/10/2005 12 | 0 | 12:00 PM | Short | 50000 | 50000 | 19.7659 | COM | RJ | DONE | A | B | DBKS | 0.05 | 20050110008E |
| ICST | 1/13/2005 9 | 15 27 AM | 1/12/2005 12 | 0 | 12:00 PM | Cover | 10000 | 10000 | 19.8055 | COM | RJ | DONE | A | B | MSPP | 0.01 | 20050113002D |
| ICST | 1/13/2005 3 | 39 48 PM | 1/13/2005 3 | 39 48 PM | | Short | 50000 | 13851 | 19.56 | TOD | TD | PART | A | B | TSCO | 0.005 | 20050113JW |
| ICST | 1/19/2005 3 | 40 28 PM | 1/19/2005 12 | 0 | 12:00 PM | Cover | 20000 | 20000 | 19.2408 | COM | RJ | DONE | A | B | PCSS | 0.04 | 2005011900GU |
| ICST | 1/20/2005 1 | 7  7:00 PM | 1/20/2005 1 | 7  7:00 PM | | Cover | 13900 | 13900 | 19.48 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005012000CR |
| ICST | 1/20/2005 10 | 4 21 AM | 1/20/2005 12 | 0 | 12:00 PM | Cover | 40000 | 40000 | 19.3975 | COM | RJ | DONE | A | B | BOFA | 0.05 | 2.00501E+11 |
| ICST | 2/11/2005 10 | 8 27 AM | 2/11/2005 10 | 8 27 AM | | Buy | 13475 | 13475 | 19.5399 | BCC | SW | DONE | A | B | TSCO | 0.005 | 2005021100SB |
| ICST | 2/11/2005 9 | 30 46 AM | 2/11/2005 12 | 0 | 12:00 PM | Buy | 25000 | 17500 | 18.6857 | BCC | SW | PART | A | B | LEHM | 0.05 | 20050211002M |
| ICST | 2/11/2005 12 | 3 23 PM | 2/11/2005 12 | 3 23 PM | | Sell | 12500 | 12500 | 19.6472 | BCC | SW | DONE | A | B | TSCO | 0.005 | 2005021100CR |
| ICST | 2/14/2005 1 | 34 35 PM | 2/14/2005 1 | 34 35 PM | | Buy | 25000 | 25000 | 19.7549 | BCC | SW | DONE | A | B | TSCO | 0.005 | 2005021400D8 |
| ICST | 2/15/2005 11 | 12 32 AM | 2/15/2005 11 | 12 32 AM | | Buy | 25000 | 3518 | 20.52 | BCC | SW | PART | A | B | TSCO | 0.005 | 2005021500AC |
| ICST | 2/15/2005 1 | 57 18 PM | 2/15/2005 12 | 0 | 12:00 PM | Buy | 250000 | 120000 | 20.4149 | GRC | JP | PART | A | B | JPHQ | 0.05 | 2005021500H3 |
| ICST | 2/15/2005 1 | 57 30 PM | 2/15/2005 12 | 0 | 12:00 PM | Buy | 50000 | 27500 | 20.4149 | GCB | JP | PART | A | B | JPHQ | 0.05 | 2005021500H5 |
| ICST | 2/15/2005 1 | 58  11:00 PM | 2/15/2005 12 | 0 | 12:00 PM | Buy | 100000 | 45000 | 20.4149 | TOD | JP | PART | A | B | JPHQ | 0.05 | 2005021500H8 |
| ICST | 2/15/2005 1 | 58 20 PM | 2/15/2005 12 | 0 | 12:00 PM | Buy | 100000 | 45000 | 20.4149 | COM | JP | PART | A | B | JPHQ | 0.05 | 2005021500HA |
| ICST | 2/15/2005 3 | 58 54 PM | 2/15/2005 12 | 0 | 12:00 PM | Buy | 45000 | 15000 | 20.2161 | TOD | JP | PART | A | B | MSCO | 0.05 | 2005021500M7 |
| ICST | 2/15/2005 3 | 59  5:00 PM | 2/15/2005 12 | 0 | 12:00 PM | Buy | 22500 | 7500 | 20.2161 | GCB | JP | PART | A | B | MSCO | 0.05 | 2005021500M8 |
| ICST | 2/15/2005 3 | 59 28 PM | 2/15/2005 12 | 0 | 12:00 PM | Buy | 130000 | 42500 | 20.2161 | GRC | JP | PART | A | B | MSCO | 0.05 | 2005021500MA |
| ICST | 2/15/2005 3 | 59 49 PM | 2/15/2005 12 | 0 | 12:00 PM | Buy | 45000 | 15000 | 20.2161 | COM | JP | PART | A | B | MSCO | 0.05 | 2005021500MB |
| ICST | 2/15/2005 11 | 13 38 AM | 2/15/2005 12 | 0 | 12:00 PM | Buy | 21000 | 21000 | 20.54 | BCC | SW | DONE | A | B | LEHM | 0.05 | 2005021500AF |
| ICST | 2/15/2005 12 | 56 48 PM | 2/15/2005 12 | 0 | 12:00 PM | Buy | 10000 | 10000 | 20.375 | BCC | SW | DONE | A | B | LEHM | 0.05 | 2005021500DR |
| ICST | 2/16/2005 3 | 45 49 PM | 2/16/2005 12 | 0 | 12:00 PM | Buy | 42500 | 42500 | 19.96 | GRC | RJ | DONE | A | B | CEUT | 0.04 | 2005021600M7 |
| ICST | 2/16/2005 3 | 45 59 PM | 2/16/2005 12 | 0 | 12:00 PM | Buy | 7500 | 7500 | 19.96 | GCB | RJ | DONE | A | B | CEUT | 0.04 | 2005021600M8 |
| ICST | 2/16/2005 4 | 7 26 PM | 2/16/2005 12 | 0 | 12:00 PM | Buy | 125000 | 125000 | 19.9633 | GRC | JP | DONE | A | B | LEHM | 0.05 | 2005021600O3 |
| ICST | 2/16/2005 4 | 7 42 PM | 2/16/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 19.9633 | GCB | JP | DONE | A | B | LEHM | 0.05 | 2005021600O8 |
| ICST | 2/16/2005 3 | 26 50 PM | 2/16/2005 3 | 26 50 PM | | Buy | 99000 | 2600 | 19.93 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005021600L3 |
| ICST | 2/17/2005 8 | 16  4:00 AM | 2/16/2005 12 | 0 | 12:00 PM | Buy | 22000 | 22000 | 22 | BCC | MC | DONE | A | B | LEHM | 0.05 | 2005021700JY |
| ICST | 2/17/2005 10 | 30 16 AM | 2/17/2005 10 | 30 16 AM | | Buy | 99000 | 65755 | 19.72 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005021700BN |
| ICST | 2/17/2005 4 | 9  5:00 PM | 2/17/2005 12 | 0 | 12:00 PM | Buy | 120000 | 120000 | 19.875 | COM | IH | DONE | A | B | JPHQ | 0.05 | 2005021700NW |
| ICST | 2/17/2005 4 | 9 46 PM | 2/17/2005 12 | 0 | 12:00 PM | Buy | 115000 | 115000 | 19.875 | TOD | IH | DONE | A | B | JPHQ | 0.05 | 2005021700NY |
| ICST | 2/17/2005 4 | 10 35 PM | 2/17/2005 12 | 0 | 12:00 PM | Buy | 100000 | 100000 | 19.875 | GRC | IH | DONE | A | B | JPHQ | 0.05 | 2005021700O0 |
| ICST | 2/17/2005 4 | 11 14 PM | 2/17/2005 12 | 0 | 12:00 PM | Buy | 15000 | 15000 | 19.875 | GCB | IH | DONE | A | B | JPHQ | 0.05 | 2005021700O2 |
| ICST | 2/18/2005 4 | 3 51 PM | 2/18/2005 12 | 0 | 12:00 PM | Buy | 53000 | 53000 | 19.8874 | COM | IH | DONE | A | B | JPHQ | 0.05 | 2005021800LM |
| ICST | 2/18/2005 4 | 6 22 PM | 2/18/2005 12 | 0 | 12:00 PM | Buy | 87000 | 87000 | 19.8874 | TOD | IH | DONE | A | B | JPHQ | 0.05 | 2005021800LO |
| ICST | 2/18/2005 4 | 7 17 PM | 2/18/2005 12 | 0 | 12:00 PM | Buy | 33000 | 33000 | 19.8874 | GRC | IH | DONE | A | B | JPHQ | 0.05 | 2005021800LQ |
| ICST | 2/18/2005 4 | 8 24 PM | 2/18/2005 12 | 0 | 12:00 PM | Buy | 70000 | 70000 | 19.8874 | GRC | IH | DONE | A | B | JPHQ | 0.05 | 2005021800LS |
| ICST | 2/18/2005 4 | 8 58 PM | 2/18/2005 12 | 0 | 12:00 PM | Buy | 17000 | 17000 | 19.8874 | GCB | IH | DONE | A | B | JPHQ | 0.05 | 2005021800LT |
| ICST | 2/22/2005 4 | 2 38 PM | 2/22/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 19.9721 | POA | AW | DONE | A | B | SILK | 0.02 | 2005022200MS |
| ICST | 2/22/2005 9 | 44 15 AM | 2/22/2005 12 | 0 | 12:00 PM | Buy | 50000 | 50000 | 19.75 | GRC | JP | DONE | A | B | LEHM | 0.05 | 2.00502E+11 |
| ICST | 2/22/2005 9 | 44 22 AM | 2/22/2005 12 | 0 | 12:00 PM | Buy | 10000 | 10000 | 19.75 | GCB | JP | DONE | A | B | LEHM | 0.05 | 2.00502E+11 |
| ICST | 2/22/2005 12 | 28 33 PM | 2/22/2005 12 | 28 33 PM | | Buy | 30000 | 30000 | 20.02 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005022200EI |
| ICST | 2/23/2005 10 | 19 57 AM | 2/23/2005 10 | 19 57 AM | | Buy | 100000 | 100000 | 19.9 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050223007I |
| ICST | 2/23/2005 3 | 35  12:00 PM | 2/23/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 19.77 | POA | RJ | DONE | A | B | PRUS | 0.05 | 2005022300J9 |
| ICST | 2/23/2005 4 | 9  7:00 PM | 2/23/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 19.4973 | GRC | RJ | DONE | A | B | INST | 0.02 | 2005022300KK |
| ICST | 2/23/2005 4 | 9 46 PM | 2/23/2005 12 | 0 | 12:00 PM | Buy | 5580 | 5580 | 19.4973 | GCB | RJ | DONE | A | B | INST | 0.02 | 2005022300KP |
| ICST | 2/23/2005 9 | 37 40 AM | 2/23/2005 9 | 37 40 AM | | Buy | 260000 | 72900 | 19.792 | COM | IH | PART | A | B | MSPP | 0.01 | 2005022300 3D |
| ICST | 2/24/2005 1 | 55 15 PM | 2/24/2005 1 | 55 15 PM | | Buy | 73869 | 73869 | 20.1015 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005022400DU |
| ICST | 2/24/2005 4 | 3 23 PM | 2/24/2005 12 | 0 | 12:00 PM | Buy | 15000 | 15000 | 20.621 | GRC | RJ | DONE | A | B | INST | 0.02 | 2005022400JO |
| ICST | 2/24/2005 4 | 3 40 PM | 2/24/2005 12 | 0 | 12:00 PM | Buy | 3000 | 3000 | 20.621 | GCB | RJ | DONE | A | B | INST | 0.02 | 2005022400JP |
| ICST | 2/24/2005 4 | 48 38 PM | 2/24/2005 12 | 0 | 12:00 PM | Buy | 50000 | 50000 | 19.7 | GRC | JP | DONE | A | B | LEHM | 0.05 | 2005022400LM |

DEFENDANT'S EXHIBIT
DX-3416
S2 09 Cr. 1184 (RJH)
PENGAD 800-631-6989

| Security | Timestamp | | | TradeDate | | | Side | Amount | Done | AvgPrc | Mgr | Trdr | Status | Alcd | Ntfy | Broker | Comm | TradeID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ICST | 2/24/2005 4 | 48 52 PM | | 2/24/2005 12 | 0 | 12:00 PM | Buy | 10000 | 10000 | 19.7 | GCB | JP | DONE | A | B | LEHM | 0.05 | 2005022400LN |
| ICST | 2/24/2005 9 | 59 54 AM | | 2/24/2005 9 | 59 54 AM | | Buy | 21900 | 9900 | 19.6853 | COM | IH | PART | A | B | MSPP | 0.01 | 2005022404W |
| ICST | 2/25/2005 4 | 7 | 12:00 PM | 2/25/2005 12 | 0 | 12:00 PM | Sell | 18800 | 18800 | 20.5 | COM | AW | DONE | A | B | JPHQ | 0.05 | 2005022500M3 |
| ICST | 2/25/2005 4 | 11 40 PM | | 2/25/2005 12 | 0 | 12:00 PM | Buy | 55000 | 55000 | 20.4647 | GRC | RJ | DONE | A | B | INST | 0.02 | 2005022500MC |
| ICST | 2/25/2005 4 | 11 57 PM | | 2/25/2005 12 | 0 | 12:00 PM | Buy | 11000 | 11000 | 20.4647 | GCB | RJ | DONE | A | B | INST | 0.02 | 2005022500MD |
| ICST | 2/25/2005 12 | 18 38 PM | | 2/25/2005 12 | 0 | 12:00 PM | Sell | 20000 | 20000 | 20.5033 | COM | AW | DONE | A | B | JPHQ | 0.05 | 2005022500CW |
| ICST | 2/25/2005 12 | 19 32 PM | | 2/25/2005 12 | 0 | 12:00 PM | Sell | 20000 | 20000 | 20.5033 | TOD | AW | DONE | A | B | JPHQ | 0.05 | 2005022500CZ |
| ICST | 2/25/2005 12 | 23 32 PM | | 2/25/2005 12 | 0 | 12:00 PM | Sell | 15000 | 15000 | 20.5033 | GRC | AW | DONE | A | B | JPHQ | 0.05 | 2005022500D2 |
| ICST | 2/25/2005 12 | 23 57 PM | | 2/25/2005 12 | 0 | 12:00 PM | Sell | 5000 | 5000 | 20.5033 | GCB | AW | DONE | A | B | JPHQ | 0.05 | 2005022500D3 |
| ICST | 2/25/2005 12 | 11 | 3:00 PM | 2/25/2005 12 | 11 | 3:00 PM | Sell | 24000 | 24000 | 20.5 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005022500CE |
| ICST | 2/28/2005 9 | 48 26 AM | | 2/28/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 20.72 | COM | AW | DONE | A | B | JPHQ | 0.05 | 2.00502E+11 |
| ICST | 2/28/2005 9 | 45 36 AM | | 2/28/2005 9 | 45 36 AM | | Buy | 20000 | 20000 | 20.7185 | BUA | BG | DONE | A | B | TSCO | 0.005 | 2005022804U |
| ICST | 3/1/2005 7 | 15 | 6:00 AM | 2/28/2005 12 | 0 | 12:00 PM | Buy | 149000 | 149000 | 20.2738 | TOD | CW | DONE | A | B | TSCO | 0.005 | 20050301000P |
| ICST | 3/1/2005 10 | 6 57 AM | | 3/1/2005 10 | 6 57 AM | | Buy | 18362 | 18362 | 20.3349 | COM | IH | DONE | A | B | TSCO | 0.005 | 20050301006Z |
| ICST | 3/1/2005 10 | 23 27 AM | | 3/1/2005 10 | 23 27 AM | | Sell | 3362 | 3362 | 20.3362 | COM | IH | DONE | A | B | TSCO | 0.005 | 2.00503E+11 |
| ICST | 3/1/2005 2 | 3 45 PM | | 3/1/2005 12 | 0 | 12:00 PM | Buy | 10000 | 10000 | 20.5657 | GRC | RJ | DONE | A | B | INST | 0.02 | 2005030100F9 |
| ICST | 3/1/2005 4 | 7 35 PM | | 3/1/2005 12 | 0 | 12:00 PM | Buy | 2000 | 2000 | 20.5657 | GCB | RJ | DONE | A | B | INST | 0.02 | 2005030100KW |
| ICST | 3/1/2005 3 | 3 13 PM | | 3/1/2005 3 | 3 13 PM | | Buy | 21000 | 4268 | 20.35 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005030100HA |
| ICST | 3/1/2005 9 | 57 32 AM | | 3/1/2005 9 | 57 32 AM | | Sell | 20000 | 20000 | 20.1188 | BUA | BG | DONE | A | B | TSCO | 0.005 | 2.00503E+11 |
| ICST | 3/2/2005 11 | 29 44 AM | | 3/2/2005 12 | 0 | 12:00 PM | Buy | 135000 | 135000 | 20.3676 | GRC | RJ | DONE | A | B | DBKS | 0.05 | 20050302009V |
| ICST | 3/2/2005 11 | 29 52 AM | | 3/2/2005 12 | 0 | 12:00 PM | Buy | 27000 | 27000 | 20.3676 | GCB | RJ | DONE | A | B | DBKS | 0.05 | 20050302009W |
| ICST | 3/3/2005 7 | 13 49 AM | | 3/2/2005 12 | 0 | 12:00 PM | Buy | 166000 | 166000 | 19.9066 | TOD | CW | DONE | A | B | TSCO | 0.005 | 20050303000S |
| ICST | 3/3/2005 10 | 55 59 AM | | 3/3/2005 10 | 55 59 AM | | Buy | 50000 | 50000 | 18.9494 | BUA | BG | DONE | A | B | TSCO | 0.005 | 20050303008T |
| ICST | 3/3/2005 11 | 17 21 AM | | 3/3/2005 11 | 17 21 AM | | Buy | 38294 | 38294 | 18.8522 | BCC | LS | DONE | A | B | TSCO | 0.005 | 20050303009X |
| ICST | 3/3/2005 12 | 59 49 PM | | 3/3/2005 12 | 0 | 12:00 PM | Buy | 50000 | 50000 | 18.7 | GRC | RJ | DONE | A | B | SBSH | 0.05 | 2.01E+16 |
| ICST | 3/3/2005 12 | 59 51 PM | | 3/3/2005 12 | 0 | 12:00 PM | Buy | 10000 | 10000 | 18.7 | GCB | RJ | DONE | A | B | SBSH | 0.05 | 2.01E+17 |
| ICST | 3/4/2005 7 | 30 | 10:00 AM | 3/3/2005 12 | 0 | 12:00 PM | Buy | 50000 | 50000 | 18.88 | TOD | CW | DONE | A | B | TSCO | 0.005 | 20050304001J |
| ICST | 3/4/2005 10 | 29 43 AM | | 3/4/2005 10 | 29 43 AM | | Sell | 29650 | 29650 | 19.3899 | BCC | LS | DONE | A | B | TSCO | 0.005 | 2.00503E+11 |
| ICST | 3/4/2005 2 | 1 15 PM | | 3/4/2005 12 | 0 | 12:00 PM | Buy | 150000 | 150000 | 19.3435 | GRC | RJ | DONE | A | B | LEHM | 0.05 | 2005030400HK |
| ICST | 3/4/2005 2 | 1 21 PM | | 3/4/2005 12 | 0 | 12:00 PM | Buy | 30000 | 30000 | 19.3435 | GCB | RJ | DONE | A | B | LEHM | 0.05 | 2005030400HL |
| ICST | 3/4/2005 2 | 33 | 4:00 PM | 3/4/2005 2 | 33 | 4:00 PM | Buy | 20000 | 20000 | 19.3432 | BCC | LS | DONE | A | B | TSCO | 0.005 | 2005030400IG |
| ICST | 3/4/2005 9 | 42 18 AM | | 3/4/2005 9 | 42 18 AM | | Sell | 50000 | 50000 | 19.2049 | BUA | BG | DONE | A | B | TSCO | 0.005 | 20050304004W |
| ICST | 3/7/2005 11 | 15 24 AM | | 3/7/2005 11 | 15 24 AM | | Buy | 25000 | 11446 | 19.6441 | BCC | LS | PART | A | B | TSCO | 0.005 | 20050307008V |
| ICST | 3/9/2005 3 | 9 | 9:00 PM | 3/9/2005 12 | 0 | 12:00 PM | Sell | 5000 | 5000 | 19.55 | BCC | JP | DONE | A | B | JPHQ | 0.05 | 2005030900ID |
| ICST | 3/9/2005 3 | 9 35 PM | | 3/9/2005 12 | 0 | 12:00 PM | Sell | 15000 | 15000 | 19.55 | GRC | JP | DONE | A | B | JPHQ | 0.05 | 2005030900IE |
| ICST | 3/9/2005 3 | 9 47 PM | | 3/9/2005 12 | 0 | 12:00 PM | Sell | 5000 | 5000 | 19.55 | GCB | JP | DONE | A | B | JPHQ | 0.05 | 2005030900IG |
| ICST | 3/9/2005 4 | 50 34 PM | | 3/9/2005 12 | 0 | 12:00 PM | Buy | 12500 | 12500 | 19.5521 | GRC | RJ | DONE | A | B | INST | 0.02 | 2005030900MB |
| ICST | 3/9/2005 4 | 50 48 PM | | 3/9/2005 12 | 0 | 12:00 PM | Buy | 3000 | 3000 | 19.5521 | GCB | RJ | DONE | A | B | INST | 0.02 | 2005030900MC |
| ICST | 3/10/2005 2 | 9 27 PM | | 3/10/2005 12 | 0 | 12:00 PM | Sell | 40000 | 40000 | 19.561 | GRC | AW | DONE | A | B | JPHQ | 0.05 | 2005031000FW |
| ICST | 3/10/2005 2 | 10 | 9:00 PM | 3/10/2005 12 | 0 | 12:00 PM | Sell | 10000 | 10000 | 19.561 | GCB | AW | DONE | A | B | JPHQ | 0.05 | 2005031000FY |
| ICST | 3/10/2005 4 | 2 42 PM | | 3/10/2005 12 | 0 | 12:00 PM | Sell | 35000 | 35000 | 19.91 | GRC | SW | DONE | A | B | SBSH | 0.05 | 2005031000KZ |
| ICST | 3/10/2005 4 | 3 | 5:00 PM | 3/10/2005 12 | 0 | 12:00 PM | Sell | 20000 | 20000 | 19.91 | GRC | SW | DONE | A | B | SBSH | 0.05 | 2005031000L1 |
| ICST | 3/10/2005 4 | 3 18 PM | | 3/10/2005 12 | 0 | 12:00 PM | Sell | 5000 | 5000 | 19.91 | GCB | SW | DONE | A | B | SBSH | 0.05 | 2005031000L3 |
| ICST | 3/11/2005 10 | 12 | 8:00 AM | 3/11/2005 12 | 0 | 12:00 PM | Sell | 50000 | 50000 | 19.9333 | GRC | JP | DONE | A | B | JPHQ | 0.05 | 20050311006K |
| ICST | 3/11/2005 10 | 12 17 AM | | 3/11/2005 12 | 0 | 12:00 PM | Sell | 10000 | 10000 | 19.9333 | GCB | JP | DONE | A | B | JPHQ | 0.05 | 20050311006L |
| ICST | 3/11/2005 11 | 7 | 7:00 AM | 3/11/2005 12 | 0 | 12:00 PM | Sell | 30000 | 30000 | 19.9183 | COM | RJ | DONE | A | B | JPHQ | 0.05 | 2.00503E+11 |
| ICST | 3/11/2005 12 | 59 40 PM | | 3/11/2005 12 | 59 40 PM | | Buy | 11000 | 11000 | 18.8981 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005031100CX |
| ICST | 3/14/2005 3 | 43 37 PM | | 3/14/2005 12 | 0 | 12:00 PM | Sell | 37500 | 37500 | 19.815 | GRC | JP | DONE | A | B | JPHQ | 0.05 | 2005031400HX |
| ICST | 3/14/2005 3 | 43 44 PM | | 3/14/2005 12 | 0 | 12:00 PM | Sell | 11080 | 11080 | 19.815 | GCB | JP | DONE | A | B | JPHQ | 0.05 | 2005031400HY |
| ICST | 3/15/2005 6 | 58 13 AM | | 3/14/2005 12 | 0 | 12:00 PM | Buy | 40000 | 40000 | 19.8866 | TOD | MD | DONE | A | B | TSCO | 0.005 | 2.00503E+11 |
| ICST | 3/15/2005 1 | 33 56 PM | | 3/15/2005 12 | 0 | 12:00 PM | Buy | 50000 | 50000 | 19.6608 | GRC | RJ | DONE | A | B | LEHM | 0.05 | 2.01E+18 |
| ICST | 3/15/2005 1 | 34 | 3:00 PM | 3/15/2005 12 | 0 | 12:00 PM | Buy | 10000 | 10000 | 19.6608 | GCB | RJ | DONE | A | B | LEHM | 0.05 | 2005031500EA |
| ICST | 3/15/2005 3 | 3 | 1:00 PM | 3/15/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 19.67 | BCC | SW | DONE | A | B | JPHQ | 0.05 | 2005031500IB |

| Security | Timestamp | | TradeDate | | | Side | Amount | Done | AvgPrc | Mgr | Trdr | Status | Alcd | Ntfy | Broker | Comm | TradeID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ICST | 3/15/2005 9 | 52 39 AM | 3/15/2005 12 | 0 | 12:00 PM | Sell | 27000 | 27000 | 19.92 | BCC | SW | DONE | A | B | JPHQ | 0.05 | 20050315004W |
| ICST | 3/15/2005 9 | 35 24 AM | 3/15/2005 9 | 35 24 AM | | Buy | 25000 | 5874 | 19.9698 | BCC | LS | PART | A | B | TSCO | 0.005 | 20050315003J |
| ICST | 3/15/2005 9 | 35 53 AM | 3/15/2005 9 | 35 53 AM | | Buy | 50000 | 50000 | 19.92 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050315003L |
| ICST | 3/16/2005 1 | 10 56 PM | 3/16/2005 12 | 0 | 12:00 PM | Sell | 150000 | 150000 | 19.875 | GRC | JP | DONE | A | B | TWPT | 0.05 | 20050316000J |
| ICST | 3/16/2005 1 | 12 52 PM | 3/16/2005 12 | 0 | 12:00 PM | Sell | 30000 | 30000 | 19.875 | GCB | JP | DONE | A | B | TWPT | 0.05 | 20050316000DL |
| ICST | 3/16/2005 3 | 50 35 PM | 3/16/2005 12 | 0 | 12:00 PM | Sell | 18957 | 18957 | 19.8536 | BCC | SW | DONE | A | B | LEHM | 0.05 | 20050316000KB |
| ICST | 3/16/2005 12 | 50 22 PM | 3/16/2005 12 | 50 22 PM | | Sell | 50481 | 709 | 20.05 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005031600CV |
| ICST | 3/16/2005 2 | 30 27 PM | 3/16/2005 2 | 30 27 PM | | Sell | 35000 | 35000 | 19.8258 | BCC | LS | DONE | A | B | TSCO | 0.005 | 20050315000FK |
| ICST | 3/17/2005 2 | 49 57 PM | 3/17/2005 12 | 0 | 12:00 PM | Sell | 20000 | 20000 | 20.15 | COM | AW | DONE | A | B | JPHQ | 0.05 | 2005031700FL |
| ICST | 3/17/2005 3 | 32 57 PM | 3/17/2005 12 | 0 | 12:00 PM | Sell | 20000 | 20000 | 20.3 | COM | AW | DONE | A | B | JPHQ | 0.05 | 2005031700GT |
| ICST | 3/17/2005 2 | 17 58 PM | 3/17/2005 2 | 17 58 PM | | Sell | 56000 | 56000 | 20.0878 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005031700EI |
| ICST | 3/18/2005 4 | 3 19 PM | 3/18/2005 12 | 0 | 12:00 PM | Buy | 40000 | 40000 | 19.55 | COM | AW | DONE | A | B | SBSH | 0.05 | 2005031800HC |
| ICST | 3/18/2005 10 | 28 11:00 AM | 3/18/2005 12 | 0 | 12:00 PM | Buy | 20000 | 20000 | 20.03 | COM | AW | DONE | A | B | JPHQ | 0.05 | 20050318006H |
| ICST | 3/18/2005 9 | 34 14 AM | 3/18/2005 9 | 34 14 AM | | Buy | 40000 | 40000 | 20.1 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005031800ZR |
| ICST | 3/21/2005 1 | 55 2:00 PM | 3/21/2005 12 | 0 | 12:00 PM | Buy | 50000 | 50000 | 19.5158 | EXC | CW | DONE | A | B | GFII | 0.015 | 2005032100HG |
| ICST | 3/21/2005 10 | 54 53 AM | 3/21/2005 12 | 0 | 12:00 PM | Buy | 50000 | 50000 | 19.5017 | GRC | AW | DONE | A | B | SBSH | 0.05 | 2005032100GV |
| ICST | 3/21/2005 10 | 55 21 AM | 3/21/2005 12 | 0 | 12:00 PM | Buy | 10000 | 10000 | 19.5017 | GCB | AW | DONE | A | B | SBSH | 0.05 | 2005032100GX |
| ICST | 3/22/2005 7 | 19 35 AM | 3/21/2005 12 | 0 | 12:00 PM | Buy | 135400 | 135400 | 19.5042 | TOD | CW | DONE | A | B | TSCO | 0.005 | 2.00503E+11 |
| ICST | 3/22/2005 3 | 32 33 PM | 3/22/2005 3 | 32 33 PM | | Buy | 44850 | 44850 | 19.1 | TOD | TD | DONE | A | B | INST | 0.02 | 200503220UJE |
| ICST | 3/24/2005 1 | 21 55 PM | 3/24/2005 12 | 0 | 12:00 PM | Buy | 100000 | 100000 | 19.3775 | GRC | RJ | DONE | A | B | BOFA | 0.05 | 2005032400GE |
| ICST | 3/24/2005 1 | 22 5:00 PM | 3/24/2005 12 | 0 | 12:00 PM | Buy | 20000 | 20000 | 19.3775 | GCB | RJ | DONE | A | B | BOFA | 0.05 | 2005032400GF |
| ICST | 3/24/2005 9 | 43 56 AM | 3/24/2005 9 | 43 56 AM | | Buy | 3000 | 3000 | 19.22 | TOD | TD | DONE | A | B | INST | 0.02 | 2.00503E+11 |
| ICST | 3/28/2005 8 | 13 37 AM | 3/24/2005 12 | 0 | 12:00 PM | Buy | 100000 | 100000 | 19.348 | TOD | MC | DONE | A | B | BEST | 0.05 | 2.00503E+11 |
| ICST | 3/28/2005 10 | 30 39 AM | 3/28/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 19.5 | GRC | RJ | DONE | A | B | MSCO | 0.05 | 20050328006Y |
| ICST | 3/28/2005 10 | 30 51 AM | 3/28/2005 12 | 0 | 12:00 PM | Sell | 5000 | 5000 | 19.5 | GCB | RJ | DONE | A | B | MSCO | 0.05 | 20050328006Z |
| ICST | 3/30/2005 10 | 23 38 AM | 3/30/2005 10 | 23 38 AM | | Buy | 13000 | 6036 | 18.82 | TOD | TD | PART | A | B | TSCO | 0.005 | 20050330007D |
| ICST | 3/30/2005 1 | 7 18 PM | 3/30/2005 12 | 0 | 12:00 PM | Sell | 40000 | 40000 | 19.28 | COM | AW | DONE | A | B | LEHM | 0.05 | 2005033000F8 |
| ICST | 3/30/2005 12 | 12 21 PM | 3/30/2005 12 | 0 | 12:00 PM | Sell | 125000 | 125000 | 19.25 | GRC | JP | DONE | A | B | COWN | 0.04 | 2005033000DN |
| ICST | 3/30/2005 12 | 12 33 PM | 3/30/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 19.25 | GCB | JP | DONE | A | B | COWN | 0.05 | 2005033000DO |
| ICST | 3/30/2005 3 | 48 17 PM | 3/30/2005 3 | 48 17 PM | | Sell | 3000 | 3000 | 19.29 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005033000LV |
| ICST | 3/31/2005 10 | 12 12:00 AM | 3/31/2005 10 | 12 12:00 AM | | Buy | 44463 | 44463 | 19.02 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2.00503E+11 |
| ICST | 4/1/2005 3 | 51 48 PM | 4/1/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 18.8914 | COM | AW | DONE | A | B | MLCO | 0.05 | 200504010KF |
| ICST | 4/1/2005 11 | 8 43 AM | 4/1/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 18.8926 | COM | AW | DONE | A | B | DBKS | 0.05 | 200504010A4 |
| ICST | 4/4/2005 11 | 14 22 AM | 4/4/2005 11 | 14 22 AM | | Buy | 56300 | 56300 | 18.6896 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005040400B1 |
| ICST | 4/6/2005 4 | 11 25 PM | 4/6/2005 12 | 0 | 12:00 PM | Buy | 6000 | 6000 | 18.8658 | GCB | RJ | DONE | A | B | INST | 0.02 | 200504060NM |
| ICST | 4/7/2005 2 | 5 34 PM | 4/7/2005 12 | 0 | 12:00 PM | Buy | 50000 | 50000 | 18.5 | GRC | JP | DONE | A | B | LEHM | 0.05 | 2005040700D6 |
| ICST | 4/7/2005 12 | 6 3:00 PM | 4/7/2005 12 | 0 | 12:00 PM | Buy | 10000 | 10000 | 18.5 | GCB | JP | DONE | A | B | LEHM | 0.05 | 2005040700D8 |
| ICST | 4/11/2005 4 | 0 36 PM | 4/11/2005 12 | 0 | 12:00 PM | Buy | 10000 | 10000 | 18.5135 | GRC | JP | DONE | A | B | INST | 0.02 | 2005041100H6 |
| ICST | 4/11/2005 4 | 0 53 PM | 4/11/2005 12 | 0 | 12:00 PM | Buy | 3742 | 3742 | 18.5132 | GCB | JP | DONE | A | B | INST | 0.02 | 2005041100H9 |
| ICST | 4/12/2005 10 | 31 15 AM | 4/12/2005 12 | 0 | 12:00 PM | Buy | 25000 | 12000 | 18.3187 | GRC | JP | PART | A | B | INST | 0.02 | 2.00504E+11 |
| ICST | 4/12/2005 10 | 39 25 AM | 4/12/2005 12 | 0 | 12:00 PM | Buy | 5000 | 3000 | 18.3187 | GCB | JP | PART | A | B | INST | 0.02 | 20050412008K |
| ICST | 4/14/2005 11 | 57 54 AM | 4/14/2005 12 | 0 | 12:00 PM | Sell | 80500 | 80500 | 18.3274 | GRC | JP | DONE | A | B | PIPR | 0.05 | 2005041400DB |
| ICST | 4/14/2005 11 | 58 1:00 AM | 4/14/2005 12 | 0 | 12:00 PM | Sell | 22742 | 22742 | 18.3274 | GCB | JP | DONE | A | B | PIPR | 0.05 | 2005041400DC |
| ICST | 4/14/2005 12 | 33 58 PM | 4/14/2005 12 | 0 | 12:00 PM | Buy | 8500 | 8500 | 18.28 | GCB | JP | DONE | A | B | MLCO | 0.05 | 2005041400EX |
| ICST | 4/15/2005 7 | 48 7:00 AM | 4/14/2005 12 | 0 | 12:00 PM | Buy | 6000 | 6000 | 18.5282 | GCB | MC | DONE | A | B | INST | 0.02 | 2.00504E+11 |
| ICST | 4/19/2005 3 | 54 9:00 PM | 4/19/2005 12 | 0 | 12:00 PM | Sell | 6000 | 6000 | 17.7671 | GCB | JP | DONE | A | B | INST | 0.02 | 2005041900LK |
| ICST | 4/19/2005 10 | 33 9:00 AM | 4/19/2005 12 | 0 | 12:00 PM | Buy | 200000 | 150000 | 17.885 | GRC | JP | PART | A | B | SBSH | 0.05 | 2.00504E+11 |
| ICST | 4/19/2005 10 | 33 16 AM | 4/19/2005 12 | 0 | 12:00 PM | Buy | 40000 | 20000 | 17.885 | GCB | JP | PART | A | B | SBSH | 0.05 | 2.00504E+11 |
| ICST | 4/20/2005 11 | 10 5:00 AM | 4/20/2005 12 | 0 | 12:00 PM | Sell | 50000 | 50000 | 18.521 | COM | AW | DONE | A | B | JPHQ | 0.05 | 2005042000BU |
| ICST | 4/20/2005 9 | 46 18 AM | 4/20/2005 9 | 46 18 AM | | Buy | 30100 | 30100 | 18.3905 | TOD | TD | DONE | A | B | TSCO | 0.005 | 200504200005F |
| ICST | 4/21/2005 3 | 36 22 PM | 4/21/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 18.6995 | GRC | JP | DONE | A | B | SILK | 0.02 | 2005042100NV |
| ICST | 4/21/2005 3 | 36 34 PM | 4/21/2005 12 | 0 | 12:00 PM | Buy | 5000 | 5000 | 18.6995 | GCB | JP | DONE | A | B | SILK | 0.02 | 2005042100NW |
| ICST | 4/21/2005 4 | 40 15 PM | 4/21/2005 12 | 0 | 12:00 PM | Buy | 3585 | 3585 | 18.4846 | GCB | JP | DONE | A | B | INST | 0.02 | 2005042100SS |

3

| Security | Timestamp | TradeDate | Side | Amount | Done | AvgPrc | Mgr | Trdr | Status | Alcd | Ntfy | Broker | Comm | TradeID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ICST | 4/21/2005 12 15 52 PM | 4/21/2005 12 0 12:00 PM | Buy | 3585 | 3585 | 18.4846 | GCB | JP | DONE | A | B | INST | 0.02 | 2005042100EQ |
| ICST | 4/21/2005 12 4 12:00 PM | 4/21/2005 12 4 12:00 PM | Sell | 50000 | 8515 | 18.7 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005042100DW |
| ICST | 4/22/2005 3 54 43 PM | 4/22/2005 12 0 12:00 PM | Buy | 15000 | 15000 | 18.3067 | GRC | JP | DONE | A | B | INST | 0.02 | 2005042200J6 |
| ICST | 4/22/2005 3 54 57 PM | 4/22/2005 12 0 12:00 PM | Buy | 2000 | 2000 | 18.3067 | GCB | JP | DONE | A | B | INST | 0.02 | 2005042200J7 |
| ICST | 4/25/2005 10 0 18 AM | 4/25/2005 10 0 18 AM | Buy | 58000 | 58000 | 18.1276 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050425005O |
| ICST | 4/25/2005 3 6 20 PM | 4/25/2005 12 0 12:00 PM | Sell | 25000 | 25000 | 18.1 | POA | JP | DONE | A | B | PACS | 0.04 | 20050425006G |
| ICST | 4/26/2005 8 21 38 AM | 4/25/2005 12 0 12:00 PM | Buy | 10000 | 10000 | 18.17 | BUJ | MC | DONE | A | B | INST | 0.02 | 20050426001D |
| ICST | 4/26/2005 11 46 15 AM | 4/26/2005 12 0 12:00 PM | Buy | 25000 | 25000 | 17.9868 | POA | JP | DONE | A | B | PALC | 0.03 | 20050426000DH |
| ICST | 4/28/2005 3 14 17 PM | 4/28/2005 12 0 12:00 PM | Buy | 25000 | 25000 | 17.9999 | POA | AW | DONE | A | B | SILK | 0.02 | 2005042800IL |
| ICST | 4/28/2005 10 18 28 AM | 4/28/2005 12 0 12:00 PM | Buy | 25000 | 25000 | 18.1052 | POA | AW | DONE | A | B | SILK | 0.02 | 20050428007Y |
| ICST | 4/28/2005 10 22 52 AM | 4/28/2005 12 0 12:00 PM | Sell | 58000 | 58000 | 18.1353 | GRC | MS | DONE | A | B | SBSH | 0.05 | 2.00504E+11 |
| ICST | 4/28/2005 10 23 9:00 AM | 4/28/2005 12 0 12:00 PM | Sell | 10000 | 10000 | 18.1353 | GCB | MS | DONE | A | B | SBSH | 0.05 | 2.00504E+11 |
| ICST | 4/28/2005 10 27 6:00 AM | 4/28/2005 12 0 12:00 PM | Sell | 34000 | 34000 | 17.9795 | GRC | MS | DONE | A | B | INST | 0.02 | 20050428008H |
| ICST | 4/28/2005 10 27 27 AM | 4/28/2005 12 0 12:00 PM | Sell | 6000 | 6000 | 17.9795 | GCB | MS | DONE | A | B | INST | 0.02 | 20050428008M |
| ICST | 4/28/2005 10 27 55 AM | 4/28/2005 12 0 12:00 PM | Sell | 6000 | 6000 | 18.1608 | GCB | MS | DONE | A | B | INST | 0.02 | 20050428008M |
| ICST | 4/28/2005 10 42 25 AM | 4/28/2005 12 0 12:00 PM | Sell | 10000 | 10000 | 17.8017 | BUJ | JP | DONE | A | B | PALC | 0.03 | 20050428009I |
| ICST | 4/29/2005 1 24 42 PM | 4/29/2005 1 24 42 PM | Buy | 10000 | 4260 | 18.0759 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005042900FJ |
| ICST | 4/29/2005 1 18 14 PM | 4/29/2005 12 0 12:00 PM | Buy | 25000 | 25000 | 18 | COM | AW | DONE | A | B | BEST | 0.05 | 2005042900F4 |
| ICST | 4/29/2005 1 17 41 PM | 4/29/2005 12 0 12:00 PM | Buy | 25000 | 25000 | 18.1 | COM | AW | DONE | A | B | DBKS | 0.05 | 2005042900H6 |
| ICST | 4/29/2005 2 56 35 PM | 4/29/2005 12 0 12:00 PM | Buy | 2700 | 2700 | 18.24 | GCB | MS | DONE | A | B | INST | 0.02 | 2005042900JC |
| ICST | 4/29/2005 2 56 55 PM | 4/29/2005 12 0 12:00 PM | Buy | 3700 | 3700 | 18.3 | GCB | MS | DONE | A | B | INST | 0.02 | 2005042900JE |
| ICST | 4/29/2005 3 7 36 PM | 4/29/2005 12 0 12:00 PM | Sell | 25000 | 25000 | 18.18 | COM | AW | DONE | A | B | OPCO | 0.03 | 2005042900K4 |
| ICST | 4/29/2005 6 12 42 PM | 4/29/2005 12 0 12:00 PM | Buy | 15000 | 15000 | 18.3 | GCB | MC | DONE | A | B | SILK | 0.02 | 2005042900PV |
| ICST | 4/29/2005 11 52 34 AM | 4/29/2005 12 0 12:00 PM | Buy | 100000 | 32000 | 17.8264 | GRC | JP | PART | A | B | SILK | 0.02 | 2005042900BD |
| ICST | 4/29/2005 11 52 42 AM | 4/29/2005 12 0 12:00 PM | Buy | 20000 | 8000 | 17.8264 | GCB | JP | PART | A | B | SILK | 0.02 | 2005042900BE |
| ICST | 4/29/2005 3 28 55 PM | 4/29/2005 3 28 55 PM | Buy | 25000 | 25000 | 18.212 | COM | IH | DONE | A | B | INST | 0.02 | 2005042900KV |
| ICST | 5/2/2005 8 55 18 AM | 5/2/2005 12 0 12:00 PM | Buy | 15000 | 15000 | 18.2061 | GCB | MC | DONE | A | B | INST | 0.02 | 20050502001I |
| ICST | 5/2/2005 10 7 37 AM | 5/2/2005 12 0 12:00 PM | Sell | 50000 | 10000 | 18.6 | GRC | JP | PART | A | B | INST | 0.02 | 20050502005K |
| ICST | 5/2/2005 10 48 46 AM | 5/2/2005 12 0 12:00 PM | Buy | 17700 | 17700 | 18.2416 | GRC | MS | DONE | A | B | INST | 0.02 | 20050502008N |
| ICST | 5/2/2005 10 49 3:00 AM | 5/2/2005 12 0 12:00 PM | Buy | 3547 | 3547 | 18.2416 | GCB | MS | DONE | A | B | INST | 0.02 | 20050502008O |
| ICST | 5/3/2005 7 4 55 AM | 5/2/2005 12 0 12:00 PM | Buy | 137150 | 137150 | 18.2297 | TOD | MD | DONE | A | B | TSCO | 0.005 | 2.00505E+11 |
| ICST | 5/3/2005 9 45 25 AM | 5/3/2005 9 45 25 AM | Buy | 9000 | 9000 | 18.22 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050503004M |
| ICST | 5/4/2005 10 5 40 AM | 5/4/2005 10 5 40 AM | Buy | 70035 | 70035 | 18.0628 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050504006Z |
| ICST | 5/4/2005 2 25 9:00 PM | 5/4/2005 12 0 12:00 PM | Buy | 15000 | 12500 | 18.1721 | GRC | MS | PART | A | B | INST | 0.02 | 20050504000JW |
| ICST | 5/4/2005 3 59 31 PM | 5/4/2005 12 0 12:00 PM | Buy | 3000 | 2500 | 18.1721 | GCB | MS | PART | A | B | INST | 0.02 | 20050504000P0 |
| ICST | 5/4/2005 4 12 31 PM | 5/4/2005 12 0 12:00 PM | Buy | 3200 | 3200 | 18.0631 | COM | AW | DONE | A | B | GFII | 0.015 | 20050504000Q4 |
| ICST | 5/5/2005 1 48 44 PM | 5/5/2005 1 48 44 PM | Buy | 25000 | 2300 | 18.91 | BCC | SW | PART | A | B | TSCO | 0.005 | 20050505000HK |
| ICST | 5/5/2005 10 4 21 AM | 5/5/2005 10 4 21 AM | Sell | 34128 | 34128 | 18.7493 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050505006H |
| ICST | 5/5/2005 1 21 55 PM | 5/5/2005 12 0 12:00 PM | Buy | 50000 | 50000 | 18.8661 | BUA | SW | DONE | A | B | GSCO | 0.05 | 20050505000GH |
| ICST | 5/5/2005 4 4 4:00 PM | 5/5/2005 12 0 12:00 PM | Sell | 50000 | 50000 | 18.8768 | COM | IH | DONE | A | B | GFII | 0.015 | 20050505000MK |
| ICST | 5/5/2005 11 33 11:00 AM | 5/5/2005 12 0 12:00 PM | Buy | 175000 | 100000 | 18.8661 | BCC | SW | PART | A | B | GSCO | 0.05 | 20050505000BJ |
| ICST | 5/5/2005 12 54 16 PM | 5/5/2005 12 0 12:00 PM | Buy | 100000 | 25000 | 18.59 | GRC | JP | PART | A | B | WARB | 0.05 | 20050505000ET |
| ICST | 5/5/2005 12 54 32 PM | 5/5/2005 12 0 12:00 PM | Buy | 20000 | 5000 | 18.59 | GCB | JP | PART | A | B | WARB | 0.05 | 20050505000EU |
| ICST | 5/6/2005 7 11 59 AM | 5/5/2005 12 0 12:00 PM | Buy | 63277 | 63277 | 18.05 | TOD | CW | DONE | A | B | TSCO | 0.005 | 2.00505E+11 |
| ICST | 5/6/2005 3 59 37 PM | 5/6/2005 12 0 12:00 PM | Buy | 21800 | 21800 | 19.06 | COM | AW | DONE | A | B | JEFF | 0.03 | 2005050600IV |
| ICST | 5/6/2005 4 51 57 PM | 5/6/2005 12 0 12:00 PM | Buy | 7100 | 7100 | 18.8 | BCC | MC | DONE | A | B | GSCO | 0.05 | 2005050600K4 |
| ICST | 5/6/2005 10 52 43 AM | 5/6/2005 12 0 12:00 PM | Sell | 50000 | 50000 | 19 | GRC | JP | DONE | A | B | MSCO | 0.05 | 20050506009C |
| ICST | 5/6/2005 10 52 58 AM | 5/6/2005 12 0 12:00 PM | Sell | 10000 | 10000 | 19 | GCB | JP | DONE | A | B | MSCO | 0.05 | 20050506009D |
| ICST | 5/10/2005 1 10 59 PM | 5/10/2005 12 0 12:00 PM | Sell | 50000 | 50000 | 19.1802 | GRC | JP | DONE | A | B | MSCO | 0.05 | 2005051000BD |
| ICST | 5/10/2005 1 11 7:00 PM | 5/10/2005 12 0 12:00 PM | Sell | 10000 | 10000 | 19.1802 | GCB | JP | DONE | A | B | MSCO | 0.05 | 2005051000BE |
| ICST | 5/10/2005 2 39 51 PM | 5/10/2005 2 39 51 PM | Buy | 50000 | 17327 | 19.0233 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005051000DR |
| ICST | 5/11/2005 10 4 1:00 AM | 5/11/2005 10 4 1:00 AM | Buy | 33000 | 33000 | 18.84 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2.00505E+11 |
| ICST | 5/11/2005 2 51 40 PM | 5/11/2005 12 0 12:00 PM | Buy | 70000 | 70000 | 19.19 | COM | JP | DONE | A | B | PALC | 0.01 | 2005051100FK |

| Security | Timestamp | | | TradeDate | | | Side | Amount | Done | AvgPrc | Mgr | Trdr | Status | Alcd | Ntfy | Broker | Comm | TradeID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ICST | 5/11/2005 2 | 52 | 12:00 PM | 5/11/2005 12 | 0 | 12:00 PM | Sell | 70000 | 70000 | 19.19 | GRC | JP | DONE | A | B | PALC | 0.01 | 2005051100FL |
| ICST | 5/11/2005 2 | 52 41 PM | | 5/11/2005 12 | 0 | 12:00 PM | Buy | 55000 | 55000 | 19.0956 | COM | IH | DONE | A | B | LEHM | 0.05 | 2005051100FM |
| ICST | 5/11/2005 2 | 53 43 PM | | 5/11/2005 12 | 0 | 12:00 PM | Sell | 5000 | 5000 | 19.19 | GRC | JP | DONE | A | B | MSCO | 0.05 | 2005051100FN |
| ICST | 5/11/2005 2 | 53 51 PM | | 5/11/2005 12 | 0 | 12:00 PM | Sell | 15000 | 15000 | 19.19 | GCB | JP | DONE | A | B | MSCO | 0.05 | 2005051100FO |
| ICST | 5/12/2005 3 | 55 24 PM | | 5/12/2005 12 | 0 | 12:00 PM | Buy | 50000 | 50000 | 18.9669 | GRC | IH | DONE | A | B | JPHQ | 0.05 | 2005051200IX |
| ICST | 5/12/2005 3 | 55 50 PM | | 5/12/2005 12 | 0 | 12:00 PM | Buy | 15000 | 15000 | 18.9669 | GCB | IH | DONE | A | B | JPHQ | 0.05 | 2005051200IZ |
| ICST | 5/12/2005 10 | 38 | 2:00 AM | 5/12/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 19.178 | COM | IH | DONE | A | B | JPHQ | 0.05 | 20050512007Z |
| ICST | 5/12/2005 12 | 58 28 PM | | 5/12/2005 12 | 0 | 12:00 PM | Sell | 75000 | 25000 | 19 | GRC | JP | PART | A | B | LEHM | 0.05 | 2005051200CO |
| ICST | 5/13/2005 10 | 11 15 AM | | 5/13/2005 12 | 0 | 12:00 PM | Sell | 75000 | 75000 | 19.8588 | GRC | JP | DONE | A | B | GSCO | 0.05 | 2.00505E+11 |
| ICST | 5/13/2005 10 | 11 25 AM | | 5/13/2005 12 | 0 | 12:00 PM | Sell | 15000 | 15000 | 19.8588 | GCB | JP | DONE | A | B | GSCO | 0.05 | 2.00505E+11 |
| ICST | 5/13/2005 10 | 17 48 AM | | 5/13/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 19.63 | COM | IH | DONE | A | B | LEHM | 0.05 | 20050513006P |
| ICST | 5/13/2005 12 | 38 57 PM | | 5/13/2005 12 | 0 | 12:00 PM | Sell | 34900 | 34900 | 19.97 | BCC | SW | DONE | A | B | LEHM | 0.05 | 2005051300CM |
| ICST | 5/13/2005 12 | 45 28 PM | | 5/13/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 19.9 | COM | JP | DONE | A | B | SBSH | 0.05 | 2005051300D0 |
| ICST | 5/13/2005 9 | 44 21 AM | | 5/13/2005 9 | 44 21 AM | | Sell | 122528 | 122528 | 19.7758 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050513003W |
| ICST | 5/16/2005 3 | 1 21 PM | | 5/16/2005 3 | 1 21 PM | | Sell | 17000 | 17000 | 19.9808 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005051600DJ |
| ICST | 5/17/2005 11 | 30 | 11:00 AM | 5/17/2005 12 | 0 | 12:00 PM | Sell | 24500 | 24500 | 20 | BCC | SW | DONE | A | B | LEHM | 0.05 | 2.00505E+11 |
| ICST | 5/17/2005 11 | 30 28 AM | | 5/17/2005 12 | 0 | 12:00 PM | Sell | 15000 | 15000 | 20 | BUA | SW | DONE | A | B | LEHM | 0.05 | 2.00505E+11 |
| ICST | 5/17/2005 9 | 54 38 AM | | 5/17/2005 9 | 54 38 AM | | Sell | 60000 | 13713 | 20.18 | TOD | TD | PART | A | B | TSCO | 0.005 | 20050517004D |
| ICST | 5/18/2005 10 | 30 | 7:00 AM | 5/18/2005 10 | 30 | 7:00 AM | Sell | 276384 | 276384 | 20.696 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2.00505E+11 |
| ICST | 5/18/2005 1 | 28 29 PM | | 5/18/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 20.7571 | COM | IH | DONE | A | B | LEHM | 0.05 | 2005051800G0 |
| ICST | 5/18/2005 1 | 49 58 PM | | 5/18/2005 12 | 0 | 12:00 PM | Sell | 10000 | 10000 | 20.8429 | BUA | SW | DONE | A | B | ADAM | 0.05 | 2005051800GV |
| ICST | 5/18/2005 1 | 50 | 9:00 PM | 5/18/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 20.8429 | BCC | SW | DONE | A | B | ADAM | 0.05 | 2005051800GW |
| ICST | 5/18/2005 11 | 51 24 AM | | 5/18/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 20.589 | COM | IH | DONE | A | B | LEHM | 0.05 | 2005051800BH |
| ICST | 5/18/2005 2 | 32 38 PM | | 5/18/2005 2 | 32 38 PM | | Sell | 24616 | 24616 | 20.8419 | BUA | SW | DONE | A | B | TSCO | 0.005 | 2005051800IM |
| ICST | 5/18/2005 2 | 40 | 11:00 PM | 5/18/2005 2 | 40 | 11:00 PM | Sell | 384 | 384 | 20.79 | BUA | SW | DONE | A | B | TSCO | 0.005 | 2005051800IX |
| ICST | 5/19/2005 4 | 0 56 PM | | 5/19/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 20.58 | COM | IH | DONE | A | B | BOFA | 0.05 | 2005051900KU |
| ICST | 5/19/2005 12 | 14 | 1:00 PM | 5/19/2005 12 | 14 | 1:00 PM | Buy | 53000 | 300 | 20.47 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005051900CO |
| ICST | 5/19/2005 9 | 57 28 AM | | 5/19/2005 9 | 57 28 AM | | Sell | 70000 | 23300 | 20.9606 | TOD | TD | PART | A | B | TSCO | 0.005 | 20050519005A |
| ICST | 5/20/2005 2 | 30 21 PM | | 5/20/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 20.52 | GRC | MS | DONE | A | B | INST | 0.02 | 2005052000ER |
| ICST | 5/20/2005 2 | 32 | 8:00 PM | 5/20/2005 12 | 0 | 12:00 PM | Buy | 5000 | 5000 | 20.52 | GCB | MS | DONE | A | B | INST | 0.02 | 2005052000ES |
| ICST | 5/20/2005 9 | 40 45 AM | | 5/20/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 20.38 | COM | JP | DONE | A | B | LEHM | 0.05 | 2005052000ZX |
| ICST | 5/20/2005 12 | 51 | 8:00 PM | 5/20/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 20.4431 | COM | MS | DONE | A | B | DBKS | 0.05 | 2005052000BG |
| ICST | 5/24/2005 3 | 59 | 9:00 PM | 5/24/2005 12 | 0 | 12:00 PM | Sell | 50000 | 50000 | 20.841 | COM | IH | DONE | A | B | SBSH | 0.05 | 2005052400IE |
| ICST | 5/24/2005 2 | 28 34 PM | | 5/24/2005 2 | 28 34 PM | | Sell | 47000 | 47000 | 20.65 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005052400FG |
| ICST | 5/25/2005 11 | 10 | 10:00 AM | 5/25/2005 12 | 0 | 12:00 PM | Buy | 2000 | 2000 | 20.965 | GCB | MS | DONE | A | B | INST | 0.02 | 2005052500AK |
| ICST | 5/25/2005 9 | 56 34 AM | | 5/25/2005 9 | 56 34 AM | | Buy | 69500 | 69500 | 20.4607 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050525005J |
| ICST | 5/26/2005 10 | 21 27 AM | | 5/26/2005 10 | 21 27 AM | | Sell | 70000 | 70000 | 20.7948 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050526007K |
| ICST | 5/26/2005 1 | 57 39 PM | | 5/26/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 20.78 | COM | IH | DONE | A | B | MSCO | 0.05 | 2005052600G4 |
| ICST | 5/26/2005 3 | 44 46 PM | | 5/26/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 20.8122 | GRC | MS | DONE | A | B | INST | 0.02 | 2005052600JM |
| ICST | 5/26/2005 3 | 45 | 12:00 PM | 5/26/2005 12 | 0 | 12:00 PM | Buy | 5000 | 5000 | 20.8122 | GCB | MS | DONE | A | B | INST | 0.02 | 2005052600JN |
| ICST | 5/26/2005 4 | 2 16 PM | | 5/26/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 20.9133 | GRC | IH | DONE | A | B | JPHQ | 0.05 | 2005052600KI |
| ICST | 5/26/2005 4 | 2 35 PM | | 5/26/2005 12 | 0 | 12:00 PM | Sell | 5000 | 5000 | 20.9133 | GCB | IH | DONE | A | B | JPHQ | 0.05 | 2005052600KJ |
| ICST | 5/26/2005 8 | 14 31 AM | | 5/26/2005 12 | 0 | 12:00 PM | Buy | 10000 | 10000 | 20.5827 | GRC | MC | DONE | A | B | INST | 0.02 | 2005052600IF |
| ICST | 5/26/2005 10 | 10 35 AM | | 5/26/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 20.6035 | GRC | JP | DONE | A | B | LEHM | 0.05 | 2005052600006Q |
| ICST | 5/26/2005 10 | 10 54 AM | | 5/26/2005 12 | 0 | 12:00 PM | Sell | 5000 | 5000 | 20.6035 | GCB | JP | DONE | A | B | LEHM | 0.05 | 2005052600006R |
| ICST | 5/26/2005 10 | 35 26 AM | | 5/26/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 20.81 | COM | IH | DONE | A | B | SBSH | 0.05 | 20050526008M |
| ICST | 5/26/2005 11 | 55 38 AM | | 5/26/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 20.812 | COM | IH | DONE | A | B | JPHQ | 0.05 | 2005052600CF |
| ICST | 5/27/2005 11 | 59 | 5:00 AM | 5/27/2005 11 | 59 | 5:00 AM | Sell | 20000 | 20000 | 20.9994 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050527008E |
| ICST | 5/31/2005 1 | 6 20 PM | | 5/31/2005 1 | 6 20 PM | | Sell | 80000 | 1400 | 21.21 | TOD | TD | PART | A | B | TSCO | 0.005 | 20050531009P |
| ICST | 5/31/2005 1 | 13 30 PM | | 5/31/2005 1 | 13 31 PM | | Sell | 80000 | 700 | 21.2043 | TOD | TD | PART | A | B | TSCO | 0.005 | 20050531009V |
| ICST | 5/31/2005 1 | 20 55 PM | | 5/31/2005 1 | 20 55 PM | | Sell | 80000 | 4100 | 21.2127 | TOD | TD | PART | A | B | TSCO | 0.005 | 20050531009X |
| ICST | 5/31/2005 1 | 26 30 PM | | 5/31/2005 1 | 26 30 PM | | Sell | 80000 | 10000 | 21.2388 | TOD | TD | PART | A | B | TSCO | 0.005 | 20050531009Z |
| ICST | 5/31/2005 9 | 59 51 AM | | 5/31/2005 12 | 0 | 12:00 PM | Sell | 22000 | 22000 | 21.1577 | BCC | SW | DONE | A | B | LEHM | 0.05 | 20050531003X |

| Security | Timestamp | | TradeDate | | | Side | Amount | Done | AvgPrc | Mgr | Trdr | Status | Alcd | Ntfy | Broker | Comm | TradeID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ICST | 5/31/2005 2 | 1 25 PM | 5/31/2005 2 | | 1 25 PM | Sell | 80000 | 3100 | 21.2087 | TOD | TD | PART | A | B | TSCO | 0.005 | 200505310081 |
| ICST | 5/31/2005 9 | 35 51 AM | 5/31/2005 9 | | 35 51 AM | Sell | 80000 | 7901 | 21.216 | TOD | TD | PART | A | B | TSCO | 0.005 | 20050531001W |
| ICST | 5/31/2005 9 | 59 35 AM | 5/31/2005 9 | | 59 35 AM | Sell | 3000 | 3000 | 21.0967 | BCC | SW | DONE | A | B | TSCO | 0.005 | 20050531003W |
| ICST | 6/1/2005 10 | 14 27 AM | 6/1/2005 10 | | 14 27 AM | Sell | 53200 | 1300 | 21.25 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005060100B |
| ICST | 6/1/2005 10 | 18   5:00 AM | 6/1/2005 10 | 0 | 12:00 PM | Buy | 35000 | 35000 | 21.1277 | GRC | MS | DONE | A | B | INST | 0.02 | 20050601006O |
| ICST | 6/1/2005 10 | 18 18 AM | 6/1/2005 12 | 0 | 12:00 PM | Buy | 7000 | 7000 | 21.1277 | GCB | MS | DONE | A | B | INST | 0.02 | 20050601006Q |
| ICST | 6/1/2005 10 | 33 36 AM | 6/1/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 21.0876 | COM | IH | DONE | A | B | MLCO | 0.05 | 2.00506E+11 |
| ICST | 6/2/2005 10 | 33 54 AM | 6/2/2005 10 | 33 54 | AM | Sell | 151000 | 2725 | 21.0529 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005062006J |
| ICST | 6/2/2005 12 | 47  12:00 AM | 6/2/2005 12 | 0 | 12:00 PM | Buy | 10000 | 10000 | 21.0502 | GRC | MS | DONE | A | B | INST | 0.02 | 2.00506E+11 |
| ICST | 6/2/2005 10 | 47 27 AM | 6/2/2005 12 | 0 | 12:00 PM | Buy | 2000 | 2000 | 21.0502 | GCB | MS | DONE | A | B | INST | 0.02 | 2005060200 7A |
| ICST | 6/3/2005 4 | 1 19 PM | 6/3/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 20.6 | COM | IH | DONE | A | B | JPHQ | 0.05 | 2005063000LY |
| ICST | 6/6/2005 11 | 1  10:00 AM | 6/6/2005 11 | 1 | 10:00 AM | Buy | 52000 | 600 | 20.2 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005060600BL |
| ICST | 6/6/2005 4 | 3  10:00 PM | 6/6/2005 12 | 0 | 12:00 PM | Buy | 25000 | 25000 | 20.36 | COM | IH | DONE | A | B | WARB | 0.05 | 2005060600GY |
| ICST | 6/6/2005 11 | 52 55 AM | 6/6/2005 12 | 0 | 12:00 PM | Buy | 150000 | 150000 | 20.3105 | GRC | JP | DONE | A | B | BOFA | 0.05 | 2005060600AA |
| ICST | 6/6/2005 11 | 53   3:00 AM | 6/6/2005 12 | 0 | 12:00 PM | Buy | 30000 | 30000 | 20.3105 | GCB | JP | DONE | A | B | BOFA | 0.05 | 2005060600AB |
| ICST | 6/7/2005 10 | 0 23 AM | 6/7/2005 10 | 0 23 | AM | Sell | 53700 | 53700 | 20.6807 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050607003X |
| ICST | 6/7/2005 1 | 10   9:00 PM | 6/7/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 21 | COM | IH | DONE | A | B | LEHM | 0.05 | 2005060700BV |
| ICST | 6/7/2005 10 | 19 18 AM | 6/7/2005 12 | 0 | 12:00 PM | Buy | 15000 | 15000 | 20.7445 | GRC | MS | DONE | A | B | INST | 0.02 | 2005060700 5D |
| ICST | 6/7/2005 10 | 20 45 AM | 6/7/2005 12 | 0 | 12:00 PM | Buy | 3000 | 3000 | 20.7445 | GCB | MS | DONE | A | B | INST | 0.02 | 2005060700 5G |
| ICST | 6/8/2005 4 | 2   5:00 PM | 6/8/2005 12 | 0 | 12:00 PM | Buy | 12500 | 12500 | 20.1 | COM | IH | DONE | A | B | JPHQ | 0.05 | 2005060800IF |
| ICST | 6/8/2005 9 | 50  12:00 AM | 6/8/2005 12 | 0 | 12:00 PM | Sell | 67871 | 67871 | 20.92 | GRC | MS | DONE | A | B | LEHM | 0.05 | 2005060800 3Z |
| ICST | 6/8/2005 9 | 52 23 AM | 6/8/2005 12 | 0 | 12:00 PM | Sell | 16129 | 16129 | 20.92 | GCB | MS | DONE | A | B | LEHM | 0.05 | 2.00506E+11 |
| ICST | 6/9/2005 2 | 15 18 PM | 6/9/2005 2 | 15 19 | PM | Buy | 35000 | 17566 | 20.14 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005060900EO |
| ICST | 6/10/2005 2 | 10 41 PM | 6/10/2005 12 | 0 | 12:00 PM | Buy | 125000 | 125000 | 19.5973 | GRC | JP | DONE | A | B | LEHM | 0.05 | 2005061000DZ |
| ICST | 6/10/2005 2 | 10 49 PM | 6/10/2005 12 | 0 | 12:00 PM | Buy | 23500 | 23500 | 19.5973 | GCB | JP | DONE | A | B | LEHM | 0.05 | 2.01E+09 |
| ICST | 6/10/2005 12 | 44   1:00 PM | 6/10/2005 12 | 44 | 1:00 PM | Buy | 30000 | 30000 | 19.6992 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2005061000BA |
| ICST | 6/13/2005 9 | 45 42 AM | 6/13/2005 9 | 45 42 | AM | Buy | 149000 | 77315 | 19.4854 | TOD | TD | PART | A | B | TSCO | 0.005 | 2.00506E+11 |
| ICST | 6/14/2005 9 | 36 29 AM | 6/14/2005 9 | 36 29 | AM | Buy | 150000 | 150000 | 19.3348 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050614002G |
| ICST | 6/15/2005 7 | 53   8:00 AM | 6/14/2005 12 | 0 | 12:00 PM | Buy | 12500 | 12500 | 19.314 | COM | MC | DONE | A | B | LEHM | 0.05 | 2.00506E+11 |
| ICST | 6/15/2005 7 | 59 41 AM | 6/14/2005 12 | 0 | 12:00 PM | Buy | 15000 | 15000 | 19.36 | BUJ | MC | DONE | A | B | LEHM | 0.05 | 2.00506E+11 |
| ICST | 6/15/2005 10 | 2   1:00 AM | 6/15/2005 10 | 2 | 1:00 AM | Buy | 130000 | 72079 | 19.201 | TOD | TD | PART | A | B | TSCO | 0.005 | 20050615004B |
| ICST | 6/15/2005 2 | 44 27 PM | 6/15/2005 12 | 0 | 12:00 PM | Buy | 15000 | 15000 | 19 | COM | IH | DONE | A | B | MWCC | 0.06 | 2005061500G0 |
| ICST | 6/15/2005 3 | 16 13 PM | 6/15/2005 12 | 0 | 12:00 PM | Sell | 15000 | 15000 | 19.7017 | COM | IH | DONE | A | B | MWCC | 0.06 | 2005061500HB |
| ICST | 6/15/2005 3 | 51   7:00 PM | 6/15/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 19.713 | COM | IH | DONE | A | B | LEHM | 0.05 | 2005061500JM |
| ICST | 6/15/2005 3 | 26 23 PM | 6/15/2005 3 | 26 23 | PM | Sell | 42000 | 3600 | 19.8411 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005061500HQ |
| ICST | 6/16/2005 1 | 56 37 PM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 50000 | 50000 | 21.967 | POA | JP | DONE | A | B | LEHM | 0.05 | 2005061600ET |
| ICST | 6/16/2005 11 | 45 38 AM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 480000 | 380000 | 22.2681 | GRC | JP | PART | A | B | MSCO | 0.05 | 2005061600AE |
| ICST | 6/16/2005 11 | 47  11:00 AM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 75000 | 75000 | 22.2681 | GCB | JP | DONE | A | B | MSCO | 0.05 | 2005061600AF |
| ICST | 6/16/2005 11 | 47 33 AM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 450000 | 350000 | 22.2681 | TOD | JP | PART | A | B | MSCO | 0.05 | 2005061600AG |
| ICST | 6/16/2005 11 | 47 51 AM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 90000 | 90000 | 22.2681 | COM | JP | DONE | A | B | MSCO | 0.05 | 2005061600AH |
| ICST | 6/16/2005 11 | 48  12:00 AM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 15000 | 15000 | 22.2681 | EXC | JP | DONE | A | B | MSCO | 0.05 | 2005061600AI |
| ICST | 6/16/2005 11 | 49 24 AM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 204000 | 204000 | 22.14 | GRC | JP | DONE | A | B | LEHM | 0.02 | 2005061600AL |
| ICST | 6/16/2005 11 | 49 53 AM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 40000 | 40000 | 22.14 | GCB | JP | DONE | A | B | LEHM | 0.02 | 2005061600AN |
| ICST | 6/16/2005 11 | 50  10:00 AM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 229000 | 229000 | 22.14 | TOD | JP | DONE | A | B | LEHM | 0.02 | 2005061600AO |
| ICST | 6/16/2005 11 | 50 31 AM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 22000 | 22000 | 22.14 | COM | JP | DONE | A | B | LEHM | 0.02 | 2005061600AP |
| ICST | 6/16/2005 11 | 50 51 AM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 5000 | 5000 | 22.14 | EXC | JP | DONE | A | B | LEHM | 0.02 | 2005061600AQ |
| ICST | 6/16/2005 12 | 53 18 PM | 6/16/2005 12 | 0 | 12:00 PM | Sell | 4200 | 4200 | 22.5 | EXC | JP | DONE | A | B | INST | 0.02 | 2005061600CQ |
| ICST | 6/16/2005 4 | 2 41 PM | 6/16/2005 4 | | 2 41 PM | Sell | 10300 | 5206 | 21.82 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005061600JN |
| ICST | 6/16/2005 5 | 8 31 PM | 6/16/2005 5 | | 8 31 PM | Sell | 10300 | 1000 | 21.82 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005061600M3 |
| ICST | 6/16/2005 7 | 30  11:00 AM | 6/16/2005 7 | 30 | 11:00 AM | Buy | 100 | 100 | 21.5 | TOD | TD | DONE | A | B | TSCO | 0.005 | 2.00506E+11 |
| ICST | 6/17/2005 10 | 18  12:00 AM | 6/17/2005 10 | 18 | 12:00 AM | Buy | 156000 | 800 | 21.17 | TOD | TD | PART | A | B | TSCO | 0.005 | 20050617006X |
| ICST | 6/20/2005 1 | 39 26 PM | 6/20/2005 1 | | 39 26 PM | Buy | 56000 | 6872 | 21.58 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005062000DA |
| ICST | 6/21/2005 3 | 28 23 PM | 6/21/2005 12 | 0 | 12:00 PM | Sell | 115003 | 25000 | 21.6 | GCB | JP | PART | A | B | LEHM | 0.05 | 2005062100GJ |

| Security | Timestamp | | | TradeDate | | | Side | Amount | Done | AvgPrc | Mgr | Trdr | Status | Alcd | Ntfy | Broker | Comm | TradeID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ICST | 6/21/2005 3 | 29 | 26 PM | 6/21/2005 12 | 0 | 12:00 PM | Sell | 50000 | 15000 | 21.6 | COM | JP | PART | A | B | LEHM | 0.05 | 2005062100GK |
| ICST | 6/21/2005 10 | 58 | 49 AM | 6/21/2005 12 | 0 | 12:00 PM | Sell | 438314 | 110000 | 21.6 | GRC | JP | PART | A | B | LEHM | 0.05 | 20050621008D |
| ICST | 6/21/2005 11 | 12 | 1:00 AM | 6/21/2005 12 | 0 | 12:00 PM | Sell | 200000 | 50000 | 21.6 | TOD | JP | PART | A | B | LEHM | 0.05 | 20050621008X |
| ICST | 6/22/2005 10 | 44 | 27 AM | 6/22/2005 10 | 44 | 27 AM | Buy | 89000 | 89000 | 21.4343 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050622007H |
| ICST | 6/23/2005 4 | 26 | 51 PM | 6/23/2005 12 | 0 | 12:00 PM | Sell | 100000 | 100000 | 21.6015 | GRC | JP | DONE | A | B | GSCO | 0.05 | 2005062300R1 |
| ICST | 6/23/2005 4 | 27 | 3:00 PM | 6/23/2005 12 | 0 | 12:00 PM | Sell | 26900 | 26900 | 21.6015 | GCB | JP | DONE | A | B | GSCO | 0.05 | 2005062300R2 |
| ICST | 6/23/2005 4 | 27 | 19 PM | 6/23/2005 12 | 0 | 12:00 PM | Sell | 60000 | 60000 | 21.6015 | TOD | JP | DONE | A | B | GSCO | 0.05 | 2005062300R3 |
| ICST | 6/23/2005 4 | 27 | 56 PM | 6/23/2005 12 | 0 | 12:00 PM | Sell | 25000 | 25000 | 21.65 | COM | JP | DONE | A | B | GSCO | 0.05 | 2005062300R5 |
| ICST | 6/23/2005 10 | 57 | 55 AM | 6/23/2005 12 | 0 | 12:00 PM | Sell | 15000 | 15000 | 21.4826 | BUJ | JP | DONE | A | B | PALC | 0.03 | 20050623009W |
| ICST | 6/28/2005 3 | 23 | 33 PM | 6/28/2005 12 | 0 | 12:00 PM | Sell | 88000 | 88000 | 20.6448 | GRC | JP | DONE | A | B | WARB | 0.05 | 2005062800GK |
| ICST | 6/28/2005 10 | 25 | 36 AM | 6/28/2005 12 | 0 | 12:00 PM | Sell | 478314 | 478314 | 20.6448 | GRC | JP | DONE | A | B | WARB | 0.05 | 20050628006T |
| ICST | 6/28/2005 10 | 25 | 50 AM | 6/28/2005 12 | 0 | 12:00 PM | Sell | 88103 | 88103 | 20.6448 | GCB | JP | DONE | A | B | WARB | 0.05 | 20050628006U |
| ICST | 6/28/2005 10 | 26 | 41 AM | 6/28/2005 12 | 0 | 12:00 PM | Sell | 173000 | 173000 | 20.6448 | COM | JP | DONE | A | B | WARB | 0.05 | 20050628006X |
| ICST | 6/29/2005 11 | 56 | 45 AM | 6/29/2005 11 | 56 | 45 AM | Sell | 40800 | 24500 | 20.87 | TOD | TD | PART | A | B | TSCO | 0.005 | 2005062900AA |
| ICST | 6/29/2005 10 | 19 | 39 AM | 6/29/2005 12 | 0 | 12:00 PM | Sell | 50000 | 50000 | 20.76 | POA | JP | DONE | A | B | GSCO | 0.05 | 20050629006C |
| ICST | 6/30/2005 9 | 43 | 32 AM | 6/30/2005 9 | 43 | 32 AM | Sell | 116000 | 116000 | 20.8989 | TOD | TD | DONE | A | B | TSCO | 0.005 | 20050630002W |

7

# DX-4682M

**POLYCOM**

| Transcation in Polycom Stock by Raj Rajaratnam for Galleon on December 21, 2005 (Manager Code: GRC) (DX 4688) | | | |
|---|---|---|---|
| Date/Time | Code | Transaction | Amount |
| 12/21/2005 2:00 PM | GRC | Buy | 40,000 |



DEFENDANT'S EXHIBIT
ALL-STATE LEGAL®
DX 4682 M
09 C. 1184 (RJH)

GOV-00007724